LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 11th Floor
New York, New York 10022
By: Moshe Maimon
    Danielle Disporto
Telephone: (212) 605-6200
Fax: (212) 605-6290

SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Arnold C. Lakind
    Robert L. Lakind
Telephone: (609) 275-0400
Fax: (609) 275-4511


Attorneys For Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, and LINDA A. RUSSELL, et al., | Case Number: _____ |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| vs. | |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | |
| Defendant. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

COMPLAINT ........................................................................................................... 1

OVERVIEW ............................................................................................................. 1

I.    JURISDICTION AND VENUE ................................................................. 4

II.    NATURE OF THE ACTION ..................................................................... 4

III.    PARTIES ............................................................................................ 7

IV.    BACKGROUND INFORMATION ABOUT THE INVESTMENT
MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b).............. 10

V.    INHERENT CONFLICT IN THE STRUCTURE OF MUTUAL FUNDS
GENERALLY AS EXEMPLIFIED BY THE HARTFORD FUND COMPLEX ........ 15

VI.    FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIM ................. 20

    A.    THE NATURE AND QUALITY OF THE INVESTMENT
MANAGEMENT AND DISTRIBUTION SERVICES
PERFORMED BY HIFSCO DO NOT JUSTIFY HIFSCO'S FEE ..................... 21

        1.    Investment Management Services ................................................. 21

        2.    12b-1 Distribution Services ......................................................... 27

    B.    THE HARTFORD FUNDS' BOARDS OF DIRECTORS WERE
NOT ACTING  CONSCIENTIOUSLY IN APPROVING THE
INVESTMENT MANAGEMENT AGREEMENTS AND RULE 12b-1
DISTRIBUTION PLANS ................................................................... 32

        1.    Investment Management Agreements........................................... 33

        2.    12b-1 Distribution Plans ............................................................. 37

    C.    COMPARATIVE FEE STRUCTURES CHARGED TO
NON-MUTUAL FUND CUSTOMERS AND OTHER MUTUAL
FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT
SERVICES DEMONSTRATE THAT HIFSCO HAS CHARGED
THE FUNDS EXCESSIVE FEES THAT BREACHED
HIFSCO'S FIDUCIARY DUTY ........................................................ 40

        1.    Fee Structure of Defendant's Sub-Advisors ................................. 40

  2. Fees Charged to Other Mutual Fund Complexes For Similar
   Investment Management Services ................................................................ 41

  3. Fees Charged By Hartford to Institutional Clients for Similar
   Investment Management Services ................................................................ 45

 D. THE ECONOMIES OF SCALE ENJOYED BY HIFSCO IN
  CONNECTION WITH THE INVESTMENT MANAGEMENT AND
  DISTRIBUTION SERVICES WERE NOT PASSED ON TO THE
  PLAINITFFS AND OTHER SHAREHOLDERS OF THE FUNDS AS
  REQUIRED UNDER SECTION 36(b) BUT WERE KEPT BY
  DEFENDANT HIFSCO IN VIOLATION OF ITS FIDUCIARY DUTY ........... 48

 E. THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT
  MANAGEMENT AND DISTRIBUTION SERVICES DID NOT
  JUSTIFY HIFSCO'S EXCESSIVE FEE............................................................ 54

COUNT I:  AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b)
DERIVATIVELYON BEHALF OF THE COUNT I FUNDS
(Investment Management Fees)...................................................................................... 59

COUNT II:  AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b)
DERIVATIVELY ON BEHALF OF THE HARTFORD FUNDS
(Unreasonable and Excessive Rule 12b-1 Distribution Fees and Extraction of
Additional Compensation for Investment Management Services) ............................................. 60

**COMPLAINT**

Plaintiff JENNIFER L. KASILAG ("Kasilag"), whose street address is 35 Oklahoma Trail, Hopatcong, New Jersey, 07843, Plaintiff LOUIS MELLINGER ("Mellinger"), whose street address is 28 Mockingbird, Hackettstown, New Jersey, 07840, Plaintiff JUDITH M. MENENDEZ ("Menendez"), whose street address is 93 Eyland Avenue, Succasunna, New Jersey, 07876, Plaintiff JACQUELINE M. ROBINSON ("Robinson"), whose street address is 45 Livingston Road, Morristown, New Jersey, 07960, and Plaintiff LINDA A. RUSSELL ("Russell"), whose street address is 52 Birch Ridge Road, Blairstown, New Jersey 07825 (collectively, "Plaintiffs") bring this action on behalf of and for the benefit of: the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund, and the Hartford Money Market Fund (collectively, "the Hartford Funds" or "Funds"), and sue Hartford Investment Financial Services, LLC ("Defendant" or "HIFSCO"), an indirect wholly-owned subsidiary of Hartford Financial Services Group, Inc. ("HIG"), a company having shares listed on the New York Stock Exchange.

**OVERVIEW**

This is a derivative action arising out of Defendant HIFSCO's receipt of improper and excessive management and/or adviser and distribution fees on Plaintiffs' investments in Hartford Funds in breach of its fiduciary duty under 36(b) of the Investment Company Act of 1940 ("ICA"), as amended, 15 U.S.C. § 80a-35(b) (hereinafter "Section 36(b)" or "§ 36(b)").  In order to violate Section 36(b) of the ICA, the adviser must charge a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."

1

Like roughly 90 million Americans who are planning ahead for retirement, Plaintiffs have invested in mutual funds through their employer-sponsored Simple IRA program.  As part of that program, Plaintiffs have invested in Hartford Mutual Funds.  Because of the excessive management and distribution fees that HIFSCO charges and receives in connection with Plaintiffs' investments in the Funds, however, Plaintiffs' (and all Hartford Fund shareholders') retirement benefits have been and continue to be diminished by staggering amounts.

Plaintiffs' investment returns are diminished because Defendant charges and collects two fees that are excessive under § 36(b) of the ICA:  (1) management and/or advisory fees and (2) distribution fees.  The management/advisory fees are excessive because Defendant sub-contracts out the majority of the management services, for which the Funds pay a separate sub-advisory fee, and then collects a "management fee" for itself for performing little, if any, work.  In fact, for one Fund, the management fee was up to 3.5 times the amount of the sub-advisory fee in 2009 alone.

Distribution fees are fees that the Securities Exchange Commission (promulgated through its Rule 12b-1, 17 C.F.R. § 270-12b-1) determined are to be used for marketing and distribution services.  The fees are to be used primarily to attract new fund shareholders in order to create economies of scale that should allow advisers to provide the same quality and nature of services at dramatically lower costs since the costs of managing a fund does not increase proportionately with an increase in fund shareholders.  Here, the distribution (or "12b-1") fees are excessive because, *inter alia*, they are not tied to any distribution activities and no economies of scale are created or passed on to the Funds.  As an example of HIFSCO's 36(b) violations, its Class B shareholders are paying 12b-1 fees despite the class having been closed to new investments since September 30, 2009.

2

As explained in detail below, the management and 12b-1 distribution fees collected by HIFSCO from the Plaintiffs are excessive and thus a breach of HIFSCO's fiduciary duty under § 36(b).  The criteria for determining a § 36(b) breach of fiduciary duty is not laid out in the statute.  Rather, the Supreme Court has set forth the following factors to use when determining whether a fee is excessive:

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

As discussed fully below, an examination of these factors demonstrates that the management and 12b-1 distribution fees charged to the Hartford Funds breached, and continue to breach, HIFSCO's fiduciary duty to the Funds.  The advisory and distribution fees received by HIFSCO were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's length bargaining, and were thus unfair to Plaintiffs and the other shareholders of the Funds.

The Plaintiffs seek to rescind the Investment Management Agreements[1] and Distribution Plans between Defendant and the Hartford Funds and to recover the total fees Defendant charged

---

[1] For the Hartford Money Market Fund, Plaintiff Kasilag only seeks to rescind the Distribution Plan and to recover the 12b-1 distribution fees Defendant charged this Fund or, alternatively, to

the Funds or, alternatively, to recover all improper compensation received by Defendant in breach of its statutory fiduciary duty under Section 36(b).   The conduct complained of is continuing in nature, and Plaintiffs seek recovery from the earliest possible period allowed by the applicable statute of limitations through the date of final judgment.   Plaintiffs allege:

## I.      JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43 as Defendant inhabits or transacts business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendant may be found in this district.

3.      No pre-suit demand on the Boards of Directors of The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (collectively the "Boards"), which are the Boards overseeing the Hartford Funds, is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under § 36(b) of the ICA.

4.      All conditions precedent to suit have been performed, or have been satisfied or waived.

## II.     NATURE OF THE ACTION

5.      This action is a derivative action brought by the Plaintiffs, for the benefit of, and on behalf of, the Hartford Funds, pursuant to ICA § 36(b).

---

recover all improper compensation in connection therewith.  She does not now challenge the investment management advisory fees (even though they are excessive) for this Fund, since HIFSCO has thus far reimbursed those fees to this Fund.

6.    Defendant HIFSCO derived and continues to derive revenues in the form of fees for what it claims to be the provision of investment advisory services[2] and distribution services to the Hartford Funds.  In particular, HIFSCO receives fee compensation from each of the Funds and earns investment management fee revenues by allegedly providing investment advisory services pursuant to investment management agreements with each Fund.   HIFSCO also improperly derived and continues to derive revenue by charging excessive 12b-1 distribution fees.  HIFSCO is sued in this Complaint based on its misconduct related to its wrongful receipt of fee income in violation of Section 36(b) of the ICA.

7.    The Hartford Mutual Funds, Inc. ("HMF") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds, including the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Advisers Fund, the Hartford Inflation Plus Fund and the Hartford Money Market Fund, each of which is a separate investment portfolio or mutual fund.  *See* Table II.

8.    The Hartford Mutual Funds II, Inc. ("HMFII") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq*., comprised of various mutual funds, including the Hartford Growth Opportunities Fund, each of which is a separate investment portfolio or mutual fund.  *See* Table II.

9.    The Plaintiffs, who own shares of the Hartford Funds, allege that the investment management fees charged to each of the Hartford Funds (except the Hartford Money Market Fund) by HIFSCO, the Funds' investment manager, breached HIFSCO's § 36(b) fiduciary duty to the Funds with respect to such compensation as demonstrated by, *inter alia*: (a) the nature and quality of services provided to the Hartford Funds and their shareholders in exchange for the

---

[2] The terms "investment advisory services" and "investment management services" are used interchangeably in this Complaint.

investment management fees, including the fact that Defendant subcontracts out most of the management services at a small fraction of the actual investment management fees charged to the Funds; (b) the failure of the Hartford Funds' Boards of Directors to exercise the requisite level of care and conscientiousness in approving the investment management agreements and the fees paid pursuant thereto; (c) the failure of Defendant to provide the Hartford Funds' Boards of Directors with all information reasonably necessary to evaluate the terms of the investment management agreements with respect to each of the Funds; (d) the level of the fees as compared to those charged by Defendant or its affiliates to institutional accounts, including non-mutual fund customers; (e) the fees other mutual fund advisers charge for similar services to similar mutual funds; (f) the failure of Defendant to adequately pass economies-of-scale savings on to the Funds and their shareholders, and the retention of those economies-of-scale savings by Defendant; and (g) Defendant's costs and high profitability associated with providing investment management services to the Hartford Funds.

