# EXHIBIT 6

```
<DOCUMENT>
<TYPE>EX-99.G
<SEQUENCE>3
<FILENAME>b64571evexv99wg.txt
<DESCRIPTION>MASTER CUSTODIAN AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT G

EXECUTION COPY

MASTER CUSTODIAN CONTRACT

This Master Custodian Contract (this "Contract") is made as of February 8, 2007 by and among each registered investment company identified on the signature page hereto (each such investment company and each investment company subsequently made subject to this Contract in accordance with Section 21.1 below, shall hereinafter be referred to as a "FUND" and references made herein to "the Fund" shall be deemed references to each Fund), and STATE STREET BANK and TRUST COMPANY, a Massachusetts trust company (the "CUSTODIAN").

WITNESSETH:

WHEREAS, each Fund is authorized to issue shares of common stock or shares of beneficial interest in separate series ("SHARES"), with each such series representing interests in a separate portfolio of securities and other assets; and

WHEREAS, each Fund intends that this Contract be applicable to each of its series set forth on Appendix A hereto (such series together with all other series subsequently established by the Fund and made subject to this Contract in accordance with Section 21.2 below, shall hereinafter be referred to as the "PORTFOLIOS");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, the parties hereto agree as follows:

1.   Employment of Custodian and Property to be Held by It

Each Fund hereby employs the Custodian as a custodian of assets of the Portfolios, including securities which the Fund, on behalf of the applicable Portfolios, desires to be held in places within the United States ("DOMESTIC SECURITIES") and securities it desires to be held outside the United States ("FOREIGN SECURITIES"). Each Fund on behalf of the Portfolios agrees to deliver to the Custodian all securities and cash of the Portfolios, and all payments of income, payments of principal or capital distributions received by it with respect to all securities owned by the Portfolios from time to time, and the cash consideration received by it for such new or treasury shares of capital stock of the Fund representing Shares as may be issued or sold from time to time. The Custodian shall not be responsible for any property of a Portfolio which is not received by it or which is delivered out in accordance with Proper Instructions (as such term is defined in Article 9 hereof) including, without limitation, Portfolio property (i) held by brokers, private bankers or other entities on behalf of the Portfolio (each a "LOCAL AGENT"), (ii) held by Special Sub-Custodians (as such term is defined in Article 6 hereof), or (iii) held by entities which have advanced monies to or on behalf of the Portfolio and which have received Portfolio property as security for such advances (each a "PLEDGEE"). With respect to uncertificated shares (the "UNDERLYING SHARES") of registered "investment companies" (as defined in Section 3(a)(1) of the Investment Company Act of 1940, as amended from time to time (the "1940 ACT")), whether in the same "group of investment companies" (as defined in Section 12(d)(1)(G)(ii) of

