## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

JENNIFER L. KASILAG, LOUIS )
MELLINGER, JUDITH )
M. MENENDEZ, JACQUELINE M. )
ROBINSON, and )   Civil Action No. 11-cv-1083 (RMB) (AMD)
LINDA A. RUSSELL, et al., )
          )
          )   Motion Date:  July 18, 2011
   Plaintiffs, )   Oral Argument Requested
          )   Document Filed Electronically
   v. )
          )
HARTFORD INVESTMENT )
FINANCIAL SERVICES, LLC, )
          )
   Defendant. )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HARTFORD INVESTMENT FINANCIAL SERVICES, LLC'S MOTION TO DISMISS ALL CLAIMS AGAINST IT PURSUANT TO RULE 12(b)(6)

**DUANE MORRIS LLP**
By: Gregory R. Haworth
744 Broad Street, Suite 1200
Newark, NJ 07102-3889
(973) 424-2000 (tel)
(973) 424-2001 (fax)
grhaworth@duanemorris.com

**ROPES & GRAY LLP**
By: Harvey J. Wolkoff (*pro hac vice* pending)
   Robert A. Skinner (*pro hac vice* pending)
   Janna J. Hansen (*pro hac vice* pending)
   Allison M. Boscarine (*pro hac vice* pending)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 4

    1.    Mutual Funds and the Investment Company Act of 1940 ..................... 4

    2.    The Hartford Funds' Investment Management Agreement and Sub-Advisory Agreements ........................................................................ 5

        a.    Investment Management Agreement ........................................ 5

        b.    The Sub-Advisory Agreements with Wellington and HIMCO ................. 7

    3.    Distribution Plans and Fees ................................................................. 7

    4.    Expense Limitation Agreement ............................................................ 9

ARGUMENT ..................................................................................................... 10

I.    THE COMPLAINT MISCONSTRUES *JONES v. HARRIS ASSOCIATES* AND FAILS TO ASSERT PLAINTIFFS' CLAIM UNDER THE CORRECT STANDARD OF LIABILITY ........................................................................................ 10

II.    COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE INVESTMENT MANAGEMENT FEES UNDER § 36(b) ................................................... 12

    A.    General Industry Criticism Cannot Form the Basis For A Claim Against HIFSCO ............................................................................. 12

    B.    The Complaint's Comparisons of the Investment Management Fees to Other Types of Fees Do Not Establish a Plausible Claim For Excessive Fees ...................................................................................... 13

        1.    Differences Between Mutual Fund Investment Management Fees and Institutional Account Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding Comparability Of Services ........................... 13

        2.    Differences Between Mutual Fund Investment Management Fees and Sub-Advisory Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding The Services Provided Under the Respective Agreements .................................................................. 16

    C.    Plaintiffs' Remaining Conclusory Allegations on "Information and Belief" Cannot Form the Basis For Liability Under § 36(b) ................. 19

III.    COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(b) OF THE ICA ...................................... 24

    A.    The Complaint Does Not Allege A Claim for Excessive Distribution and Service Fees under § 36(b), But Merely Criticizes Rule 12b-1 Generally ........................................................................................ 25

    B.    There is no Private Right of Action to Assert a Violation of § 12(b) of the ICA or Rule 12b-1 .................................................................... 30

CONCLUSION ................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>CASES</u>

*Alexander v. Sandoval,*
  532 U.S. 275 (2001)..................................................................................30

*Amron v. Morgan Stanley Inv. Advisers, Inc.,*
  464 F.3d 338 (2d Cir. 2006).............................................................. passim

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009).................................................................... passim

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................................1, 12, 24, 26

*Curran v. Principal Mgmt. Corp., LLC,*
  2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010) ......................18

*Fowler v. UPMC Shayside,*
  578 F.3d 203 (3d Cir. 2009)..........................................................10, 14, 26

*Gallus v. Am. Express Fin. Corp.,*
  370 F. Supp. 2d 862 (D. Minn. 2005).....................................................30

*Gallus v. Am. Express Fin. Corp.,*
  Civ. No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 9, 2010)............11, 15, 20, 24

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
  694 F.2d 923 (2d Cir. 1982)............................................................. passim

*Hoffman v. UBS-AG,*
  591 F. Supp. 2d 522 (S.D.N.Y 2008)...............................................21, 26, 29, 30

*In re Franklin Mut. Funds Fee Litig.,*
  478 F. Supp. 2d 677 (D.N.J. 2007) .................................................18, 21, 23, 30

*In re Goldman Sachs Mut. Funds Fee Litig.,*
  No. 04-2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ....................22

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.,*
  184 F.3d 280 (3d Cir. 1999)............................................................5

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
  528 F. Supp. 2d 332 (S.D.N.Y. 2007)...............................................21

*In re Scudder Mut. Funds Fee Litig.*,
   No. 04 Civ.1921(DAB), 2007 WL 2325862 (S.D.N.Y. Aug. 14, 2007) ...............................26

*Jones v. Harris Assocs. L.P.*,
   130 S. Ct. 1418 (2010) ................................................................................................... passim

*Krantz v. Prudential Inv. Fund Mgmt. LLC*,
   305 F.3d 140 (3d Cir. 2002) ........................................................................................18, 20, 25

*Krinsk v. Fund Asset Mgmt.*,
   715 F. Supp. 472 (S.D.N.Y. 1988) ......................................................................................26

*Krinsk v. Fund Asset Mgmt.*,
   875 F.2d 404 (2d Cir. 1989) ...............................................................................................21

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
   248 F.3d 321 (4th Cir. 2001) ..............................................................................................20

*Mintz v. Baron*,
   No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ......................................18, 25

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
   663 F. Supp. 962 (S.D.N.Y. 1987) ......................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ..............................................................................................................5

*Yameen v. Eaton Vance Distribs., Inc.*,
   394 F. Supp. 2d 350 (D. Mass. 2005) ..................................................................26, 27, 30

*Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*,
   No. 03 Civ. 5710, 2004 WL 1065533 (S.D.N.Y. May 12, 2004) ..........................................19

## STATUTES

15 U.S.C. § 80a-2(a) ..............................................................................................................4

15 U.S.C. § 80a-15(a) and (c) ...............................................................................................4

## OTHER AUTHORITIES

75 Fed. Reg. 47064 ................................................................................................................27

Fed. R. Civ. P. 8(a) ................................................................................................................10

Fed. R. Civ. P. 12(b)(6) .................................................................................................1, 5, 13

John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund Industry:*
   *Evidence and Implications for Policy* (2007) ......................................................................23

iv

17 C.F.R. 270.12b-1................................................................................................. passim

U.S. Securities and Exchange Commission, http://www.sec.gov/answers/mfclass.htm ...............27

Plaintiffs Jennifer E. Kasilag, Louis Mellinger, Judith M. Menendez, Jacqueline M. Robinson, and Linda A. Russell bring this action purportedly on behalf of the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund, and the Hartford Money Market Fund (collectively, "the Funds" or "the Hartford Funds"), against the Funds' investment manager, defendant Hartford Investment Financial Services, LLC ("HIFSCO"), alleging that fees paid by the Funds to HIFSCO violated § 36(b) of the Investment Company Act of 1940 (the "ICA").  HIFSCO moves to dismiss the Amended Complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6) because it fails to state a claim that satisfies the pleading requirements in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## PRELIMINARY STATEMENT

The Complaint should be dismissed because, rather than allege facts, it relies almost exclusively on conclusory statements, rehashed policy arguments, and an abundance of sheer speculation alleged on "information and belief."[1]  Indeed, much of the Complaint simply recounts commentators' general criticisms of the mutual fund industry's fee structures.  When this irrelevant commentary is set aside, the actual "*facts*" alleged about the Hartford Funds are too conclusory and sparse to satisfy the pleading requirements under *Iqbal* and *Twombly*.

