LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 11th Floor
New York, New York 10022
By: Moshe Maimon
    Danielle Disporto
Telephone: (212) 605-6200
Fax: (212) 605-6290


SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Arnold C. Lakind
    Robert L. Lakind
Telephone: (609) 275-0400
Fax: (609) 275-4511


Attorneys For Plaintiffs

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, and LINDA A. RUSSELL, et al., | Case No. 11-cv-1083 (RMB)(AMD) |
|       Plaintiffs, | PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT |
| vs. | |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | |
|       Defendant. | |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………………1

STATEMENT OF FACTS……………………………………………………………………..2

ARGUMENT……………………………………………………………………………...3

I.  PLAINTIFFS' COMPLAINT, DRAFTED IN GREAT DETAIL WITH CITATION TO SUPPORTING AUTHORITY, STATES A PLAUSIBLE CLAIM THAT DEFENDANT HAS VIOLATED ICA SECTION 36(b) BY VIRTUE OF THE DISPROPORTIONALITY OF ITS FEES……………………………………………………………………….................3

    A.    Introduction………………………………………………………………3

    B.    Application of the *Gartenberg* Factors………………………………………..5

        1.  Nature and Quality of the Services Rendered by HIFSCO…………………..6

            a.  Investment Management Fees…………………………….…….6

            b.  12b-1 Fees……………………………….. …………………………10

        2.    The Funds' Board Lacks Independence and Conscientiousness………..12

            a.    HIFSCO's SEC Violation…………………………………… 13

            b.    Failure to Compare Advisor and Sub-adviser Fees and Services…………………………………………………..13

            c.    The Board's Insufficient Review Process……………………….14

            d.    Fund Classes………………………………………………….15

            e.    The Breakpoints……………………………………………….15

        3.    Comparable Fees…………………………………………...19

            1.    Investment Management Fees…………………………….…...19

            2.    12b-1 Fees…………………………………………………….23

        4.    Economies of Scale…………………………………………...23

        5.    The Profitability of the Fund to the Adviser-Manager…………………28

C. Conclusion………………………………………………………………..29

II. PLAINTIFFS' HAVE NOT ASSERTED A CAUSE OF ACTION UNDER RULE 12b-1; THEY HAVE ASSERTED, IN COUNT II, A VIABLE §36(b) CLAIM WHICH INCLUDES 12B-1 FEES…………………………………………………………………………...30

CONCLUSION…………………………………………………………………………...30

# TABLE OF AUTHORITIES

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
 464 F.3d 338 (2d Cir. 2006) ....................................................................... 5, 18, 22

*Arista Records LLC v. DOE 3,*
 604 F.3d 110 (2d Cir. 2010) ................................................................................. 17

*Ashcraft v. Iqbal,*
 129 S.Ct. 1937 (2009) ........................................................................................ 4, 30

*Braden v. Wal-Mart Stores, Inc.,*
 588 F.3d 585 (8th Cir. 2009) ......................................................................... passim

*Curran v. Principal Mgmt. Corp., LLC,*
 No. 4:09-00433, 2010 WL 2889752 (S.D. Iowa June 8, 2010) ....................... passim

*Curran v. Principal Mgmt. Corp., LLC,*
 No. 4:09-433, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) .................................... 8

*Dreyfus Mutual Funds Fee Litig.,*
 428 F. Supp. 2d 342 (W.D. Pa. 2005) ................................................................. 2, 4

*Forsythe v. Sun Life Fin., Inc.,*
 417 F. Supp. 2d 100 (D. Mass. 2006) ...................................................... 2, 4, 8, 30

*Fowler v. UPMC Shadyside,*
 578 F.3d 203 (3d Cir. 2009) ............................................................................... 2,4

*Gallus v. Am. Express Fin. Corp.,*
 370 F. Supp. 2d 862 (D. Minn. 2005) ................................................................... 30

*Gallus v. Ameriprise Fin., Inc.,*
 561 F.3d 816 (8th Cir. 2009) ................................................................................ 17

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
 694 F.2d 923 (2d Cir. 1982) ......................................................................... 1, 4, 24

*Hoffman v. UBS-AG,*
 591 F. Supp. 2d 522 (S.D.N.Y. 2008) ........................................................... 14, 27

*Hunt v. Invesco Funds Group, Inc.,*
 No. 04-02555, 2006 WL 1581846 (S.D. Tex. Jun. 5, 2006) ...................... 21, 24, 26

*In re American Mutual Funds Fee Litig.,*
  No 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009) ............................................. 10, 17

*In Re Evergreen Mutual Funds Fee Litig.,*
  423 F. Supp. 2d 249 (S.D.N.Y. 2006) ............................................................................. 2, 29

*In re Federated Mut. Funds Excessive Fee Litig.,*
  No. 04-cv-352, 2009 WL 5821045 (W.D. Pa. Sept. 30, 2009) ........................................ passim

*In re Franklin Mut. Funds Fee Litig.,*
  478 F. Supp. 2d 677 (D.N.J. 2007) ............................................................................ 9, 27, 28

*In re Goldman Sachs Mut. Fund Funds Fee Litig.,*
  No. 04-2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ........................................... 27, 28

*Jones v. Harris Assocs. L.P,*
  130 S. Ct. 1418 , & n.5 (2010) .................................................................... 2, 4,  23, 29

*Jones v. Harris Assocs. L.P.,*
  No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7, 2005) ................................................... 23

*Krantz v. Fidelity Mgmt. & Research Co.,*
  98 F. Supp. 2d 150 (D. Mass. 2000) ............................................................................. 21

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
  305 F.3d 140 (3d Cir. 2002) .............................................................................. 5, 9, 18

*Krinsk v. Fund Asset Mgmt., Inc.,*
  875 F.2d 404 (2d Cir. 1989) ........................................................................................ 27, 30

*Marketvision/Gateway Research, Inc. v. Priority Pay Payroll, LLC,*
  No. 10-1537, 2011 WL 1640459 (D.N.J. May 2, 2011) ....................................................... 17

*Meyer v. Openheimer Management Corp.,*
  764 F2d 76 (2d Cir 1985) ............................................................................................... 30

*Migdal v. Rowe Price-Fleming Intern., Inc.,*
  248 F.3d 321 (4th Cir. 2001) ..................................................................................... 18. 24

*Mintz v. Baron,*
  No. 05 Civ. 4904, 2009 WL 735140 (S.D.N.Y. Mar. 20, 2009) ........................................ 9, 11

*Pfeiffer v. Bjurman, Barry & Assocs, ,*
  No. 03-CIV-9741 DLC, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) ..................... 10, 15, 30

*Revell v. Port Auth.,*
  598 F.3d 128 (3d Cir. 2010) ...................................................................................... 16

*Saullo v. Borough of Nesquehong,*
   10-CV-824, 2011 WL 320566 (M.D.Pa. Jan. 28, 2011)........................................................ 17

*Schuyt v. Rowe Price Prime Reserve Fund Inc.,*
   663 F.Supp. 962 (S.D.N.Y. 1987), ..................................................................................... 22

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
   627 F.3d 85 (3d Cir. 2010) .................................................................................................. 16

*Yameen v. Eaton Vance Distributors, Inc.,*
   394 F. Supp. 2d 350 (D. Mass. 2005) ............................................................................ 11, 15

## **Statutes**

15 U.S.C. §80a-35(b) ......................................................................................................... 1

Fed. R. Civ. P. 8(a) ........................................................................................................... 29

## **Other Authorities**

Division of Investment Management:  Report on Mutual Fund Fees and Expenses, U.S.
Securities and Exchange Commission, § III.B.1.
http://www.sec.gov/news/studies/feestudy.htm#P244_50400...................................................9

17 C.F.R. § 270.12b...................................................................................................……..16

JOURNAL OF INVESTMENT COMPLIANCE, *When do Breakpoints Give
Mutual Fund Investors a Break*, Faten Sabry and Winai Wongsurawat,
Vol. 9 No. 2, 2008, p. 10; Available at:
http://www.nera.com/extImage/Journal%20of%20Investment%20
Compliance%20article_0708.pdf....................................................................................25

John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of
Interest*, 26 J. Corp. L. 610, at 614 (2001) ..............................................................……..23

## PRELIMINARY STATEMENT

Plaintiffs, Jennifer L. Kasilag, Louis Mellinger, Judith M. Menendez, Jacqueline M. Robinson, and Linda A. Russell, bring this action pursuant to §36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. §80a-35(b) ("Section 36(b)" or "§36(b)"), which imposes upon a mutual fund adviser and its affiliates "a fiduciary duty with respect to the receipt of compensation for services."

