SZAFERMAN, LAKIND, BLUMSTEIN &
BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, New Jersey 08648
By: Robert L. Lakind
      Arnold C. Lakind
Telephone: (609) 275-0400
Fax: (609) 275-4511

LEVY, PHILLIPS & KONIGSBERG, LLP
800 Third Avenue, 11th Floor
New York, New York 10022
By: Moshe Maimon
Telephone: (212) 605-6200
Fax: (212) 605-6290

Attorneys For Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, LINDA A. RUSSELL, AND DENNIS RUSSELL, ON BEHALF OF AND FOR THE BENEFIT OF THE HARTFORD GLOBAL HEALTH FUND, THE HARTFORD CONSERVATIVE ALLOCATION FUND, THE HARTFORD GROWTH OPPORTUNITIES FUND, THE HARTFORD INFLATION PLUS FUND, THE HARTFORD ADVISERS FUND, AND THE HARTFORD CAPITAL APPRECIATION FUND, | Case Number: 1:11-cv-01083-RMB- KMW |
| Plaintiffs, | **SECOND AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |
| vs. | |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | |
| Defendant. | |

## SECOND AMENDED COMPLAINT

Plaintiff JENNIFER L. KASILAG ("Kasilag"), whose street address is 35 Oklahoma Trail, Hopatcong, New Jersey, 07843, Plaintiff LOUIS MELLINGER ("Mellinger"), whose street address is 28 Mockingbird, Hackettstown, New Jersey, 07840, Plaintiff JUDITH M. MENENDEZ ("Menendez"), whose street address is 93 Eyland Avenue, Succasunna, New Jersey, 07876, Plaintiff JACQUELINE M. ROBINSON ("Robinson"), whose street address is 45 Livingston Road, Morristown, New Jersey, 07960, Plaintiff LINDA A. RUSSELL ("L. Russell"), whose street address is 52 Birch Ridge Road, Blairstown, New Jersey 07825, and Plaintiff DENNIS RUSSELL, ("D. Russell") whose street address is 52 Birch Ridge Road, Blairstown, New Jersey 07825  (collectively, "Plaintiffs") bring this action on behalf of and for the benefit of: the Hartford Global Health Fund[1], the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund, and the Hartford Capital Appreciation Fund (collectively, the "Hartford Funds"), and sue Hartford Investment Financial Services, LLC ("Defendant" or "HIFSCO"), an indirect wholly-owned subsidiary of Hartford Financial Services Group, Inc. ("HIG"), a company having shares listed on the New York Stock Exchange.

## I.    NATURE OF THE ACTION

1.    This action is a derivative action brought by the Plaintiffs, for the benefit of, and on behalf of, the Hartford Funds, pursuant to Section 36(b) of the Investment Company Act of 1940 ("ICA"), as amended 15 U.S.C. § 80a-35(b) (hereinafter Section 36(b) or "§ 36(b)."

2.    ICA § 36(b), 15 U.S.C. § 80a-35(b), provides that an investment manager to a mutual fund acts in a fiduciary capacity when it charges a mutual fund fees for its advisory

---

[1] Effective August 5, 2011, the "Hartford Global Health Fund" was re-named the "Hartford Healthcare Fund."

services, and thus authorizes a security holder of a mutual fund to sue the adviser to such fund to recover any compensation received by the adviser in breach of its fiduciary duties.

3.    The Hartford Mutual Funds, Inc. ("HMF") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq.*, comprised of various mutual funds, including the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Advisers Fund, the Hartford Inflation Plus Fund, and the Hartford Capital Appreciation Fund, each of which is a separate investment portfolio or mutual fund. *See* Tables I and II.

4.    The Hartford Mutual Funds II, Inc. ("HMFII") is an open-end management investment company registered under the ICA, 15 U.S.C. § 80a-1, *et seq.*, comprised of various mutual funds, including the Hartford Growth Opportunities Fund, each of which is a separate investment portfolio or mutual fund. *See* Tables I and II.

5.    HIFSCO serves as the investment manager/adviser to each of the Hartford Funds and is sued in this Second Amended Complaint ("SAC") based on its misconduct related to its wrongful receipt of fee income in violation of Section 36(b) of the ICA.

6.    HIFSCO derived and continues to derive revenues in the form of fees for what it claims to be the provision of investment management services and distribution services to the Hartford Funds.  In particular, HIFSCO receives fee compensation from each of the Hartford Funds and earns investment management fee revenues by allegedly providing investment advisory services pursuant to investment management agreements with each Hartford Fund. HIFSCO also improperly derived and continues to derive revenue by charging excessive 12b-1 distribution fees.  HIFSCO is sued in this SAC based on its misconduct related to its wrongful receipt of fee income in violation of Section 36(b) of the ICA.

7.     The Plaintiffs, who own shares of the Hartford Funds, allege that the investment management fees charged to each of the Hartford Funds by HIFSCO, the funds' investment manager, breached HIFSCO's § 36(b) fiduciary duty to the Hartford Funds with respect to such compensation as demonstrated by, *inter alia*: (a) the nature and quality of services provided to the Hartford Funds and their security holders in exchange for the investment management fees, including the fact that HIFSCO subcontracts out most of the management services, yet still charges, in all cases, an investment management fee that exceeds the fee paid to the Hartford Funds' sub-advisers,; (b) the failure of the Hartford Funds' Boards of Directors to exercise the requisite level of care and conscientiousness in approving the investment management agreements and the fees paid pursuant thereto; (c) the failure of HIFSCO to provide the Hartford Funds' Boards of Directors with all information reasonably necessary to evaluate the terms of the investment management agreements with respect to each Hartford Fund; (d) the level of the fees as compared to those charged by HIFSCO or its affiliates to institutional accounts, including non-mutual fund customers; (e) the fees other mutual fund advisers charge for similar services to similar mutual funds; (f) the failure of HIFSCO to adequately pass economies-of-scale savings on to the Hartford Funds and their security holders, and the retention of those economies-of-scale savings by HIFSCO; and (g) HIFSCO's costs and high profitability associated with providing investment management services to the Hartford Funds.

8.     The Plaintiffs further allege that HIFSCO improperly received Rule 12b-1 Distribution Fees[2] ("12b-1 fees") from Class A and Class B of the Hartford Funds and breached

---

[2] Securities and Exchange Commission ("SEC") Rule 12b-1, 17 C.F.R. § 270.12b-1, permits a fund to market and sell its shares using shareholder funds (Distribution Fees) deducted from fund assets only in strict compliance with the rule. Distribution fees cover the costs associated with the marketing and selling involved with running a mutual fund. These fees are deducted from a mutual fund to compensate securities professionals for sales efforts and services

its fiduciary duty to the Hartford Funds with respect to such compensation by, *inter alia*: (a) the minimal nature and quality of the services provided in exchange for the 12b-1 fees; and (b) having produced minimal benefits (in the form of economies-of-scale benefits or otherwise) for the Hartford Funds while generating significant additional investment management fee revenue for HIFSCO.[3]

9.      Plaintiffs bring this action derivatively pursuant to ICA § 36(b), 15 U.S.C. §80a-35(b), on behalf of all of the Hartford Funds.

10.      Plaintiffs, seek, pursuant to ICA § 36(b)(3), 15 U.S.C. § 80a-35(b)(3), on behalf of the Hartford Funds, the actual damages resulting from the breaches of fiduciary duties by HIFSCO, including the amount of excessive compensation and payments received from the Hartford Funds and/or, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), rescission of the contracts, that resulted in these breaches, due to HIFSCO's, violation of ICA § 36(b), 15 U.S.C. § 80a-35(b).

11.      Plaintiffs seek a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

12.      The allegations in this SAC are based, in large part, on publicly-available information, including, but not limited to, information contained in the public filings with the Securities Exchange Commission ("SEC" or "Commission") of HMF and HMFII ("Hartford Disclosure Materials"), and on information and belief after a reasonable investigation. On information and belief, the statements that are contained in any SEC filing represent HIFSCO's and the sub-advisers conduct throughout the entire time period applicable to Plaintiffs' claims.

---

provided to the fund's investors. *See SEC Proposes Measures to Improve Regulation of Fund Distribution Fees and Provide Better Disclosure for Investors* available at:
http://www.sec.gov/news/press/2010/2010-126.htm.
[3] Plaintiffs only challenge the 12b-1 fees charged to Class A and Class B of the Hartford Funds.

## II.   JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

14.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 80a-43 as Defendant inhabits or transacts business in this district, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred in this district, and Defendant may be found in this district.

15.   No pre-suit demand on the Boards of Directors of The Hartford Mutual Funds, Inc. and The Hartford Mutual Funds II, Inc. (collectively the "Boards"), which are the Boards overseeing the Hartford Funds, is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions or counts brought under § 36(b) of the ICA.

16.   All conditions precedent to suit have been performed, or have been satisfied or waived.

## III.   PARTIES

### A.   Plaintiffs

17.   Plaintiff Mellinger owns shares of and is therefore a security holder of the Hartford Growth Opportunities Fund (Class L shares) and the Hartford Inflation Plus Fund (Class L and C shares).[4]

---

[4] Plaintiffs are not required to plead the individual share classes of the Hartford Funds that that they own. This is a derivative action brought on behalf of the entire Fund. Plaintiffs have standing because they are Hartford Fund shareholders, which is all that is required to bring a Section 36(b) claim. *See In re Am. Mut. Funds Fees Litig.*, No. CV 04-5593 GAF, 2005 U.S. Dist. LEXIS 41884, at *9-10 (C.D.Cal. Dec. 16, 2005) ("Section 36(b) … does not distinguish among owners of different classes of shares in a mutual fund, and does not impose any requirement at the share class level. *See* 15 U.S.C. § 80a-35(b)") (citations omitted)).

18.     Plaintiff Menendez owns shares of and is therefore a security holder of the Hartford Advisers Fund (Class A shares).

19.     Plaintiff L. Russell owns shares of and is therefore a security holder of the Hartford Advisers Fund (Class A shares), the Hartford Growth Opportunities Fund (Class A shares) and the Hartford Capital Appreciation Fund (Class A shares).

20.     Plaintiff D. Russell owns shares of and is therefore a security holder of the Hartford Capital Appreciation Fund (Class A shares).[5]

21.     Plaintiff Robinson owns shares of and is therefore a security holder in the Hartford Advisers Fund (Class A shares) and the Hartford Inflation Plus Fund (Class A shares).

22.     Plaintiff Kasilag owns shares of and therefore is a security holder of the Hartford Conservative Allocation Fund (Class A shares) and the Hartford Global Health Fund (Class A shares).

**B.      Defendant**

23.     HIFSCO, a Delaware corporation with its principal place of business in Simsbury, Connecticut, is an affiliate (indirect wholly-owned subsidiary) of Hartford Financial Services Group, Inc. ("HIG") (together with its subsidiaries, the "Hartford" or "Company").[6]  HIG is an insurance and financial services company with shares listed on the New York Stock Exchange. HIG, through its wholly-owned subsidiaries, provides a variety of investment management,

---

[5] Plaintiffs L. Russell and D. Russell, for the first time, in this Second Amended Complaint, bring claims on behalf of the Hartford Capital Appreciation Fund.  HIFSCO has consented to Plaintiffs adding a claim on behalf of the Hartford Capital Appreciation Fund, on the condition that the damage period for this specific fund is determined based on the filing date of this Second Amended Complaint.

[6] Plaintiffs refer to HIG, together with its subsidiaries and/or affiliates that perform a variety of investment management, administrative, and operational services to mutual funds and managed accounts, collectively as "Hartford," which is also how Hartford refers to itself in its public filings.

administrative, and operational services for a large number of investment companies or mutual funds (the "Hartford Funds Complex") and managed accounts, including HIG's indirect wholly-owned subsidiary HIFSCO.[7] *See* Table I.

24.    HIFSCO is the investment manager/adviser for each of the Hartford Funds, and is registered as an investment adviser under the Investment Advisers Act of 1940 ("the Investment Advisers Act").  On November 1, 2009, HMF and HMFII, on behalf of each of the Hartford Funds, entered into Investment Management Agreements with HIFSCO (collectively, "Investment Management Agreements").

25.    HIFSCO is also a registered broker-dealer and serves as the Hartford Funds' principal underwriter and distributor.  HIFSCO receives 12b-1 distribution fees from each of the Hartford Funds pursuant to Rule 12b-1 Distribution Plans ("Distribution Plan" or "Distribution Plans") adopted by HMF and HMFII on behalf of the Funds.

26.    HIFSCO, as the underwriter, distributor, adviser, and control person of the Harford Funds received compensation from the Hartford Funds for providing investment management and other services to them.  As such, HIFSCO owes fiduciary and other duties to the Plaintiffs and all security holders of each of the Hartford Funds.

III.    **BACKGROUND INFORMATION ABOUT THE INVESTMENT MANAGEMENT INDUSTRY AND THE PURPOSE OF SECTION 36(b)**

27.    A mutual fund is "typically created and managed by a pre-existing organization known as an investment adviser" that "generally supervises the daily operation of the fund and

---

[7] The Hartford Funds Complex is composed of 85 mutual funds, which are contained in the following four management investment companies registered under the ICA:  the Hartford HLS Series Fund II, Inc., the Hartford Series Fund, Inc., the Hartford Mutual Funds, Inc. and the Hartford Mutual Funds II, Inc., each containing mutual funds.  The mutual funds at issue in this SAC are contained in the Hartford Mutual Funds, Inc. and the Hartford Mutual Funds II, Inc. *See* Tables I and II.

often selects affiliated persons to serve on the [fund's] board of directors." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 (1984).

28.     Congress recognized as early as 1935 that because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter, sever its relationship with the advisor."   S. Rep. No. 91-184, p. 5 (1969). Therefore, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." *Id.*

29.     As a result, in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are adversely affected . . . when investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interest of [shareholders] . . . or when the investment companies . . . are not subjected to adequate independent scrutiny.

> ICA § 1(b)(2), 15 U.S.C. § 80a-1(b)(1994)

30.     Accordingly, the ICA was designed to regulate and curb "abuses inherent in the structure of [the mutual fund industry]," *Jones v. Harris Associates L.P.*, 130 S.Ct. 1418, 1422 (2010) (quoting *Daily Income Fund*, 464 U.S. at 536), and to create standards of care applicable to investment advisers and their affiliates, such as HIFSCO.

31.     By the 1960s, it had become clear to Congress that investment advisers to equity mutual funds were charging those funds excessive fees, particularly by not taking economies of scale into account.

32.     Thus, ICA § 36(b), 15 U.S.C. § 80a-35(b) was added to the ICA in 1970, (primarily to remedy excessive fees charged by mutual funds such as those owned by Plaintiffs). This provision created a federal cause of action for breach of fiduciary duty by investment advisers. Section 36(b) – which imposes a fiduciary duty on mutual fund investment managers

(and their affiliates) with respect to the receipt of compensation for services – states in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. **An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation** or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

ICA § 36(b), 15 U.S.C. § 80a-35(b) (Emphasis added).

33.     The conflicts in the inherent structure of mutual funds, including those at issue here, exemplify the concern raised in the preamble to the ICA that "investment companies are organized, operated and managed in the interest of investment advisers, rather than in the interest of shareholders." Indeed, the goal of ICA § 36(b), 15 U.S.C. § 80a-35(b), is to empower security holders to independently police whether investment advisers have fulfilled their fiduciary obligations.

