**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, and LINDA A. RUSSELL, et al., | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | ) ) |
| | ) |
| Defendant. | ) |
|_____| ) |

Civil Action No. 11-cv-1083 (RMB) (AMD)

Motion Date:  May 7, 2012
Oral Argument Requested
Document Filed Electronically

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

**RIKER DANZIG SCHERER HYLAND PERETTI LLP**
By:     Anthony J. Sylvester
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800 (tel)
(973) 538-1984 (fax)
asylvester@RIKER.com

**ROPES & GRAY LLP**
By:     Harvey J. Wolkoff
          Robert A. Skinner
          Allison M. Boscarine
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
(617) 951-7000

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...........................................................................................................5

1.      Investment Management Agreement and Sub-Advisory Agreements ...............................6

2.      Distribution Plans and 12b-1 Fees ...............................................................................8

ARGUMENT .................................................................................................................9

I.      MOST OF COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE
INVESTMENT MANAGEMENT FEES UNDER § 36(B) OF THE ICA ......................9

     A.      The SAC's Comparison of Sub-Advisory Fees and Services Fails to Plead Facts
Specific to HIFSCO that Plausibly Allege that HIFSCO's Fees Were "So
Disproportionately Large" Under *Jones* ............................................................ 10

     B.      The SAC's Allegations that HIFSCO Charges Higher Fees than Vanguard Does
Not Plausibly Support a Claim that HIFSCO's Fees Were "So Disproportionately
Large" Under *Jones* ............................................................................................ 16

     C.      Plaintiffs' Theory of Liability Based on Comparison to Institutional Fees Should
Be Limited to the Single Fund as to which the SAC Alleges Facts .................... 17

II.      COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION
AND SERVICE FEES UNDER § 36(B) OF THE ICA .................................................19

     A.      The SAC Does Not Allege a Plausible Claim for Excessive Distribution and
Service Fees under § 36(b), But Merely Quarrels with the Policies Behind Rule
12b-1 Fees .......................................................................................................... 19

     B.      Plaintiffs' Contention that 12b-1 Fees Cannot Be Charged on Class A Shares if
Sales Loads Are also Charged Is Baseless .......................................................... 20

     C.      Plaintiffs' Allegations that Ongoing Distribution and Servicing Fees Cannot Be
Charged to Share Classes that are Closed Has No Support and Is Legally Incorrect
.............................................................................................................................. 23

         1.      Plaintiffs lack Article III standing to pursue Count II with respect to Class
B shares. ................................................................................................... 23

         2.      Plaintiffs' Class B allegations cannot meet the plausibility standard of
*Iqbal* and *Twombly* ................................................................................. 25

CONCLUSION ..........................................................................................................288

## TABLE OF AUTHORITIES

CASES

*Allen v. Wright,*
    468 U.S. 737 (1984)................................................................................................23

*Amron v. Morgan Stanley Inv. Advisors, Inc.,*
    464 F.3d 338 (2d Cir. 2006)...........................................................................16, 17

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009) ................................................................................. passim

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... passim

*DaimlerChrysler Corp. v. Cuno,*
    126 S. Ct. 1854 (2006) ..........................................................................................23

*DeMarco v. Depotech Corp.,*
    149 F. Supp. 2d 1212 (S.D. Cal. 2001).................................................................14

*Domino's Pizza LLC v. Deak,*
    No. 09-3772, 383 Fed. App'x 155 (3d Cir. 2010) .................................................14

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009).................................................................................9, 20

*Gollust v. Mendell,*
    501 U.S. 115 (1991)...............................................................................................24

*In re American Mutual Funds Fee Litigation,*
    No. 04-civ-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009)...........................24

*In re Goldman Sachs Mut. Funds Fee Litig.,*
    No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006)............................26

*In re Mut. Funds Inv. Litig.,*
    519 F. Supp. 2d 580 (D. Md. 2007) ......................................................................24

*In re Viropharma, Inc., Sec. Litig.,*
    No. 02-civ-1627, 2003 WL 1824914 (E.D. Pa. Apr. 7, 2003)...............................14

*ING Principal Protection Funds Deriv. Litig.,*
    369 F. Supp. 2d 163 (D. Mass. 2005) ..............................................................19, 26

*Kalish v. Franklin Advisers, Inc.,*
    742 F. Supp. 1222 (S.D.N.Y. 1990)......................................................................16

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
    248 F.3d 321 (4th Cir. 2001) ...............................................................................18

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993) .................................................................................6

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
    632 F.3d 762 (1st Cir. 2011) ...............................................................................24

*Rose v. Bartle*,
    871 F.2d 331 (3d Cir. 1989)................................................................................13

*Santiago v. Warminster Township*,
    629 F.3d 121 (3d Cir. 2010)........................................................................5, 9, 28

*Schuyt v. Rowe Price Prime Reserve Fund Inc.*,
    663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) ...................16

*Turner v. Davis Select Advisers LP*,
    No. 08-civ-421 (D. Ariz. Jun. 1, 2011) ....................................................16, 24, 25

*Warth v. Seldin*,
    422 U.S. 490 (1975)............................................................................................23

*Yameen v. Eaton Vance Distribs., Inc.*,
    394 F. Supp. 2d 350 (D. Mass. 2005) ..............................................................26, 27

STATUTES

15 U.S.C. § 80a-35(b) ................................................................................... passim

OTHER AUTHORITIES

75 Fed. Reg. 47064 ...............................................................................................21

Fed. R. Civ. P. 8(a) .................................................................................................9

Fed. R. Civ. P. 12(b)(6)...........................................................................................1

Office of Investor Education and Advocacy, U.S. Securities and Exchange Commission,
    Mutual Funds: A Guide for Investors, http://www.sec.gov/investor/pubs/sec-guide-
    to-mutual-funds.pdf .........................................................................................21

Division of Investment Management, U.S. Securities and Exchange Commission, Report
    on Mutual Fund Fees and Expenses, http://www.sec.gov/news/studies/feestudy.htm............20

Mutual Fund Classes, U.S. Securities and Exchange Commission,
    http://www.sec.gov/answers/mfclass.htm..............................................................27

U.S. Securities and Exchange Commission, *Mutual Fund Fees and Expenses*,
http://www.sec.gov/answers/ mffees.htm ................................................................................13

Plaintiffs bring this action purportedly on behalf of the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund, and the Hartford Capital Appreciation Fund (collectively, "the Funds" or "the Hartford Funds"), against the Funds' investment manager and distributor, defendant Hartford Investment Financial Services, LLC ("HIFSCO"), alleging that fees paid by the Funds to HIFSCO violated § 36(b) of the Investment Company Act of 1940 (the "ICA"). HIFSCO moves to dismiss the Second Amended Complaint (the "SAC") pursuant to Fed. R. Civ. P. 12(b)(6) because, as was the case with the Amended Complaint (the "AC"), the SAC fails to state a claim upon which relief can be granted under the stringent pleading requirements established by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## PRELIMINARY STATEMENT

After oral argument on September 8, 2011, this Court granted HIFSCO's motion to dismiss Plaintiffs' allegations that HIFSCO's investment fees are excessive because HIFSCO purportedly delegated "all the work" to sub-advisers for a lower fee than HIFSCO's; however, the Court gave Plaintiffs an opportunity to re-plead. The Court also invited additional briefing on Plaintiffs' allegation that HIFSCO's investment fees are excessive because the fees of one other fund family, Vanguard, are lower than HIFSCO's. Similarly, the Court also dismissed – but with leave to re-plead – Plaintiffs' allegations about HIFSCO's 12(b)(1) fees, except for the Class B shares, as to which the Court again invited additional briefing. *See* Oral Argument Tr. ("Tr.") 69:25-73:1[1] The Court also reached the same decision in a similar case involving six other HIFSCO funds, *Southworth v. HIFSCO*, No. 1:10-cv-00878-RMB (D. Del.). In apparent

_____

[1] The Court let stand Plaintiffs' investment fee allegations about institutional investors. *Id.*

recognition of the futility of any amendment, the plaintiff in *Southworth* voluntarily dismissed her case with prejudice following the Court's decision. Although the Court afforded Plaintiffs here the opportunity to re-plead, the SAC continues to suffer from the same fatal flaws as the AC, and these allegations should be dismissed, this time with prejudice.