10.    The Plaintiffs further allege that HIFSCO improperly received Rule 12b-1 Distribution Fees[3] ("12b-1 fees") from the Funds and breached its fiduciary duty to the Funds with respect to such compensation by, *inter alia*: (a) the nature and quality of the services provided in exchange for the 12b-1 fees; (b) having produced few, if any, benefits (in the form of economies-of-scale benefits or otherwise) for the Hartford Funds while generating significant additional investment management fee revenue for HIFSCO; (c) Defendant's failure to provide

---

[3] Securities and Exchange Commission ("SEC") Rule 12b-1, 17 C.F.R. § 270.12b-1, permits a fund to market and sell its shares with shareholder funds (Distribution Fees) out of fund assets only in strict compliance with the rule.  Distribution fees cover the costs associated with the marketing and selling involved with running a mutual fund.  These fees are deducted from a mutual fund to compensate securities professionals for sales efforts and services provided to the fund's investors.  *See SEC Proposes Measures to Improve Regulation of Fund Distribution Fees and Provide Better Disclosure for Investors* available at: http://www.sec.gov/news/press/2010/2010-126.htm.

the Hartford Funds' Boards of Directors with all information reasonably necessary to evaluate the Rule 12b-1 Distribution Plans and 12b-1 fees paid pursuant thereto; (d) the fees other mutual fund advisers charge for similar distribution services to similar mutual funds, and (e) Defendant's costs and high profitability associated with providing distribution and marketing services to the Hartford Funds.

11. The allegations in this Complaint are predicated on publicly-available information, including, but not limited to, information contained in the public filings with the Securities and Exchange Commission ("SEC" or the "Commission") of HMF and HMFII ("Hartford Disclosure Materials"), and on information and belief after a reasonable investigation.[4]

## III.    PARTIES

12. Plaintiff Mellinger owns shares and is therefore a security holder in the Hartford Growth Opportunities Fund and the Hartford Inflation Plus Fund.

13. Plaintiff Menendez owns shares and is therefore a security holder in the Hartford Advisers Fund.

14. Plaintiff Russell owns shares and is therefore a security holder in the Hartford Advisers Fund and the Hartford Growth Opportunities Fund.

15. Plaintiff Robinson owns shares and is therefore a security holder in the Hartford Advisers Fund and the Hartford Inflation Plus Fund.

---

[4] It should be noted that in shareholder claims against mutual funds, plaintiffs generally lack the inside information necessary to allege their claims in detail because the facts are peculiarly within the possession and control of defendant.  For example, internal information about the Boards' fee-approval process and the costs that advisers incur to operate these funds is solely within Defendant's possession.  Additionally Plaintiffs have not attached to the Complaint all of the public filings upon which Plaintiffs relied herein.  Upon request, however, Plaintiffs will provide the Court with copies.

16.    Plaintiff Kasilag owns shares and is therefore a security holder in the Hartford Conservative Allocation Fund, the Hartford Global Health Fund and the Hartford Money Market Fund.   For the Hartford Money Market Fund, Plaintiff Kasilag only challenges the 12b-1 distribution fees and not the investment management fees at this time.

17.    Defendant HIFSCO is the investment manager/adviser for each of the Hartford Funds.   HIFSCO is incorporated in Delaware with its principal place of business in Simsbury, Connecticut.   HIFSCO is an affiliate (indirect wholly-owned subsidiary) of Hartford Financial Services Group, Inc. ("HIG") (together with its subsidiaries, the "Hartford" or "Company"),[5] an insurance and financial services company having shares listed on the New York Stock Exchange. HIG, through its wholly-owned subsidiaries, provides a variety of investment management, administrative, and operational services for a large number of investment companies or mutual funds (the "Hartford Funds Complex") and managed accounts, including HIG's indirect wholly-owned subsidiary HIFSCO.[6]  See Table I.

18.    Defendant HIFSCO is registered as an investment adviser under the Investment Advisers Act of 1940 ("the Investment Advisers Act").   HMF and HMFII, on behalf of each of the Funds, have each entered into an Investment Management Agreement with HIFSCO.   The Investment Management Agreements provide that HIFSCO, subject to the supervision and approval of HMF's and HMFII's Boards of Directors, shall: (a) provide investment advice and

---

[5] Plaintiffs refer to HIG, together with its subsidiaries and/or affiliates that perform a variety of investment management, administrative, and operational services to mutual funds and managed accounts, collectively as "Hartford" or the "Company," which is also how Hartford refers to itself in its public filings.

[6] The Hartford Funds Complex is composed of 88+ mutual funds, which are contained in the following five management investment companies registered under the ICA:  the Hartford HLS Series Fund II, Inc., the Hartford Series Fund, Inc., the Hartford Income Shares Fund, Inc., the Hartford Mutual Funds, Inc. and the Hartford Mutual Funds II, Inc., each containing mutual funds.  The mutual funds at issue in this Complaint are contained in the Hartford Mutual Funds, Inc. and the Hartford Mutual Funds II, Inc.  See ¶¶7-8; Tables I and II.

recommendations to each fund, (b) continuously supervise the investment program of each fund and determine what securities should be bought and sold by each fund, (c) arrange for the purchase and sale of investments for each fund, and (d) provide economic and statistical data and/or other information as HIFSCO shall deem appropriate or as shall be requested by the Boards of Directors.  Since 1997, HIFSCO has continuously been the primary investment adviser to the Hartford Funds and/or their predecessors which are included in HMF pursuant to an Investment Management Agreement, and since 2002 to the Hartford Funds included in HMFII. *See* Composite Ex. 1, comprised of the March 3, 1997 Investment Management Agreement between HIFSCO and HMF, as amended, in pertinent part on April 27, 2000, October 31, 2002, and May 26, 2004; as well as the November 1, 2009 Investment Management Agreement (collectively, "HMF HIFSCO Agreement"); *see also* Composite Ex. 2, comprised of the February 19, 2002 and the November 1, 2009 Investment Management Agreements between HIFSCO and HMFII (collectively, "HMFII HIFSCO Agreement")[7]; *see also* Composite Ex. 3, comprised of the February 6, 2008 Expense Limitation Agreement between HMF and HMFII and HIFSCO, as amended and restated on November 1, 2008; November 1, 2009; and November 1, 2010.

19.    Defendant HIFSCO is also a registered broker-dealer and serves as the Hartford Funds' principal underwriter and distributor.  HIFSCO receives 12b-1 distribution fees from each of the Hartford Funds pursuant to Rule 12b-1 Distribution Plans ("Distribution Plan" or "Distribution Plans") adopted by HMF and HMFII on behalf of the Funds.  *See* Ex. 4, the August 2, 2006 HMF Amended and Restated Distribution Plan ("HMF Distribution Plan"); Ex. 5, the August 2, 2006 HMFII Amended and Restated Distribution Plan ("HMFII Distribution Plan").

---

[7] The HMF HIFSCO Agreement and the HMFII HIFSCO Agreement are collectively referred to as the "Investment Management Agreements."

20.     Defendant HIFSCO, as the underwriter, distributor, adviser, and control person of the Harford Funds received compensation from the Funds for providing investment management and other services to them.  As such, Defendant HIFSCO owes fiduciary and other duties to the Plaintiffs and all shareholders of each of the Funds.

## IV.     BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b)

21.     A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and often selects affiliated persons to serve on the [fund's] board of directors."  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984)

22.     Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation.  As early as 1935 Congress recognized that because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor."  S. Rep. No. 91-184, p. 5 (1969).  Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *Id.*

23.     As a result in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994).  Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Associates*

*L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as Defendant.

24.   By the 1960s, it had become clear to Congress that investment advisers to equity mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.  As a result, Section 36(b) was added to the ICA in 1970, (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs), which created a federal cause of action for breach of fiduciary duty by investment advisers. Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services.

25.   Section 36(b) created a judicial remedy for breach of such fiduciary duty by authorizing litigation against investment advisers, their affiliates, and certain others by the SEC or by a security holder on behalf of the investment company with respect to payments made to such entities or persons by the investment company or by its security holders.  Section 36(b) states, in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b).

26.    Further, notwithstanding requirements regarding the increased disinterestedness of the boards of directors,[8] "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund*, 464 U.S. at 540, also adding a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company shall be given such consideration by the court as is deemed appropriate *under all the circumstances*.

ICA § 36(b)(2); 15 U.S.C. § 80a-35(b)(2) (emphasis added).

27.    Congress also chose not to rely only the ability or willingness of a fund's directors to prevent excessive fees and other abuses.  Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on an adviser's fulfillment of its fiduciary duties and receipt of unfair fees.  By enacting § 36(b), Congress provided shareholders with a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  S. Rep. 91-184, at 6.

28.    Although on a shareholder-by-shareholder basis, the fees charged and received by HIFSCO may appear to be very small, the cumulative effect of the excessive fees charged cause a dramatic decrease in Plaintiffs' investment returns over time.  Arthur Levitt, past Chairman of the SEC, was critical of what he called the "tyranny of compounding high costs:"

---

[8] At least 40% of the Funds' directors must be "disinterested" as defined in § 10 of the ICA.

> Instinct tells me that many investors would be shocked to know
> how seemingly small fees can over time, create such drastic
> erosion in returns . . . In the years ahead, what will mutual fund
> investors say if they realize too late their returns have fallen hard
> under the weight of compounding fees?

Arthur Levitt, Jr., *Inaugural Address: Costs Paid with Other People's Money, Address at Fordham University School of Law* (Nov. 3, 2000), 6 FORDHAM J. CORP. & FIN. L. 261, 259, 267 (2001).

29.   For example, assume that an employee with 35 years until retirement has a current 401(k) account balance of $25,000.  If returns on investments in his account over the next 35 years average 7 percent, and fees and expenses reduce their average returns by 0.5 percent, his account balance would grow to $227,000 at retirement, even if there were no further contributions to their account.  However, if fees and expenses being withheld are 1.5 percent, their account balance would grow to only $163,000 at retirement.  The 1 percent increase in fees and expenses caused his account balance to be reduced at retirement by a shocking 28 percent or $64,000.  *See* the following table:



*See* Department of Labor Publication "A Look at 401(k) Plan Fees," available at

http://www.dol.gov/ebsa/publications/401k_employee.html.

30.   Section 36(b) itself does not set forth a list of factors to be considered in determining whether an investment adviser, such as HIFSCO, has breached its fiduciary duty with respect to its receipt of compensation for services paid by a mutual fund such as any of the Hartford Funds.  "Fiduciary duty" includes the duties of good faith, loyalty, and due care.  A breach of fiduciary duty occurs "when a fiduciary permits an unreasonable or excessive fee to be levied on the fund," or "when compensation to the adviser for his services is excessive, in view of the services rendered – where the fund pays what is an unfair fee under the circumstances." *Mutual Fund Amendments: Hearing Before the Subcomm. on the Commerce on Interstate and Foreign Commerce*, Investment Company Act of 1940 and The Securities Exchange Act of 1934, H.R. 11995, S. 2224, H.R. 13754, and H.R. 14737, 91st Cong. (1st Sess. 1969) ("1969 Hearings"), at 189-90.  Indeed, an advisor "may not overreach in the amount of his fee even though the other party to the transaction, in full possession of all the facts, does not believe the fee is excessive." *Id.*, *December 17, 1969 Letter from the Investment Company Institute included with Mutual Funds Amendments*, at 441; *see also* S. Rep. 91-184, pp. 15-16 ("the ultimate test, *even if the compensation or payments are approved by the directors* and stockholders, . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

31.   In *Pepper v. Litton*, 308 U.S. 295 (1939), Supreme Court Justice William O. Douglas (former SEC Chairman) further explained the fiduciary duty standard.  He opined that fiduciaries'

> dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the [fiduciary] not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. The essence of the test is whether or not under all the

circumstances the transaction carries the earmarks of an arm's length bargain.  If it does not, equity will set it aside . . . He who is in such a fiduciary position cannot serve himself first and his cestuis second . . . He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements.  For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.  Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation.

*Id*. at 306-311 (*emphasis added*).   In *Jones*, the United States Supreme Court held that the formulation of the concept of fiduciary duty stated in *Pepper* "expresses the meaning of the phrase 'fiduciary duty' in § 36(b) . . . ."   130 S.Ct. at 1427.   Thus, by reaffirming *Pepper*, the Supreme Court incorporated its fiduciary duty standard into § 36(b) requiring both good faith in the negotiation process and a fair outcome.