```
<PAGE>
```

the 1940 Act) or otherwise, including pursuant to Section 12(d)(1)(F) of the 1940 Act (hereinafter sometimes referred to as the "UNDERLYING PORTFOLIOS") the holding of confirmation statements that identify the shares as being recorded in the Custodian's name on behalf of the Portfolios will be deemed custody for purposes hereof.

Upon receipt of Proper Instructions, the Custodian shall on behalf of the applicable Portfolios from time to time employ one or more sub-custodians, located in the United States as approved by the Board; provided, however, that the Custodian shall have no more or less responsibility or liability to the Funds on account of any actions or omissions of any sub-custodian so employed than any such sub-custodian has to the Custodian. The Custodian may place and maintain each Portfolio's foreign securities with foreign banking institution sub-custodians employed by the Custodian and/or foreign securities depositories, all as designated in Schedules A and B hereto, but only in accordance with the applicable provisions of Articles 3 and 4 hereof.

2.   Duties of the Custodian with Respect to Property of the Fund Held By the Custodian in the United States

2.1  Holding Securities. The Custodian shall hold and physically segregate for the account of each Portfolio all non-cash property to be held by it in the United States including all domestic securities owned by such Portfolio, other than (a) securities which are maintained pursuant to Section 2.9 in a clearing agency which acts as a securities depository or in a book-entry system authorized by the U.S. Department of the Treasury and certain federal agencies (each, a "U.S. SECURITIES SYSTEM") and (b) Underlying Shares owned by each Fund which are maintained pursuant to Section 2.11 hereof in an account with State Street Bank and Trust Company or such other entity which may from time to time act as a transfer agent for the Underlying Portfolios (the "UNDERLYING TRANSFER AGENT").

2.2  Delivery of Securities. The Custodian shall release and deliver domestic securities owned by a Portfolio held by the Custodian in a U.S. Securities System account of the Custodian only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio, which may be continuing instructions when deemed appropriate by the parties, and only in the following cases:

  1)   Upon sale of such securities for the account of the Portfolio and receipt of payment therefor;

  2)   Upon the receipt of payment in connection with any repurchase agreement related to such securities entered into by the Portfolio;

  3)   In the case of a sale effected through a U.S. Securities System, in accordance with the provisions of Section 2.9 hereof;

  4)   To the depository agent in connection with tender or other similar offers for securities of the Portfolio;

2

<PAGE>

  5)   To the issuer thereof or its agent when such securities are called, redeemed, retired or otherwise become payable; provided that, in any such case, the cash or other consideration is to be delivered to the Custodian;

  6)   To the issuer thereof, or its agent, for transfer into the name of the Portfolio or into the name of any nominee or nominees of the Custodian or into the name or nominee name of any agent appointed pursuant to Section 2.8 or into the name or nominee name of any sub-custodian appointed pursuant to Article 1; or for exchange for a different number of bonds, certificates or other evidence representing the same aggregate face amount or number of units; provided that, in any such case, the new securities are to be delivered to the Custodian;

  7)   Upon the sale of such securities for the account of the Portfolio, to the broker or its clearing agent, against a receipt, for examination in accordance with "street delivery" custom; provided that in any such case, the Custodian shall have no responsibility or liability for any loss arising from the delivery of such securities prior to receiving payment for such securities except as may arise from the Custodian's

own negligence or willful misconduct;

8)   For exchange or conversion pursuant to any plan of merger,
     consolidation, recapitalization, reorganization or readjustment of the
     securities of the issuer of such securities, or pursuant to provisions
     for conversion contained in such securities, or pursuant to any
     deposit agreement; provided that, in any such case, the new securities
     and cash, if any, are to be delivered to the Custodian;

9)   In the case of warrants, rights or similar securities, the surrender
     thereof in the exercise of such warrants, rights or similar securities
     or the surrender of interim receipts or temporary securities for
     definitive securities; provided that, in any such case, the new
     securities and cash, if any, are to be delivered to the Custodian;

10)  For delivery in connection with any loans of securities made by the
     Portfolio;

11)  For delivery as security in connection with any borrowings by the Fund
     on behalf of the Portfolio requiring a pledge of assets by the Fund on
     behalf of the Portfolio, but only against receipt of amounts borrowed;

12)  For delivery in accordance with the provisions of any agreement among
     the Fund on behalf of the Portfolio, the Custodian and a broker-dealer
     registered under the Securities Exchange Act of 1934, as amended (the
     "EXCHANGE ACT") and a member of The National Association of Securities
     Dealers, Inc. ("NASD"), relating to compliance with the rules of The
     Options Clearing Corporation and of any registered national securities
     exchange, or of any similar organization or organizations, regarding
     escrow or other arrangements in connection with transactions by the
     Fund on behalf of a Portfolio;

                                    3

<PAGE>

13)  For delivery in accordance with the provisions of any agreement among
     the Fund on behalf of the Portfolio, the Custodian, and a Futures
     Commission Merchant registered under the Commodity Exchange Act,
     relating to compliance with the rules of the Commodity Futures Trading
     Commission (the "CFTC") and/or any contract market, or any similar
     organization or organizations, regarding account deposits in
     connection with transactions by the Portfolio of the Fund;

14)  Upon receipt of instructions from the transfer agent ("TRANSFER
     AGENT") for the Fund, for delivery to such Transfer Agent or to the
     holders of shares in connection with distributions in kind, as may be
     described from time to time in the currently effective prospectus and
     statement of additional information of the Fund, related to the
     Portfolio ("PROSPECTUS"), in satisfaction of requests by holders of
     Shares for repurchase or redemption; and

15)  Upon the sale or other delivery of such securities (including, without
     limitation, to one or more (a) Special Sub-Custodians or (b)
     additional custodians appointed by the Fund, and communicated to the
     Custodian from time to time via a writing duly executed by an
     authorized officer of the Fund, for the purpose of engaging in
     repurchase agreement or securities lending transactions, each a "REPO
     CUSTODIAN"), and prior to receipt of payment therefor, as set forth in
     written Proper Instructions (such delivery in advance of payment,
     along with payment in advance of delivery made in accordance with
     Section 2.6(7), as applicable, shall each be referred to herein as a
     "FREE TRADE"), provided that such Proper Instructions shall set forth
     (a) the securities of the Portfolio to be delivered and (b) the
     person(s) to whom delivery of such securities shall be made;

16)  For delivery as initial or variation margin in connection with futures
     or options on futures contracts entered into by the Fund on behalf of
     the Portfolio; and

17) In the case of a sale processed through the Underlying Transfer Agent of Underlying Shares, in accordance with Section 2.11 hereof; and

18) For any other purpose, but only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio specifying (a) the securities of the Portfolio to be delivered and (b) the person or persons to whom delivery of such securities shall be made.

2.3 Registration of Securities. Domestic securities held by the Custodian (other than bearer securities) shall be registered in the name of the Portfolio or in the name of any nominee of a Fund on behalf of the Portfolio or of any nominee of the Custodian which nominee shall be assigned exclusively to the Portfolio, unless the Fund has authorized in writing the appointment of a nominee to be used in common with other registered investment companies having the same investment adviser as the Portfolio, or in the name or nominee name of any agent appointed pursuant to Section 2.8 or in the name or nominee name of any sub-custodian appointed pursuant to Article 1. All securities accepted by the Custodian on behalf of the Portfolio under the terms of this Contract shall be in "street name" or other

4

<PAGE>

good delivery form. If, however, a Fund directs the Custodian to maintain securities in "street name", the Custodian shall utilize its best efforts only to timely collect income due the Fund on such securities and to notify the Fund on a best efforts basis only of relevant corporate actions including, without limitation, pendency of calls, maturities, tender or exchange offers.

2.4 Bank Accounts. The Custodian shall open and maintain a separate bank account or accounts in the United States in the name of each Portfolio of each Fund, subject only to draft or order by the Custodian acting pursuant to the terms of this Contract, and shall hold in such account or accounts, subject to the provisions hereof, all cash received by it from or for the account of the Portfolio, other than cash maintained by the Portfolio in a bank account established and used in accordance with Rule 17f-3 under the 1940 Act. Funds held by the Custodian for a Portfolio may be deposited by it to its credit as Custodian in the banking department of the Custodian or in such other banks or trust companies as it may in its discretion deem necessary or desirable; provided, however, that every such bank or trust company shall be qualified to act as a custodian under the 1940 Act and that each such bank or trust company and the funds to be deposited with each such bank or trust company shall on behalf of each applicable Portfolio be approved by vote of a majority of the Board of Directors of the applicable Fund (in each case, the "BOARD"). Such funds shall be deposited by the Custodian in its capacity as Custodian and shall be withdrawable by the Custodian only in that capacity.

2.5 Collection of Income. Except with respect to Portfolio property released and delivered pursuant to Section 2.2(10) or 2.2(15) or purchased pursuant to Section 2.6(7), and subject to the provisions of Section 2.3, the Custodian shall collect on a timely basis all income and other payments with respect to registered domestic securities held hereunder to which each Portfolio shall be entitled either by law or pursuant to contract or custom in the securities business, and shall collect on a timely basis all income and other payments with respect to bearer domestic securities if, on the date of payment by the issuer, such securities are held by the Custodian or its agent thereof. Without limiting the generality of the foregoing, the Custodian shall detach and present for payment all coupons and other income items requiring presentation as and when they become due and shall collect interest when due on securities held hereunder. The Custodian shall credit income to the Portfolio as such income is received or in accordance with Custodian's then current payable date income schedule. Any credit to the Portfolio in advance of receipt may be reversed when the Custodian determines that payment will not occur in due course and the Portfolio may be charged at the Custodian's applicable rate for time credited. Income on securities loaned other than from the Custodian's securities lending

program shall be credited as received. Income due each Portfolio on securities loaned pursuant to the provisions of Section 2.2(10) shall be the responsibility of the applicable Fund. The Custodian will have no duty or responsibility in connection therewith, other than to provide the Fund with such information or data as may be necessary to assist the Fund in arranging for the timely delivery to the Custodian of the income to which the Portfolio is properly entitled.

5

<PAGE>

2.6   Payment of Fund Monies. Upon receipt of Proper Instructions on behalf of the applicable Portfolio, which may be continuing instructions when deemed appropriate by the parties, the Custodian shall pay out monies of a Portfolio in the following cases only:

1)   Upon the purchase of domestic securities, options, futures contracts or options on futures contracts for the account of the Portfolio but only (a) against the delivery of such securities or evidence of title to such options, futures contracts or options on futures contracts to the Custodian (or any bank, banking firm or trust company doing business in the United States or abroad which is qualified under the 1940 Act to act as a custodian and has been designated by the Custodian as its agent for this purpose) registered in the name of the Portfolio or in the name of a nominee of the Custodian referred to in Section 2.3 hereof or in proper form for transfer; (b) in the case of a purchase effected through a U.S. Securities System, in accordance with the conditions set forth in Section 2.9 hereof; (c) in the case of a purchase of Underlying Shares, in accordance with the conditions set forth in Section 2.11 hereof; (d) in the case of repurchase agreements entered into between the applicable Fund on behalf of the Portfolio and the Custodian, or another bank, or a broker-dealer which is a member of NASD, (i) against delivery of the securities either in certificate form or through an entry crediting the Custodian's account at the Federal Reserve Bank with such securities or (ii) against delivery of the receipt evidencing purchase by the Portfolio of securities owned by the Custodian along with written evidence of the agreement by the Custodian to repurchase such securities from the Portfolio or (e) for transfer to a time deposit account of the Fund in any bank, whether domestic or foreign; such transfer may be effected prior to receipt of a confirmation from a broker and/or the applicable bank pursuant to Proper Instructions from the Fund as defined in Article 9;

2)   In connection with conversion, exchange or surrender of securities owned by the Portfolio as set forth in Section 2.2 hereof;

3)   For the redemption or repurchase of Shares issued by the Portfolio as set forth in Article 7 hereof;

4)   For the payment of any expense or liability incurred by the Portfolio, including but not limited to the following payments for the account of the Portfolio: interest, taxes, management, accounting, transfer agent and legal fees, and operating expenses of the Fund whether or not such expenses are to be in whole or part capitalized or treated as deferred expenses;

5)   For the payment of any dividends on Shares of the Portfolio declared pursuant to the Fund's articles of incorporation or organization and by-laws or agreement or declaration of trust, as applicable, and Prospectus (collectively, "GOVERNING DOCUMENTS");

6)   For payment of the amount of dividends received in respect of securities sold short;

6

<PAGE>

7)   Upon the purchase of domestic securities including, without limitation, repurchase agreement transactions involving delivery of Portfolio monies to Repo Custodian(s), and prior to receipt of such investments, as set forth in written Proper Instructions (such payment in advance of delivery, along with delivery in advance of payment made in accordance with Section 2.2(15), as applicable, shall each be referred to herein as a "FREE TRADE"), provided that such Proper Instructions shall also set forth (a) the amount of such payment and (b) the person(s) to whom such payment is made; and

8)   For delivery as initial or variation margin in connection with futures or options on futures contracts entered into by a Fund on behalf of a Portfolio; and

9)   For any other purpose, but only upon receipt of Proper Instructions from the Fund on behalf of the applicable Portfolio specifying (a) the amount of such payment and (b) the person or persons to whom such payment is to be made.

2.7   Liability for Payment in Advance of Receipt of Securities Purchased. Except as specifically stated otherwise in this Contract, in any and every case where payment for purchase of domestic securities for the account of a Portfolio is made by the Custodian in advance of receipt of the securities purchased in the absence of specific written instructions from the Fund on behalf of such Portfolio to so pay in advance, the Custodian shall be absolutely liable to the Fund for such securities to the same extent as if the securities had been received by the Custodian.

2.8   Appointment of Domestic Sub-Custodians. The Custodian may at any time or times in its discretion appoint (and may at any time remove) any other bank or trust company which is itself qualified under the 1940 Act, to act as a custodian, as its sub-custodian to carry out such custodial functions under this Article 2 as the Custodian may from time to time direct; provided, however, that the appointment of any domestic sub-custodian shall not relieve the Custodian of or in any way abrogate its responsibilities or liabilities hereunder. An Underlying Transfer Agent shall not be deemed an agent or sub-custodian of the Custodian for purposes of this Section 2.8 or any other provision of this Contract.

2.9   Deposit of Fund Assets in U.S. Securities Systems. The Custodian may deposit and/or maintain securities owned by a Portfolio in a U.S. Securities System in compliance with the conditions of Rule 17f-4 under the 1940 Act, as amended from time to time.

2.10   Segregated Account. The Custodian shall upon receipt of Proper Instructions on behalf of each applicable Portfolio establish and maintain a segregated account or accounts for and on behalf of each such Portfolio, into which account or accounts may be transferred cash and/or securities, including securities maintained in an account by the Custodian pursuant to Section 2.9 hereof, (i) in accordance with the provisions of any agreement among the Fund on behalf of the Portfolio, the Custodian and a broker-dealer registered under the Exchange Act and a member of the NASD (or any futures commission merchant registered under the Commodity Exchange Act), relating to compliance with the rules of The Options Clearing Corporation and of any registered national securities exchange (or the Commodity Futures

7

<PAGE>

Trading Commission or any registered contract market), or of any similar organization or organizations, regarding escrow or other arrangements in connection with transactions by the Portfolio, (ii) for purposes of segregating cash or government securities in connection with options purchased, sold or written by the Portfolio or commodity futures contracts or options thereon purchased or sold by the Portfolio, (iii) for the purposes of compliance by the Portfolio with the procedures required by Investment Company Act Release No. 10666, or any subsequent release or releases of the Securities and Exchange Commission relating to the

maintenance of segregated accounts by registered investment companies and (iv) for any other purpose but only upon receipt of and in accordance with Proper Instructions from the Fund on behalf of the applicable Portfolio.

2.11 Deposit of Fund Assets with an Underlying Transfer Agent. Underlying Shares beneficially owned by a Fund, on behalf of a Portfolio, shall be deposited and/or maintained in an account or accounts maintained with an Underlying Transfer Agent. The Custodian's responsibilities with respect thereto shall be limited to the following:

1) Upon receipt of a confirmation or statement from an Underlying Transfer Agent that such Underlying Transfer Agent is holding or maintaining Underlying Shares in the name of the Custodian (or a nominee of the Custodian) for the benefit of a Portfolio, the Custodian shall identify by book-entry that such Underlying Shares are being held by it as custodian for the benefit of the Portfolio.

2) In respect of the purchase of Underlying Shares for the account of a Portfolio, upon receipt of Proper Instructions, the Custodian shall pay out monies of such Portfolio as so directed, and record such payment from the account of such Portfolio on the Custodian's books and records.

3) In respect of the sale or redemption of Underlying Shares for the account of a Portfolio, upon receipt of Proper Instructions, the Custodian shall transfer such Underlying Shares as so directed, record such transfer from the account of such Portfolio on the Custodian's books and records and, upon the Custodian's receipt of the proceeds therefor, record such payment for the account of such Portfolio on the Custodian's books and records.

The Custodian shall not be liable to any Fund for any loss or damage to such Fund or any Portfolio resulting from the maintenance of Underlying Shares with an Underlying Transfer Agent except to the extent that such loss or damage results directly from the fraud, negligence or willful misconduct of the Custodian or any of its agents.

2.12 Ownership Certificates for Tax Purposes. The Custodian shall execute ownership and other certificates and affidavits for all federal and state tax purposes in connection with receipt of income or other payments with respect to domestic securities of each Portfolio held by it and in connection with transfers of securities.

2.13 Proxies. The Custodian shall, with respect to the domestic securities held hereunder, cause to be promptly executed by the registered holder of such securities, if the securities are

8

<PAGE>

registered otherwise than in the name of the Portfolio or a nominee of the Portfolio, all proxies, without indication of the manner in which such proxies are to be voted, and shall promptly deliver to the Fund such proxies, all proxy soliciting materials and all notices relating to such securities.

2.14 Communications Relating to Portfolio Securities. Subject to the provisions of Section 2.3, the Custodian shall transmit promptly to the Fund for each Portfolio all written information (including, without limitation, pendency of calls and maturities of domestic securities and expirations of rights in connection therewith and notices of exercise of call and put options written by the Fund on behalf of the Portfolio and the maturity of futures contracts purchased or sold by the Portfolio) received by the Custodian from issuers of the securities being held for the Portfolio. With respect to tender or exchange offers, the Custodian shall transmit promptly to the Portfolio all written information received by the Custodian from issuers of the securities whose tender or exchange is sought and from the party (or his agents) making the tender or exchange offer. The Custodian shall not be liable for any untimely exercise of any tender, exchange or other right or

power in connection with domestic securities or other property of the Portfolios at any time held by it unless (i) the Custodian is in actual possession of such domestic securities or property and (ii) the Custodian receives Proper Instructions with regard to the exercise of any such right or power, and both (i) and (ii) occur at least three business days prior to the date on which the Custodian is to take action to exercise such right or power. The Custodian shall also transmit promptly to the Fund for each applicable Portfolio all written information received by the Custodian regarding any class action or other litigation in connection with Portfolio securities or other assets issued in the United States and then held, or previously held, during the term of this Contract by the Custodian for the account of the Fund for such Portfolio, including, but not limited to, opt-out notices and proof-of-claim forms. For avoidance of doubt, upon and after the effective date of any termination of this Contract, with respect to a Fund or its Portfolio(s), as may be applicable, the Custodian shall have no responsibility to so transmit any information under this Section 2.14.

2.15  Investments in Loans. The provisions of this section shall apply with respect to Loans (as defined below).

   1)  For purposes of this section, the following terms shall have the following meanings:

       "FINANCING DOCUMENTS" means promissory notes, mortgages, security agreements, assignment agreements, settlement agreements, participation agreements, leases and other instruments, certificates, agreements and documents (or copies thereof) constituting, evidencing, representing or otherwise relating to Loans.

       "LOAN INFORMATION" for a Loan means (i) the Financing Documents, (ii) the Payment Schedule, and (iii) such other information with respect to the Loan and Financing Documents as the Custodian reasonably may require in order to perform its services hereunder.

9

<PAGE>

       "LOANS" means Portfolio assets in the nature of loans and participations and other interests in loans in which a Fund on behalf of the applicable Portfolio is a lender, including leases used as financing transactions.

       "OBLIGOR" means the party obligated under applicable Financing Documents to pay a Loan.

       "PAYMENT SCHEDULE" an amortization schedule of payments identifying the amount and due dates of scheduled principal and interest payments and related payment amount information.

   2)  Safekeeping and Delivery of Financing Documents. The Custodian shall hold Financing Documents that the Fund delivers or causes to be delivered to Custodian from time to time in its vault facility but only pursuant to Proper Instructions from the Fund. Financing Documents other than those described in the foregoing sentence shall be held subject to the same security as other physical documents and records that the Custodian holds for the Fund. The Custodian is not obligated to require delivery of any Financing Documents or to require delivery of originals of Financing Documents that may be delivered to it as physical or electronic copies, or to inquire into the issuance of any Financing Documents or the existence of originals thereof, the Fund being solely responsible for determining the Financing Documents to be delivered, the form in which they are to be delivered and the method of acquiring and evidencing the ownership thereof. The Custodian shall promptly release any Financing Documents to the Fund or to any party specified to receive such Financing Documents pursuant to Proper Instructions from the Fund. The Custodian shall not be deemed to have or be charged with knowledge of the sale of any Loan unless the Custodian shall have received Proper Instructions from the

Fund with respect thereto.

3) Responsibility for Financing Documents. The Custodian shall not be obligated to examine the contents or determine the sufficiency of any Financing Documents or to provide any certification with respect thereto, whether such Financing Documents are received by the Custodian as original documents, photocopies, electronic documents, by facsimile or otherwise. The Custodian shall be entitled to assume the genuineness, sufficiency and completeness of any Financing Documents received, and the genuineness and due authority of any signature appearing thereon. The Custodian shall not be obligated to examine Financing Documents or make other inquiries to determine the sufficiency, validity or genuineness of or title to any Financing Documents or whether the assignment or transfer of the related Loan or applicable interest or participation in the related Loan is effective or enforceable. Without limiting the generality of the foregoing, it is understood and agreed that the Company in its sole discretion may cause delivery of a Loan to the Custodian to be evidenced solely by delivery to the Custodian of an original or physical or electronic copy of an assignment or transfer agreement or a confirmation or certification stating that the Fund on

10

<PAGE>

behalf of the applicable Portfolio has acquired such Loan, with or without delivery of any promissory note, participation certificate or similar instrument.

4) Record Keeping. The Custodian shall (i) record and track Loan payments on a daily basis; (ii) maintain detailed accrual information for each Loan, including but not limited to interest payments and fee payments received, receivables past due and principal payments received; (iii) value each Loan in accordance with the Fund's Proper Instructions utilizing the information sources designated in writing by the Fund; and (iv) provide reports and information from the books and records it maintains for the Fund in accordance with the Fund's Proper Instructions.

5) Collection of Loan Payments. The Fund on behalf of the applicable Portfolio shall cause the Custodian to be. named as its nominee for payment purposes under the Financing Documents or otherwise provide for the direct payment of the Loan payments to the Custodian. The Custodian shall credit to the Portfolio's account all payments with respect to a Loan actually received by the Custodian and identified as for the account of the Portfolio. All credits and payments credited to the Portfolio shall be conditional upon clearance and actual receipt by the Custodian of final payment thereon. If any Loan payments, whether principal or interest, are not received by the Custodian within three business days of the due date, the Custodian shall notify the Fund of the Obligor's failure to make the Loan payment. The Custodian shall have no obligations with respect to Loan payments and the collection thereof other than the duty to notify the Fund as provided in this paragraph. In no event shall the Custodian be under any obligation to make any advance of its own funds in respect of any Loan.

6) Other Responsibilities of the Custodian. The Custodian shall have no responsibilities or duties whatsoever with respect to Loans or the Financing Documents, except as expressly set forth herein. Without limiting the generality of the foregoing, the Custodian shall have no obligation to preserve any rights against prior parties or to exercise any right or perform any obligation in connection with the Loans or any Financing Documents (including, without limitation, no obligation to take any action in respect of or upon receipt of any consent solicitation, notice of default or similar notice received from any bank agent or Obligor, except that the Custodian shall undertake reasonable efforts to forward any such notice to the Fund). The Custodian shall be entitled to rely upon the Loan Information provided

to it by the Fund and any information and notices received by the Custodian from time to time from the related bank agent, Obligor or similar party with respect to the related Loan, without any obligation on the part of the Custodian independently to verify, investigate, recalculate, update or otherwise confirm the accuracy or completeness thereof. The Custodian shall have no liability for any delay or failure on the part of the Fund in providing necessary Loan Information to the Custodian, or for any inaccuracy therein or incompleteness thereof. In case any question arises as to its duties hereunder, the Custodian may request instructions from the Fund and shall be entitled at all times

11

<PAGE>

to refrain from taking any action unless it has received Proper Instructions from the Fund.

3.   Provisions Relating to Rules 17f-5 and 17f-7

3.1   Definitions. The following capitalized terms as used throughout this Contract shall have the following meanings:

"COUNTRY RISK" means all factors reasonably related to the systemic risk of holding Foreign Assets in a particular country including, but not limited to, such country's political environment, economic and financial infrastructure (including any Eligible Securities Depository operating in the country), prevailing or developing custody and settlement practices, and laws and regulations applicable to the safekeeping and recovery of Foreign Assets held in custody in that country.

"ELIGIBLE FOREIGN CUSTODIAN" has the meaning set forth in section (a)(1) of Rule 17f-5, including a majority-owned or indirect subsidiary of a U.S. Bank (as defined in Rule 17f-5), a bank holding company meeting the requirements of an Eligible Foreign Custodian (as set forth in Rule 17f-5 or by other appropriate action of the U.S. Securities and Exchange Commission (the "SEC")), or a foreign branch of a Bank (as defined in Section 2(a)(5) of the 1940 Act) meeting the requirements of a custodian under Section 17(f) of the 1940 Act; the term does not include any Eligible Securities Depository.

"ELIGIBLE SECURITIES DEPOSITORY" has the meaning set forth in section (b)(1) of Rule 17f-7 of the 1940 Act.

"FOREIGN ASSETS" means any of the Portfolios' investments (including foreign currencies) for which the primary market is outside the United States and such cash and cash equivalents as are reasonably necessary to effect the Portfolios' transactions in such investments.

"FOREIGN CUSTODY MANAGER" has the meaning set forth in section (a)(3) of Rule 17f-5 of the 1940 Act.

3.2   The Custodian as Foreign Custody Manager.

1)   Delegation to the Custodian as Foreign Custody Manager. Each Fund, by resolution adopted by its Board, hereby delegates to the Custodian, subject to Section (b) of Rule 17f-5, the responsibilities set forth in this Section 3.2 with respect to Foreign Assets of the Portfolios held outside the United States, and the Custodian hereby accepts such delegation as Foreign Custody Manager with respect to the Portfolios.

2)   Countries Covered. The Foreign Custody Manager shall be responsible for performing the delegated responsibilities defined below only with respect to the countries and custody arrangements for each such country listed on Schedule A to

12

<PAGE>

this Contract, which list of countries may be amended from time to time by the Fund with the agreement of the Foreign Custody Manager. The Foreign Custody Manager shall list on Schedule A the Eligible Foreign Custodians selected by the Foreign Custody Manager to maintain the assets of the Portfolios, which list of Eligible Custodians may be amended from time to time in the sole discretion of the Foreign Custody Manager. The Foreign Custody Manager will provide amended versions of Schedule A in accordance with Section 3.2(5) hereof.

Upon the receipt by the Foreign Custody Manager of Proper Instructions to open an account or to place or maintain Foreign Assets in a country listed on Schedule A, and the fulfillment by the Fund, on behalf of the applicable Portfolios, of the applicable account opening requirements for such country, the Foreign Custody Manager shall be deemed to have been delegated by the Board on behalf of the Portfolios responsibility as Foreign Custody Manager with respect to that country and to have accepted such delegation. Execution of this Contract by a Fund shall be deemed to be a Proper Instruction to open an account, or to place or maintain Foreign Assets, in each country listed on Schedule A in which the Custodian has previously placed or currently maintains Foreign Assets pursuant to the terms of the Contract. Following the receipt of Proper Instructions directing the Foreign Custody Manager to close the account of a Portfolio with the Eligible Foreign Custodian selected by the Foreign Custody Manager in a designated country, the delegation by the Board on behalf of the Portfolios to the Custodian as Foreign Custody Manager for that country shall be deemed to have been withdrawn and the Custodian shall immediately cease to be the Foreign Custody Manager of the Portfolios with respect to that country.

The Foreign Custody Manager may withdraw its acceptance of delegated responsibilities with respect to a designated country upon written notice to the Fund. Thirty days (or such longer period to which the parties agree in writing) after receipt of any such notice by the Fund, the Custodian shall have no further responsibility in its capacity as Foreign Custody Manager to the Fund with respect to the country as to which the Custodian's acceptance of delegation is withdrawn.

3)  Scope of Delegated Responsibilities:

    a)  Selection of Eligible Foreign Custodians. Subject to the provisions of this Section 3.2, the Foreign Custody Manager may place and maintain the Foreign Assets in the care of the Eligible Foreign Custodian selected by the Foreign Custody Manager in each country listed on Schedule A, as amended from time to time. In performing its delegated responsibilities as Foreign Custody Manager to place or maintain Foreign Assets with an Eligible Foreign Custodian, the Foreign Custody Manager shall determine that the Foreign Assets will be subject to reasonable care, based on the standards applicable to custodians in the country in which the Foreign Assets will be held by that Eligible Foreign Custodian, after considering

13

<PAGE>

    all factors relevant to the safekeeping of such assets, including, without limitation the factors specified in Rule 17f-5(c)(1).

    b)  Contracts With Eligible Foreign Custodians. The Foreign Custody Manager shall determine that the contract governing the foreign custody arrangements with each Eligible Foreign Custodian selected by the Foreign Custody Manager will satisfy the requirements of Rule 17f-5(c)(2).

c)   Monitoring. In each case in which the Foreign Custody Manager maintains Foreign Assets with an Eligible Foreign Custodian selected by the Foreign Custody Manager, the Foreign Custody Manager shall establish a system to monitor (i) the appropriateness of maintaining the Foreign Assets with such Eligible Foreign Custodian and (ii) the performance of the contract governing the custody arrangements established by the Foreign Custody Manager with the Eligible Foreign Custodian. In the event the Foreign Custody Manager determines that the custody arrangements with an Eligible Foreign Custodian it has selected are no longer appropriate, the Foreign Custody Manager shall notify the Board in accordance with Section 3.2(5) hereunder.

4)   Guidelines for the Exercise of Delegated Authority. For purposes of this Section 3.2, the Board shall be deemed to have considered and determined to accept such Country Risk as is incurred by placing and maintaining the Foreign Assets in each country for which the Custodian is serving as Foreign Custody Manager of the Portfolios.

5)   Reporting Requirements. The Foreign Custody Manager shall report the withdrawal of the Foreign Assets from an Eligible Foreign Custodian and the placement of such Foreign Assets with another Eligible Foreign Custodian by providing to the Board an amended Schedule A at the end of the calendar quarter in which an amendment to such Schedule has occurred. The Foreign Custody Manager shall make written reports notifying the Board of any other material change in the foreign custody arrangements of the Portfolios described in this Section 3.2 after the occurrence of the material change.

6)   Standard of Care as Foreign Custody Manager of a Portfolio. In performing the responsibilities delegated to it, the Foreign Custody Manager agrees to exercise reasonable care, prudence and diligence such as a person having responsibility for the safekeeping of assets of management investment companies registered under the 1940 Act would exercise.

14

<PAGE>

7)   Representations with Respect to Rule 17f-5. The Foreign Custody Manager represents to the Fund that it is a U.S. Bank as defined in section (a)(7) of Rule 17f-5. The Fund represents to the Custodian that the Board has determined that it is reasonable for the Board to rely on the Custodian to perform the responsibilities delegated pursuant to this Contract to the Custodian as the Foreign Custody Manager of the Portfolios.

8)   Effective Date and Termination of the Custodian as Foreign Custody Manager. The Board's delegation to the Custodian as Foreign Custody Manager of the Portfolios shall be effective as of the date hereof and shall remain in effect until terminated at any time, without penalty, by written notice from the terminating party to the non-terminating party. Termination will become effective thirty (30) days after receipt by the non-terminating party of such notice. The provisions of Section 3.2(2) hereof shall govern the delegation to and termination of the Custodian as Foreign Custody Manager of the Portfolios with respect to designated countries.

3.3  Eligible Securities Depositories.

1)   Analysis and Monitoring. The Custodian shall (a) provide the Fund (or its duly-authorized investment manager or investment adviser) with an analysis of the custody risks associated with maintaining assets with the Eligible Securities Depositories set forth on Schedule B hereto in accordance with section (a)(1)(i)(A) of Rule 17f-7, and (b) monitor such risks on a continuing basis, and promptly notify the Fund (or its duly-authorized investment manager or investment adviser) of any material change in such risks, in accordance with section (a)(1)(i)(B)

of Rule 17f-7.

2)    Standard of Care. The Custodian agrees to exercise reasonable care, prudence and diligence in performing the duties set forth in Section 3.3(1).

4.    Duties of the Custodian with Respect to Property of the Portfolios Held Outside the United States

4.1   Definitions. Capitalized terms in this Article 4 shall have the following meanings:

"FOREIGN SECURITIES SYSTEM" means an Eligible Securities Depository listed on Schedule B hereto.

"FOREIGN SUB-CUSTODIAN" means a foreign banking institution serving as an Eligible Foreign Custodian.

4.2   Holding Securities. The Custodian shall identify on its books as belonging to the Portfolios the foreign securities held by each Foreign Sub-Custodian or Foreign Securities System. The Custodian may hold foreign securities for all of its customers, including the Portfolios, with any Foreign Sub-Custodian in an account that is identified

15

<PAGE>

as belonging to the Custodian for the benefit of its customers, provided however, that (i) the records of the Custodian with respect to foreign securities of the Portfolios which are maintained in such account shall identify those securities as belonging to the Portfolios and (ii), to the extent permitted and customary in the market in which the account is maintained, the Custodian shall require that securities so held by the Foreign Sub-Custodian be held separately from any assets of such Foreign Sub-Custodian or of other customers of such Foreign Sub-Custodian.

4.3   Foreign Securities Systems. Foreign securities shall be maintained in a Foreign Securities System in a designated country through arrangements implemented by the Custodian or a Foreign Sub-Custodian, as applicable, in such country.

4.4   Transactions in Foreign Custody Account.

1)    Delivery of Foreign Assets. The Custodian or a Foreign Sub-Custodian shall release and deliver foreign securities of the Portfolios held by the Custodian or such Foreign Sub-Custodian, or in a Foreign Securities System account, only upon receipt of Proper Instructions, which may be continuing instructions when deemed appropriate by the parties, and only in the following cases:

a)    upon the sale of such foreign securities for the Portfolio in accordance with commercially reasonable market practice in the country where such foreign securities are held or traded, including, without limitation: (A) delivery against expectation of receiving later payment; or (B) in the case of a sale effected through a Foreign Securities System, in accordance with the rules governing the operation of the Foreign Securities System;

b)    in connection with any repurchase agreement related to foreign securities;

c)    to the depository agent in connection with tender or other similar offers for foreign securities of the Portfolios;

d)    to the issuer thereof or its agent when such foreign securities are called, redeemed, retired or otherwise become payable;

e)    to the issuer thereof, or its agent, for transfer into the name of the Custodian (or the name of the respective Foreign