The Complaint asserts that two categories of fees paid to HIFSCO – the investment management fee (Count I) and the distribution and service fee (Count II) – were excessive, in

---

[1] The Court will note this Memorandum's similarities to the memorandum in support of HIFSCO's motion to dismiss the complaint in *Southworth v. Hartford Investment Financial Services, LLC*, No. 10-cv-878-RMB (D. Del.) because the two complaints overlap substantially. As a result, many of the arguments asserted by HIFSCO in its motion to dismiss the *Southworth* complaint apply equally to the *Kasilag* Complaint; HIFSCO also addresses whatever minor differences exist between the complaints herein.

breach of HIFSCO's "fiduciary duty with respect to the receipt of compensation" set forth in § 36(b). The U.S. Supreme Court has held that to allege a claim under § 36(b), a plaintiff must meet the significant hurdle of alleging sufficient facts to demonstrate that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *See Jones v. Harris Assocs. L.P.*, 130 S. Ct. 1418, 1426 (2010) (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982)). The Complaint must be dismissed because it fails to allege facts about HIFSCO that state a plausible claim for excessive fees under § 36(b).

Count I, regarding investment management fees, fails to state a claim because it relies mainly on comparisons to other types of fees without pleading necessary facts that make the comparisons relevant. Plaintiffs first allege that the investment management fees paid by the Funds to HIFSCO are greater than the investment management fees paid to HIFSCO by non-mutual fund (or "institutional") clients for "virtually identical" services. Compl. ¶ 127. But differences between mutual fund fees and institutional account fees are only actionable if sufficient facts are pled showing that comparable *services* are provided to the different clients. The Supreme Court addressed this question specifically in *Jones*, admonishing that "courts must be wary of inapt comparisons" because "there may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund." 130 S. Ct. at 1428-29. The Complaint utterly fails to allege facts supporting comparability of services. *See* Compl. ¶ 126. The mere fact that HIFSCO's different clients pay different fees – without any factual basis for comparability of the services provided for those fees – cannot support a claim that the Funds' fees are excessive.

Plaintiffs next allege that the investment management fees paid by the Funds to HIFSCO

are greater than the fees paid by HIFSCO to the Funds' sub-advisers, even though plaintiffs conclusorily assert that HIFSCO delegated "virtually all" of its investment management duties to the sub-advisers.  Here again, plaintiffs allege no *facts* supporting this theory.  The Investment Management Agreement ("IMA") attached to the Complaint states clearly that HIFSCO provides both investment management services and administrative services to the Funds.  The Complaint simply assumes that the entirety of the investment management services are delegated to the sub-adviser, and then waves away the administrative services altogether – because "*on information and belief*, the administrative type services included are a very small percentage of the expenses incurred under the agreement . . . ."  Compl. ¶ 44 (emphasis added).  With no factual allegations in support, the Complaint thus concludes that "HIFSCO has delegated virtually all of its duties to subcontractors at a fraction of HIFSCO's fee."  Compl. ¶ 49.  The Court is not required to accept such *ipse dixit* conclusions as true facts for purposes of a motion to dismiss, nor should it.  Count I fails to plead a plausible claim that the investment management fees are excessive.

With respect to Count II, regarding the distribution and service fees (commonly known as "12b-1 fees"), the allegations fail to state a claim for two separate reasons.  First, the Complaint does not allege any facts demonstrating that the 12b-1 fees were excessive in light of the services provided.  Indeed, it makes no attempt to allege that the fees were "disproportionately large," as required by *Jones*.  Nor do plaintiffs allege anything about the quantity or quality of the distribution and servicing provided in exchange for the fee, or whether the size of the fee bears a reasonable relationship to those services.  Instead, the Complaint simply recounts commentary criticizing Rule 12b-1 fees and parrots this criticism to conclude that the Hartford Funds' shareholders "enjoyed no benefits" from the 12b-1 fees.  Compl. ¶ 109.  But this policy debate has no place in a lawsuit, and does not form a plausible factual basis for an excessive fee claim

3

under *Jones*.  Second, the assertion in Count II that the 12b-1 fees should not have been approved at all fails because plaintiffs have no private right of action to bring such a claim.

At bottom, the Complaint is grounded on general industry criticism and the plaintiffs' hope that they can prove there was something wrong with the Hartford Fund fees.  But such a hope, supported only by conclusory assertions (many of which are copied from the *Southworth* complaint, which in turn copies from other complaints), does not allege a plausible basis for relief under the recent Supreme Court precedent.  Indeed, if this Complaint can pass muster, the same pleading could be asserted against literally any fund complex, as demonstrated by plaintiffs' doing precisely that, using the *Southworth* complaint.

## STATEMENT OF FACTS

### 1.   Mutual Funds and the Investment Company Act of 1940

The ICA creates a regulatory structure for mutual fund governance designed to safeguard the interests of fund shareholders.  Section 15(a) of the ICA requires that fund investment advisers serve pursuant to written management contracts approved by a majority of the fund's shareholders, which must be approved annually by the fund's board of directors or a majority of shareholders.  *See* 15 U.S.C. §§ 80a-15(a), 80a-2(a)(12).  Section 15(c) requires fund directors to request and evaluate such information from the adviser as may be reasonably necessary to evaluate the terms of the proposed contract.  *See* 15 U.S.C. § 80a-15(c).  Section 15(c) further requires that approval of the management contract by the fund directors be accomplished by a majority of disinterested directors, who represent the "cornerstone" of the ICA's efforts to check conflicts of interest.  *See Jones*, 130 S. Ct. at 1423.

Section 10(a) of the ICA provides that at least 40% of the fund's board of directors must not be "interested persons" of the fund, as defined by § 2(a)(19).  15 U.S.C. § 80a-2(a)(19).  On

4

the Hartford Funds' board, seven of the nine directors (or 77%) are independent.  *See* Ex. 1[2]

(Combined Statement of Additional Information for the Hartford Mutual Funds dated March 1,

2011("2011 SAI") at 43-46).[3]

## 2.     The Hartford Funds' Investment Management Agreement and Sub-Advisory Agreements

### a.     *Investment Management Agreement*

The Funds and HIFSCO annually enter into an IMA whereby HIFSCO agrees to provide

investment management and administrative services to the Funds.  Among its duties as

investment manager, HIFSCO supervises the Funds' investment portfolios and provides overall

management of all aspects of the Funds' business affairs.  *See* Compl. Ex. 1 at 716; Compl. Ex. 2

at 738; Ex. 1 (2011 SAI at 106-07).  When a Fund is sub-advised, certain of HIFSCO's duties are

delegated to the sub-adviser, but HIFSCO retains the responsibility to scrutinize the investment

program of the Funds.   *See* Compl. Ex. 1 at 716; Compl. Ex. 2 at 738.

In addition to investment advisory services, HIFSCO has sole responsibility for

coordinating the work of the Funds' custodian, transfer agent, accountants, and legal counsel.

Compl. Ex. 1 at 716; Compl. Ex. 2 at 738.  HIFSCO also provides the Funds with personnel who

serve as officers of the Funds, and compensates them for performing administrative functions.

*Id.*  HIFSCO also must provide adequate office space and related services necessary to

effectively operate the Funds.  *Id.*

---

[2] Unless otherwise specified, all exhibit numbers in this memorandum refer to Exhibits to the Certification of Allison M. Boscarine dated May 12, 2011, filed herewith.

[3] Courts addressing Rule 12(b)(6) motions examine sources in addition to the complaint, such as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see also In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) (holding that a court may consider "document[s] integral to or explicitly relied upon in the complaint" without converting a motion to dismiss to a motion for summary judgment).