In their Amended Complaint ("AC"), Plaintiffs allege in great detail the manner in which Defendant Hartford Investment Financial Services, LLC ("HIFSCO") violated ICA §36(b) by charging excessive investment management fees and 12b-1 fees to the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund and the Hartford Money Market Fund (collectively, "the Funds").[1]  Defendant now moves to dismiss the AC.[2]

There are four fundamental flaws that infect all of the Defendant's arguments.  First, they simply ignore many of the very specific allegations of the AC; allegations supported by statements made in Securities and Exchange Commission ("SEC") filings[3] for the Funds.  AC ¶¶ 7, 8. Second, HIFSCO invites this Court to consider each of the *Gartenberg* (*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982)) factors ("*Gartenberg* Factors") in isolation, suggesting that the failure to satisfy one factor requires dismissal. However, in the §36(b) context, a court is to engage in a collective weighing process.  *Jones v.*

---

[1] Plaintiffs do not challenge the 12b-1 fee for the Hartford Money Market Fund.
[2] The Memorandum of Law in Support of Defendant Hartford Investment Financial Services, LLC's Motion to Dismiss is referred to as "Mem."
[3] The SEC filings are made by the Hartford Mutual Funds, Inc. and Hartford Mutual Funds II, Inc., the registered investment companies comprising the Funds.

*Harris Assocs. L.P*, 130 S. Ct. 1418, 1425-26, & n.5 (2010) ("*Jones*"). Indeed, a §36(b) complaint need not even address all of the *Gartenberg* Factors. *In Re Evergreen Mutual Funds Fee Litig.,* 423 F. Supp. 2d 249, 258 (S.D.N.Y. 2006) (holding that "[o]n a motion to dismiss a Section 36(b) claim, Plaintiffs need not assert facts supporting each of the six *Gartenberg* factors"); *Dreyfus Mutual Funds Fee Litig.* 428 F. Supp. 2d 342, 350 (W.D. Pa. 2005) (denying motion to dismiss an ICA §36(b) claim where plaintiffs had made two general allegations related to fees with no discussion of services); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100 (D. Mass. 2006) (in §36(b) claim, "failure to plead specifically any of the *Gartenberg* factors is not itself a ground for dismissal").

Third, HIFSCO advances arguments that, while perhaps appropriate for a summary judgment motion, have no place in the analysis of a motion to dismiss. *Fowler v UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Finally, HIFSCO seeks to impose upon Plaintiffs a burden to plead facts to refute its largely conclusory responses, an inappropriate burden on a Rule 12(b)(6) motion. *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 596-97 (8th Cir. 2009).

## STATEMENT OF FACTS

This is a derivative action brought by Plaintiffs for, and on behalf of, the Funds arising out of excessive management and 12b-1 fees paid to HIFSCO. The fees for investment management services are excessive because they are either charged for services which HIFSCO did not render, or were grossly disproportionate to the insignificant investment management services which HIFSCO claims to have rendered. AC ¶ 70. HIFSCO's management and 12b-1 fees are excessive for several reasons, among them that, while HIFSCO acted as the nominal advisor to each of the Funds, it contracted out the bulk of the investment management services to

third-party sub-advisers, Wellington Management Company, LLP ("Wellington") and Hartford Investment Management Company ("HIMCO").  AC ¶ 58.

HIFSCO's 12b-1 fees, which are charged to investors of a mutual fund for the fund's marketing and distribution efforts, are excessive for several reasons.  First, they are not based upon actual distribution activity or costs.  AC ¶ 88.  Second, they are charged to a share class[4] that has been closed to new investors since 2009, which obviates the need for marketing or distribution services or, at the very least, obviates the need for large 12b-1 fees.  AC ¶¶ 79, 82, 83.  Third, HIFSCO's 12b-1 fees significantly exceed 12b-1 fees charged by comparable funds.  AC ¶ 123.  Fourth, the management fee breakpoints, which afford a reduction in fees assessed on assets in excess of specified levels, are so high as to be virtually unattainable.  AC ¶ 144.  Fifth, in the unlikely event that a breakpoint is reached, the resulting investment management fee reduction is miniscule, less than 1% of the additional 12b-1 fees paid on the excess assets to achieve the reduction.  Mem. at 6-8.  These allegations, drawn from SEC and HIFSCO's own documents, are discussed in more detail below.

## ARGUMENT[5]

## I.  PLAINTIFFS' COMPLAINT, DRAFTED IN GREAT DETAIL WITH CITATION TO SUPPORTING AUTHORITY, STATES A PLAUSIBLE CLAIM THAT DEFENDANT HAS VIOLATED ICA SECTION 36(b) BY VIRTUE OF THE DISPROPORTIONALITY OF ITS FEES

### A.     Introduction

An investment adviser violates §36(b) of the ICA if it charges a fee that is "so disproportionately large that it [bares] no reasonable relationship to the services rendered and

---

[4] Mutual funds typically have different share classes.  Each share class invests in the same diversified pool of securities and the only difference between each share class is the fees an investor is charged on their investment.  The Funds have five share classes, A, B, C, L and Y.

[5] Given that this Court is also presiding over *Southworth v. Hartford*, No. 10-CV-00878-RMB-KW, the background and history of the Investment Company Act are not discussed in this brief.

could not have been the product of arm's length bargaining." *Jones*, 130 S.Ct. 1418 (quoting *Gartenberg*, 694 F.2d at 928). The test for an ICA §36(b) violation anticipates consideration of the following non-exclusive factors: (1) the nature and quality of services rendered; (2) whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements; (3) comparative fee structures; (4) whether economies of scale were passed to the funds and their investors and (5) the profitability of the fund to the investment adviser. *Jones,* 130 S. Ct. at 1425-26 & n.5.

Traditional pleading requirements apply to an ICA §36(b) claim. *See e.g. Dreyfus*, 428 F. Supp. 2d at 346; *Forsythe*, 417 F. Supp. 2d at 117 ("the plaintiff need not plead in a high degree of factual detail and failure to plead specifically any of the *Gartenberg* Factors is not itself a ground for dismissal"); *In re Federated Mut. Funds Excessive Fee Litig.*, No. 04-cv-352, 2009 WL 5821045, *3 (W.D. Pa. Sept. 30, 2009) ("Proving fraud is not a component of a section 36(b) claim and therefore the heightened pleading standards of Rule 9(b) are not brought into play"). HIFSCO, disputing these holdings, suggests that *Jones* requires an enhanced burden of proof, but that opinion does not even address this issue.

As with all complaints, Plaintiffs need only allege sufficient factual matter which, if accepted as true, "states a claim that is plausible on its face." *Ashcraft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Moreover, at the pleading stage in a highly complex investment case, a plaintiff cannot be required to plead facts only known to the defendant or to rebut a benign explanation advanced to excuse facially wrongful conduct. *See Fowler*, 578 F.3d at 213; *Braden,* 588 F.3d at 598 (In ERISA investment case, the Eighth Circuit Court of Appeals recognized that "plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences").

Nonetheless, the AC is replete with allegations that HIFSCO has charged excessive and disproportionate management and 12b-1 fees measured by the *Gartenberg* Factors.  AC ¶¶ 6, 9, 10, 41, 49, 50, 54, 71, 90, 104, 113, 114, 117, 132, 150, 164, 160, 161.  Defendant relies upon *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338 (2d Cir. 2006) and *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140 (3d Cir. 2002), to suggest that Plaintiffs' AC contains only "speculation, inference and generalizations."  Mem. at 12-13.  These cases are distinguishable.  The court in *Amron* (a case in which plaintiffs only alleged that their funds' poor performance did not warrant the fees paid) found that plaintiffs' complaint adequately addressed only one of the *Gartenberg* Factors.  464 F.3d at 344-45.  *Amron* did not contain the extensive factual detail pled in the AC, which is primarily based on statements in HIFSCO's SEC filings.[6]  Thus:

> [c]ontrary to defendants' efforts to characterize the allegations of the [complaint] as formulaic recitations of legal principles, assertions that lack meaning without proper context, or naked assertions incapable of further factual enhancement, plaintiffs' allegations are grounded in sufficient fact or are derived from concrete factual matter.  Standing unrebutted through expert testimony or otherwise, they are enough to "nudge" the section 36(b) claim "across the line from conceivable to plausible," which is all that is required.