34.     The relationship between investment advisers and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker*, 441 U.S. 471, 481 (1979), and is "potentially incestuous." *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

35.     Through ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress gave security holders a "unique right," *Daily Income Fund*, 464 U.S. at 536, empowering them with the ability to be an independent check on an adviser's fulfillment of its fiduciary duties and receipt of excessive fees. By enacting ICA § 36(b), 15 U.S.C. § 80a-35(b), Congress provided security holders with

a means to redress breaches of the adviser's fiduciary duty to the funds it manages and distributes while leaving the "ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court." S. Rep. 91-184, p. 6.

## IV.  FACTORS GENERALLY RELEVANT TO A SECTION 36(b) CLAIM

36.     ICA § 36(b), 15 U.S.C. § 80a-35(b), itself does not set forth a list of factors to be considered in determining whether an investment adviser, such as HIFSCO, has breached its fiduciary duty with respect to its receipt of compensation for services paid by a mutual fund such as any of the Hartford Funds.

37.     The test for determining whether fee compensation paid to HIFSCO violates ICA § 36(b), 15 U.S.C. § 80a-35(b), is "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's length in light of all the surrounding circumstances." *Gartenberg*, 694 F.2d at 928.

38.     If an adviser charges a fee that is "so disproportionately large that it bore no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining" (*see Jones*, 130 S.Ct. at 1418 (quoting *Gartenberg*)), the adviser has violated ICA § 36(b), 15 U.S.C. § 80a-35(b).

39.     In the context of § 36(b) litigation, courts have historically considered, *inter alia*, the following factors ("*Gartenberg* Factors"):

- the nature and quality of services being paid for by the fund and its investors;

- whether the directors exercised a sufficient level of care and conscientiousness in approving the investment advisory or management agreements;

- what fees are charged by the adviser to its other non-mutual fund customers, if any;

- what fees other mutual fund complexes or funds within the same fund family charge for similar services to similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- the costs of providing those services and the profitability of providing the services.

40.     As set forth below, an examination of the *Gartenberg* Factors demonstrates that the fees charged to the Hartford Funds and their investors breached and continue to breach HIFSCO's fiduciary duty to the Hartford Funds.  Indeed, HIFSCO's receipt of the advisory and distribution fees were so disproportionately large that they bore no reasonable relationship to the services rendered, and could not have been the product of arm's length bargaining, and were thus unfair to Plaintiffs and the other security holders of the Hartford Funds.

**A.     THE NATURE AND QUALITY OF THE INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES PERFORMED BY HIFSCO DO NOT JUSTIFY HIFSCO'S FEE**

**1.     Investment Management Services**

41.     Each of the Hartford Funds pays a monthly management fee to HIFSCO, based on a stated percentage of the Fund's average daily net asset value, for its investment management services.  As such, the investment management fees are not based on the services actually rendered or HIFSCO's actual costs in providing services to the Hartford Funds.

42.     Rather than providing the majority of the investment management services directly to the Funds, HIFSCO subcontracts with others to provide the services.

43.     Since 1997, HIFSCO has sub-contracted its investment management duties to either Wellington Management Company, LLP ("Wellington"), pursuant to an Investment Sub-Advisory Agreement, and/or to Hartford Investment Management Company ("HIMCO"), pursuant to an Investment Services Agreement, and subsequently an Investment Sub-Advisory Agreement (collectively, "Investment Sub-Advisory Agreements").

44.     Wellington is a sub-adviser to the Hartford Advisers Fund, the Hartford Growth Opportunities Fund, the Hartford Global Health Fund and the Hartford Capital Appreciation Fund.  HIMCO is the sub-adviser to the Hartford Conservative Allocation Fund and the Hartford Inflation Plus Fund.

45.     HIFSCO's fee schedule varies for each of the Hartford Funds.  Each Fund pays a fee to HIFSCO, which subcontracts with Wellington and/or HIMCO at a fraction of HIFSCO's fee.

46.     The table below sets forth the investment management fees which are paid to, and retained by, HIFSCO from each of the Hartford Funds, and the separate investment management fees paid to the funds' sub-advisers – Wellington and HIMCO – for the year ended October 31, 2010.

**2010 HARTFORD FUNDS HIFSCO FEES RETAINED AFTER PAYMENT TO SUB-ADVISERS WELLINGTON & HIMCO**

| Hartford Fund | Investment Services/Sub-Advisory Agreement | Net Paid HIFSCO (retained by HIFSCO) | Net Paid Sub-Adviser | Difference (Retained by HIFSCO) | Percent By Which HIFSCO's Fee Is Greater Than Sub-Adviser |
|---|---|---|---|---|---|
| Hartford Advisers Fund | Wellington | $3,806,784 | $1,107,952 | $2,698,832 | 343% |
| Hartford Growth Opportunities Fund | Wellington | $8,866,594 | $5,368,829 | $3,497,765 | 165% |
| Hartford Inflation Plus Fund | HIMCO | $8,179,707 | $1,822,225 | $6,357,482 | 448% |
| Hartford Conservative Allocation Fund | HIMCO | $308,924 | $53,613 | $255,311 | 576% |
| Hartford Global Health Fund | Wellington | $2,002,216 | $1,437,771 | $564,445 | 139% |
| Hartford Capital Appreciation Fund | Wellington | $76,888,718 | $47,793,436 | $29,095,282 | 160% |
| **Totals** | | **$100,052,943** | **$57,583,826** | **$42,469,117** | **173%** |

47.     The table above demonstrates that in 2010 the total investment management fees charged to the Hartford Funds equaled $157,636,796 ($100,052,943 investment management fees paid to HIFSCO in addition to  $57,583,826 in investment management fees paid to the Hartford Funds' sub-advisers.

48.     The investment management fee paid to HIFSCO by each of the Hartford Funds was, at a minimum, 139%, and at a maximum 576%, greater than the fee paid to the Hartford Funds' sub-advisers.  Further, on average, HIFSCO's fees exceeded the sub-advisers fees by 305%.  On information and belief, similar fees, as those reflected in the above table (*see* ¶46), will be paid to HIFSCO and the Hartford Funds' sub-advisers for the entire time period applicable to Plaintiffs' claims.

49.     Pursuant to the Investment Management Agreements, in exchange for the investment management fees HIFSCO receives (for a listing  of the investment management fees HIFSCO received in 2010 see paragraph 46), HIFSCO allegedly provides both (a) investment management and (b) certain administrative services, to the Hartford Funds.  As explained below, the total fee (i.e., the total investment management fee) it should receive for these alleged services should be a small fraction of the fees that are paid to the Hartford Funds' sub-advisers.

**(a) HIFSCO's Alleged Investment Management Services Pursuant to the Investment Management Agreements (i.e., services it claims to provide in exchange for its investment management fee).**

50.     As stated above, on November 1, 2009, HIFSCO entered into an Investment Management Agreement with each of the Hartford Funds.  Further, HIFSCO has also entered into sub-advisory investment management agreements with the sub-advisers to the Hartford Funds. The table below represents a comparison of the investment management responsibilities that  HIFSCO undertakes pursuant to the Investment Management Agreements with the Hartford

Funds, and the investment management responsibilities delegated to the the sub-advisers pursuant to the Investment Sub-Advisory Agreements with the Hartford Funds.   The services listed in the left hand column, are all contained in HIFSCO's Investment Management Agreements with the Hartford Funds under the heading of section 2 "Investment Management Services."

| Investment Management Agreements (Services Allegedly Performed by HIFSCO) | Investment Sub-Advisory Agreements |
|---|---|
| [A comparable provision does not exist in the Investment Management Agreements] | "2.    The Sub-Adviser **shall evaluate and implement an investment program appropriate for each Portfolio**, which shall be amended and updated from time to time...as determined by the Adviser and the Sub-Adviser." |
| "2.    Investment Management Services<br><br>(a) The Adviser shall, or shall cause an affiliate to: (i) regularly provide investment advice and recommendations to each Portfolio [the Funds] with respect to its investments, investment policies and the purchase of securities; (ii) supervise continuously the investment management program of each Portfolio and the composition and performance of its portfolio securities and determine which securities shall be purchased or sold by each Portfolio; and (iii) arrange, subject to the provisions of Section 4 hereof [the delegation provision], for the purchase of securities and other investments for each Portfolio and the sale of securities and other investments held in each Portfolio." | "3.  The Sub-Adviser, in consultation with the Adviser when appropriate, will make **all determinations with respect to the investment of the assets of the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same.**  Such determinations and services shall include advising the Company's Board of Directors of the manner in which voting rights, rights to consent to corporate action, and any other non-investment decisions pertaining to a Portfolios securities should be exercised." |
| "(b) The Adviser shall provide, or cause an affiliate to provide, such economic and statistical data relating to each portfolio and such information concerning important economic political and other developments as | "4.  The Sub-Adviser will regularly furnish reports with respect to the Portfolios at period meetings of the Company's Board of Directors, and at such other times as may be reasonably requested by the Company's Board of |

14

| Investment Management Agreements (Services Allegedly Performed by HIFSCO) | Investment Sub-Advisory Agreements |
|---|---|
| the Adviser shall deep appropriate or as shall be requested by the Company's Board of Directors." | Directors, which reports shall include the **Sub-Advisers economic outlook and investment strategy and a discussion of the portfolio activity and the performance of the Portfolios since the last report."** |
| [A comparable provision does not exist in the Investment Management Agreements] | "5.  The Sub-Adviser shall manage each Portfolio in conformity with the Company's Articles of Incorporation and By-laws...the Investment Company Act...and to the investment objectives...of each Portfolio as set forth in the Portfolio's prospectus....." |
| [A comparable provision does not exist in the Investment Management Agreements] | "6.  The Sub-Adviser will select the brokers or dealers that will execute the purchases and sale of portfolio securities..." |

(Emphasis added)

51.      As the above table reflects, pursuant to the Investment Sub-Advisory Agreements, the sub-advisers are responsible for substantially all of the investment management services required by the Hartford Funds.   Although HIFSCO's role is limited and is predominantly supervisory in nature, HIFSCO's fees are significantly more than the funds' sub-advisors' investment management fees.

52.      The evaluation and implementation of a fund's investment program is generally the most expensive, and important, investment management activity, with respect to a fund.  *See* Declaration of Steve Pomerantz, Ph. D (Ex. A, ¶6) With respect to the Hartford Funds, this service is provided by the Funds' sub-advisers, not HIFSCO.  According to the Investment Sub-advisory Agreements, it is the Fund's sub-adviser who "evaluate and implement an investment program appropriate for each [fund]," while HIFSCO's role is limited to *supervising* the Fund's investment program and providing minimal administrative functions.

53.     The sub-advisers assumption of substantially all of the investment management services is specifically contemplated in the Investment Management Agreements HIFSCO entered into with each of the Hartford Funds, as those agreements contain the following investment management delegation provision:

> The Adviser [HIFSCO] . . . may engage one or more investment advisers that are registered as such under the Investment Advisers Act of 1940, as amended, to act as sub-adviser with respect to existing and future Portfolios of the Company. **Such sub-adviser or sub-advisers shall assume such responsibilities and obligations of the Adviser pursuant to this Investment Management Agreement as shall be delegated to the sub-adviser or sub-advisers, and the Adviser will supervise and oversee the activities of any such sub-adviser or sub-advisers.** In addition, the Adviser may subcontract for any of the administrative services set forth in Section 3 [of the Investment Management Agreement].

(Emphasis added).

54.     In light of this delegation provision, HIFSCO's investment management services are significantly limited to oversight and supervising the funds' sub-advisers.   HIFSCO's supervisory roles are further limited given that it is the HMF and HMFII's Board of Directors who are charged with the substantial supervision of the Funds.  According to the March 1, 2011 Combined Statement of Additional Information for the Hartford Funds ("SAI"), the Board: "(i) provides broad supervision over the affairs of [HMF and HMFII] and the Funds and (ii) elects officers who are responsible for the day-to-day operations of the Funds and the execution of policies formulated by the Boards of Directors."

55.     If HIFSCO performed all of the alleged investment management services listed in the Investment Management Agreements (see Table at ¶50), for each Hartford Fund, and if the fees charged for these alleged services were the product of arm's-length bargaining, such fees should have been, for each Hartford Fund, a fraction of the investment management fees charged

by each sub-adviser to each Hartford Fund, in light of the substantial investment management services the sub-advisers provide to the Hartford Funds under the terms of their respective sub-advisory agreements.  However, HIFSCO's investment management fee, on average, exceeded the sub-advisers' fees by 305%, even though the services HIFSCO performed for the funds were minimal and predominantly supervisory in nature.

**(b)  HIFSCO's Alleged Administrative Services Pursuant to the Investment Management Agreements (i.e., services HIFSCO claims to provide in exchange for its investment management fee)**

56.     The Investment Management Agreements HIFSCO entered into with the Hartford Funds, in addition to containing a section entitled "Investment Management Services" also contains a section entitled "Administrative Services", which lists the administrative services HIFSCO allegedly provided, or caused an affiliate to provide to the Hartford Funds.    The "Administrative Services" section of the Investment Management Agreements, which HIFSCO entered into with each Hartford Fund, is reproduced in the table on the following page.

| Investment Management Agreements - Administrative Services |
|---|
| **3.** In addition to the performance of investment advisory services, the Adviser shall perform, or shall cause an affiliate to perform, the following services in connection with the management of the Company:<br><br>   **(a)**   assist in the supervision of all aspects of the Company's operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company;<br><br>   **(b)**   provide the Company with the services of persons, who may be the Adviser's officers or employees, competent to serve as officers of the Company and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company; and<br><br>   **(c)**   provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement.<br><br>   **(d)**   provide such other services as the parties hereto may agree upon from time to time. |

57.     Thus, according to section 3(a) of the Investment Management Agreements, HIFSCO will "assist in the supervision of all aspects of the Company's [i.e., Hartford Funds] operations, including the coordination of all matters relating to the functions of custodian, transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company."

58.     The Hartford Funds, however, pay for these services pursuant to separate agreements and/or separate fees. For example, according to the Annual Report (an SEC filing) for the Hartford Global Health Fund,  for year ended October 31, 2010, this fund paid a custodian fee of $9,000, a transfer agent fee of $988,000, accounting services fees of $53,000, an administrative service fee (undefined) of $18,000, registration and filing fees of $97,000, Board of Directors' fees of $10,000, audit fees of $14,000 and other expenses (undefined) of $94,000,

for a total of $1,283,000. These fees are produced below in chart format. A similar chart is contained in the Hartford Global Health Fund's 2010 Annual Report, Statement of Operations, for year ended October 31, 2010.

| Expenses | Dollar Amount |
|---|---|
| Investment Management Fee | 3,440,000 |
| Administrative Services Fee | 18,000 |
| Transfer Agent Fees | 988,000 |
| Distribution Fees | |
| Class A | 618,000 |
| Class B | 282,000 |
| Class C | 767,000 |
| R-3 | 13,000 |
| R-4 | 19,000 |
| Custodian Fees | 9,000 |
| Accounting Services Fees | 53,000 |
| Board of Directors Fees | 10,000 |
| Registration and Filing Fees | 97,000 |
| Audit | 14,000 |
| Other Expenses | 94,000 |
| Total Expenses (before waivers and fees paid indirectly) | 6,422,000 |

59.   The Annual Reports, for all of the Hartford Funds (like the Hartford Global Health Fund) reflect that, for year ended October 31, 2010, these funds also paid, in addition to paying HIFSCO an investment management fee, the following fees: Administrative Services Fees, Transfer Agent Fees, Distribution Fees, Custodian Fees, Accounting Services Fees, Board of Directors Fees, Audit Fees, and Other Expenses. *See also* Exhibit B, which contains similar charts for the other Hartford Funds and reflect that these funds were also charged an Administrative, Transfer agent, Distribution, Custodian, Accounting Services, Board of Director, Audit and Other Expense Fee, in addition to an investment management fee. These charts are also based on data contained in the Annual Reports for each of these funds.