The SAC's Count I on investment management fees continues to make the same allegations as the AC, except to scale back the claim that the sub-adviser performs "virtually all" the services to an allegation that the sub-advisers perform "substantially all" the services. *Compare* AC ¶ 68 *with* SAC ¶¶ 51, 53, 79. But this semantic change cannot and does not mask the lack of factual underpinning that is fatal to Plaintiffs' claim. The Investment Management Agreement ("IMA") referenced in the SAC states clearly that HIFSCO provides both investment management services and administrative services to the Funds. Nonetheless, the SAC conclusorily assumes that "substantially all" of the investment management services are delegated to the sub-adviser, and then states that the delegated portion of the services are "generally the most expensive" based on supposed *general industry* experience. *See* SAC ¶ 52. With respect to the *administrative* services also set forth in the IMA, the SAC asserts without support that these services *might* actually be paid for with other fees charged to the Funds – ignoring the IMA's provisions to the contrary – and contends that any such services that HIFSCO actually *does* provide under the IMA "should not be" very expensive. *See* SAC ¶¶ 57- 73. In support of these allegations, Plaintiffs have submitted a declaration from a purported industry expert as a substitute for the law review article they unsuccessfully relied on before this Court in support of their AC. However, while Plaintiffs fail to mention it, the declarant is the same person who authored the law review article and, in fact, the declaration is no more than a regurgitation of the law review article's general points about the industry – with nothing to say

about HIFSCO in particular, as the Court recognized at oral argument. Moreover, it is well-established that reliance on an expert declaration is improper at the pleading stage.

At bottom, Plaintiffs' sub-advisory allegations remain as flawed as in the AC and provide no plausible basis to conclude that *HIFSCO's* investment management fees were "so disproportionately large" that they "*could not* have been the product of arm's length bargaining." This is particularly true where, as here, the Funds have an independent board of directors who negotiate and approve the fees annually as part of the IMA. Indeed, it is conspicuous that Plaintiffs still fail to bring to the Court's attention a single piece of information that the board allegedly did not possess or consider in making its decision to approve the IMA. *See infra* at 10-16.

Similarly, Plaintiffs' comparison of HIFSCO's investment management fees in Count I to the fees charged by Vanguard – a not-for-profit entity specifically organized and marketed as a low-cost provider – does not plausibly support a conclusion that HIFSCO's fees violate the "so disproportionately large" standard. Courts have repeatedly rejected similar attempts by plaintiffs in § 36(b) cases to use Vanguard as a bellwether standard, when in fact Vanguard is nothing more than a single data point at the very bottom end of the range. More significant than the SAC's mention of Vanguard is what the SAC omits: it says nothing about where the Hartford Funds' fees fall within the range of those charged by comparable peer funds, notwithstanding that this information is readily available from the same source as Plaintiffs' information about Hartford and Vanguard, *i.e.*, the public fee disclosures required of every mutual fund. *See infra* at 16-17.

With respect to Count II on distribution and service fees (commonly known as "12b-1 fees"), the SAC continues to substitute general attacks on 12b-1 fees for specific facts as to why

HIFSCO's 12b-1 fees are allegedly excessive in light of the services provided. Accordingly, the SAC does not even attempt to address the Court's invitation to re-plead the complaint with specific facts. Indeed, Plaintiffs still allege nothing at all about the quantity or quality of the distribution and servicing provided in exchange for the fee, or whether the size of the fee bears a reasonable relationship to those services. Instead, the SAC recounts general commentary criticizing 12b-1 fees, and then relies on this criticism to conclusorily assert that the Hartford Funds' shareholders obtained "minimal, if any, benefits" from them, SAC ¶ 256, and that the fees are "substantially a waste of fund assets." SAC ¶ 98. But as this Court previously recognized at oral argument, this policy debate (in which the SEC, among others, is on the other side) has no place in a lawsuit, and does not form a plausible factual basis for an excessive fee claim under *Jones*. *See* Tr. 110:5-7; *infra* at 19-20.

Plaintiffs then contend that the 12b-1 fees charged to Class A shareholders are *per se* excessive because this class of shareholders pay 12b-1 fees in addition to a front-end sales commission, or "load." SAC ¶¶ 92-93. At oral argument and again in the SAC, Plaintiffs suggest that HIFSCO falsely represented in public filings with the SEC that the 12b-1 fees charged to fund shareholders would be an "alternative" to paying front-end sales loads. *Id.*; Tr. 95:11-25, 100:19-20 ("[HIFSCO] said it's an alternative, one excludes the other."). But this argument is flatly contradicted by the very document relied on by Plaintiffs for their contention. This disclosure, as well as others filed with the SEC, clearly explains that certain classes of shareholders pay only sales loads, others pay only 12b-1 fees, and Class A shareholders pay a combination of both. *See infra* at 20-23.

Plaintiffs also challenge the 12b-1 fees on the Funds' Class B shares because this class was closed to new investors. As an initial matter, the named Plaintiffs have no standing under

Article III of the U.S. Constitution to assert this theory given that none of them owns any Class B shares.  Since no Plaintiff pays the Class B share 12b-1 fee, none has any personal stake in the outcome of a challenge to that fee.  *See infra* at 23-25.  Even if they had standing, however, Plaintiffs fail to state a claim.  There is simply nothing *per se* inappropriate about charging a distribution and service fee for a closed share class.  To the contrary, as set forth in the disclosures and recognized by the SEC, the bulk of a Class B 12b-1 fee is charged in lieu of the up-front sales load that the Class B shareholders do not pay.  *See infra* at 25-28.

Like its predecessors, the SAC is at bottom grounded on Plaintiffs' hope that they can embark on discovery and find evidence to prove there was something wrong with the Hartford Fund fees.  But such a hope, supported only by conclusory assertions, does not allege a plausible basis for relief under the Supreme Court precedent, and the Third Circuit has been clear that supposed "asymmetries" in information at the pleading stage do not justify subjecting defendants to burdensome discovery so that plaintiffs can search further for a plausible case.  *See, e.g.*, *Santiago v. Warminster Township*, 629 F.3d 121, 134 n.10 (3d Cir. 2010).  Indeed, if the SAC passes muster, the same general pleading could be asserted against virtually any fund complex by merely switching the names and fee schedules.

## BACKGROUND

In its Order of September 13, 2011, this Court ruled upon HIFSCO's previous motions to dismiss the AC in this action and the very similar complaint in *Southworth*.  In its oral ruling at the September 8, 2011 hearing, the Court addressed whether each of Plaintiffs' primary theories or "sub-allegations" set forth a plausible claim for § 36(b) liability under the *Twombly*/*Iqbal* pleading standard.  In light of the Court's Order, the *Southworth* plaintiffs elected not to pursue their claims, voluntarily dismissing that action with prejudice on November 7, 2011.  Plaintiffs in

this action are proceeding, however, and filed the SAC on November 14, 2011.[2] Following are

salient background facts relevant to Plaintiffs' sub-allegations addressed in this Motion. For the

sake of brevity, HIFSCO has not repeated the general background facts set forth in the prior

motions, which are incorporated here by reference.