32.    Furthermore, independent directors have a duty to diligently bargain to ensure that the best possible deal is made on their corporation's behalf.

## V.    INHERENT CONFLICT IN THE STRUCTURE OF MUTUAL FUNDS GENERALLY  AS EXEMPLIFIED BY THE HARTFORD FUNDS COMPLEX

33.    The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous."   *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

34.    Indeed, while mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA.

35.    For example, in *Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002), the court quoted the following comment made by Warren Buffett, famous investor and chairman of Berkshire Hathaway:

> I think independent directors have been anything but independent. The Investment Company Act, in 1940, made these provisions for independent directors on the theory that they would be the watchdogs for all these people pooling their money.  The behavior of independent directors in aggregate since 1940 has been to rubber stamp every deal that's come along from management – whether management was good, bad, or indifferent.  Not negotiate for fee reductions and so on.  A long time ago, an attorney said that in selecting directors, the management companies were looking for Cocker Spaniels and not Dobermans.  I'd say they found a lot of Cocker Spaniels out there.

*Id.* (citation omitted).

36.   The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders."  Indeed, the goal of ICA § 36(b) is to empower shareholders to independently police whether investment advisers have fulfilled their fiduciary obligations.

37.   Operating within this framework, the Hartford Funds Complex is also wrought with inherent structural conflicts.

38.   The Hartford Funds Complex consists of dozens of mutual funds, all of which were conceived and started by Defendant or its affiliates.  Defendant's, or its affiliates', purpose in starting, maintaining, and servicing mutual funds is to make a profit on the management, administrative, and shareholder services sold to the Funds for fee income to the service-providers.

39.   The Hartford Funds Complex, like almost all other mutual fund complexes, operates under a single structure consisting of a group of related investment companies (the mutual funds themselves) that are owned by their shareholders and governed by a Board of Directors.  *See* Table I.  The mutual funds themselves, however, are basically corporate shells in that they have few or no employees.  Rather, the mutual funds contract for all of the services they

need – including distribution of their securities, custodianship of their assets, auditing, servicing shareholder accounts, portfolio management, and day-to-day administration – all of which, in this case, are provided by or arranged for by Defendant and its affiliates.

40.   Each of the services provided by Hartford through its various affiliates is the subject of separate contracts, each of which gives rise to a separate fee paid by the Funds.  *See e.g.,* Ex. 6: the February 8, 2007 Master Custodian Contract; Ex. 7: the February 1, 2006 Transfer Agency and Service Agreement; Ex. 8: the February 6, 2008 Transfer Agency Fee Waiver Agreement; Ex. 9: the July 22, 1996 Principal Underwriting Agreement, as amended July 22, 1997; Ex. 10: the January 3, 2000 Fund Accounting Agreement; and Ex. 11: the May 3, 2004 Share Purchase Agreement.

41.   While the Funds are charged a myriad of other fees, Plaintiffs' Complaint is limited to the excessive investment management and 12b-1 fees charged by HIFSCO.

42.   Under the terms of the HMF HIFSCO Agreement and the HMFII HIFSCO Agreement, Defendant HIFSCO provides two categories of services: investment management services and administrative services.  *See* Composite Exs. 1 and 2.  Although the Investment Management Agreements purport to include administrative services, it bears noting that the Funds' Annual Reports include a separate line item for administrative services fees *already paid* by the Funds.  Furthermore, HIFSCO cannot be performing many administrative services, given that, for example, for year ended October 31, 2010, the Inflation Plus Fund's investment management fees were 188 times greater than the Fund's administrative fees.  *Id.*

43.   Although investment managers typically provide various services, such as custodian, transfer agency and service, underwriting, and accounting, HIFSCO *does not* provide

these services to the Hartford Funds.  The Funds contract directly with other entities for the provision of these services.  *See* Exs. 6-11.

44.    To the extent these services are included in the Investment Management Agreements, on information and belief, the administrative type services included are a very small percentage of the expenses incurred under these agreements, as transfer agency costs are typically by far the largest component of administrative costs but are provided to the Hartford Funds pursuant to a separate contract with Hartford Administrative Services Company ("HASCO"), a wholly-owned subsidiary of HIG.  *See* Ex. 8.  HASCO's services include communications with each Hartford Fund's shareholders as well as the preparation and distribution of reports, proxies, notices, confirmation of transactions, prospectuses, and tax information.  In the aggregate, various miscellaneous administrative items, aside from the transfer agency costs, do not account for more than three basis points[9] ("bps") of the average mutual fund's advisory fee.  *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 113, n. 104 (2008) ("Freeman, Brown & Pomerantz Study"), attached as Ex. 12.

45.    When Hartford starts a new mutual fund, it not only contracts to provide all the services the fund needs, it also nominates and elects the members of the fund's Board (including all "independent"[10] Board members).

46.    Each of the Hartford Funds is governed by a Board of Directors.  These same individuals, including all independent board members, simultaneously serve on the Boards for

---

[9] A basis point is a unit of measure used in finance to describe the percentage change in the value or rate of a financial instrument.  One basis point is equivalent to 0.01% (1/100th of a percent) or 0.0001 in decimal form.  *See* Investopedia.com, available at: http://www.investopedia.com/ask/answers/05/basispoint.asp.

[10] "Independent" board members are those who are not "interested persons" as defined under the 1940 Act.  *See* 15 U.S.C. § 80a-2(a).

each Fund overseeing all of the approximately 88 portfolios in the Hartford Funds Complex.[11]
*See* Table I.

47.   The Board members are compensated for their services with a fee that consists
of an annual retainer component and a meeting fee component, as well as retirement benefits.
For the fiscal year ending October 31, 2009, according to publicly-available information, the
Board members for the funds in the Hartford Funds Complex received total compensation in the
following amounts:

| | |
|---|---|
| Lynn S. Birdsong | $190,000 |
| Dr. Robert M. Gavin | $266,500 |
| Duane E. Hill | $170,000 |
| Sandra S. Jaffee | $164,500 |
| William P. Johnston | $196,500 |
| Phillip O. Peterson | $196,500 |
| Lemma W. Senbet | $159,000 |
| Lowndes A. Smith | $189,000 |

48.   Lowndes A. Smith is an "interested" director by virtue of his prior position as a
Hartford executive.  David N. Levenson is also an "interested" director by virtue of his current
position as a Hartford executive.  Directors who are also employed by Hartford do not receive
director compensation.

49.   As discussed below, the excessive fees charged to each of the Hartford Funds
(except for the Hartford Money Market Fund) by HIFSCO for the investment management
services are so large that they breach HIFSCO's fiduciary duty to the Funds with respect to such
compensation, especially in light of the fact that HIFSCO has delegated virtually all of its duties

---

[11] All Directors of the HMF and HMFII also hold corresponding positions with the Hartford
Series Fund, Inc., the Hartford HLS Series Fund II, Inc., and the Hartford Income Shares Fund,
Inc. overseeing the 88+ funds within the Hartford Fund Complex.  *See* Table I.  Mutual funds
contained within the Hartford Series Fund, Inc., the Hartford HLS Series Fund II, Inc., and the
Hartford Income Shares Fund, Inc. are not at issue in this Complaint.

to subcontractors at a fraction of HIFSCO's fee, and when compared to the fees charged by Hartford to institutional accounts that bargain at arm's length.

50.    Likewise, the 12b-1 fees charged to the Hartford Funds breach HIFSCO's fiduciary duty to the Funds with respect to such compensation because those fees provide few, if any, benefits to the Funds and their shareholders but, rather, serve as a means by which Defendant can extract additional management compensation and because those fees were not approved in accordance with applicable statutory and/or regulatory requirements.

## VI.    FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIM

51.    "A court's evaluation of an investment adviser's fiduciary duty must take into account both procedure and substance." *Jones,* 130 S.Ct. at 1429.  The test for determining whether fee compensation paid to Defendant violates ICA § 36(b) is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

52.    In order to violate Section 36(b) of the ICA, the adviser must charge a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*).

53.    In the context of § 36(b) litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

54.     As set forth below, an examination of the *Gartenberg* Factors demonstrates that the fees charged to the Hartford Funds and their investors breached and continue to breach HIFSCO's fiduciary duty to the Funds.   Indeed, HIFSCO's receipt of the advisory and distribution fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's length bargaining, and were thus unfair to Plaintiffs and the other shareholders of the Funds.

**A.     THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES PERFORMED BY HIFSCO DO NOT JUSTIFY HIFSCO'S FEE**

**1.     Investment Management Services**

55.     For investment management services, each of the Hartford Funds pays a monthly management fee to HIFSCO based on a stated percentage of the Fund's average daily net asset value.  As such, the investment management fees are not based on the services actually rendered or HIFSCO's actual costs in providing services to the Hartford Funds.

56.     Pursuant to the terms of the Investment Management Agreements between HIFSCO and the Funds, the duties of HIFSCO, as the investment adviser to the Hartford Funds, are to manage the portfolio of securities, to research securities, and to make the purchase, sale and hold decisions for each of the portfolios.  *See* Composite Exs. 1 and 2.

57.   Rather than directly providing these investment management services, HIFSCO subcontracts with others to provide the services; and does so at a fraction of HIFSCO's fee collected from each Hartford Fund.

58.   Since 1997, HIFSCO has sub-contracted its investment management duties to either Wellington Management Company, LLP ("Wellington")[12], pursuant to an Investment Sub-Advisory Agreement, and/or to Hartford Investment Management Company ("HIMCO")[13], pursuant to an Investment Services Agreement, and subsequently an Investment Sub-Advisory Agreement.   *See* Composite Ex. 13: the HMF March 3, 1997 Investment Sub-advisory Agreement between HIFSCO and Wellington, as amended in pertinent part on April 28, 2000, as well as the October 1, 2009 Investment Sub-Advisory Agreement ("HMF Wellington Agreement"); Composite Ex. 14: the HMFII February 19, 2002 Investment Sub-advisory Agreement between HIFSCO and Wellington, as well as the October 1, 2009 Investment Sub-Advisory Agreement ("HMFII Wellington Agreement"); Composite Ex. 15: the HMF March 3, 1997 Investment Services Agreement between HIFSCO and HIMCO, as amended in pertinent part on October 31, 2002 and August 1, 2007; as well as the October 1, 2009 Investment Sub-Advisory Agreement between HIFSCO and HIMCO ("HMF HIMCO Agreement").   *See* Table II.

59.   According to The Funds' Annual Reports, "HIFSCO has overall investment supervisory responsibility for the [Funds]" and "provides administrative personnel, services, equipment, facilities and office space for proper operation of the [Funds]."

---

[12] Wellington provides sub-advisory services for the Hartford Global Health Fund, the Hartford Advisers Fund and the Hartford Growth Opportunities Fund.
[13] HIMCO provides sub-advisory services for the Hartford Conservative Allocation Fund and the Hartford Inflation Plus Fund.

60.    The most recent Statement of Additional Information ("SAI") for the Hartford Funds disclosed that "HIFSCO has the responsibility, subject to oversight by the [Hartford Funds' Boards of Directors], to oversee the sub-advisers and recommend their hiring, termination, and replacement."  HIFSCO specifically will: "(a) set the applicable Fund's overall investment strategies; (b) evaluate, select, and recommend sub-advisers to manage all or a part of the applicable Fund's assets; (c) allocate and, when appropriate, reallocate the applicable Fund's assets among multiple sub-advisers; (d) monitor and evaluate the investment performance of sub-advisers; and (e) implement procedures reasonably designed to ensure that the sub-advisers comply with the applicable Fund's investment objective, policies, and restrictions."  *Id.*  In other words, HIFSCO makes a one-time, initial determination regarding investment objectives and selects sub-advisers.  Other than HIFSCO's initial involvement, it provides minimal services to the funds and it charges its sub-advisers with providing the substantive investment advisory services to the funds.