Sub-Custodian or of any nominee of the Custodian or such Foreign Sub-Custodian) or for exchange for a different number of bonds, certificates or other evidence representing the same aggregate face amount or number of units;

f) to brokers, clearing banks or other clearing agents for examination or trade execution in accordance with market custom; provided that in any such case the Foreign Sub-Custodian shall have no responsibility or liability for any loss arising from the delivery of such foreign securities prior to

16

<PAGE>

receiving payment for such foreign securities except as may arise from the Foreign Sub-Custodian's own negligence or willful misconduct;

g) for exchange or conversion pursuant to any plan of merger, consolidation, recapitalization, reorganization or readjustment of the securities of the issuer of such securities, or pursuant to provisions for conversion contained in such securities, or pursuant to any deposit agreement;

h) in the case of warrants, rights or similar foreign securities, the surrender thereof in the exercise of such warrants, rights or similar securities or the surrender of interim receipts or temporary securities for definitive securities;

i) for delivery as security in connection with any borrowing by a Fund on behalf of Portfolios requiring a pledge of assets by the Fund on behalf of such Portfolios;

j) in connection with trading in options and futures contracts, including delivery as original margin and variation margin;

k) in connection with the lending of foreign securities; and

(1) Upon the sale or other delivery of such foreign securities (including, without limitation, to one or more Special Sub-Custodians or Repo Custodians) as a Free Trade, provided that applicable Proper Instructions shall set forth (A) the foreign securities to be delivered and (B) the person or persons to whom delivery shall be made;

m) for any other purpose, but only upon receipt of Proper Instructions specifying the foreign securities to be delivered and naming the person or persons to whom delivery of such securities shall be made.

2) Payment of Portfolio Monies. Upon receipt of Proper Instructions, which may be continuing instructions when deemed appropriate by the parties, the Custodian shall pay out, or direct the respective Foreign Sub-Custodian or the respective Foreign Securities System to pay out, monies of a Portfolio in the following cases only:

a) upon the purchase of foreign securities for the Portfolio, unless otherwise directed by Proper Instructions, by (A) delivering money to the seller thereof or to a dealer therefor (or an agent for such seller or dealer) against expectation of receiving later delivery of such foreign securities; or (B) in the case of a purchase effected through a Foreign Securities System, in accordance with the rules governing the operation of such Foreign Securities System;

17

<PAGE>

b) in connection with the conversion, exchange or surrender of foreign securities of the Portfolio;

c) for the payment of any expense or liability of the Portfolio, including but not limited to the following payments: interest, taxes, investment advisory fees, transfer agency fees, fees under this Contract, legal fees, accounting fees, and other operating expenses;

d) for the purchase or sale of foreign exchange or foreign exchange contracts for the Portfolio, including transactions executed with or through the Custodian or its Foreign Sub-Custodians;

e) in connection with trading in options and futures contracts, including delivery as original margin and variation margin;

f) for payment of part or all of the dividends received in respect of securities sold short;

g) in connection with the borrowing or lending of foreign securities; and

(h) Upon the purchase of foreign investments including, without limitation, repurchase agreement transactions involving delivery of Portfolio monies to Repo Custodian(s), as a Free Trade, provided that applicable Proper Instructions shall set forth (A) the amount of such payment and (B) the person or persons to whom payment shall be made;

i) for any other purpose, but only upon receipt of Proper Instructions specifying the amount of such payment and naming the person or persons to whom such payment is to be made.

3) Market Conditions. Notwithstanding any provision of this Contract to the contrary, settlement and payment for Foreign Assets received for the account of the Portfolios and delivery of Foreign Assets maintained for the account of the Portfolios may be effected in accordance with the customary established securities trading or processing practices and procedures in the country or market in which the transaction occurs, including, without limitation, delivering Foreign Assets to the purchaser thereof or to a dealer therefor (or an agent for such purchaser or dealer) with the expectation of receiving later payment for such Foreign Assets from such purchaser or dealer.

The Custodian shall provide to the Boards the information with respect to custody and settlement practices in countries in which the Custodian employs a Foreign Sub-Custodian described on Schedule C hereto at the time or times set forth on such Schedule. The Custodian may revise Schedule C from time to time, provided that no such revision shall result in the Boards being provided with substantively less information than had been previously provided hereunder.

18

<PAGE>

4.5   Registration of Foreign Securities. The foreign securities maintained in the custody of a Foreign Sub-Custodian (other than bearer securities) shall be registered in the name of the applicable Portfolio or in the name of the Custodian or in the name of any Foreign Sub-Custodian or in the name of any nominee of the foregoing, and the applicable Fund on behalf of such Portfolio agrees to hold any such nominee harmless from any liability as a holder of record of such foreign securities. The Custodian or a Foreign Sub-Custodian shall not be obligated to accept securities on behalf of a Portfolio under the terms of this Contract unless the form of such securities and the manner in which they are delivered are in accordance with reasonable market practice.

4.6   Bank Accounts. The Custodian shall identify on its books as belonging to

the Fund cash (including cash denominated in foreign currencies) deposited with the Custodian. Where the Custodian is unable to maintain, or market practice does not facilitate the maintenance of, cash on the books of the Custodian, a bank account or bank accounts shall be opened and maintained outside the United States on behalf of a Portfolio with a Foreign Sub-Custodian. All accounts referred to in this Section shall be subject only to draft or order by the Custodian (or, if applicable, such Foreign Sub-Custodian) acting pursuant to the terms of this Contract to hold cash received by or from or for the account of the Portfolio. Cash maintained on the books of the Custodian (including its branches, subsidiaries and affiliates), regardless of currency denomination, is maintained in bank accounts established under, and subject to the laws of, The Commonwealth of Massachusetts.

4.7   Collection of Income. The Custodian shall use reasonable commercial efforts to collect all income and other payments with respect to the Foreign Assets held hereunder to which the Portfolios shall be entitled. In the event that extraordinary measures are required to collect such income, the Fund and the Custodian shall consult as to such measures and as to the compensation and expenses of the Custodian relating to such measures. The Custodian shall credit income to the applicable Portfolio as such income is received or in accordance with Custodian's then current payable date income schedule. Any credit to the Portfolio in advance of receipt may be reversed when the Custodian determines that payment will not occur in due course and the Portfolio may be charged at the Custodian's applicable rate for time credited. Income on securities loaned other than from the Custodian's securities lending program shall be credited as received.

4.8   Shareholder Rights. With respect to the foreign securities held pursuant to this Article 4, the Custodian will use reasonable commercial efforts to facilitate the exercise of voting and other shareholder rights, subject always to the laws, regulations and practical constraints that may exist in the country where such securities are issued. The Fund acknowledges that local conditions, including lack of regulation, onerous procedural obligations, lack of notice and other factors may have the effect of severely limiting the ability of the Fund to exercise shareholder rights.

4.9   Communications Relating to Foreign Securities. The Custodian shall transmit promptly to the Fund written information with respect to materials received by the Custodian via

19

<PAGE>

the Foreign Sub-Custodians from issuers of the foreign securities being held for the account of the Portfolios (including, without limitation, pendency of calls and maturities of foreign securities and expirations of rights in connection therewith). With respect to tender or exchange offers, the Custodian shall transmit promptly to the Fund written information with respect to materials so received by the Custodian from issuers of the foreign securities whose tender or exchange is sought or from the party (or its agents) making the tender or exchange offer. The Custodian shall not be liable for any untimely exercise of any tender, exchange or other right or power in connection with foreign securities or other property of the Portfolios at any time held by it unless (i) the Custodian or the respective Foreign Sub-Custodian is in actual possession of such foreign securities or property and (ii) the Custodian receives Proper Instructions with regard to the exercise of any such right or power, and both (i) and (ii) occur at least three business days prior to the date on which the Custodian is to take action to exercise such right or power. The Custodian shall also transmit promptly to the applicable Fund all written information received by the Custodian via the Foreign Sub-Custodians from issuers of the foreign securities being held for the account of the Portfolios regarding any class action or other litigation in connection with Portfolio foreign securities or other assets issued outside the United States and then held, or previously held, during the term of this Contract by the Custodian via a Foreign Sub-Custodian for the account of the Fund for such Portfolio, including, but not limited to, opt-out notices and proof-of-claim forms. For avoidance of doubt, upon and after the effective

date of any termination of this Contract, with respect to a Fund or its
Portfolio(s), as may be applicable, the Custodian shall have no
responsibility to so transmit any information under this Section 4.9.

4.10 Liability of Foreign Sub-Custodians. Each agreement pursuant to which the
Custodian employs a Foreign Sub-Custodian shall, to the extent possible,
require the Foreign Sub-Custodian to exercise reasonable care in the
performance of its duties, and to indemnify, and hold harmless, the
Custodian from and against any loss, damage, cost, expense, liability or
claim arising out of or in connection with the Foreign Sub-Custodian's
performance of such obligations. At a Fund's election, the Portfolios shall
be entitled to be subrogated to the rights of the Custodian with respect to
any claims against a Foreign Sub-Custodian as a consequence of any such
loss, damage, cost, expense, liability or claim if and to the extent that
the Portfolios have not been made whole for any such loss, damage, cost,
expense, liability or claim.

4.11 Liability of Custodian. Except as may arise from the Custodian's own
negligence or willful misconduct or the negligence or willful misconduct of
a Sub-Custodian, the Custodian shall be without liability to the Fund for
any loss, liability, claim or expense resulting from or caused by anything
which is part of Country Risk.

The Custodian shall be liable for the acts or omissions of a Foreign
Sub-Custodian to the same extent as set forth with respect to
sub-custodians generally in the Contract and, regardless of whether assets
are maintained in the custody of a Foreign Sub-Custodian or a Foreign
Securities System, the Custodian shall not be liable for any loss, damage,
cost, expense, liability or claim resulting from nationalization,
expropriation, currency

20

<PAGE>

restrictions, or acts of war or terrorism, or any other loss where the
Foreign Sub-Custodian has otherwise acted with reasonable care.

5.   Contractual Settlement Services (Purchase / Sales)

5.1 The Custodian shall, in accordance with the terms set out in this section,
debit or credit the appropriate cash account of each Portfolio in
connection with (i) the purchase of securities for such Portfolio, and (ii)
proceeds of the sale of securities held on behalf of such Portfolio, on a
contractual settlement basis.

5.2 The services described above (the "CONTRACTUAL SETTLEMENT SERVICES") shall
be provided for such instruments and in such markets as the Custodian may
advise from time to time. The Custodian may terminate or suspend any part
of the provision of the Contractual Settlement Services under this Contract
at its sole discretion immediately upon notice to the applicable Fund on
behalf of each Portfolio, including, without limitation, in the event of
force majeure events affecting settlement or any material disorder in
applicable securities markets.

5.3 The consideration payable in connection with a purchase transaction shall
be debited from the appropriate cash account of the applicable Portfolio as
of the time and date that monies would ordinarily be required to settle
such transaction in the applicable market. The Custodian shall promptly
recredit such amount at the time that the Portfolio or the Fund notifies
the Custodian by Proper Instruction that such transaction has been
canceled.

5.4 With respect to the settlement of a sale of securities, a provisional
credit of an amount equal to the net sale price for the transaction (the
"SETTLEMENT AMOUNT") shall be made to the account of the applicable
Portfolio as if the Settlement Amount had been received as of the close of
business on the date that monies would ordinarily be available in good
funds in the applicable market. Such provisional credit will be made
conditional upon (i) the Custodian's having received Proper Instructions

with respect to, or reasonable notice of, the transaction, as applicable; and (ii) the Custodian or its agent's having possession of the asset(s) (which shall exclude assets subject to any third party lending arrangement entered into by a Portfolio) associated with the transaction in good deliverable form and not being aware of any facts which would lead them to believe that the transaction will not settle in the time period ordinarily applicable to such transactions in the applicable market.

5.5   Simultaneously with the making of such provisional credit, the Fund on behalf of the applicable Portfolio agrees that the Custodian shall have, and hereby grants to the Custodian, a security interest in any property at any time held for the account of the Portfolio to the full extent of the credited amount, and each Portfolio hereby pledges, assigns and grants to the Custodian a continuing security interest and a lien on any and all such property under the Custodian's possession, in accordance with the terms of Article 17 of this Contract. In the event that the applicable Portfolio fails to promptly repay any

21

<PAGE>

provisional credit, the Custodian shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of The Commonwealth of Massachusetts.

5.6   The Custodian shall have the right to reverse any provisional credit or debit given in connection with the Contractual Settlement Services at any time when the Custodian believes, in its reasonable judgment, that such transaction will not settle in accordance with its terms or amounts due pursuant thereto will not be collectable or where the Custodian has not been provided Proper Instructions with respect thereto, as applicable, and the Portfolio shall be responsible for any costs or liabilities resulting from such reversal. Upon such reversal, a sum equal to the credited or debited amount shall become immediately payable by the Portfolio to the Custodian and may be debited from any cash account held for benefit of the Portfolio.

5.7   In the event that the Custodian is unable to debit an account in accordance with Section 5.6 above of the Portfolio, and the Portfolio fails to pay any amount due to the Custodian at the time such amount becomes payable in accordance with Section 5.6 this Contract, (i) the Custodian may charge the Portfolio for reasonable costs and expenses associated with providing the provisional credit, including without limitation the reasonable cost of funds associated therewith, (ii) the amount of any accrued dividends, interest and other distributions with respect to assets associated with such transaction may be set off against the credited amount, (iii) the provisional credit and any such costs and expenses shall be considered an advance of cash for purposes of this Contract and (iv) the Custodian shall have the right to setoff against any property and the discretion to sell, exchange, convey, transfer or otherwise dispose of any property at any time held for the account of the Portfolio to the full extent necessary for the Custodian to make itself whole, provided, however, that the Custodian shall notify the applicable Fund promptly following any such disposition of any property of a Portfolio, state the reason for such disposition and list the property disposed of.

6.   Special Sub-Custodians

Upon receipt of Proper Instructions, the Custodian shall, on behalf of one or more Portfolios, appoint one or more Special Sub-Custodians for the purposes of effecting such transactions as may be designated in such Proper Instructions or to serve as a Foreign Sub-Custodian in such markets as may be designated in such Proper Instructions. In connection with the appointment of any Special Sub-Custodian, and in accordance with Proper Instructions, the Custodian shall enter into a sub-custodian agreement with the Fund and the Special Sub-Custodian in form and substance acceptable to the Custodian and approved by such Fund, provided that such agreement shall in all events comply with the provisions of the 1940 Act and the rules and regulations thereunder and the terms and provisions of this Contract. At a Fund's election, the Portfolios shall be

entitled to be subrogated to the rights of the Custodian with respect to any claims against a Special Sub-Custodian as a consequence of any loss, damage, cost, expense, liability or claim if and to the extent that the Portfolios have not been made whole for any such loss, damage, cost, expense, liability or claim.

22

<PAGE>

7.   Payments for Sales or Repurchases or Redemptions of Shares of the Fund

The Custodian shall receive from the distributor for the Shares or from the Transfer Agent of the Fund and deposit into the account of the appropriate Portfolio such payments as are received for Shares of that Portfolio issued or sold from time to time by the applicable Fund. The Custodian will provide timely notification to the Fund on behalf of each such Portfolio and the Transfer Agent of any receipt by it of payments for Shares of such Portfolio.

From such funds as may be available for the purpose, the Custodian shall, upon receipt of instructions from the Transfer Agent, make funds available for payment to holders of Shares who have delivered to the Transfer Agent a request for redemption or repurchase of their Shares. In connection with the redemption or repurchase of Shares of a Portfolio, the Custodian is authorized upon receipt of instructions from the Transfer Agent to wire funds to or through a commercial bank designated by the redeeming shareholders.

8.   Tax Law

The Custodian shall have no responsibility or liability for any obligations now or hereafter imposed on the Fund, the Portfolios or the Custodian as custodian of the Portfolios by the tax law of the United States or of any state or political subdivision thereof. It shall be the responsibility of the Fund to notify the Custodian of the obligations imposed on the Fund with respect to the Portfolios or the Custodian as custodian of the Portfolios by the tax law of jurisdictions other than those mentioned in the above sentence, including responsibility for withholding and other taxes, assessments or other governmental charges, certifications and governmental reporting. The sole responsibility of the Custodian with regard to such tax law shall be to use reasonable efforts to assist the Fund with respect to any claim for exemption or refund under the tax law of jurisdictions for which the Fund has provided such information.

9.   Proper Instructions

"PROPER INSTRUCTIONS," which may also be standing instructions, as such term is used throughout this Contract shall mean instructions received by the Custodian from a Fund, a Fund's duly authorized transfer agent, investment manager or investment adviser, or a person or entity duly authorized by either of them. Such instructions may be in writing signed by the authorized person or persons or may be in a tested communication or in a communication utilizing access codes effected between electro-mechanical or electronic devices or may be by such other means and utilizing such intermediary systems and utilities as may be agreed from time to time by the Custodian and the person(s) or entity giving such instruction, provided that the Fund has followed any security procedures agreed to from time to time by the applicable Fund and the Custodian including, but not limited to, the security procedures selected by the Fund via the form of Funds Transfer Addendum hereto. Oral instructions will be considered Proper Instructions if the Custodian reasonably believes them to have been given by a person authorized to provide such instructions with respect to the transaction involved; the Fund shall cause all oral instructions to be confirmed in writing. For purposes of this Section, Proper Instructions shall include instructions received by the Custodian pursuant to any multi-party agreement which requires a segregated asset account in accordance with Section 2.10 hereof.

23

<PAGE>

Concurrently with the execution of this Contract, and from time to time thereafter, as appropriate, each Fund shall deliver to the Custodian, duly certified by such Fund's Treasurer or Assistant Treasurer, a certificate setting forth the names, titles, signatures and scope of authority of all persons authorized to give Proper Instructions or any other notice, request, direction, instruction, certificate or instrument on behalf of the Fund. Such certificate may be accepted and relied upon by the Custodian as conclusive evidence of the facts set forth therein and shall be considered to be in full force and effect until receipt by the Custodian of a similar certificate to the contrary.

10.  Actions Permitted without Express Authority

The Custodian may in its discretion, without express authority from the applicable Fund on behalf of each applicable Portfolio:

1)  make payments to itself or others for minor expenses of handling securities or other similar items relating to its duties under this Contract, provided that all such payments shall be accounted for to the Fund on behalf of the Portfolio;

2)  surrender securities in temporary form for securities in definitive form;

3)  endorse for collection, in the name of the Portfolio, checks, drafts and other negotiable instruments; and

4)  in general, attend to all non-discretionary details in connection with the sale, exchange, substitution, purchase, transfer and other dealings with the securities and property of the Portfolio except as otherwise directed by the applicable Board.

11.  Evidence of Authority

The Custodian shall be protected in acting upon any instructions, notice, request, consent, certificate or other instrument or paper reasonably believed by it to be genuine and to have been properly executed by or on behalf of the applicable Fund. The Custodian may receive and accept a copy of a resolution certified by the Secretary or an Assistant Secretary of any Fund as conclusive evidence (a) of the authority of any person to act in accordance with such resolution or (b) of any determination or of any action by the applicable Board as described in such resolution, and such resolution may be considered as in full force and effect until receipt by the Custodian of written notice to the contrary.

12.  Duties of Custodian with Respect to the Books of Account and Calculation of Net Asset Value and Net Income

The Custodian shall cooperate with and supply necessary information to the entity or entities appointed by the applicable Board to keep the books of account of each Portfolio and/or compute the net asset value per share of the outstanding Shares of each Portfolio.

24

<PAGE>

13.  Records

The Custodian shall with respect to each Portfolio create and maintain all records relating to its activities and obligations under this Contract in such manner as will meet the obligations of the Fund under the applicable provisions of the 1940 Act, with particular attention to Section 31 thereof and Rules 31a-1 and 31a-2 thereunder. All such records shall be the property of the Fund and shall at all times during the regular business hours of the Custodian be open for inspection by duly authorized officers, employees or agents of the Fund and employees and agents of the SEC. The Custodian shall, at the Fund's request, supply the Fund with a tabulation of securities owned by each Portfolio and held by the Custodian and shall, when requested to do so by the Fund and for such compensation as shall be agreed upon between the Fund and the Custodian, include certificate numbers in such tabulations.

Each Fund acknowledges and agrees that, with respect to investments maintained with an Underlying Transfer Agent, the Underlying Transfer Agent is the sole source of information on the number of shares of a fund held by it on behalf of a Portfolio and that the Custodian has the right to rely on holdings information furnished by the Underlying Transfer Agent to the Custodian in performing its duties under this Contract, including without limitation, the duties set forth in this Article 13; provided, however, that the Custodian shall be obligated to reconcile information as to purchases and sales of Underlying Shares contained in trade instructions and confirmations received by the Custodian and to report promptly any discrepancies to the Underlying Transfer Agent. Each Fund acknowledges that, with respect to Portfolio property released and delivered pursuant to Section 2.2(15), or purchased pursuant to Section 2.6(7) hereof, the Custodian is authorized and instructed to rely upon information provided to it by the Fund, the Fund's counterparty(ies), or the agents of either of them in performing its duties under this Contract, including without limitation, the duties set forth in this Article 13.

14.   Intentionally omitted.

15.   Reports to Fund by Independent Public Accountants

The Custodian shall provide the applicable Fund, on behalf of each of the Portfolios at such times as the Fund may reasonably require, with reports by independent public accountants on the accounting system, internal accounting control and procedures for safeguarding securities, futures contracts and options on futures contracts, including securities deposited and/or maintained in a U.S. Securities System or a Foreign Securities System (either, a "SECURITIES SYSTEM"), relating to the services provided by the Custodian under this Contract; such reports, shall be of sufficient scope and in sufficient detail, as may reasonably be required by the Fund to provide reasonable assurance that any material inadequacies would be disclosed by such examination, and, if there are no such inadequacies, the reports shall so state.

16.   Compensation of Custodian

The Custodian shall be entitled to reasonable compensation for its services and expenses as Custodian, as agreed upon in writing from time to time between each Fund on behalf of each applicable Portfolio and the Custodian.

25

<PAGE>

17.   Responsibility of Custodian

So long as and to the extent that it is in the exercise of reasonable care, the Custodian shall not be responsible for the title, validity or genuineness of any property or evidence of title thereto received by it or delivered by it pursuant to this Contract and shall be held harmless in acting upon any notice, request, consent, certificate or other instrument reasonably believed by it to be genuine and to be signed by the proper party or parties, including any futures commission merchant acting pursuant to the terms of a three-party futures or options agreement. The Custodian shall be held to the exercise of reasonable care in carrying out the provisions of this Contract, but shall be kept indemnified by each Fund and shall be without liability to any Fund for any action taken or omitted by it in good faith without negligence, including, without limitation, acting in accordance with any Proper Instruction. It shall be entitled to rely on and may act upon advice of counsel (who may be counsel for the Fund) on all matters, and shall be without liability for any action reasonably taken or omitted pursuant to such advice. The Custodian shall be without liability to any Fund or Portfolio for any loss, liability, claim or expense resulting from or caused by anything which is part of Country Risk, including without limitation nationalization, expropriation, currency restrictions, or acts of war, revolution, riots or terrorism.

Except as may arise from the Custodian's own negligence or willful misconduct or the negligence or willful misconduct of a sub-custodian or agent, the Custodian shall be without liability to any Fund for any loss, liability, claim or expense resulting from or caused by; (i) events or circumstances beyond

the reasonable control of the Custodian or any sub-custodian or Securities System or any agent or nominee of any of the foregoing, including, without limitation, nationalization or expropriation, imposition of currency controls or restrictions, the interruption, suspension or restriction of trading on or the closure of any securities market, power or other mechanical or technological failures or interruptions, computer viruses or communications disruptions, acts of war or terrorism, riots, revolutions, work stoppages, natural disasters or other similar events or acts; (ii) errors by any Fund or its investment manager or investment adviser in their instructions to the Custodian provided such instructions have been in accordance with this Contract; (iii) the insolvency of or acts or omissions by a Securities System; (iv) any delay or failure of any broker, agent or intermediary, central bank or other commercially prevalent payment or clearing system to deliver to the Custodian's sub-custodian or agent securities purchased or in the remittance or payment made in connection with securities sold; (v) any delay or failure of any company, corporation, or other body in charge of registering or transferring securities in the name of the Custodian, any Fund, the Custodian's sub-custodians, nominees or agents or any consequential losses arising out of such delay or failure to transfer such securities including non-receipt of bonus, dividends and rights and other accretions or benefits; (vi) delays or inability to perform its duties due to any disorder in market infrastructure with respect to any particular security or Securities System; (vii) any act or omission of a Special Sub-Custodian including, without limitation, reliance on reports prepared by a Special Sub-Custodian; and (viii) any provision of any present or future law or regulation or order of the United States of America, or any state thereof, or any other country, or political subdivision thereof or of any court of competent jurisdiction.

The Custodian shall be liable for the acts or omissions of a Foreign Sub-Custodian to the same extent as set forth with respect to sub-custodians generally in this Contract.

<div align="center">26</div>

&lt;PAGE&gt;

If a Fund on behalf of a Portfolio requires the Custodian to take any action with respect to securities, which action involves the payment of money or which action may, in the opinion of the Custodian, result in the Custodian or its nominee assigned to the Fund or the Portfolio being liable for the payment of money or incurring liability of some other form, such Fund on behalf of the Portfolio, as a prerequisite to requiring the Custodian to take such action, shall provide indemnity to the Custodian in an amount and form satisfactory to it.

If a Fund requires the Custodian, its affiliates, subsidiaries or agents, to advance cash or securities for any purpose (including but not limited to securities settlements, foreign exchange contracts and assumed settlement) or in the event that the Custodian or its nominee shall incur or be assessed any taxes, charges, expenses, assessments, claims or liabilities in connection with the performance of this Contract, except such as may arise from its or its nominee's own negligent action, negligent failure to act or willful misconduct, any property at any time held for the account of the applicable Portfolio shall be security therefor and should the Fund fail to repay the Custodian promptly, the Custodian shall be entitled to utilize available cash and to dispose of such Portfolio's assets to the extent necessary to obtain reimbursement.

Except as may arise from the Custodian's own negligence or willful misconduct, each Fund shall indemnify and hold the Custodian harmless from and against any and all costs, expenses, losses, damages, charges, reasonable counsel fees, payments and liabilities which may be asserted against the Custodian (a) acting in accordance with any Proper Instruction including, without limitation, any Proper Instruction with respect to Free Trades including, but not limited to, cost, expense, loss, damage, liability, tax, charge, assessment or claim resulting from (i) the failure of the applicable Portfolio to receive income with respect to purchased investments, (ii) the failure of the applicable Portfolio to recover amounts invested on maturity of purchased investments, (iii) the failure of the Custodian to respond to or be aware of notices or other corporate communications with respect to purchased investments, or (iv) the Custodian's reliance upon information provided by the

applicable Fund, the Fund's counterparty(ies) or the agents of either of them with respect to Fund property released, delivered or purchased pursuant to either of Section 2.2(15) or Section 2.6(7) hereof, or (b) for the acts or omissions of any Special Sub-Custodian.

In no event shall the Custodian be liable for indirect, special or consequential damages.

18. Effective Period, Termination and Amendment

1) This Contract shall become effective as of its execution, shall continue in full force and effect until terminated as hereinafter provided, and may be amended at any time by mutual written agreement of the parties hereto.

2) At any time following the effective date of this Contract:

(i) the Funds may at any time by action of the applicable Board(s) of Directors immediately terminate this Contract in the event of the appointment of a conservator or receiver for the Custodian by an appropriate regulatory agency or court of competent jurisdiction; and

27

<PAGE>

(ii) any party to this Contract may at any time terminate this Contract upon one hundred eighty (180) days prior written notice to the other party or parties.

3) Notwithstanding the foregoing, no Fund shall terminate this Contract in contravention of any applicable federal or state regulations, or any provision of such Fund's Governing Documents.

4) Any termination of this Contract may be with respect to any one particular Fund or Portfolio and, in such event, shall in no way affect the rights and duties under this Contract with respect to any other Fund or Portfolio.

5) Upon termination of the Contract for any reason, the applicable Fund on behalf of each applicable Portfolio shall pay to the Custodian such compensation as may be due as of the date of such termination and shall likewise reimburse the Custodian for its costs, expenses and disbursements associated with its provision of services hereunder to such Portfolio.

19. Successor Custodian

If a successor custodian for one or more of the Portfolios shall be appointed by the applicable Board, the Custodian shall, upon termination and receipt of Proper Instructions, deliver to such successor custodian at the office of the Custodian, duly endorsed and in the form for transfer, all securities of each applicable Portfolio then held by it hereunder and shall transfer to an account of the successor custodian all of the securities of each such Portfolio held in a Securities System or at an Underlying Transfer Agent.

If no such successor custodian shall be appointed, the Custodian shall, in like manner, upon receipt of Proper Instructions, deliver at the office of the Custodian and transfer such securities, funds and other properties in accordance with such Proper Instructions.

In the event that no Proper Instructions designating a successor custodian or alternative arrangements shall have been delivered to the Custodian on or before the date when such termination shall become effective, then the Custodian shall have the right to deliver to a bank or trust company, which is a "bank" as defined in the 1940 Act, doing business in Boston, Massachusetts or New York, New York, of its own selection, having an aggregate capital, surplus, and undivided profits, as shown by its last published report, of not less than $25,000,000, all securities, funds and other properties held by the Custodian on

behalf of each applicable Portfolio and all instruments held by the Custodian relative thereto and all other property held by it under this Contract on behalf of each applicable Portfolio and to transfer to an account of such successor custodian all of the securities of each such Portfolio held in any Securities System or at an Underlying Transfer Agent. Thereafter, such bank or trust company shall be the successor of the Custodian under this Contract.

In the event that securities, funds and other properties remain in the possession of the Custodian after the date of termination hereof owing to failure of any Fund to provide Proper Instructions, the Custodian shall be entitled to fair compensation for its services during such period

28

<PAGE>

as the Custodian retains possession of such securities, funds and other properties and the provisions of this Contract relating to the duties and obligations of the Custodian shall remain in full force and effect.

20. Interpretive and Additional Provisions

In connection with the operation of this Contract, the Custodian and each Fund on behalf of each of the Portfolios, may from time to time agree on such provisions interpretive of or in addition to the provisions of this Contract as may in their joint opinion be consistent with the general tenor of this Contract; provided that no such interpretive or additional provisions shall contravene any applicable federal or state regulations or any provision of a Fund's Governing Documents. Any agreement as to interpretive or additional provisions shall be in a writing signed by the Custodian and each applicable Fund and shall be annexed hereto. Unless such writing specifically provides otherwise, no interpretive or additional provisions made as provided in this sub-section shall be deemed to be an amendment of this Contract.

21. Additional Funds and Portfolios

21.1 Additional Funds. In the event that any registered investment company in addition to those executing this Contract on the signature page hereto desires to have the Custodian render services as custodian under the terms hereof, it shall so notify the Custodian in writing, and if the Custodian agrees to provide such services, such registered investment company shall become a Fund hereunder and be bound by all terms and conditions and provisions hereof including, without limitation, the representations and warranties set forth in Article 22 below. The Custodian acknowledges that it will agree to render services as custodian to any additional registered investment companies that are determined to be acceptable pursuant to the Custodian's then-current new business acceptance policies and procedures, and that it will promptly notify any entity that is determined to be unacceptable.

21.2 Additional Portfolios. In the event that any Fund establishes one or more series of Shares in addition to those set forth on Appendix A hereto with respect to which it desires to have the Custodian render services as custodian under the terms hereof, it shall so notify the Custodian in writing, and if the Custodian agrees to provide such services, such series of Shares shall become a Portfolio hereunder. The Custodian acknowledges that that it will agree to render services as custodian to any additional portfolios provided that (a) the types of assets held by such portfolios, and (b) the services to be provided by the Custodian hereunder, are substantially the same as the types of assets and services relating to the then existing Portfolios and Funds. If the conditions of the preceding sentence do not apply to an additional portfolio, the parties agree to negotiate in good faith to reach mutually acceptable terms relating to the services, if any, to be provided by the Custodian and the compensation, if any, to be paid to the Custodian with regard to such services.

22. Representations and Warranties.

29

<PAGE>

Each of the Custodian and the Funds hereby represents and warrants to the other parties hereto that (a) it is duly incorporated or organized and is validly existing in good standing in its jurisdiction of incorporation or organization; (b) it has the requisite power and authority under applicable law and its Governing Documents to enter into and perform this Contract; (c) all requisite proceedings have been taken to authorize it to enter into and perform this Contract; (d) this Contract constitutes its legal, valid, binding and enforceable agreement; and (e) its entrance into this Contract shall not cause a material breach or be in material conflict with any other agreement or obligation of such party or any law or regulation applicable to it.

23.  Massachusetts Law to Apply

This Contract shall be construed and the provisions thereof interpreted under and in accordance with laws of The Commonwealth of Massachusetts.

24.  Prior Contracts

This Contract supersedes and terminates, as of the date hereof, all prior contracts between each Fund on behalf of each of the Portfolios and the Custodian relating to the custody of such Fund's assets.

25.  Reproduction of Documents

This Contract and all schedules, exhibits, addenda, attachments and amendments hereto may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties hereto all/each agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

26.  Remote Access Services Addendum.

The Custodian and each Fund agree to be bound by the terms of the Remote Access Services Addendum attached hereto.

27.  Notices.

Any Proper Instruction, notice, communication or other instrument required to be given hereunder may be (a) delivered in person to the offices of the parties as set forth herein during normal business hours; or (b) effected directly between electro-mechanical or electronic devices as provided in Article 9 hereof; or (c) delivered by prepaid certified mail (in which case it shall be deemed to have been served on the delivery date specified on the return receipt ); or (d) delivered by telecopy (in which case it shall be deemed to have been served on the business day after the receipt thereof). Each party hereto shall designate from time to time the person(s) and address(es) for Proper Instructions and other communications related to the daily operations. Proper Instructions and other communications related to this Contract (including, but not limited

                                    30

<PAGE>

to termination, breach, or default) shall be delivered at the following addresses or such other addresses as may be notified by any party from time to time.

     To Custodian:

          State Street Bank and Trust Company
          801 Pennsylvania Avenue
          Kansas City, MO 64105