For its services, HIFSCO receives a fee from each Fund, calculated as a percentage of that Fund's net assets at the end of the preceding month.  *See* Ex. 1 (2011 SAI at 108-11).  The fees are set forth in the IMA between HIFSCO and the Funds.  The fee structures feature "breakpoints" – that is, the marginal percentage fee declines as the net assets of the Fund increase.  *See id.*

The IMA is reviewed and approved annually by the Board of Directors of the Funds. This process consists of multiple meetings with HIFSCO representatives, independent legal counsel, an independent financial services consulting firm, and, Lipper Inc.  *See* Ex. 2 (Advisers Fund Annual Report dated October 31, 2010, at 36).  As described in the Funds' Annual Reports, the Board undertook a robust process that involved multiple rounds of information requests to the investment managers and to independent consultants and counsel about each of the Funds. *See, e.g.*, *id.*  The Board met on June 22-23, 2010 and on August 3-4, 2010 and considered renewal of the IMA.  *See id.*

In recent years, the annual contract renewal process has resulted in reductions to the Funds' fee schedules for every Fund at issue in the Complaint.  For example, in 2010, HIFSCO agreed to reduce management fees by 10 basis points (or 0.10%)[4] on the first $100 million of assets of one of the Funds at issue and agreed to reduce management fees by 5 basis points on all levels of assets for another Fund at issue.  *See* Ex. 11 (Growth Opportunities Fund Annual Report at 17); Ex. 10 (Inflation Plus Fund Annual Report at 20).  In 2008, HIFSCO agreed to implement breakpoints to reduce management fees by .25 basis points on assets over $5 billion and an additional .25 basis points on assets over $10 billion for three of the Funds at issue, and agreed to breakpoints on a fourth Fund at issue to reduce management fees by 2 basis points on

---

[4] A basis point is equal to one one-hundredth of one percent.

assets over $5 billion and an additional 1 basis point on assets over $10 billion.  *See* Ex. 3

(Certified Shareholders Report dated October 31, 2008 at 441).  This was preceded the year

before by a permanent reduction of management fees by 5 basis points in two of the Funds and

by 10 basis points in one of the Funds.  *See* Ex. 4 (Certified Shareholders Report for all Hartford

Funds dated October 31, 2007 at 402).

      **b.**     ***The Sub-Advisory Agreements with Wellington and HIMCO***

      The IMA states that HIFSCO may engage one or more sub-advisers for the Funds.

HIFSCO contracted with Wellington Management Company LLP ("Wellington") and Hartford

Investment Financial Services Company ("HIMCO") (collectively, the "sub-advisers") to act as

sub-advisers to the Funds.  Compl. Exs. 13, 15.  The sub-advisory arrangements are disclosed in

the Funds' prospectuses, *see, e.g.*, Ex. 5 (Advisers Fund Prospectus dated March 1, 2011, at 21-

22), and the corresponding fees are disclosed in the Funds' Statements of Additional

Information.  *See* Ex. 1 (2011 SAI at 112-14).  The sub-advisory agreements are reviewed and

approved annually by the Funds' Board.  *See* Ex. 2 (Advisers Fund Annual Report at 36-37).

      As sub-advisers, Wellington and HIMCO evaluate and implement an investment program

appropriate for each portfolio, while HIFSCO retains responsibility for supervising the sub-

advisers, conducting continuing due diligence of the sub-advisers, and recommending their

termination and replacement, as appropriate.  Ex. 1 (2011 SAI at 106-07).  The sub-advisory

agreements require the sub-advisers to consult with HIFSCO about portfolio management issues

when appropriate, and HIFSCO is charged with the responsibility to review all investment

performance reports prepared by the sub-advisers before the reports are provided to the Board of

Directors.  *Id*.

**3.**     **Distribution Plans and Fees**

      Pursuant to Rule 12b-1 of the ICA, the Funds adopted distribution plans that authorize

the payment of "12b-1 fees." *See* Ex. 1 (2011 SAI at 148-51).[5]  In adopting the distribution

plans, the Funds' Board of Directors determined that there was a reasonable likelihood that the

Distribution Plans would benefit the Funds' current and future shareholders. *Id.* at 150.  Some of

these potential benefits include the ability to fulfill current shareholder servicing needs, the

potential to increase assets and possibly benefit from economies of scale, the potential to avoid a

decrease in assets and portfolio liquidations through redemption activity, the ability to sell shares

of the Funds through adviser and broker distribution channels, and the ability to provide

investors with an alternative to paying front end sales loads. *Id.*  As required by the ICA, these

plans were adopted by a majority vote of the Board of Directors of the Fund, including at least a

majority of non-interested directors. *Id.*

The plans authorize that these distribution activities be funded by a fee paid to HIFSCO,

which acts as the Funds' distributor under a separate agreement. *See id.* at 148-51; Compl. Ex. 9.

Each fee is based on a percentage of a Fund's net assets and varies by share class, allowing

investors to select the manner in which they pay sales charges.  Currently, although the

distribution plan for Class A shares allows for payment of 35 basis points to the distributor, the

Funds' Board of Directors authorizes only 25 basis points to HIFSCO for 12b-1 fees. *See* Ex. 1

(2011 SAI at 148-49).  Class L shares also pay 25 basis points annually for 12b-1 fees, *see id.*,

and Class A and L shares pay front-end sales loads of up to 5.5% of the purchase price,

depending on the Fund and the amount invested. *See id.* at 147.  Investors purchasing Class B

and Class C shares do so without paying an initial sales charge so that the full amount of the

---

[5] The fee may be used to pay commissions to brokers, dealers, and financial institutions who sell
the Fund shares; expenses related to the dissemination of prospectuses and statements of
additional information; the costs of preparation and distribution of sales literature; and other
expenses related to the provision of personal service to shareholders and the maintenance of
shareholder accounts.  Ex. 1 (2011 SAI at 149).

purchase payment is invested in the Fund.  *See id.* at 153.  Class B shares pay a 12b-1 fee of 100

basis points, and pay a contingent deferred sales charge ("CDSC") on any shares redeemed

during the first 6 years after initial investment, after which time Class B shares are automatically

converted to Class A shares.[6]  *See* Ex. 1 (2011 SAI at 149).  Class C shares are "level load,"

paying an annual 12b-1 fee of 100 basis points, and do not pay front- or back-end sales loads

unless shares are redeemed within one year of purchase.  *Id.* at 149, 153.  Each quarter, HIFSCO

provides to the Funds' Board of Directors a written report of the amounts expended under the

distribution plans and the purposes for which the expenditures were made.  *Id.* at 150.

### 4.      Expense Limitation Agreement

In addition to the Investment Management and Underwriting Agreements, HIFSCO also

entered into an Expense Limitation Agreement with the Funds in which it agreed to reimburse a

Fund whenever its total operating expenses exceed a specified percentage of the Fund's average

daily net assets.  *See* Compl. Ex. 3.  As a result of these expense caps, HIFSCO reimbursed the

six Funds 10% of gross fees on average for the fiscal year ending October 31, 2010.  *See* Ex. 2

(Advisers Fund Annual Report at 13); Ex. 15 (Money Market Fund Annual Report at 8); Ex. 11

(Growth Opportunities Fund Annual Report at 9); Ex. 12 (Global Health Fund Annual Report at

8); Ex. 13 (Conservative Allocation Fund Annual Report at 8); Ex. 10 (Inflation Plus Fund

Annual Report at 9); Ex. 1 (2011 SAI at 114).[7]

---

[6] The Hartford Advisers Fund, for example, charges a CDSC for shares redeemed in the first 6 years (the declining rate, by year, is: 5%, 4%, 3%, 3%, 2%, and 1%).  Ex. 5 (Advisers Fund Prospectus at 28).

[7] The overall expense reimbursement for one of the Funds at issue, the Hartford Money Market Fund, is high compared to the other Funds at issue because HIFSCO has currently agreed to reimburse expenses or waive fees to the extent necessary to prevent earnings from falling below the level of expenses.  *See* Ex. 14 (Money Market Fund Prospectus dated March 1, 2011 at 18).

## ARGUMENT

Fed. R. Civ. P. 8(a) requires pleading factual allegations that are sufficient to state a claim for relief that is "plausible on its face." *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). The Supreme Court's recent decisions have "shifted" pleading standards "from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shayside*, 578 F.3d 203, 210 (3d Cir. 2009). "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). Thus, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id.* at 211 (citing Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1949.

## I.    THE COMPLAINT MISCONSTRUES *JONES  V. HARRIS ASSOCIATES* AND FAILS TO ASSERT PLAINTIFFS' CLAIM UNDER THE CORRECT STANDARD OF LIABILITY

The Supreme Court has made clear that the liability standard is that the fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones*, 130 S. Ct. at 1426. This is a very high bar, one that plaintiffs fail to reach.