*Federated*, No. 04-cv-352, 2009 WL 5821045, at *8.

### B.    Application of the *Gartenberg* Factors

Set forth below is a summary of the facts pled in the AC, based in large part on HIFSCO's SEC filings, that demonstrate Plaintiffs have stated a plausible ICA §36(b).

---

[6] *Prudential* is equally distinguishable because it too only contained conclusory allegations, lacking in "any facts indicating that the fees received were disproportionate to services rendered."  305 F.3d at 143.  The AC contains far more detailed factual allegations than did the complaint in *Prudential*.

### 1.    Nature and Quality of the Services Rendered by HIFSCO

### a.    Investment Management Fees

The nature and quality of the investment management services performed by HIFSCO were either non-existent or minimal because all, or substantially all, of these services were performed by each Fund's sub-adviser, Wellington or HIMCO.  AC ¶¶ 61-70, 115-117, 148, 159.  In either case, Plaintiffs have plausibly pled that HIFSCO's investment management Fees, several times those of the sub-advisers who had the actual investment responsibility, were disproportional to the services rendered.  AC ¶¶ 54, 70, 114, 117, 148, 160, 164.

HIFSCO's brief simply ignores the extensive and specific factual contentions of the AC when it asserts that Plaintiffs' allegations are "exclusively" based on conclusory statements, policy arguments and sheer speculation.  Mem. at 1.  On the contrary, Plaintiffs' allegations are detailed and compelling.

The sub-advisory agreement between Wellington and HIFSCO, filed with the SEC for the Hartford Global Health Fund, the Hartford Advisers Fund and the Hartford Growth Opportunities Fund, reveal that the bulk of the investment management responsibilities fall to Wellington:

> HFISCO hereby employs Wellington Management to serve as Sub-Adviser with respect to the assets of the Portfolios [i.e., Hartford Global Health Fund] and to perform the services hereinafter set forth....

> Wellington Management shall evaluate and implement an investment program appropriate for each Portfolio....

> Wellington Management, in consultation with HIFSCO, will make the appropriate determinations with respect to the investment of the assets of the Portfolio and the purchase and sale of securities.....

> Wellington Management will furnish reports with respect to the Portfolios...which reports shall include Wellington Management's economic outlook and investment strategy and a discussion of portfolio activity....

> Wellington Management will select the brokers or dealers that will execute the purchases and sales of portfolio securities for the Portfolios.....

> \*                          \*                          \*

> Wellington Management will bear all expenses in connection with the performance of its services under this Agreement.

AC ¶ 61 (citing sub-adviser agreements, attached as Exs. 13 and 14 to AC); *see also* Exs. A (HMF Wellington Agreement) and B (HMF II Wellington Agreement).[7]

HIMCO is the sub-adviser to the Hartford Inflation Plus Fund, the Hartford Conservative Allocation Fund and the Hartford Money Market Fund. AC ¶ 58. The sub-advisory agreements between HIMCO and HIFSCO are similar (i.e., HIMCO renders all or substantially all of the investment management services for those funds).[8] AC ¶ 64 (citing sub-adviser agreements, attached as Ex. 15 to AC); *see also* Ex. C (HMF HIMCO Agreement). Based on the sub-advisory agreements, largely ignored by Defendant, it is clear that the sub-advisers, Wellington and HIMCO, render all, or substantially all, of the necessary investment management services for the Funds. AC ¶¶ 49, 57-58, 62, 64-66.

Hartford's other SEC filings, also ignored by Defendant, support this allegation. According to Hartford's SEC Statement of Additional Information ("SAI") filing, HIFSCO has contracted with Wellington under a sub-advisory agreement for the provision of the day-to-day

---

[7] Unless otherwise specified, all exhibit numbers in this memorandum refer to Exhibits to the Certification of Moshe Maimon dated June 27, 2011, filed herewith.

[8] The only difference between the terms of the sub-advisory agreements that HIFSCO has entered into with Wellington and HIMCO is that Wellington is required to provide all of the investment management services at its own expense whereas, HIMCO, an affiliate of HIFSCO, does not have to fund its own expenses. *See* Ex. 15 attached to the AC.

investment management services of the Fund.  AC ¶ 62; Ex. D (2011 SAI).  The SAI makes the same statement with respect to the Funds that are sub-advised by HIMCO.  *See* AC ¶ 65; Ex. D (Combined SAI for The Hartford Funds Dated Mar. 1, 2011, p. 7).

Inexplicably, HIFSCO's advisory fees substantially exceed those of the sub-advisers.  As the AC states, HIFSCO charges the Funds investment management fees ranging from 145% (1.45 times) to 676% (6.76 times) of the investment management fees that were charged by Wellington and HIMCO.  AC ¶ 70.  Courts have generally found allegations that an investment advisor retained investment advisory fees when the advisor was rendering no or minimal services to state a claim under ICA §36(b).  *See Curran v. Principal Mgmt. Corp., LLC*, No. 4:09-00433, 2010 WL 2889752, *9 (S.D. Iowa June 8, 2010) (holding that: "Plaintiffs' allegations that PMC charges more than the subadvisors, who allegedly provide the bulk of investment advice...support a reasonable inference that PMC collected excessive fees for its investment advising services of the Subject Funds"); *Forsythe,* 417 F.Supp.2d at 116 (holding that "plaintiffs theory...that fees that amount to 'something for nothing' are inherently excessive" states a claim under ICA §36(b)).

In an attempt to distinguish *Curran,* a case substantially similar to this one where the court denied defendant's motion to dismiss.  Mem. at 18, n. 11,  HIFSCO argues that the *Curran* court denied the motion to dismiss based on the multi-layer fees associated with the fund-of-funds at issue, Mem. at 18, n. 11; a factor not present here.   Nowhere does the *Curran* court state that the multi-layer fee is the key factor it relied upon in making its decision.  More importantly, upon reconsideration, the *Curran* court dismissed the underlying funds' shareholder claims for lack of standing, *Curran v. Principal Mgmt. Corp., LLC,* No. 4:09-433, 2011 WL 223872, *4 (S.D. Iowa Jan. 24, 2011), thereby eliminating the multi-layers of fees, while leaving

8

intact the claims for fees identical to those at issue in this case.  Accordingly, *Curran* is directly on point and supports Plaintiffs' positions herein.

Defendant cites three cases which they contend require dismissal of Plaintiffs' Complaint.  Mem. at 18.  All are distinguishable because, in those cases, the pleadings asserted no underlying facts to support the conclusion advanced.  *In re Franklin Mut. Funds Fee Litig.,* 478 F. Supp. 2d 677, 686-87 (D.N.J. 2007); *Prudential*, 305 F.3d at 143; *Mintz v. Baron,* No. 05 Civ. 4904, 2009 WL 735140, *3-4 (S.D.N.Y. Mar. 20, 2009) (dismissing claim "in the absence of facts sufficient to provide context for *any Gartenberg* factor" to support a claim of excessive fees).  In a conclusory and unsupported response, HIFSCO contends that its management fees are justified because it coordinates service providers, provides personnel, performs administrative functions, and provides office space.  Mem. at 2, 5-6, 15-17.  Setting aside that this argument is more appropriate for a motion for summary judgment, and that the AC alleges that some of these services are separately compensated,[9] AC ¶¶ 42-44, it defies logic to suggest that HIFSCO's modest services warrant a management fee that is 146% to 676% of the sub-adviser's fee.  Under any view, HIFSCO's fees are disproportionate to the services that it renders.