60.   Further evidence that the Hartford Funds separately pay for the services listed in Section 3(a) of the Investment Management Agreements is confirmed by the fact that all of the Hartford Funds are charged an "Other Expense Charge."

61.   For example, the March 1, 2011 Annual Prospectus for the Hartford Global Health Fund, reflects that investors in this fund pay the following fees:

| | Class A | Class B | Class C | Class I | Class R3 | Class R4 | Class R5 | Class Y |
|---|---|---|---|---|---|---|---|---|
| Management fees | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% | 0.90% |
| Distribution & Services (12b-1) fees | 0.25% | 1.00% | 1.00% | None | 0.50% | 0.25% | None | None |
| **Other Expense** | **0.34%** | **0.49%** | **0.28%** | **0.32%** | **0.30%** | **0.22%** | **0.18%** | **0.07%** |

62.   This table reflects, in basis points  the annual fees an investor pays for investing in the Hartford Global Health Fund.

63.   As the table in paragraph 61 reflects, in addition to being charged an annual investment management fee, investors are also charged an "Other Expense Charge." According to the SEC, the Other Expense Charge, usually covers expenses for "payments to transfer agents, securities custodians, providers of shareholder accounting services, attorneys, auditors, and fund independent directors." *See* Division of Investment Management: Report on Mutual Fund Fees and Expenses, U.S. Securities and Exchange Commission, § III.B.1. http://www.sec.gov/news/studies/feestudy.htm#P244_50400; U.S. Securities and Exchange Commission, *Mutual Fund Fees and Expenses,* http://www.sec.gov/answers/mffees.htm.

64.     Exhibit B reproduces the fee tables for the remaining Hartford Funds, which reflect that investors in these funds also paid an "Other Expense Charge," in addition to paying an investment management fee. [8]

65.     Thus, through the Hartford Funds' "Other Expense Charge", which is separate from HIFSCO's investment management charges, Plaintiffs paid for the services listed in Section 3(a) of the Investment Management Agreement.  Therefore, it would be improper, and excessive, for HIFSCO to charge for any of these services through its investment management fee.

66.     In addition to the above SEC disclosures in the Annual Reports and Prospectuses, which reflect that the services listed in Section 3(a) are paid for independently of the investment management fees Plaintiffs paid to HIFSCO, the SAI states the following:

> Each Fund pays its own expenses including, without limitation: (1) expenses of maintaining the Fund and continuing its existence; (2) registration of the Fund under the 1940 Act; (3) auditing, accounting and legal expenses; (4) taxes and interest; (5) governmental fees; (6) expenses of issue, sale, repurchase and redemption of Fund shares; (7) expenses of registering and qualifying the Fund and its shares under federal and state securities laws and of preparing and printing prospectuses for such purposes and for distributing the same to shareholders and investors, and fees and expenses of registering and maintaining registrations of the Fund and of the Fund's principal underwriter, if any, as broker-dealer or agent under state securities laws; (8) expenses of reports and notices to shareholders and of meetings of shareholders and proxy solicitations thereof; (9) expenses of reports to governmental officers and commissions; (10) insurance expenses; (11) fees, expenses and disbursements of custodians for all services to the Fund; (12) fees, expenses and disbursements of transfer agents, dividend disbursing agents, shareholder servicing agents and registrars for all services to the Fund; (13) expenses for servicing shareholder accounts; (14) any direct charges to shareholders approved by the directors of the Fund; (15) compensation and expenses of directors of the Fund, other than those who are also officers of The Hartford; and (16) such nonrecurring items as may arise, including expenses incurred in connection with litigation, proceedings and claims and the obligation of the Fund to indemnify its directors and officers with respect thereto.

---

[8] The information contained in these fee tables is derived from each fund's March 1, 2011 Annual Prospectus.

67.    As multiple SEC filings demonstrate, the services listed in Section 3(a) of the Investment Management Agreements are paid by fees that are separate from the investment management fees paid to HIFSCO.   Further, as Section 3(a) of the Investment Management Agreements confirms, HIFSCO's role is limited to the "supervision" and "coordination" of the services listed in Section 3(a).   However, the Hartford Funds' accounting, transfer agent and custodian services are accounted for pursuant to separate agreements to which HIFSCO is not even a party, which indicates that HIFSCO's role is limited to minimal oversight.  Further, as the Annual Reports for the Hartford Funds reflect, the fees for the performance of the actual services listed in Section 3(a) are much less than the investment management fee for each Hartford Fund. Therefore, if the fees to actually perform the services listed in Section 3(a) are significantly less than the investment management fee for each Hartford Fund, then the fees to supervise these services should, if a product of arm's-length bargaining, be a fraction of the fees charged to perform such services.

68.    Section 3(b) of the Investment Management Agreement states that HIFSCO shall "provide the Company with the services of persons…to perform effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company."

69.    Each of the Hartford Funds' Annual Reports reflect that for year ended October 31, 2010, security holders in the funds, paid a separate "Administrative Services Fee," (i.e., independent of the investment management fee) which presumably covered these services. However, even if these services were paid for through HIFSCO's investment management fee, under the Investment Sub-Advisory Agreements, the sub-advisers must provide reports to HIFSCO and the funds' Boards, which  "include the Sub-Adviser's economic outlook and

investment strategy and a discussion of the portfolio activity and the performance of the Portfolios since the last report." Thus, even if the investment management fees that HIFSCO charged to the Hartford Funds was also used to pay for the services allegedly provided pursuant to paragraph 3(b) of the Investment Management Agreements, the data needed for those services was largely provided by the sub-advisers, presumably because it is the sub-advisers who actually perform the substantial investment advisory/management services, and thus the fees for such services should be minimal.

70.    As further evidence of the Hartford Funds' sub-advisers' substantial reporting and investment management role, Hartford relied upon the Funds' sub-advisers, not HIFSCO, to provide an explanation in the Hartford Funds' SEC filings as to how the funds performed in the prior year and what the fund's outlook is for next year. Specifically, the Hartford Funds' Annual Reports state, for each Hartford Fund,: "[t]he views expressed in the Fund's Manager Discussion under 'Why did the Fund perform this way?' and 'What is the outlook?' are views of the Fund's sub-adviser and portfolio management team...." The "portfolio management team" are employees of the sub-advisers.

71.    Section 3(c) (Administrative Services Section) of the Investment Management Agreements provides that HIFSCO will "provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement."

72.    As described above substantially all of the investment management services are performed by the funds' sub-advisers. With respect to the administrative services, HIFSCO's role is limited to oversight and is essentially supervisory in nature since it is not even a party to the agreements under which most of these administrative services are provided. Thus, given (i) the magnitude of the services that the sub-advisers provide, (ii) that the sub-advisers provide

such services at their own expense (i.e., they provide the office space needed for the substantial investment management services they provide under their sub-advisory agreements), and (iii) that the sub-advisers, on average, despite performing substantially all of the investment management services for the Hartford Funds at their own expense, are paid 305% less than HIFSCO, the fees for the office space needed by HIFSCO for its alleged services should be a fraction of the fees that are charged by the sub-advisers. Further, the Annual Reports for each of the Hartford Funds reflects two ambiguous fees: "Administrative Services Fee" and "Other Expenses" (*see* Table at ¶58), which may pay for this office space, and thus such office space may be paid for through fees separate from each Fund's investment management fee.

73.     HIFSCO, which is located in Simco, Connecticut, has $59 billion in assets under management through all of its investment operations, and charges an annual percentage fee on all of these assets.   Thus, even if HIFSCO pays for the minimal office space it requires (or should require) for alleged services to the Hartford Funds through the funds' investment management fee, each fund's portion of that fee, in dollar terms, should be very small.

74.     As stated in the Declaration of Steve Pomerantz Ph.D (Exhibit A, ¶¶5 to 8), (i) the investment management services should be the most expensive service that is listed in the Investment Management Agreements, (ii) HIFSCO delegated, consistent with the Investment Management Agreements substantially all of the investment management services required by the Hartford Funds to the funds' sub-advisers (Wellington and HIMCO), and (iii) the investment management role that remained for HIFSCO was predominately supervisory in nature.

75.     As stated in the Declaration of Steve Pomerantz Ph.D (Exhibit A, ¶9), with respect to the Administrative Services listed in Section 3(a) of the Investment Management Agreements, HIFSCO's role was limited to supervising the performance of the services, and

such supervisory role should have resulted in HIFSCO receiving fees that were a small fraction of the fee to perform the actual services.

76.     As stated in the Declaration of Steve Pomerantz Ph.D (Exhibit A, ¶¶10 to 11), with respect to the Administrative Services listed in Section 3(b) of the Investment Management Agreements, these services should have been paid for by fees that were charged to the Hartford Funds that were separate, and in addition to, HIFSCO's investment management fee.

77.     As stated in the Declaration of Steve Pomerantz Ph.D (Exhibit A, ¶13), given that HIFSCO sub-contracted to third parties the most crucial services required by the Hartford Funds to third parties, the expenses it should have incurred for providing the services listed in Section 3(c) of the Investment Management Agreement should have been very small.

78.     Accordingly, as set forth in the Declaration of Steven Pomerantz Ph.D (Exhibit A, ¶¶20 to 21),   HIFSCO's total investment management fee for each Hartford Fund bore no reasonable relationship to the services it rendered.

79.     Given that substantially all of the investment management services have been delegated to the Hartford Funds' sub-advisers and HIFSCO's responsibility is limited and essentially supervisory in nature, the investment management fee HIFSCO received was substantially disproportionate to the value of the investment management services it rendered.

80.     Plaintiffs, on behalf of the Hartford Funds, are entitled to recover the investment management fees received (and continuing to be received) by HIFSCO in breach of its fiduciary duty to the Funds with respect to such compensation.  The excessive management fees represent additional compensation for advisory services, and thus, are subject to an ICA § 36(b) claim

## 2.      12b-1 Distribution Services

81.     Prior to 1980, the SEC prohibited the use of fund assets (which are owned by the security holders) to sell new fund shares.  The SEC had traditionally been reluctant to allow fund advisers to charge their security holders for selling shares to others because:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

*Statement on the Future Structure of the Securities Markets*, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

82.     After intense lobbying by the mutual fund industry, however, the SEC agreed to consider modifying its objections to allow current fund security holders to pay distribution expenses.  In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund security holders at dramatically lower costs.

83.     Accepting the mutual fund industry's argument that a growth in assets would lead to a *quid pro quo* reduction in fees and other expenses, the Commission tentatively approved Rule 12b-1.  The SEC feared that "the use of mutual fund assets to finance distribution activities would benefit mainly the management of a mutual fund rather than its shareholders, and therefore that such use of fund assets should not be permitted."  *Bearing of Distribution Expenses by Mutual Funds*, Investment Company Act Release No. 9915, 1977 SEC LEXIS 943 (Aug. 31, 1977).  Indeed, the SEC attached numerous conditions to the use of fund assets to pay distribution expenses.  For example, the SEC wanted to be certain that investment advisers would not "extract additional compensation for advisory services by excessive distributions

under a 12b-1 plan." *Meyer v. Oppenheimer Management Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).

84.   HIFSCO has, however, charged and collected additional compensation for its retail management services by causing the Plaintiffs and other Hartford Fund security holders to pay HIFSCO's marketing expenses to acquire new security holders so that these new security holders could pay additional investment management fees to HIFSCO. Existing security holders are thus forced to pay additional fees because, along with new security holders, assets under management increase thereby increasing the 12b-1 and other fees.

85.   Under this regime, HIFSCO has fashioned yet another way to increase its financial benefit while leaving Plaintiffs and other security holders to bear the financial burden. Indeed, Plaintiffs, and the other security holders of the Hartford Funds, pay 12b-1 distribution fees for marketing, selling, and distributing mutual fund shares to new security holders.

86.   HMF and HMFII, on behalf of their respective Hartford Funds, have each adopted a separate Distribution Plan for each share class of each fund.

87.   The Hartford Disclosure Materials state that the distribution fees paid to HIFSCO may be spent on any activities or expenses primarily intended to result in the sale of the Hartford Funds' shares including: (a) payment of initial and ongoing commissions and other compensation payments to brokers, dealers, financial institutions or others who sell the funds' shares, (b) compensation to employees of HIFSCO, (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of HIFSCO, incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information, (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, i.e., advertisements and sales

literature, (e) other distribution-related expenses and (f) for the provision of personal service and/or the maintenance of shareholder accounts.

88.     Pursuant to the HMF and HMFII's Class A Distribution Plans for the Hartford Funds, a fund may compensate HIFSCO for its expenditures in financing any activity primarily intended to result in the sale of fund shares and for maintenance and personal service provided to existing Class A shareholders.  The HMF and HMFII's Boards of Directors authorized Rule 12b-1 payments of 0.25% of each fund's average daily net assets attributable to Class A shares.  The entire amount of the fee may be used for shareholder servicing expenses with the remainder, if any, used for distribution expenses.

89.     Pursuant to the HMF and HMFII's Class B Distribution Plan, the Hartford Funds may pay HIFSCO a fee of up to 1.00% of the average daily net assets attributable to those classes, 0.75% of which is a fee for distribution financing activities and 0.25% of which is for shareholder account services.

90.     Each of the Hartford Fund's most recent Annual Reports further provides that each fund's 12b-1 fees are accrued daily and paid monthly.

91.     According to the Harford Disclosure Materials, Class A shares of the Hartford Funds pay a maximum sales charge (front-end sales load) of 5.50% depending on the amount of shareholder's initial investment, and a distribution and servicing fee of 0.25%.

92.     According to Hartford's SEC filings, "[p]otential benefits which the [12b-1 Distribution] Plans may provide to the Funds include ... the ability to provide investors with an *alternative* to paying front end sales loads." (Emphasis added).[9]

---

[9] Pursuant to the Court's order, during oral argument on HIFSCO's Motion to Dismiss, Plaintiffs are providing to the Court a copy of the Hartford Funds (which applies to the funds at issue in this case and other funds) Statement of Additional Information dated March 1, 2011, and

93.    The 12b-1 fees that are charged to Class A shareholders of the Hartford Funds are therefore excessive because shareholders of this class pay 12b-1 fees *in addition* to significant front-end sales loads.