1.     **Investment Management Agreement and Sub-Advisory Agreements**

The IMA entered into annually between the Funds and HIFSCO – following approval by

the Funds' Board of Directors – sets forth both investment management services and

administrative services that HIFSCO agrees to provide to the Funds. Ex. 1 at 716; Ex. 2 at

738.[3]Each of the Funds is sub-advised by either Wellington Management Company LLP

("Wellington") or Hartford Investment Management Company ("HIMCO"), pursuant to a sub-

advisory agreement that delegates *some* of HIFSCO's investment management duties. Exs. 22,

23. The rest of the investment management services and all the administrative services remain

the responsibility of HIFSCO – including oversight and responsibility for any termination or

replacement of the sub-advisers, oversight of other third-party service providers (who provide

services such as transfer agency and fund accounting pursuant to separate agreements), provision

of personnel to serve as Fund officers, provision of office space for Fund operations, support of

---

[2] The SAC has dropped without explanation one of the six Funds at issue in the prior complaints,
the Hartford Money Market Fund. The SAC also asserts claims with respect to an additional
Fund, the Hartford Capital Appreciation Fund, which was not included in the prior *Kasilag*
complaints.

[3] Unless otherwise noted, all Exhibits referenced in this Memorandum refer to Exhibits to the
Certification of Robert A. Skinner, dated January 17, 2012, filed contemporaneously herewith.
Although the prior complaints attached the contracts at issue in this case, the SAC does not.
Nonetheless, these documents are properly considered on a motion to dismiss because Plaintiffs'
claims are based upon them, and, in some cases, explicitly refer to them. *See Pension Ben.
Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("Otherwise, a
plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to
attach a dispositive document on which it relied.").

the Fund Board of Directors' oversight function and contract negotiations, and regulatory and legal support.  Ex. 1 at 716; Ex. 2 at 738.

The IMA and the sub-advisory agreements are reviewed and approved annually by the Board of Directors.  This process consists of multiple meetings of the Board with independent legal counsel, with an independent financial services consulting firm, with fund industry consultant Lipper Inc., and with HIFSCO representatives.  *See* Ex. 5 (Advisers Fund Annual Report dated October 31, 2010, at 36).  As described in the Funds' Annual Reports, the Board undertakes a robust process involving multiple rounds of requests for information made to the investment managers, independent consultants, and counsel about each of the Funds, followed by at least two separate meetings to review and approve the contracts and fee schedules.

As the very documents relied upon and cited by Plaintiffs in the SAC show, the annual contract renewal process has in recent years resulted in reductions to the Funds' fee schedules for every Fund at issue in the SAC.  For example, in 2010, HIFSCO agreed to reduce management fees by 10 basis points (or 0.10%) on the first $100 million of assets of one of the Funds at issue, and agreed to reduce management fees by 5 basis points on all levels of assets for another Fund at issue.  *See* Ex. 6 (Growth Opportunities Fund Annual Report at 17); Ex. 7 (Inflation Plus Fund Annual Report at 20).  In 2008, HIFSCO agreed to implement breakpoints to reduce management fees by .25 basis points on assets over $5 billion and an additional .25 basis points on assets over $10 billion in three of the Funds at issue, and agreed to breakpoints to reduce management fees by 2 basis points on assets over $5 billion and an additional 1 basis point on assets over $10 billion in a fourth Fund at issue.  *See* Ex. 8 (Certified Shareholders Report dated October 31, 2008 at 441).  This was preceded by a permanent reduction of management fees by 5

basis points in two of the Funds and by 10 basis points in one of the Funds. *See* Ex. 9 (Certified

Shareholders Report for all Hartford Funds, Oct. 31, 2007, at 402).

      2.      **Distribution Plans and 12b-1 Fees**

      Pursuant to the SEC's Rule 12b-1, the Funds' Board of Directors adopted distribution

plans that authorize the payment of 12b-1 fees. *See* Ex. 10 (2011 SAI at 148-51). In adopting

the distribution plans, the Funds' Board of Directors determined that there was a reasonable

likelihood the distribution plans would benefit the Funds' current and future shareholders. *Id.* at

150.

      The plans authorize that these distribution and shareholder servicing activities are funded

by a fee paid to HIFSCO, serving as the Funds' distributor under a separate agreement. *See id.* at

148-51; Ex. 11. Each fee is based on a percentage of a Fund's net assets and varies by share

class, allowing investors to select the manner in which they pay sales charges. In the SAC,

Plaintiffs challenge only the Class A and Class B shares. Currently, although the distribution

plan for Class A shares allows for payment of 35 basis points to the distributor, the Board

authorizes only 25 basis points to HIFSCO for 12b-1 fees. *See* Ex. 10 (2011 SAI) at 148-49.

Class A shares pay front-end sales loads of up to 5.5% of the purchase price, depending on the

Fund and the amount invested. *See id.* at 147. Investors purchasing Class B shares do so

without paying an initial sales charge, so that the full purchase payment is invested in the Fund.

*See id.* at 153. Class B shares pay a 12b-1 fee of 100 basis points, and a contingent deferred

sales charge ("CDSC") on any shares redeemed during the first 6 years after initial investment,

after which time Class B shares are automatically converted to Class A shares (with their lower

12b-1 fee). *See id.* at 149. Each quarter, HIFSCO provides to the Funds' Board of Directors a

written report of the amounts expended under the distribution plans and the purposes for which the expenditures were made. *Id.* at 150.[4]

<h2 style="text-align:center"><u>ARGUMENT</u></h2>

The Supreme Court's decisions in *Iqbal* and *Twombly* have "shifted" pleading standards under Rule 8(a) "from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* (quoting *Iqbal*, 129 S. Ct. at 1949). Thus, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id.* at 211 (citing *Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1949; *accord Santiago v. Warminster Township*, 629 F.3d 121, 133 (3d Cir. 2010).

**I.    MOST OF COUNT I FAILS TO STATE A CLAIM FOR EXCESSIVE INVESTMENT MANAGEMENT FEES UNDER § 36(B) OF THE ICA**

The re-pled sub-allegations in Count I should be dismissed, and this time with prejudice. The SAC still fails to assert facts specific to HIFSCO and the Hartford Funds that state a plausible claim under § 36(b). Indeed, as was true of the AC, most of Plaintiffs' allegations purport to address the mutual fund industry as a whole, and fail to state specific facts about

---

[4] In addition to the IMAs and distribution and shareholder servicing agreements, HIFSCO also entered into an Expense Limitation Agreement with the Funds in which it agreed to reimburse a Fund whenever its total operating expenses exceed a specified percentage of the Fund's average daily net assets. *See* Ex. 12.

HIFSCO. The few "facts" alleged that do pertain to HIFSCO fail to make out a claim because they are based on nothing more than conclusory assertions that are directly contradicted by the very documents that Plaintiffs themselves reference in the SAC, and as such are plainly insufficient to make out a "plausible" basis for relief under the pleading requirements of *Iqbal* and *Twombly*.