61.    Wellington is a sub-adviser to the Hartford Advisers Fund, the Hartford Growth Opportunities Fund and the Hartford Global Health Fund, and provides the day-to-day investment management for each of these Funds.  Indeed, according to the HMF Wellington Agreement and the HMFII Wellington Agreement, it is Wellington that is charged with "evaluat[ing] and implement[ing] an investment program appropriate for each Portfolio" and "will make all determinations with respect to the investment of the assets for the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same."  *See* Composite Exs. 13 and 14.

62.    According to the SAI, Wellington, subject to the general supervision of the applicable HMF and HMFII's Boards of Directors and HIFSCO, is responsible for (among other

things) the day-to-day investment and reinvestment of the assets of such Funds and furnishing each such Fund with advice and recommendations with respect to investments and the purchase and sale of appropriate securities for each Fund.  The most recent Annual Reports for the Hartford Advisers Fund, the Hartford Growth Opportunities Fund and the Hartford Global Health Fund also state that "HIFSCO has contracted with Wellington under a sub-advisory agreement for the provision of day-to-day investment management services to the Fund in accordance with the Fund's investment objective and policies."  As such, virtually all of the investment management services are performed by Wellington.

63.   Further evidence that Wellington performs substantially all of the Funds' management/advisory services is demonstrated by the fact that when Vanguard Group, Inc. ("Vanguard") retains Wellington as its investment advisor for the Vanguard funds, Vanguard does not get paid.  Although Wellington provides Vanguard with substantially similar services as it provides for the Hartford Funds, Vanguard does not charge any investment advisory/management fee, much less one that is up to 3.5 times greater than the fee paid to Wellington.

64.   HIMCO is a sub-adviser to the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund, and provides the day-to-day investment management for this Fund.  HIMCO is a wholly-owned subsidiary of HIG.  Similar to Wellington, under the HMF HIMCO Agreement, "HIMCO shall evaluate and implement an investment program appropriate for each Portfolio" and "will make all determinations with respect to the investment of the assets for the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same."  *See* Composite Ex. 15.

65.     With respect to the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund, HIFSCO has entered into an investment services agreement with HIMCO for the provision of the day-to-day investment management services.  Further, the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund's most recent Annual Reports further state that "HIFSCO has contracted with HIMCO under a sub-advisory agreement for the provision of day-to-day investment management services to the Fund in accordance with the Fund's investment objective and policies."  As such, virtually all of the investment management services are performed by HIMCO.

66.     Each of the Hartford Funds' Prospectuses also provide that "the sub-advisers are responsible for the day-to-day portfolio management activities of the funds they sub-advise, including effecting securities transactions."

67.     HIFSCO's fee schedule varies for each of the Hartford Funds.  Each Fund pays a fee to HIFSCO, which subcontracts with Wellington and/or HIMCO at a fraction of HIFSCO's fee.  The Hartford Funds employ a declining rate structure, known as "fee breakpoints," in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. Notably, in the case of Wellington, who is a for-profit independent sub-advisor, upon information and belief, HIFSCO negotiated at arm's length for the lowest possible sub-advisory fee, which contains breakpoints at much lower levels than HIFSCO charged those Funds for its advisory services.

68.     Virtually all of the portfolio management and investment management services required by the Funds are performed by Wellington and/or HIMCO and there is little, if any, work left to be done by HIFSCO.

69.   Despite the fact that the sub-advisers provided the bulk of the investment advisory services to the Funds, in fiscal year 2009 alone, HIFSCO collected nearly $23 million in investment management fees from the Hartford Funds (*see* ¶154) paying its sub-advisers just a fraction of that fee:

### HARTFORD FUNDS' FEE BREAKDOWN PURSUANT TO THE SAI
### ("M" refers to "Million" and "B" refers to "Billion")

| Hartford Fund | Investment Services/ Sub-Advisory Agreement | HIFSCO Fee Schedule (annual rate based on average daily net assets) | Sub-Advisor Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| Hartford Advisers Fund | Wellington | First $500 million – 0.6900% Next $500 million – 0.6250% Next $4 billion – 0.5750% Next $5 billion – 0.5725% Amt. over $10B – 0.5700% | First $50 million – 0.2200%; Next $100 million – 0.1800% Next $350 million – 0.1500% Amt. over $500M – 0.1250% |
| Hartford Growth Opportunities Fund | Wellington | First $100 million – 0.9000%; Next $150 million – 0.8000% Next $4.75 billion – 0.7000% Next $5 billion – 0.6975% Amt. over $10B – 0.6950% | All Assets – 0.2700% |
| Hartford Inflation Plus Fund | HIMCO | First $500 million – 0.5500% Next $4.5 billion – 0.5000% Next $5 billion – 0.4800% Amt. over $10B – 0.4700% | All Assets – At Cost |
| Hartford Global Health Fund | Wellington | First $500 million – 0.9000% Next $500 million – 0.8500% Next $4 billion – 0.8000% Next $5 billion – 0.7975% Amt. over $10B – 0.7950% | First $100 million – 0.4500% Next $400 million  – 0.3500% Amt. over $500M – 0.3000% |
| Hartford Conservative Allocation Fund | HIMCO | First $500 million  – 0.1500% Next $4.5 billion – 0.1000% Next $5 billion – 0.0800% Amt. over $10B – 0.0700% | All Assets – At Cost |

70.   While Wellington's fees are a fraction of HIFSCO's fee, upon information and belief, Wellington still makes a profit.  Moreover, assuming *arguendo* that HIMCO's "at cost"

fee represents the actual cost of performing services, HIFSCO's fee of 2.5 to 6.5 times the "cost" is grossly disproportionate to the services it actually provides to the Funds.  *See* ¶154.  In 2009 alone, HIFSCO was paid a total of $23,473,358 in investment management fees from the Funds at issue in this Complaint.  *Id.*  Of that sum, HIFSCO paid Wellington and HIMCO $9,579,617 for sub-advisory services, retaining $13,893,741 for itself despite providing minimal additional advisory services to the Funds.  *Id.*  This is a clear breach of HIFSCO's fiduciary duties and a violation of ICA § 36(b).

71.    Plaintiffs, on behalf of the Hartford Funds, are entitled to recover the investment management fees received (and continuing to be received) by HIFSCO in breach of its fiduciary duty to the Funds (except the Hartford Money Market Fund) with respect to such compensation. The excessive management fees represent additional compensation for advisory services, and thus, are subject to an ICA § 36(b) claim.

### 2.    12b-1 Distribution Services

72.    Prior to 1980, the SEC prohibited the use of fund assets (which are owned by the shareholders) to sell new fund shares.  The SEC had traditionally been reluctant to allow fund advisers to charge their shareholders for selling shares to others because:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

*Statement on the Future Structure of the Securities Markets*, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

73.    After intense lobbying by the mutual fund industry, however, the SEC agreed to consider modifying its objections to allow current fund shareholders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of

distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.

74.   Accepting the mutual fund industry's argument that a growth in assets would lead to a *quid pro quo* reduction in fees and other expenses, the Commission tentatively approved Rule 12b-1.  The SEC feared that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  *Bearing of Distribution Expenses by Mutual Funds*, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  Indeed, the SEC attached numerous conditions to the use of fund assets to pay distribution expenses.  For example, the SEC wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions under a 12b-1 plan."  *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).

75.   Unfortunately, that is precisely what Defendant HIFSCO has done: charged and collected additional compensation for its retail management services by causing the Plaintiffs and other Hartford Fund shareholders to pay Defendant HIFSCO's marketing expenses to acquire new shareholders so that these new shareholders could pay additional investment management fees to Defendant.  Existing shareholders are thus forced to pay additional fees because, along with new shareholders, assets under management increase thereby increasing the 12b-1 fees.

76.   Under this regime, Defendant HIFSCO has fashioned yet another way to increase its financial benefit while leaving Plaintiffs and other shareholders to bear the financial

burden.  Indeed, Plaintiffs and the other shareholders of the Hartford Funds pay Rule 12b-1 distribution fees for marketing, selling, and distributing mutual fund shares to new shareholders pursuant to distribution plans that Defendant adopted for the Hartford Funds pursuant to SEC Rule 12b-1.  HMF and HMFII, on behalf of their respective Funds, have each adopted a separate Distribution Plan for each of the Class A, Class B, Class C and Class L shares of each Fund, pursuant to appropriate resolutions of HMF's and HMFII's Boards of Directors.  *See* HMF Distribution Plan, Ex. 4; HMFII Distribution Plan, Ex. 5.

77.   Pursuant to the HMF and HMFII's Class A Distribution Plans, a Fund may compensate HIFSCO for its expenditures in financing any activity primarily intended to result in the sale of Fund shares and for maintenance and personal service provided to existing Class A shareholders.  The HMF and HMFII's Boards of Directors authorized Rule 12b-1 payments of 0.25% of each Fund's average daily net assets attributable to Class A shares.

78.   Hartford's 2009 SEC filings state that the 12b-1 Distribution Plans create "potential benefits … [which] include … the ability to provide investors with an *alternative* to paying front-end sales loads."  (Emphasis added).  Class A shares of the Hartford Funds, however, are charged significant front-end sales loads *in addition to* the 12b-1 fees.

79.   Pursuant to the HMF and HMFII's Class B and Class C Distribution Plans, a Fund may pay HIFSCO a fee of up to 1.00% of the average daily net assets attributable to those classes, 0.75% of which is a fee for distribution financing activities and 0.25% of which is for shareholder account services.

80.   Pursuant to the HMF and HMFII's Class L Distribution Plans, a Fund may pay HIFSCO a total fee in connection with the servicing of shareholder accounts and distribution-

related services attributable to Class L shares, calculated and payable monthly at an annual rate of 0.25% of the Fund's average daily net assets attributable to Class L shares.

81.    Each of the Hartford Funds' most recent Annual Reports further provides that each Fund's 12b-1 fees are accrued daily and paid monthly.

82.    Defendant HIFSCO's wrongdoing is especially blatant in the case of the Class B shares of the Hartford Funds – a class that was closed to new investments as of September 30, 2009 ("Close Date").  Effective at the close of business on the Close Date, no new or additional investments were allowed in Class B shares of the Funds.

83.    Nonetheless, Defendant continues to charge the holders of the Hartford Funds' Class B shares 12b-1 fees for *distribution and marketing activities* for this share class, even though the sale of Class B shares is closed to new investments.  For instance, a shareholder of the Hartford Funds may pay HIFSCO a fee of up to 1.00% of the average daily net assets attributable to Class B shares, 0.75% of which is a fee for distribution financing activities and 0.25% of which is for shareholder account services.  Class B shareholders are also required to pay a significant back-load charge when the holders of this class seek to redeem their investment(s) in the Funds' Class B shares.  According to the Harford Disclosure Materials, the maximum deferred sales charge (load) (as a percentage of purchase price or redemption proceeds, whichever is less) is 5.00% for Class B shares for the Hartford Funds.  Class B shareholders are therefore forced to either: (1) stay in a class of shares that is closed to new investments and continue to pay significant distribution and marketing fees, or (2) pay a significant back-load charge if the shareholder seeks to redeem his/her Class B shares and avoid such useless distribution and marketing fees.