```
                    Attention: Vice President, Custody
                    Telephone: 816-871-4100
                    Telecopy: 816-871-9675

          To each Fund:

                    [Fund name]
                    c/o Hartford Administrative Services Company
                    500 Bielenberg Drive
                    Woodbury, MN 55125
                    Attention: Tami Fagely, Vice President
                    Tel: 651-738-5586
                    Fax: 651-738-0996

                    With a copy to:

                    The Hartford
                    Life Law Group - Mutual Funds Unit
                    200 Hopmeadow Street
                    Simsbury, CT 06070
                    Attention: Edward MacDonald, Assistant General Counsel
                    Tel: 860-843-9934
                    Fax: 860-297-8892
```

28.  Counterparts.

        This Contract may be executed in several counterparts, each of which shall
be deemed to be an original, and all such counterparts taken together shall
constitute one and the same Contract.

29.  Business Continuity.

        On or before the date of this Contract, the Custodian shall, at its
expense, have implemented, and shall continue to maintain and periodically test
and update a commercially reasonable business continuity and disaster recovery
plan to provide for the protection of information, data and assets of and
relevant to its customers, including the Funds.


                                        31

<PAGE>

30.  Severability; Waiver.

        If any provision or provisions of this Contract shall be held to be
invalid, unlawful or unenforceable, the validity, legality and enforceability of
the remaining provisions shall not in any way be affected or impaired. Failure
by any party to insist on strict compliance with this Contract will not be
considered a waiver by such party of any default or breach under the Contract.
The failure of any party to exercise any right under this Contract shall not to
any extent preclude such party from asserting or relying upon such right at any
other time or in any other instance.

31.  Employment of Sub-contractors and Agents.

        Subject to Section 2.8 and Article 4, the Custodian may at any time or
times in its discretion employ (and may at any time remove) sub-contractors and
agents to carry out such functions as the Custodian may from time to time
direct; provided, however, that the employment of any sub-contractor or agent
shall not relieve the Custodian of its responsibilities or liabilities
hereunder.

31.  Shareholder Communications

        SEC Rule 14b-2 requires banks which hold securities for the account of
customers to respond to requests by issuers of securities for the names,
addresses and holdings of beneficial owners of securities of that issuer held by
the bank unless the beneficial owner has expressly objected to disclosure of
this information. In order to comply with the rule, the Custodian needs each
Fund to indicate whether it authorizes the Custodian to provide the Fund's

names, address, and share position to requesting companies whose securities the
Fund owns. If a Fund tells the Custodian "no", the Custodian will not provide
this information to requesting companies. If a Fund tells the Custodian "yes" or
does not check either "yes" or "no" below, the Custodian is required by the rule
to treat the Fund as consenting to disclosure of this information for all
securities owned by the Fund or any funds or accounts established by the Fund.
For the Fund's protection, the Rule prohibits the requesting company from using
the Fund's name and address for any purpose other than corporate communications.
Please indicate below whether the Fund consents or object by checking one of the
alternatives below.

       Yes [ ] The Custodian is authorized to release the Fund's name,
       address, and share positions.

       No [X] The Custodian is not authorized to release the Fund's name,
       address, and share positions.

                Next Page is Signature Page

                32

<PAGE>

IN WITNESS WHEREOF, each of the parties has caused this instrument to be
executed in its name and behalf by its duly authorized representative as of the
date first above-written.

STATE STREET BANK AND TRUST COMPANY      ATTEST

By: /s/ Kenneth A. Bergeron             By: /s/ Elizabeth G. Bruce
---------------------------------       ------------------------------------
Name: Kenneth A. Bergeron               Name: Elizabeth G. Bruce
Title: Senior Vice President

Each of the following registered investment companies acting with respect to
each of its series listed on Appendix A hereto or, if no such series is so
listed, acting for itself, severally and not jointly

HARTFORD SERIES FUND, INC.              ATTEST

By: /s/ Tamara L. Fagely                By: /s/ Edward P. Macdonald
---------------------------------       ------------------------------------
Name: Tamara L. Fagely                  Name: Edward P. Macdonald
Title: Vice President

THE HARTFORD MUTUAL FUNDS, INC.         ATTEST

By: /s/ Tamara L. Fagely                By: /s/ Edward P. Macdonald
---------------------------------       ------------------------------------
Name: Tamara L. Fagely                  Name: Edward P. Macdonald
Title: Vice President

THE HARTFORD MUTUAL FUNDS II, INC.      ATTEST

By: /s/ Tamara L. Fagely                By: /s/ Edward P. Macdonald
---------------------------------       ------------------------------------
Name: Tamara L. Fagely                  Name: Edward P. Macdonald
Title: Vice President

HARTFORD HLS SERIES FUND II, INC.       ATTEST

By: /s/ Tamara L. Fagely                By: /s/ Edward P. Macdonald

```
-----------------------------         ------------------------------------
Name: Tamara L. Fagely                Name: Edward P. Macdonald
Title: Vice President


HARTFORD INCOME SHARES FUND, INC.     ATTEST


By: /s/ Tamara L. Fagely             By: /s/ Edward P. Macdonald
-----------------------------         ------------------------------------
Name: Tamara L. Fagely                Name: Edward P. Macdonald
Title: Vice President
```

33

<PAGE>

APPENDIX A

The following registered management investment companies and series are parties
to the attached Custodian Contract as of February 8, 2007:

```
<TABLE>
<CAPTION>
INVESTMENT COMPANY NAME, JURISDICTION OF
ORGANIZATION AND TYPE OF ENTITY                    NAME OF SERIES
----------------------------------------          --------------
<S>                                               <C>
Hartford Series Fund, Inc., a Maryland corporation

The Hartford Mutual Funds, Inc., a Maryland
corporation

The Hartford Mutual Funds II, Inc., a Maryland
corporation

Hartford HLS Series Fund II, Inc., a Maryland
corporation

Hartford Income Shares Fund, Inc., a Maryland
corporation
</TABLE>
```

1

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

```
<TABLE>
<CAPTION>
COUNTRY                   SUBCUSTODIAN
-------                   ------------
<S>                       <C>
Argentina                 Citibank, N.A.

Australia                 Westpac Banking Corporation

                          Citibank Pty. Limited

Austria                   Erste Bank der Osterreichischen Sparkassen AG

Bahrain                   HSBC Bank Middle East
                          (as delegate of the Hongkong and Shanghai Banking Corporation Limited)
```

| | |
|---|---|
| Bangladesh | Standard Chartered Bank |
| Belgium | BNP Paribas Securities Services, S.A. |
| Benin | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Bermuda | The Bank of Bermuda Limited |
| Botswana | Barclays Bank of Botswana Limited |
| Brazil | Citibank, N.A. |
| Bulgaria | ING Bank N.V. |
| Burkina Faso | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Canada | State Street Trust Company Canada |
| Cayman Islands | Scotiabank & Trust (Cayman) Limited |
| Chile | BankBoston, N.A. |
| People's Republic of China | The Hongkong and Shanghai Banking Corporation Limited, Shanghai and Shenzhen branches |

</TABLE>


1


<PAGE>


                                                              SCHEDULE A


                           STATE STREET
                     GLOBAL CUSTODY NETWORK
                         SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---------|--------------|
| <S> | <C> |
| Colombia | Cititrust Colombia S.A. Sociedad Fiduciaria |
| Costa Rica | Banco BCT S.A. |
| Croatia | Privredna Banka Zagreb d.d |
| Cyprus | Cyprus Popular Bank Public Company Ltd. |
| Czech Republic | Ceskoslovenska Obchodni Banka, A.S. |
| Denmark | Skandinaviska Enskilda Bankken AB, Sweden (operating through its Copenhagen branch) |
| Ecuador | Banco de la Produccion S.A. PRODUBANCO |
| Egypt | HSBC Bank Egypt S.A.E. (as delegate of The Hongkong and Shanghai Banking Corporation Limited) |
| Estonia | AS Hansabank |
| Finland | Nordea Bank Finland Plc. |
| France | BNP Paribas Securities Services, S.A. |
| | Deutsche Bank AG, Netherlands (operating through its Paris branch) |
| Germany | Deutsche Bank AG |

| Ghana | Barclays Bank of Ghana Limited |
| Greece | National Bank of Greece S.A. |
| Guinea-Bissau | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Hong Kong | Standard Chartered Bank (Hong Kong) Limited |

</TABLE>

2

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
| ------- | ------------ |
| <S> | <C> |
| Hungary | HVB Bank Hungary Rt. |
| Iceland | Kaupthing Bank hf. |
| India | Deutsche Bank AG |
| | The Hongkong and Shanghai Banking Corporation Limited |
| Indonesia | Deutsche Bank AG |
| Ireland | Bank of Ireland |
| Israel | Bank Hapoalim B.M. |
| Italy | BNP Paribas Securities Services, S.A. |
| | Deutsche Bank S.p.A. |
| Ivory Coast | Societe Generale de Banques en Cote d'Ivoire |
| Jamaica | Bank of Nova Scotia Jamaica Ltd. |
| Japan | Mizuho Corporate Bank Ltd. |
| | Sumitomo Mitsui Banking Corporation |
| Jordan | HSBC Bank Middle East (as delegate of the Hongkong and Shanghai Banking Corporation Limited) |
| Kazakhstan | HSBC Bank Kazakhstan (as delegate of the Hongkong and Shanghai Banking Corporation Limited) |
| Kenya | Barclays Bank of Kenya Limited |
| Republic of Korea | Deutsche Bank AG |

</TABLE>

3

<PAGE>

SCHEDULE A

STATE STREET

```
                    GLOBAL CUSTODY NETWORK
                        SUBCUSTODIANS

<TABLE>
<CAPTION>
COUNTRY                     SUBCUSTODIAN
-------                     ------------
<S>                         <C>
                            The Hongkong and Shanghai Banking Corporation Limited

Latvia                      A/s Hansabanka

Lebanon                     HSBC Bank Middle East
                            (as delegate of The Hongkong and Shanghai Banking Corporation Limited)

Lithuania                   SEB Vilniaus Bankas AB

Malaysia                    Standard Chartered Bank Malaysia Berhad

Mali                        via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast

Malta                       The Hongkong and Shanghai Banking Corporation Limited

Mauritius                   The Hongkong and Shanghai Banking Corporation Limited

Mexico                      Banco Nacional de Mexico S.A.

Morocco                     Attijariwafa bank

Namibia                     Standard Bank Namibia Limited

Netherlands                 Deutsche Bank AG

New Zealand                 Westpac Banking Corporation

Niger                       via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast

Nigeria                     Stanbic Bank Nigeria Limited

Norway                      Nordea Bank Norge ASA

Oman                        HSBC Bank Middle East Limited
                            (as delegate of The Hongkong and Shanghai Banking Corporation Limited)
</TABLE>


                                4


<PAGE>


                                                            SCHEDULE A


                            STATE STREET
                      GLOBAL CUSTODY NETWORK
                         SUBCUSTODIANS

<TABLE>
<CAPTION>
COUNTRY                     SUBCUSTODIAN
-------                     ------------
<S>                         <C>
Pakistan                    Deutsche Bank AG

Palestine                   HSBC Bank Middle East Limited
                            (as delegate of The Hongkong and Shanghai Banking Corporation Limited)

Panama                      HSBC Bank (Panama) S.A.