The Complaint asserts that *Jones* authorized liability for a breach of § 36(b) based upon a showing *either* that the fee charged was the result of a "defective" process or was not "fair." *See* Compl. ¶¶ 31, 91. But the Supreme Court rejected this very argument, holding that a court must answer the ultimate question of whether the adviser's fee is excessive – not whether the fee or

10

process is reasonable or fair.  *See* 130 S. Ct. at 1426; *see also id.* at 1430 ("Section 36(b) is sharply focused on the question of whether the fees themselves were excessive." (quoting *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001))).

First, the *Jones* decision did not mandate a more searching review of the board process than contemplated by *Gartenberg*'s "so disproportionate" standard.  Although *Jones* confirmed that a reviewing court should consider the expertise, diligence, and conscientiousness of the board as part of its review of all of the relevant circumstances,[8] *Jones* did not authorize "process" reviews *independent* from the "so disproportionate" inquiry that serves as the ultimate standard.[9]

Second, the Court admonished that § 36(b) does *not* call for "judicial second-guessing of informed board decisions" or for courts to engage in a "reasonableness" review of the approved fees – indeed, Congress expressly rejected a reasonableness standard, as "courts are not well suited to make such precise calculations."  130 S. Ct. at 1430 ("[H]ow is a judge or jury to determine a 'fair price'?" (quotation omitted)); *see also Gartenberg*, 694 F.2d at 928 ("[T]he court is not authorized to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees" (citation omitted).).

Accordingly, as explained in Sections II and III, *infra*, the Complaint has directed its facts toward an incorrect standard of liability and fails to allege facts to avoid dismissal under the high bar established by *Jones*.

---

[8] The *Gartenberg* court described a non-exclusive list of six "factors" that could be considered in determining whether a fee bears no reasonable relationship to the services rendered:  (i) the nature and quality of the services provided by the adviser to the shareholders; (ii) the profitability of the mutual fund to the adviser; (iii) fall-out benefits; (iv) economies of scale realized by the adviser; (v) comparative fee structures with similar funds; and (vi) the independence and conscientiousness of the independent trustees.  *Gartenberg*, 694 F.2d at 928-31.

[9] In *Gallus v. American Express Financial Corp.*, Civ. No. 04-4498, 2010 WL 5137419 (D. Minn. Dec. 9,  2010), the court recently rejected the very mis-reading of *Jones* asserted by plaintiffs here.

## II.      COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE INVESTMENT MANAGEMENT FEES UNDER § 36(b)

Count I must be dismissed because the Complaint fails to assert facts specific to HIFSCO and the Hartford Funds that state a claim under § 36(b).  Plaintiffs' allegations are largely addressed to the investment management industry as a whole, and say nothing specific about either the Hartford Funds or HIFSCO.  The few facts alleged that *do* pertain to HIFSCO fail to make out a claim because they are based on nothing more than conclusory assertions, often directly contradicted by the Fund documents attached to the Complaint.  In contrast to the paucity of the plaintiffs' allegations, the documents attached to the Complaint and the public record reflect that 77% of the Hartford Funds' board is comprised of independent directors whose reviews of the fee arrangements have resulted in *reductions* in advisory fees and the addition of more breakpoints to the fee schedules.  Plaintiffs' sparse allegations are insufficient to make out a "plausible" basis for relief under the pleading requirements of *Iqbal* and *Twombly*.

### A.      General Industry Criticism Cannot Form the Basis For A Claim Against HIFSCO

The Complaint cannot assert a claim against HIFSCO by raising general complaints about the entire mutual fund industry.  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged." *See Iqbal*, 129 S. Ct. at 1949 (emphasis added).

The Complaint lifts large portions of the *Southworth* complaint, and thus suffers from the same infirmities, trying inappropriately to make its case by citing law review articles and criticisms by a handful of academics, industry insiders, and regulators – whole pages pass without a single reference to the defendant in this case.  *See* Compl. ¶¶ 31-35, 72, 73, 133-38. This Circuit and others have noted the "strikingly similar" § 36(b) complaints filed in multiple courts over the past decade, which have relied on "speculation, inference and generalized

observations about the securities industry." *See, e.g.*, *Amron v. Morgan Stanley Inv. Advisers, Inc.*, 464 F.3d 338, 346 n.2, 343, 345 (2d Cir. 2006) (quoting *Krantz v. Prudential Inv. Fund Mgmt. LLC*, 305 F.3d 140, 143 (3d Cir. 2002)).  Courts have regularly ignored these generic industry criticisms in determining whether a complaint's allegations pass muster under Rule 12(b)(6).  *See, e.g.*, *Amron*, 464 F.3d at 342 ("Reviewing the factual allegations in the complaints, the pleadings rely heavily on generalities about deficiencies in the securities industry, and statements made by industry critics and insiders. . . . [C]onspicuously absent from . . . the complaints are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants.").  These allegations are entitled to no weight.

### B.   The Complaint's Comparisons of the Investment Management Fees to Other Types of Fees Do Not Establish a Plausible Claim For Excessive Fees

The few facts alleged in the Complaint about the Hartford Funds and HIFSCO are plainly insufficient to establish a plausible claim for excessive fees under § 36(b).  The bulk of these allegations in support of Count I are comparisons of the Funds' investment management fees to other types of fees – namely, (i) investment management fees charged by HIFSCO to "institutional" accounts such as pension funds; and (ii) the fees paid by HIFSCO to the Funds' sub-advisers for taking on certain delegated responsibilities.  But these comparisons do not plausibly show HIFSCO's fees to be excessive, because they are not supported by factual allegations that make the comparisons relevant under the high *Jones* standard.

#### 1.   *Differences Between Mutual Fund Investment Management Fees and Institutional Account Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding Comparability Of Services*

The *Jones* decision directly addressed fee comparisons and concluded that such comparisons should be given weight only if the services provided were comparable.  Plaintiffs fail to establish a basis for comparing the funds listed in the Complaint because they *conclude* on

13

the basis of their own *ipse dixit* that the services provided to these funds are similar without

providing specific facts.

In *Jones*, the Supreme Court specifically addressed the comparison between investment

management fees charged to different types of clients in a § 36(b) claim:

> [C]ourts may give such comparisons the weight that they merit in light of the
> similarities and differences between the services that the clients in question
> require, *but courts must be wary of inapt comparisons*.  As the panel below noted,
> there may be significant differences between the services provided by an
> investment adviser to a mutual fund and those it provides to a pension fund which
> are attributable to the greater frequency of shareholder redemptions in a mutual
> fund, the higher turnover of mutual fund assets, the more burdensome regulatory
> and legal obligations, and higher marketing costs.  If the services rendered are
> sufficiently different that a comparison is not probative, then courts *must* reject
> such a comparison.

*Jones*, 130 S. Ct. at 1428-29 (emphases added) (citation omitted).  While *Jones* involved the

standard for summary judgment, its holding informs the principles for adequate pleading.  Under

*Jones*, a plaintiff cannot simply list the respective fees of the challenged funds and selected

institutional accounts and assert that any differences between the fees charged to the funds and

institutional accounts must demonstrate excessiveness.  Instead, a plaintiff must plead facts that

would *show* such comparisons to be apt.  *See Fowler*, 578 F.3d at 211.  And the Supreme Court

has made clear that even a showing of a "large disparity" in fees "that cannot be explained by the

different services" would not be actionable without "other evidence that the fee is outside the

arm's-length range . . ."  *See Jones*, 130 S. Ct. at 1429 n.8.

The Complaint fails to compare the services provided to the Hartford Funds to the

services provided to institutional accounts.  The Complaint simply provides *conclusions* – that

"the services that Hartford provides to the institutional accounts are substantially similar, if not

identical, to the investment management services Defendant provides to the Funds" – but no

supporting facts are alleged.[10]  *See* Compl. ¶ 126; *see also* Compl. ¶ 127 (services "virtually

identical") and ¶ 130 (services "the same").  Under recent precedents, such conclusory pleading

is simply inadequate.  *See Iqbal*, 129 S. Ct. at 1949, 1950 ("[C]onclusory statements" are "not

entitled to the assumption of truth.").