In sum, the AC plausibly asserts a claim insofar as it alleges that HIFSCO's management fees, 145% to 676% of the management fees of the sub-advisers, AC ¶¶ 155-57, are not

---

[9] HIFSCO contends that besides rendering investment advice, it is also responsible for "coordinating the work of the Funds' custodian, transfer agent, accountants and legal counsel." Mem. at 5.  However, all of these underlying services are rendered by HIFSCO affiliates, which are compensated by additional fees, pursuant to separate contracts, that are charged to the Funds. AC ¶¶ 39, 40, 43-44.  In fact, the SEC specifically designates "payments to transfer agents, securities custodians, providers of shareholder accounting services, attorneys, auditors, and fund independent directors" as "other expenses," which *must* be separate from the investment management charge.  *See* Division of Investment Management:  Report on Mutual Fund Fees and Expenses, U.S. Securities and Exchange Commission, § III.B.1. http://www.sec.gov/news/studies/feestudy.htm#P244_50400.

warranted by the non-existent or modest nature of the services it claims to provide.  AC ¶¶ 56, 59, 60-66, 70, 148, 159.

> **b.**      **12b-1 Fees**

In several ways, HIFSCO's 12b-1 fees are not warranted by the nature and quality of its services.  First, despite the fact that Fund Class B[10] shares are closed to new shareholders, HIFSCO continues to charge Plaintiffs a one percent 12b-1 fee on their investments into this share class.  AC ¶¶ 82-83.  Since HIFSCO acknowledges that the Class B shares are not accepting new investors, Mem. at 27, it obviously is not marketing to the general public to attract new investors into this share class and cannot hope to achieve economies of scale.  Thus, HIFSCO is charging 12b-1 fees with respect to this share class, but not rendering services that justify such a high 12b-1 fee.

Even were HIFSCO to have rendered some modest service, there is no justification for a 12b-1 fee equal in amount and, in one instance, four times the amount of the 12b-1 fee charged for share classes which accept new investors, *see* Mem. at 7-8, 27, n.25, and, as discussed below, well in excess of the 12b-1 fees charged by other funds who, because they are accepting new investors, are providing some value.  The District Court in *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03-Civ.-9741 DLC, 2004 WL1903075, *1, 3 (S.D.N.Y. Aug. 26, 2004) found similar allegations sufficient to defeat a Rule 12(b)(6) motion where plaintiff alleged, *inter alia*, that the

---

[10] Presumably as a backdoor challenge to Plaintiffs' standing, Defendant asserts that "Plaintiffs do not allege that they hold shares in each of the share classes which they mention in the Complaint." Mem. at 27, n. 23.  Plaintiffs have alleged that they are Fund shareholders and that is all that is required.  *See In re Am. Mut. Funds Fees Litig.*, No. CV 04-5593 GAF, 2005 U.S. Dist. LEXIS 41884, at *9-10 (C.D.Cal. Dec. 16, 2005) ("Section 36(b) … does not distinguish among owners of different classes of shares in a mutual fund, and does not impose any requirement at the share class level.  *See* 15 U.S.C. § 80a-35(b).10.") (citations omitted)).

12b-1 fees were excessive because "it was 'inconceivable' that the Fund's Rule 12b-1 expenses increased so dramatically" at a time when it was closed.

The cases cited by Defendant attacking Plaintiffs' 12b-1 fee allegations, Mem. at 18, 25, are distinguishable.  In *Mintz*, No. 05 Civ. 4904 (LTS)(HBP), 2009 WL 735140, at *3-4, the complaint put in issue only one *Gartenberg* Factor – the nature and quality of services – with allegations that no marketing or administrative services were provided after funds were *partially* closed.  The court found this single allegation to be conclusory and lacking in factual support. *Id.*  Likewise, in *Yameen v. Eaton Vance Distributors, Inc.*, 394 F. Supp. 2d 350, 355 (D. Mass. 2005), the complaint only alleged facts related to one *Gartenberg* Factor – the independence and conscientiousness of the Board – and the sole claim was that the Trustees failed to consider the fact that the fund was closed to new investors when they approved the advisory fees in violation of Section 36(b).  Here, Plaintiffs' allegations, which comprehensively address five of the *Gartenberg* factors are far more detailed than those advanced in *Mintz* and *Yameen.*

Second, the 12b-1 fees for the remaining share classes, (Classes A, C and L), are also excessive.  Neither HIFSCO's Class Y nor the Hartford Money Market Fund charge a 12b-1 fee. AC ¶¶ 10, 76, 81, 85-87.  Both funds no doubt desire to attract new investors, and the Hartford Money Market Fund, as with all of the Plaintiffs' Funds, are offered to the general public, and thus require the same distribution services.  If Class Y and the Money Market Fund can function in the absence of marketing and distribution services, then presumably, the marketing and distribution services with respect to the remaining classes are either unnecessary or excessive. AC ¶¶ 85-89.  Thus, the fees for such services violate ICA §36(b).

Third, the AC alleges that HIFSCO markets the 12b-1 fees as "an alternative to paying front-end sales loads [another type of fee]."  AC ¶ 78.  Yet with respect to share Class A,

11

Plaintiffs pay a front-end sales load in addition to 12b-1 fees, and for Class B, they pay a back-end sales load, in addition to 12b-1 fees.  AC ¶¶ 78, 83.  These allegations, precise and specific, are not, as HIFSCO argues, conclusory or policy based.  Rather, they are concrete evidence of a misrepresentation in HIFSCO's marketing.

Moreover, the 12b-1 fees are allegedly used to attract new investors to the Funds in order to increase Fund assets.  If the assets in a Fund increase to a certain level, the percentage rate of the investment management fee decreases—i.e. a breakpoint.  Thus, the purpose of the services paid for by the 12b-1 fee, from the investor's perspective, is to reach the breakpoint.  Here, three of the Funds have not reached even their first breakpoint.  *See* Ex. D (2011 SAI) and Ex. E (The Hartford Funds Annual Reports for the fiscal year ending Oct. 31, 2010).  Moreover, even where a breakpoint is reached, all that Plaintiffs receive is a .25 basis point reduction, Mem. at 6, in exchange for paying a 75-basis point 12B-1 fee.  AC ¶¶ 79, 83.   That is, the management fee reduction is 1/300 of the 12b-1 fee paid to market the funds to achieve that reduction – the investment management fee reduction is simply too small.

These facts, all drawn from Hartford's SEC filings, plausibly assert that the 12b-1 fees are disproportionate to the services provided.

## 2. The Funds' Board Lacks Independence and Conscientiousness.

The second Gartenberg Factor focuses on the independence and conscientiousness of the Board.  Fund Board members have a fiduciary duty to the Funds and their shareholders when negotiating and approving investment management and 12b-1 fees.  AC ¶ 92.  The Board is required to assure that the fees are both beneficial to the Funds and are comparable to the fees that would have been negotiated at arm's length.  AC ¶¶ 32, 91, 92.  As both the management and 12b-1 fees were approved concurrently, this section addresses them together.

### a.      HIFSCO's SEC Violation

According to the SEC, "[f]rom at least January 2000 through December 2003 … [HIFSCO] made material misrepresentations and omitted to state material facts to the…Boards [of the Plaintiffs Funds [11]]…relating to their use of $51 million of Fund assets…" [i.e., fees].  Ex. 16 attached to AC at 3; *see also* AC ¶¶ 103, 105.  The SEC found that HIFSCO's actions constituted a willful scheme of fraud or deceit, which included making misrepresentations in SEC filings.  *See* Ex. 16 attached to AC at 8.  It is plausible to assert that a conscientious Board would not have approved large fees for an advisor, who has been found to have committed fraud and deceit.

### b.      Failure to Compare Advisor and Sub-adviser Fees and Services

The Board of each of the six Funds in this case that approved HIFSCO's investment management and 12b-1 fees were made up of the same nine individuals, and those nine individuals also served on the board for 79 other Hartford funds (for a total of 85 funds).  AC ¶¶ 46, 93, 96.  The sub-advisory agreements, which were accessible to the Funds' Board, reveal that the sub-advisers rendered all, or substantially all, of the investment management services for the Funds.  AC ¶¶ 62, 65, 66.  Yet the Funds' Board still approved investment management Fees for HIFSCO that were at a minimum 146%, and at a maximum 676%, of the fees that were paid to sub-advisers.  AC ¶¶ 155, 159.  A conscientious Board would have no reason to pay a large fee to a company, found to have violated SEC regulations, to perform modest ministerial work.

---

[11] Specifically, this action involved, among other funds, HIFSCO's representations to the boards of the Hartford Growth Opportunities Fund and the Hartford Advisers Fund (i.e., two of the Plaintiffs' funds).