94.    HIFSCO's 12b-1 fees charged to the Class B shareholders of the Hartford Funds are also excessive because this class was closed to new investments as of September 30, 2009 ("Close Date").   Effective at the close of business on the Close Date, no new or additional investments were allowed in Class B shares of the Hartford Funds.   Nonetheless, HIFSCO continues to charge the holders of the Hartford Funds' Class B shares 12b-1 fees for *distribution and marketing activities* for this share class.

95.    A shareholder of the Hartford Funds may pay HIFSCO a fee of up to 1.00% of the average daily net assets attributable to Class B shares, 0.75% of which is a fee for distribution financing activities and 0.25% of which is for shareholder account services.   Class B shareholders are also required to pay a significant back-load charge when the holders of this class seek to redeem their investment(s) in the Hartford Funds' Class B shares.   According to the Harford Disclosure Materials, the maximum deferred sales charge (load) (as a percentage of purchase price or redemption proceeds, whichever is less) is 5.00% for Class B shares for the Hartford Funds.   Class B shareholders are therefore forced to either: (1) stay in a class of shares that is closed to new investments and continue to pay significant distribution and marketing fees, or (2) pay a significant back-load charge if the shareholder seeks to redeem his/her Class B shares in order to avoid such useless distribution and marketing fees.

---

amended and restated on May 31, 2011.  The language quoted in paragraph 92 appears on page 181 if the reader is going by the page numbers that are located in the top right hand corner of the document, and page 150 if the reader is going by the page numbers on the bottom center of the pages.

96.     Hartford's 2010 SEC filings state: "potential benefits which the [12b-1 Distribution] Plans may provide to the Funds include … the potential to increase assets [and] the ability to sell shares of the Funds through adviser and broker distribution channels."   The 12b-1 fees charged to the Class B shareholders of the Hartford Funds cannot accomplish these services. As a closed class, there is no potential to increase the Class B assets.   Furthermore, there are no brokers or dealers to be contacted because there are no new shares of Class B to sell or market to the investing public.

97.     Furthermore, both the HMF Distribution Plan and HMFII Distribution Plan states that some of the services HIFSCO performs in exchange for the 12b-1 fees include: "(b) compensation to employees of the [HIFSCO]; (c) compensation to and expenses, including overhead such as communications and telephone, training, supplies, photocopying and similar types of expenses, of [HIFSCO] incurred in the printing and mailing or other dissemination of all prospectuses and statements of additional information; (d) the costs of preparation, printing and mailing of reports used for sales literature and related expenses, advertisements and other distribution-related expenses (including personnel of   [HIFSCO])."   The Investment Management Agreements also provide for the provision of HIFSCO personnel, office space and related services for HIFSCO's operations pursuant to the investment management fee. Therefore, HIFSCO's distribution-related expenses are *de minimis.*

98.     Although Plaintiffs, and the other shareholders of the Hartford Funds, pay for marketing, selling and distributing each fund through the 12b-1 fees, the monetary benefits derived from attracting new shareholders largely accrue to HIFSCO, not the existing shareholders.  As such, the 12b-1 fees are substantially a waste of fund assets.

99.     Plaintiffs, on behalf of the Hartford Funds, are entitled to recover the Class A and, a portion of, the Class B 12b-1 fees received (and continuing to be received) by HIFSCO in breach of its fiduciary duty to the Hartford Funds with respect to such compensation.

100.    The excessive distribution fees represent additional compensation for advisory services, and thus, are subject to an ICA § 36(b) claim.

**B.      THE ECONOMIES OF SCALE ENJOYED IN CONNECTION WITH THE INVESTMENT MANAGEMENT SERVICES AND DISTRIBUTION SERVICES WERE NOT PASSED ON TO THE PLAINITFFS AND OTHER SECURITY HOLDERS OF THE FUNDS AS REQUIRED BY SECTION 36(b), BUT WERE KEPT BY DEFENDANT HIFSCO IN VIOLATION OF ITS FIDUCIARY DUTY**

101.    The legislative history of ICA § 36(b), 15 U.S.C. § 80a-35(b), recognizes that an investment adviser's failure to pass on economies of scale to the fund is the principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), as reprinted in 1970  U.S. Code Cong. & Ad. News, at 4901-02.

102.    The amount of the compensation received by the adviser should be evaluated in context with the economies of scale realized by a fund.  Economies of scale are created when assets under management increase more quickly than the cost of advising and managing those assets.  The work required to operate a mutual fund does not increase proportionately with the assets under management.

Investment management efforts, the most important (and most expensive) input into portfolio management, do not increase along with portfolio size.  A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion.  (Size may impair performance, but it imposes little logistical challenge.)  Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment,* David Swensen, Free Press (2005), p. 238.  "The intrinsic characteristics of the mutual-fund...suggest that economies of scale should lead to lower fees as assets under management [i.e., the amount people invest in a fund] increase."  *Id.* at 237.  Economies of scale with respect to a mutual fund exist, and are available to be passed along to the fund's investors, because "investment management efforts...do not increase along with portfolio size."  *Id.* at 238.  Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit."  *Id.*

103.   On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur at both the fund complex and portfolio level for various costs incurred.  Moreover, fixed costs are spread over more assets as a fund grows in size.

104.   Indeed, investment management organizations can realize economies of scale from increased assets within a particular mutual fund and from increased total assets in all mutual funds under management.

105.   As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and is charged a fee of 75 basis points (100 basis points = 1%; 1 basis point equals 1/100th of a percent), the fee equals $375,000 per year.  A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of

three million seven hundred and fifty thousand dollars ($3,750,000).  Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

106.   As assets under management increase, however, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In other words, it simply does not cost a fund's adviser ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund.  In fact, the investment management services or securities selection process for a ten billion dollar fund and a one billion dollar fund, or even a one million dollar fund, are virtually identical, generating enormous economies of scale.  Indeed, at some point, the additional cost to advise each additional dollar in the fund (whether added because of a rise in the value of the securities or additional contributions by current or new security holders) approaches a number at or close to zero.

107.   The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO").  Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of management services.  *See SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives* (June 2000) ("GAO Report"), at 9.  The GAO has estimated as much as 64% of mutual fund asset growth has been the result of market appreciation rather than additional purchases of new shares of a fund.  *Id.*

108.    Economies of scale exist not only fund by fund but also with respect to an entire fund complex and even with respect to an investment adviser's entire scope of operations, including services provided to institutional and other clients. *See John P. Freeman & Stewart L. Brown, Mutual Fund Advisory Fees: The Cost of Conflicts of Interest,* 26 J. CORP. L. 610, at 621 n. 62 (2001) (the "Freeman & Brown Study") (citing Victoria E. Schonfeld & Thomas M.J. Kerwin, *Organization of a Mutual Fund,* 49 BUS. LAW 107 (1993))

109.    As fund portfolios grow, they quickly create economies of scale and eventually the incremental cost of servicing additional assets approaches zero.  As the GAO confirms, it is possible for the adviser to service the additional assets with zero additional costs.  *See* GAO Report, at 9 (noting that growth from portfolio appreciation is unaccompanied by costs).

110.    Although significant economies of scale exist for each of the Hartford Funds, the associated cost savings largely have been appropriated for the benefit of HIFSCO rather than being shared with the Hartford Funds.  The economies-of-scale benefits that have been captured and misappropriated by HIFSCO can and have generated huge unreasonable and excessive, undeserved profits for HIFSCO in breach of its fiduciary duty to the Hartford Funds with respect to such compensation.

111.    The management fees received by HIFSCO are paid as a varying percentage of assets under management.  The Hartford Funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The fees vary based on the amount of assets under management, and are reduced as the total amount of assets under management increase.  *See* following table.

**HARTFORD FUNDS' FEE BREAKDOWN PURSUANT TO THE SAI**
**("M" refers to "Million" and "B" refers to "Billion")**

| Hartford Fund | Investment Services/ Sub-Advisory Agreement | HIFSCO Fee Schedule (annual rate based on average daily net assets) | Sub-Adviser Fee Schedule (annual rate based on average daily net assets) |
|---|---|---|---|
| Hartford Advisers Fund | Wellington | First $500 million – 0.6900%<br>Next $500 million – 0.6250%<br>Next $4 billion – 0.5750%<br>Next $5 billion – 0.5725%<br>Amt. over $10B – 0.5700% | First $50 million – 0.2200%<br>Next $100 million – 0.1800%<br>Next $350 million – 0.1500%<br>Amt. over $500M – 0.1250% |
| Hartford Growth Opportunities Fund | Wellington | First $250 million – 0.8000%<br>Next $4.75 billion – 0.7000%<br>Next $5 billion – 0.6975%<br>Amt. over $10B – 0.6950% | All Assets – 0.2700% |
| Hartford Inflation Plus Fund | HIMCO | First $500 million – 0.5000%<br>Next $4.5 billion – 0.4500%<br>Next $5 billion – 0.4300%<br>Amt. over $10B – 0.4200% | All Assets – At Cost |
| Hartford Global Health Fund | Wellington | First $500 million – 0.9000%<br>Next $500 million – 0.8500%<br>Next $4 billion – 0.8000%<br>Next $5 billion – 0.7975%<br>Amt. over $10B – 0.7950% | First $100 million – 0.4500%<br>Next $400 million – 0.3500%<br>Amt. over $500M – 0.3000% |
| Hartford Conservative Allocation Fund | HIMCO | First $500 million – 0.1500%<br>Next $4.5 billion – 0.1000%<br>Next $5 billion – 0.0800%<br>Amt. over $10B – 0.0700% | All Assets – At Cost |
| Hartford Capital Appreciation Fund | Wellington | First $500 million – 0.8000%<br>Next $500 million – 0.7000%<br>Next $4 billion – 0.6500%<br>Next $5 billion – 0.6475%<br>Amt. over $10B – 0.6450% | All Assets – 0.2500% |

112.    This fee structure known as "breakpoints" implicitly recognizes the economies of

scale and gives the appearance that the funds share in those benefits.  A fee breakpoint has been

explained as follows:

> Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

*See* Freeman & Brown Study, at 620, n. 59.

113. Economies of scale can be passed on to and shared with the mutual funds as assets increase if management fee breakpoints are installed at higher asset levels (but at asset levels that are reachable), or if lower asset based investment advisory fees are adopted by the management company in response to increases in the overall level of assets under management.

114. The 12b-1 distribution fees are also paid to HIFSCO based upon a percentage of net assets of each of the Hartford Funds. HIFSCO purportedly collects these fees in order to grow or stabilize the assets of the Hartford Funds so that the funds can benefit from economies of scale through reductions in other fees, such as management and administrative fees.

115. The benefits achieved by the Hartford Funds' economies of scale can and should have been shared with mutual funds and their security holders by reducing and/or eliminating the management fees and distribution fees and other costs charged to the funds by HIFSCO.

116. In the case of the Hartford Funds, however, HIFSCO has failed to share meaningful savings with the funds as a result of economies of scale. While the Investment Management Agreements include advisory fee breakpoints, these breakpoints are meaningless, because as a practical matter, they did not pass on any of the economies of scale to Plaintiffs, and the other security holders of the funds. The mere existence of breakpoints does not mean that economies of scale are adequately passed on to security holders of the funds, unless the breakpoints are reached.

117.    Indeed, the breakpoints are designed by HIFSCO to benefit itself rather than the Hartford Funds.  As described below, the initial breakpoints are set too high, the breakpoints are spaced too far apart, and the fee reductions made at breakpoints are far too small, thereby depriving Plaintiffs and the other security holders of the funds of the benefits of the economies of scale created by the contribution of their capital to the funds.

118.    For instance, the first breakpoint occurs at $500 million for the Hartford Advisers Fund, the Hartford Inflation Plus Fund, the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, and the Hartford Capital Appreciation Fund, and at $250 million for the Hartford Growth Opportunities Fund.  *See* table at ¶111.  Significant economies of scale are created by the Plaintiffs' and the other security-holders' investments in the Hartford Funds long before this initial breakpoint, but they are not shared with the funds.  HIFSCO retains for itself the benefits created by the economies of scale between breakpoints.  A flat management fee (in dollars, not percentage) or lower breakpoints would allow the Hartford Funds to capture economies of scale that rightfully belongs to them under Section 36(b), while also allowing HIFSCO to earn a fair and competitive profit for its services.

119.    In fact, for the year ended October 31, 2010, the Hartford Global Health Fund, and the Hartford Conservation Allocation Fund have not been able to avail themselves of even the first breakpoint in HIFSCO's fee schedule.  Even though the Hartford Advisers Fund, the Hartford Growth Opportunities Fund and the Hartford Inflation Plus Fund were able to take advantage of the first breakpoint, it is unlikely that they will achieve the remaining breakpoints because the breakpoints are spaced too far apart.  Furthermore, the Hartford Capital Appreciation Fund reached its final breakpoint of over $10 billion in assets over $9 billion ago (for the year ended October 31, 2010, this fund has almost $20 billion in assets).  However, HIFSCO failed to

install any additional breakpoints beyond the $10 billion breakpoint. By not doing so, HIFSCO has failed to pass on to this fund's security holders, including Plaintiffs, the substantial economies of scale that occurred during the appreciation of assets in the fund from $10 billion to approximately $20 billion.

120.    HIFSCO's breakpoint schedule is the breakpoint schedule that impacts the investment management fees that Plaintiffs pay. Conversely, the sub-advisers' breakpoint schedule determines how much of the overall investment management fee which Plaintiffs pay to HIFSCO is allocated between HIFSCO and the funds' sub-advisers. Thus, if a breakpoint with respect to the sub-advisers schedule is reached, it does not impact the total amount of investment management fees Plaintiffs pay, only if a breakpoint of HIFSCO is reached do Plaintiffs receive an investment management fee reduction. Therefore, if HIFSCO negotiates with the sub-advisers that they (the sub-advisers) charge a lower initial investment management fee, as compared to HIFSCO's investment management fee, along with a sub-adviser breakpoint schedule that reduces the sub-adviser's initial investment management fee, at asset levels lower than the breakpoint schedule applicable to HIFSCO, then HIFSCO is benefitted because it gets to retain a larger portion of the investment management fees that Plaintiffs pay.

121.    Wellington is a for-profit independent sub-adviser to four of the Hartford Funds. HIFSCO negotiated at arm's-length, not only to pay it much lower initial investment management fees than HIFSCO charged the Hartford Funds, but also for a breakpoint schedule at asset levels much lower than HIFSCO's breakpoint schedule. *See* Table at ¶111.

122.    Wellington's fee/breakpoint schedules for the Hartford Funds allowed it to accomplish all of the services it was required to undertake pursuant to its sub-advisory agreements, and, presumably, still include a profit.