> **A.** **The SAC's Comparison of Sub-Advisory Fees and Services Fails to Plead Facts Specific to HIFSCO that Plausibly Allege that HIFSCO's Fees Were "So Disproportionately Large" Under *Jones***

The SAC contains the same infirmity that the AC did, alleging that HIFSCO's investment management fees were excessive because of the fees paid to the Funds' sub-advisers, who are alleged to have done "virtually all" of the work. Plaintiffs continue to rely only on *conclusions,* rather than facts specific to HIFSCO. Indeed, their conclusions are not only asserted without foundational facts, but also are contradicted by the very documents referenced in the SAC itself.

As detailed in the IMA, HIFSCO provides extensive administrative and investment management services that are not delegated to the sub-advisers. HIFSCO has overall responsibility for the investment program of the Funds, which includes reviewing investment portfolios and securities, monitoring performance, and providing the extensive data and information requested by the Board. Ex. 1 at 716-17; Ex. 2 at 738-39.The contracts with the Funds' sub-advisers provide that HIFSCO will consult with the sub-advisers when appropriate in making investment decisions, and will supply investment guidelines and other written instructions. Ex. 3 at 960-61; Ex. 4 at 988-89.

With respect to administrative services, the IMA provides that HIFSCO bears sole responsibility for supervising all aspects of the Funds' operations, including the coordination of the custodian, transfer agent, accountants, and attorneys. Ex. 1 at 716, ¶ 2(a); Ex. 2 at 738, ¶ 2(a). HIFSCO also contracts to provide the Funds with personnel to serve as officers of the

funds, as well as employees who perform various administrative functions, such as the preparation and maintenance of required reports and books and records, and provides the required office space and related services necessary to perform all the foregoing services. Ex. 1 at 716 ¶ 2(b)-(c); Ex. 2 at 738 ¶ 2(b)-(c).

In light of these provisions, the SAC fails to cure the fatal defects in this sub-allegation, as ruled on by the Court in its prior decision on the AC. In fact, Plaintiffs' theory in the SAC has not changed from what they conceded at oral argument on the AC, *i.e.*, that HIFSCO did perform *some* services, while alleging that the sub-advisers perform "virtually all" or "substantially all" of that work, Tr. at 49:7-8, AC ¶ 63, and that HIFSCO "cannot be performing many administrative services," AC ¶¶ 41, 43. *See also* Tr. 37:4-7 (acknowledging that plaintiffs were not "hid[ing] from the fact that there are some additional provisions to the contract for which [HIFSCO] do[es] something . . . ."). Indeed, the *Southworth* plaintiff conceded that "[i]t's not a matter of [HIFSCO] doing absolutely zero work"; rather, "it's a matter of can those services justify the difference in fees . . . that basically [HIFSCO] keeps versus, versus what they pay Wellington." Tr. 37:7-11.

The Court rejected this argument, noting that the IMA and sub-advisory agreements "lay[ ] out a whole list of conduct or services that HIFSCO [was] to perform," and that "for the plaintiffs to allege that HIFSCO virtually did nothing flies in the face of those documents themselves." Tr. 70:12-18; *see also id.* at 70: 9-12 ("I do agree with the defendants that that allegation is conclusory and I find that it is a conclusory allegation that is contradicted by the very documents that the plaintiffs rely upon."). The Court also made clear that the bare allegation that HIFSCO retains a purportedly "high" percentage of total fees is conclusory and fails to supply the required factual support to make an inference of disproportionality plausible.

Tr. 38:10-13 ("[I]it seems to me what you are saying is . . . that if the percentages are so high, that fact alone satisfies *Iqbal*, and I don't think so.").

Yet despite this express guidance from the Court on the AC's shortcomings, Plaintiffs opted merely to repackage their same argument in the SAC, continuing to allege that the sub-advisers perform "*substantially* all" of the services at issue, SAC ¶ 80 – a phrase that is not new, but rather was used interchangeably with "virtually all." *See* AC ¶ 63 (alleging that "Wellington performs substantially all of the Funds' management/advisory services"); AC ¶ 157 ("[HIFSCO] delegate[es] all or substantially all of its investment management duties to sub-advisers and perform[s] little, if any additional work.").  Plaintiffs again ask the Court to accept their *ipse dixit* that any services actually performed by HIFSCO are "minimal," valueless, or "should" cost less than they do.  *See* SAC at ¶¶ 52, 54, 67, 73.[5]  In short, Plaintiffs still assert, without any reference to the costs actually incurred by HIFSCO, that HIFSCO simply retains "too much" of the investment management fees paid by the Funds.[6]  The Court already has correctly determined that this conclusory allegation is insufficient to state a plausible claim under *Iqbal* and *Twombly*.

---

[5] Plaintiffs claim again on information and belief, and without supporting factual allegations, that because transfer agency, custodian, and accounting services are provided pursuant to separate contracts,  the administrative services provided by HIFSCO were limited to only "minimal oversight" that should not cost very much.  SAC ¶ 67; *compare* AC ¶ 44 ("To the extent these services are included in the Investment Management Agreements, on information and belief, the administrative type services included are a very small percentage of the expenses incurred under these agreements . . . .").

[6] Whether intentionally or not, Plaintiffs' calculations of the "Percent By Which HIFSCO's Fee Is Greater Than Sub-Adviser" (*see* SAC p. 12) consistently overstate the actual percentage by 100%.  Thus, instead of showing the percentage by which HIFSCO's net fees are *greater than* the fees paid to the sub-advisers, Plaintiffs' figures represent the percentage *of the sub-advisers' fees* that HIFSCO is paid (*i.e.*, not just the *excess* over the sub-advisers' fees).  For example, according to the Table, HIFSCO is paid a net fee of approximately $2 million for managing the Hartford Global Health Fund.  The sub-adviser is paid a net fee of $1.4 million.  HIFSCO's fee is only 39% greater than the sub-adviser's fee, not 139% greater as Plaintiffs' Table indicates.

The SAC also alleges that the administrative services that HIFSCO performs under the IMA's express terms are actually paid for by separate additional fees, SAC at ¶ 65, an allegation squarely at odds with the documents referenced in the SAC. *See* Ex. 1 at 716; Ex. 2 at 738. Dismissing these provisions in the IMA to the contrary, Plaintiffs instead invite the Court to hypothesize that the administrative services described in the IMA *could be* financed by other fees charged to the Funds. *See, e.g.*, SAC ¶ 63 (alleging that the Other Expense Charge "*usually*" covers expenses for "payments to transfer agents, securities custodians, providers of shareholder accounting services, attorneys, auditors, and fund independent directors" (emphasis added));[7] *id.* ¶ 69 (alleging that the separate "Administrative Services Fee" "*presumably* covered these services" set forth in Section 3(b) of the IMA) (emphasis added).  While the Court must make all reasonable inferences in favor of plaintiffs when deciding a motion to dismiss, it is beyond cavil that inferences cannot be reasonable when they are at war with the documents cited in the plaintiffs' own pleading.  Plaintiffs have set forth no actual facts supporting their theory, and this allegation should not be credited.

Plaintiffs attempt to mask their failure to plead sufficient facts specific to HIFSCO by appending to the SAC a declaration of a putative expert, Steve Pomerantz.  But this declaration cannot save this allegation, for at least three reasons.  First, the Third Circuit has held that declarations are inappropriate at the pleading stage, and are not properly considered on a motion to dismiss.  *See, e.g.*, *Rose v. Bartle*, 871 F.2d 331, 340 n.3 (3d Cir. 1989) (holding that items submitted for the purpose of bolstering plaintiffs' allegations set forth in a complaint are not

---

[7] Plaintiffs overlook the fact that the very SEC document they cite in support of this proposition states that "[i]ncluded in this category [Other Expenses] are expenses *not included* in the categories 'Management Fees' or 'Distribution [and/or Service] (12b-1) Fees.'"  U.S. Securities and Exchange Commission, *Mutual Fund Fees and Expenses*, http://www.sec.gov/answers/ mffees.htm (emphasis added).