84.    Not only are the Class B 12b-1 fees that Plaintiffs paid to HIFSCO excessive for the reasons detailed above, the amounts HIFSCO charged with respect to Class A, Class B, Class C and Class L shares combined are improperly high.  In one case, the 12b-1 fees are 3 times higher than the advisory and sub-advisory fees *combined*.  *See* Table below:

| Hartford Fund | 2009 Total Advisory and Sub-Advisory Fees | 2009 Total 12b-1 Fees | 12b-1 fees as a Percentage of Advisory and Sub-Advisory Fees *Combined* |
|---|---|---|---|
| Advisers Fund | $4,928,966 | $3,144,687 | 63.80% |
| Growth Opportunities Fund | $15,948,779 | $5,274,826 | 33.07% |
| Inflation Plus Fund | $6,321,876 | $5,245,536 | 82.97%% |
| Conservative Allocation Fund | $298,999 | $896,293 | 299.76% |
| Global Health Fund | $5,554,355 | $1,812,431 | 32.63%% |
| **Totals** | **$33,052,975** | **$16,373,773** | **49.54%** |

85.    As an example of HIFSCO's gouging on the 12b-1 fees paid by the Plaintiffs, the Hartford Funds issue Class Y shares, which pay no 12b-1 Distribution Fees.  This class of shares was created to meet the demands of institutional investors who refused to purchase mutual fund shares obligating them to pay 12b-1 Distribution Fees because they, and Defendant HIFSCO, unlike Plaintiffs and the holders of shares in other share classes in the Funds, clearly understand that the payment of such fees benefits only Defendant HIFSCO.  This further underscores the absence of any benefit to Plaintiffs.

86.    The existence of this "12b-1-fee free" class of shares (Class Y) demonstrates that the Funds' Distribution Plans, including the 12b-1 fees, should never have been adopted or continued year after year.  If the benefits achieved by virtue of these services or the economies of scale created by additional assets were shared with the Funds (as required by the enabling rule), then the institutional holders of the "12b-1-free" Class Y shares would be eager to pay them and obtain their benefit.  The benefits created by economies of scale, however, were not shared with

the Plaintiffs or the Funds.  The adoption and continuation of the distribution fees, therefore, is

contrary to Rule 12b-1 and their receipt by Defendant HIFSCO violates Section 36(b).

87.    The 12b-1 fees paid by the Funds are excessive because they are based on the

net asset value of the Hartford Funds and not on the distribution activity, if any, by Defendant

HIFSCO, such as number of shares sold.  Indeed, any portion of the fees paid to Defendant

HIFSCO that are derived from market increases in the net asset value of the fund, rather than any

distribution activity by Defendant HIFSCO, constitutes a breach of HIFSCO's fiduciary duty to

the Funds with respect to such compensation.

88.    Although Plaintiffs, and the other shareholders of the Hartford Funds, pay for

marketing, selling and distributing each fund through the 12b-1 fees, the monetary benefits

derived from attracting new shareholders largely accrue to Defendant HIFSCO, not the existing

shareholders.  As such, the 12b-1 fees are entirely a waste of fund assets.

89.    Plaintiffs, on behalf of the Hartford Funds, are entitled to recover the 12b-1 fees

received (and continuing to be received) by HIFSCO in breach of its fiduciary duty to the Funds

with respect to such compensation.   The excessive distribution fees represent additional

compensation for advisory services, and thus, are subject to an ICA § 36(b) claim.

**B.      THE HARTFORD FUNDS' BOARDS OF DIRECTORS WERE NOT
        ACTING CONSCIENTIOUSLY IN APPROVING THE INVESTMENT
        MANAGEMENT AGREEMENTS AND RULE 12b-1 DISTRIBUTION
        PLANS**

90.    In *Jones*, the Supreme Court adopted a fiduciary duty standard for § 36(b) that

requires both a fair outcome and good faith in the negotiation process.  *See* ¶31.  Defendant

failed to provide the Funds' Directors with all necessary information, and the Directors did not

act with sufficient care and conscientiousness in reviewing and approving the management and

12b-1 fees.  The fee-setting process undertaken by the Boards lacked the requisite integrity, care

and good faith and was, therefore, defective.  It is this defective process that has produced the excessive fees paid to HIFSCO in violation of ICA § 36(b).

91.   Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

92.   Each Hartford Board, in this case the identical nine people for all 88+ funds, has a separate and distinct fiduciary duty to each Hartford Fund to enter into serious and substantive negotiations with respect to all fees charged by Hartford Management, including HIFSCO.  *See* Am. Bar. Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis.").  Correspondingly, Hartford Management, including HIFSCO, has a reciprocal fiduciary duty to each mutual fund under its management, including each Hartford Fund, to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's length negotiation.

### 1.   Investment Management Agreements

93.   Congress has fortified fund directors' oversight responsibilities by adopting § 15(c) of the ICA, requiring directors to be adequately informed of the terms of any investment management contracts.

94.   ICA § 15(c) requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when

evaluating investment advisory contracts.  *See* 15 U.S.C. § 80a-15(c).  This section also gives directors the authority to demand such information from advisers.  *Id.*

95.    The Hartford Disclosure Materials indicate that the Boards of Directors for HMF and HMFII are composed of the identical nine people, who meet and make decisions for all of the Hartford Funds.  This same group of directors oversees and makes decisions for all approximately 88 funds in the Hartford Funds Complex.  No public information is disclosed on the length of the meetings of these Boards of Directors other than the fact that they took place over two consecutive days.  The issues that would need to be covered in these board meetings include the numerous corporate governance, portfolio management, portfolio pricing, audit and accounting issues that a mutual fund board must review annually under applicable statutes, rules and regulations in overseeing or governing a particular mutual fund, and would also include the annual renewals of the Investment Management Agreements and the Rule 12b-1 Distribution Fee Agreements.

96.    The Hartford Directors are well compensated for their services with a fee that consists of an annual retainer component and a meeting fee component as well as retirement benefits.  *See* ¶47.  As a result of the compensation they receive, Board membership in the Hartford Funds Complex is a lucrative part-time job for the Fund Directors.  Further, the Directors' continuation in the role of an Independent Director from year to year is at least partially dependent on the continued good will and support of Defendant HIFSCO.

97.    The independent or "non-interested" directors are supposed to be "watchdogs" for the Funds' shareholders.  However, since the same directors are charged with the oversight of all of the mutual funds (including over 88 funds) in the Hartford Funds Complex, regardless of the dedication, sophistication, and the individual educational and business qualifications of the

independent members of the Boards of Directors of the Hartford Funds, many of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the directors were to look at each fund individually.

98.   The Boards do not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Boards' practice has been to consider all funds at one time. According to each Fund's Annual Report, the information related to the Boards' discussion of the *Gartenberg* Factors is copied substantially verbatim for each Fund, and provides little, if any, supporting facts to conclude that the Boards undertook a thorough discussion of the relevant information for all 88+ funds within the Hartford Funds Complex during their two-day meeting.

99.   By analyzing the Funds on an aggregated basis, the Boards likely overlook Defendant's higher profitability attributable to larger funds and prevents the Boards from carefully reviewing the fairness of investment management fees for individual funds.

100. Furthermore, even if statutorily "non-interested," the Directors are in all practical respects dominated and unduly influenced by Defendant in reviewing the fees paid by the Funds and their shareholders.  In particular, upon information and belief, Defendant does not provide the directors with sufficient information to fulfill their obligations, a factor demonstrating that the fee-setting process lacked good faith and integrity, in violation of ICA § 36(b).

101. Truly independent boards of directors acting conscientiously would not have tolerated the investment management fees charged by Defendant HIFSCO, (which performed minimal, if any, advisory services), if they had obtained adequate information regarding, among other things: (1) the sub-advisory fees Defendant paid for the Hartford Funds and the services

received by the Funds from Defendant for the additional "premium" charged on top of the sub-advisory fees; (2) the management fees charged and services provided by competitors with similar fund structures; the management fees charged and services provided to pension funds and other institutional clients of Defendant or its affiliates; (3) the economies of scale enjoyed by Defendant; and (4) the profitability of the Funds to Defendant (and how to evaluate the profitability data in light of economies of scale).

102. In fact, Hartford has been the subject of SEC Cease and Desist proceedings regarding HIFSCO's Financial Arrangements with Broker-Dealers for Shelf Space and HIFSCO's failure to disclose the uses of Fund assets to the Board, resulting in a financial settlement. *See* November 8, 2006 Order, attached as Ex. 16.  Under the November 8, 2006 SEC Order setting forth the terms of the settlement reached with HIFSCO and two other HIG subsidiaries, resolving the SEC's Division of Enforcement's investigation of HIG's variable annuity and mutual fund operations related to directed brokerage and revenue sharing, HIFSCO (along with the other two HIG subsidiaries) was ordered to pay $55 million to settle charges of misrepresenting and failing to disclose to HMF and HMFII fund shareholders that fund assets were improperly used, in the form of directed brokerage commissions, to satisfy financial obligations to certain broker-dealers for the marketing and distribution of funds.  *Id.*  In light of the SEC Cease-and-Desist Order, the Boards should have been especially diligent in reviewing and approving any HIFSCO fee agreements.

103. On information and belief, the Fund Directors rarely, if ever, questioned the adequacy or completeness of any information or recommendations provided by Defendant, including, for example, misleading representations by HIFSCO that it is difficult to anticipate whether and to what extent that economies of scale may be realized by HIFSCO as fund assets

grow over time.  The evidence needed to establish the truth of these allegations is believed to be exclusively in the control of Defendant and is not in Plaintiffs' possession at this time.

104.  The foregoing assures that the HMF and HMFII Directors do not understand Defendant HIFSCO's true cost structure and, in particular, the economies of scale HIFSCO enjoyed in providing investment management services to the Funds.  Indeed, the Boards of the HMF and HMFII knew that most, it not all, of the investment management services to the Funds were being provided by the Funds' sub-adviser and not by Defendant HIFSCO, and that HIFSCO had previously been cited by the SEC for misappropriating fund assets through improper fees.  Accordingly, the HMF and HMFII Boards violated their fiduciary responsibilities when they approved the payment of HIFSCO's excessive investment management fees.

## 2.      12b-1 Distribution Plans

105.  In addition to their annual review of the Investment Management Agreements, the Directors must also review the 12b-1 Plans on an annual basis.  In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders."  17 C.F.R. § 270.12b-l(e).

106. The Hartford Funds' 12b-1 Distribution Plans have not been adopted in accordance with these requirements.  In particular, the Boards could not have found that the Distribution Plans in general, or the 12b-1 fees in particular, benefit the Funds or their shareholders by generating savings from economies of scale in excess of the cost of the plan.  In

fact, despite yearly increases in total assets held by the Funds, both the management fee and total 12b-l fees received by Defendant increased as assets grew, thus depriving the Funds of the benefit of these economies of scale.

107. A recent report written by Dr. Lori Walsh, a financial economist at the SEC, studied "whether shareholders do, in fact, reap the benefits of 12b-1 plans" and concluded that shareholders, as distinguished from the fund advisers, do not benefit from 12b-1 fees:

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee. This study confirms these results using a more recent dataset . . . In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth. This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans. . . 12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund. Although it is hypothetically possible for most types of funds to generate sufficient scale economies to offset the 12b-1 fee, it is not an efficient use of shareholder assets. … Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees.

Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns* (2004), at 4, 18.

108. Despite the fact that Plaintiffs and the other shareholders of the Hartford Funds have enjoyed no benefits from the Distribution Plans, and despite the fact that the Distribution Plans have allowed Defendant to extract additional unreasonable and excessive compensation from Plaintiffs and the other shareholders of the Funds, the Hartford Funds' Directors nevertheless have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and ICA §§ 12 thereby establishing a violation of § 36(b).

109. A truly independent board would not have tolerated the 12b-1 fees charged by Defendant if it had obtained adequate information regarding the Distribution Plans and the benefit (or lack thereof) to the shareholders of the Plans (such as whether the Distribution Plans should have been implemented and whether they should have been continued).