Peru                        Citibank del Peru, S.A.

Philippines                 Standard Chartered Bank
```

| Poland | Bank Handlowy w Warszawie S.A. |
|--------|--------------------------------|
| Portugal | Banco Comercial Portugues S.A. |
| Puerto Rico | Citibank N.A. |
| Qatar | HSBC Bank Middle East Limited<br>(as delegate of The Hongkong and Shanghai Banking Corporation Limited) |
| Romania | ING Bank N.V. |
| Russia | ING Bank (Eurasia) ZAO, Moscow |
| Senegal | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Serbia | HVB Bank Serbia and Montenegro a.d. |
| Singapore | DBS Bank Limited |
| | United Overseas Bank Limited |
| Slovak Republic | Ceskoslovenska Obchodni Banka, A.S., pobocka zahranicnej banky v SR |
| Slovenia | Bank Austria Creditanstalt d.d. - Ljubljana |

</TABLE>

5

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---------|--------------|
| ------- | ------------ |
| <S> | <C> |
| South Africa | Nedbank Limited |
| | Standard Bank of South Africa Limited |
| Spain | Deutsche Bank S.A.E. |
| Sri Lanka | The Hongkong and Shanghai Banking Corporation Limited |
| Swaziland | Standard Bank Swaziland Limited |
| Sweden | Skandinaviska Enskilda Banken AB |
| Switzerland | UBS AG |
| Taiwan - R.O.C. | Central Trust of China |
| Thailand | Standard Chartered Bank (Thai) Public Company Limited |
| Togo | via Societe Generale de Banques en Cote d'Ivoire, Abidjan, Ivory Coast |
| Trinidad & Tobago | Republic Bank Limited |
| Tunisia | Banque Internationale Arabe de Tunisie |
| Turkey | Citibank, A.S. |
| Uganda | Barclays Bank of Uganda Limited |

| | |
|---|---|
| Ukraine | ING Bank Ukraine |
| United Arab Emirates | HSBC Bank Middle East Limited<br>(as delegate of The Hongkong and Shanghai Banking Corporation Limited) |
| United Kingdom | State Street Bank and Trust Company, United kingdom Branch |

</TABLE>

6

<PAGE>

SCHEDULE A

STATE STREET
GLOBAL CUSTODY NETWORK
SUBCUSTODIANS

<TABLE>
<CAPTION>

| COUNTRY | SUBCUSTODIAN |
|---------|--------------|
| <S> | <C> |
| Uruguay | BankBoston, N.A. |
| Venezuela | Citibank, N.A. |
| Vietnam | The Hongkong and Shanghai Banking Corporation Limited |
| Zambia | Barclays Bank of Zambia Plc. |
| Zimbabwe | Barclays Bank of Zimbabwe Limited |

</TABLE>

7

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>

| COUNTRY | DEPOSITORIES |
|---------|--------------|
| <S> | <C> |
| Argentina | Caja de Valores S.A. |
| Australia | Austraclear Limited |
| Austria | Oesterreichische Kontrollbank AG<br>(Wertpapiersammelbank Division) |
| Bahrain | Clearing, Settlement, and Depository System of the Bahrain Stock Exchange |
| Bangladesh | Central Depository Bangladesh Limited |
| Belgium | Banque Nationale de Belgique |
| | Euroclear Belgium |
| Benin | Depositaire Central - Banque de Reglement |
| Bermuda | Bermuda Securities Depository |

| | |
|---|---|
| Brazil (CETIP) | Central de Custodia e de Liquidacao Financeira de Titulos Privados |
| | Companhia Brasileira de Liquidacao e Custodia |
| | Sistema Especial de Liquidacao e de Custodia (SELIC) |
| Bulgaria | Bulgarian National Bank |
| | Central Depository AD |
| Burkina Faso | Depositaire Central - Banque de Reglement |
| Canada | The Canadian Depository for Securities Limited |
| Chile | Deposito Central de Valores S.A. |
| People's Republic </TABLE> | China Securities Depository and Clearing Corporation Limited |

1

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                 DEPOSITORIES
-------                 ------------
<S>                     <C>
```

| | |
|---|---|
| of China | Shanghai Branch |
| | China Securities Depository and Clearing Corporation Limited Shenzhen Branch |
| Colombia | Deposito Central de Valores |
| | Deposito Centralizado de Valores de Colombia S..A. (DECEVAL) |
| Costa Rica | Central de Valores S.A. |
| Croatia | Sredisnja Depozitarna Agencija d.d. |
| Cyprus | Central Depository and Central Registry |
| Czech Republic | Czech National Bank |
| | Stredisko cennych papiru - Ceska republika |
| Denmark | Vaerdipapircentralen (Danish Securities Center) |
| Egypt | Misr for Clearing, Settlement, and Depository S.A.E. |
| | Central Bank of Egypt |
| Estonia | AS Eesti Vaartpaberikeskus |
| Finland | Suomen Arvopaperikeskus Oy |
| France | Euroclear France |
| Germany | Clearstream Banking AG, Frankfurt |
| Greece | Apothetirion Titlon AE - Central Securities Depository |
| | Bank of Greece, |

```
                              System for Monitoring Transactions in Securities in Book-Entry Form

Guinea-Bissau                 Depositaire Central - Banque de Reglement
</TABLE>
```

                              2

```
<PAGE>
```

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                       DEPOSITORIES
-------                       ------------
<S>                           <C>
Hong Kong                     Central Moneymarkets Unit

                              Hong Kong Securities Clearing Company Limited

Hungary                       Kozponti Elszamolohaz es Ertektar (Budapest) Rt. (KELER)

Iceland                       Icelandic Securities Depository Limited

India                         Central Depository Services (India) Limited

                              National Securities Depository Limited

                              Reserve Bank of India

Indonesia                     Bank Indonesia

                              PT Kustodian Sentral Efek Indonesia

Israel                        Tel Aviv Stock Exchange Clearing House Ltd. (TASE Clearinghouse)

Italy                         Monte Titoli S.p.A.

Ivory Coast                   Depositaire Central - Banque de Reglement

Jamaica                       Jamaica Central Securities Depository

Japan                         Bank of Japan  - Net System

                              Japan Securities Depository Center (JASDEC) Incorporated

Jordan                        Securities Depository Center

Kazakhstan                    Central Securities Depository

Kenya                         Central Depository and Settlement Corporation Limited

                              Central Bank of Kenya
</TABLE>
```

                              3

```
<PAGE>
```

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                        DEPOSITORIES
-------                        ------------
<S>                            <C>
Republic of Korea              Korea Securities Depository

Latvia                         Latvian Central Depository

Lebanon                        Banque du Liban

                               Custodian and Clearing Center of Financial Instruments for Lebanon and
                               the Middle East (Midclear) S.A.L.

Lithuania                      Central Securities Depository of Lithuania

Malaysia                       Bank Negara Malaysia

                               Bursa Malaysia Depository Sdn. Bhd.

Mali                           Depositaire Central - Banque de Reglement

Malta                          Central Securities Depository of the Malta Stock Exchange

Mauritius                      Bank of Mauritius

                               Central Depository and Settlement Co. Ltd.

Mexico                         S.D. INDEVAL, S.A. de C.V.

Morocco                        Maroclear

Namibia                        Bank of Namibia

Netherlands                    Euroclear Nederland

New Zealand                    New Zealand Central Securities Depository Limited

Niger                          Depositaire Central - Banque de Reglement
</TABLE>
```

4

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

```
<TABLE>
<CAPTION>
COUNTRY                        DEPOSITORIES
-------                        ------------
<S>                            <C>
Nigeria                        Central Securities Clearing System Limited

Norway                         Verdipapirsentralen (Norwegian Central Securities Depository)

Oman                           Muscat Depository & Securities Registration Company, SAOC

Pakistan                       Central Depository Company of Pakistan Limited

                               State Bank of Pakistan

Palestine                      Clearing, Depository and Settlement, a department of the Palestine
                               Stock Exchange

Panama                         Central Latinoamericana de Valores, S.A. (LatinClear)
```

| | |
|---|---|
| Peru | Caja de Valores y Liquidaciones, Institucion de |
| | Compensacion y Liquidacion de Valores S.A |
| Philippines | Philippine Depository & Trust Corporation |
| | Registry of Scripless Securities (ROSS) of the Bureau of Treasury |
| Poland | Rejestr Papierow Wartosciowych |
| | Krajowy Depozyt Papierow Wartosciowych S.A. |
| Portugal | INTERBOLSA - Sociedade Gestora de Sistemas de Liquidacao e de Sistemas Centralizados de Valores Mobiliarios, S.A. |
| Qatar | Central Clearing and Registration (CCR), a |
| | department of the Doha Securities Market |
| Romania | Bucharest Stock Exchange Registry Division |
| | National Bank of Romania |
| Russia | Vneshtorgbank, Bank for Foreign Trade of the Russian Federation |

</TABLE>

5

<PAGE>

SCHEDULE B

STATE STREET
GLOBAL CUSTODY NETWORK
DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>

| COUNTRY | DEPOSITORIES |
|---------|--------------|
| <S> | <C> |
| Senegal | Depositaire Central - Banque de Reglement |
| Serbia | Central Registrar and Central Depository for Securities |
| Singapore | The Central Depository (Pte) Limited |
| | Monetary Authority of Singapore |
| Slovak Republic | Naodna banka slovenska |
| | Centralny depozitar cennych papierov SR, a.s. |
| Slovenia | KDD - Centralna klirinsko depotna druzba d.d. |
| South Africa | Share Transactions Totally Electronic (STRATE) Ltd. |
| Spain | IBERCLEAR |
| Sri Lanka | Central Depository System (Pvt) Limited |
| Sweden | Vardepapperscentralen  VPC AB (Swedish Central Securities Depository) |
| Switzerland | SegaIntersettle AG (SIS) |
| Taiwan - R.O.C. | Taiwan Depository and Clearing Corporation |
| Thailand | Thailand Securities Depository Company Limited |

```
Togo                          Depositaire Central - Banque de Reglement

Trinidad and Tobago           Trinidad and Tobago Central Bank

Tunisia                       Societe Tunisienne Interprofessionelle pour la Compensation
</TABLE>


                                      6


<PAGE>

                                                          SCHEDULE B


                              STATE STREET
                         GLOBAL CUSTODY NETWORK
                   DEPOSITORIES OPERATING IN NETWORK MARKETS

<TABLE>
<CAPTION>
COUNTRY                       DEPOSITORIES
-------                       ------------
<S>                           <C>
                              et de Depots des Valeurs Mobilieres (STICODEVAM)

Turkey                        Central Bank of Turkey

                              Central Registry Agency

Uganda                        Bank of Uganda

Ukraine                       Mizhregionalny Fondovy Souz

                              National Bank of Ukraine

United Arab Emirates          Clearing and Depository System,
                              a department of the Dubai Financial Market

United Kingdom                CrestCo.

Uruguay                       Banco Central del Uruguay

Venezuela                     Banco Central de Venezuela

                              Caja Venezolana de Valores

Vietnam                       Vietnam Securities Depository

Zambia                        Bank of Zambia

                              LuSE Central Shares Depository Limited

TRANSNATIONAL

Euroclear

Clearstream Banking, S.A.
</TABLE>


                                      7


<PAGE>

                                                          SCHEDULE C


                         MARKET INFORMATION

<TABLE>
<CAPTION>
```

| PUBLICATION/TYPE OF INFORMATION | BRIEF DESCRIPTION |
| --- | --- |
| <S> (SCHEDULED FREQUENCY) | <C> |
| The Guide to Custody in World Markets (hardcopy annually and regular website updates) | An overview of settlement and safekeeping procedures, custody practices and foreign investor considerations for the markets in which State Street offers custodial services. |
| Global Custody Network Review (annually) | Information relating to Foreign Sub-Custodians in State Street's Global Custody Network. The Review stands as an integral part of the materials that State Street provides to its U.S. mutual fund clients to assist them in complying with SEC Rule 17f-5. The Review also gives insight into State Street's market expansion and Foreign Sub-Custodian selection processes, as well as the procedures and controls used to monitor the financial condition and performance of our Foreign Sub-Custodian banks. |
| Securities Depository Review (annually) | Custody risk analyses of the Foreign Securities Depositories presently operating in Network markets. This publication is an integral part of the materials that State Street provides to its U.S. mutual fund clients to meet informational obligations created by SEC Rule 17f-7. |
| Global Legal Survey (annually) | With respect to each market in which State Street offers custodial services, opinions relating to whether local law restricts (i) access of a fund's independent public accountants to books and records of a Foreign Sub-Custodian or Foreign Securities System, (ii) a fund's ability to recover in the event of bankruptcy or insolvency of a Foreign Sub-Custodian or Foreign Securities System, (iii) a fund's ability to recover in the event of a loss by a Foreign Sub-Custodian or Foreign Securities System, and (iv) the ability of a foreign investor to convert cash and cash equivalents to U.S. dollars. |
| Subcustodian Agreements (annually) | Copies of the contracts that State Street has entered into with each Foreign Sub-Custodian that maintains U.S. mutual fund assets in the markets in which State Street offers custodial services. |
| Global Market Bulletin (daily or as necessary) | Information on changing settlement and custody conditions in markets where State Street offers custodial services. Includes changes in market and tax regulations, depository developments, dematerialization information, as well as other market changes that may impact State Street's clients. |
| Foreign Custody Advisories (as necessary) | For those markets where State Street offers custodial services that exhibit special risks or infrastructures impacting custody, State Street issues market advisories to highlight those unique market factors which might impact our ability to offer recognized custody service levels. |
| Material Change Notices (presently on a quarterly basis or as otherwise necessary) | Informational letters and accompanying materials confirming State Street's foreign custody arrangements, including a summary of material changes with Foreign Sub-Custodians that have occurred during the previous quarter. The notices also identify any material changes in the custodial risks associated with maintaining assets with Foreign Securities Depositories. |

</TABLE>

1

<PAGE>

REMOTE ACCESS SERVICES ADDENDUM

To Custodian Contract by and between State Street Bank and Trust Company

and each registered investment company identified on the signature page
hereto, dated February 8, 2007

State Street and its subsidiaries have developed proprietary accounting and
other systems which we utilize in conjunction with the services we provide to
you (the "Systems"). In this regard, we maintain certain information in
databases under our control and ownership that we make available on a remote
basis to our customers (the "Remote Access Services").

The Services. This addendum shall govern use of all Systems that State
Street may from time to time agree to provide you, the Customer, and your
designated investment advisors, consultants or other third parties authorized by
State Street who agree to abide by the terms of this Addendum ("Authorized
Designees") in order to provide Remote Access Services for the purpose of
obtaining and analyzing reports and information.

Security Procedures. You agree to comply, and to cause your Authorized
Designees to comply, with remote access operating standards and procedures and
with user identification or other password control requirements and other
security procedures as may be issued from time to time by State Street for use
of the Systems and access to the Remote Access Services. You agree to advise
State Street immediately in the event that you learn or have reason to believe
that any person to whom you have given access to the Systems or the Remote
Access Services has violated or intends to violate the terms of this Addendum
and you will cooperate with State Street in seeking injunctive or other
equitable relief. You agree to discontinue use of the Systems and Remote Access
Services, if requested, for any security reasons cited by State Street.

Fees. Fees and charges (if any) for the use of the Systems and the Remote
Access Services and related payment terms shall be as set forth in the fee
schedule in effect from time to time between the parties (the "Fee Schedule").
You shall be responsible for any tariffs, duties or taxes imposed or levied by
any government or governmental agency by reason of the transactions contemplated
by this Addendum, including, without limitation, federal, state and local taxes,
use, value added and personal property taxes (other than income, franchise or
similar taxes which may be imposed or assessed against State Street). Any
claimed exemption from such tariffs, duties or taxes shall be supported by
proper documentary evidence delivered to State Street.

Proprietary Information/Injunctive Relief. The Systems and Remote Access
Services and the databases, computer programs, screen formats, report formats,
interactive design techniques, formulae, processes, systems, software, know-how,
algorithms, programs, training aids, printed materials, methods, books, records,
files, documentation and other information made available to you by State Street
as part of the Remote Access Services and through the use of the Systems and all
copyrights, patents, trade secrets and other proprietary rights of State Street
and its relevant licensors related thereto are the exclusive, valuable and
confidential property of State Street and its relevant licensors, as applicable
(the "Proprietary Information").

You agree on behalf of yourself and your Authorized Designees to keep the
Proprietary Information confidential and to limit access to your employees and
Authorized Designees (under a similar duty of confidentiality) who require
access to the Systems for the purposes intended. The foregoing shall not apply
to Proprietary Information in the public domain or required by law to be made
public.

1

<PAGE>

You agree to use the Remote Access Services only in connection with the
proper purposes of this Addendum. You will not, and will cause your employees
and Authorized Designees not to, (i) permit any third party to use the Systems
or the Remote Access Services, (ii) sell, rent, license or otherwise use the
Systems or the Remote Access Services in the operation of a service bureau or
for any purpose other than as expressly authorized under this Addendum, (iii)
use the Systems or the Remote Access Services for any fund, trust or other
investment vehicle without the prior written consent of State Street, or (iv)
allow or cause any information transmitted from State Street's databases,

including data from third party sources, available through use of the Systems or the Remote Access Services, to be redistributed or retransmitted for other than use for or on behalf of yourself, as our Customer.

You agree that neither you nor your Authorized Designees will modify the Systems in any way, enhance or otherwise create derivative works based upon the Systems, nor will you or your Authorized Designees reverse engineer, decompile or otherwise attempt to secure the source code for all or any part of the Systems.

You acknowledge that the disclosure of any Proprietary Information, or of any information which at law or equity ought to remain confidential, will immediately give rise to continuing irreparable injury inadequately compensable in damages at law, and that State Street and its licensor, if applicable, shall be entitled to obtain immediate injunctive relief against the breach or threatened breach of any of the foregoing undertakings, in addition to any other legal remedies which may be available.

Limited Warranties. State Street represents and warrants that it has the right to grant access to the Systems and to provide the Remote Access Services contemplated herein. Because of the nature of computer information technology, including but not limited to the use of the Internet, and the necessity of relying upon third-party sources, and data and pricing information obtained from third parties, the Systems and Remote Access Services are provided "AS IS", and you and your Authorized Designees shall be solely responsible for the investment decisions, results obtained, regulatory reports and statements produced using the Remote Access Services. State Street and its relevant licensors will not be liable to you or your Authorized Designees for any direct or indirect, special, incidental, punitive or consequential damages arising out of or in any way connected with the Systems or the Remote Access Services, nor shall either party be responsible for delays or nonperformance under this Addendum arising out of any cause or event beyond such party's control.

EXCEPT AS EXPRESSLY SET FORTH IN THIS ADDENDUM, STATE STREET FOR ITSELF AND ITS RELEVANT LICENSORS EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES CONCERNING THE SYSTEM AND THE SERVICES TO BE RENDERED HEREUNDER, WHETHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTIBILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Infringement. State Street will defend or, at our option, settle any claim or action brought against you to the extent that it is based upon an assertion that access to any proprietary System developed and owned by State Street or use of the Remote Access Services through any such proprietary System by you under this Addendum constitutes direct infringement of any United States patent or copyright or misappropriation of a trade secret, provided that you notify State

2

<PAGE>

Street promptly in writing of any such claim or proceeding and cooperate with State Street in the defense of such claim or proceeding. Should any such proprietary System or the Remote Access Services accessed thereby or any part thereof become, or in State Street's opinion be likely to become, the subject of a claim of infringement or the like under the patent or copyright or trade secret laws of the United States, State Street shall have the right, at State Street's sole option, to (i) procure for you the right to continue using such System or Remote Access Services, (ii) replace or modify such System or Remote Access Services so that the System or the Remote Access Services becomes non-infringing, or (iii) terminate access to the Remote Access Services without further obligation.

Termination. Either party may terminate access to the Remote Access Services (i) for any reason by giving the other party at least one-hundred and eighty (180) days' prior written notice in the case of notice of termination by State Street to you or thirty (30) days' notice in the case of notice from you to State Street of termination, or (ii) immediately for failure of the other party to comply with any material term and condition of the Addendum by giving the other party written notice of termination. In the event of termination, you will return to State Street all Proprietary Information in your possession or in

the possession of your Authorized Designees. The foregoing provisions with respect to confidentiality and infringement will survive termination for a period of three (3) years.

Miscellaneous. Except as provided in the next sentence, this Addendum constitutes our entire understanding with respect to access to the Systems and the Remote Access Services. If any State Street custody, accounting or other services agreement with you contains terms and conditions relating to computer systems or data access, this Addendum shall constitute an amendment and supplement to them, and in the event of any inconsistency the provisions providing the greatest benefit to State Street shall control. This Addendum cannot be modified or altered except in a writing duly executed by both of us and shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

[next page is signature page]

3

<PAGE>

CONFIRMED AND AGREED:

Each of the following registered investment companies acting with respect to each of its series, if any, or, if it has no such series, acting for itself, severally and not jointly

HARTFORD SERIES FUND, INC.