     The Complaint attempts to plug this factual hole by asserting that the Hartford Funds

contract for certain services with entities *other* than HIFSCO.  In a footnote, the Complaint

references the fact that fund accounting and transfer agency services provided to the Funds are

performed pursuant to separate agreements.  *See* Compl. ¶ 126 n.14 (referencing the agreements

at Compl. Exs. 7 and 10).  Plaintiffs attempt to imply that *all* services necessary to operate the

Funds – other than the types of services also provided to institutional accounts – are provided

under separate agreements, thus establishing apples-to-apples comparability of the services

provided under the Funds' IMA and the services provided to the institutional clients.  But this

logical leap has no basis in the facts alleged.  Indeed, the Supreme Court itself in *Jones* pointed

to potentially "significant differences between the services . . . which are attributable to the

greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual

fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs."

*Jones*, 130 S. Ct. at 1428-29.  The Complaint provides no plausible basis to assume away all

such differences based merely on the fact that fund accounting and transfer agency services are

delegated to a third party.  Moreover, the Funds' IMA (attached to the Complaint at Exhibit 1)

---

[10]A strikingly similar allegation (made "on information and belief") is found in the *Southworth* and *Curran* complaints; a similar allegation is also made in the *Gallus* complaint and the *Jones* complaint.  *See* Ex. 9 (*Southworth* Compl. ¶ 86); Ex. 6 (*Curran v. Principal Mgmt. Corp.*, No. 09-cv-00433 (S.D. Iowa filed Jan. 15, 2010) Compl. ¶ 86 (hereinafter, "*Curran* Complaint")); Ex. 7 (*Gallus v. Am. Express Fin. Corp*, No. 04-8305 (D. Minn. filed Apr. 22, 2005) Compl. ¶ 53 (hereinafter, "*Gallus* Compl.")); Ex. 8 (*Jones v. Harris*, No. 04-8305 (N.D. Ill. filed June 10, 2005) Compl. ¶ 25 (hereinafter, "*Jones* Compl.")).

delineates "administrative services" that HIFSCO provides to the Funds, and the Complaint alleges no basis to support plaintiffs' apparent conclusion that those services are identical to what HIFSCO provides to institutional accounts.

With no factual basis to make the institutional fee comparison an apt one, the mere fact that institutional accounts pay lower fees (taking this fact to be true for purposes of this motion) does not provide a plausible basis for liability under the *Jones* "so disproportionately large" standard. Plaintiffs should not be allowed, based on so thin a reed, to launch broad discovery and hope they find evidence to support their conclusory assertions.

> **2.    *Differences Between Mutual Fund Investment Management Fees and Sub-Advisory Fees Do Not Make Out a § 36(b) Claim Where No Facts Are Pled Regarding The Services Provided Under the Respective Agreements***

The Complaint also attempts to allege that HIFSCO's investment management fees were excessive by comparing them to the fees paid to the Funds' sub-advisers. This comparison fails to state a claim, however, because the Complaint again relies only on *conclusions* and not facts, and because many of the conclusory statements in the Complaint are contradicted by documents attached to the Complaint as exhibits.

Under the IMA between HIFSCO and the Funds, HIFSCO provides both investment management services and administrative services to the Funds. *See* Compl. Ex. 1 at 716; Compl. Ex. 2 at 738. The Complaint breezily concludes that "virtually all" of the *investment management* services are performed by the Funds' sub-advisers. *See* Compl. ¶ 68 ("Virtually all of the portfolio management and investment management services required by the mutual funds are performed by [the sub-advisers] and there is little, if any, work left to be done by HIFSCO."); *see also* Compl. ¶ 60 ("HIFSCO makes a one-time, initial determination regarding investment objectives and selects sub-advisers.").

As for the administrative services provided by HIFSCO under the IMA, the Complaint asserts only "on information and belief" that "the administrative type services included are a very small percentage of the expenses incurred under these agreements . . . ."  See Compl. ¶ 44.  The Complaint contains no specific factual allegations about the nature and quality of the investment management and administrative services provided to the Funds by HIFSCO.  Instead, the Complaint merely assumes that "HIFSCO has delegated virtually all of its duties to subcontractors at a fraction of HIFSCO's fee."  See Compl. ¶ 49.  These conclusions are not enough to meet the pleading standards mandated by the Supreme Court and this Circuit.

Moreover, the Complaint's conclusory assertions are contradicted by Fund documents attached as exhibits to the Complaint.  Although the Court must make all reasonable inferences in favor of the plaintiff when deciding a motion to dismiss, inferences *cannot be reasonable* when they are at war with the documents in a plaintiff's own pleading.  As detailed in the IMA (Exhibits 1 and 2 to the Complaint), HIFSCO provides extensive administrative and investment management services that are not provided by the sub-advisers.  HIFSCO has sole responsibility for coordinating the service providers for the Funds, provides personnel that serve in various capacities as employees of the Funds, compensates these personnel for performing various administrative functions (such as those outlined in the Statement of Facts) and provides space and services to operate the Funds.  *See* Statement of Facts at 2.a.; Compl. Ex. 1 at 716; Compl. Ex. 2 at 738.  As for investment management services, HIFSCO has overall responsibility for the investment program of the Funds, which includes reviewing investment portfolios and securities, monitoring performance, and providing the extensive data and information required by the Board.  *See id.*  And, as the Exhibits to the Complaint and the public record reflect, the Board of Directors has recently acted to reduce management fees in all of the Funds at issue.  *See*

Statement of Facts at 2.a., 2.b.

Case law on § 36(b) confirms that a Complaint must contain specific factual allegations about the services provided by an investment manager. *See In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (holding that the complaint at issue "does not address *the actual services* rendered to [the relevant] Funds") (emphasis added); *Amron*, 464 F.3d at 342, 343 ("[C]onspicuously absent from either of the complaints are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants."); *Krantz*, 305 F.3d at 143 (dismissing action where plaintiff "failed to allege any facts indicating that the fees received were disproportionate to services rendered"); *Mintz v. Baron*, No. 05 Civ. 4904, 2009 WL 735140, at *3 (S.D.N.Y. Mar. 20, 2009) ("[T]he gravamen of the Amended Complaint is the allegation that no marketing services and no 'new' administrative services were provided after the funds were partially closed. The allegations are conclusory and bereft of sufficient factual support to render plausible any contention premised on the first *Gartenberg* factor – the nature and quality of the services provided – particularly in light of public SEC filings reflecting substantial net additional investments in the funds during the periods in question.").[11]

The same reasoning applies here: the Complaint's bare-bones conclusion that the sub-

---

[11] In a recent ruling post-dating the Supreme Court's decision in *Jones*, the Southern District of Iowa denied an adviser's motion to dismiss § 36(b) claims in a case involving sub-advised funds. *See Curran v. Principal Mgmt. Corp., LLC*, 2010 U.S. Dist. LEXIS 83730 (S.D. Iowa June 8, 2010). *Curran*, however, presented many unique facts that are absent in this case. The *Curran* court pointed first and foremost to the fact that the funds at issue were "funds of funds" whereby the funds in which the shareholders invested held shares in numerous other funds. *Id*. at *22. As a result, the funds allegedly paid "four layers of fees" with the first layer paid to the adviser of the funds in which the shareholders directly invested, the second layer to the sub-adviser of those funds, the third layer to the adviser of each underlying fund and the fourth layer to the sub-adviser of each underlying fund. *Id*. at *31-32. The Hartford Funds do not have such a multi-layer fee structure, which resulted in allegedly extreme fees for overlapping and repetitive services in *Curran*.

advisers are providing essentially all investment management services for only a fraction of the fee is not based upon sufficient factual allegations to make out a plausible claim.

### C.    Plaintiffs' Remaining Conclusory Allegations on "Information and Belief" Cannot Form the Basis For Liability Under § 36(b)

The remaining allegations in support of Count I consist of plaintiffs invoking the so-called "*Gartenberg* factors" and making "information and belief" allegations about them.  Many of these allegations have been made *verbatim* in other § 36(b) complaints, and are far too conclusory to overcome the high bar posed by *Jones.  See Yampolsky v. Morgan Stanley Inv. Advisers, Inc.*, No. 03 Civ. 5710, 2004 WL 1065533, *1-2 (S.D.N.Y. May 12, 2004) (dismissing § 36(b) claims where plaintiffs "crafted their complaints" to track the *Gartenberg* factors).  As shown below, plaintiffs' allegations are textbook examples of *Iqbal*'s caution that "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1949.