### c.    The Board's Insufficient Review Process

Inexplicably, rather than scrutinize HIFSCO's fees in greater detail, after the SEC's findings, the Board precipitously approved these fees.  This is evident from the fact that the Boards of each Fund did not hold separate meetings for each Fund, AC ¶¶ 99, 100, but rather approved the investment management and 12b-1 fees for all 85 funds.  AC ¶ 96.  Defendant contends the Board considered the fees over 4 days of meetings.  Mem. at 6.  This translates to 23 minutes per fund (4 days x 8 hours per day x 60 minutes per hour/85 funds) to make complex evaluations involving millions of dollars of other people's money.

ICA §15(c) required HIFSCO to furnish documents and other information so that the Board can make informed and independent decisions when evaluating HIFSCO's investment advisory contracts.  AC ¶ 95.  With respect to HIFSCO's management fee, the Board would have needed to consider, with respect to each Fund, among other data, the quality of the portfolio management, portfolio pricing, audit and accounting issues and performance.  AC ¶ 96.  With respect to HIFSCO's 12b-1 fee, the Board would have had to consider the marketing costs, comparable costs, differences among the funds and other factors relevant to marketing and distribution costs.  Twenty-three minutes is simply insufficient.

Based upon less comprehensive allegations addressed to the absence of board diligence than those in the AC, courts have denied motions to dismiss.[12]  *See e.g. Federated*, 04-cv-352, 2009 WL 5821045, at *5 (plaintiffs alleged, *inter alia*, that the 14-member board: oversaw 140 funds simultaneously, did not hold separate meetings or consider fund fees separately, and were

---

[12] In *Hoffman v. UBS-AG,* 591 F.Supp.2d 522, 539 (S.D.N.Y 2008), cited by Defendant, Mem. at 26, plaintiffs only alleged that 12b-1 fees were used for an improper purpose without including underlying facts supporting this allegation.  Here, the AC supports Plaintiffs' claim that HIFSCO's 12b-1 fee is excessive with ample factual allegations supporting five *Gartenberg* Factors.  AC ¶¶ 75-90.

not presented with sufficient information to properly scrutinize the fees); *Curran*, No. 4:09-433, 2010 WL 2889752 at *9 (upholding complaint on motion to dismiss where plaintiffs alleged, *inter alia*, that common board of directors oversaw 114 portfolios in the fund complex), Ex. F (*Curran* Compl. ¶ 95).

### d.    Fund Classes

The Board could not have been conscientious when it approved the 12b-1 fees for Class B,13 a share class that was closed to new investors as of September of 2009, AC ¶ 82.  *See e.g. Pfeiffer*, No. 03-Civ.9741 DLC, 2004 WL1903075, at *1, 3; *Curran*, No. 4:09-433, 2010 WL 2889752, at *11-12 (excessive 12b-1 fee claim upheld where plaintiffs' alleged that monetary benefits largely accrue to defendants rather than existing shareholders and that fees were based on net assets rather than distribution activity).  Furthermore, Class B owners are required to pay a significant back-end sales charge to redeem their shares in order to stop paying the 12(b)-1 fee. AC ¶ 83.  Defendant also touts the use of 12(b)-1 fees as "an alternative to paying front end sales loads."  AC ¶ 78.  Class A shares, however, are charged 12(b)-1 fees in addition to significant front-end sales loads.  AC ¶ 78.  All of these facts demonstrate that Board was not careful and conscientious when reviewing and approving the 12b-1 fees HIFSCO charged the Funds.

### e.    The Breakpoints

The Board could not have been conscientious when it approved marketing costs to attract new investors when fee breakpoints were largely unattainable.  Nor could it have been

---

[13] Defendant erroneously suggests that Plaintiffs criticize its multi-class fee structure merely for treating classes differently.  Mem. at 27.  Rather, Plaintiffs simply allege that *HIFSCO's* specific class treatment supports the inference that HIFSCO's 12b-1 fees are substantively excessive. Further, the SEC's approval of a multi-class fee structure in no way makes the Fees reasonable as Defendant suggests, Mem. at 27.  *See Pfeiffer*, No. 03-Civ.9741 DLC, 2004 WL1903075, at *5 (fees within SEC's allowable ranges are not "*per se* reasonable"); *see also Yameen*, 394 F. Supp. 2d at 355 (same).

conscientious when it approved breakpoint reductions that saved the investors less than 1% (.25 basis points in management fees than the 75 basis points in 12b-1 fee incurred to achive that savings).  Mem at 6-8.

SEC Rule 12b-1 requires that directors conclude "in light of their fiduciary duty under state law and under Sections 36(a) and (b) of the ICA, there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders."  17 C.F.R. § 270.12b-l(e); AC ¶106.  The Board failed to fulfill this duty.

With respect to Plaintiffs allegations regarding the Board's approval of the Funds' investment management and 12b-1 fees, HIFSCO again contends that the AC "contains no factual allegations about the independence, expertise, care, and conscientiousness of the directors in evaluating adviser compensation," Mem. at 19, or dismisses allegations, addressed to the Board's care and conscientiousness, that are pled on information and belief.  Mem. at 3, 17, 19-20, 22.  Defendant errs.  All of the above allegations are premised on Hartford's SEC filings and documentation associated with the SEC's formal proceeding against HIFSCO.  These facts and all inferences that may be reasonably drawn therefrom, must be construed in Plaintiffs' favor.  *See e.g. W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 91 (3d Cir. 2010); (citing *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010) (all holding that inferences are to be drawn in favor of Plaintiffs as the non-moving party)).

While Defendant argues otherwise, Mem. at 3, 17, 19-20, 22, "[t]he *Twombly* plausibility standard does not prevent a plaintiff from pleading facts alleged upon "information and belief" where the facts are peculiarly within the possession and control of the defendant … or where the belief is based on factual information that makes the inference of culpability plausible."  *Saullo*

16

*v. Borough of Nesquehong*, 10-CV-824, 2011 WL 320566, *4 (M.D.Pa. Jan. 28, 2011) (quoting *Arista Records LLC v. DOE 3*, 604 F.3d 110, 120 (2d Cir. 2010)).[14]

The only allegations, pled on information and belief, are those that relate to internal events that occurred at the Board meetings and facts related to specific Fund costs, which, in the absence of public disclosure or discovery, could be pled in no other fashion.  *See e.g. Gallus v. Ameriprise Fin., Inc.*, 561 F.3d 816, 819-20 (8th Cir. 2009) ("*Gallus II*") vacated, 130 S.Ct. 2340 (2010) (only through discovery did plaintiffs learn that there were questions regarding the veracity and completeness of the materials provided to the board by the defendant-adviser in comparing the advisory fees paid to, and the services performed by, the adviser's mutual fund clients as compared to its institutional clients); *In re American Mutual Funds Fee Litig.*, No 04-5593, 2009 WL 5215755, *55 (C.D. Cal. Dec. 28, 2009) (only with discovery were plaintiffs able to fully develop evidence that the directors did not scrutinize the adviser's compensation diligently and that they failed to recognize the consequences of fee information presented to them); *accord Braden*, 588 F.3d at 598 (in this ERISA excessive fee case, the the Court declined to grant defendant's motion to dismiss because  "plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences.").

HIFSCO invites the Court to review the public filings for contradictory interpretations. *See* Mem. at 6, 7, 12, 17, 18, 20, 29.  This, however, would be an improper factual inquiry on a motion to dismiss.  *See Curran*, No. 4:09-433, 2010 WL 2889752, at *9 (In §36(b) case, the court rejected defendant's invitation to review additional information related to, *inter alia*, the

---

[14]  *Accord Marketvision/Gateway Research, Inc. v. Priority Pay Payroll, LLC*, No. 10-1537, 2011 WL 1640459, *8 (D.N.J. May 2, 2011) ("[T]o the extent that a significant amount of discovery is likely to be in Defendant's possession, custody and control … [p]laintiffs are entitled to seek that discovery to further develop the record" if they "have set forth sufficient factual allegations to support their claims."); *see also Curran*, No. 4:09-433, 2010 WL 2889752 at *7; *Braden*, 588 F.3d at 597-98.