123.   With respect to the Hartford Advisers Fund, HIFSCO negotiated a breakpoint schedule with its sub-adviser Wellington, such that Wellington's initial investment management fee was 22 basis points, and, under this schedule, graduated fee reductions commenced after assets in this fund surpassed $50 million. *See* Table at ¶111.   This graduated fee reduction schedule results in Wellington charging an investment management fee of just 12.5 basis points on assets in excess of $500 million.   *Id.*   In contrast, HIFSCO's breakpoint schedule sets HIFSCO's initial investment management fee at 69 basis points, and only after assets in the fund exceed $500 million is their any reduction in HIFSCO's fees.   Further, the graduated reductions are of such a small value that if assets in this fund exceed $10 billion, HIFSCO's fee is only reduced to 57 basis points. *Id.*

124.   With respect to the Hartford Global Health Fund, HIFSCO negotiated a breakpoint schedule with its sub-adviser Wellington for an initial investment management fee of 45 basis points, with graduated fee reductions commencing after assets in this fund surpass $100 million. *See* Table at ¶111. This graduated fee reduction schedule results in a fee of just 30 basis points on assets in excess of $500 million. *Id.* In contrast, HIFSCO's breakpoint schedule sets HIFSCO's initial investment management fee at 90 basis points, and only after assets in this fund exceed $500 million is there any reduction in HIFSCO's fees.   Further, the graduated reductions are of such a small value that if assets in this fund exceed $10 billion, HIFSCO's fee only drops to 79 basis points. *Id.*

125.   For the two HIMCO sub-advised funds, the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund, HIMCO's sub-advisory fee is set "at cost", and this fee is substantially lower than HIFSCO's advisory fees for these funds. Thus, similar to the

Wellington sub-advised Hartford funds there is a large disparity between HIFSCO's breakpoint schedule and HIMCO's.

126.    This disparity between HIFSCO's breakpoint schedule, which determines the total amount of investment management fees HIFSCO collects from the Hartford Funds, and the sub-advisers' breakpoint schedule, which determines the value of the portion of the overall investment management fees that HIFSCO collects from the Hartford Funds that it must pay to their sub-advisers, reflects that HIFSCO is using the breakpoint mechanism to benefit itself rather than the Hartford Funds and the Plaintiffs.

127.    HIFSCO benefits from this breakpoint arrangement because as the sub-advisers grow the funds' assets, the overall fee HIFSCO collects from each fund increases on account of the following: (A) the investment management fees HIFSCO collects are based on a percentage of assets in the funds, and (B) the portion of the investment management fees HIFSCO collects from the funds that and must pay to the sub-advisers decreases, on account of the sub-advisers breakpoint schedule. If the breakpoint schedule that HIFSCO negotiated for at arm's-length with the Hartford Funds' sub-advisers was used as the breakpoint schedule for HIFSCO's investment management fee, the economies of scale generated by asset growth would not be disproportionately provided to HIFSCO. Rather, the economies-of-scale savings would be appropriately shared with Hartford Funds' security holders.

128.    Accordingly, HIFSCO fails to share with the Hartford Funds' security holders the benefits of economies of scale realized from the Hartford Funds. HIFSCO's receipt of these fees is particularly excessive given that the cost of the oversight functions it performs for the funds should not increase as the funds' assets increase, resulting in enormous economies-of-scale

benefits that HIFSCO retains for itself but that should be shared with the funds and their security holders.

129.    As assets under management have grown, the management fees paid to HIFSCO have grown dramatically, despite the economies of scale realized by HIFSCO.  HIFSCO has not shared with the Plaintiffs, and other security holders of the funds, the economies of scale it has gained from that growth.  For example, for fiscal year 2009-2010, the assets in the Hartford Inflation Plus Fund increased by 51% (from $1.48 billion to $2.24 billion).  During this same time period, the investment advisory fees to HIFSCO increased by 80% (from $5.57 million to $10.00 million).

130.    The investment management and distribution fees paid to HIFSCO are disproportionate to the value of services rendered, and therefore excessive, especially when compared to the rates charged by the sub-advisers, by competitors or to institutional clients (discussed in the next section), as well as the excess profits resulting from these economies of scale.  The economies of scale enjoyed by HIFSCO with respect to the Hartford Funds have not been adequately shared with the Funds, as required by § 36(b) and Rule 12b-1, in breach of HIFSCO's § 36(b) fiduciary duty to the Funds with respect to such compensation.

> **C.    COMPARATIVE FEE STRUCTURES CHARGED TO NON-MUTUAL FUND CUSTOMERS AND OTHER MUTUAL FUND COMPLEXES FOR SIMILAR INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES DEMONSTRATE THAT HIFSCO HAS CHARGED THE FUNDS EXCESSIVE FEES THAT BREACHED HIFSCO'S FIDUCIARY DUTY**

131.    An analysis of: (1) the fees paid to the Hartford Funds' sub-advisers, (2) investment management fees charged by HIFSCO's competitors to mutual funds comparable to the Hartford Funds, and (3) the management fees charged by Hartford to third-party institutional clients, including non-mutual fund customers, demonstrates that HIFSCO has charged the

Hartford Funds excessive investment management fees that violate HIFSCO's fiduciary duty with respect to the receipt of compensation. The following relevant comparative fee structures establish that HIFSCO is charging advisory fees to the Hartford Funds that are disproportionate to the value of the services rendered.

### 1.    Fee Structure of the Hartford Funds' Sub-Advisers

132.    HIFSCO hired sub-advisers for all of the Hartford Funds that assumed the obligation of providing substantially all of the investment advisory services to their designated funds. As each sub-adviser is a for-profit investment management company that negotiated its fee with HIFSCO, the fees they charge provide a guidepost of the cost of the investment advisory services provided to the Hartford Funds, presumably including a comfortable profit margin. Compared to the fees charged by the sub-advisers who actually perform the majority of the substantive advisory services to the Hartford Funds, the additional fees charged by HIFSCO for its oversight of the Hartford Funds are unjustified and excessive.

133.    While Plaintiffs do not challenge the fees paid to the sub-advisers of the Hartford Funds, those rates do provide a measure of how much the investment advisory services cost (and the economies of scale realized by the advisors). Indeed, the fees charged by each Hartford Fund's sub-adviser are indicative of the fee the funds should pay for the investment management services. HIFSCO charges far more than the sub-advisers it hires for the funds (*i.e.*, Wellington and HIMCO) even though the sub-advisers assume the obligations of HIFSCO to provide substantially all of the investment advisory services to their designated funds.

134.    Since HIFSCO's investment management fees charged to the Plaintiffs, and the other shareholders of the Hartford Funds, and collected by HIFSCO were far in excess of the sub-adviser fee amount (who provides substantially all of the investment management services),

HIFSCO's fees were necessarily so disproportionately large that they bore no reasonable relationship to the value of the services rendered and could not have been the product of arm's-length bargaining.

### 2.    Fees Charged to Other Mutual Fund Complexes For Similar Investment Management Services

135.    Vanguard generally provides the same services to the Vanguard Health Care Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund (the "Vanguard Funds") as HIFSCO provides to the comparable Hartford Funds.

136.    Wellington is the sub-adviser to both the Vanguard Health Care Fund and the Hartford Global Health Fund.  Wellington is the sub-adviser to both the Vanguard Wellington Fund and the Hartford Advisers Fund. Wellington is the sub-adviser to both the Vanguard Morgan Growth Fund and the Hartford Growth Opportunities.[10]

137.    The Vanguard Funds and the Hartford Funds listed in the prior paragraph, generally have the same investment philosophies.   Further, the terms of the sub-advisory agreements Wellington has entered into with the above listed Hartford Funds, and the terms of the sub-advisory agreements that Wellington as entered into with the above-listed Vanguard Funds, are not materially different.

138.    While HIFSCO is paid a substantial investment management fee from the Hartford Funds, Vanguard does not receive an investment management fee from the Vanguard Health Care Fund or the Vanguard Wellington Fund.  Vanguard does charge a 1 basis point investment management fee to the Vanguard Morgan Growth Fund, which is in addition to the 16 basis points it pays to this fund's sub-advisers.   However, Vanguard's 1 basis point

---

[10] The Vanguard Morgan Growth Fund employs four sub-advisers, one of them being Wellington.  However, the total sub-advisory fees paid to all of the fund's sub-advisers equals 16 bps.

investment management fee, with respect to this fund, is significantly lower than the 50 basis points investment management fee that HIFSCO charged to the comparable Hartford Fund.

139.    Thus, the Vanguard Funds only pay investment management fees to their sub-advisers (with the exception of the 1 basis point investment management fee that the Vanguard Morgan Growth Fund pays to Vanguard).

140.    Vanguard does charge its funds a "Management and Administration" charge which is, on average, 360% lower than the investment management fee HIFSCO charges the Hartford Funds.[11]

141.    A comparison of Vanguard's "Management and Administration" fee and HIFSCO's investment management fee demonstrates that HIFSCO's investment management fee is substantially disproportionate to the services it rendered for such fee and could not have been the product of arm's-length bargaining.

142.    The table below compares HIFSCO's investment management fee to Vanguard's "Management and Administration" fee for each fund listed in the first column.  The fees set forth in the second column, "HIFSCO's Investment Management Fee", exclude that portion of the fee paid to the sub-advisers; the amount set forth is the net fee that HIFSCO maintains for itself.

---

[11] Besides this Management and Administration fee, Vanguard, like HIFSCO charges the Vanguard Funds an "Other Expense" charge (which in all cases, in basis points, is much smaller than the Hartford Funds' other expense charge).  Similar to HIFSCO, Vanguard charges a fee to pay the funds' sub-advisers.  However, while HIFSCO charges 12b-1 fees on investments into the Hartford Funds, 12b-1 fees are *not* charged on investments into the Vanguard Funds.

| Hartford Fund | HIFSCO's Investment Management Fee in Basis Points, After Deducting The Investment Management Fees Paid to Wellington For Its Sub-Advisory Services | Comparable Vanguard Fund Which Also Uses Wellington as the Fund's Sub-Adviser | Vanguard "Management and Administrative Expenses" Fees, which are Separate and Apart From the Fees Vanguard Pays to Wellington For Its Sub-Advisory Services |
|---|---|---|---|
| Hartford Global Health Fund (Health) | For fiscal year ended October 31, 2010:<br><br>**55 bps** | Vanguard Health Care Fund (Health) | For fiscal year ended January 31, 2011:<br><br>**15 bps** |
| Hartford Advisers Fund (Moderate Allocation) | For the year ended October 31, 2010, investment advisory fee represented:<br><br>**54 bps** | Vanguard Wellington Fund (Moderate Allocation) | For fiscal year ended November 30 2010:<br><br>**16 bps** |
| Hartford Growth Opportunities Fund (Large Cap Growth) | For the year ended October 31, 2010, investment advisory fee represented:<br><br>**50 bps** | Vanguard Morgan Growth Fund (Large Cap Growth) | For the year ended September 30, 2010, the investment advisory fee represented:<br><br>**20 bps** |

143.   In addition to paying Vanguard's "Management and Administration" fees, the Vanguard Funds, also pay Wellington, in its capacity as sub-adviser to the comparable Vanguard Funds, sub-advisory fees ranging from 7 bps to 16 bps, depending on the fund.

144.   In exchange for the "Management and Administration" charge, for each of the Vanguard Funds, Vanguard performs "[c]orporate management and administrative services." "Corporate management and administrative services include: (1) executive staff; (2) accounting and financial; (3) legal and regulatory; (4) shareholder account maintenance; (5) monitoring and control of custodian relationships; (6) shareholder reporting; and (7) review and evaluation of advisory and other services provided to the funds by third parties."

145.   HIFSCO's investment management fee (the portion that it does not pay to the funds' sub-advisers) exceeds Vanguard's "Management and Administrative" fees, on average, by approximately 360%. *See* Table at ¶142.

146.   For three reasons, explained below, the services provided by Vanguard for its "Management and Administration" fee, demonstrate that the portion of the investment management fee HIFSCO retains from the Hartford Funds, is substantially disproportionate to the value of services HIFSCO rendered and could not have been the product of arm's-length bargaining.

### (a) Vanguard's "Management and Administration" fees Pays for the Vanguard Funds' Transfer Agent Services.

147.   Transfer agent fees represent a significant portion of a fund's expenses. *See Fees and Expenses of Mutual Funds,* Investment Company Institute ("ICI") Publication, June 6, 2005; *see also* Declaration of Steve Pomerantz, Ph. D. (Exhibit A, ¶19)

148.   According to the ICI, the services provided for transfer agent fees include "shareholder services such as basic individual shareholder account maintenance..." *See Id.*

149.   Vanguard's "Management and Administration" charge pays for, among other things, "shareholder account maintenance" and "shareholder reporting" (i.e., transfer agent services).[12]

150.   According to the ICI, transfer agent fees for mutual funds are on average equal to 15 bps. *See Fees and Expenses of Mutual Funds,* ICI Publication, June 6, 2005; *see also* Declaration of Steve Pomerantz, Ph. D. (Exhibit A, ¶19)

---

[12] Meaning the transfer agent fees for the Vanguard Funds are not paid through such funds "Other Expense" charge, but rather through the "Management and Administration" charge.

151.    Vanguard is the transfer agent to the Vanguard Funds and pays for such funds transfer agent expenses (which, as the ICI confirms are on average equal to 15 bps) through its "Management and Administration" charge, which, for the comparable Vanguard Funds, on average, such charge equals 17 bps.

152.    As reflected in the table in paragraph 142, the Vanguard Health Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund's "Management and Administration" fees equal 15 bps, 16 bps and 20 bps, respectively.  Meaning, that either all, or a substantial portion of, the "Management and Administration" fees that Vanguard charges the Vanguard Funds are used to pay the funds' transfer agent expenses.

153.    In contrast, HIFSCO is not the transfer agent for the Hartford Funds.  Rather, Hartford Administrative Services Company, an affiliate of HIFSCO, serves as the Transfer Agent for the Hartford Funds.  Therefore, the investment management fee that HIFSCO charges the Hartford Funds is not used to pay the Hartford Funds' transfer agent expenses, since those services are performed by others.

154.    As Exhibit B reflects, Plaintiffs pay "transfer agent fees" for investing in the Hartford Funds, which are separate, and in addition to, the investment management fees they pay HIFSCO.  These separate and additional "transfer agent fees" pay for the transfer agent services to the Hartford Funds.

155.    The transfer agent fee for the Hartford Global Health Fund is approximately 28 bps.  The transfer agent fee for the Hartford Advisers Fund is approximately 26 bps.  The transfer agent fee for the Hartford Growth Opportunities Fund is approximately 19 bps.

156.    Accordingly, a substantial portion, if not all, of the Management and Administration" fees that Vanguard charges to the Vanguard Funds are used to pay for the funds'

transfer agent expenses.  By contrast, the security holders in the Hartford Fund pay HIFSCO's investment management fee and a separate transfer agent fee.  The transfer agent fee charged to, and paid by, the Hartford Funds on average equals 24 bps, which is 9 bps higher than the average fee for this service.

### (b) Vanguard's Fees For Oversight And Other Services Are *De Minims*

157.    The services that are paid through Vanguard's "Management and Administration" charge by the Vanguard Funds equals, on average, 17 bps.  These services include the following: "(1) executive staff; (2) accounting and financial; (3) legal and regulatory; … (5) monitoring and control of custodian relationships;  . . .  and (7) review and evaluation of advisory and other services provided to the funds by third parties."  Vanguard also pays for the funds' transfer agent services through the "Management and Administration" charge.

158.    According to Sections 3(a) and (b) of the Investment Management Agreements, HIFSCO performs the following administrative services for the Hartford Funds for its investment management fee:

> (a)   assist in the supervision of all aspects of the Company's [Hartford Funds] operation, including the coordination of all matters relating to functions of the custodian, transfer agent or other shareholders servicing agents (if any) accountant and other parties performing services or operational functions for the Company [Hartford Funds];

> (b)   provide the Company [Hartford Funds] with the services of persons…competent to serve as officers of the Company [Hartford Funds] and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company [Hartford Funds], including the preparation and maintenance of required reports, books and records of the Company [Hartford Funds];….