"written instruments" within the meaning of Fed. R. Civ. P. 10(c), and, accordingly, affidavits "constitute[] a matter outside the pleading."); *Domino's Pizza LLC v. Deak*, No. 09-3772, 383 Fed. App'x 155, 158 (3d Cir. 2010). Courts refuse to consider such documents as part of the pleading because, *inter alia*, "[c]onsidering an expert affidavit on a motion to dismiss, whether attached to a motion to dismiss or as an exhibit [to] the plaintiff's complaint, forces a district court to confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage." *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001).[8]

Second, even if the declaration were properly considered in connection with the motion, Plaintiffs cannot cure unsupported conclusions merely by placing them in the mouth of a putative expert. "[A]verments in an expert affidavit carry no additional probative weight merely because they appear within an affidavit rather than numbered paragraphs of the complaint." *DeMarco*, 149 F. Supp. 2d at 1222 (citing *Rose v. Bartle*, 871 F.2d at 340 n.3) (explaining that "[a] securities fraud complaint must, regardless of its form and attachments, provide the factual specificity required by the Reform Act and Rule 9(b)."). For example, Plaintiffs alleged in the AC, "on information and belief," that any administrative services provided by HIFSCO under the IMA "are only a very small percentage of the expenses incurred under these agreements . . . ." AC ¶ 44. In the SAC, Plaintiffs attempt to substitute in their expert's opinion on this point. *See* SAC ¶ 77 ("As stated in the Declaration of Steve Pomerantz Ph.D . . . the expenses [HIFSCO] should have incurred for providing the [administrative] services listed in Section 3(c) of the [IMA] should have been very small."). It is clear, however, that Plaintiffs cannot save the SAC's

---

[8] *See also In re Viropharma, Inc., Sec. Litig.*, No. 02-civ-1627, 2003 WL 1824914, at *2 (E.D. Pa. Apr. 7, 2003) ("The Plaintiffs' submission of an expert report at this stage is entirely improper. Besides being wholly outside of the pleadings, this expert report attempts to circumvent the usual procedures for allowing expert testimony.").

"[c]onclusory allegations and speculation" by "plac[ing] them within an affidavit of a retained expert." *See DeMarco*, 149 F. Supp. 2d at 1222.

Finally, the Pomerantz declaration (like the allegations in the SAC that repeat the statements in the declaration) is no more than a regurgitation by the same "expert" of the points made in a law review article co-authored by the same individual – an article that the Court declined to rely upon because it contained no facts specific to HIFSCO. *See* Tr. 34:11-17; *compare* SAC Ex. A (Pomerantz Declaration) *with* AC Ex. 12 (Pomerantz *et al*., "Mutual Fund Advisory Fees:  New Evidence and a Fair Fiduciary Duty Test," 61 Okl. L. Rev. 83, 117-21 (2008)).  Here, the SAC and the declaration make frequent assertions about what "should be" the most expensive and important service, how much HIFSCO "should have" charged, how the costs of performing those services "should have been" very small to HIFSCO, how much office space HIFSCO "should require," and how much that office space "should cost."[9]  These allegations provide no more facts specific to HIFSCO than were contained in the AC.  As the Court previously ruled, *ipse dixit* assertions cannot carry the day under *Iqbal* and *Twombly*.  Tr. 37:12-14 ("[Y]ou've got to put more facts in the complaint to make that allegation plausible, because just because you say it's so isn't enough.").  Indeed, Plaintiffs' reliance on an "expert" to provide

---

[9] *See* SAC ¶ 55 ("[E]ach fund's portion of that fee, in dollar terms, should be very small."); *id.* ¶ 74 ("[T]he investment management services should be the most expensive service that is listed in the Investment Management Agreements."); *id.* ¶ 75 ("such supervisory role should have resulted in [lower fees]"); *id.* ¶ 77 ("[T]he expenses [HIFSCO] should have incurred for providing services listed in Section 3(c) of the Investment Management Agreement should have been very small."); *id.* ¶ 73 ("Thus, even if HIFSCO pays for the minimal office space it requires (or should require) for alleged services to the Hartford Funds through the funds' investment management fee, each fund's portion of that fee, in dollar terms, should be very small."); *id.* ¶ 55 ("If HIFSCO performed all of the alleged investment management services listed in the Investment Management Agreements (see Table at ¶ 50), for each Hartford Fund, and if the fees charged for these alleged services were the product of arm's-length bargaining, such fees should have been, for each Hartford Fund, a fraction of the investment management fees charged by each sub-adviser to each Hartford Fund, in light of the substantial investment management services the sub-advisers provide . . . .") (emphases added throughout).

purported industry-wide data actually does no more than reflect Plaintiffs' implicit recognition that they lack sufficient facts *about HIFSCO* to allege a plausible claim. *See Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 342 (2d Cir. 2006) (affirming dismissal where the complaint contained no factual allegations specific to the defendants at issue).

Ultimately, the core of Plaintiffs' argument – that all of the "important" services are provided by the Funds' sub-advisers and that HIFSCO keeps too much of the fee – is unaffected by Plaintiffs' amendments to the complaint. Again, Plaintiffs have failed to plead sufficient facts to make plausible their conclusory assertions, particularly when viewed in the context here, where an overwhelmingly independent Board voted in favor of the IMA. Plaintiffs have not moved their claims across the line from *conceivable* to *plausible*. The Court has already found such allegations to be insufficient under *Iqbal* and *Twombly*, and it should do so again here.[10]

**B.      The SAC's Allegations that HIFSCO Charges Higher Fees than Vanguard Does Not Plausibly Support a Claim that HIFSCO's Fees Were "So Disproportionately Large" Under *Jones***

Plaintiffs' sub-allegation that the fees paid to HIFSCO violate § 36(b) because they exceed those charged by Vanguard must also fail.[11] Courts have recognized that Vanguard is simply not an appropriate metric, as it is a not-for-profit entity that specifically markets itself as a low-cost mutual fund provider. *See, e.g.*, *Amron*, 464 F.3d at 345 ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under this [*Gartenberg*] factor."); *Turner v. Davis Select Advisers LP*, No. 08-civ-421 (D. Ariz. Jun. 1, 2011); *Schuyt v. Rowe Price Prime Reserve Fund Inc.*, 663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987); *Kalish v. Franklin Advisers, Inc.*, 742 F.

---

[10] As the Court previously recognized, the AC failed to identify a single fact that the Board overlooked or did not consider. Tr. 79:1-5. Plaintiffs still have not supplied any such facts.

[11] With respect to the sub-allegation comparing HIFSCO's fees to Vanguard in the AC, the Court denied HIFSCO's motion to dismiss without prejudice. Tr. at 72:14-20.

Supp. 1222, 1250 (S.D.N.Y. 1990) ("The Vanguard comparison is seriously flawed."). The mere existence of a single lower-cost product in the marketplace cannot, by itself, plausibly support an inference that the Hartford Funds are being charged disproportionately excessive fees.