110. Based on the foregoing, the Hartford Funds Boards did not (and, indeed, were unable to) act conscientiously and fulfill their fiduciary duty when they approved fees. In contravention of its duty to provide to the Boards all information necessary to evaluate terms of the Hartford Funds Investment Management Agreements and Distribution Plans, HIFSCO did not furnish such necessary information to the Boards for purposes of its review of the Funds' investment management agreements and 12b-1 Distribution Plans. *See* 15 U.S.C. § 80a-15(c); 17 C.F.R. § 270.12b-1(d). Thus, the Boards were unable to conduct informed arm's-length negotiations when approving the fees charged to the Funds.

111. Alternatively, if HIFSCO did provide the Boards with the necessary information to review the Funds' Investment Management Agreements and 12b-1 Distribution Plans, then the Boards acted unconscientiously by continuing to approve the excessive management and 12b-1 fees.

112. The Supreme Court has instructed that where, as here, "the board's process was deficient [and/] or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Jones*, 120 S. Ct. at 1430. As described herein, the deficient fee-setting process resulted in fees that constitute a § 36(b) breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

**C.     COMPARATIVE FEE STRUCTURES CHARGED TO NON-MUTUAL
FUND CUSTOMERS AND OTHER MUTUAL FUND COMPLEXES FOR
SIMILAR INVESTMENT MANAGEMENT SERVICES DEMONSTRATE
THAT HIFSCO HAS CHARGED THE FUNDS EXCESSIVE FEES THAT
BREACHED HIFSCO'S FIDUCIARY DUTY**

113. An analysis of: (1) the fees paid by Defendant's sub-advisors, (2) investment
management fees charged by Defendant's competitors to mutual funds comparable to the
Hartford Funds, and (3) the management fees charged by Hartford to third-party institutional
clients, including non-mutual fund customers, demonstrates that HIFSCO has charged the
Hartford Funds excessive investment management and distribution fees that violate HIFSCO's
fiduciary duty with respect to the receipt of compensation.  The following relevant comparative
fee structures establish that HIFSCO is charging advisory fees to the Funds that are
disproportionate to the value of the services rendered.

**1.     Fee Structure of Defendant's Sub-Advisors**

114. Defendant HIFSCO hired sub-advisors for all of the Hartford Funds that
assumed the obligation of providing essentially all of the substantive investment advisory
services to their designated funds.  As each sub-advisor is a for-profit investment management
company that negotiated its fee with Defendant, the fees they charge provide a guidepost of the
cost of the investment advisory services provided to the Hartford Funds, presumably including a
comfortable profit margin.  Compared to the fees charged by the sub-advisors who actually
perform the substantive advisory services to the Hartford Funds, the additional fees charged by
Defendant for the little, if any, services to the Hartford Funds are unfair and excessive.

115. While Plaintiffs do not challenge the fees paid to the sub-advisers of the
Hartford Funds, those rates do provide a measure of how much the investment advisory services
cost (and the economies of scale realized by the advisors).  Indeed, the fees charged by each

Funds' sub-adviser is indicative of the fee the Funds should pay for the investment management services. *See* ¶154. Defendant charges far more than the sub-advisors it hires for the Funds (*i.e.*, Wellington and HIMCO) even though the sub-advisors assume the obligations of HIFSCO to provide investment advisory services to their designated funds.

116. Since Defendant HIFSCO's investment management fees charged to the Plaintiffs, and the other shareholders of the Hartford Funds, and collected by HIFSCO were far in excess of the sub-adviser fee amount, Defendant HIFSCO's fees were necessarily so disproportionately large that they bore no reasonable relationship to services rendered and could not have been the product of arm's-length bargaining.

### 2. Fees Charged to Other Mutual Fund Complexes For Similar Investment Management Services

117. Other investment advisers who offer services to funds similar to the Hartford Funds charge substantially less than Defendant. On information and belief, the services provided by these other advisers are the same or substantially similar management services that Defendant HIFSCO provides to shareholders of the Hartford Funds. Indeed, the fee structure imposed by HIFSCO on the Hartford Funds far exceeded the fees that would be paid as a result of arm's-length bargaining.

118. For example, Wellington, the sub-adviser to the Hartford Global Health Fund, the Hartford Growth Opportunities Fund and the Hartford Advisers Fund, has also been engaged by Vanguard to provide investment advisory services to a number of the Vanguard mutual funds. While Vanguard provides services to the Vanguard funds at cost, the investment management services for its actively managed funds are provided by external managers, such as Wellington, who subcontract with Vanguard for a negotiated fee and earn a reasonable profit for its services.

119. Among others, Wellington provides management services to the Vanguard Health Care Fund, which is classified as a health fund; to the Vanguard Wellington Fund, which is classified as a moderate allocation fund; and to the Vanguard Morgan Growth, which is classified as a large cap growth fund.  Shareholders of these Vanguard Funds pay significantly lower investment management fees than the Hartford Global Health Fund, the Hartford Advisers Fund, and the Hartford Growth Opportunities Fund, which are classified as health, moderate allocation and large cap growth funds, respectively.  The following table contains a side-by-side comparison of the management fee schedules for the Hartford Funds, including the fees that Wellington charges for providing substantially similar advisory services to the Hartford Funds, with the fee schedules charged to comparable Vanguard funds:

| Hartford Fund | HIFSCO Fee Schedule (annual rate based on average daily net assets) | Wellington Fee for Providing Sub-Advisory Services to the Hartford Funds | Vanguard Fund (comparable investment classification) | Most Recent Fee Schedule for Vanguard Funds (based on average daily net assets) |
|---|---|---|---|---|
| Hartford Global Health Fund (Health) | First $500 million – 0.9000% Next $500 million – 0.8500% Next $4 billion – 0.8000% Next $5 billion – 0.7975% Amt. over $10B – 0.7950% | First $100 million – 0.4500% Next $400 million – 0.3500% Amt. over $500M – 0.3000% | Vanguard Health Care Fund (Health) | For the six months ended July 31, 2010, investment advisory fee represented: Annual rate of **0.15%** of the fund's average net assets |
| Hartford Advisers Fund (Moderate Allocation) | First $500 million – 0.6900% Next $500 million – 0.6250% Next $4 billion – 0.5750% Next $5 billion – 0.5725% Amt. over $10B – 0.5700% | First $50 million – 0.2200% Next $100 million – 0.1800% Next $350 million – 0.1500% Amt. over $500M – 0.1250% | Vanguard Wellington Fund (Moderate Allocation) | For the year ended November 30 2010, the investment advisory fee represented: Annual rate of **0.07%** of the fund's average net assets |
| Hartford Growth Opportunities Fund (Large Cap Growth) | First $100 million – 0.9000% Next $150 million – 0.8000% Next $4.75 billion – 0.7000% Next $5 billion – 0.6975% Amt. over $10B – 0.6950% | All Assets – 0.2700% | Vanguard Morgan Growth Fund (Large Cap Growth) | For the year ended September 30, 2010, the investment advisory fee represented: Annual rate of **0.16%** of the fund's average net assets |

120.  Had the Vanguard investment management fee schedules been applicable to the

Hartford Global Health Fund, the Hartford Advisers Fund and the Hartford Growth

Opportunities Fund, those Funds would have saved millions of dollars in 2009 alone.  For

example, the first breakpoint that HIFSCO charges to the Hartford Growth Opportunities Fund

does not start until $100 million at 90 basis points, which is almost 5.5 times greater than the

advisory fee schedule for Vanguard's comparable large cap growth funds.  *See* ¶69.  In the case

of the Harford Global Health Fund, the first breakpoint in HIFSCO's fee schedule does not even

start until $500 million at 90 basis points, which is 6 times greater than the advisory fee schedule

for Vanguard's comparable health fund.  *Id.*  Similarly, the Harford Advisers Fund's first

breakpoint of 69 basis points at $500 million in HIFSCO's fee schedule is almost 10 times

greater than the advisory fee schedule for Vanguard's comparable moderate allocation fund.  *Id.*

121.  The Vanguard fees set forth in the above table (¶119) are appropriate fee

comparisons for the fees Defendant HIFSCO *should have been* charging Plaintiffs, and the other

shareholders of the Hartford Funds for investment management services.  As evidenced by the

following table, the services provided by Wellington to the Vanguard Funds are substantially

comparable to the services Defendant HIFSCO provides to the Hartford Funds.

| Investment Advisor | Funds | Investment Management Services Performed by Investment Advisor |
|---|---|---|
| HIFSCO | Hartford Funds | (a) provide investment advice and recommendations to each fund, (b) supervise continuously the investment program of each fund and determine what securities should be bought and sold by each fund, (c) arrange for the purchase and sale of investments for each fund, and (d) provide economic and statistical data and/or other information as HIFSCO shall deem appropriate or as shall be requested by the Board of Directors. |
| Wellington | Vanguard Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) continuously review, supervise, and administer an investment program for the fund; (c) determine the securities to be purchased or sold for the fund; (d) provide the fund with records concerning Wellington's activities; and (d) render regular reports to the Board of Trustees. |

122.  Further, HIFSCO's 12b-1 fee structure imposed by HIFSCO on the Hartford

Funds far exceeded the fees that would be paid as a result of arm's-length bargaining.  For

example, the comparable Vanguard funds discussed above do not charge any 12b-1 fees:

| Hartford Fund | 12b-1 Fee Class A | 12b-1 Fee Class B | 12b-1 Fee Class C | 12b-1 Fee Class Y | Vanguard Fund (comparable investment classification) | 12b-1 Fee Investor Share Class |
|---|---|---|---|---|---|---|
| Hartford Global Health Fund (Health) | 0.25 % | 1.00 % | 1.00 % | None | Vanguard Health Care Fund (Health) | None |
| Hartford Advisers Fund (Moderate Allocation) | 0.25 % | 1.00 % | 1.00 % | None | Vanguard Wellington Fund (Moderate Allocation) | None |
| Hartford Growth Opportunities Fund (Large Cap Growth) | 0.25 % | 1.00 % | 1.00 % | None | Vanguard Morgan Growth Fund (Large Cap Growth) | None |

### 3.     Fees Charged By Hartford to Institutional Clients for Similar Investment Management Services

123.   Defendant and/or its affiliated entities also provide investment management services to third-party institutional, or separately managed, accounts.

124.   In *Jones*, the Supreme Court indicated that a court, in assessing an investment adviser's fiduciary duty, should give comparisons between management fees charged to an adviser's mutual funds and management fees charged to its independent clients "the weight that they merit in light of the similarities and differences between the services." 130 S. Ct. at 1428.

125.   Here, the services that Hartford provides to the institutional accounts are substantially similar, if not identical, to the investment management services Defendant provides to the Funds.   Indeed, the Hartford Funds pay separately pursuant to separate agreements for services that are not provided to non-mutual fund clients.[14]   As a result, the comparison of the

---

[14] For example, the Hartford Funds have entered into a separate Fund Accounting Agreement pursuant to which they pay fees to Hartford Life Insurance Co. for accounting services.  *See* Ex. 10.  Similarly, the Funds pay Hartford Administrative Services Company separately for administrative and transfer agency services.  *See* Ex. 7.

investment management fees HIFSCO charges to the Funds to the fees charged by Hartford to the institutional accounts is entitled to considerable weight.

126. Although the investment management services provided to the Funds are virtually identical to services provided to the institutional accounts, and therefore are directly comparable, the fees charged to the Funds are materially higher than the fees charged to the institutional accounts.

127. While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. CORP. L. 610, at 627-28 (2001) (the "Freeman & Brown Study"), attached as Ex. 17. Indeed, "a mutual fund, as an entity, actually is an institutional investor. When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest." *Id*. at 629 n.93. Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id*. at 671-72.

128. For example, HIMCO, an affiliate of HIFSCO and sub-adviser to two of the Hartford Funds at issue here, provides investment management services to employee benefit plans and/or mutual funds unaffiliated with Hartford, such as the State Board of Administration of Florida, the State of Connecticut, and Montgomery Street Income Securities, Inc.