By: /s/ Tamara L. Fagely
    ---------------------------------
Name: Tamara L. Fagely
Title: Vice President


THE HARTFORD MUTUAL FUNDS, INC.


By: /s/ Tamara L. Fagely
    ---------------------------------
Name: Tamara L. Fagely
Title: Vice President


THE HARTFORD MUTUAL FUNDS II, INC.


By: /s/ Tamara L. Fagely
    ---------------------------------
Name: Tamara L. Fagely
Title: Vice President


HARTFORD HLS SERIES FUND II, INC.


By: /s/ Tamara L. Fagely
    ---------------------------------
Name: Tamara L. Fagely
Title: Vice President


HARTFORD INCOME SHARES FUND, INC.


By: /s/ Tamara L. Fagely
    ---------------------------------
Name: Tamara L. Fagely
Title: Vice President

4

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 7

```
<DOCUMENT>
<TYPE>EX-99.H.(I)
<SEQUENCE>5
<FILENAME>b62326lcexv99whwxiy.txt
<DESCRIPTION>TRANSFER AGENCY AND SERVICE AGREEMENT
<TEXT>
<PAGE>
```

EXECUTION COPY

Exhibit h.1
TRANSFER AGENCY AND SERVICE AGREEMENT

AGREEMENT made as of the 1 day of February, 2006, by and among The Hartford Mutual Funds, Inc., a Maryland corporation, having its principal office and place of business at 200 Hopmeadow Street, Simsbury, Connecticut 06089 and Hartford Mutual Funds II, Inc, a Maryland corporation having its principal office and place of business at 200 Hopmeadow Street, Simsbury, Connecticut 06089 (together, the "Funds"), and Hartford Administrative Services Company ("HASCO"), having its principal office and place of business at 500 Bielenberg Drive, Woodbury, Minnesota 55125. This Agreement is intended to take effect as if entered into among the Funds on behalf of each of its series of shares (each a "Portfolio"), severally, and HASCO, and the provisions of this Agreement shall be construed accordingly.

WHEREAS, the Funds are authorized to issue shares in separate series and classes within each series; and

WHEREAS, the Funds, on behalf of each Portfolio, desire to appoint HASCO as transfer agent, dividend disbursing agent and agent in connection with certain other activities, and HASCO desires to accept such appointment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1.   TERMS OF APPOINTMENT; DUTIES OF HASCO

   1.1   Subject to the terms and conditions set forth in this Agreement, the Funds, on behalf of the Portfolios, hereby employ and appoint HASCO to act as, and HASCO agrees to act as its transfer agent for each of the Funds' authorized and issued shares of its common stock ("Shares"), dividend disbursing agent and agent, in connection with any accumulation, open-account or similar plans provided to the shareholders of each of the respective Portfolios of the Funds ("Shareholders") and set out in the currently effective prospectuses and statements of additional information ("prospectuses") of the Funds.

   1.2   HASCO agrees that it will perform the following services:

      (a)   In accordance with procedures as may be established from time to time by agreement between the Funds on behalf of each of the Portfolios, as applicable and HASCO, HASCO shall:

         (i)   Receive for acceptance, orders for the purchase of Shares, and promptly deliver payment and appropriate documentation thereof to the custodian of the Funds (the "Custodian");

```
<PAGE>
```

(ii) Pursuant to purchase orders, issue the appropriate number of Shares and hold such Shares in the appropriate Shareholder accounts;

(iii) Receive for acceptance redemption requests and redemption directions and deliver the appropriate documentation thereof to the Custodian;

(iv) In respect to the transactions in items (i), (ii) and (iii) above, HASCO is authorized to accept purchase orders and redemption requests from broker-dealers authorized by the Funds and from investors;

(v) At the appropriate time as and when it receives monies paid to it by the Custodian with respect to any redemption, pay over or cause to be paid over in the manner requested such monies to the redeeming Shareholders;

(vi) Effect transfers of Shares by the registered owners thereof upon receipt of appropriate instructions;

(vii) Prepare and transmit payments for dividends and distributions declared by the Funds on behalf of each Portfolio; and effect (as requested by Shareholders) the reinvestment thereof;

(viii) Maintain Shareholder account records and advise the Funds and their Shareholders as to the foregoing;

(ix) Record the issuance of shares of the Funds and maintain pursuant to SEC Rule 17Ad-10(e) a record of the total number of Shares that are authorized, issued and outstanding. HASCO shall also provide the Funds on a regular basis with the total number of shares that are authorized, issued and outstanding and shall have no obligation, when recording the issuance of shares, to be responsible for any laws relating to the issue or sale of such shares, which function shall be the sole responsibility of the Funds; and

(x) Upon instruction from the principal underwriter of the Funds, deduct applicable front end sales charges from purchase payments and applicable deferred sales charges from redemption payments and remit them to the appropriate party.

(b) In addition to the services set forth in paragraph (a), HASCO shall (i) perform the customary services of a transfer agent, dividend disbursing agent and, as relevant, agent in connection with accumulation, open-account or other similar plans (including without limitation any periodic

-2-

<PAGE>

investment plan or periodic withdrawal program), including but not limited to: maintaining Shareholder accounts, preparing Shareholder meeting lists, mailing proxies, mailing Shareholder reports and prospectuses to current Shareholders, withholding taxes on U.S. resident and non-resident alien accounts, preparing

and filing U.S. Treasury Department Forms 1099 and other appropriate forms required with respect to dividends and distributions by federal authorities for all Shareholders, preparing and mailing confirmation forms and statements of account to Shareholders for purchases and redemptions of Shares and other confirmable transactions in Shareholder accounts (as are required by law), preparing and mailing activity statements for Shareholders, and providing Shareholder account information, and (ii) provide a system which will enable the Funds to monitor the total shares sold in each state.

(c) The Funds shall (i) identify to HASCO in writing those transactions and assets to be treated as exempt from blue sky reporting for each State and (ii) verify the establishment of transactions for each State on the system prior to activation and thereafter monitor the daily activity for each State. The responsibility of HASCO for the Fund's blue sky State registration status is solely limited to the initial establishment of transactions subject to blue sky compliance by the Funds and the reporting of such transactions to the Funds as provided above.

(d) HASCO may, in its discretion and without further consent on the part of the Funds, subcontract with a sub-transfer agent or broker-dealer (each a "Designated Partner") for the performance of HASCO's obligations to provide services hereunder to accounts of Shareholders who are clients of such Designated Partner, provided, further, that HASCO shall be as fully responsible to the Funds for the acts and omissions of any Designated Partner as it is for its own acts and omissions.

(e) HASCO may, in its discretion and without further consent on the part of the Funds, appoint third party plan administrators (each a "TPA") to provide record keeping and related services to participants in plans which are Shareholders in the Funds, provided that HASCO shall be as fully responsible to the Funds for the acts and omissions of any TPA as it is for its own acts and omissions.

(f) HASCO shall provide additional services on behalf of the Funds (e.g., escheatment services) which may be agreed upon in writing between the Funds and HASCO.

(g) HASCO shall provide all services necessary to monitor shareholder activity in the funds in order to detect and prevent market timing and excessive trading in shares of the Funds as described in the Policies and Procedures Relating to Market Timing and Excessive Trading in Shares of

-3-

<PAGE>

the Funds, as such may be amended by the Board of Directors of the Funds from time to time.

(h) HASCO will ensure Designated Partners and TPAs appointed by HASCO shall agree (i) to provide HASCO with information regarding trading in Fund shares by participant accounts sufficient to

enable HASCO to enforce the market timing policy set forth in the Funds' prospectus; and (ii) to the extent required by Rule 22c-2 under the Investment Company Act of 1940, to execute HASCO's instructions to restrict or prohibit further purchases or exchanges of Fund shares by a specific participant who has violated the Funds' policy.

(i)    HASCO hereby acknowledges receipt of a copy of the Funds' anti-money laundering ("AML") compliance program, and HASCO agrees to implement the requirements of the AML compliance program with respect to purchases of the Funds' shares. In accordance with mutually-agreed procedures, HASCO shall use its best efforts in carrying out such agreed functions consistent with the requirements of the Funds' AML program. The Funds acknowledge that their Shareholders are customers of the Funds and not customers of HASCO and the Funds retain legal responsibility under the USA PATRIOT Act for AML compliance with respect to transactions in their shares. HASCO agrees to cooperate with any request from examiners of United States Government agencies having jurisdiction over the Funds for information and records relating to the Funds' AML program and consents to inspection by such examiners for this purpose.

(j)    In accordance with Regulation S-P of the Securities and Exchange Commission, "Nonpublic Personal Information" includes (1) all personally identifiable financial information; (2) any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available information; and (3) any information derived therefrom. HASCO must not use or disclose Nonpublic Personal Information for any purpose other than to carry out the purpose for which Nonpublic Personal Information was provided to HASCO as set forth in this Agreement, and agrees to cause its employees, agents, representatives, or any other party to whom HASCO may provide access to or disclose Nonpublic Personal Information to limit the use and disclosure of Nonpublic Personal Information to that purpose. HASCO agrees to implement appropriate measures designed to ensure the security and confidentiality of Nonpublic Personal Information, to protect such information against any anticipated threats or hazards to the security or integrity of such information, and to protect against unauthorized access to, or use of, Nonpublic Personal Information that could result in substantial harm or inconvenience to any customer of the Funds. HASCO

-4-

<PAGE>

further agrees to cause all its agents, representatives, subcontractors, or any other party to whom HASCO may provide access to, or disclose, Nonpublic Personal Information to implement appropriate measures designed to meet the objectives set forth in this paragraph. With respect only to the provisions of this Section, HASCO agrees to indemnify and hold harmless the Funds and any officer or director or trustee of the Board ("Board member"), against losses, claims, damages, expenses, or liabilities to which the Funds, or any officer or Board member of

the Funds, may become subject as the result of (1) a material breach of the provisions of this section of the Agreement or (2) any acts or omissions of HASCO, or of any of its officers, directors, employees, representatives, subcontractors or agents, that are not in accordance with this Agreement, including, but not limited to, any violation of any federal statute or regulation. Notwithstanding the foregoing, no party shall be entitled to indemnification pursuant to this Section if such loss, claim, damage, expense, or liability is due to the willful misfeasance, bad faith, gross negligence, or reckless disregard of duty by the party seeking indemnification.

(k)  Procedures establishing criteria to be used by HASCO in selecting Designated Partners and TPAs with respect to these services in this Section 1 shall be established from time to time by agreement between the Funds on behalf of each Portfolio and HASCO.

2.   FEES AND EXPENSES

2.1  For the performance by HASCO pursuant to this Agreement, the Funds agree on behalf of each of the Portfolios to pay HASCO an annual maintenance fee (the "TA Fee") for each Shareholder Participant Account (as defined below) per Portfolio according to the Fee Schedule attached hereto as Exhibit A. Such fees and out-of-pocket expenses and advances identified under Section 2.2 below may be changed from time to time subject to mutual written agreement between the Funds and HASCO. A "Shareholder Participant Account" shall mean (i) any shareholder account maintained on the books and records of HASCO, (ii) any shareholder account maintained on the books and records of a Designated Partner appointed by HASCO pursuant to Section 1.2(d), and (iii) the account of any plan participant that is a beneficial owner of Shares which is maintained on the books and records of a TPA engaged by HASCO pursuant to Section 1.2(e).

2.2  Unless otherwise provided in Exhibit A hereto, in addition to the fee paid under Section 2.1 above, the Funds agree on behalf of each of the Portfolios to reimburse HASCO for reasonable out-of-pocket expenses specifically incurred and directly related to the services provided hereunder, including but not limited to: confirmation production, postage, forms, telephone, microfilm, microfiche, tabulating proxies, records storage, or advances incurred by HASCO for the items

-5-

<PAGE>

set out in the fee schedule attached hereto. In addition, any other expenses incurred by HASCO at the request or with the consent of the Funds, will be reimbursed by the Funds on behalf of the applicable Portfolio.

2.3  The Funds agree on behalf of each of the Portfolios to pay all fees and reimbursable expenses within fifteen days following the receipt of the respective billing notice. Postage for mailing of dividends, proxies, Fund reports and other mailings to all Shareholders Participant Accounts shall be advanced to HASCO by the Funds at least seven (7) days prior to the mailing date of such materials.

3.   REPRESENTATIONS AND WARRANTIES OF HASCO

HASCO represents and warrants to the Funds that:

3.1   It is a corporation duly organized and existing and in good standing under the laws of Minnesota.

3.2   It is duly qualified to carry on its business in the State of Minnesota and is duly registered as a transfer agent pursuant to Section 17A(c)(2) of the Securities Exchange Act of 1934, as amended.

3.3   It is empowered under applicable laws and by its Charter and By-Laws to enter into and perform this Agreement.

3.4   All requisite corporate proceedings have been taken to authorize it to enter into and perform this Agreement.

3.5   It has and will continue to have access to the necessary facilities, equipment and personnel to perform its duties and obligations under this Agreement.

3.6   It has and will continue to have necessary procedures and policies in place reasonably designed to comply with Rule 38a -1 of the Investment Company Act of 1940, as amended.

4.   REPRESENTATIONS AND WARRANTIES OF THE FUNDS

The Funds represent and warrant to HASCO that:

4.1   They are each corporations duly organized and existing and in good standing under the laws of the State of Maryland.

4.2   Each is empowered under applicable laws and by its Articles of Incorporation and By-Laws to enter into and perform this Agreement.

4.3   All corporate proceedings required by such Articles of Incorporation and By-Laws have been taken to authorize them to enter into and perform this Agreement.

-6-

<PAGE>

4.4   Each is registered as an open-end, management investment company under the Investment Company Act of 1940, as amended.

4.5   A registration statement under the Securities Act of 1933, as amended, is currently effective, and will remain in effect, for each series and class of Shares, and appropriate securities law filings have been made and will continue to be made with the SEC with respect to all of the Funds. The Funds shall notify HASCO when such registration statement shall have been amended to include additional series of the Fund and shall notify HASCO if such registration statement or any state securities registration or qualification has been terminated or a stop order has been entered with respect to the Shares.

5.   DATA ACCESS AND PROPRIETARY INFORMATION

5.1   The Funds acknowledge that the data bases, computer programs, screen

formats, report formats, interactive design techniques, and documentation manuals furnished to the Funds by HASCO as part of their ability to access certain Funds-related data ("Customer Data") maintained by HASCO on data bases under the control and ownership of HASCO ("Data Access Services") constitute copyrighted, trade secret, or other proprietary information (collectively, "Proprietary Information") of substantial value to HASCO or other third party. In no event shall Proprietary Information be deemed Customer Data. The Funds agree to treat all Proprietary Information as proprietary to HASCO and further agree that it shall not divulge any Proprietary Information to any person or organization except as may be provided hereunder. Without limiting the foregoing, the Funds agree for themselves and their employees and agents:

(a)   to access Customer Data solely from locations as may be designated in writing by HASCO and solely in accordance with HASCO's applicable user documentation;

(b)   to refrain from copying or duplicating in any way the Proprietary Information;

(c)   to refrain from obtaining unauthorized access to any portion of the Proprietary Information, and if such access is inadvertently obtained, to inform in a timely manner of such fact and dispose of such information in accordance with HASCO's instructions;

(d)   to refrain from causing or allowing the data acquired hereunder from being retransmitted to any other computer facility or other location, except with the prior written consent of HASCO;

(e)   that the Funds shall have access only to those authorized transactions agreed upon by the parties;

-7-

<PAGE>

(f)   to honor all reasonable written requests made by HASCO to protect at HASCO' expense the rights of HASCO in Proprietary Information at common law, under federal copyright law and under other federal or state law.

5.2   Each party shall take reasonable efforts to advise its employees of their obligations pursuant to this Section 5. The obligations of this Section shall survive any termination of this Agreement.

5.3   If the Funds notify HASCO that any of the Data Access Services do not operate in material compliance with the most recently issued user documentation for such services, HASCO shall endeavor in a timely manner to correct such failure. Organizations from which HASCO may obtain certain data included in the Data Access Services are solely responsible for the contents of such data and the Funds agree to make no claim against HASCO arising out of the contents of such third-party data, including, but not limited to, the accuracy thereof. DATA ACCESS SERVICES AND ALL COMPUTER PROGRAMS AND SOFTWARE SPECIFICATIONS USED IN CONNECTION THEREWITH ARE PROVIDED ON AN AS IS, AS AVAILABLE BASIS. HASCO EXPRESSLY DISCLAIMS ALL WARRANTIES EXCEPT THOSE EXPRESSLY STATED HEREIN INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

6.    INDEMNIFICATION

6.1   HASCO shall not be responsible for, and the Funds shall, on behalf of
      the applicable Portfolio, indemnify and hold HASCO harmless from and
      against, any and all losses, damages, costs, charges, reasonable
      counsel fees, payments, expenses and liability arising out of or
      attributable to:

      (a)   All actions of HASCO or its agents or subcontractors required to
            be taken pursuant to this Agreement, provided that such actions
            are taken in good faith and without negligence or willful
            misconduct.

      (b)   Lack of good faith, negligence or willful misconduct on the part
            of the Funds or the breach of any representation or warranty of
            the Funds hereunder.

      (c)   The reliance on or use by HASCO or its agents or subcontractors
            of information, records, documents or services which (i) are
            received by HASCO or its agents or subcontractors, and (ii) have
            been prepared, maintained or performed by the Funds or any other
            person or firm on behalf of the Funds.

                                    -8-

<PAGE>

      (d)   The reliance on, or the carrying out by HASCO or its agents or
            subcontractors of any instructions or requests of the Funds on
            behalf of the applicable Portfolio.

      (e)   The offer or sale of Shares in violation of any requirement under
            the federal securities laws or regulations or the securities laws
            or regulations of any state or in violation of any stop order or
            other determination or ruling by any federal agency or any state
            with respect to the offer or sale of such Shares in such state,
            unless such violation is the result of HASCO's or HASCO's
            affiliate's negligent or willful failure to comply with the
            provisions of Section 1.2 of this Agreement.

6.2   At any time HASCO may apply to any officer of the Funds for
      instructions, and may consult with legal counsel to the Funds with
      respect to any matter arising in connection with the services to be
      performed by HASCO under this Agreement, and HASCO and its agents or
      subcontractors (excluding Designated Partners and TPAs) shall not be
      liable and shall be indemnified by the Funds on behalf of the
      applicable Portfolio for any action taken or omitted by it in reliance
      upon such instructions or upon the opinion of such counsel. HASCO, its
      agents and subcontractors (excluding Designated Partners and TPAs)
      shall be protected and indemnified in acting upon any paper or
      document furnished by or on behalf of the Funds, reasonably believed
      to be genuine and to have been signed by the proper person or persons,
      or upon any instruction, information, data, records or documents
      provided HASCO or its agents or subcontractors (excluding Designated
      Partners and TPAs) by machine readable input, telex, CRT data entry or
      other similar means authorized by the Funds, and shall not be held to
      have notice of any change of authority of any person, until receipt of
      written notice thereof from the Funds. HASCO, its agents and

subcontractors (excluding Designated Partners and TPAs) shall also be protected and indemnified in recognizing stock certificates which are reasonably believed to bear the proper manual of facsimile signatures of the officer or officers of the Funds, and the proper countersignature of any former transfer agent or registrar, or of a co-transfer agent or co-registrar.

6.3 The Funds shall not be responsible for, and HASCO shall indemnify and hold the Funds harmless from and against, any and all losses, damages, costs, charges, reasonable counsel fees, payments, expenses and liability arising out of or attributable to failure by HASCO to comply with the terms of this Agreement due to HASCO's negligence or willful misconduct or the breach of any representation or warranty of HASCO hereunder.

6.4 In the event either party is unable to perform its obligations under the terms of this Agreement because of acts of God, strikes, equipment or transmission failure or damage reasonably beyond its control, or other causes reasonably beyond its control, such party shall not be liable for damages to the other for any damages resulting from such failure to perform or otherwise from such causes.

-9-

<PAGE>

Notwithstanding the above, HASCO shall not be excused from liability in the event any telecommunications, power or equipment (of HASCO, its agents or subcontractors) failures could have been avoided or minimized by such parties having maintained adequate industry standard backup systems or plan and a disaster recovery plan.

6.5 In order that the indemnification provisions contained in this Section 6 shall apply, upon the assertion of a claim for which the Funds may be required to indemnify HASCO, HASCO shall promptly notify the Funds of such assertion, and shall keep the Funds advised with respect to all developments concerning such claim. The Funds shall have the option to participate with HASCO in the defense of such claim or to defend against said claim in its own name or in the name of HASCO. HASCO shall in no case confess any claim or make any compromise in any case in which the Funds may be required to indemnify HASCO except with the Funds' prior written consent. For clarity, to the extent any obligation to provide indemnity under this Section 6 arises in respect of a Portfolio or Portfolios, the obligation so to indemnify shall be the obligation only of such Portfolio or Portfolios, and of no other Portfolio.