**Diligence of Directors.**  The Complaint contains no factual allegations about the independence, expertise, care, and conscientiousness of the directors in evaluating adviser compensation.  The Complaint alleges "on information and belief" that the directors of the Hartford Funds do not consider each fund separately but consider all the funds together.  *See* Compl. ¶¶ 96, 98, 99, 100.[12]  The Complaint also alleges that the directors were "dominated" and "unduly influenced" because "upon information and belief" HIFSCO "does not provide the

---

[12] The Complaint claims that "[n]o public information is disclosed on the length of the meetings of these Board meetings [sic] other than the fact that they took place over two consecutive days," Compl. ¶ 96, despite the fact that the public Annual Report provides details about Board consideration of extensive information related to the IMA at "meetings through the year" as well as at the Board's meetings in June and August, 2010.  *See* Statement of Facts, at 2.a; Ex. 2 (Advisers Fund Annual Report at 36).

directors with sufficient information to fulfill their obligations"[13] and, "on information and belief," the directors "rarely, if ever, questioned the adequacy or completeness of any information or recommendations provided by Defendant."[14]  *See* Compl. ¶¶ 101, 102, 104.  Such "naked assertions" contain no factual content to permit an inference other than, at most, a mere possibility of misconduct.  *Iqbal*, 129 S. Ct. at 1949-50.  The Complaint does not identify any relevant information that the Board should have considered but did not.  Rather, the documents attached to the Complaint and the public record reflect a Board review process sufficiently rigorous (by a Board composed overwhelmingly of independent Board members) to result in fee reductions and the addition of more breakpoints to the fee structures.

Courts have rejected similar efforts to base § 36(b) claims on an alleged lack of director independence, which fail to overcome the express presumption in the ICA that independent directors are disinterested.  *See, e.g.*, *Amron*, 464 F.3d at 344 ("[A] plaintiff's burden to overcome this presumption is a heavy one.") (internal quotation marks omitted).  Likewise, plaintiffs' "assertions that the directors were dependent on the investment advisers for information shed no light on the question of whether the directors are disinterested."  *Migdal*, 248 F.3d at 330.[15]  And, as reiterated in  *Jones*, § 36(b) does *not* call for "judicial second-guessing of informed board decisions" or for courts to engage in a "reasonableness" review of

---

[13] Similar allegations appear in other § 36(b) cases as well.  *Compare* Compl. ¶¶ 101, 102 *with* Ex. 9 (*Southworth* Compl. ¶¶ 68, 69); Ex. 6 (Curran Compl. ¶¶ 94, 97, 98); Ex. 7 (*Gallus* Compl. ¶¶ 17, 66); Ex. 8 (*Jones* Compl. ¶ 49).

[14] A nearly identical "information and belief" allegation was also made in *Southworth*, *Jones*, *Gallus*, and *Curran*.  *See* Ex. 9 (*Southworth* Compl. ¶ 70); Ex. 8 (*Jones* Compl. ¶ 49(d)); Ex. 7 (*Gallus* Compl. ¶ 66); Ex. 6 (*Curran* Compl. ¶ 111).

[15] *See also Krantz*, 305 F.3d at 143-44 (holding that service on multiple boards did not render directors "interested" under the ICA); *Migdal*, 248 F.3d at 330 ("The fact that directors of the funds might be busy does not suggest that they were in any way 'interested' as defined by the ICA.").

the approved fees – indeed, Congress expressly rejected a reasonableness standard, as "courts are not well suited to make such precise calculations."  130 S. Ct. at 1430.

**Economies of Scale.**  The Complaint devotes several paragraphs to third parties' views of economies of scale and general examples of how economies of scale *might* work.  *See* Compl. ¶¶ 133-138.  A few paragraphs then discuss the Hartford Funds:  the Complaint asserts that since HIFSCO and its sub-adviser, Wellington, have different breakpoints in their fee agreements, economies of scale are not "meaningfully" shared with the fund shareholders.  *See* Compl. ¶ 147. These conclusory allegations are insufficient because they say nothing about the *costs* per investor.  *See Hoffman*, 591 F. Supp. 2d 522,  540 (S.D.N.Y. 2008) ("In order to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew.  Without such information, there is no way to determine whether any economy of scale even existed that could have been passed on to investors . . . .") (internal citations omitted).[16]

Plaintiffs' allegations also ignore the documents attached to their Complaint, which show that every Fund contains "breakpoints" that decrease the fee rate as the Funds grow in size.  *See* Statement of Facts at 2.a.; Compl. Exs. 1 and 2.  Courts in this Circuit and others have dismissed cases relying on general allegations that defendant investment managers refused to pass along economies of scale.  *See, e.g.*, *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687

---

[16] *See also Krinsk v. Fund Asset Mgmt.*, 875 F.2d 404, 411 (2d Cir. 1989) ("[P]laintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased."); *In re Salomon Smith Barney Mut. Fund Fees Litig.*, 528 F. Supp. 2d 332, 338-39 (S.D.N.Y. 2007) ("Economies of scale allegations are insufficient where there are no allegations of the costs."); *Hoffman*, 591 F. Supp. 2d at 540 ("Moreover, Plaintiffs' claims concerning the differential in breakpoints between sub-advisors and investment advisors is irrelevant to the issue of economies of scale.  As Plaintiffs' complaint acknowledges, investment advisers and sub-advisers perform distinct services.  The differences in services and compensation packages alone justify the different breakpoint arrangements." (internal citation omitted)).

(dismissing complaint based on inadequate allegations including general allegations that any economies of scale achieved by marketing of the funds to new investors were not passed on); *Amron*, 464 F.3d at 345 (dismissing complaint based on, *inter alia*, conclusory allegations regarding economies of scale); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04-2567, 2006 WL 126772, *9 (S.D.N.Y. Jan. 17, 2006) ("Mere assertions that fees increased with the size of the Funds are not enough to establish that the benefits from economies of scale were not passed on to investors.").

**Costs and Profitability of Providing Investment Management Services.**  The Complaint attempts to make allegations in regard to costs and profitability in managing the Funds – again, relying primarily on "information and belief" and industry-wide generalizations. The Complaint focuses on the dollar amounts of the investment management fees but alleges nothing of substance on HIFSCO's *costs*, which essentially equates revenue with profits.

On the cost side, the Complaint states only that HIFSCO's incremental costs of providing management services "are *believed* to be nominal."  *See* Compl. ¶ 152.  The Complaint then re-asserts its allegations that the sub-adviser provides all (or "virtually all") of the relevant services. *See* Compl. ¶¶ 157-160.  These allegations are based on nothing more than "information and belief," general industry criticism, and conclusory assertions.  None of these allegations addresses, as they must, the *actual costs* to or *specific services* provided by HIFSCO.[17]

Such sparse allegations cannot support a claim for excessive fees.  For instance, the District of New Jersey dismissed a § 36(b) claim involving allegations that certain of the funds at issue "had some of the highest fees in the industry," which increased over time and had no

---

[17]  Not surprisingly, the Complaint's allegations do not mention let alone address the telling facts that HIFSCO's rates were *lowered* in recent years, additional breakpoints were added to the advisory fee schedules, and total expense caps reduced overall fees.  *See* Statement of Facts at 2.a.; Compl. Exs. 1 and 2.

breakpoints.  The court recognized that since the complaint did not adequately address "the actual services rendered to those Funds," it must be dismissed.  *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 686-87; *see also Amron*, 464 F.3d at 344-45 ("[Plaintiffs'] assertions regarding the size of 12b-1 and advisory fees, moreover, are irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds. Instead, the Complaints merely pray for discovery on these points.").