"detailed explanations of the steps taken [by the board] in setting fees," holding that this would be an inappropriate factual inquiry in the context of Rule 12(b)(6) motion).  In any event, these filings do not demonstrate that the Board considered adequate information when it approved the 2010 fee renewals to justify increasing the advisory fees.  For example, although net assets decreased for the Hartford Advisers Fund from the previous year, the advisory fees, which are based upon a percentage of assets under management, *actually* went up in real dollars.  *See* Exs. E (Annual Reports 2010) and G (Annual Report for the Hartford Advisers Fund for the fiscal year ending Oct. 31, 2009).  This fact is even more egregious given that during this same time period, the Hartford Advisers Fund lost value.  *See* Exs. E (Annual Reports 2010) and G (Annual Report for the Hartford Advisers Fund for the fiscal year ending Oct. 31, 2009).

Finally, Defendant urges the Court to dismiss the AC based upon three distinguishable cases, *Amron*, 464 F.3d 338, *Migdal v. Rowe Price-Fleming Intern., Inc*., 248 F.3d 321 (4th Cir. 2001) and *Prudential*, 305 F.3d 140.  Mem. at 20.  In all of these cases, the plaintiffs only pled facts relating to director compensation or alleged that the directors served on multiple boards. *See Amron*, 464 F.3d at 345; *Migdal*, 248 F.3d at 328; *Prudential*, 305 F.3d at 142-44 (dismissing complaint since "Plaintiff failed to allege any facts indicating that the fees received were disproportionate to services rendered").

Plaintiffs' AC pleads much more.  *See* AC ¶¶ 91-113.  Here the AC alleges: (i) that HIFSCO has previously deceived the Board (a fact not present in any of the above cases) and thus greater scrutiny was needed, AC ¶¶ 103, 105; (ii) that the Board approved large investment management Fees to HIFSCO, when a simple review of public filings would have informed the Board that the sub-advisers, who were paid a fraction of HIFSCO's fees, performed all, or substantially all, of the investment management services for the Funds, AC ¶¶ 60, 66, 69; (iii) the

limited amount of time the board devoted in approving HIFSCO's Fees AC ¶¶ 99-100;  (iv) specific errors made by the Board (i.e., approving 12b-1 Fees on a closed share class), AC ¶¶ 82-83, 163-65; and (v) the illusory benefits offered by the breakpoints AC ¶ 144.

### 3.    Comparable Fees

An examination of whether the Funds' investment management and 12b-1 fees were comparable to fees charged by other funds, the third of the *Gartenberg* Factors, demonstrates the excessiveness of HIFSCO's Fees.

### a.    Investment Management Fees

To further illustrate how the fees at issue are disproportionate to the services rendered, the AC provides a comparison of HIFSCO's investment management fees to: (1) the Funds' sub-advisers' fees; (2) the fees the Funds' sub-advisers charge non-Hartford funds; (3) the fees (not charged) by the Vanguard Group, Inc. when in the same position as HIFSCO and (4) the fees that HIFSCO or its affiliate charges to third-party institutional clients, all for providing substantially similar services.  AC ¶¶ 114-132.

The first comparison made in the AC is between HIFSCO's fees and those of its sub-advisers, Wellington and HIMCO.  AC ¶¶115-117.  For example, with respect to the Hartford Advisers Fund, the Hartford Growth Opportunities Fund and the Hartford Global Health Fund (Wellington-sub-advised Funds), HIFSCO's investment management fees were 77.46%, 62.29% and 58.20%, respectively, greater than the fees charged by Wellington.  AC ¶ 155.  A similar pattern pertains with the three HIMCO-sub-advised Funds for which HIFSCO's fees are 81.78%, 85.21% and 31.16%, greater than HIMCO's fees, which are announced "at cost."  AC ¶¶ 69, 70, 148, 155, 159.  Overall, with respect to all the Funds, in 2010, HIFSCO charged fees totaling $34,082,650, while the sub-advisers were only paid $10,566,899 in fees.  AC ¶ 155.  These latter

fees represent what the Funds *should pay* for the investment management services because the sub-advisers performed all, or substantially all, of those services.

Second, Plaintiffs compare HIFSCO's fees to the advisory fees its sub-advisers charged to other mutual fund complexes for similar investment management services.  AC ¶¶ 118-123. For example, Wellington provides substantially similar, if not identical, investment management services for comparable funds in the Vanguard Group, Inc., but at much lower rates.  AC ¶¶ 120-122.  Yet, Vanguard, unlike HIFSCO, does not charge any investment advisory fee.  AC ¶ 63. This comparison is relevant for three reasons.  First it illustrates the large differential in total Fees.  Second, the absence of a Vanguard advisory fee demonstrates that the advisors' services are likely quite nominal.  AC ¶63.  Third, while Defendant asserts that Vanguard is a nonprofit low-cost entity, Vanguard is not in business to lose money and it is a fiduciary's (the Board's) responsibility to achieve low costs.   Thus, the amount Wellington charges Vanguard likely represents the sum of the cost of providing services plus profit to Wellington.  AC ¶ 70. HIFSCO's charges, considerably greater than and in addition to those of Wellington, must, therefore, be substantially all profit.   Even were Wellington's services to Vanguard more extensive than those it provides to HIFSCO, as Defendant speculates, this possibility which cannot be assessed without discovery, does not explain why HIFSCO's fees are 77.5%, 62.9% and 58.2% higher than those charged by Wellington to Vanguard for comparable services.  AC ¶ 155.

Third, the AC alleges that, when HIFSCO (or its affiliate) provides substantially similar investment management services to third-party institutional clients, it charges significantly less. AC ¶¶ 124-132.  For example, in the case of the Hartford Inflation Plus Fund, shareholders pay 5 times the management fees to HIFSCO that HIMCO charges the institutional clients that bargain

20

at arm's-length over fees.  AC ¶¶ 130-131.  And, as the AC points out, while HIFSCO may provide additional services to the Funds, those services are compensated pursuant to separate agreements.  AC ¶ 126.

These relevant comparisons demonstrate that HIFSCO's investment management fees, with respect to the Funds, were disproportionate to the services it rendered.  *See Hunt v. Invesco Funds Group, Inc.*, No. 04-02555, 2006 WL 1581846, *2-5 (S.D. Tex. Jun. 5, 2006) (allegations "sufficient to allege disproportionality" between the fees charged and the services rendered coupled with comparisons with fees charged for "equivalent advisory services" sufficient to state a claim"); *Curran*, No. 4:09-433, 2010 WL 2889753, at *8-9 (court denied motion to dismiss where plaintiff alleged, *inter alia*, that defendants charged plaintiffs many times over the fee charged by the sub-advisor who provided the core investment management services and charged its institutional clients lower fees for similar services); *Federated*, No. 04-352, 2009 WL 5821045, at *8 (court denied motion to dismiss where plaintiff alleged, *inter alia*, that the investment management services provided by defendant had not been of a quality or quantity that would justify the adviser's fee arrangement).

Defendant argues that Plaintiffs' allegations fail because a "'large disparity' in fees 'that cannot be explained by the different services' would not be actionable without other evidence that the fee is outside the arm's length range…"  Mem. at 14.  The "facts" which Defendant urges to be lacking, however, are uniquely within its knowledge and cannot, given the requirements of Rule 11, be plead otherwise.  *Krantz v. Fidelity Mgmt. & Research Co.*, 98 F. Supp. 2d 150, 159 (D. Mass. 2000) (denying motion to dismiss court held, "[w]hen the opposing party is the only practical source for discovering the specific facts supporting a pleader's

conclusion, less specificity of pleading may be required pending discovery.") (citation omitted); *Braden*, 588 F.3d at 595-96.

*Amron,* 464 F.3d 338 and *Schuyt v. Rowe Price Prime Reserve Fund Inc.,* 663 F.Supp. 962 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987), cited by Defendants, Mem. at 23, for the principal that comparisons to Vanguard funds are inappropriate, did not involve a situation in which there was a common sub-adviser, as there is here with Wellington.  The plaintiffs in those cases also did not include the additional comparisons pled here, nor did they address the remaining *Gartenberg* Factors.[15]  In *Amron*, Vanguard was the *only* fee comparator plaintiff included, a fact the court found to be insufficient to support this *Gartenberg* Factor.  464 F.3d at 345 (emphasis added).  The court's finding in *Amron* (where plaintiff only pled that the fees were not warranted given the funds' poor performance) is inapplicable here where Plaintiffs have pled detailed and multiple fee comparators.