159.    Vanguard also assumes responsibility for "review and evaluation [i.e., supervisory] of advisory and other services provided to the funds by third parties" in exchange for payment of the "Management and Administration" fee.

48

160.    Vanguard also uses the "Management and Administration" to pay for the following services for the Vanguard Funds: legal, regulatory, accounting, financial, and transfer agent services.  In contrast, HIFSCO only agrees to supervise these services in exchange for its investment management fee.

161.    Vanguard's "Management and Administration" fee also pays for the executive staff of the Vanguard Funds.

162.    Vanguard's "Management and Administration" fee charged to the Vanguard Health Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund equals 15 bps, 16 bps and 20 bps, respectively.  Further, the "Management and Administration" charge pays for the Vanguard Funds' transfer agent services, which, on average, equal 15 bps.  HIFSCO's investment management fee does not pay the transfer agent services needed by the Hartford Funds, rather that service is paid for through a separate fee.

163.    After Vanguard paid for the Vanguard Funds' transfer agent services (which on average cost 15 bps) through the "Management and Administration" charge, a *de minims* amount of the "Management and Administration" fee (which on average totals 17bps) remained to pay for the other services that are covered by this fee, which include the supervision of third-party service providers to the Vanguard Funds. Thus, supervision, therefore, only incurs a *de minims* fee.  HIFSCO also claims to provide these supervisory services in exchange for payment of its investment management fee.

164.    Unlike HIFSCO's investment management fee, Vanguard's "Management and Administration" fee not only pays for transfer agent and supervisory services, but also pays for the actual performance of the legal, accounting and financial services that are required by the Vanguard Funds.  Thus, Vanguard's "Management and Administration" fee does not merely pay

for the supervision of the performance of the legal, accounting and financial services, as is the case with HIFSCO's investment management fee.

165.    Accordingly, Vanguard provides more extensive administrative services to the Vanguard Funds than those HIFSCO provides to the Hartford Funds, as set forth in sections 3(a) and (b) of HIFSCO's Investment Management Agreement.  Moreover, Vanguard provides such services for a *de minims* fee.

### (c) Vanguard Does Not Charge For Investment Advisory Services On Top of The Fees For the Investment Advisory Services Provided by Wellington

166.    Vanguard does <u>not</u> allocate any of the "Management and Administration" fees charged to the Vanguard Funds to investment management services.  In fact, almost all, if not all, of Vanguard's "Management and Administration" fees are used to pay for transfer agent services.

167.    Further, Vanguard does not charge the comparable Vanguard Funds an investment management fee )with the exception of the 1 bp investment fee charged to the Vanguard Morgan Growth Fund, while HIFSCO charges its comparable fund, the Hartford Growth Opportunities Fund, a 50 bps investment management fee).[13]

168.    HIFSCO charges the Hartford Global Health Fund an investment management fee equal to 55 bps compared to Vanguard, which charges no investment management fee to its comparable fund.  HIFSCO charges the Hartford Advisers Fund an investment management fee of 54 bps compared to Vanguard, which charges no investment management fee to its comparable fund.  HIFSCO charges the Hartford Growth Opportunities Fund an investment

---

[13] Thus, Vanguard's investment management fee of 1bp for this fund is largely *de minims*.  The sub-advisers to the Vanguard Morgan Growth Fund are the entities that, with limited exceptions, render all of the investment management services for this fund and are paid a combined fee of 16 bps.

management fee of 50 bps compared to Vanguard, which charges a fee of 1 bp to its comparable fund.

169.     While Vanguard does not receive an investment management fee from the Vanguard Funds (other than the 1 bp investment management fee it receives from the Vanguard Morgan Growth Fund), similar to HIFSCO, Vanguard pays the sub-advisers to the Vanguard Funds an investment management fee.

170.     The sub-adviser to all of the Vanguard Funds and the Hartford Funds discussed in this section is Wellington. Vanguard pays the sub-advisers to the Vanguard Health Fund, the Vanguard Wellington Fund and the Vanguard Morgan Growth Fund, sub-advisory fees equal to 15 bps, 7b bps and 16bps, respectively.

171.     Vanguard's fees for investment management services to the Vanguard funds (zero or 1 bp in the case of the Vanguard Morgan Growth Fund) are appropriate fee comparators for the investment management fees HIFSCO should have charged Plaintiffs, and the other security holders of the Hartford Funds,  for its investment management services.  As shown in the following table, the services provided by Wellington to the Vanguard Funds are substantially comparable to the services Wellington provides to the Hartford Funds.

| Investment Advisor | Funds | Investment Management Services Performed by Investment Advisor |
|---|---|---|
| Wellington | Hartford Funds | (a) evaluate and implement an investment program for each fund; (b) make all determinations with respect to the investment of each fund's assets; (c) arrange for the purchase and sale of investments for each fund; and (d) render regular reports to the Board of Trustees. |
| Wellington | Vanguard Funds | (a) manage the investment and reinvestment of the assets of the fund; (b) continuously review, supervise, and administer an investment program for the fund; (c) determine the securities to be purchased or sold for the fund; (d) provide the fund with records concerning |

| Investment Advisor | Funds | Investment Management Services Performed by Investment Advisor |
|---|---|---|
| | | Wellington's activities; and (d) render regular reports to the Board of Trustees. |

172.    As the sub-advisory agreements that Wellington entered into with the Vanguard Funds are not materially different than the sub-advisory agreements Wellington entered into with the Hartford Funds, HIFSCO's investment management fee should have been the same, or very close to, Vanguard's investment management fee, which was zero (except for a 1 bp investment management fee for the Vanguard Morgan Growth Fund).    Thus, substantially all of the investment management fees HIFSCO charged the Hartford Funds were so disproportionately large that they bore no reasonable relationship to the services it rendered and could not have been the product of arm's length negotiations.

173.    Had the Vanguard investment management fee schedules been applicable to the Hartford Global Health Fund, the Hartford Advisers Fund and the Hartford Growth Opportunities Fund, those Funds would have saved millions of dollars in 2010 alone.

### 3.    Fees Charged By Hartford to Institutional Clients for Similar Investment Management Services

174.    HIFSCO and/or its affiliated entities also provide investment management services to third-party institutional, or separately managed, accounts.

175.    In *Jones*, the Supreme Court indicated that a court, in assessing an investment adviser's fiduciary duty, should give comparisons between management fees charged to an adviser's mutual funds and management fees charged to its independent clients "the weight that they merit in light of the similarities and differences between the services." 130 S. Ct. at 1428.

176.    Here, the services that HIFSCO provides to the institutional accounts are substantially similar, if not identical, to the investment management services HIFSCO provides

to the Hartford Funds.    Indeed, the Hartford Funds pay separately pursuant to separate agreements for services that are not provided to non-mutual fund clients.[14] As a result, the comparison of the investment management fees HIFSCO charges to the Hartford Funds to the fees charged by Hartford to the institutional accounts is entitled to considerable weight.

177.    Although the investment management services provided to the Hartford Funds are virtually identical to services provided to the institutional accounts, and therefore are directly comparable, the fees charged to the funds are materially higher than the fees charged to the institutional accounts.

178.    While a "manager may encounter different levels of fixed and variable research costs depending on the type of the portfolio, . . . the fundamental management process is essentially the same for large and small portfolios, as well as for pension funds and mutual funds. The portfolio owner's identity (pension fund versus mutual fund) should not logically provide a reason for portfolio management costs being higher or lower." *See Freeman & Brown Study*, at 627-28.  Indeed, "a mutual fund, as an entity, actually is an institutional investor.  When it comes to fee discrepancies, the difference between funds and other institutional investors does not turn on 'institutional status,' it turns on self-dealing and conflict of interest."  *Id.* at 629 n.93. Accordingly, the "'apples-to-apples' fee comparisons between equity pension managers and equity fund managers can be most difficult and embarrassing for those selling advice to mutual funds." *Id.* at 671-72.

179.    For example, HIMCO, an affiliate of HIFSCO and sub-adviser to two of the Hartford Funds at issue here, provides investment management services to employee benefit

---

[14] For example, the Hartford Funds have entered into a separate Fund Accounting Agreement pursuant to which they pay fees to Hartford Life Insurance Co. for accounting services. Similarly, the Funds pay Hartford Administrative Services Company separately for administrative and transfer agency services.

plans and/or mutual funds unaffiliated with Hartford, such as the State Board of Administration of Florida, the State of Connecticut, and Montgomery Street Income Securities, Inc.

180.   Although the investment management services that HIMCO provides these institutional accounts are the same as the investment management services that HIFSCO provides to the Hartford Funds (to whom HIFSCO owes a fiduciary duty), the funds pay investment management fees that are significantly higher than those paid by the institutional clients, who bargain at arm's-length over fees.  For example:

a.  For the fiscal year ending December 31, 2010, HIMCO charged Montgomery Street Income Securities, Inc., a closed end mutual fund, a total annual investment management fee of approximately 0.25% of the average net assets managed.

b.  HIMCO provides investment management services to a fixed income account for the State of Connecticut.  In exchange for these investment management services, the State of Connecticut pays approximately 9 to 11 basis points (.09% to .11%).[15]  In fiscal year 2010, HIMCO received a fee of $399,253 for advising an approximately $462 million account. Meanwhile, in 2010, the Hartford Inflation Plus Fund, a fixed income fund, with average assets under management of $2.2 billion, paid approximately $10 million (the combined investment management fee paid to HIFSCO and HIMCO) for the same investment management services that the State of Connecticut received at a fraction of the price.  In exchange for these investment management services provided by HIFSCO, Plaintiffs, and other shareholders invested in the Hartford Inflation Plus Fund, paid approximately 44 basis points.

c.  HIMCO also manages an approximately $2 billion fixed income account for the State Board of Administration of Florida.  For fiscal years 2009-2010, the State Board of Administration of Florida paid 10 basis points, to the investment advisers of its fixed income accounts.[16]

---

[15] These figures are derived from reported fiscal year end assets managed by HIMCO and total fees paid to HIMCO by fiscal year.

[16] Although the precise fee charged by HIMCO is not reported, it is unlikely that the fees HIMCO charges would deviate materially from the reported aggregate fee, particularly given that the fee is in line with what HIMCO charges the State of Connecticut.

181.    In 2010, the Hartford Inflation Plus Fund, a fixed income fund, paid investment management fees to HIFSCO that were as much as 5 times higher in basis points than what HIMCO charges institutional clients to provide investment management services to fixed income accounts.    At the Hartford Inflation Plus Fund's current level of assets ($2.2 billion), the difference in investment management fees that HIFSCO charged that Fund, as compared to the investment management fees that HIMCO charges its institutional clients, translates to over $8 million per year.

182.    That HIFSCO and its affiliates charge third parties far lower fees than they are charging the Hartford Funds, to whom they owe a fiduciary duty, for the same services, demonstrates that the investment management fees HIFSCO charged the Hartford Funds constitute a breach of HIFSCO's fiduciary duties to the funds with respect to such compensation.

### D.    THE HARTFORD FUNDS' BOARDS OF DIRECTORS WERE NOT ACTING CONSCIENTIOUSLY IN APPROVING THE INVESTMENT MANAGEMENT AGREEMENTS AND RULE 12b-1 DISTRIBUTION PLANS

183.    In *Jones*, the Supreme Court adopted a fiduciary duty standard for § 36(b) that requires both a fair outcome and good faith in the negotiation process. 130 S.Ct. at 1427.  Fund directors have a fiduciary duty to mutual funds and to their shareholders (who individually have no power to negotiate such fees for the funds) to negotiate fees that are both beneficial to the mutual funds and are comparable to fees that would be negotiated at arm's length.

184.    Congress has fortified fund directors' oversight responsibilities by adopting § 15(c) of the ICA, requiring directors to be adequately informed of the terms of any investment management contracts.

185.    ICA § 15(c), 15 U.S.C. § 80a-15(c) requires investment advisers to furnish documents and other information so that fund directors can make informed and independent decisions when evaluating investment advisory contracts.  This section also gives directors the authority to demand such information from advisers.  *Id.*

186.    When Hartford starts a new mutual fund, it not only contracts to provide all the services the fund needs, it also nominates and elects the members of the fund's Board (including all "independent"[17] Board members).

187.    Each of the Hartford Funds is governed by a Board of Directors.  The Boards of Directors for HMF and HMFII are composed of the identical nine people, who meet and make decisions for all of the Hartford Funds.  This same group of directors oversees and makes decisions for all 85 funds in the Hartford Funds Complex.[18] *See* Table I.

188.    The HMF and HMFII's Board of Directors are charged with the substantial supervision of the Funds.  According to the SAI, the Board: "(i) provides broad supervision over the affairs of [HMF and HMFII] and the Funds and (ii) elects officers who are responsible for the day-to-day operations of the Funds and the execution of policies formulated by the Boards of Directors."

189.    The Board members are compensated for their services with a fee that consists of an annual retainer component and a meeting fee component, as well as retirement benefits.  As a result of the compensation they receive, Board membership in the Hartford Funds Complex is a

---

[17] "Independent" board members are those who are not "interested persons" as defined under the 1940 Act. *See* 15 U.S.C. § 80a-2(a).

[18] All Directors of the HMF and HMFII also hold corresponding positions with the Hartford Series Fund, Inc. and the Hartford HLS Series Fund II, Inc. overseeing the 85 funds within the Hartford Funds Complex. *See* Table I.  Mutual funds contained within the Hartford Series Fund, Inc. and the Hartford HLS Series Fund II, Inc. are not at issue in this SAC.

lucrative part-time job for the Fund Directors. For the fiscal year ending October 31, 2010, according to publicly-available information, the Board members for the funds in the Hartford Funds Complex received total compensation in the following amounts:

| Lynn S. Birdsong | $187,500 |
| Dr. Robert M. Gavin | $261,500 |
| Duane E. Hill | $167,500 |
| Sandra S. Jaffee | $166,000 |
| William P. Johnston | $191,500 |
| Phillip O. Peterson | $191,500 |
| Lemma W. Senbet | $154,000 |
| Lowndes A. Smith | $183,000 |

190.    David N. Levenson is an "interested" director by virtue of his current position as a Hartford executive. Directors who are also employed by Hartford do not receive director compensation.

191.    Each Hartford Board, in this case the identical nine people for all 85 funds, has a separate and distinct fiduciary duty to each Hartford Fund to enter into serious and substantive negotiations with respect to all fees charged by Hartford Management, including HIFSCO. *See* Am. Bar. Ass'n, *Fund Director's Guidebook* (2d ed. 2003), at 10 ("Although there are areas of common interest among the funds, the directors must exercise their specific board responsibilities on a fund-by-fund basis."). Correspondingly, Hartford Management, including HIFSCO, has a reciprocal fiduciary duty to each mutual fund under its management, including each Hartford Fund, to assure that the fees it charges for services rendered are reasonably related to the services provided and correspond with fees that would be charged in an arm's length negotiation.