Rather, Vanguard represents just one data point at the lowest end of the range of possible fees. Indeed, while Plaintiffs repeatedly decry their inability to obtain facts, the information about where HIFSCO's fees fall within the range of *similar* funds is eminently available to Plaintiffs, by simply looking at the public filings of other funds. Plaintiffs, however, have not made any such allegation – and, without alleging where HIFSCO's fees fall within the *range* of fees paid by shareholders of comparable funds, Plaintiffs have provided no basis for the Court to infer that HIFSCO's fees are "so disproportionately large" that they fall "outside of the range of arm's-length bargaining." *Cf. Amron*, 464 F.3d at 345 ("The Yampolsky Complaint . . . conveniently omit[s] where the AO Fund ratio falls on the distribution of fees."). If Plaintiffs' contention were correct, then every fund in the United States except Vanguard would be charging excessive fees, because Vanguard's fees are consistently the lowest in the industry. This is not the case, and Courts have recognized the fallacy of this argument. This sub-allegation simply cannot pass muster under *Jones*, *Iqbal*, and *Twombly*.

C.      **Plaintiffs' Theory of Liability Based on Comparison to Institutional Fees Should Be Limited to the Single Fund as to which the SAC Alleges Facts**

In its prior ruling, the Court held that Plaintiffs may proceed on their theory of liability based on a comparison of Fund fees to the fees charged to institutional accounts. Tr. at 71:23-72:2 (noting that "plaintiffs have barely crossed that line"). HIFSCO does not seek to reargue this point, but respectfully requests that litigation over this sub-allegation be limited in scope to the single Fund as to which Plaintiffs have made *any* factual allegation in this regard, the Hartford Inflation Plus Fund. *See* SAC ¶¶ 180-81. This Fund is sub-advised by HIFSCO

affiliate HIMCO, which also manages certain fixed-income strategies for institutional account clients. The SAC sets forth no similar comparison to any other Fund. Indeed, four of the remaining five Funds at issue in this action are sub-advised by third party Wellington (Hartford Advisers Fund, Hartford Growth Opportunities Fund, Hartford Global Health Fund, Hartford Capital Appreciation Fund), and thus an analogous institutional fee comparison simply does not exist. Accordingly, Plaintiffs' pursuit of this sub-allegation, including discovery, should be limited to the Hartford Inflation Plus Fund, as the SAC sets forth no plausible basis for liability based on this theory regarding any other Fund.[12]

* * *

Taken as a whole, the allegations in Count I do not state a plausible claim that HIFSCO charged excessive investment management fees under § 36(b). The allegations that are specific to HIFSCO are an assembly of speculation and conclusion that could be alleged against any fund adviser (with minimal tweaks as to the particular fee arrangements at issue). The SAC's allegations fall well short of the high bar of showing a disproportionate fee that "could not" have been the product of arm's length bargaining, particularly given that the Board (a majority of whom are disinterested directors) has repeatedly reduced the investment management fees in recent years. HIFSCO respectfully submits that these allegations do not state a plausible claim

---

[12] The remaining "facts" in support of Count I consist of Plaintiffs invoking the so-called "*Gartenberg* factors" and making "information and belief" allegations about them. As before, however, the SAC contains no factual support for these allegations. Because these allegations repeat those made in the AC, HIFSCO incorporates by reference the arguments made in its motion to dismiss the AC, at pp. _. Plaintiffs will undoubtedly again claim that they *cannot* plead additional facts until discovery commences. But as the Court noted at oral argument, such "information asymmetries" cannot obstruct the pleading standards required by *Iqbal* and *Twombly*. A complaint cannot survive a motion to dismiss on the mere hope that discovery will unearth evidence to support a claim. *Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 328 (4th Cir. 2001) ("[P]laintiffs cannot simply promise the court that once they have completed discovery, something will turn up.").

of excessive advisory fees under *Iqbal*, *Twombly*, and *Jones,* and Count I must be dismissed in part.

## II. COUNT II FAILS TO STATE A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(B) OF THE ICA

### A. The SAC Does Not Allege a Plausible Claim for Excessive Distribution and Service Fees under § 36(b), But Merely Quarrels with the Policies Behind Rule 12b-1 Fees

The SAC fails to allege sufficient facts to avoid dismissal of the 12b-1 claim.  Plaintiffs allege nothing as to the quantity or quality of distribution and servicing activities, thus leaving them unable to claim that fees are excessive *in relation to* those services, as required by *Jones*. Instead, Plaintiffs contend that 12b-1 fees simply do not benefit shareholders, based on their presentation of only one side of the industry commentary, and their own say-so.  The Court has already rejected such policy arguments, and it should do so again here.

In the AC, Plaintiffs alleged that 12b-1 fees "produced few, if any benefits" to Fund shareholders, AC ¶¶ 10, 50, that "the payment of such fees benefits only Defendant HIFSCO," *id.* ¶ 85, and that "12b-1 fees are entirely a waste of fund assets," *id.* ¶ 89.  At oral argument, Plaintiffs maintained that "[i]t makes much more sense for [distribution] fees to be paid by those who are the beneficiaries, which are the people that come into the investments later."  Tr. 96:25-97-3.  Plaintiffs were forced to concede that, "[f]rankly, that's an argument that is a challenge to the industry as a whole and is frankly [a] more difficult argument for plaintiffs."  Tr. 97:3-5.

The Court rejected Plaintiffs' industry-wide attack on 12b-1 fees, noting that such policy arguments were inappropriate in a complaint.  Tr. 110:5-7.  The Court also dismissed Plaintiffs' conclusory allegation that HIFSCO provided only "modest" services in exchange for the distribution fees and that shareholders received "no benefit" from HIFSCO's distribution services.  Tr. 97:8-11; *id.* at 111: 13-15 ("But just to say that the defendant is charging excessive

12b-1 fees and the plaintiffs are getting nothing for it is very conclusory."); *id.* at 112:6-7 ("But to say they're absolutely getting no benefit I think is conclusory and you are going to have to back it up with facts.").

Despite this, Plaintiffs continue to make the same argument in the SAC, namely that the 12b-1 fees charged *must be* excessive because shareholders purportedly derive "minimal, if any, benefits" from them. SAC ¶ 256. Again, Plaintiffs engage in a weak attempt to change the phrasing of their allegations – the 12b-1 fees that were "*entirely* a waste of fund assets" in the AC are now "*substantially* a waste of fund assets" in the SAC[13] – but the SAC fails to discuss the actual distribution and shareholder services provided, and never attempts to compare the nature and quality of those services to the fees charged. *See ING Principal Protection Funds Deriv. Litig.*, 369 F. Supp. 2d 163, 166 (D. Mass. 2005) (dismissing complaint where plaintiffs failed to allege the "fundamental claim" that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided"). These sorts of "threadbare recitals . . . supported by mere conclusory statements" simply cannot survive a motion to dismiss. *See Fowler*, 578 F.3d at 210 (quoting *Iqbal*, 129 S. Ct. at 1949).

## B. Plaintiffs' Contention that 12b-1 Fees Cannot Be Charged on Class A Shares if Sales Loads Are also Charged Is Baseless

The SEC has explained that "many funds offer their shares in multiple classes – an organizational structure that permits investors to choose whether to pay for fund distribution and marketing costs up-front (via front-end sales charge), over time from their fund investment (via 12b-1 fees), when they redeem (via deferred sales charge), *or in some combination of the above*." Division of Investment Management, U.S. Securities and Exchange Commission, Report on Mutual Fund Fees and Expenses, http://www.sec.gov/news/studies/feestudy.htm (cited in SAC

---

[13] *Compare* AC ¶ 89 *with* SAC ¶ 98 (emphases added).

¶ 63) (emphasis added).  The SEC also implicitly recognizes the structure of the Hartford Funds'

12b-1 fees/sales loads as fully consistent with the industry norm:

> Class "A" shares generally are sold with a front-end sales load, and also
> often have a 12b-1 fee of about 25 basis points.  Class "B" shares typically
> are sold without a front-end load but charge a spread load consisting of a
> 12b-1 fee of 100 basis points . . . and a declining [contingent deferred
> sales load].  Class B shares usually convert automatically to class A shares
> after a fixed period of time has elapsed (commonly six to eight years from
> the date of purchase).