129. Although the investment management services that HIMCO provides these institutional accounts are the same as the investment management services that HIFSCO provides to the Funds (to whom HIFSCO owes a fiduciary duty), the Funds pay investment management fees that are significantly higher than those paid by the institutional clients, who bargain at arm's-length over fees. For example:

    a. For the fiscal year ending December 31, 2009, HIMCO charged Montgomery Street Income Securities, Inc., a closed end mutual fund, a total annual investment management fee of approximately 0.25% of the average net assets managed.

    b. HIMCO provides investment management services to a fixed income account for the State of Connecticut. In exchange for these investment management services, the State of Connecticut pays approximately 9 to 11 basis points (.09% to .11%).[15] In fiscal year 2009, HIMCO received a fee of approximately $444,000 for advising an approximately $407 million account. Meanwhile, in 2009, the Hartford Inflation Plus Fund, a fixed income fund, with average assets under management of $1.5 billion, paid approximately $4.5 million for the same investment management services that the State of Connecticut received at a fraction of the price. In exchange for these investment management services provided by HIFSCO, Plaintiffs, and other shareholders, invested in the Hartford Inflation Plus Fund paid approximately 52 basis points.

    c. HIMCO also manages an approximately $2 billion fixed income account for the State Board of Administration of Florida. For fiscal years 2007-2008 and 2008-2009, the State Board of Administration of Florida paid 8 basis points and 10 basis points, respectively, to the investment advisers of its fixed income accounts.[16]

130. In 2009, the Hartford Inflation Plus Fund, a fixed income fund, paid investment management fees to HIFSCO that were as much as 5 to 6 times higher in basis points than what

---

[15] These figures are derived from reported fiscal year end assets managed by HIMCO and total fees paid to HIMCO by fiscal year.

[16] Although the precise fee charged by HIMCO is not reported, it is unlikely that the fees HIMCO charges would deviate materially from the reported aggregate fee, particularly given that the fee is in line with what HIMCO charges the State of Connecticut.

HIMCO charges institutional clients to provide investment management services to fixed income accounts.  *See* ¶69.  At the Harford Inflation Plus Fund's current level of assets ($1.5 billion), the difference in investment management fees that HIFSCO charged that Fund, as compared to the investment management fees that HIMCO charges its institutional clients, translates to over $6 million per year.

131.  That Defendant and its affiliates charge third parties far lower fees than they are charging the Hartford Funds, to whom they owe a fiduciary duty, for the same services demonstrates that the investment management fees charged constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

**D.    THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES WERE NOT PASSED ON TO THE PLAINITFFS AND OTHER SHAREHOLDERS OF THE FUNDS AS REQUIRED BY SECTION 36(b), BUT WERE KEPT BY DEFENDANT HIFSCO IN VIOLATION OF ITS FIDUCIARY DUTY**

132.  The amount of the compensation received by the adviser should be evaluated in context with the economies of scale realized by a fund.  Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

> [I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size.  A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion.  (Size may impair performance, but it imposes little logistical challenge.)

Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238.

Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both

fund manager and fund shareholders to benefit." *Id.* Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." *Id*. According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering." John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005).

133. As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

134. As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale. Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

135. The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31, attached as Ex. 18; GAO, Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9, attached as Ex. 19.  The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund.  *Id.*

136. In addition, the most significant academic research undertaken since the Wharton School study in the 1960s (*see* Wharton School of Finance & Commerce, 87th Cong., *A Study of Mutual Funds* 493 (Comm. Print 1962)) has proven that economies of scale are not being passed along to mutual fund shareholders – in violation of Defendant's duty to do so under § 36(b) and Rule 12b-1.  *See* Freeman & Brown Study at 661, Ex. 17.  The Freeman & Brown Study noted: "The existence of economies of scale has been admitted in SEC filings made by fund managers and is implicit in the industry's frequent use of fee rates that decrease as assets under management increase.  Fund industry investment managers are prone to cite economies of scale as justification for business combinations."  *Id*. at 620.

137.  Economies of scale exist not only fund by fund but also exist with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients.  *Id.* at 621 n.62 (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund*, 49 BUS. LAW 107 (1993)).

138.  As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero.  As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs.  *See* GAO Report, at 9, Ex. 19 (noting that growth from portfolio appreciation is unaccompanied by costs). The Freeman & Brown Study at 619, n.43, Ex. 17, also noted that investment advisors have benefited by garnering "increased fees from the general increase in market prices with no commensurate efforts on their part."

139.  Although significant economies of scale exist for each of the Hartford Funds, the associated cost savings largely have been appropriated for the benefit of Defendant rather than being shared with the Funds.  The economies-of-scale benefits that have been captured and misappropriated by Defendant can and have generated huge unreasonable and excessive, undeserved profits for HIFSCO in breach of its fiduciary duty to the Funds with respect to such compensation.

140.  The management fees received by HIFSCO are paid as a varying percentage of assets under management.  The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  This fee structure, known as "breakpoints," implicitly recognizes the economies of scale and gives the appearance that the Funds share in those benefits.

141.  The 12b-1 distribution fees are also paid to HIFSCO based upon a percentage of net assets of each of the Funds.  Defendant HIFSCO purportedly collects these fees in order to grow or stabilize the assets of the Hartford Funds so that the Funds can benefit from economies of scale through reductions in other fees, such as management and administrative fees.

142. These benefits can and should have been shared with mutual funds and their shareholders by reducing and/or eliminating the management and distribution fees and other costs charged to the funds by Defendant.

143. In the case of the Hartford Funds, however, HIFSCO has failed to share any meaningful savings with the Funds. While the Investment Management Agreements include advisory fee breakpoints, these breakpoints are meaningless, because as a practical matter, they did not pass on any of the economies of scale to Plaintiffs, and the other shareholders of the Funds. The mere existence of breakpoints does not mean that economies of scale are adequately passed on to shareholders of the Funds. Indeed, the breakpoints are designed by Defendant HIFSCO to benefit itself rather than the Funds. As described below, the initial breakpoints are too high, the breakpoints are spaced too far apart, and the reductions made at breakpoints are far too small, thereby depriving Plaintiffs and the Funds of the benefits of the economies of scale created by the contribution of their capital to the Funds.

144. For instance, the first breakpoint occurs at $500 million for the Hartford Advisers Fund, the Hartford Inflation Plus Fund, the Hartford Global Health Fund, and the Hartford Conservative Allocation Fund, and at $250 million for the Hartford Growth Opportunities Fund. *See* ¶69. Significant economies of scale are created by the Plaintiffs' and the other shareholders' investments in the Funds long before this initial breakpoint, but they are not shared with the Funds. Defendant HIFSCO retains for itself the benefits created by the economies of scale between breakpoints. A flat management fee (in dollars, not percentage) or a breakpoint approaching zero would allow the Funds to capture economies of scale that rightfully belongs to them under Section 36(b), while also allowing Defendant HIFSCO to earn a fair and competitive profit for its services.

145.  HIFSCO has also negotiated a breakpoint schedule with Wellington on at least two of its funds (Hartford Advisers Fund and Hartford Global Health Fund) by which Wellington grants fee reductions at several levels prior to $500 million in assets under management.  *See* ¶69.  On the other hand, the breakpoint schedule that HIFSCO charges to those Funds does not even start until $500 million.  *Id.*  For example, when HIFSCO negotiated the breakpoint schedule with Wellington, the sub-advisor for the Hartford Advisers Fund, HIFSCO negotiated a schedule under which Wellington granted fee reductions beginning after this Fund reaches $50 million in assets and drops to just 12.5 basis points on any amount over $500 million.  *Id.*  In contrast, HIFSCO offers Plaintiffs, and the other shareholders of the Hartford Advisers Fund, their first breakpoint only after assets reach $500 million at 69 basis points, and HIFSCO's fee only drops to 57 basis points when there are more than $10 billion in assets under management.  *Id.*

146.  The cost of Defendant's minimal oversight function should not increase as fund assets increase.  As a result, HIFSCO fails to share with the Funds' shareholders the benefits of economies of scale realized from the HMF Wellington Agreement and generally fails to meaningfully share economies of scale with the Fund's shareholders regarding the fees HIFSCO collects from the Funds.

147.  Wellington's sub-advisory fees are substantially lower than HIFSCO's advisory fees for the Funds Wellington sub-advises.  HIMCO charges a sub-advisory fee "at cost" and which is substantially lower than HIFSCO's advisory fees for the two Funds sub-advised by HIMCO.  By subcontracting with Wellington and/or HIMCO to provide sub-advisory and/or investment services at a fraction of HIFSCO's fee, HIFSCO receives fees that are disproportionate to the services it renders.  HIFSCO's receipt of these fees is particularly

egregious given that the cost of the "oversight" function it performs for the Funds should not increase as Fund assets increase, resulting in enormous economies-of-scale benefits that HIFSCO retains for itself but that should be shared with the Funds and their shareholders.

148. As assets under management have grown, the management and distribution fees paid to HIFSCO have grown dramatically, despite the economies of scale realized by Defendant. Defendant has not shared with the Plaintiffs, and other shareholders of the Funds, the economies of scale it has gained from that growth.

149. Given that the investment management and distribution fees paid to HIFSCO are unfair, unreasonable, and excessive, especially when compared to the rates charged by the sub-advisers, by competitors or to institutional clients, the excess profits resulting from these economies of scale belong to the Plaintiffs and the other shareholders of the Funds. Nevertheless, the economies of scale enjoyed by Defendant HIFSCO with respect to the Hartford Funds have not been adequately shared with the Funds, as required by § 36(b) and Rule 12b-1, in breach of HIFSCO's § 36(b) fiduciary duty to the Funds with respect to such compensation.

**E.     THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES DID NOT JUSTIFY HIFSCO'S EXCESSIVE FEE**

150. "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See* Freeman & Brown Study, at 661, Ex. 17.  The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

151. Following discovery, Defendant's true profitability can be determined on either an incremental basis or a full-cost basis.   Defendant's incremental costs of providing management services to Plaintiffs are believed to be nominal while the additional fees received

by Defendant are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same in breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.  On information and belief, a review of Defendant's full costs of providing management services will also demonstrate the enormous profitability to Defendant of managing the Hartford Funds.

152.  The table in Paragraph 69 shows the investment management fee schedule that HIFSCO charges to each of the Funds as compared to the fee schedule that HIFSCO pays its sub-advisers to whom HIFSCO delegates the core of the investment management duties.

153.  While fees of less than 1% may seem inconsequential, these percentages translate into substantial fees when applied to Fund assets in the hundreds of millions, or even billions, of dollars.

154.  HIFSCO has collected investment management fees of over $250 thousand per year for its smallest funds (while paying the sub-adviser only $39 thousand per year) to nearly $11 million per year for the largest funds (while paying the sub-adviser only $5 million).  *See* the following table.

**2009 HARTFORD FUNDS HIFSCO FEES RETAINED AFTER PAYMENT TO SUB-ADVISERS WELLINGTON & HIMCO PURSUANT TO THE SAI**

| Fund | Investment Services/Sub-Advisory Agreement | Net Paid HIFSCO | Net Paid Sub-Advisor | Difference | Percent Retained by HIFSCO |
|------|---------|---------|---------|---------|---------|
| Hartford Advisers Fund | Wellington | $3,821,451 | $1,107,515 | $2,713,936 | 71.02% |
| Hartford Growth Opportunities Fund | Wellington | $10,981,675 | $4,967,104 | $6,014,571 | 54.77% |
| Hartford Inflation Plus Fund | HIMCO | $4,540,815 | $1,781,061 | $2,759,754 | 60.78% |
| Hartford Conservative Allocation Fund | HIMCO | $259,330 | $39,669 | $219,661 | 84.70% |
| Hartford Global Health Fund | Wellington | $3,870,087 | $1,684,268 | $2,185,819 | 56.48% |
| **Totals** | | **$23,473,358** | **$9,579,617** | **$13,893,741** | |

155. "[F]und managers … routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders."  Freeman, Brown & Pomerantz Study, at 117-118, Ex. 12.  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house."  *Id.* at 118.  As demonstrated above, HIFSCO is no different, padding the bill by approximately $14 million dollars in fiscal year 2009 alone, for providing few, if any, additional services to the Hartford Funds.