7.   STANDARD OF CARE

HASCO shall at all times act in good faith, and agrees to use due care and its best efforts within reasonable limits to insure the accuracy of all services performed under this Agreement, but assumes no responsibility and shall not be liable for loss or damage due to errors unless said errors are caused by its negligence, bad faith, or willful misconduct or that of its employees, agents or subcontractors and its Designated Partners and TPAs.

8.   COVENANTS OF THE FUNDS AND HASCO

8.1 The Funds shall on behalf of each of the Portfolios promptly furnish

to HASCO the following:

    (a)  A certified copy of the resolution of the Board of Directors of the Funds authorizing the appointment of HASCO and the execution and delivery of this Agreement.

    (b)  A copy of the Articles of Incorporation and By-Laws of the Funds and all amendments thereto.

8.2  HASCO shall keep records relating to the services to be performed hereunder, in the form and manner as it may deem advisable. To the extent required by Section 31 of the Investment Company Act of 1940, as amended, and the Rules thereunder, HASCO agrees that all such records prepared or maintained by HASCO relating to the services to be performed by HASCO hereunder are the property of the Funds and will be preserved, maintained and made available in accordance with such Section and Rules, and will be surrendered promptly to the

-10-

<PAGE>

Funds on and in accordance with its request. Records surrendered hereunder shall be in machine readable form, except to the extent that HASCO has maintained such a record only in paper form.

8.3  HASCO and the Funds agree that all books, records, information and data pertaining to the business of the other party which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law.

8.4  In case of any requests or demands for the inspection of the Shareholder records of the Funds, HASCO will notify the Funds and endeavor to secure instructions from an authorized officer of the Funds as to such inspection. HASCO reserves the right, however, to exhibit the Shareholder records to any person whenever it is advised by its counsel that it may be held liable for the failure to exhibit the Shareholder records to such person.

9.   TERMINATION OF AGREEMENT

9.1  This Agreement may be terminated by either party upon ninety (90) days written notice to the other.

9.2  Should the Funds exercise their right to terminate, all out-of-pocket expenses associated with the movement of records and material will be borne by the Funds on behalf of the applicable Portfolio(s). Additionally, HASCO reserves the right to charge for any other reasonable expenses associated with such termination.

10.  ADDITIONAL FUNDS

In the event that one or more of the Funds establishes one or more additional series or classes of Shares to which it desires to have HASCO render services as transfer agent under the terms hereof, it shall so notify HASCO in writing, and if HASCO agrees in writing to provide such services, such series or classes of Shares shall be included under this agreement.

11.  ASSIGNMENT

    11.1  Except as otherwise provided in Section 1 of this Agreement, neither this Agreement nor any rights or obligations hereunder may be assigned by either party without the written consent of the other party.

    11.2  This Agreement shall inure to the benefit of and be binding upon the parties and their respective permitted successors and assigns.

-11-

<PAGE>

12.  AMENDMENT

This Agreement may be amended or modified by a written agreement executed by both parties and authorized or approved by a resolution of the Board of Directors of the Funds.

13.  CONNECTICUT LAW TO APPLY

This Agreement shall be construed and the provisions thereof interpreted under and in accordance with the laws of Connecticut.

14.  CONSEQUENTIAL DAMAGES

No party to this Agreement shall be liable to another party for consequential damages under any provision of this Agreement or for any consequential damages arising out of any act or failure to act hereunder.

15.  MERGER OF AGREEMENT

This Agreement constitutes the entire agreement between the parties hereto and supersedes any prior agreement with respect to the subject matter hereof whether oral or written.

16.  COUNTERPARTS

This Agreement may be executed by the parties hereto on any number of counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

-12-

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in their names and on their behalf by and through their duly authorized officers, as of the day and year first above written.

                             THE HARTFORD MUTUAL FUNDS, INC.,
                             Severally, on behalf of their respective
                             Series of Shares,

                             BY: /s/ Robert M. Arena
                             ------------------------------------
                             Name: Robert Arena

Title: Vice President


THE HARTFORD MUTUAL FUNDS II, INC.,
Severally, on behalf of their respective
Series of Shares,


BY: /s/ Robert M. Arena
    ------------------------------------
Name: Robert Arena
Title: Vice President


HARTFORD ADMINISTRATIVE SERVICES COMPANY


BY: /s/ Denise A. Settimi
    ------------------------------------
Name: Denise A. Settimi
Title: Operations Officer


-13-

<PAGE>

EXIBIT A


TA FEE SCHEDULE


CLASS A, B, AND C SHARES:

     $25 per Shareholder Participant Account per Portfolio.

CLASS Y SHARES:

     0.05% of assets in each Portfolio; provided however, that the annual
aggregate TA Fee paid by the Funds for Class Y Shares shall not exceed $150,000.

The TA Fee shall include all out of pocket expenses otherwise payable by a
Portfolio pursuant to Section 2.2 and 2.3 of the Agreement except for postage,
solicitation, tabulation and printing expenses related to proxy solicitation,
unless otherwise agreed to by the Funds and HASCO.
</TEXT>
</DOCUMENT>

# EXHIBIT 8

```
<DOCUMENT>
<TYPE>EX-99.(H)(XIX)
<SEQUENCE>11
<FILENAME>b68643a1exv99wxhyxxixy.txt
<DESCRIPTION>TRANSFER AGENCY FEE WAIVER AGREEMENT
<TEXT>
<PAGE>
```

Exhibit H.(XIX)

TRANSFER AGENCY FEE WAIVER AGREEMENT

THIS AGREEMENT, dated as of February 6, 2008, between The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (each a "Company" and collectively, the "Companies") on behalf of each series of the Companies (each a "Fund" and collectively, the "Funds") and Hartford Administrative Services Company (the "Transfer Agent").

WHEREAS, the Transfer Agent has been appointed the transfer agent of each of the Funds pursuant to a Transfer Agency and Service Agreement between each Company, on behalf of the Funds, and the Transfer Agent; and

WHEREAS, each Company and the Transfer Agent desire to enter into the arrangements described herein relating to the transfer agency fees of the Funds;

NOW, THEREFORE, each Company and the Transfer Agent hereby agree as follows:

1. For the period commencing November 1, 2007 through February 28, 2009, the Transfer Agent hereby agrees to reimburse any portion of the transfer agency fees over 0.30% of the average daily net assets per fiscal year for each class of shares for each Fund.

2. The reimbursement described in Section 1 above is not subject to recoupment by the Transfer Agent.

3. The Transfer Agent understands and intends that the Funds will rely on this Agreement (1) in preparing and filing amendments to the registration statements for the Companies on Form N-1A with the Securities and Exchange Commission, (2) in accruing each Fund's expenses for purposes of calculating its net asset value per share and (3) for certain other purposes and expressly permits the Funds to do so.

4. This Agreement shall renew automatically for one-year terms unless the Transfer Agent provides written notice of termination prior to the start of such term.
```
<PAGE>
```

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE HARTFORD MUTUAL FUNDS, INC.


Name: /s/ Tamara L. Fagely
      -----------------------------
      Tamara L. Fagely
Title: Vice President, Treasurer and
       Controller

THE HARTFORD MUTUAL FUNDS II, INC.


Name: /s/ Tamara L. Fagely
     -------------------------------
     Tamara L. Fagely
Title: Vice President, Treasurer and
     Controller


HARTFORD ADMINISTRATIVE SERVICES COMPANY


Name: /s/ Robert Arena
     -------------------------------
     Robert Arena
Title: Director and Senior Vice
     President


2

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 9

```
<DOCUMENT>
<TYPE>EX-99.E.I
<SEQUENCE>19
<FILENAME>b45788h1exv99wewi.txt
<DESCRIPTION>PRINCIPAL UNDERWRITING AGREEMENT
<TEXT>
<PAGE>
```

EXHIBIT 99.e(i)

PRINCIPAL UNDERWRITING AGREEMENT

The ITT Hartford Mutual Funds, Inc. (the "Company")
on behalf of

ITT Hartford Capital Appreciation Fund
ITT Hartford Dividend and Growth Fund
ITT Hartford International Opportunities Fund
ITT Hartford Small Company Fund
ITT Hartford Stock Fund
ITT Hartford Advisers Fund
ITT Hartford Bond Income Strategy Fund
ITT Hartford Money Market Fund

July 22, 1996

Hartford Securities Distribution Company, Inc.
200 Hopmeadow Street
Simsbury, CT  06089

Re:  Underwriting Agreement

Gentlemen:

The Company is a Maryland corporation registered as an investment company
under the Investment Company Act of 1940, as amended (the "1940 Act") and has
shares of capital stock (hereinafter the "Shares") representing interests in
investment portfolios of the Company hereto (individually the "Fund" and
collectively the "Funds") which are registered under the Securities Act of 1933,
as amended (the "1933 Act") and securities acts of various states and
jurisdictions.

You have informed us that your company, Hartford Securities Distribution
Company ("HSD"), is registered as a broker-dealer under the provisions of the
Securities Exchange Act of 1934 (the "1934 Act") and that HSD is a member in
good standing of the National Association of Securities Dealers, Inc. You have
indicated your desire to become the exclusive selling agent and principal
underwriter for the Company. We have been authorized to execute and deliver this
Agreement to you, which Agreement has been approved by a vote of a majority of
the company's directors (the "Directors") who are not parties to such Agreement
or "interested persons" of any party thereto, cast in person at a meeting called
for the purpose of voting on the Approval of this Agreement.

```
<PAGE>
```

1. Appointment of Underwriter. Upon the execution of this Agreement
and in consideration of the agreements on your part herein expressed and upon
the terms and conditions set forth herein, we hereby appoint you as the
exclusive sales agent for distribution of the Shares (other than sales made
directly by the Company without sales charge) and agree that we will deliver to
you such shares as you may sell. You agree to use your best efforts to promote

the sale of the Shares, but you are not obligated to sell any specific number of the Shares.

2. Independent Contractor. You will undertake and discharge your obligations hereunder as an independent contractor and shall have no authority or power to obligate or bind the Company by your actions, conduct, or contracts, except that you are authorized to accept orders for the purchase or repurchase of the Shares as our agent. You may appoint sub-agents or distribute the Shares through dealers (or otherwise) as you may determine necessary or desirable from time to time. This Agreement shall not, however, be construed as authorizing any dealer or other person to accept orders for sale or repurchase on our behalf or to otherwise act as our agent for any purpose.

3. Offering Price. Shares shall be offered for sale at a price equivalent to their net asset value plus, as appropriate, a variable percentage of the public offering price as a sales load, as set forth in the Company's Prospectus for the Shares, as amended from time to time. On each business day on which the New York Stock Exchange is open for business, we will furnish you with the net asset value of the Shares, which shall be determined and become effective as of the close of business of the New York Stock Exchange on that day. The net asset value so determined shall apply to all orders for the purchase of the Shares received by dealers prior to such determination, and you are authorized in your capacity as our agent to accept orders and confirm sales at such net asset value; provided that, such dealers notify you of the time when they received the particular order and that the order is placed with you prior to your close of business on the day on which the applicable net asset value is determined. To the extent that our Shareholder Servicing and Transfer Agent (collectively "Agent") and the Custodian(s) for any pension, profit-sharing, employer or self-employed plan receive payments on behalf of the investors, such Agent and Custodian(s) shall be required to record the time of such receipt with respect to each payment, and the applicable net asset value shall be that which is next determined and effective after the time of receipt by them. In all events, you shall forthwith notify all of the dealers comprising your selling group and the Agent and Custodian(s) of the effective net asset value as received from us. Should we at any time calculate our net asset value more frequently than once each business day, you and we will follow procedures with respect to such additional price or prices comparable to those set forth above in this Section 3.

4. Sales Commission. (a) You shall be entitled to charge a sales commission on the sale of certain classes of Shares in the amount set forth in the Company's Prospectus (including any supplements or amendments thereto) then in effect under the 1933 Act and the 1940 Act. Such commission (subject to any quantity or other discounts or eliminations of commission as set forth in our then currently effective Prospectus) shall be an amount mutually agreed upon by the Company and HSD and shall be equal to the difference between the net asset value and the public offering price of the Shares.

<PAGE>

(b) In addition, in accordance with the distribution plans adopted pursuant to Rule 12b-1 under the 1940 Act (the "Distribution Plans") for certain classes of Shares, you will be entitled to be paid a sales commission not exceeding the product of the price received by the Company for sales of its Shares (excluding reinvestment of dividends and distributions) multiplied by the percentage set forth in the Prospectus and mutually agreed to by the Company and HSD from time to time. In connection with the Shares, you may also be entitled to be paid by the Company an interest fee (calculated in accordance with the Prospectus and the Distribution Plan). Payment of the sales commissions and separate interest fee, if applicable, shall be spread over a period of time and

shall be paid in the manner described in such Prospectus and the Distribution Plan.

(c) In addition to the payments of the sales commissions to you provided for in paragraphs 4(a) and 4(b), you may also receive reimbursement for expenses or a maintenance or trail fee as may be required by and described in the Distribution Plans adopted by the Company for the various classes of Shares.

(d) You may allow appointed sub-agents or dealers such commissions or discounts (not exceeding the total sales commission) as you shall deem advisable, so long as any such commissions or discounts are set forth in the Company's then current Prospectus, to the extent required by the applicable federal and state securities laws.

5. Payment for Shares. At or prior to the time of delivery of any of our Shares you will pay or cause to be paid to the Custodian, for our account, an amount in cash equal to the net asset value of such Shares. In the event that you pay for shares sold by you prior to your receipt of payment from purchasers, you are authorized to reimburse yourself for the net asset value of such Shares from the offering price of such Shares when received by you.

6. Registration of Shares. No Shares shall be registered on our books until (i) receipt by us of your written request therefor; (ii) receipt by the Custodian and Agent of a certificate signed by an officer of the Company stating the amount to be received therefor; and (iii) receipt of payment of that amount by the Custodian. We will provide for the recording of all Shares purchased in unissued form in "book accounts," unless a request in writing for certificates (if available) is received by the Agent, in which case certificates for Shares in such names and amounts as is specified in such writing will be delivered by the Agent, as soon as practicable after registration thereof on the books.

7. Purchases for Your Own Account. You shall not purchase Shares for your own account for purposes of resale to the public, but you may purchase Shares for your own investment account upon your written assurance that the purchase is for investment purposes only and that the Shares will not be resold except through redemption by us.

8. Sale of Shares to Affiliates. You may sell the Shares at net asset value, plus a varying sales charge as appropriate, pursuant to a uniform offer described in the

<PAGE>

Company's current Prospectus (i) to our Directors and officers, our investment manager and its affiliates, and/or any sub-adviser to the Company, or your company or affiliated companies thereof, (ii) to the bona fide, full time employees or sales representatives of any of the foregoing, (iii) to any trust, pension, profit-sharing, or other benefit plan for such persons, or (iv) to any other person set forth in the Company's then current Prospectus; provided that such sales are made in accordance with the rules and regulations under the 1940 Act and that such sales are made upon the written assurance of the purchaser that the purchases are made for investment purposes only, not for the purpose of resale to the public and that the Shares will not be resold except through redemption by us.

9. Allocation of Expenses. (a) We will pay the following expenses in connection with the sales and distribution of Shares of the Company:

(i) expenses pertaining to the preparation of our audited and

certified financial statements to be included in any amendments ("Amendments") to our Registration Statements under the 1933 Act, including the Prospectuses and Statements of Additional Information included therein;

(ii) expenses pertaining to the preparation (including legal fees) and printing of all Amendments or supplements filed with the Securities and Exchange Commission, including the copies of the Prospectuses and Statements of Additional Information included in the Amendments and the first ten (10) copies of the definitive Prospectuses and Statements of Additional Information or supplements thereto, other than those necessitated by or related to your (including your "Parent") activities where such amendments or supplements result in expenses which we would not otherwise have incurred;

(iii) expenses pertaining to the preparation, printing, and distribution of any reports or communications, including Prospectuses and Statements of Additional Information, which are sent to our existing shareholders;

(iv) filing and other fees to federal and state securities regulatory authorities necessary to register and maintain registration of the Shares; and

(v) expenses of the Agent, including all costs and expenses in connection with the issuance, transfer and registration of the Shares, including but not limited to any taxes and other governmental charges in connection therewith.

(b) Except to the extent that you are entitled to reimbursement under the provisions of any of the Distribution Plans for the Company, you will pay the following expenses:

<PAGE>

(i) expenses of printing additional copies of the Prospectuses and Statement of Additional Information and any amendments or supplements thereto which are necessary to continue to offer our shares to the public;

(ii) expenses pertaining to the preparation (excluding legal fees) and printing of all amendments and supplements to our Registration Statements if the Amendment or supplement arises from or is necessitated by or related to your (including your "Parent") activities where those expenses would not otherwise have been incurred by us; and

(iii) expenses pertaining to the printing of additional copies, for use by you as sales literature, of reports or other communications which have been prepared for distribution to our existing shareholders or incurred by you in advertising, promoting and selling our Shares to the public.

10. Furnishing of Information. We will furnish to you such information with respect to our Company and its Shares, in such form and signed by such of our officers as you may reasonably request, and we warrant that the statements therein contained when so signed will be true and correct. We will also furnish you with such information and will take such action as you may reasonably request in order to qualify our Shares for sale to the public under

the Blue Sky Laws or in jurisdictions in which you may wish to offer them. We will furnish you at least annually with audited financial statements of our books and accounts certified by independent public accountants, and with such additional information regarding our financial condition, as you may reasonably request from time to time.

11. Conduct of Business. Other than currently effective Prospectuses and Statements of Additional Information, you will not issue any sales material or statements except literature or advertising which conforms to the requirements of federal and state securities laws and regulations and which have been filed, where necessary, with the appropriate regulatory authorities. You will furnish us with copies of all such material prior to their use and no such material shall be published if we shall reasonably and promptly object.

You shall comply with the applicable federal and state laws and regulations where our Shares are offered for sale and conduct your affairs with us and with dealers, brokers, or investors in accordance with the Rules of Fair Practice of the National Association of Securities Dealers, Inc.

12. Redemption or Repurchase within Seven Days. If Shares are tendered to us for redemption or are repurchased by us within seven (7) business days after your acceptance of the original purchase order for such shares, you will immediately refund to us the full amount of any sales commission (net of allowances to dealers or brokers) allowed to you on the original sale, and will promptly, upon receipt thereof, pay to us any refunds from dealers or brokers of the balance of sales commissions reallowed by you. We shall notify you of such tender for

<PAGE>

redemption within ten (10) days of the day on which notice of such tender for redemption is received by us.

13. Other Activities. Your services pursuant to this Agreement shall not be deemed to be exclusive, and you may render similar services and act as an underwriter, distributor or dealer for other investment companies in the offering of their shares.

14. Term of Agreement. This Agreement shall become effective on the date of its execution and shall remain in effect for a period of two (2) years from the date of this Agreement. This Agreement shall continue annually thereafter for successive one (1) year periods if approved at least annually (i) by a vote of a majority of the outstanding voting securities of the Company or by a vote of the Directors of the Company, and (ii) by a vote of a majority of the Directors of the Company who are not parties to this Agreement or interested persons of any such party, cast in person at a meeting called for the purpose of voting on this Agreement.

15. Termination. This Agreement: (i) may be terminated at any time without the payment of any penalty, either by vote of the Directors of the Company or by a vote of a majority of the outstanding voting securities of the Company, on sixty (60) days' written notice to you; (ii) shall terminate immediately in the event of its assignment; and (iii) may be terminated by you on sixty (60) days' written notice to us.

16. Suspension of Sales. We reserve the right at all times to suspend or limit the public offering of the Shares upon written notice to you, and to reject any order in whole or in part.

17. Miscellaneous. This Agreement shall be subject to the laws of

the State of Connecticut and shall be interpreted and construed to further and promote the operation of the Company as an open-end investment company. As used herein, the terms "Net Asset Value," "Offering Price," "Investment Company," "Open-End Investment Company," "Assignment," "Principal Underwriter," "Interested Person," and "Majority of the Outstanding Voting Securities," shall have the meanings set forth in the 1933 Act and the 1940 Act, as applicable, and the rules and regulations promulgated thereunder.

18. Liability. Nothing contained herein shall be deemed to protect you against any liability to us or to our shareholders to which you would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence in the performance of your duties hereunder, or by reason of your reckless disregard of your obligations and duties hereunder.

<PAGE>

If the foregoing meets with your approval, please acknowledge your acceptance by signing below whereupon this shall constitute a binding agreement as of the date first above written.