**Comparison to Vanguard Fees.**  Plaintiffs' assertion that "[s]hareholders of [certain] Vanguard Funds pay significantly lower investment management fees" than the Hartford Funds, Compl. ¶ 120, is irrelevant.  The Complaint fails to plausibly allege why Vanguard's fees are an appropriate comparator.  Vanguard is a not-for-profit entity that markets itself as a low-cost mutual fund provider.  The mere existence of a lower-cost product in the marketplace does not, by itself, plausibly support an inference that the Hartford Funds are being charged excessive fees. *See Amron*, 464 F.3d at 345 ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under this [*Gartenberg*] factor."); *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 980 n.53 (S.D.N.Y. 1987) (in comparing funds involving similar investment management services, "the appropriate analysis is a comparison at equivalent size levels," among other factors).[18]

* * *

Taken as a whole, the allegations in the Complaint do not state a plausible claim that HIFSCO charged excessive investment management fees under § 36(b).  The allegations that are

---

[18] *See also* John C. Coates IV & R. Glenn Hubbard, *Competition in the Mutual Fund Industry: Evidence and Implications for Policy*, 33 J. Corp. L. 151, 196-97 (2007) (cited in Compl. Ex. 12 at 85 n.11 & *passim*) ("Vanguard's and other funds' business models are based on being low-cost alternatives, while still other funds provide a larger set of services to investors, at higher prices.  That is, expense ratios will vary depending on the type of services provided and selected by investors.").

specific to HIFSCO are an assembly of speculation and conclusion that could be alleged against any fund family (with minimal tweaks as to the particular fee arrangements at issue) – and, in fact, many of these same allegations have been pled in other cases against other fund groups. The Complaint's allegations fall short of the high bar of showing a disproportionate fee that "could not" have been the product of arm's length bargaining, particularly given the majority of disinterested directors who have reduced  investment management fees in recent years.  HIFSCO respectfully submits that the Complaint does not state a plausible claim of excessive advisory fees under *Iqbal*, *Twombly*, and *Jones,* and that Count I must be dismissed.

## III.    COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(b) OF THE ICA

Plaintiffs' 12b-1 allegations – much of which are lifted word-for-word from other complaints – do not include the most basic components of an excessive fee claim under *Jones*.[19] Although the Complaint offers general criticisms of Rule 12b-1 as bad policy, the Complaint alleges virtually nothing that is specific to the Hartford Funds, other than listing the fees charged and making the bald conclusion that the Funds' shareholders received "no benefits" from the fees.  Count II is also governed by the "so disproportionately large" standard set forth in *Jones*, and plaintiffs' allegations fall far short of stating a plausible case for liability under that high bar. Instead of alleging *excessive* 12b-1 fees, plaintiffs argue that *any* such fee was improper because the requirements of Rule 12b-1 were not met when the fees and distribution plan were approved by the independent directors.  But plaintiffs have no direct private right of action to assert such a claim under Rule 12b-1, and Count II must therefore be dismissed.

---

[19] The Complaint's 12b-1 allegations closely pattern the allegations made in the *Southworth* complaint, the *Curran* complaint, and the *Gallus* complaint.  *Compare* Compl. ¶¶ 72-76, 106-11 *with* Ex. 9 (*Southworth* Compl. ¶¶ 49-56, 72-77); Ex. 6 (*Curran* Compl. ¶¶ 52-59, 101-04); Ex. 7 (*Gallus* Compl. ¶¶ 19-27).

**A.      The Complaint Does Not Allege A Claim for Excessive Distribution and Service Fees under § 36(b), But Merely Criticizes Rule 12b-1 Generally**

The Complaint fails to allege sufficient facts to avoid dismissal of the 12b-1 claim.  The Complaint makes no allegations of the quantity or quality of distribution and servicing – despite the fact that no claim can be made that fees are excessive in relation to the services provided when there are no allegations about those services.[20]  Instead, plaintiffs contend that 12b-1 fees do not benefit shareholders, based on general industry criticism.  Such bare-bones pleading cannot support a claim for excessive 12b-1 fees under the high bar of Jones.

Plaintiffs plead essentially no facts about the relevant circumstances of HIFSCO's 12b-1 fees.  In the Complaint's introduction, plaintiffs claim that the 12b-1 fees purportedly breached HIFSCO's fiduciary duties based on "the nature and quality of the services provided in exchange for the 12b-1 fees."  *See* Compl. ¶ 10.  But plaintiffs do not even mention "the nature" or "quality" of distribution and shareholder services after the introductory statement.  This alone is dispositive:  without pleading any facts about the applicable services, plaintiffs cannot make out a case that the 12b-1 fees "bear[] no reasonable relationship to the services rendered."  *Jones*, 130 S. Ct. at 1426.  *See Krantz*, 305 F.3d at 143 (plaintiff "failed to allege any facts indicating that the fees received were disproportionate to the services rendered").[21]  Having alleged nothing about the quantity or quality of the distribution and servicing provided in exchange for the 12b-1

---

[20] As discussed above, the Supreme Court has held that:  "To face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining."  *Jones*, 130 S. Ct. at 1426.  This standard applies equally to plaintiffs' claims concerning distribution and service fees.

[21] *See also Amron*, 464 F.3d at 342 ("[C]onspicuously absent . . . are any factual allegations as to the *actual* fee negotiations or management and distribution services rendered by *these* defendants."); *Mintz*, 2009 WL 735140, at *3 ("The allegations are conclusory and bereft of sufficient factual support to render plausible any contention premised on the first *Gartenberg* factor – the nature and quality of the services provided . . .").

fee or whether the size of the fee bears a reasonable relationship to those services, plaintiffs have failed to state a claim.

The bulk of the 12b-1 allegations in the Complaint are conclusions about the purported lack of benefits to shareholders from 12b-1 fees without any specific allegations about the services provided by HIFSCO or any attempt to compare those services to the fees charged. *See* Compl. ¶ 50 (12b-1 fees "provide few, if any, benefits to the Funds and their shareholders"); *id*. ¶¶ 72-74, 89, 108-109. But these sorts of "threadbare recitals . . . supported by mere conclusory statements" cannot survive a motion to dismiss, under the guidance of *Iqbal* and *Twombly*. *See Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 129 S. Ct. at 1949). Courts have dismissed complaints premised on assertions that shareholders receive "no benefits" from 12b-1 fees, rather than fact-based allegations that the fees themselves were excessive. *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d at 539 ("Plaintiff's allegations regarding 12b-1 fees . . . refer to the propriety of the fees, not to the amount charged. This form of pleading is insufficient to the extent that Section 36(b) permits actions where fees are disproportionately large, not where fees are merely applied improperly.") (internal quotation marks omitted).[22]

Plaintiffs' claims about the differences in fees paid by different classes of Fund

---

[22] *See also Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 356 (D. Mass. 2005) (dismissing 12b-1 fee claim premised on allegations that distribution fees paid after the fund was closed to new investors did not benefit shareholders); *In re Scudder Mut. Funds Fee Litig.*, No. 04 Civ.1921(DAB), 2007 WL 2325862, *4, 14-15 (S.D.N.Y. Aug. 14, 2007) ("Here, the plaintiffs do not allege any facts that would demonstrate that the compensation paid to the defendants was disproportionate to the services rendered. Instead, [the plaintiff's Section 36(b) claim] states only that the defendants improperly charged certain distribution fees."); *ING Principal Protection Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 166 (D. Mass. 2005) (dismissing complaint where plaintiffs failed to allege the "fundamental claim" that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided"). *Cf. Krinsk v. Fund Asset Mgmt.*, 715 F. Supp. 472, 501 (S.D.N.Y. 1988), *aff'd* 875 F.2d 404 (2d Cir. 1989) ("Plaintiff . . . asserts that use of 12b-1 payments to encourage better shareholder service and to maintain Fund size violates Rule 12b-1. The Court disagrees.").