Moreover, *Amron* and *Schuyt* were decided in advance of the Supreme Court's decision in *Jones,* where the Court stated:

> Since the [ICA] Act requires consideration of all relevant factors . .. ***we do not think that there can be any categorical rule regarding the comparisons of the fees charged different types of clients***. . . . Instead, courts may give such comparisons ***the weight that they merit in light of the similarities and differences between the services*** that the clients in question require, but courts must be wary of inapt comparisons.

---

[15] *Schuyt*, 663 F.Supp.962, is also distinguishable for other reasons.  First, *Schuyt* arose after a bench trial where the factual record was fully developed.  *Id*. at 972.  Second, the plaintiff compared the advisory fees to "fees charged by others for performing *different types of services*" and to "companies that perform services that are *unrelated to the advisory services* at issue in this case, such as *insurance companies*, *large banks* and *trust companies*." *Id.* at 974 (emphasis added).  And third, although Defendant cites to *Schuyt* to attack the Vanguard comparison, the plaintiff in *Schuyt* did not even include a Vanguard comparison.

130 S. Ct. at 1428 (emphasis added).  The weighing process anticipated by *Jones* cannot be performed without discovery.  *See e.g. Jones v. Harris Assocs. L.P.*, No. 04-8305, 2005 WL 831301 (N.D. Ill. Apr. 7, 2005) (denying the motion to dismiss, the District Court held, "[w]e are in no position based on the allegations of the complaint to determine what services [p]laintiffs received from [defendant] or how much they can fairly be worth").

### b.    12b-1 Fees

A comparison of the Funds' 12b-1 fees to the relevant benchmarks reveals that they are also excessive.  By way of comparison, neither Hartford's Class Y nor the Hartford Money Market Fund charge 12b-1 fees.  AC ¶¶ 85-87.  Second, Vanguard funds do not charge any 12b-1 fees (AC ¶122).

Third, a comparison of the Funds' 12b-1 fees to the Funds' investment management fees reveals their excessiveness.   Investment management fees are typically the most costly shareholder service.  *See* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610, at 614 (2001) (attached as Ex. 17 to AC).  HIFSCO's 12b-1 fees range as high as 267% of the advisory and sub-advisory fees combined.  AC ¶ 84.  For example, for the Hartford Conservative Allocation Fund, the 12b-1 fees are almost 3 times higher than the advisory and sub-advisory fees *combined*.  AC ¶ 84.  These facts, taken together, demonstrate that the 12b-1 fees are excessive.  AC ¶ 90.  Accordingly, HIFSCO's receipt of these 12b-1 Fees amounts to a breach of its fiduciary duty under ICA §36(b).  AC ¶¶ 88, 90.

### 4.    Economies of Scale

Section 36(b):

> was enacted in large part because Congress recognized that as
> mutual funds grew larger, it became less expensive for investment

> advisers to provide the additional services.  Congress wanted to
> ensure that investment advisers passed on to fund investors the
> savings that they realized from these economies of scale.

*Federated*, 04-cv-352, 2009 WL 5821045, at *8; (citing *Migdal*, 248 F.3d at 326-27).  That is, under *Gartenberg*, as the funds under management grow, the percentage costs should shrink.  These economies of scale are to be passed along to the Funds' investors.  *Gartenberg*, 694 F.2d at 927; *Hunt*, No. 04-02555, 2006 WL 1581846, at *2-5.  This is achieved through breakpoints: as the fund assets grow, a fund achieves certain these breakpoints which trigger fee reductions.  AC ¶ 67.

In this case, an examination of the breakpoints set by HIFSCO reveals that Defendant failed to pass along economies of scale to the Plaintiffs because the breakpoints were set so high as to be unattainable, AC ¶¶ 141-50, and because the fee reductions, even if reached, are miniscule.

These contentions are supported by the following facts.  Plaintiffs pay both HIFSCO's advisory fee and the sub-advisory fees of Wellington and HIMCO.  AC ¶¶ 153, 155.  However, Plaintiffs do not pay the sub-advisers directly.  Rather, the Funds are charged a single investment management Fee, which is paid to HIFSCO, and then from that Fee, HIFSCO pays the sub-adviser.  AC ¶ 69.  Since the sub-adviser's fees are paid from money that is paid to HIFSCO, the latter has an incentive to negotiate a reasonable market rate sub-advisory fee.  AC ¶ 67.  It accomplished this by including breakpoints in the terms of sub-advisory contracts.  AC ¶¶ 67, 69.

The Wellington sub-advised Funds have sub-advisory breakpoints when assets under management reach $50 and $100 million, while HIFSCO's fee breakpoints are not achieved until

assets reach $250 million for one Fund and $500 million for two of the Funds.16  AC ¶ 69.

Wellington's breakpoints were negotiated at arm's length, and thus represent the breakpoint

schedule that the market would support for that particular Fund.  AC ¶¶ 67, 69.  In comparison,

HIFSCO's breakpoint schedule, which was set by a board, employs breakpoints that are so high

and far apart as to be meaningless.  AC ¶ 144.  In fact, only three of the six Funds have been able

to avail themselves of even the first breakpoint.  *See* Exs. E (Annual Reports 2010) and D (2011

SAI).  "Advisory contracts with breakpoints may lower expenses for the investor if the

breakpoints are set such that the fund's assets actually reach higher breakpoint asset levels."

JOURNAL OF INVESTMENT COMPLIANCE, *When do Breakpoints Give Mutual Fund Investors a*

*Break*, Faten Sabry and Winai Wongsurawat, Vol. 9 No. 2, 2008, p. 10; Available at:

http://www.nera.com/extImage/Journal%20of%20Investment%20Compliance%20article_0708.p

df.  "Breakpoint advisory fee contracts do not guarantee lower fees."  *Id*.  In this case, there is

simply no justification for HIFSCO's breakpoints to be so much higher than those of Wellington

and HIMCO, both of which were negotiated at arm's length.

Second, even if the Court credits Defendant's assertion, not explored in discovery, that

they provide office space and reporting functions, these costs are relatively fixed and should not

rise significantly as the funds grow, in contrast to Wellington's day-to-day management

functions which are more sensitive to fund size. HIFSCO's breakpoints, one would expect,

would be reached before those of the sub-advisers.

---

16 The Hartford Growth Opportunities Fund, sub-advised by Wellington, does not employ any
breakpoints, but charges a fixed .27% of net assets. AC ¶ 69.  It's sub-advisory fee, however, is
significantly lower than the advisory fee charged by HIFSCO for this Fund, which ranges from
.80% of net assets for the first $250 million in assets to .70% of net assets over $10 billion. AC ¶
69.

HIFSCO's failure to set and the Board's failure to require appropriate breakpoints has resulted in Plaintiffs being denied the benefit of economies of scale, as such benefits were retained by HIFSCO.  AC ¶¶ 121-22, 141, 143-45.  For example, for fiscal year 2009-2010, the assets in the Hartford Inflation Plus Fund increased by 51% (from $1.48 billion to $2.24 billion).  *See* Ex. F (Annual Reports 2010).  During this same period, the investment advisory Fees to HIFSCO increased by 80% (from $5.57 million to $10.00 million).[17]  *See* Ex. D (2011 SAI).  Investors in that Fund enjoyed no economies of scale.  *See Hunt*, No. 04-02555, 2006 WL 1581846, at *2-5 (court found this fact to demonstrate that economies of scale were not passed on to investors).

According to Defendant, in "2008, HIFSCO agreed to implement breakpoints to reduce management fees by .25 basis points on assets over $5 billion and an additional .25 basis points on assets over $10 billion for three of the Funds at issue." Mem. at 6.  Breakpoints can be achieved either by positive performance or successful marketing efforts which attract new investors.  Marketing efforts, in turn, are financed by 12b-1 fees.  Here, however, HIFSCO's 12b-1 fees on all old and new investments are so high (75 basis points[18]) that they offset any management fee reduction achieved (.25 basis points) by reaching the $5 billion breakpoint.  In other words, Plaintiffs pay 75 basis points in 12b-1 fees in the hope of achieving a .25 basis point management fee reduction.