192.    The eight independent or "non-interested" directors are supposed to be "watchdogs" for the Funds' shareholders. However, since the same directors are charged with the oversight of all of the 85 mutual funds in the Hartford Funds Complex, regardless of the

dedication, sophistication, and the individual educational and business qualifications of the independent members of the Boards of Directors of the Hartford Funds, many of whom are otherwise fully employed in demanding positions of responsibility, the amount of documentation that must be reviewed for each meeting would be daunting if the directors were to look at each fund individually.

193.    Furthermore, even if statutorily "non-interested," the Trustees are in all practical respects dominated and unduly influenced by HIFSCO in reviewing the fees paid by the Hartford Funds and their shareholders.  The Directors' continuation in the role of an independent Director from year-to-year, and the compensation they earn, is at least partially dependent on the continued good will and support of HIFSCO.

### 1.    Investment Management Agreements

194.    HIFSCO must obtain the annual approval of the Boards for the investment management fee it seeks to charge each Hartford Fund pursuant to the Investment Management Agreements.

195.    As detailed below, the Boards failed to act conscientiously by continuing to approve substantially all of the investment management fees that HIFSCO charged to the Hartford Funds, but did not pay to the sub-advisers of each of the funds. The fee-setting process undertaken by the Boards lacked the requisite integrity, care and good faith, and was therefore defective.

196.    The Boards do not hold separate meetings for each mutual fund.  Instead, upon information and belief, the Boards' practice has been to consider all funds at one time.  The Boards approved the investment management fees HIFSCO requested, with respect to each of the Hartford Funds, over a four-day period. During this same four-day period, the same nine

individuals that compose the Boards of the Hartford Funds also approved the investment management fees for all 85 funds within the Hartford Funds Complex.

197.    According to each Hartford Fund's Annual Report, the information related to the Boards' discussion of the *Gartenberg* Factors is copied substantially verbatim for each Hartford Fund, and provides little supporting facts to conclude that the Boards undertook a thorough discussion of the relevant information for all 85 funds during their four-day meeting.

198.    Truly independent boards of directors acting conscientiously would not have tolerated the investment management fees charged by HIFSCO, which performed limited services for such fees that were predominately supervisory in nature, if they had obtained adequate information regarding, among other things: (1) the services provided by the funds' sub-advisers, and the fees they charged for such services, as compared to the investment management fees that HIFSCO charged for its minimal services to the funds; (2) the management fees charged and services provided by competitors with similar fund structures; (3) the management fees charged and services provided to pension funds and other institutional clients of HIFSCO or its affiliates; (4) the economies of scale enjoyed by HIFSCO; and (4) the profitability of the Hartford Funds to HIFSCO (and how to evaluate the profitability data in light of economies of scale).

199.    The Investment Sub-Advisory Agreements, which were accessible to the Boards, reveal that the sub-advisers rendered a substantial portion of the investment management services required for the Hartford Funds.  Thus, the Boards were not acting conscientiously when they approved investment management fees for HIFSCO that were at a minimum 139%, and at a maximum 576%, of the fees that were paid to the Hartford Funds' sub-advisers.

200.   With respect to the Investment Management Agreements between HIFSCO and the Hartford Funds, Robert Arena, who is listed as the President of HIFSCO, executed these agreements on behalf of both HIFSCO and the Hartford Funds.  This information, which was publicly available,  should have been a red flag to the Boards that the terms of the Investment Management Agreements, and the compensation paid to HIFSCO pursuant thereto, were not the product of an arm's-length negotiation as Mr. Arena executed this agreement on behalf of both HIFSCO and the Harford Funds.

201.   In light of the fact that the documents which revealed that the sub-advisers to the Hartford Funds performed the substantial portion of the investment management services for the funds, were publicly available, the Boards knew, or should have known, that they were approving  grossly excessive investment management fees for HIFSCO.  The Boards therefore violated  their  fiduciary  responsibilities  when  they  approved  the  excessive  investment management fees paid to HIFSCO.

202.   As further evidence that the Board was not acting conscientiously when it approved HIFSCO's advisory fees, HIFSCO has been the subject of an SEC Cease and Desist proceeding regarding its, and its affiliates, improper use of the Hartford Funds' (except for the Hartford Conservative Allocation Fund and the Hartford Inflation Plus Fund) assets. Specifically, according to a SEC Order issued on November 8, 2006,  "[f]rom at least January 2000 through December 2003 ... [HIFSCO] made material misrepresentations and omitted to state material facts to the shareholders and Boards [of the Hartford Funds] ... relating to their use of $51 million of Fund assets.." [i.e., fees]. In connection with this fraudulent scheme, the SEC found HIFSCO liable for misrepresentations made in SEC filings.

203.    Under the November 8, 2006 SEC Order setting forth the terms of the settlement reached with HIFSCO and two other HIG subsidiaries, resolving the SEC's Division of Enforcement's investigation, HIFSCO (along with the other two HIG subsidiaries) was ordered to pay $55 million to settle charges of misrepresenting and failing to disclose to HMF and HMFII fund shareholders that fund assets were improperly used, in the form of directed brokerage commissions, to satisfy financial obligations to certain broker-dealers for the marketing and distribution of funds. *Id.* at 3. The SEC found that HIFSCO's actions constituted a willful scheme of fraud or deceit, which included making misrepresentations in SEC filings. In light of the SEC Cease-and-Desist Order, the Boards should have been especially diligent and exerted greater scrutiny in reviewing and approving any HIFSCO fee agreements. *See Siemers v. Wells Fargo*, No. C-05-04518(WHA), 2006 WL 2355411 (N.D. Cal. Aug 14, 2006) (facts outside the one-year statutory period can be used as evidence to support plaintiffs' allegations regarding excessive investment management fees under Section 36(b) of the ICA).    A conscientious Board would not have approved large fees for an advisor who has been found to have committed fraud and deceit.

204.    Furthermore, the Hartford Global Health Fund and the Vanguard Health Fund are both managed by Wellington, yet the Hartford Fund has posted inferior performance in comparison to the comparable Vanguard Health Fund.   Thus, HIFSCO's minimal investment management services did not add any benefit to the Hartford Global Health Fund, and in fact, it arguably hindered the fund's performance in comparison to the Vanguard Health Fund. *See* Declaration of Steve Pomerantz Ph.D, Exhibit A,¶15.

205.    For the period of September 30, 2001 to September 30, 2011, the Hartford Global Health Fund earned an annualized return of 5.22% as compared to Vanguard's Health Care Fund

that earned 6.27%, for a net underperformance of 105 basis points per year. This is the approximate difference in fees charged between those two comparable funds. This analysis ignores any front-end sales load paid by Hartford investors, which the Vanguard investors do not pay. Amortizing this load over any time period will lower Hartford investors' returns even further. *See* Declaration of Steve Pomerantz Ph.D, Exhibit A,¶15.

206. It was apparent, or should have been apparent, to Hartford Global Health Fund's Board of Directors that, prior to the Board's decision to renew the Investment Management Agreement with HIFSCO, Vanguard's Wellington-managed health fund performed better than did Defendant's Wellington-managed health fund.

207. The Hartford Global Health Fund and the Vanguard Health Care Fund have the same investment philosophy, are both health funds and are both managed by Wellington.

208. Vanguard provided no investment management services in addition to those provided by Wellington in the management of the Vanguard Health Care Fund other than to review and evaluate Wellington's services.

209. For the Hartford Global Health Fund, HIFSCO charged an investment management fee to the shareholders of this fund that was approximately 139% greater than the investment management fee HIFSCO paid to Wellington.

210. The Directors of the Hartford Global Health Fund therefore failed to exercise a sufficient level of care and conscientiousness when they approved the Investment Management Agreements with HIFSCO given the fact that HIFSCO's claimed investment management services were considerably more expensive than Wellington's services, and HIFSCO's services did not result in any improved performance. In fact, the Hartford Global Health Fund performed worse than the comparable Vanguard Health Fund, which was managed by Wellington alone.

211.   Wellington is also the sub-adviser to both the Hartford Advisers Fund and the Vanguard Wellington Fund.  Further, Wellington is also the sub-adviser to both the Vanguard Morgan Growth Fund  and the Hartford Growth Opportunities Fund.   The investment philosophies between these Hartford and Vanguard Funds are also generally the same and these funds are appropriate for comparison (like above with respect to the Hartford Global Health Fund and the Vanguard Health Care Fund).   Therefore, Dr. Pomerantz was able to, and did, perform the above analysis he performed for the Hartford Global Health Fund, with respect to these funds, and reached the same material conclusions that he reached with regard to the Hartford Global Health Fund  A similar analysis cannot be performed for the HIMCO sub-advised Hartford Funds because HIMCO does not provide advisory or sub-advisory management services for other mutual funds. *See* Declaration of Steve Pomerantz Ph.D, Exhibit A,¶18.

212.   The Boards also were not acting conscientiously when they approved HIFSCO's breakpoints in the Investment Management Agreements, which were largely unattainable creating illusory benefits.   In fact, because the Boards approved HIFSCO's investment management fee breakpoint schedules for the Hartford Funds that were set so high and far apart as to be meaningless, two of the six Hartford Funds have not been able to avail themselves of even the first breakpoint. *See* ¶119.

213.   As further evidence that the Board was not acting conscientiously when it approved HIFSCO's advisory fees for the Hartford Advisers Fund for year ended October 31, 2010, despite the fact that the fund's net assets decreased from the previous year, the investment management fee went up in real dollar terms since such fees are based upon a percentage of assets under management. This fact is even more egregious given that, during this same time period, the Hartford Advisers Fund lost value and this fund's performance declined.

214.   Accordingly, the Boards did not act conscientiously and therefore breached their fiduciary duty when they approved HIFSCO's investment management fees. *See* ICA § 15(c), 15 U.S.C. § 80a-15(c).   The Board's lack of conscientiousness resulted in fees that are disproportionate to the value of the services rendered and therefore breach HIFSCO's fiduciary duty to the Funds under ICA § 36(b), 15 U.S.C. § 80a-35(b).

### 2.   12b-1 Distribution Plans

215.   In addition to their annual review of the Investment Management Agreements, the Directors must also review the 12b-1 Plans on an annual basis.   In particular, the directors must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued."  17 C.F.R. § 270.12b-1(d). In addition, minutes must be maintained to record all aspects of the directors' deliberation, and the directors must conclude "in light of their fiduciary duties under state law and under Sections 36(a) and (b) of the ICA, that there is a reasonable likelihood that the Distribution Plans will benefit the company and its shareholders."  17 C.F.R. § 270.12b-l(e).

216.   The HMF Distribution Plan and HMFII Distribution Plan, which are executed on behalf of the Hartford Funds, have not been adopted in accordance with these requirements.  In particular, the Boards could not have found that the Distribution Plans in general, or the 12b-1 fees in particular, benefit the Hartford Funds or their shareholders by generating savings from economies of scale in excess of the cost of the plan.  In fact, despite yearly increases in total assets held by the Hartford Funds, both the management fee and total 12b-l fees received by HIFSCO increased as assets grew, thus depriving the Hartford Funds of the benefit of these economies of scale.

217.    A recent report written by Dr. Lori Walsh, a financial economist at the SEC, studied "whether shareholders do, in fact, reap the benefits of 12b-1 plans", and concluded that shareholders, as distinguished from the fund advisers, do not benefit from 12b-1 fees:

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee. In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee. This study confirms these results using a more recent dataset . . . In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth. This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans. . . 12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund. Although it is hypothetically possible for most types of funds to generate sufficient scale economies to offset the 12b-1 fee, it is not an efficient use of shareholder assets. ... Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees.

Lori Walsh, *The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns* (2004), at 4, 18.

218.    The Boards failed to consider that Class B shares have been closed to new investments since September 30, 2009 and that Class B shareholders could not possibly derive any benefit from the 0.75% of the 12b-1 fee, which should be used for activity intended to result in the sale of the Hartford Funds' shares. The Boards also failed to consider that, despite the fact that HIFSCO touts the 12b-1 fee as having "the ability to provide investors with an alternative to paying front-end sales loads," Class A shareholders are charged a 12b-1 fee in addition to a significant front-end sales load.

219.    Despite the fact that Plaintiffs and the other shareholders of the Hartford Funds have enjoyed minimal benefits from the HMF and HMFII Distribution Plans, and despite the fact that the Distribution Plans have allowed HIFSCO to extract additional unreasonable and

excessive compensation from Plaintiffs and the other shareholders of the funds, the Hartford Funds' Directors nevertheless have continued to approve, year after year, continuation of the Distribution Plans in violation of both Rule 12b-1 and ICA §§ 12 thereby establishing a violation of § 36(b).

220.   A truly independent board would not have tolerated the 12b-1 fees charged by HIFSCO if it had obtained adequate information regarding the Distribution Plans and the benefit (or lack thereof) to the shareholders of the Plans (such as whether the Distribution Plans should have been implemented and whether they should have been continued).

221.   Based on the foregoing, the Hartford Funds Boards did not, and, indeed, were unable to, act conscientiously and fulfill their fiduciary duty when they approved fees.   In contravention of its duty to provide to the Boards all information necessary to evaluate terms of the Hartford Funds Investment Management Agreements and Distribution Plans, HIFSCO did not furnish such necessary information to the Boards for purposes of their review of the Hartford Funds' investment management agreements and 12b-1 Distribution Plans. *See* 15 U.S.C. § 80a-15(c); 17 C.F.R. § 270.12b-1(d).   Thus, the Boards were unable to conduct informed arm's-length negotiations when approving the fees charged to the Funds.

222.   Alternatively, if HIFSCO did provide the Boards with the necessary information to review the Hartford Funds' Investment Management Agreements and 12b-1 Distribution Plans, then the Boards acted unconscientiously by continuing to approve the excessive investment management and 12b-1 fees.

223.   The Supreme Court has instructed that where, as here, "the board's process was deficient [and/] or the adviser withheld important information, the court must take a more rigorous look at the outcome." *Jones*, 120 S. Ct. at 1430. As described herein, the deficient fee-

setting process resulted in fees that constitute a § 36(b) breach of HIFSCO's fiduciary duty to the Funds with respect to such compensation.

### E.   THE COSTS AND PROFITABILITY OF PROVIDING INVESTMENT MANAGEMENT AND DISTRIBUTION SERVICES DID NOT JUSTIFY HIFSCO'S EXCESSIVE FEE

224.   "[T]he 'profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its advisor be equivalent to 'the product of arm's-length bargaining.'" *See* Freeman & Brown Study, at 661.   The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.

225.   HIFSCO's incremental costs of providing management services to Plaintiffs are not substantial, while the additional fees received by HIFSCO are unreasonable and hugely excessive given that the nature, quality, and level of the services remain the same in breach of HIFSCO's fiduciary duty to the Hartford Funds with respect to such compensation.   On information and belief, a review of HIFSCO's full costs of providing management services will also demonstrate the enormous profitability to HIFSCO in managing the Hartford Funds.

226.   The table in paragraph 46 shows the investment management fee schedule that HIFSCO charges to each of the Hartford Funds as compared to the fee schedule that HIFSCO pays its sub-advisers to whom HIFSCO delegates the core of the investment management duties.

227.   While fees of less than 1% may seem inconsequential, these percentages translate into substantial fees when applied to Fund assets in the hundreds of millions, or even billions, of dollars.