See Mutual Fund Distribution Fees; Confirmations, Securities Act Release No. 9128, Exchange

Act Release No. 62544, Investment Company Act Release No. 29367, 75 Fed. Reg. 47064,

47070 (proposed Aug. 4, 2010) (hereinafter, "SEC 2010 Release"); see also Office of Investor

Education and Advocacy, U.S. Securities and Exchange Commission, Mutual Funds:  A Guide

for Investors, http://www.sec.gov/investor/pubs/sec-guide-to-mutual-funds.pdf ("Class A shares

typically impose a front-end sales load.  They also tend to have a lower 12b-1 fee . . . .").

    Nonetheless, Plaintiffs complain that the 25 basis point distribution and servicing fee

charged to the Hartford Funds' Class A shareholders is "excessive because shareholders of this

class pay 12b-1 fees in *addition* to significant front-end sales loads."  SAC ¶ 93.  Plaintiffs made

the same allegation in the AC and at oral argument, accusing HIFSCO of falsely representing in

SEC filings that the 12b-1 fees charged to Class A shareholders would be an "alternative" to

paying front-end sales loads.  Tr. 95:11-25, 100:19-24 ("[HIFSCO] said it's an alternative, one

excludes the other.").  Plaintiffs continued, contending that "when they tell the SEC that you get

one or the other, that is not a fair charge to the plaintiffs – or it's a disproportionate charge

because we're paying both."  Tr. 95:18-25.

    This allegation is patently incorrect, as the Hartford Funds' public filings set forth

precisely what each share class pays in terms of sales loads and 12b-1 fees, including the fact

that Class A shareholders pay both a front-end sales load and a small 12b-1 fee that is largely

used for providing ongoing account services to existing shareholders.[14]  In response to the

Court's request that Plaintiffs submit the allegedly misleading document for the Court's review,

Plaintiffs have now attached the document to the SAC.  *See* SAC Ex. C.  The full passage at

issue – which discusses the distribution plans for *all* share classes, not just Class A – states as

follows:

> Potential benefits which the [Distribution] Plans *may provide* to the Funds
> include shareholder servicing, the potential to increase assets and possibly
> benefit from economies of scale, the potential to avoid a decrease in assets
> and portfolio liquidations through redemption activity, the ability to sell
> shares of the Funds through adviser and broker distribution channels, and
> the ability to provide investors with an alternative to paying front end sales
> loads.

SAC Ex. C at 182 of 235 (emphasis added).  This statement in no way suggests that Class A

shareholders pay no up-front sales load.  And just a few pages earlier in the same document, the

SAI details the front-end sales load charged to Class A shareholders, followed by a class-by-

class description of the ongoing 12b-1 fees paid by shareholders thereafter.  *See* SAC Ex. C at

178, 181 of 234.  Furthermore, each Hartford Fund Prospectus, under the section heading

"Choosing a Share Class," also expressly details both the sales charges and 12b-1 distribution

and servicing fees paid by each share class.  *See* Ex. 13 (Advisers Fund Prospectus at 17-18); *id.*

at 25 (disclosing that "Class A shares are subject to a front-end sales charge and distribution fee

unless an investor qualifies for the waiver of the Class A front-end sales charge.").  Each of these

disclosures explains clearly that Class A shareholders pay front-end sales charges of up to 5.5%

of the purchase price (depending on the amount of initial investment) and pay distribution and

servicing fees of .25%.

---

[14] The Class A Distribution Plan provides that "[t]he entire amount of the fee may be used for
shareholder servicing expenses with the remainder, if any, used for distribution expenses."  SAC
Ex. C at 182 of 235.

Accordingly, the SAI's language describing 12b-1 fees as a possible "alternative to paying front-end sales loads" can plausibly be read to apply only to Class B and Class C shareholders, who in fact do not pay front-end sales loads – and the SAC's allegation that the Funds' public filings misrepresent the sales loads and 12b-1 fees paid by Class A shareholders is flatly contradicted by the very documents Plaintiffs claim were misleading.  Because the Court only allowed this allegation to move forward on the express condition that Plaintiffs were not taking the document out of context, Tr. 111:8-12, this allegation should now be dismissed.

C.  **Plaintiffs' Allegations that Ongoing Distribution and Servicing Fees Cannot Be Charged to Share Classes that are Closed Has No Support and Is Legally Incorrect**

1.  **Plaintiffs lack Article III standing to pursue Count II with respect to Class B shares.**

As a threshold matter, Plaintiffs lack standing to attack the 12b-1 fees charged on Class B shares, since none of them actually owns class B shares, and thus none has a personal stake in the outcome of their claim.  It is settled law that, in determining whether a plaintiff has standing under Article III of the U.S. Constitution, the central question is whether the plaintiff has a "personal stake" in establishing liability.[15]  *See Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) ("[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." (citation omitted)).  Although § 36(b) authorizes a suit "by a security holder of such registered investment company on behalf of such company," 15 U.S.C. § 80a-35(b), the Supreme Court has made clear that federal statutes

---

[15] The plaintiff bears the burden of establishing standing.  *See DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006).  To satisfy the threshold standing requirement, the plaintiff must allege (1) personal injury suffered by him (2) that is fairly traceable to a defendant's allegedly unlawful conduct, and (3) that is likely to be redressed by the relief requested.  *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

cannot be construed in a manner that is inconsistent with the fundamental requirements of

Article III:

> Although Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules, Art. III's requirement remains:  the plaintiff still must allege a distinct and palpable injury to himself.  Moreover, the plaintiff must maintain a personal stake in the outcome of the litigation throughout its course.

*Gollust v. Mendell*, 501 U.S. 115, 126 (1991) (citations and internal quotation marks omitted).

*See also Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632

F.3d 762, 770 (1st Cir. 2011) (noting that Article III creates an "outer limit based on the

incentives of the named plaintiffs to adequately litigate issues of importance to them"); *In re*

*Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 588-90 (D. Md. 2007) (holding that shareholder of

multi-series fund could only sue under § 36(b) for excessive advisory fees charged to his series,

and not for the fees charged to other series, although both series were part of the same corporate

entity).

Here, the SAC does not allege that Plaintiffs own Class B shares in any of the Funds at

issue.  SAC ¶¶ 17-22.  Neither does the SAC allege that these Plaintiffs personally suffered any

injury as a result of any allegedly excessive 12b-1 fees charged to Class B shareholders.

Plaintiffs have no financial stake in litigation concerning 12b-1 fees charged to owners of Class

B shares, since they would not stand to receive any benefit from a recovery under this claim.

Therefore, with respect to the SAC's Class B 12b-1 fee claim, because the Court is not presented

with a concrete case or controversy as required under Article III, Plaintiffs' claim regarding

those fees must be dismissed for lack of Article III standing.[16]

---

[16] The contrary holdings in *In re American Mutual Funds Fee Litigation*, No. 04-civ-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009), and *Turner v. Davis Select Advisers LP*, No. 08-civ-421 (D. Ariz. Jun. 1, 2011), were both premised on an incorrect assumption that 12b-1 fees for a given class affect shareholders of all classes equally.  For example, the *Turner* court reasoned

Because Plaintiffs have not alleged – and cannot allege – that they suffered personal injury as a result of Class B 12b-1 fees, Plaintiffs have no personal stake in the outcome of the litigation of this claim.  Accordingly, Plaintiffs' claim regarding 12b-1 fees paid by Class B shareholders should be dismissed for lack of Article III standing.