156.  Despite delegating all or substantially all of its investment management duties to sub-advisers and performing little, if any additional work, HIFSCO retains between 55% and 85% of these investment management fees, resulting in exorbitant profits.  *See* ¶154.

157.  Put another way, the true cost of investment management services should represent 15% to 45% of HIFSCO's fee to the Hartford Funds, which correlates to the fees charged by Wellington and/or HIMCO.  In fact, as an external, for-profit sub-adviser, the fees charged by Wellington to HIFSCO include Wellington's costs plus a reasonable profit.

158.  Indeed, the Hartford Funds' disclosures characterize the HIMCO fees charged as "at cost."  *See* ¶69.  Assuming *arguendo* that HIMCO's sub-advisory services truly are provided "at cost" and do not include any markup or built-in profit, HIMCO's cost to provide advisory services to the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund in 2009 were at most approximately 12 basis points, and 1.8 basis points, respectively.  For performing little, if any, additional services to the funds, HIFSCO nevertheless charged the Hartford Inflation Plus Fund a fee that is nearly 2.5 times, and in the case of the Hartford Conservative Allocation Fund a fee that is almost 6.5 times, HIMCO's costs.

159.  This subcontracting arrangement led to fees that were disproportionate to services actually rendered and to enormous profits to HIFSCO for little or no work.

160.  These markups could not be the product of negotiations conducted at arm's length and therefore constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to the receipt of such compensation.

161.  HIFSCO has also collected 12b-1 distribution fees of over $17,000,000 for the Funds.  *See* the following table.

**2009 HARTFORD FUNDS 12B-1 DISTRIBUTION FEES PURSUANT TO THE SAI**

| Fund | Class A | Class B | Class C | Class L |
|------|---------|---------|---------|---------|
| Hartford Advisers Fund | $1,369,789 | $825,322 | $949,576 | |
| Hartford Growth Opportunities Fund | $2,265,142 | $346,912 | $1,747,200 | $915,572 |
| Hartford Inflation Plus Fund | $1,115,490 | $859,514 | $3,270,532 | |
| Hartford Conservative Allocation Fund | $287,954 | $212,525 | $395,814 | |
| Hartford Global Health Fund | $641,795 | $364,786 | $805,850 | |
| Hartford Money Market Fund | $383,511 | $228,059 | $439,974 | |
| **Totals** | **$6,063,681** | **$2,837,118** | **$7,608,946** | **$915,572** |

162. The cost of providing distribution and marketing services does not justify charging such an excessive fee, especially since Class B shares have been closed to new investments and the fees are not tied to any distribution activities.

163. The 12b-1 fees were therefore disproportionate to the services actually rendered resulting in huge profits for HIFSCO.

164. The 12b-1 fees could not be the product of negotiations conducted at arm's length, especially given that institutional investors, investors with greater negotiating authority, refuse to pay 12b-1 fees, and therefore constitute a breach of HIFSCO's fiduciary duty to the Funds with receipt of such compensation.

## COUNT I

## AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b) DERIVATIVELY ON BEHALF OF THE HARTFORD ADVISERS FUND, THE HARTFORD GLOBAL HEALTH FUND, THE HARTFORD GROWTH OPPORTUNITIES FUND, THE HARTFORD INFLATION PLUS FUND AND THE HARTFORD CONSERVATIVE ALLOCATION FUND ("COUNT I FUNDS")

### (Investment Management Fees)

165.  The Plaintiffs repeat and reallege each and every allegation contained prior to Count I as if fully set forth herein.

166.  The Defendant had a fiduciary duty to the Count I Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to such Defendant.

167.  The fees charged by Defendant for providing investment management and/or advisory services to the Count I Funds breach HIFSCO's fiduciary duty to the Count I Funds with respect to such compensation.

168.  This Count is brought by Plaintiffs derivatively on behalf of the Count I Funds against Defendant HIFSCO for breach of its fiduciary duties with respect to the receipt of compensation as defined by § 36(b).

169.  The fees received by Defendant breach HIFSCO's fiduciary duty to the Count I Funds with respect to such compensation.  By reason of the conduct described above, Defendant violated § 36(b) of the ICA.

170.  As a direct, proximate and foreseeable result of Defendant's breaches of fiduciary duties in its role as investment adviser to the Count I Funds and their investors, the Count I Funds and their shareholders have sustained many millions of dollars in damages.

171. In charging and receiving inappropriate and unlawful compensation, and in failing to put the interests of the Plaintiffs, and other shareholders of the Count I Funds ahead of its own interests, Defendant has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of § 36(b).

172. The Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, "the amount of compensation or payments received from" the Count I Funds and earnings that would have accrued to Plaintiffs had that compensation not been paid.

173. Alternatively, the Plaintiffs seek rescission of the contracts and restitution of all fees paid pursuant thereto. *See* 15 U.S.C. § 80a-46(a-b) of the ICA. When a violation of the ICA has occurred, a court may order that the Investment Management Agreements between Defendant and the Count I Funds on behalf of the Count I Funds be rescinded, thereby requiring restitution of all investment management fees paid to it by the Count I Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## COUNT II

### AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b) DERIVATIVELY ON BEHALF OF THE HARTFORD FUNDS

### (Unreasonable and Excessive Rule 12b-1 Distribution Fees and Extraction of Additional Compensation for Investment Management Services)

174. The Plaintiffs repeats and realleges each and every allegation contained prior to Count II as if fully set forth herein.

175.  The 12b-1 fees charged and received by Defendant HIFSCO were designed to, and did, extract additional compensation for Defendant's management services in violation of Defendant's fiduciary duty under ICA § 36(b).  Even to the extent that the 12b-1 fees (as opposed to market forces, continued participant contributions or appreciation) contributed to the growth in assets of the Hartford Funds, the resulting economies of scale benefited only Defendant, and not the Hartford Funds or their shareholders, such as the Plaintiffs.

176.  In failing to pass along economies-of-scale benefits from the 12b-1 fees, and in continuing to assess 12b-1 fees pursuant to the HMF Distribution Plan and the HMFII Distribution Plan despite the fact that no benefits inured to the Hartford Funds or their shareholders, Defendant HIFSCO has violated, and continues to violate, the ICA and has breached and continues to breach its statutory fiduciary duty to Plaintiffs and the Funds in violation of § 36(b), both as a result of a negotiation process that lacked good faith and integrity and/or with respect to the substantive amounts of the fees.

177.  Plaintiffs seek, pursuant to ICA § 36(b)(3), the "actual damages resulting from the breach of fiduciary duty" by Defendant, up to and including, the "amount of compensation or payments received from" the Hartford Funds as well as earnings that would have accrued to Plaintiffs had that compensation not been paid.

178.  Alternatively, the Plaintiffs seeks rescission of the Rule 12b-1 Distribution Plans and restitution of all fees paid pursuant thereto.  *See* 15 U.S.C. § 80a-46(a-b) of the ICA. When a violation of the ICA has occurred, a court may order that the contracts between the Defendant and the Hartford Funds on behalf of the Hartford Funds be rescinded, thereby requiring restitution of all 12b-1 fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs,

disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(1) An order declaring that Defendant has violated and continues to violate ICA §§ 12, 36(b) and Rule 12b-1 through the receipt of fees from the Hartford Funds that breach Defendant's fiduciary duty with respect to the receipt of compensation.

(2) An order preliminarily and permanently enjoining Defendant from further violations of the Investment Company Act.

(3) An order awarding compensatory damages on behalf of the Hartford Funds against Defendant, including repayment of all unlawful and/or excessive fees paid to it by the Hartford Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law. Plaintiff reserves the right to seek punitive damages where applicable.

(4) An order rescinding the HMF HIFSCO Agreement and the HMFII HIFSCO Agreement between Defendant and the Count I Funds; and rescinding the Rule 12b-1 Distribution Plans between the Defendant and the Hartford Funds, pursuant to 15 U.S.C. § 80a-46(b), including restitution of all investment management fees paid to Defendant by the Count I Funds and the 12b-1 fees paid to it by the Hartford Funds from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

(5)  The Plaintiffs respectfully request a trial by jury for all issues above so triable.

(6) Such other and further relief as may be just and proper under the circumstances.

Dated: February 25, 2011

Respectfully submitted,

**LEVY PHILLIPS & KONIGSBERG, LLP**

By:  s/ Danielle Disporto

Danielle Disporto
Moshe Maimon
800 Third Ave.
New York, NY 10022
(212) 605-6200

**SZAFERMAN, LAKIND, BLUMSTEIN, & BLADER, P.C.**

Arnold C. Lakind
Robert L. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
(609) 275-4511

*Attorneys for Plaintiffs*

**TABLE I**

**HARTFORD FINANCIAL SERVICES GROUP, INC.**
# HIG

**HARTFORD FUNDS COMPLEX**
**(including 5 investment management companies containing 88+ funds)**

BOARDS OF DIRECTORS
SAME 9 PEOPLE
FOR ALL 88+ FUNDS
(contained in 5 investment
management companies)

**DEFENDANT HIFSCO**
**(wholly owned subsidiary of HIG)**

**INVESTMENT ADVISER/MANAGER FOR ALL FUNDS**
**AT ISSUE IN THIS COMPLAINT**

- **provides management and distribution services**
- **collects management fees & 12b-1 fees**

**HARTFORD MUTUAL**
**FUNDS, INC.**
**HMF**
Advisers Fund
Global Health Fund
Inflation Plus Fund
Conservative Allocation Fund
Money Market Fund

**HARTFORD MUTUAL**
**FUNDS II, INC.**
**HMFII**

Growth Opportunities Fund

**HARTFORD HLS SERIES FUND II, INC.**
**HARTFORD SERIES FUND, INC.**
**HARTFORD INCOME SHARES FUND, INC.**
**(Hartford investment management companies with funds that are**
**not at issue in this complaint)**

# TABLE II

## HMF
**open-end management investment company registered under the ICA**

### ADVISERS FUND
Adviser:    **HIFSCO**
             **Fees:  Advisory**
             **12b-1**
Sub-adviser:   **WELLINGTON**
             Fees: Sub-advisory (not challenged in Complaint)

### GLOBAL HEALTH FUND
Adviser:    **HIFSCO**
             **Fees:  Advisory**
             **12b-1**
Sub-adviser:   **WELLINGTON**
             Fees: Sub-advisory (not challenged in Complaint)

### INFLATION PLUS FUND
Adviser:    **HIFSCO**
             **Fees:  Advisory**
             **12b-1**
Sub-adviser:   **HIMCO**
             Fees: Sub-advisory (not challenged in Complaint)

### CONSERVATIVE ALLOCATION FUND
Adviser:    **HIFSCO**
             **Fees:  Advisory**
             **12b-1**
Sub-adviser:   **HIMCO**
             Fees: Sub-advisory (not challenged in Complaint)

### MONEY MARKET  FUND
Adviser:    **HIFSCO**
             **Fees:**  **Advisory** (not challenged in Complaint)
             **12b-1**
Sub-adviser:   **HIMCO**
             Fees: Sub-advisory (not challenged in Complaint)

## HMFII
**open-end management investment company registered under the ICA**

### GROWTH OPPORTUNITIES FUND
Adviser:    **HIFSCO**
             **Fees:  Advisory**
             **12b-1**
Sub-Adviser:   **WELLINGTON**
             Fees:  Sub-advisory (not challenged in Complaint)