                              Very truly yours,

                              ITT Hartford Mutual Funds, Inc.
                              on behalf of:

                              ITT Hartford Capital Appreciation Fund
                              ITT Hartford Dividend and Growth Fund
                              ITT Hartford International Opportunities Fund
                              ITT Hartford Small Company Fund
                              ITT Hartford Stock Fund
                              ITT Hartford Advisers Fund
                              ITT Hartford Bond Income Strategy Fund
                              ITT Hartford Money Market Fund

                              By: /s/ Andrew W. Kohnke
                                  ---------------------------------------

                              Print Name: Andrew W. Kohnke
                                          -------------------------------

                              Its: Vice President
                                   --------------------------------------

Agreed to and Accepted:

Hartford Securities Distribution Company, Inc.

By: /s/ Peter W. Cummins
    --------------------------------

Print Name: Peter W. Cummins
            ------------------------

Its: Vice President
     -------------------------------

</TEXT>
</DOCUMENT>

```
<DOCUMENT>
<TYPE>EX-99.E.III
<SEQUENCE>20
<FILENAME>b45788h1exv99wewiii.txt
<DESCRIPTION>AMEND. #1 TO PRINCIPAL UNDERWRITING AGRMT.
<TEXT>
<PAGE>
```

EXHIBIT 99.e(iii)

AMENDMENT NUMBER 1 TO PRINCIPAL UNDERWRITING AGREEMENT

Effective July 22, 1997, the following section is added as Section 19 to the Principal Underwriting Agreement:

19. Sub-Accounting Services. In addition to your traditional distribution functions, you are authorized to appoint sub-agents to perform sub-accounting services as long as you have determined that 1) the services are necessary for the Company and not a duplication of services performed by the Company's transfer agent, 2) the sub-agent is competent to perform such services, and 3) the price per account is competitive with the prices charged by other third parties performing similar services. Such sub-accounting services may include: a) the maintenance of separate records for each customer reflecting all account activities such as sales and purchases of the Company's shares, b) the transmittal to the Company of share purchase and redemption orders, c) the transmittal of periodic account statements, and d) the transmittal of customer proxy materials, reports and other information required to be sent to shareholders under the federal securities laws. Upon receipt of the invoice for such services, and after you verify the accuracy of the invoice, you are authorized to rebill, or cause to be billed, the Company for such services in the amount invoiced by the sub-agent.

                              ITT Hartford Mutual Funds, Inc.
                              on behalf of:

                              ITT Hartford Capital Appreciation Fund
                              ITT Hartford Dividend and Growth Fund
                              ITT Hartford International Opportunities Fund
                              ITT Hartford Small Company Fund
                              ITT Hartford Stock Fund
                              ITT Hartford Advisers Fund
                              ITT Hartford Bond Income Strategy Fund
                              ITT Hartford Money Market Fund

                              By: /s/ Joseph H. Gareau
                                 ------------------------------------------
                                      Joseph H. Gareau
                                      President

Agreed to and Accepted:

Hartford Securities Distribution Company

By: /s/ Peter W. Cummins
   ------------------------------------
        Peter W. Cummins
        Vice President

```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 10

```
<DOCUMENT>
<TYPE>EX-99.H(IX)
<SEQUENCE>10
<FILENAME>b60453a1exv99whxixy.txt
<DESCRIPTION>FUND ACCOUNTING AGREEMENT DATED JANUARY 3, 2000
<TEXT>
<PAGE>
```

EXHIBIT h.(ix)

FUND ACCOUNTING AGREEMENT

THIS AGREEMENT is made as of this 3rd day of January, 2000, by and between the mutual funds listed on Schedule A (each a "Fund" and together the "Funds") and HARTFORD LIFE INSURANCE COMPANY (the "Fund Accountant") a Connecticut corporation.

WHEREAS, the Funds are comprised of one or more registered open-end, diversified management investment companies under the Investment Company Act of 1940, as amended, (the "1940 Act") and are currently offering shares of common stock (such shares, of all series and classes, are hereinafter called the "Shares"); and

WHEREAS, the Funds desire that the Fund Accountant perform certain fund accounting services for each Fund; and

WHEREAS, the Fund Accountant is prepared to perform such services on the terms and conditions set forth in this Agreement,

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and intending to be legally bound hereby, the parties agree as follows:

1.   SERVICES AS FUND ACCOUNTANT

The Fund Accountant will provide such fund accounting services as the Funds may reasonably request, including daily pricing of portfolio securities, computation of the net asset value and the net income of the Funds in accordance with the Funds' prospectuses and statements of additional information; calculation of the dividend and capital gain distributions (including that needed to avoid all Federal excise taxes), if any; calculation of yields on all applicable Funds and all classes thereof; preparation of the following reports: (i) a current security position report; (ii) a summary report of transactions and pending maturities (including the principal, cost, and accrued interest on each portfolio security in maturity date order); and (iii) a current cash position report (including cash available from portfolio sales and maturities and sales of a Fund's Shares less cash needed for redemptions and settlement of portfolio purchases); and such other similar services with respect to a Fund as may be reasonably requested by the Funds. With regard to securities for which market quotations are available, the Fund Accountant may use one or more external pricing services as selected and authorized by the Fund on the Pricing Authorization Form attached hereto as Schedule B. The Fund Accountant will keep and maintain the following books and records of each Fund pursuant to Rule 31a-1 under the 1940 Act (the "Rule"): journals containing an itemized daily record in detail of all purchases and sales of securities, all receipts and disbursements of cash and all other debits and credits, as required by subsection (b)(1) of the Rule; general and auxiliary ledgers reflecting all asset, liability, reserve, capital, income and expense accounts, including interest accrued and interest received, as required by subsection (b)(2)(i) of the Rule; separate ledger accounts required by subsection

<PAGE>

(b)(2)(ii) and (iii) of the Rule; and a monthly trial balance of all ledger accounts (except shareholder accounts) as required by subsection (b)(8) of the Rule.

In compliance with the requirements of Rule 31a-3 under the 1940 Act, Fund Accountant hereby agrees that all records which it maintains for the Funds are the property of the Funds and further agrees to surrender promptly to the Funds any of such records upon the Funds' request. However, Fund Accountant has the right to make copies of such records, in its discretion. Fund Accountant further agrees to preserve for the periods prescribed by Rule 31a-2 under the 1940 Act the records required to be maintained by Rule 31a-1 under the 1940 Act. Fund Accountant may delegate some or all of its responsibilities under this Agreement with the consent of the Funds, which will not be unreasonably withheld.

2.   COMPENSATION

In consideration of services rendered and expenses assumed pursuant to this Agreement, each of the Funds will pay the Fund Accountant on the first business day of each month, or at such time(s) as the Fund Accountant shall request and the parties hereto shall agree, a fee calculated at the applicable annual rate set forth on Schedule C hereto. Net asset value shall be computed at least once a day, as set forth in the Funds' prospectuses. Upon any termination of this Agreement before the end of any month, the fee for such part of a month shall be payable upon the date of termination of this Agreement.

The Fund Accountant will from time to time employ or associate with such person or persons as the Fund Accountant may believe to be particularly fitted to assist it in the performance of this Agreement. Such person or persons may be officers, or employees who are employed by both Fund Accountant and the Funds. The compensation of such person or persons shall be paid by the Fund Accountant and no obligation may be incurred on behalf of the Funds in such respect. Other expenses to be incurred in the operation of the Funds including taxes, interest, brokerage fees and commissions, if any, fees of Directors who are not officers, directors, shareholders or employees of the Fund Accountant or the investment adviser or distributor for the Funds, SEC fees and state Blue Sky qualification fees, advisory and administration fees, transfer and dividend disbursing agents' fees, certain insurance premiums, auditing and legal expenses, costs of maintenance of corporate existence, typesetting and printing prospectuses for regulatory purposes and for distribution to current Shareholders of the Funds, costs of Shareholders' reports and meetings and any extraordinary expenses will be borne by the Funds.

3.   CONFIDENTIALITY

The Fund Accountant agrees to treat confidentially and as the proprietary information of the Funds, all records and other information relative to the Funds and prior, present, or potential Shareholders, and not to use such records and information for any purpose other than performance of its responsibilities and duties hereunder, except after prior notification to and approval in writing by the Funds, which approval shall not be unreasonably withheld and may not be withheld where the Fund Accountant may be exposed to civil or criminal contempt proceedings for failure to comply, when requested to divulge such information by duly constituted authorities, or when so requested by the Funds.

2

<PAGE>

4.   INDEMNIFICATION

The Fund Accountant shall use its best efforts to insure the accuracy of all services performed under this Agreement, but shall not be liable to the Funds for any action taken or omitted by the Fund Accountant in the absence of bad faith, willful misfeasance or gross negligence. The Fund Accountant assumes no responsibility hereunder, and shall not be liable, for any damage, loss of data, delay, or any other loss whatsoever caused by events beyond its reasonable control.

Any person, even though also an employee, or agent of the Fund Accountant who may be or become an officer, trustee, employee, or agent of the Funds shall be deemed, when rendering services to the Funds, or acting on any business of that party, to be rendering such services to or acting solely for that party and not as an employee, or agent or one under the control or direction of the Fund Accountant even though paid by them.

The Funds agree to indemnify and hold the Fund Accountant harmless from all taxes, charges, expenses, assessments, claims and liabilities (including, without limitation, liabilities arising under the Securities Act of 1933, the Securities Exchange Act of 1934, the 1940 Act, and any state and foreign securities and blue sky laws, all as amended from time to time) and expenses, including (without limitation) attorneys' fees and disbursements arising directly or indirectly from any action or thing which the Fund Accountant takes or does or omits to take or do hereunder, provided that the Fund Accountant shall not be indemnified against any liability to the Funds or to their Shareholders (or any expenses incident to such liability) arising out of the Fund Accountant's negligent failure to perform its duties under this Agreement.

5.   TERM

This Agreement shall become effective on January 3, 2000 and may be terminated upon at least sixty (60) days' written notice to the other party.

6.   NOTICES

All notices and other communications (collectively referred to as a "Notice" or "Notices" in this paragraph) hereunder shall be in writing or by telegram, cable, telex or facsimile sending device. Notices shall be addressed (a) if to the Fund Accountant, at their address, 200 Hopmeadow Street, Simsbury, CT 06089, Attn: George R. Jay; (b) if to the Funds, at their principal place of business or (c) if to neither of the foregoing, at such other address as to which the sender shall have been notified by any such Notice or other communication. The Notice may be sent by first-class mail, in which case it shall be deemed to have been given three days after it is sent, or if sent by confirming telegram, cable, telex, or facsimile sending device, it shall be deemed to have been given immediately.

7.   FURTHER ACTIONS

3

<PAGE>

Each party agrees to perform such further acts and execute such further documents as are necessary to effectuate the purposes hereof.

8. ASSIGNMENT

This Agreement and the rights and duties hereunder shall not be assignable with respect to a Fund by either of the parties hereto except by the specific written consent of the other party which, in the case of assignment to an affiliate, shall not be unreasonably denied.

9. AMENDMENTS

This Agreement or any part hereof may be changed or waived only by an instrument in writing signed by the party against which enforcement of such change or waiver is sought.

10. GOVERNING STATE LAW

This Agreement shall be governed by and its provisions shall be construed in accordance with the laws of the State of Connecticut.

11. MISCELLANEOUS

This Agreement embodies the entire agreement and understanding between the parties hereto, and supersedes all prior agreements and understandings relating to the subject matter hereof. The captions in this Agreement are included for convenience of reference only and in no way define or delimit any of the provisions hereof or otherwise affect their construction or effect. If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby. This Agreement shall be binding and shall inure to the benefit of the parties hereto and their respective successors.

4

<PAGE>

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed all as of the day and year first above written.

```
                         The Hartford Mutual Funds, Inc.
                            on behalf of:
                            The Hartford Advisers Fund
                            The Hartford Bond Income Strategy Fund
                            The Hartford Capital Appreciation Fund
                            The Hartford Dividend and Growth Fund
                            The Hartford Global Leaders Fund
                            The Hartford Growth and Income Fund
                            The Hartford High Yield Fund
                            The Hartford International Opportunities Fund
                            The Hartford MidCap Fund
                            The Hartford Money Market Fund
                            The Hartford Small Company Fund
                            The Hartford Stock Fund


                         By: /s/ David M. Znamierowski
                            ---------------------------------------------
                            David M. Znamierowski, President


                         Hartford Life Insurance Company
```

```
By: /s/ George R. Jay
    ------------------------------------------
    George R. Jay, Assistant Vice President
```

<PAGE>

## SCHEDULE A

### to the Fund Accounting Agreement

NAME OF FUND

The Hartford Mutual Funds, Inc.
   on behalf of:
   The Hartford Advisers Fund
   The Hartford Bond Income Strategy Fund
   The Hartford Capital Appreciation Fund
   The Hartford Dividend and Growth Fund
   The Hartford Global Leaders Fund
   The Hartford Growth and Income Fund
   The Hartford High Yield Fund
   The Hartford International Opportunities Fund
   The Hartford MidCap Fund
   The Hartford Money Market Fund
   The Hartford Small Company Fund
   The Hartford Stock Fund

<PAGE>

## SCHEDULE B

### to the Fund Accounting Agreement

#### PRICING AUTHORIZATION FORM

Each Fund hereby authorizes Fund Accountant to use the following price sources, market indices and tolerance ranges for performing fund pricing and evaluating the reasonability of security prices for each Fund.

<TABLE>
<CAPTION>

| SECURITY TYPE | SOURCE/TYPE OF QUOTE | TOLERANCE LEVEL | GENERAL BACK-UP |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Bonds (domestic) | IDC/Broker Quotes | 1% | Broker Quotes |
| Equities (domestic) | Reuters/last sale or mean between bid and ask if no last sale | 5% | Bloomberg |
| Bonds (foreign) | IDC/Broker Quotes | 1% | Broker Quotes |
| Equities (foreign) | IDC/ last sale or mean between last bid and ask if no last sale | 5% | Bloomberg |

</TABLE>

<PAGE>

SCHEDULE C

to the Funding Accounting Agreement

MUTUAL FUND ACCOUNTING FEES

```
<TABLE>
<CAPTION>
AGGREGATE FUND NET ASSETS      ANNUAL FEE
------------------------      ---------------
<S>                           <C>
        All Assets            1.5 Basis Points
</TABLE>
</TEXT>
</DOCUMENT>
```

# EXHIBIT 11

```
<DOCUMENT>
<TYPE>EX-99.H(V)
<SEQUENCE>7
<FILENAME>b50650mfexv99whxvy.txt
<DESCRIPTION>SHARE PURCHASE AGREEMENT
<TEXT>
<PAGE>
```

<div align="center">

THE HARTFORD MUTUAL FUNDS, INC.
THE HARTFORD MUTUAL FUNDS II, INC.
SHARE PURCHASE AGREEMENT

</div>

HARTFORD LIFE INSURANCE COMPANY ("HL"), a Connecticut Corporation, as Sponsor-Depositor, now and in the future, of certain separate accounts ("Separate Accounts"), and issuer of certain variable funding agreements (the "Contracts") issued with respect to such Separate Accounts, hereby agrees as of the 3rd day of May 2004 with THE HARTFORD MUTUAL FUNDS, INC. and THE HARTFORD MUTUAL FUNDS II, INC., each an open-end management investment company (each, a "Fund" and together, the "Funds"), to this Share Purchase Agreement, which contemplates an arrangement whereby Fund shares shall be made available to serve as the underlying investment media for the Contracts, subject to the following provisions:

1.    Fund shares shall be purchased at the net asset value applicable to each order as established in accordance with the provisions of the then currently effective prospectus of the Fund. Fund shares shall be ordered in such quantity and at such times as determined by HL (or its successor) to be necessary to meet the requirements of the Contracts. Confirmations of Fund share purchases will be sent directly to HL by the Fund. All Fund share purchases shall be maintained in a book share account in the name of HL. Payment for shares shall be made directly to the Fund by HL and payment for redemption shall be made directly to HL by the Fund, all within the applicable time periods allowed for settlement of securities transactions. If payment is not received by the Fund within such period, the Fund may, without notice, cancel the order and hold HL responsible for any loss suffered by the Fund resulting from such failure to receive timely payment.

Notice shall be furnished promptly to HL by the Fund of any dividend or distribution payable on Fund shares. HL elects to receive all such dividends or distributions in the form of additional Fund shares. HL reserves the right to revoke this election and to receive in cash all such dividends and distributions declared after the Fund's receipt of notice of HL's revocation of this election.

2.    (a) The Fund represents that its shares are registered under the Securities Act of 1933, as amended, and that all appropriate federal and state registration provisions have been complied with as to such shares and that such shares may properly be made available for the purposes of this Agreement. The Fund shall bear the cost of any such registration, as well as the expense of any taxes assessed upon the issuance or transfer of Fund shares pursuant to this Agreement.

(b)    The Fund shall supply to HL, in a timely manner and in a sufficient number to allow distribution by HL to each owner of or participant under a Contract (i) annual and semiannual reports of the Fund's condition, and (ii) any other Fund shareholder notice, report or document required by law to be

<PAGE>
   delivered to shareholders. The Fund shall bear the cost of preparing and
   supplying the foregoing materials and the cost of any distribution thereof.

   (c)  HL represents that it has registered or will register under the
   Securities Act of 1933, as amended and the Investment Company Act of 1940,
   as amended (the "1940 Act"), unless exempt from such registration, the
   Contracts. HL will maintain such registrations to the extent required by
   law. The Contracts will be issued in compliance with all applicable federal
   and state laws and regulations.

   (d)  HL has legally and validly established each Separate Account prior to
   any issuance or sale as a segregated asset account under the Connecticut
   Insurance Code and has registered or, prior to any issuance or sale of the
   Contracts, will register and will maintain the registration of, each
   Separate Account as a unit investment trust in accordance with the 1940
   Act, unless exempt from such registration.

3.   HL shall not make any representation concerning Fund shares except those
     contained in the then current prospectus of the Fund and in printed
     information subsequently issued by the Fund as information supplemental to
     the prospectus.

4.   This Agreement shall terminate:

     (a)  At the option of HL or the Fund upon six months' advance notice to the
     other;

     (b)  At the option of HL if Fund shares are not available for any reason to
     meet the requirements of any of the Contracts but then only as to those
     Contracts;

     (c)  At the option of HL, upon institution of formal proceedings against
     the Fund by the Securities and Exchange Commission or any other regulatory
     body;

     (d)  Upon assignment of this Agreement, unless made with the written
     consent of the other party to this Agreement;

     (e)  If Fund shares are not registered, issued or sold in conformance with
     applicable federal or state law or if such laws preclude the use of Fund
     shares as the underlying investment media of the Contracts. Prompt notice
     shall be given to HL in the event the conditions of this provision occur.

     Notice of termination hereunder shall be given promptly by the party
     desiring to terminate to the other party to this Agreement.

5.   Termination as the result of any cause listed in the preceding paragraph
     shall not affect the Fund's obligation to furnish Fund shares in connection
     with Contracts then in force for which the shares of the Fund serve or may
     serve as the underlying investment media, unless further sale of Fund
     shares is proscribed by the Securities and Exchange Commission or other
     regulatory body, or if Fund shares of the requisite Series are no longer
     available.

<PAGE>
6.   This Agreement shall supersede any prior agreement between the parties
     hereto relating to the same subject matter.

7.   Each notice required by this Agreement shall be given in writing as
     follows:

                      If to the Fund:
                      ---------------

                      The Hartford Mutual Funds
                      P.O. Box 2999
                      Hartford, Connecticut 06104-2999
                      Attn: Counsel to the Fund

                      If to HL:
                      ---------

                      Hartford Life Insurance Company
                      P.O. Box 2999
                      Hartford, Connecticut 06104-2999
                      Attn: General Counsel

8.   This Agreement shall be construed in accordance with the laws of the State
     of Connecticut.

9.   The Fund will provide HL with copies of its proxy solicitations applicable
to each series of the Fund (each a "Series"). HL will, to the extent required by
law, (a) distribute proxy materials applicable to the Series to eligible
Contract owners; (b) solicit voting instructions from eligible Contract owners;
(c) vote the Series shares in accordance with instructions received from
Contract owners; (d) if required by law, vote Series shares for which no
instructions have been received in the same proportion as shares of the Series
for which instructions have been received; and (e) calculate voting privileges
in a manner consistent with other life insurance companies to whose separate
accounts Series shares are offered. Unregistered separate accounts subject to
the Employee Retirement Income Security Act of 1974 ("ERISA") will refrain from
voting shares for which no instructions are received if such shares are held
subject to the provisions of ERISA.


<PAGE>


Dated: May 3, 2004

                           THE HARTFORD MUTUAL FUNDS, INC.


                           By: /s/ David M. Znamierowski
                               ------------------------------------
                               David M. Znamierowski



                           THE HARTFORD MUTUAL FUNDS II, INC.


                           By: /s/ David M. Znamierowski
                               ------------------------------------
                               David M. Znamierowski

HARTFORD LIFE INSURANCE COMPANY

By: /s/ Eric H. Wietsma
    ------------------------------------
    Eric H. Wietsma

```
</TEXT>
</DOCUMENT>
```