26

shareholders, *see* Compl. ¶¶ 76-86, are also not supported by any allegations about the services

provided to these classes of Fund shareholders.[23]   Although plaintiffs appear to be alleging that

different classes of shares should not pay different 12b-1 fees, the SEC has explicitly approved a

"multi-class [fund] structure [which] offers investors the ability to select a fee and expense

structure."  *See* Mutual Fund Classes, U.S. Securities and Exchange Commission,

http://www.sec.gov/answers/mfclass.htm.[24]   And, the SEC has recognized the basic 12b-1 fee

structure of the Hartford Funds as the industry norm.  *See* SEC 2010 Release at 47070.[25]

Despite this express SEC guidance, plaintiffs claim that HIFSCO somehow engaged in

"wrongdoing" in requiring Class B shareholders of the Funds to pay 12b-1 fees when the class

was "closed to new investments as of September 30, 2009."  *See* Compl. ¶ 82.  But, Class B

shareholders chose this option of paying certain on-going 12b-1 fees instead of paying a front-

end sales charge.  And courts and the SEC have recognized that shareholders who choose to pay

higher 12b-1 fees instead of a front-end sales charge properly continue to pay those fees if the

fund becomes closed to new investments.  *See, e.g.*, *Yameen*, 394 F. Supp. 2d at 357-58 ("SEC

---

[23] Plaintiffs do not allege that they hold shares in each of the share classes which they mention in
the Complaint.

[24]  *See also* Mutual Fund Distribution Fees; Confirmations, Securities Act Release No. 9128,
Exchange Act Release No. 62544, Investment Company Act Release No. 29367, 75 Fed. Reg.
47064, 47074 (proposed Aug. 4, 2010) (hereinafter, "SEC 2010 Release") ("We do not believe
that it would benefit fund investors to return to the era in which they paid a substantial front-end
sales load and did not have access to various alternative forms of distribution payment
arrangements.").

[25]"Class 'A' shares generally are sold with a front-end sales load, and also often have a 12b-1 fee
of about 25 basis points. Class 'B' shares typically are sold without a front-end load but charge a
spread load consisting of a 12b-1 fee of 100 basis points . . . and a declining [contingent deferred
sales load].  Class B shares usually convert automatically to class A shares after a fixed period of
time has elapsed (commonly six to eight years from the date of purchase). Class 'C' shares
typically charge a 'level load' consisting of a 100 basis point 12b-1 fee that is imposed for as
long as the investor owns the shares, and also may charge a small [contingent deferred sales
load] of one percent if a shareholder redeems within the first year . . . ."  SEC 2010 Release at
47070.

Rule 12b-1 has for some time been authoritatively interpreted by officials of the SEC . . . to allow mutual funds to compensate companies for past distribution services. . . . [The SEC has rejected] the categorical contention . . . that [12b-1] fees are *per se* disproportionately large and hence unreasonable when paid out while the fund is closed"); *ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005) (same).

The Complaint's assertion that Class Y shareholders – that is, institutional shareholders – pay no distribution fees also fails to allege disproportionality under the *Jones* standard. *See* Compl. ¶ 85. The Complaint alleges no facts that would make a comparison between Class Y and other share classes relevant. *See Jones*, 130 S. Ct. at 1438 (explaining that "courts may give such comparisons [to institutional clients] the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons"). In fact, the SEC recognizes that mutual funds generally do not charge their institutional share classes 12b-1 fees, but the SEC continues to recognize the benefits of 12b-1 fees for other investors. *See* SEC 2010 Release at 47110 n.452 ("We do not expect that institutional classes would be affected by our proposal because funds do not typically charge 12b-1 fees on these classes."). Plaintiffs' claims about the differing level of 12b-1 fees charged to different shareholder classes do not in any way make out an allegation that Hartford's 12b-1 fees were excessive.

The Complaint also attempts to compare the Funds' 12b-1 fees to the Vanguard funds and the Hartford Money Market Funds without alleging any facts to support these comparisons. Plaintiffs contend that because these funds do not charge 12b-1 fees, any 12b-1 fees paid by other Funds *must* be excessive. Compl. ¶¶ 123, 87. The Complaint contains no facts, however, about why these comparisons are apt. Instead, using plaintiffs' logic, a complaint could be

lodged against every fund paying *any* 12b-1 fees, no matter the size of the fees or the relationship to the services paid for by those fees.  Courts have rejected claims, however, that allege that any 12b-1 fee is *per se* excessive.  *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d at 539.

Moreover, plaintiffs make no effort to explain why the Funds' Board of Directors would negotiate over 12b-1 fees in good faith for the Hartford Money Market Fund while simultaneously neglecting its duties with respect to the other Funds.  Indeed, plaintiffs' allegation merely confirms that the Board makes decisions about 12b-1 fees based on the services required for each separate fund.  The Complaint provides nothing more than "naked assertions," *Iqbal*, 129 S. Ct. at 1949-50, based on general industry criticism about the supposed lack of diligence of the Board in approving 12b-1 fees.  *See* Compl. ¶¶ 106-113.  Such conclusory assertions, without supporting facts, do not meet plaintiffs' "heavy" burden to overcome the express presumption in the ICA that independent directors are disinterested.  *See, e.g.*, *Amron*, 464 F.3d at 344.

Nor do the Complaint's allegations as to economies of scale provide any substance.  Plaintiffs assert that the "management fee and the total 12b-1 fees received by Defendant have increased as assets grew," Compl. ¶ 107 – an *aggregate* increase due to the growth of the Funds' assets under management, not an increase in the percentage fees applied.  Plaintiffs then insist that this growth in fees "depriv[es] the Funds of the benefit of these economies of scale" achieved by the growth of the Funds.  *Id*.  Again, the Complaint asserts no facts regarding the actual *costs* of managing the Funds (on a per-investor basis or otherwise) and whether those costs decreased as the assets under management grew.  *See Hoffman*, 591 F. Supp. 2d at 540 ("In order to meet their burden, Plaintiffs must make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets

29

under management grew."); *see also Amron*, 464 F.3d at 345.  If plaintiffs were allowed to state a § 36(b) claim "based upon such paltry allegations," "then any fund that grew over time while not simultaneously lowering its fees would be subject to suit under the ICA.  This cannot be allowed."  *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d at 687.

At bottom, plaintiffs are attempting to litigate whether Rule 12b-1 fees should have been permitted by the SEC in the first place.  As numerous courts have found, such allegations do not meet a plaintiff's pleading obligations.  *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d at 539 (rejecting plaintiff's allegations about the "propriety of the fees, not [ ] the amount charged"); *Yameen*, 394 F. Supp. 2d at 356.  HIFSCO respectfully requests that this Court dismiss Count II in its entirety.

**B.     There is no Private Right of Action to Assert a Violation of § 12(b) of the ICA or Rule 12b-1**

Although plaintiffs assert that the approval of the Funds' 12b-1 fees violated Rule 12b-1 and § 12(b) of the ICA, Compl. ¶ 109, there is no private right of action for plaintiffs to bring a claim under either the rule or the statute.  The ICA does not expressly provide that a shareholder may bring a claim for alleged violations of § 12(b) or Rule 12b-1.  Nor is there an implied private right of action under § 12(b) or Rule 12b-1.  *See, e.g.*, *Gallus v. Am. Express Fin. Corp.*, 370 F. Supp. 2d 862, 868 (D. Minn. 2005) ("The Court finds it telling that no federal court has found an implied right of action under section 12(b)."); *see also Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.").

<u>**CONCLUSION**</u>

For all of the foregoing reasons, HIFSCO respectfully requests that the Court enter an order dismissing the Complaint with prejudice for failure to state a claim.

Respectfully submitted,


**DUANE MORRIS LLP**
*/s/ Gregory R. Haworth*
Gregory R. Haworth
744 Broad Street, Suite 1200
Newark, NJ 07102-3889
(973) 424-2000 (tel)
(973) 424-2001 (fax)
grhaworth@duanemorris.com

*Attorneys for Defendant*
*Hartford Investment Financial Services, LLC*

Of Counsel:
**ROPES & GRAY LLP**
Harvey J. Wolkoff (pro hac vice pending)
Robert A. Skinner (pro hac vice pending)
Janna J. Hansen (pro hac vice pending)
Allison M. Boscarine (pro hac vice pending)
Prudential Tower
800 Boylston Street
Boston, MA 02199
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com
janna.hansen@ropesgray.com
allison.boscarine@ropesgray.com