Defendant argues that, in the recent past the advisory fee rates were lowered, breakpoints were introduced and expense caps were included.  Mem. at 21-22.  None of these facts, if

---

[17] The approval of such unrealistic and unachievable breakpoints also informs the consideration of the conscientiousness of the Board's review of HIFSCO's fees.

[18] The 12b-1 Fees for the Funds are 100 basis points, 25 of which are used for current shareholder services, while 75 are allegedly used for marketing and distribution services.  AC

verified in discovery, render Plaintiffs' contentions, that economies of scale were not sufficiently shared with the Funds, that the fees were excessive, or that the breakpoints have not been correctly set, implausible.  At most, the magnitude of the wrong has been reduced but not eliminated.  At best, these contentions (assuming they can even be considered on a motion to dismiss) raise factual issues inappropriate for resolution at the pleading stage.  *See Curran*, No. 4:09-433, 2010 WL 2889752, at *9 (rejecting a similar argument, the court held "[t]hese arguments ask the Court to engage in a factual inquiry that would be inappropriate in the context of a Rule 12(b)(6) motion … [and] raise what appear to be fact-intensive inquiries suggest[ing] that resolution of the § 36(b) claim against [defendant] is unlikely even at the summary judgment stage of litigation").

Relying on *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008), Defendant also argues that Plaintiffs must aver specifics about "costs per investor" to satisfy the requirements of this *Gartenberg* Factor.  Mem. at 21.  *Hoffman* in turn, quotes *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 411 (2d Cir. 1989), in which the Second Circuit held that, at summary judgment, stage "plaintiff bore the burden of proving that the per unit cost of performing Fund transactions decreased as the number of transactions increased." (emphasis added).  At this stage, it is impossible to know the per-unit cost of Fund transactions without discovery since that information is solely within Defendant's possession.

Defendant's reliance on *In re Goldman Sachs Mut. Fund Funds Fee Litig*., No. 04-2567, 2006 WL 126772, *9 (S.D.N.Y. Jan. 17, 2006) and *Franklin,* 478 F. Supp. 2d at 687, Mem. at 21-22, is also misplaced.  Both of those cases stand for the proposition that "mere assertions that fees increased with the size of the Funds are not enough to establish that benefits from economies of scale were not passed on to investors."  *Goldman*, No. 04-2567, 2006 WL 126772,

27

*9; *accord Franklin*, 478 F. Supp. 2d at 686-87 (granting motion to dismiss where plaintiffs conclusorily alleged that the funds' performance was poor and that because the funds had increased fees should have decreased, while alleging *no facts* regarding the fees during the relevant time period) (emphasis added).  Plaintiffs' assertions are far more detailed.

### 5.      The Profitability of the Fund to the Adviser-Manager

Plaintiffs have detailed how  HIFSCO receives advisory fees that are significantly higher than the fees paid to sub-advisors (HIFSCO retains between 31% to 85% of all advisory fees for an annual   total of over $23 million), although the sub-advisors provide the core advisory services while HIFSCO provides few, if any, additional services.  AC ¶¶ 155, 156, 157.

Plaintiffs further allege that the advisory and 12b-1 fees have grown as assets increased without passing on any economies of scale to the Funds.  AC ¶ 149.  The AC also details how the 12b-1 distribution fees are excessive, because, *inter alia*: they are not tied to any distribution activity, AC ¶ 88; they are exceedingly high in comparison to the advisory and sub-advisory fees combined (in one case almost 3 times as large), AC ¶ 84; they are charged to the closed Class B Fund shares (.75% of which is charged for marketing activities), AC ¶¶ 82-83; the institutional shares are not charged 12b-1 fees since these sophisticated investors understand that they only benefit HIFSCO and it presumably profits from this share class, AC ¶¶ 85-87; the breakpoints are immaterial, AC ¶ 144, and the benefits of achieving breakpoints are not equitably distributed between HIFSCO and Fund investors.  AC ¶ 144.

Defendant criticizes Plaintiffs' allegations for not addressing "the actual costs to or specific services provided by HIFSCO."  Mem. at 22.  This information is solely within Defendant's control, and is likely proprietary. *See* Ex. 19 to AC, AC ¶ 152.  It is unavailable to Plaintiffs at the pleading stage.  Therefore, absent discovery, it is impossible for Plaintiffs to

know, with any precision, the magnitude of HIFSCO's profit margins for each Fund or the costs that it incurs.  In any event, these details are not required under Fed. R. Civ. P. 8(a), as Plaintiffs have sufficiently pled extensive facts that support a plausible inference that Defendant's fees were disproportionately large in comparison to the services rendered.  *See Curran*, No. 4:09-433, 2010 WL 2889752, at *9.

### C.   Conclusion

Defendant ignores many of the allegations of the AC; it attempts to dissect others as if discovery had been completed and it raises its own facts in an attempt to rebut the allegations of Plaintiffs, although those facts are nowhere included in the AC, or the public documents upon which Plaintiffs rely.  Defendant contends that Plaintiffs' allegations with regard to each *Gartenberg* Factor, on its own, must be demonstrably irrefutable to state a claim under §36(b). This is not what is required.  *Curran*, No. 4:09-433, 2010 WL 2889752, at *9 ("Plaintiffs need not make a conclusive showing of each of the *Gartenberg* factors but, instead, may state a § 36(b) claim by alleging any combination of facts that plausibly support an inference that a particular fee, given all of the surrounding facts and circumstances, is disproportionately large to the services rendered in exchange for that fee"); *see also Evergreen*, 423 F. Supp. 2d at 258 (emphasis added).  The allegations in the AC must be "read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Braden*, 588 F.3d at 594.

For the convenience of the Court, Plaintiffs have separately discussed the application of each *Gartenberg* Factor to both management and 12b-1 fees.  *Jones*, 130 S. Ct. at 1425-26, & n.5 however, instructs that all of the factors, and other information, are to be collectively assessed. Accordingly, Plaintiffs' detailed allegations, related to five of the *Gartenberg* Factors, more than sufficiently satisfy their pleading burden.  The issue before this Court is whether, at this stage of

the litigation absent discovery and reading the AC as a whole, Plaintiffs have pled sufficient factual allegations for the Court to "draw the reasonable inference that [HIFSCO] is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Plaintiffs respectfully submit that they have done so.

### III.   PLAINTIFFS' HAVE NOT ASSERTED A CAUSE OF ACTION UNDER RULE 12b-1; THEY HAVE ASSERTED, IN COUNT II, A VIABLE §36(b) CLAIM WHICH INCLUDES 12B-1 FEES

Relying upon *Gallus v Am. Express Fin. Corp.*, 370 F. Supp. 2d 862, 868 (D. Minn. 2005), Defendant argues that there is no implied right of action under Rule 12b-1. Mem. at 30. Plaintiffs have not pled a claim directly under Rule 12b-1. Rather, Count II of the AC alleges that the 12b-1 Fees are excessive and as a result, Defendant has violated ICA §36(b). AC ¶ 109. *Gallus*, and every other Court to have considered this issue, have found such a claim viable. *See Meyer v Openheimer Management Corp.* 764 F2d 76 (2d Cir 1985); *Forsythe*, 417 F.Supp.2d at 115 (citations omitted); *Pfeiffer,* 03-CIV-9741 DLC, 2004 WL 1903075, at *4 ("An action alleging that Rule 12b-1 expenses resulted in excessive compensation to a mutual fund's investment adviser is properly brought under Section 36(b) of the ICA.") (citing *Krinsk,* 875 F.2d at 406). Defendant's argument is inapposite.

### CONCLUSION

For the foregoing reasons, it is respectfully submitted that Defendant's motion should be denied in its entirety[19].

---

[19] In the event the Court grants Defendant's motion to dismiss, Plaintiffs respectfully request leave to amend the AC.

Dated: June 27, 2011

Respectfully submitted,

**LEVY PHILLIPS & KONIGSBERG, LLP**

By:  s/Moshe Maimon

Moshe Maimon
Danielle Disporto

800 Third Ave.
New York, NY 10022
(212) 605-6200

**SZAFERMAN, LAKIND, BLUMSTEIN, & BLADER, P.C.**

Arnold C. Lakind
Robert L. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
(609) 275-4511

*Attorneys for Plaintiffs*

31