228.   In 2010 alone, HIFSCO was paid a total of $157,636,769  in investment management fees from the Hartford Funds at issue in this SAC. *See* ¶46.   Of that sum, HIFSCO paid Wellington and HIMCO $57,583,826  for sub-advisory services, retaining $100,052,943 for

itself despite providing minimal additional management services that are predominately supervisory in nature to the Funds. *Id.* HIFSCO has collected investment management fees of over $300 thousand per year for its smallest funds (while paying the sub-adviser only $53 thousand per year) to over $76 million per year for the largest funds (while paying the sub-adviser approximately $48 million). *Id.*

229.   "[F]und managers … routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge.  True, the sub-adviser may charge only 30 bps for its investment advice, but the manager will typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory charge to fund shareholders." *See* John P. Freeman, Stewart L. Brown and Steve Pomerantz, *Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Test*, 61 OKLA. L. REV. 83, 117-118 (2008).  Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house." *Id.* at 118.  As demonstrated above, HIFSCO is no different, padding the bill by over $100 million dollars in fiscal year 2010 alone, for providing limited investment management services that are supervisory in nature to the Hartford Funds.

230.   HIFSCO's fees do not equal the fees charged by the sub-advisers, as suggested by Messrs. Freeman, Brown and Pomerantz.  Rather, on average, HIFSCO's fees exceed the sub-advisers fees by 305%.

231.   Despite delegating a substantial portion of its investment management duties to sub-advisers and performing minimal additional work that was predominately supervisory in nature, HIFSCO charged, on average, fees that were 305% greater than the investment management fees that were paid to the sub-advisers.

232.   Put another way, the true cost of investment management services should correlate to the fees charged by Wellington and/or HIMCO.  In fact, as an external, for-profit sub-adviser, the fees charged by Wellington to HIFSCO include Wellington's costs plus, presumably, a reasonable profit.

233.   While Wellington's fees are much smaller than HIFSCO's fee, upon information and belief, Wellington still makes a profit.

234.   The Hartford Disclosure Materials characterize the HIMCO fees charged as "at cost."   Assuming *arguendo* that HIMCO's "at cost" fee represents the actual cost of performing services, HIFSCO's fee, which ranges from approximately 4.4 to 5.7 times higher than HIMCO's "cost," is grossly disproportionate to the value of the services it actually provides to the Hartford Funds. *See* Table at ¶46.

235.   Further assuming that HIMCO's sub-advisory services truly are provided "at cost" and do not include any markup or built-in profit, HIMCO's cost to provide advisory services to the Hartford Inflation Plus Fund and the Hartford Conservative Allocation Fund, in 2010 were at most approximately 8 basis points and  2 basis points, respectively.  For providing limited additional investment management services to the Funds, HIFSCO nevertheless charged the Hartford Inflation Plus Fund a fee that is nearly 4.5 (450%) times, and in the case of the Hartford Conservative Allocation Fund a fee that is 5.7 (576%) times, HIMCO's costs.

236.   This subcontracting arrangement led to fees that were disproportionate to value of the services actually rendered and to enormous profits to HIFSCO for minimal investment management work that is supervisory in nature.

237.   In addition, HIFSCO enjoys enormous economies of scale, which translates into profits for HIFSCO.   HIFSCO's advisory services do not increase since the same entities

(Wellington or HIMCO) have served as the sub-advisers to the Hartford Funds for numerous years, which has allowed HIFSCO to avoid significant costs in their annual evaluation.

238.    Further, the investment philosophies of each fund has remained unchanged, which has allowed HIFSCO to avoid the costs of implementing new investment programs.

239.    Wellington and HIMCO perform sub-advisory services for all of the HIFSCO funds in the Hartford Funds Complex.    Therefore, much of HIFSCO's review work is duplicative.

240.    In addition, HIFSCO's percentage and absolute fees grow as each sub-adviser's fee breakpoint is reached.  HIFSCO realizes the portion of the investment management fee paid to each sub-adviser when a sub-adviser's fee breakpoint is reached.  Rather than passing these savings onto the funds' investors, HIFSCO retains the savings for itself.  However, the true cost of HIFSCO's advisory services does not increase because a sub-adviser achieves a breakpoint. Thus, HIFSCO enjoys economies of scale.

241.    These markups resulted in fees that are disproportionate to services rendered, and could not be the product of negotiations conducted at arm's length and therefore constitute a breach of HIFSCO's fiduciary duty to the Funds with respect to the receipt of such compensation.

242.    HIFSCO has also collected 12b-1 distribution fees of almost $41 million for the Class A and Class B shares of the Hartford Funds.  *See* the following table.

### 2010 HARTFORD FUNDS 12B-1 DISTRIBUTION FEES PURSUANT TO THE SAI

| Fund | Class A | Class B | TOTAL |
|---|---|---|---|
| Hartford Advisers Fund | $1,434,934 | $602,421 | 2,037,355 |
| Hartford Growth Opportunities Fund | $1,637,984 | $359,545 | 1,997,529 |
| Hartford Inflation Plus Fund | $1,900,245 | $1,028,542 | $2,928,787 |
| Hartford Conservative Allocation Fund | $375,236 | $240,498 | $615,734 |

| | | | |
|---|---|---|---|
| Hartford Global Health Fund | $618,259 | $282,094 | $900,353 |
| Hartford Capital Appreciation Fund | $23,147,151 | $9,286,834 | $32,433,985 |
| **TOTALS** | **$29,113,809** | **$11,799,934** | **$40,913,743** |

243.   The cost of providing distribution and marketing services does not justify charging such an excessive fee, especially since Class B shares are closed to new investments, Class A shareholders are paying a significant front-end sales load in addition to paying the 12b-1 fee, and the 12b-1 fee is not tied to any distribution activity.

244.   The 12b-1 fees were therefore disproportionate to the services actually rendered resulting in huge profits for HIFSCO, and therefore constitute a breach of HIFSCO's fiduciary duty to the Funds with receipt of such compensation.

## COUNT I

### AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b) DERIVATIVELY ON BEHALF OF THE HARTFORD FUNDS

#### (Investment Management Fees)

245.    The Plaintiffs repeat and re-allege each and every allegation contained in this Second Amended Complaint as if fully set forth herein.

246.    HIFSCO had a fiduciary duty to the Hartford Funds and their investors with respect to the receipt of compensation for services and payments of a material nature made by and to HIFSCO.

247.    The fees charged by HIFSCO for providing investment management services to the Hartford Funds breached HIFSCO's fiduciary duty to the Hartford Funds with respect to such compensation.

248.    This Count is brought by Plaintiffs derivatively on behalf of the Hartford Funds against HIFSCO for breach of its fiduciary duties with respect to the receipt of compensation as defined by § 36(b).

249.    The excessive fees received by HIFSCO were in breach of its fiduciary duties to the Hartford Funds with respect to such compensation.  By reason of the conduct described in this Second Amended Complaint, HIFSCO violated § 36(b) of the ICA.

250.    As a direct, proximate and foreseeable result of HIFSCO's breaches of fiduciary duties in its role as investment adviser to the Hartford Funds and their investors, the Hartford Funds and their shareholders have sustained many millions of dollars in damages.

251.    In charging and receiving inappropriate, unlawful and excessive compensation, and in failing to put the interests of the Plaintiffs, and other shareholders of the Hartford Funds

ahead of its own interests, HIFSCO has breached and continues to breach its statutory fiduciary duty to Plaintiffs in violation of § 36(b).

252.    The Plaintiffs seek, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by HIFSCO, up to and including, "the amount of compensation or payments received from" the Hartford Funds and earnings that would have accrued to Plaintiffs had that compensation not been paid.

253.    Alternatively, the Plaintiffs seek rescission of the contracts and restitution of all the excessive fees paid pursuant thereto. *See* ICA § 47(b), 15 U.S.C. § 80a-46(a-b). When a violation of the ICA has occurred, a court may order that the Investment Management Agreements between HIFSCO and the Hartford Funds, on behalf of the Hartford Funds, be rescinded, thereby requiring restitution of all investment management fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## COUNT II

### AGAINST DEFENDANT HIFSCO PURSUANT TO ICA § 36(b) DERIVATIVELY ON BEHALF OF THE HARTFORD FUNDS

#### (Unreasonable and Excessive Rule 12b-1 Distribution Fees and Extraction of Additional Compensation for Investment Management Services)

254.    The Plaintiffs repeat and re-allege each and every allegation contained in this Second Amended Complaint as if fully set forth herein.

255.    The 12b-1 fees charged and received by HIFSCO were designed to, and did, extract additional compensation for HIFSCO's management services in violation of HIFSCO's fiduciary duty under ICA § 36(b).  Even to the extent that the 12b-1 fees contributed to the growth in assets of the Hartford Funds, the resulting economies of scale benefited only HIFSCO, and not the Hartford Funds or their security holders, such as the Plaintiffs.

256.    In failing to pass along economies-of-scale benefits from the 12b-1 fees, and in continuing to assess 12b-1 fees pursuant to the HMF Distribution Plan and the HMFII Distribution Plan despite the fact that minimal, if any, benefits inured to the Hartford Funds or their shareholders, HIFSCO has violated, and continues to violate, the ICA and has breached and continues to breach its statutory fiduciary duty to Plaintiffs and the Hartford Funds in violation of § 36(b), both as a result of a negotiation process that lacked good faith and integrity and/or with respect to the substantive amounts of the fees.

257.    Plaintiffs seek, pursuant to ICA § 36(b)(3), the "actual damages resulting from the breach of fiduciary duty" by HIFSCO, up to and including, the excessive "amount of compensation or payments received from" the Hartford Funds as well as earnings that would have accrued to Plaintiffs had that compensation not been paid. With respect to the Class B shares of the Hartford Funds, Plaintiffs seek 0.75% of the 12b-1 fee charged to, and paid by, the

Plaintiffs and other security holders of the Hartford Funds that was intended to be used for marketing and distribution services.   With respect to Class A shares of the Hartford Funds, Plaintiffs seek to recover the full amount of the 12b-1 fee charged to, and paid by the Plaintiffs and other security holders of the Hartford Funds.

258.   Alternatively, the Plaintiffs seek rescission of the HMF Distribution Plan and the HMFII Distribution Plan and restitution of all of the excessive fees paid pursuant thereto. *See* ICA § 47(a-b), 15 U.S.C. § 80a-46(a-b) of the ICA.  When a violation of the ICA has occurred, a court may order that the contracts between HIFSCO and the Hartford Funds, on behalf of the Hartford Funds, be rescinded, thereby requiring restitution of all 12b-1 fees paid to it by the Hartford Funds from one year prior to the commencement of this action through the date of trial, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum permitted by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

(1) An order declaring that HIFSCO has violated and continues to violate ICA §§ 12, 36(b) and Rule 12b-1 through the receipt of fees from the Hartford Funds that breach HIFSCO's fiduciary duty with respect to the receipt of compensation.

(2) An order preliminarily and permanently enjoining HIFSCO from further violations of the ICA.

(3) An order awarding compensatory damages on behalf of the Hartford Funds against HIFSCO, including repayment of all unlawful and/or excessive investment management and 12b-1 fees paid to it by the Hartford Funds or their security holders from one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.  Plaintiff reserves the right to seek punitive damages where applicable.

(4) An order rescinding the Investment Management Agreements between HIFSCO and the Hartford Funds (and/or HMF and HMFII); and rescinding the HMF Distribution Plan and the HMFII Distribution Plan between HIFSCO and the Hartford Funds, pursuant to ICA § 47(b), 15 U.S.C. § 80a-46(b), including restitution of the excessive investment management fees and 12b-1 fees paid to HIFSCO by the Hartford Funds from a period commencing one year prior to the commencement of this action through the date of the trial of this case, together with interest, costs, disbursements, attorneys' fees, fees of expert witnesses, and such other items as may be allowed to the maximum extent permitted by law.

(5) The Plaintiffs respectfully request a trial by jury for all issues above so triable.

(6) Such other and further relief as may be just and proper under the circumstances.

Dated: November 14, 2011

Respectfully submitted,

**SZAFERMAN, LAKIND, BLUMSTEIN, & BLADER, P.C.**

/s/ Robert Lakind
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
(609) 275-4511

**LEVY PHILLIPS & KONIGSBERG, LLP**

/s/ Moshe Maimon
Moshe Maimon
800 Third Ave.
New York, NY 10022
(212) 605-6200

*Attorneys for Plaintiffs*

**TABLE I**

**HARTFORD FINANCIAL SERVICES GROUP, INC.**
# HIG

**HARTFORD FUNDS COMPLEX**
**(including 4 investment management companies containing 85 funds)**

BOARDS OF DIRECTORS
SAME 9 PEOPLE
FOR ALL 85 FUNDS
(contained in 4 investment
management companies)

**DEFENDANT HIFSCO**
**(wholly owned subsidiary of HIG)**

**INVESTMENT ADVISER/MANAGER FOR ALL FUNDS**
**AT ISSUE IN THIS COMPLAINT**

- **provides management and distribution services**
- **collects management fees & 12b-1 fees**

**HARTFORD MUTUAL FUNDS, INC.**
**HMF**
Advisers Fund
Global Health Fund
Inflation Plus Fund
Conservative Allocation Fund
Capital Appreciation Fund

**HARTFORD MUTUAL FUNDS II, INC.**
**HMFII**

Growth Opportunities Fund

**HARTFORD HLS SERIES FUND II, INC.**
**HARTFORD SERIES FUND, INC.**
**(Hartford investment management companies with funds that are**
**not at issue in this complaint)**

# TABLE II

## HMF
**open-end management investment company registered under the ICA**

### ADVISERS FUND
Adviser:          **HIFSCO**
                  **<u>Fees</u>: Advisory**
                           **12b-1**
Sub-adviser:   **WELLINGTON**
                  <u>Fees</u>: Sub-advisory (not challenged in Complaint)

### GLOBAL HEALTH FUND
Adviser:          **HIFSCO**
                  **<u>Fees</u>: Advisory**
                           **12b-1**
Sub-adviser:   **WELLINGTON**
                  <u>Fees</u>: Sub-advisory (not challenged in Complaint)

### INFLATION PLUS FUND
Adviser:          **HIFSCO**
                  **<u>Fees</u>: Advisory**
                           **12b-1**
Sub-adviser:   **HIMCO**
                  <u>Fees</u>: Sub-advisory (not challenged in Complaint)

### CONSERVATIVE ALLOCATION FUND
Adviser:          **HIFSCO**
                  **Fees: Advisory**
                         **12b-1**
Sub-adviser:   **HIMCO**
                  <u>Fees</u>: Sub-advisory (not challenged in Complaint)

### CAPITAL APPRECIATION  FUND
Adviser:          **HIFSCO**
                  **<u>Fees</u>:    Advisory**
                         **12b-1**
Sub-adviser:   **WELLINGTON**
                  <u>Fees</u>: Sub-advisory (not challenged in Complaint)

## HMFII
**open-end management investment company registered under the ICA**

### GROWTH OPPORTUNITIES FUND
Adviser:          **HIFSCO**
                  **<u>Fees</u>: Advisory**
                         **12b-1**
Sub-Adviser:   **WELLINGTON**
                  <u>Fees</u>:  Sub-advisory (not challenged in Complaint)