> ### 2. Plaintiffs' Class B allegations cannot meet the plausibility standard of *Iqbal* and *Twombly*.

Even if Plaintiffs owned Class B shares and thus did have standing, Plaintiffs' allegations nonetheless fail to make out a claim under § 36(b).  Both regulatory authorities and courts have consistently affirmed that mutual funds that are closed to new investors may still continue to pay ongoing 12b-1 fees in order to compensate distributors for past marketing and distribution services – yet Plaintiffs claim that the B Classes of the Hartford Funds should not be allowed to do so.

The SEC has expressly stated that distribution fees may be paid after a fund is closed, as long as payments do not exceed certain limits set by the Financial Industry Regulatory Authority ("FINRA") (formerly the National Association of Securities Dealers ("NASD")).  Indeed, in

---

that "[b]ecause each share class participates in the same portfolio of assets, excessive fees charged to one class will detract from the overall pool and affect the value of other share classes," citing *American Funds* and an SEC release in support. *Id.* (citing Mutual Fund Classes, http://www.sec.gov/answers/ mfclass.htm) ("Mutual Fund Classes Release").  But this SEC statement actually militates the *opposite* conclusion, that different share classes will experience different performance results due to differing 12b-1 fees charged:  "Each class will invest in the same 'pool' (or investment portfolio) of securities and will have the same investment objectives and policies.  But each class will have different shareholder services and/or distribution arrangements with *different fees and expenses* and, therefore, *different performance results*."  Mutual Fund Classes Release (emphases added); *see also* Ex. 13 (Advisers Fund Prospectus at 9) (displaying different performance results for different share classes).  Thus, a shareholder will suffer injury due to excessive 12b-1 fees *only* when those fees are charged to his or her own share class.  Without the required personal stake in the Class B 12b-1 fees, Plaintiffs would have little or no incentive to pursue zealously a recovery for the absent Class B shareholders.

responding to a Congressional inquiry on this precise issue, the SEC explicitly rejected Plaintiffs' interpretation of Rule 12b-1:

> Rule 12b-1 permits a fund to spread its distribution expenses over several years and allows payment of fees for past distribution services. Therefore, even if a fund closes to new investors, it may continue to pay rule 12b-1 fees in order to compensate the distributor for its past distribution efforts.

*See* Ex. 14, Letter dated August 19, 1993 to Congressman John D. Dingell from Acting Chairman Arthur Levitt enclosing Memorandum dated August 16, 1993 of Division of Investment Management (hereinafter, "1993 SEC Memorandum").[17] The NASD agreed with the SEC's interpretation. *See* NASD Notice 93-12, Questions and Answers About New NASD Rules Governing Investment Company Sales Charges (Feb. 1993), Question No. 6, *available* at 1993 WL 1434082 (explaining that even if a fund stops selling its shares, it may still pay asset-based sales charges).

Accordingly, courts have held that funds closed to new investors may continue to pay Rule 12b-1 expenses to fulfill obligations for past sales and marketing efforts. *See, e.g.*, *Yameen v. Eaton Vance Distribs., Inc.*, 394 F. Supp. 2d 350, 358 (D. Mass. 2005) (noting that "SEC Rule 12b-1 has for some time been authoritatively interpreted by officials of the SEC . . . to allow mutual funds to compensate companies for past distribution services" and that "Rule 12b-1 and NASD Rule 2830 are specifically designed to allow mutual funds to continue paying sales charges after a fund has closed to new investors"); *see also ING Principal Prot. Funds Derivative Litig.*, 369 F. Supp. 2d 163, 169 (D. Mass. 2005) (same); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) (finding

---

[17] The 1993 SEC Memorandum goes on to address ongoing distribution expenses referred to as "trail commissions," which are used to compensate broker-dealers for services such as responding to shareholder inquiries and maintaining their accounts; to spread sales commissions over time; and to incentivize brokers to continue promoting a fund in order to minimize shareholder redemptions, which may have a negative effect on existing shareholders. *Id.*

that "by merely asserting that Rule 12b-1 fees were charged while the funds at issue were closed to new investors, plaintiffs have not alleged that the fees charged were disproportionate to the services rendered" because "[p]laintiffs have not claimed that the Rule 12b-1 fees for the Closed Funds ever exceeded this cap [imposed by NASD]").

Notwithstanding this adverse precedent from regulatory bodies and the courts, Plaintiffs still cry foul that Class B shareholders should not pay 12b-1 fees once the class was closed to new investors. Yet Class B shareholders chose this option of paying certain ongoing 12b-1 fees rather than pay a front-end sales charge. The SEC has approved multi-class fund structures precisely because they "offer[ ] investors the ability to select a fee and expense structure that is most appropriate for their investment goals (including the time that they expect to remain invested in the fund)." *See* Mutual Fund Classes, U.S. Securities and Exchange Commission, http://www.sec.gov/answers/mfclass.htm. And the SEC has recently reaffirmed that shareholders benefit from being able to choose how to finance sales charges. *See* SEC 2010 Release at 47074 ("We do not believe that it would benefit fund investors to return to the era in which they paid a substantial front-end sales load and did not have access to various alternative forms of distribution payment arrangements.").

Here, Plaintiffs allege neither that the ongoing 12b-1 fees charged to the closed class were greater than the amount of the up-front distribution costs or the continued financing of those costs, nor that the total 12b-1 fees exceed the limits imposed by FINRA. As was the case in *Yameen*, the SAC fails to allege that "the distribution fees are disproportionate and unrelated to the sales-related services actually provided when shares of the funds were marketed and sold to the general public." *Yameen*, 394 F. Supp. at 358. Instead, the SAC "relies upon the categorical contention, rejected by the regulatory bodies charged with supervising this activity,

that such fees are *per se* disproportionately large and hence unreasonable when paid out while the fund is closed. The Plaintiff[s] must allege more than an erroneous construction of an SEC rule to state a claim under Section 36(b)." *Id.*

Given the "obvious alternative explanation" of the Class B 12b-1 fees as compensation to the distributor and broker-dealers for past distribution efforts, the inference Plaintiffs ask the Court to make that the fees were excessive is not a plausible one. *See Santiago*, 629 F.3d at 133 (discussing the "obvious alternative explanation" of lawful conduct, noting that "'[p]ossibility' is no longer the touchstone for pleading sufficiency after *Twombly* and *Iqbal*. Plausibility is what matters. Allegations that are 'merely consistent with a defendant's liability' or show the 'mere possibility of misconduct' are not enough."). Accordingly, this allegation should be dismissed.

## CONCLUSION

For all the foregoing reasons, HIFSCO respectfully requests that the Court enter an order dismissing with prejudice the allegations of the Second Amended Complaint discussed above for failure to state a claim.

Dated: January 17, 2012        Respectfully submitted,
RIKER DANZIG SCHERER HYLAND PERETTI LLP


*/s/ Anthony J. Sylvester*
Anthony J. Sylvester
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800 (tel)
(973) 538-1984 (fax)
asylvester@RIKER.com

Of Counsel:
ROPES & GRAY LLP
Harvey J. Wolkoff
Robert A. Skinner
Allison M. Boscarine
Prudential Tower
800 Boylston Street
Boston, MA 02199
harvey.wolkoff@ropesgray.com
robert.skinner@ropesgray.com
allison.boscarine@ropesgray.com

*Attorneys for Defendant Hartford
Investment Financial Services, LLC*