## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENNIFER L. KASILAG, LOUIS MELLINGER, JUDITH M. MENENDEZ, JACQUELINE M. ROBINSON, LINDA A. RUSSELL, AND DENNIS RUSSELL, ON BEHALF OF AND FOR THE BENEFIT OF THE HARTFORD GLOBAL HEALTH FUND, THE HARTFORD CONSERVATIVE ALLOCATION FUND, THE HARTFORD GROWTH OPPORTUNITIES FUND, THE HARTFORD INFLATION PLUS FUND, THE HARTFORD ADVISERS FUND, AND THE HARTFORD CAPITAL APPRECIATION FUND,<br><br>      Plaintiffs,<br><br>vs.<br><br>HARTFORD INVESTMENT FINANCIAL SERVICES, LLC,<br><br>      Defendant. | Case Number: 1:11-cv-01083-RMB-KMW |

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## HARTFORD INVESTMENT FINANCIAL SERVICES, LLC'S,
## MOTION TO DISMISS

| | |
|---|---|
| SZAFERMAN, LAKIND,<br>  BLUMSTEIN & BLADER, P.C.<br>By: Robert L. Lakind<br>    Arnold C. Lakind<br>101 Grovers Mill Rd., Suite 200<br>Lawrenceville, New Jersey 08648<br>Telephone: (609) 275-0400<br>Fax: (609) 275-4511<br>*Attorneys for Plaintiffs* | LEVY, PHILLIPS & KONIGSBERG, LLP<br>  Moshe Maimon<br>  Danielle Disporto<br>101 Grovers Mill Rd., Suite 200<br>Lawrenceville, New Jersey 08648<br>Telephone: (609) 275-0400<br>Fax: (609) 275-4511<br>*Attorneys for Plaintiffs* |

## TABLE OF CONTENTS

**Page**

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

Procedural History and Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

     Point I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

          Plaintiffs' Complaint, Drafted in Great Detail, States A
          Plausible Claim That Defendant Charged An Excessive
          Investment Management Fee in Violation of ICA § 36(b) . . . . . . . . . . . . . . . . .   3

          A.     The Nature and Quality of HIFSCO's Services . . . . . . . . . . . . . . . . . . . . .   4

          B.     Analysis of Comparative Fee Structures Weighs in Plaintiffs' Favor . . .   13

     Point II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

          Count II States A Claim For Excessive Distribution And Service
          Fees Under § 36(b) of the ICA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

          A.     Plaintiffs' Allegations Relating to Count II are Specific and
                   Detailed, Not Conclusory or Policy-Based . . . . . . . . . . . . . . . . . . . . . . .   20

          B.     Plaintiffs State a Plausible Claim that HIFSCO Charged
                   Excessive 12b-1 Fees on Class A Shares in Violation of
                   ICA § 36(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

          C.     Plaintiffs State a Plausible Claim that HIFSCO Charged
                    Excessive 12b-1 Fees on Class B Shares in Violation of
                   ICA § 36(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

638819.1

# TABLE OF AUTHORITIES

Amron v. Morgan Stanley Investment Advisors Inc.,
    464 F.3d 338 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Association of International Automobile Manufacturers, Inc.
    v. Commissioner, Massachusetts Dep't of Envtl. Prot.,
    208 F.3d 1 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Braden v. WalMart Stores, Inc., 588 F.3d 585 (8th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 12

Curran v. Principal Mgmt. Corp., No. 4:09-cv-433,
    2010 WL 2889752 (S.D. Iowa June 8, 2010),
    *overturned on reh'g on other grounds,*
    Curran v. Principal Mgmt. Corp.,
    2011 WL 223872 (S.D. Iowa Jan. 24, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Daily Income Fund, Inc. v. Fox, 464 U.S. 523 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Fallick v. Nationwide Mutual Insurance Co., 162 F.3d 410 (6th Cir. 1998) . . . . . . . . . . . . . . . 26

DeMarco v. Depotech Corp., 149 F.Supp.2d 1212 (S.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . 12

Dominos Pizza LLC v. Deak, 383 F. App'x. 155 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 12

Fleming v. County of Kane, 855 F.2d 496 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 19

Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100 (D. Mass. 2006) . . . . . . . . . . . . . . . . . 2, 15

Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451 (D. N.J. 2005) . . . . . . . . . . . . . . . . . . . 26

Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,
    694 F.2d 923 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17

Hunt v. Invesco Funds Group, Inc., No. 04-02555,
    2006 WL 1581846 (S.D. Tex. Jun. 5, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

In re Am. Mut. Funds Fees Litig., No. Civ 04-5593,
    2009 WL 5215755 (C.D. Cal. Dec. 16, 2005) . . . . . . . . . . . . . . . . . . . . . 26, 27, 42-43

In re Cendant Corp. Litig, 60 F. Supp. 2d 354 (D.N.J.1999) . . . . . . . . . . . . . . . . . . . . . . . . 12

In re Dreyfus Mut. Funds Fee Litig.,
    428 F. Supp. 2d 342 (W.D. Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

638819.1

In re Evergreen Mut. Funds Fee Litig.,
    423 F. Supp. 2d 249 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

In re Goldman Sachs Mut. Funds Fee Litig., No. 04-civ-2567,
    2006 WL 126772 ( S.D.N.Y. Jan. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

In re Hypodermic Products Antitrust Litig., MDL 1730,
    2007 WL 1959225 (D.N.J. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

In re Mut. Funds Inv. Litig., 519 F. Supp. 2d 580 (D. Md. 2007) . . . . . . . . . . . . . . . . . . . . 26, 27

In re Resource America Security Litig., C.A. No. 5446,
    2000 WL 1053861 (E.D. Pa. July 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ING Principal Protection Funds Derivative Litig.,
    369 F. Supp 2d 163 (D. Mass 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 29

Jones v. Harris Associates, L.P, 130 S. Ct. 1418 (2010) . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 15, 16

Kurdyla v. Pinkerton Security, 197 F.R.D. 128 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 28

Lieber ex rel. Invesco Balanced Fund/Inv v. Invesco Funds Group,
    371 F. Supp. 2d 852 (S.D. Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309 (2011) . . . . . . . . . . . . . . . . . . . . . . 3, 4

Mid-America Care Found. v. NLRB, 148 F.3d 638 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . 28, 29

Operating Local 649 Annuity Trust Fund
    v. Smith Barney Mgmt LLC, 595 F.3d 86 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 25

Pfeiffer v. Bjurman, Barry & Associates, No. 03-Civ.9741,
    2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

Reso v. Artisan Partners Ltd. Pshp, No. 11-cv-873,
    2011 WL 5826034 (E.D. Wis. Nov. 18, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 16, 18

Rose v. Bartle, 871 F.2d 331 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Schuyt v. Rowe Price Prime Reserve Fund Inc.,
    663 F. Supp. 962 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Turner v. Davis Select Advisers LP,
    No. 08-civ-421 (D. Ariz. Jun. 1, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Yameen v. Eaton Vance Distributors, Inc.</u>,
    394 F. Supp. 2d 350 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28, 29

<u>Zucker ex rel. AIM Small Cap Growth Fund/A v. AIM Advisors, Inc.</u>,
    371 F. Supp. 2d 845 (S.D. Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 28

## FEDERAL STATUTES

15 U.S.C. § 80a-35(b), ICA § 36(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## FEDERAL REGULATIONS

17 C.F.R. §270.12b-l(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## MISCELLANEOUS

75 Fed. Reg. 47074 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

638819.1

## PRELIMINARY STATEMENT

Plaintiffs, Jennifer L. Kasilag, Louis Mellinger, Judith M. Menendez, Jacqueline M. Robinson, Linda A. Russell and Dennis Russell, bring this action pursuant to § 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b) ("ICA § 36(b)"), which imposes "a fiduciary duty with respect to the receipt of compensation for services" upon a mutual fund adviser and its affiliates. In their Second Amended Complaint ("SAC"), Plaintiffs allege that Defendant, Hartford Investment Financial Services, LLC ("HIFSCO"), violated ICA § 36(b) when it collected excessive investment management and 12b-1 fees paid by shareholders of the Hartford Global Health Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund and the Hartford Capital Appreciation Fund (collectively, the "Hartford Funds" or "Funds").

HIFSCO has now filed a second motion to dismiss Plaintiffs' complaint.  There are four fundamental flaws in HIFSCO's arguments.  First, HIFSCO ignores the detailed allegations of the SAC; allegations supported by statements made in the Funds' Securities and Exchange Commission ("SEC") filings.  Second, in its argument seeking to dismiss Count I, HIFSCO fails to address the factors relevant to the analysis of an ICA § 36(b) claim set forth in Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982) (the "Gartenberg Factors").  Plaintiffs address five of these factors in their SAC; HIFSCO addresses only two.  Third, Defendant seems to argue that the failure to satisfy a single Gartenberg Factor requires dismissal.  However, when appraising an ICA § 36(b) claim, a court is to engage in a collective weighing process.  See Jones v. Harris Assocs., L.P., 130 S. Ct. 1418, 1425, 1426, n.5 (2010); see also Reso v. Artisan Partners Ltd. Pshp, No. 11-cv-873, 2011 WL 5826034, (E.D. Wis. Nov. 18, 2011) (must look to the totality of the

1

638036.14

alleged facts); a plaintiff is not required to satisfy all of the Gartenberg Factors.  See e.g., In Re Evergreen Mut. Funds Fee Litig., 423 F. Supp. 2d 249, 258 (S.D.N.Y. 2006); In Re Dreyfus Mut. Funds Fee Litig., 428 F. Supp. 2d 342, 350 (W.D. Pa. 2005); Forsythe v. Sun Life Fin., Inc., 417 F. Supp. 2d 100, 115 (D. Mass. 2006).  Since Defendant has failed to address all of the Gartenberg Factors in its brief, its motion, for that reason alone, should be denied.  Fourth, HIFSCO, in part, simply renews arguments rejected on its earlier motion to dismiss.

## STATEMENT OF FACTS

This is a derivative action brought by Plaintiffs for, and on behalf of, the Hartford Funds arising out of excessive investment management and 12b-1 fees paid to HIFSCO.

The investment management fees paid to HIFSCO were excessive because they were grossly disproportionate to the alleged investment management services that HIFSCO claims to have provided.  (SAC ¶¶ 41-80; 110-113; 115-214; 224-241).  While HIFSCO was the nominal investment manager to each of the Hartford Funds, it contracted out most of the investment management services to third-party sub-advisers, who did the bulk of this work, Wellington Management Company, LLP ("Wellington") and Hartford Investment Management Company ("HIMCO").  These sub-advisers received far smaller investment management fees than did HIFSCO.

HIFSCO's 12b-1 fees, which are charged to investors of a mutual fund for the fund's marketing and distribution efforts, were excessive for the reasons set forth in Point II.  Among other things, HIFSCO charged an exorbitant 5.5% front end load and an annual 25 bps 12b-1 fee on Class A shares.  Second, HIFSCO charged an excessive 12b-1 fee to shareholders in the closed Class B of its Funds.  Third, the management fee breakpoints, which afforded a reduction in fees assessed

638036.14

on assets in excess of specified levels, were set so high as to be largely unachievable, while HIFSCO

retained the fee savings on the lower breakpoints of its sub-advisors.

**ARGUMENT**

**POINT I**

**PLAINTIFFS' COMPLAINT, DRAFTED IN GREAT DETAIL, STATES A PLAUSIBLE CLAIM THAT DEFENDANT CHARGED AN EXCESSIVE INVESTMENT MANAGEMENT FEE IN VIOLATION OF ICA § 36(b)**

An investment adviser violates ICA § 36(b) if it charges a fee that is "so disproportionately

large that it bears no reasonable relationship to the services rendered and could not have been the

product of arm's length bargaining." Jones, 130 S. Ct. at 1426. The test for an ICA § 36(b) violation

anticipates consideration of the following non-exclusive Gartenberg Factors: (1) the nature and

quality of services rendered; (2) whether the directors exercised a sufficient level of care and

conscientiousness in approving the investment advisory or management agreements and 12b-1 fees;

(3) comparative fee structures; (4) whether economies of scale were passed on to the funds and their

investors and (5) the profitability of the fund to the investment adviser. Jones, 130 S. Ct. at 1426

n. 5.

As with all complaints, Plaintiffs need only allege facts which, assumed to be true, Matrixx

Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1314 (2011), "state a claim that is plausible on its

face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Here, the SAC contains extensive and

detailed allegations addressed to the Gartenberg Factors.

HIFSCO does not dispute that it earned substantially larger fees ($100,052,943) than the

3

Funds' sub-advisers ($57,583,826) (SAC ¶ 47; Declaration of Robert Lakind "Dec. RL" ¶2 Ex. A)[1].

However, it challenges the accuracy of the SAC's comparison of the duties performed by HIFSCO,

as set forth in its Investment Management Agreements ("IMA"), with the duties performed by the

sub-advisers, as set forth in the respective Sub-Advisory Agreements. Second, HIFSCO renews its

challenge to Plaintiffs' comparison of HIFSCO's advisory fees to those charged by similar Vanguard

funds, managed by HIFSCO's sub-advisers. Third, HIFSCO renews its challenge to consideration

of the fees paid by institutional accounts. As HIFSCO admits, the Court has already denied its

motion to dismiss Plaintiffs' ICA § 36(b) claim based on the latter two arguments (Db 1 n. 1; Db 16

n. 11).

HIFSCO fails to challenge the adequacy of any of Plaintiffs' other allegations addressed to

the Gartenberg Factors and, for that reason alone, its motion should be denied. Moreover, HIFSCO's

arguments raise factual disputes which are inappropriate for resolution on a motion to dismiss

because Plaintiffs' allegations must be assumed to be true. See Matrixx, 131 S. Ct. at 1314.

A.    **The Nature and Quality of HIFSCO's Services**

1.    **Investment Services**

The material terms of the IMA's and the relevant sub-advisory agreements are, with regard

to each Hartford Fund, identical. As permitted by the IMAs, HIFSCO received investment

---

[1] Exhibit A to the Declaration of Robert Lakind is an SEC filing for the Hartford Funds. All page citations are to the numbers on the top right hand corner of this document (not to the numbers on the bottom center). As page 129 indicates, in 2010, HIFSCO charged the six Hartford Funds an advisory fee that totaled $157,636,769. As pages 131 and 134 indicate, the sub-advisers to the Hartford Funds, in 2010, were paid sub-advisory fees that totaled $57,583,826. The sub-advisers were paid from HIFSCO's approximately $157 million dollar investment management fee. Meaning, in 2010, for the Hartford Funds, HIFSCO's investment management fee totaled $100,052,943, while the sub-advisers' investment management fee was an additional $57,583,826.

4

management fees in 2010, with regard to the Funds at issue, that exceeded the sub-advisers' fees by $42,469,117.  (SAC ¶¶ 46-8).  However, substantially all of the investment management services were performed by each Fund's sub-adviser.  Remarkably, HIFSCO performed the "investment management services" for the 6 Funds at issue, its 49 other funds, and its college savings plan using no more than 5 investment advisory employees.  (Dec. RL ¶ 2-3, Exs. A and B).  Assuming each of the 5 employees (Dec. RL ¶ 3 Ex. B) devoted equal time to the 55 funds, 55% (($5 \div 55$) ×6 Funds) of the time of a single investment advisor produced $100,052,943 in investment management fees for HIFSCO in 2010 from Plaintiffs' 6 Funds.  (SAC ¶ 46).

While HIFSCO also performed administrative services,  HIFSCO or another entity received separate and additional compensation for many of those services.  (SAC ¶¶ 49; 55-63; 74-78; see also Declaration of Dr. S. Pomerantz, attached as Ex. A to the SAC).

Sections 2 and 3 of the IMA list the investment management and administrative services to be performed by HIFSCO.  Section 4 of the IMA authorizes HIFSCO to delegate all of these services to third-parties.  (SAC ¶ 53; Dec. RL ¶¶ 4-5; Exs. C-D § 4).  Availing itself of this opportunity, HIFSCO delegated substantially all of its investment management responsibilities under the IMA (SAC ¶¶ 51-3) to the sub-advisers, as is apparent from a comparison of the investment management provisions of the IMA and the sub-advisory agreements; leaving little to do for its, at most, 5 investment advisory employees.

| IMA/HIFSCO's Alleged Services | Sub-Advisers Services |
|---|---|
| [A comparable provision does not exist in the Investment Management Agreements] | "2.  The Sub-Adviser shall evaluate and implement an investment program appropriate for each Portfolio [i.e., the Fund], which shall be amended and updated from time to time...as determined by the Adviser and the Sub-Adviser." |

5

638036.14

| | |
|---|---|
| "2.   Investment Management Services (a) The Adviser shall, or **shall cause an affiliate** to: (i) regularly provide investment advice and recommendations to each Portfolio with respect to its investments, investment policies and the purchase of securities; (ii) supervise continuously the investment management program of each Portfolio and the composition and performance of its portfolio securities and determine which securities shall be purchased or sold by each Portfolio; and (iii) arrange, subject to the provisions of Section 4 hereof [the delegation provision], for the purchase of securities and other investments for each Portfolio and the sale of securities and other investments held in each Portfolio." | "3.   **The Sub-Adviser, in consultation with the Adviser when appropriate, will make all determinations with respect to the investment of the assets of the Portfolios and the purchase or sale of portfolio securities, and shall take such steps as may be necessary to implement the same.**  Such determinations and services shall include advising the Company's Board of Directors of the manner in which voting rights, rights to consent to corporate action, and any other non-investment decisions pertaining to a Portfolio's securities should be exercised." |
| "(b) The Adviser shall provide, **or cause an affiliate** to provide, such economic and statistical data relating to each portfolio and such information concerning important economic political and other developments as the Adviser shall deem appropriate or as shall be requested by the Company's Board of Directors." | "4.   **The Sub-Adviser will regularly furnish reports with respect to the Portfolios at periodic meetings of the Company's Board of Directors, and at such other times as may be reasonably requested by the Company's Board of Directors, which reports shall include the Sub-Advisers' economic outlook and investment strategy and a discussion of the portfolio activity and the performance of the Portfolios since the last report.**" |
| [A comparable provision does not exist in the Investment Management Agreements] | "5.   The Sub-Adviser shall manage each Portfolio in conformity with the Company's Articles of Incorporation and By-laws...the Investment Company Act...and to the investment objectives...of each Portfolio as set forth in the Portfolio's prospectus....." |
| [A comparable provision does not exist in the Investment Management Agreements] | "6.   The Sub-Adviser will select the brokers or dealers that will execute the purchases and sale of portfolio securities..." |

(SAC ¶ 50; see also Dec. RL ¶¶ 4-8, Exs. C-G emphasis added).  As the sub-advisory agreements

6

require, the "Sub-Adviser shall evaluate and implement an investment program appropriate for each" Hartford Fund (SAC ¶¶ 50; 70; Dec. RL ¶¶ 6-8, Exs. E-G), using the "portfolio management team" who are all employees of the sub-advisers. Id. This task, Dr Pomerantz has opined, "is generally the most expensive and important investment management activity with respect to a fund." (SAC ¶¶ 51-52 and 74; see also Dec. Dr. Pomerantz, ¶ 6, Ex. A to the SAC).

This task allocation is verified by HIFSCO's SEC filing, which states that sub-advisers, "Wellington Management Company, LLP ("Wellington Management") and Hartford Investment Management Company ("Hartford Investment Management") . . . provide the day-to-day management of such Funds' portfolios...." (Dec. RL ¶ 2, Ex. A p. 8 (page citations are to page numbers on top right hand corner of document). In addition, SEC filings state that the sub-advisers, not HIFSCO, inform investors how the Funds performed in the prior year and project the Funds' outlook for the coming year. (SAC ¶ 70).[2]

HIFSCO does not dispute the fact that its investment management role is limited to supervising the Fund's investment program. (SAC ¶ 52; see also Dec. of Dr. S. Pomerantz, ¶ 7, Ex. A to the SAC). Rather, HIFSCO maintains that it "has overall responsibility for the investment program of the funds, which includes reviewing investment portfolio and securities, monitoring performance, and providing extensive data...requested by the Board." (Db 10). For several reasons, it is clear these claimed services are limited in scope. First, HIFSCO has no more than 5 investment management [or 50 total] employees (Dec. RL ¶ 3, Ex. B) servicing all 55 of its funds. (Dec. RL

---

[2] See Annual Report for each of the Hartford Funds stating "[t]he views expressed in the Fund's Manager Discussion under 'Why did the Fund perform this way?' and 'What is the outlook?' are the views of the Funds' **sub-adviser and portfolio management team.**" The portfolio management team is composed of employees of the sub-advisors. (emphasis added) (SAC ¶ 70; Dec. RL ¶¶ 9-14 Exs. H-M).

638036.14

¶ 2, Ex. A).  Second, HIFSCO requires that the sub-advisers to assume the responsibility to furnish periodic reports.  (Dec. RL ¶¶ 6-8  Exs. E-G  § 4).  Third, HIFSCO relies on the sub-advisers to provide information regarding fund performance to investors.  Fourth,  HIMCO and Wellington have served as HIFSCO's sub-advisers since 1997 (SAC ¶ 43), which should have reduced HIFSCO's supervisory burden.  Finally the Boards of the Hartford Funds allegedly "provide broad supervision over the affairs of the...Funds...." (SAC ¶ 54; Dec. RL ¶ 2, Ex. A p. 55), thus minimizing HIFSCO's supervisory role.

In sum, review of HIFSCO's SEC filings, the sub-advisory agreements, and the IMA's reveal that substantially all of the  investment management services were delegated to the sub-advisers. Thus, HIFSCO should not have charged a fee of $100,052,943 for the investment management services of its, at most, 5 investment management employees.  (SAC ¶¶ 47; 49; 78-9; Dec. RL ¶¶ 2-3 Exs. A and B; Dec. Dr. S. Pomerantz ¶¶ 4-8, Ex. A to the SAC).

### 2.    Administrative Services

Sections 3(a), (b) and (c) of the IMAs address administrative services.  In § 3(a) of the IMA, HIFSCO promises to:

> (a)     assist in the supervision of all aspects of the Company's operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents (if any), accountants, attorneys and other parties performing services or operational functions for the Company;

(SAC ¶ 56; Dec. RL. ¶¶ 4-5, Exs. C and D § 3(a)).  However, review of relevant documents reveals that  transfer agent, accounting, custodian and other costs are defrayed by fees that are in addition to  HIFSCO's investment management fee.

The Annual Report for each Hartford Fund lists the fees Plaintiffs pay on investments into the Funds.  See excerpt drawn from annual report of the Hartford Global Health Fund below:

638036.14

| Expenses | Dollar Amount |
| --- | --- |
| Investment Management Fee | $3,440,000 |
| Administrative Services Fee | $18,000 |
| Transfer Agent Fees | $988,000 |
| Distribution Fees | |
| . . . | . . . |
| Custodian Fees | $9,000 |
| Accounting Servicing Fees | $53,000 |
| Registration and Filing Fees | $97,000 |
| Board of Directors' Fees | $10,000 |
| Audit | $14,000 |
| Other Expenses | $94,000 |
| Total Expenses (before fee waivers paid indirectly) | $6,422,000 |

(SAC ¶ 58; see also Dec. RL ¶ 9 Ex. H).  The Annual Reports, for the remaining Hartford Funds

(like the Hartford Global Health Fund) confirm that transfer agent, custodian, accounting , audit and

other administrative fees are separately compensated. (SAC ¶ 59; see also Dec. RL ¶¶ 10-14 Exs.

I-M;  see also Dec. RL ¶ 2 Ex. A  pp. 137-38 (page citations to pages on top right hand corner)

(Funds pay HIFSCO's parent, Hartford Life for accounting services)).

An "Other Expense" category is also reported within each Fund's prospectus. See, by way

of example, the prospectus for the Hartford Global Health Fund, which provides that the Class A

shareholders pay a management fee of .90%, a 12b-1 fee of .25% and an "other expense fee" of

.34%.  The Class B shareholders pay a management fee of .90%, a 12b-1 fee of 1.00% and an "other

expense fee" of .49%.  (SAC ¶ 61; Exhibit B to Plaintiffs' SAC reproduces the fee tables for the

9

remaining Hartford Funds; see also, Dec. RL ¶¶ 15-20 Exs. N-S).  According to the SEC, an "Other Expense Charge" covers, among other things, transfer agent, custodian, shareholder servicing, accounting, auditors and attorneys fees.  (SAC ¶ 63; Dec. RL ¶ 21 Ex. T).

Moreover, it is clear that HIFSCO does not itself maintain records (which would be required to perform or review transfer agency tasks),  as HIFSCO was required to rely on Plaintiffs to identify the share class of their respective investments:

> We don't have in our records what classes these shareholders own. ... [S]o we don't have individual shareholders' records.

(Dec. RL ¶ 22 Ex. U, 103:24-5; 104:2).  Thus, transfer agent, custodian, and shareholder services are separately performed and are compensated by additional fees.

In § 3(b) of the IMA, HIFSCO claims to provide the following administrative services:

> (b)   provide the Company with the services of persons, who may be the Adviser's officers or employees, competent to serve as officers of the Company and to perform such administrative and clerical functions as are necessary in order to provide effective administration for the Company, including the preparation and maintenance of required reports, books and records of the Company;....

Once again, as HIFSCO's SEC filings reveal, all, or most, of the costs of these services are defrayed by separate fees assessed to Plaintiffs.  According to each Funds' Annual Report, in addition to their investment management fee, Plaintiffs pay "Accounting Services Fees." (SAC ¶¶ 58-9).  As HIFSCO acknowledges, "Fund accounting is putting together the financial statements to submit to the SEC . . ."  (Dec. RL ¶ 22 Ex. U p. 63:5-7).  Plaintiffs also pay "Audit" fees, "Administrative Services Fee" and "Registration and Filing Fees," all of which are in addition to the "Accounting Services Fees," "Investment Management Fee" and "Other Expenses." (SAC ¶¶ 58-9) Thus, the costs for the services described in § 3(b) of the IMA were defrayed by fees in addition to HIFSCO's Investment Management Fee.  (SAC ¶ 76; Dec. of Dr. S. Pomerantz ¶¶ 10-11).

In § 3(c) of the IMA, HIFSCO claims to provide the following administrative services:

(c)   provide the Company with adequate office space and related services necessary for its operations as contemplated in this Agreement.

These costs should have been minimal.  First, the sub-advisers, accountants, custodians and transfer agents are third-parties with their own offices.  (SAC ¶¶ 67, 77).  Second, the sub-advisers' investment management fee, which is significantly less than HIFSCO's fee, covers the sub-advisers' office space.  (Dec. RL ¶¶ 6-8  Exs. E-G).  Third, HIFSCO, under the IMA, is limited to a supervisory role, which requires less office space than that needed for the performance of the actual tasks.  Fourth, HIFSCO should allocate the office expense for its 50 employees over the 55 mutual funds, which it claims to manage, allocating only a portion to the six Funds at issue here. (Dec. RL ¶ 3 Ex. B).  Fifth, HIFSCO is a wholly-owned indirect subsidiary of Hartford Life Insurance Company, and HIFSCO uses as its office address, the office of Hartford Life Insurance Company. (Dec. RL ¶¶ 3,  23-4 Exs. B, V, W). Finally, as the Annual Reports for each of the Hartford Funds states, HIFSCO charges an ambiguous fee titled "Administrative Services Fees" and "Other Expenses" (SAC ¶¶ 58-9), which should have been used to pay for any office space it needed. (SAC ¶ 77; see also Dec. Dr. S. Pomerantz, ¶ 13, Ex. A to the SAC).

*          *          *

Review of HIFSCO's 2010 SEC ADV filing confirms that the Funds use minimal services. In this filing, HIFSCO checked a box indicating it has between  "11-50" employees; of which 1 to 5 perform investment advisory services -- for all 55 HIFSCO funds and a college savings plan product.   (Dec. RL ¶ 3 Ex. B).  HIFSCO's investment management fee in 2010 exceeded $100 million for the 6 Funds at issue here.  Assuming HIFSCO has the maximum 50 employees, (5 of whom are investment advisors) who provide equal time to each of the 55 funds, then it provides the

11

6 Hartford Funds with the services of 5.45 persons ((50÷55)×6)), and charges the 6 Funds an annual fee of  $100 million or $18 million per year per employee -- for supervisory and administrative services.  Of course, if HIFSCO has less than 50 employees (the minimal 11), the per employee revenues would be greater.  HIFSCO has failed to fulfill its fiduciary duty because fees of this magnitude simply could not be the product of arm's-length negotiations.

HIFSCO cites little relevant case law in its motion.   Rather, Defendant advances factual arguments that are inappropriate for resolution on a motion to dismiss, <u>Braden v. WalMart Stores, Inc.</u>, 588 F. 3d 585, 596-97 (8th Cir. 2009), and that cannot be reconciled with HIFSCO's own SEC filings.  Insofar as HIFSCO may assert that any SEC filings support its position, which they do not, HIFSCO errs.  A defendant may not rely upon its own SEC filings to support a motion to dismiss. <u>In re Cendant Corp. Litig</u>,  60 F. Supp. 2d 354, 365 (D.N.J.1999) (collecting cases).  As HIFSCO argues, <u>Rose v. Bartle</u>, 871 F.2d. 331, 340 n.3 (3d Cir. 1989) holds that declarations may not be considered on a motion to dismiss. (Db 13).  However, allegations incorporated in a pleading drawn from a declaration may be considered.  <u>Dominos Pizza LLC v. Deak</u>, 383 F. App'x. 155, 158 (3d Cir. 2010); <u>DeMarco v. Depotech Corp.</u>, 149 F.Supp.2d 1212, 1222 (S.D. Cal. 2001) (cited by HIFSCO but holding "the Court DENIES Defendants' motion to the extent it seeks an order striking those portions in the Second Amended Complaint that were derived from the Makuch [expert] affidavit"); <u>In re Resource Am. Sec. Litig.</u>, C.A. No. 5446, 2000 WL 1053861 *4 (E.D. Pa. July 26, 2000) (citing two expert declarations in denying a motion to dismiss in a securities case).  Here, the bulk of Dr. Pomerantz's declaration is incorporated into the SAC.  (SAC ¶¶ 52; 74; 75; 76; 77; 78; 204-05; and 211).

638036.14

### B.    Analysis of Comparative Fee Structures Weighs in Plaintiffs' Favor

The Gartenberg comparative fee factor also weighs in Plaintiffs' favor.  In its brief, HIFSCO simply repeats those arguments that the Court has already rejected.  (Dec.  RL ¶ 22 Ex. U pp. 71-72).  The SAC compares HIFSCO's investment management fees:  (1) to fees of comparable Vanguard funds sub-advised by HIFSCO's sub-advisers; (2) to fees that HIMCO charges to institutional accounts; and, (3) to fees charged by Hartford's sub-advisers.[3]  (SAC ¶¶ 131 to 182).  In its brief, HIFSCO largely renews arguments rejected by the Court.  See Jones where the Supreme Court reversed **summary judgment** in favor of defendants and ruled that courts may consider fee comparisons "in light of the similarities and differences between the services."  Jones, 130 S. Ct. at 1428.

### 1.    Vanguard Comparisons

Plaintiffs have not simply compared  Vanguard fees with those of HIFSCO, as Defendant suggests.  Rather, the SAC compares the fees, by task, charged by a Vanguard fund to its counterpart HIFSCO fund.  These comparisons are appropriate because:  (1) the funds all have Wellington as their sub-adviser; (2) the Wellington sub-advisory agreements are materially similar; and (3) and these Vanguard and Hartford funds generally have the same investment philosophies. (SAC ¶¶ 135-37; 171).

### a.    Investment Management Fee Comparison

Vanguard  pays its sub-adviser, Wellington, an investment management fee ranging from 7 to 16 bps for each of the Vanguard funds.  (SAC ¶¶ 143; 166).  Vanguard, unlike HIFSCO, does not

---

[3]  HIFSCO does not contest the relevance of the comparison of its fees to those of its sub-advisers, it challenges only Plaintiffs' methodology.

13

itself charge an investment advisory fee (other than a 1 basis point investment advisory fee for the Vanguard Morgan Growth Fund). (SAC ¶ 138). By way of comparison, HIFSCO's investment management fee, after deducting the portion paid to the comparable Hartford Funds' sub-advisers, equals or exceeds 50 bps. (SAC ¶ 142).

This comparison is relevant for five reasons. First, it illustrates the large differential in total fees. Second, the absence of a Vanguard advisory fee (other than a 1 bps fee for a single fund) demonstrates that HIFSCO's advisors' services are largely unnecessary. Third, while HIFSCO asserts that Vanguard is a nonprofit low-cost entity, Vanguard is not in business to lose money. Further, its sub-adviser, Wellington, is a for profit entity, and it performed all of the required investment management services for the Vanguard funds, presumably for a profit. Since Wellington could perform all of its advisory work for the comparable Vanguard funds, subject to materially similar investment management agreements at a fraction of HIFSCO's costs, it is plausible to assert that the latter's fees are excessive. Fourth, many of the services that HIFSCO claims to provide, over and above those of Vanguard, are compensated separately from the investment management fees. Fifth, HIFSCO has but 5 persons advising all of its 55 funds; the amount of time devoted to Plaintiffs' 6 Funds should be relatively small.

### b.   Administrative Fees

Vanguard's "Management and Administrative Expenses," which for each of the Vanguard funds is 15 bps, 16 bps and 20 bps respectively, pays for:

> Corporate management and administrative services [which] include: (1) executive staff; (2) accounting and financial; (3) legal and regulatory; (4) shareholder account maintenance; (5) monitoring and control of custodian relationships; (6) shareholder reporting; and (7) review and evaluation of advisory and other services provided to the funds by third parties.

(SAC ¶¶ 142-44). These items include "transfer agency services." (Dec. RL ¶¶ 25-27, Ex. X, p.21-

14

638036.14

3, Ex. Y, p. 26, 28, Ex. Z  p. 19, 21).

After HIFSCO compensated the sub-advisers from its investment management fee, it retained, on average, 53 bps. (SAC ¶ 142). HIFSCO, for this fee allegedly (a) supervised the service providers to the Funds; (b) provided information to the Board (Db 10); (c) provided the Funds with persons to maintain the Funds' books and records;[4] and (d) provided the Funds with office space. (SAC ¶ 56).  While HIFSCO is only "supervis[ing]" the Funds' "transfer agent or other shareholder servicing agents (if any), accountants, attorneys" (Dec. RL ¶¶ 4-5, Exs. C-D § 3(a)), Vanguard, for its 15 to 20 bps actually **performs** transfer agency services and "accounting and financial services;" **pays** for "legal and regulatory" services; **provides** administrative staff; and **conducts** a "review and evaluation of advisory [i.e., Wellington] and other services provided to the funds by third parties." (SAC ¶157, emphasis added).  Further, HIFSCO not only charges Plaintiffs investment management fees but also charges "Accounting Services Fees, "Audit" fees, "Registration and Filing Fees", and "Transfer Agent Fees," all fees which are paid from Vanguard's, on average, 17 bps, "Management and Administrative Expenses." (SAC ¶¶ 58-9; 157).[5]  Thus, the SAC does not compare the gross performance and costs of the Vanguard and Hartford Funds; it compares the costs assessed for identical tasks.

A comparison of costs of services is appropriate.  See Jones, 130 S. Ct. at 1428 (court may give comparisons the weight that they merit); Forsythe, 417 F. Supp. 2d at 116 ("plaintiffs

_____

[4]  As discussed above, the Hartford Funds were charged separate fees for "Audit," "Accounting Service Fees" and "Registration and Filing Fees," which paid for the maintenance of the Funds' books and records.

[5]  Additionally, as transfer agent fees for a mutual fund, on average, equal 15 bps (SAC ¶ 150) , almost all of Vanguard's 17 bps "Management and Administrative Expenses" pays for the Vanguard funds' transfer agent services (SAC ¶¶ 151-52).

638036.14

theory…that fees that amount to 'something for nothing' are inherently excessive" states a claim under ICA § 36(b)); Hunt v. Invesco Funds Group, Inc., No. 04-02555, 2006 WL 1581846, *2-5 (S.D. Tex. Jun. 5, 2006) (allegations "sufficient to allege disproportionality" between the fees charged and the services rendered coupled with comparisons with fees charged for 'equivalent advisory services' sufficient to state a claim"); Curran v. Principal Mgmt. Corp., No. 4:09-cv-433, 2010 WL 2889752, *8-9 (S.D. Iowa June 8, 2010), overturned on rehearing on other grounds, Curran v. Principal Mgmt. Corp., 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) (denying motion to dismiss where plaintiff alleged, *inter alia*, defendants charged more than the sub-advisor who provided the core investment management services and charged its institutional clients lower fees for similar services); Reso, No. 11-cv-873, 2011 WL 5826034 (denying motion to dismiss in a case in which the plaintiffs' allegations were far less extensive than those of Plaintiffs here).

Neither Amron v. Morgan Stanley Inv. Advisors Inc., 464 F.3d 338 (2d Cir. 2006), (where plaintiff only pled that the fees were not warranted given the funds' poor performance) nor Schuyt v. Rowe Price Prime Reserve Fund Inc., 663 F.Supp. 962 (S.D.N.Y. 1987), involved common sub-advisers operating under similar agreements. Moreover, plaintiffs in those cases failed to make the detailed comparisons pled here (SAC ¶¶ 132-82), nor did the complaints address the remaining Gartenberg Factors. Finally, the cases relied upon by HIFSCO were decided prior to the Supreme Court's decision in Jones, where the Court stated:

> Since the [ICA] Act requires consideration of all relevant factors . .. we do not think that there can be any categorical rule regarding the comparisons of the fees charged different types of clients. . . . **Instead, courts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons.**

130 S.Ct. at 1428 (emphasis added).

16

638036.14

HIFSCO also argues that Plaintiffs' comparison of its fees to those of the Vanguard funds, is improper because HIFSCO's fees do not fall outside the range of the other funds.  This argument was rejected by the Supreme Court in <u>Jones</u>, which recognized that the lack of competition among advisers may make the comparisons misleading.  <u>Id.</u> at 1428.  <u>See also</u> <u>Gartenberg</u>, 694 F. 2d at 929-30 (because advisory fees are not the result of arm's-length negotiations, it is improper to reject claim because fee is within the norm).  Indeed, such comparisons are meaningless without consideration of the number of employees (HIFSCO has between 1 and 5 investment advisors servicing all of its 55 funds) devoted to advisory tasks.  Further, HIFSCO's fees are not slightly larger than Vanguard's, they are substantially larger.  At the motion to dismiss stage, the Vanguard comparison supports a plausible claim.

### 2.     Institutional Accounts Comparison

The Court previously denied HIFSCO's motion to dismiss Plaintiffs' comparative fee allegations related to the investment management fees that HIMCO charges institutional clients. (<u>See</u> Dec. RL ¶ 22 Ex. U p. 71 and Db 17).  These allegations are set forth in SAC ¶¶ 174-82 where Plaintiffs identify instances in which HIMCO charged two institutional accounts and an independent mutual fund much lower investment management fees than HIFSCO charged the Hartford Funds. HIFSCO's initial defense to this comparison, that a mutual fund requires services in addition to those of institutional accounts, was rejected by the Court because those services are compensated pursuant to other contracts.  (SAC ¶¶ 58-9; Dec. RL. ¶ 22 Ex. U p. 62:19).

HIFSCO now argues "this sub-allegation [comparison to institutional accounts], including discovery, should be limited to the Hartford Inflation Plus Fund...." because the other accounts HIMCO manages do not have similar investment strategies to those of the Hartford Funds. (Db 18).

17

638036.14

This argument, made without the benefit of any case law, is flawed.  First, the Court previously ruled these comparisons sufficiently establish the comparative fee factor for all of the Hartford Funds. Plaintiffs have pled that HIMCO (a sub-adviser to the Hartford Funds and an affiliate of HIFSCO), when acting as an investment advisor to a third-party mutual fund and fixed income accounts, charges significantly lower investment management fees than HIFSCO, because, in the former circumstance, fees are the product of arm's-length negotiations.  (SAC ¶ 180).  To permit an institutional account comparison only when the mutual funds and institutional accounts have similar investment philosophies would defy Jones admonition that: "courts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require...."  130 S.Ct. at 1428.  Since HIFSCO's own SEC filings confirm that any additional services required by the mutual Funds are compensated by separate fees and that it devotes few resources (5 or less employees to all 55 funds) to investment management, a comparison of HIFSCO's investment management fee for the Plaintiffs' Funds with the management fees charged by HIFSCO's affiliate for institutional accounts is an apt comparison.  (SAC ¶¶ 57-9).  See Reso, 2011 WL 5826034, *2 and *9 (Court permitted comparison of fees charged the "California Public Employees' Retirement System" as well as to fees charged to a third party mutual fund).

*          *          *

HIFSCO does not dispute any of Plaintiffs' allegations with respect to the remaining Gartenberg Factors.  Each factor is not a sub-allegation or an element of a cause of action.  Rather, all factors are to be collectively weighed, and plaintiffs are not required to state a claim with respect to each Gartenberg Factor.  See Jones; Reso, 2011 WL 5826034, *6 ("Rather, as mentioned, the Court will look to the totality of the facts alleged in Reso's complaint, viewed through the lens of

18

Gartenberg, to determine whether he has stated a plausible claim for relief under Section 36(b)");

In Re Evergreen Mutual Funds Fee Litig., 423 F. Supp. 2d at 258; In Re Dreyfus Mut. Funds Fee

Litig., 428 F. Supp. 2d at 350.[6]  HIFSCO inexplicably fails to discuss Plaintiffs' allegations

addressed to the following Gartenberg Factors: economies of scale (SAC ¶¶ 101 to 130);

conscientiousness of the Board  (SAC ¶¶ 183 to 223); and profitability of the fund to the adviser.

(SAC ¶¶ 224 to 244).

**POINT II**

**COUNT II STATES A CLAIM FOR EXCESSIVE DISTRIBUTION AND SERVICE FEES UNDER § 36(b) OF THE ICA**

Count II of the SAC alleges that HIFSCO improperly derived, and continues to derive,

revenue from Rule 12b-1 distribution and service fees charged to the Hartford Funds' Class A and

Class B shares and, thereby, has breached its fiduciary duty under ICA § 36(b).

As a threshold matter, HIFSCO attempts to re-argue the merits of Plaintiffs' ICA § 36(b)

excessive 12b-1 fee claim that was resolved in Plaintiffs' favor at oral argument.  This Court already

ruled, *inter alia*, that: (1) with respect to the Funds' Class A shares, Plaintiffs' allegations that

HIFSCO "represented to the SEC that the distribution fees will be taken care of or addressed in the

front end and back end loads and then that the distribution fees have actually turned out to be much

more," create "a plausible claim" and "at this juncture . . . can survive" (Dec. RL ¶ 22 Ex. U pp.

97:18-98:18; 98:23 -99:4; 102:6-10; 104:15-105:13; 106: 12-23); and (2) with respect to the Funds'

---

[6] In footnote 12 of its brief, HIFSCO states "it incorporates by reference the arguments made in its [initial] motion to dismiss the AC, at pp. ___."  This practice is not permitted, and violates the page limitations of Local Rule 7.2(b).  The un-identified pages HIFSCO seeks to incorporate should  be disregarded.  See e.g., In re Hypodermic Products Antitrust Litig., MDL 1730, 2007 WL 1959225, *15 n. 31 (D.N.J. 2007).  Cf Fleming v County of Kane, 855 F.2d 496, 498 (7th Cir. 1988) ("litigants should not hide excess text in...footnotes").

19

Class B shares, Plaintiffs' allegations "that's a fund that's closed and they are still being charged 12b-1 fees" (id. 111:4-6), "goes forward" because "the arguments that the defendants make go to summary judgment" (Id. 95:4-7, 106:21-22).  Moreover, HIFSCO fails to address any of the Gartenberg Factors and, for this reason alone, its motion should be denied.

### A.   Plaintiffs' Allegations Relating to Count II are Specific and Detailed, Not Conclusory or Policy-Based

The SAC adequately pled the manner in which HIFSCO's 12b-1 fees are excessive in light of the distribution and shareholder services allegedly provided to the Funds' Class A and B shareholders.  (See SAC ¶¶ 110, 114 to 130 (economies of scale); ¶¶ 85 to 99 (nature and quality of services); ¶¶ 183 to 193; 215 to 223 (conscientiousness of the board); and ¶¶ 242 to 244 (profitability)).  HIFSCO, nonetheless, ignores the SAC's detailed allegations, and erroneously contends that Plaintiffs' 12b-1 excessive fee allegations are merely based upon policy arguments and general industry commentary.  (Db 5).  On the contrary, Plaintiffs' allegations relating to Count II are more than adequate measured by the standards of Matrixx  and Ashcroft.

### 1.   Nature and Quality of the Services Rendered by HIFSCO

The SAC details the complete disconnect between the $41 million in 12b-1 fees paid by the Funds' Class A and Class B security holders to HIFSCO (SAC Table ¶ 242) and the *de minimis* services it provides.  (SAC ¶¶ 85-99).  First, HIFSCO represented to the SEC that one of the potential benefits that the Distribution Plans may provide to the Funds includes "the ability to provide investors with an *alternative* to paying front end sales loads." (SAC ¶ 92; see also Dec.  RL ¶ 2 Ex. A (last pg of exhibit; emphasis added)).  The Hartford Funds' Class A shares, however, pay a front-end sales load *in addition* to a 12b-1 distribution and service fee.  (SAC ¶¶ 91, 93; see also Dec.  RL ¶¶ 15-20 Exs. N-S).  Second, HIFSCO also represented to the SEC that the "the potential

20

to increase assets and...the ability to sell shares of the funds through advisers and broker distribution channels" are benefits that the Distribution Plans may provide to the Funds. (SAC ¶ 96; see also Dec. RL ¶ 2 Ex. A (last page)). The Funds' Class B shares were closed to new investments as of September 2009 (SAC ¶ 94), eliminating any potential to increase the Class B sales, and there are no brokers or dealers to contact because there are no new shares to sell. (SAC ¶ 96). Third, the SAC alleges that the12b-1 fees, as detailed in the Distribution Plans (*i.e.*, compensation for personnel, office space, and related services for HIFSCO's operations) (SAC ¶ 97), duplicate other payments made pursuant to the IMAs. (SAC ¶¶ 50; 56-57; 68; 71; see also Dec. RL ¶¶ 4-5 Exs. C-D).

### 2.   The Funds' Boards Lack of Independence and Conscientiousness

The SAC pled detailed facts demonstrating that the Boards have not been conscientious in protecting the interests of the Funds and their shareholders when they approved the Distribution Plans and HIFSCO's 12b-1 fee, as required by Rule 12b-1. (SAC ¶¶ 215; 218-222); 17 C.F.R. § 270.12b-l(e). For example, Plaintiffs allege that the Boards failed to consider that Class B shares have been closed to new investments since September 30, 2009 (SAC ¶ 94) and that Class B shareholders could not possibly derive any benefit from the 0.75% of the 12b-1 fee claimed to be used to facilitate the sale of the Hartford Funds' shares. The Boards also failed to consider that, despite the fact that HIFSCO touts the 12b-1 fee as having "the ability to provide investors with an alternative to paying front-end sales loads" (SAC ¶ 92), Class A shareholders are charged a 12b-1 fee in addition to a significant front-end sales load. (SAC ¶¶ 91, 93). Additionally, despite the fact that the 12b-1 fees increased as assets under management grew — which deprived the Funds of savings attributable to economies of scale — the Boards continued to approve the Distribution Plans

21

each year.  (SAC ¶ 216).  Moreover, the Board approved 12b-1 and investment management fees to defray the cost of no more than 50 employees for all 55 HIFSCO funds in only four days of meetings. (SAC ¶¶ 196-97).

### 3.    The Profitability of the Funds to HIFSCO

Plaintiffs allege that the 12b-1 fees resulted in huge profits for HIFSCO.  For example, HIFSCO has collected 12b-1 fees of almost $41 million for the Funds' Class A and Class B shares for 2010.  (SAC ¶ 242; See also Dec. RL ¶ 2 Ex. A (last page).  (This ignores the 12b-1 fees HIFSCO's 50 employees collected from its 49 other funds).  The SAC alleges that the cost of providing distribution and marketing services does not justify charging large 12b-1 fees, especially since Class B shares are closed to new investors (SAC ¶¶ 94-96), Class A shareholders are paying a significant  - 5.5% - front-end sales load in addition to paying the 12b-1 fee (SAC ¶¶ 91-93), and the 12b-1 fee is not tied to any distribution activity.  (SAC ¶ 243).

### 4.    Economies of Scale

Plaintiffs allege in detail how the 12b-1 fees have produced minimal benefits (in the form of economies-of-scale or otherwise) while generating significant additional revenue for HIFSCO. (SAC ¶¶ 91-98; 114-16; 128; 216; 220-22; 242-43).  Here, despite yearly increases in total assets held by the Hartford Funds, the total 12b-1 fees received by HIFSCO increased as assets grew, thus depriving the Funds of the benefit of economies of scale.  (SAC ¶ 216).  The sub-advisers generally had lower breakpoints[7] than did HIFSCO.  Thus, the savings which accrued to HIFSCO, when the sub-adviser's breakpoints were reached, were not passed on to Plaintiffs but retained by HIFSCO. The economies of scale largely benefitted HIFSCO, not the investors.  (SAC ¶ 240).

---

[7]  Once a breakpoint is reached, the fees incurred on additional assets are reduced.

638036.14

**B.**     **Plaintiffs State a Plausible Claim that HIFSCO Charged Excessive 12b-1 Fees on Class A Shares in Violation of ICA § 36(b)**

In Point II(B) of its brief, HIFSCO argues that Plaintiffs wrongly assert that it violated ICA § 36(b) when it charged Class A shareholders a 12b-1 fee of 25 basis points along with a potential 5.5% front-end sales load. (SAC ¶ 91). HIFSCO maintains that Plaintiffs err because (1) the SEC permits a fund to charge both a front-end sales load and a 12b-1 fee; and (2) HIFSCO unambiguously disclosed that it charged both fees on Class A shares.[8]  This Court previously determined that Plaintiffs' Class A excessive 12b-1 fee allegations state plausible claims and "at this juncture . . . can survive." (Dec. RL ¶ 22  Ex. U pp. 105:10-13; 106:16-20).  Even if the Court were to revisit the issue, HIFSCO's arguments lack merit.

The mere fact that the SEC has recognized that Class A shares may be sold with a front-end load - of an indeterminate amount - and also a 12b-1 fee (Db 20) does not insulate HIFSCO's **specific** 5.5% front-end load and 25 basis point 12b-1 fee from challenge.  This is so because Plaintiffs are not contending that charging both fees is *per se* unlawful.  Rather, Plaintiffs are arguing that HIFSCO's specific fees are excessive, to which HIFSCO responds only that its fees were disclosed.

Nonetheless, the documents upon which HIFSCO relies undermine its contention.  The Mutual Fund Distribution Fees, Confirmations, Securities Act Release No. 9128, cited at Db 21, states:

> Asset-based distribution fees have evolved into a **substitute** for front-end loads, and have also enabled the development of new models of fund distribution that could not have been

---

[8]  Defendant simply ignores these allegations. Defendant erroneously suggests that Plaintiffs criticize its multi-class fee structure merely for treating classes differently.  (Db 20-21). Rather, Plaintiffs allege that HIFSCO's specific class treatment supports the inference that HIFSCO's 12b-1 fees are substantively excessive.

anticipated when the rule was adopted.

(Emphasis added). 75 Fed. Reg. 47074, 47127 (proposed Aug. 4, 2010). Moreover, HIFSCO's front

end load fee, of up to 5.5%, exceeds the median 4.5% front-end load fee reported in the Division of

Investment Management Study, authored by the U. S. Securities and Exchange Commission cited

at Db 20. http://www.sec.gov/news/studies/feestudy.htm#P1143_163930, at § C.3, n. 84.

In any event, the SEC's recognition that funds may charge both a front-end load and 12b-1

fee does not render any specific fee lawful. See e.g. Yameen v. Eaton Vance Distributors, Inc., 394

F. Supp. 2d 350, 355 (D. Mass. 2005) (service fees that are "within the limits set by NASD.

Rule 2830 does not necessarily mean that the fees are *per se* reasonable"); ING Principal Protection

Funds Derivative Litig., 369 F. Supp 2d 163, 168 (D. Mass 2005) (same); Zucker ex rel. AIM Small

Cap Growth Fund/A v. AIM Advisors, Inc., 371 F. Supp. 2d 845, 850 (S.D. Tex. 2005) (compliance

with NASD rule does not render distribution fee lawful); Lieber ex rel. Invesco Balanced Fund/Inv

v. Invesco Funds Group, 371 F. Supp. 2d 852, 857 (S.D. Tex. 2005) (same); Pfeiffer v. Bjurman,

Barry & Assoc's., No. 03-Civ.9741, 2004 WL 1903075, *5 (S.D.N.Y. Aug. 26, 2004)

HIFSCO's only other argument addressed to the Class A 12b-1 fees is that Plaintiffs have

incorrectly stated that HIFSCO's public filings reported that 12b-1 fees are an "alternative" to a front

end load. Plaintiffs' allegation is drawn from HIFSCO's statements in its SAI "the ability to provide

investors with an **alternative** to paying front end sales loads" (SAC ¶ 92; See also Dec. RL ¶ 2 Ex.

A (last pg. of exhibit; emphasis added)) and Prospectuses, which read as follows:

> In approving the [12b-1] Plans, the directors identified and considered a number of potential
> benefits which the Plans may provide including the . . . ability to provide investors with an
> **alternative** to paying front end sales loads.

(Emphasis added).   (Dec. RL ¶¶ 15-20 Exs. N p. 33; O  p. 36; P p. 31; Q p. 38; R p. 32; S p. 36).

HIFSCO argues that use of the phase "may provide" "in no way suggests that Class A shareholders

pay no up-front sales load."  (Db 22).  An ICA §36(b) claim does not focus on the accuracy of the

disclosure, rather, it focuses on whether the fees were disproportionate to the services rendered

(disclosure does not abrogate this fiduciary duty). The Board of Directors, in approving the Hartford

Funds' 12b-1 fees, specifically identified them as "an alternative to paying front end sales charges."

This finding is consistent with 75 Fed. Reg. 47074, 47127.  HIFSCO fails to explain how it can

reconcile charging both fees when the Directors considered them to be alternatives.  Given that

HIFSCO levied both front end sales charges and 12b-1 fees, Plaintiffs' claim that the 12b-1 fees were

excessive (i.e., duplicative) is certainly plausible, and supported by the Directors' findings.

### C.     Plaintiffs State a Plausible Claim that HIFSCO Charged Excessive 12b-1 Fees on Class B Shares in Violation of ICA § 36(b)

#### 1.     Plaintiffs Have Article III Standing to Assert Their Claims

In a brief point that fails to properly characterize the derivative nature of an ICA § 36(b) claim

and ignores contrary case law, Defendant argues that Plaintiffs lack standing to assert a claim that

Class B 12b-1 fees violate ICA § 36(b) because they do not own Class B shares.  HIFSCO errs.

Plaintiffs have alleged that they are security holders of the Funds (SAC ¶¶ 17-22) and that is all that

is required under ICA § 36(b).

An ICA § 36(b) claim is "derivative" in nature because it is brought "on behalf of" an

investment company to vindicate the rights of the investment company.  Daily Income Fund, Inc. v.

Fox, 464 U.S. 523, 535, n.11 (1984). "The 'on behalf of' language in § 36(b) indicates only that the

right asserted by a shareholder suing under the statute is a 'right of the corporation'. . . ." Id.  Any

recovery belongs to the fund, not the shareholder or the specific share class of the fund. Id.;

638036.14

<u>Operating Local 649 Annuity Trust Fund v. Smith Barney Mgmt LLC</u>, 595 F.3d  86, 97-8 (2d Cir. 2010).

Therefore, a shareholder of a mutual fund has Article III and statutory standing to sue on behalf of the fund it owns as well as "various mutual funds within the same family of funds." <u>In re Mut. Funds Inv. Litig.</u>, 519 F. Supp. 2d 580, 587-89 (D. Md. 2007); <u>Franklin Mut. Funds Fee Litig.</u>, 388 F. Supp. 2d 451, 461-62 (D.N.J. 2005) (even where a plaintiff seeks to sue on behalf of a mutual fund in which he or she lacks an interest, plaintiff has standing where the complaint seeks relief against the same defendants for the same types of wrongs).

What a plaintiff may not do is sue on behalf of a separate mutual fund (or investment company). That is not, however, what is at issue here. Rather, Plaintiffs are suing on behalf of the shareholders of several classes within the same fund against a common defendant who collects 12b-1 fees pursuant to a single 12b-1 Distribution Plan. ICA § 36(b) "does not distinguish among owners of different classes of shares in a mutual fund [it only distinguishes among different funds], and does not impose any requirement at the share class level." <u>Turner v. Davis Select Advisers LP,</u> No. 08-civ-421, *8 (D. Ariz. Jun. 1, 2011) (Dec. RL ¶ 28 Ex. AA) <u>quoting</u> <u>In re Am. Mut. Funds Fees Litig.</u>, No. Cv 04-5593, 2009 WL 5215755, *42 (C.D. Cal. Dec. 16, 2005). Thus, "ownership in any one share class is sufficient to confer ... [statutory and Article III] standing." <u>Turner</u>, No. 08-cv-421-48); <u>cf.</u> <u>Fallick v. Nationwide Mut. Ins. Co.</u>, 162 F.3d 410, 421 - 24 (6th Cir. 1998).

By way of example, the plaintiffs in <u>In re American Mut. Funds</u> were held to have both statutory and Article III standing to bring suit on behalf of the fund for all fund share classes, regardless of which class they owned:

> No Plaintiffs paid Rule 12b–1 fees on Class B shares because none of them own such shares.
> ... Plaintiffs have standing to pursue a Section 36(b) claim with respect to Rule 12b–1 ... fees

26

charged to each class of shares for each of the Funds at issue in this litigation. **Plaintiffs are not limited to bringing claims and seeking remedies with respect to only those share classes that they own.** ... Section 36(b) . . .does not distinguish among owners of different classes of shares in a mutual fund, and does not impose any requirement at the share class level. ... The different share classes in a particular Fund invest in the same portfolio of assets, receive the same types and level of service, and are managed in the same manner. The fact that different share classes are assessed different fees and/or fee levels is not sufficient to preclude Plaintiffs from proceeding on behalf of all shareholders of the funds at issue.

In re American Mut. Funds, 2009 WL 5215755, at *42 (emphasis added) (internal citations omitted).

HIFSCO does not cite a single case that holds that a § 36(b) plaintiff lacks standing to proceed on behalf of other shareholders who own different share classes.[9]

### 2. Plaintiffs State a Plausible Claim that HIFSCO Charged Excessive 12b-1 Fees to the Funds' Class B Shares in Violation of ICA § 36(b)

This Court has already held that Plaintiffs' excessive 12b-1 fee claim, related to the Funds' Class B shares, "goes forward" because "the arguments, that the defendants make go to summary judgment." (Dec. RL, Ex. U pp. 95:4-7; 106:21-22). Even if this Court were to inquire anew into the substance of HIFSCO' s arguments, none are correct.

It is undisputed that the Boards of Directors caused the Hartford Funds, as of September 30, 2009, to discontinue selling the Funds' Class B shares to the public. (SAC ¶ 94). In addition to a back end load of up to 5%, HIFSCO claims it may continue to charge the Funds' Class B security holders 12b-1 fees of 1.00% on their investments into this share class, 0.75% of which is supposed

---

[9] HIFSCO misconceives the facts and conclusions of In re Mut. Funds Inv. Litig., 519 F. Supp. 2d 580 (D.Md. 2007). That case involved a series trust, which is a registered investment company that holds within it numerous "series." Each series is akin to a separate mutual fund. Id. at 589. The court there simply held that an investor in one series (i.e., fund) may not sue on behalf of a completely separate series. The case did not address the issue of share class, as the defendants in that case never suggested that, in a derivative action, share class impacts standing. In fact, as stated above, every court to address this issue has rejected HIFSCO's argument.

638036.14

to be used for distribution activities.  (SAC ¶ 89).[10]   The 12b-1 fee, even to the extent allowed, is superfluous when levied upon a closed share class because  HIFSCO is not marketing those shares.

The court in <u>Pfeiffer</u>, found this allegation sufficient to defeat a Rule 12(b)(6) motion where plaintiff alleged that, *inter alia*, defendant's 12b-1 fees were excessive because "it was 'inconceivable' that the Fund's Rule 12b-1 expenses increased 'so dramatically'" at a time when it was closed. <u>Pfeiffer</u>, 2004 WL 1903075, at *1, 3 (S.D.N.Y. Aug. 26, 2004).

HIFSCO argues that the 12b-1 fees are not excessive because the percentage charged to this class is not greater than the maximum annual percentage permitted by National Association of Securities Dealers (Now FINRA) Rule 2830.  (Db 25-27).  Compliance with an NASD Rule does not insulate HIFSCO from liability for an ICA § 36(b) violation.  <u>See</u> <u>Yameen</u>, 394 F. Supp. 2d at 355; <u>ING Principal Prot. Funds Derivative Litig.</u>, 369 F. Supp. 2d at 168; <u>Zucker</u>, 371 F. Supp 2d at 850; <u>Lieber</u>, 371 F. Supp. 2d at 857.

Furthermore, HIFSCO improperly relies upon two unofficial statements by staff of the SEC and the NASD expressing the "opinion" that there is no *per se* rule against a closed fund continuing to pay Rule 12b-1 fees. <u>(See</u> Ex. 14 to Skinner Cert.)  These documents may not be considered on a motion to dismiss because they are not cited in the SAC, and Plaintiffs' claims are not based upon them.  <u>Kurdyla v. Pinkerton Sec.</u>, 197 F.R.D. 128, 131 (D.N.J. 2000).  Nor are they entitled to any deference because they are not rules or regulations promulgated by the SEC.  Advisory opinions of an administrative agency do not "command any particular deference under <u>Chevron</u> or comparable doctrines." <u>Ass'n of Int'l Auto. Mfrs., Inc. v. Comm'r, Massachusetts Dep't of Envtl. Prot.</u>, 208 F.3d

---

[10]  Notwithstanding the fact that the Distribution Agreement authorizes a .25% service fee and a .75% distribution fee (Dec. RL ¶¶ 29-30, Exs. BB, CC), at least one fund, the Hartford Global Health fund, paid a 1.23% distribution fee ($282,094 ÷ $23,023,000), or significantly more than permitted.  (Dec. RL ¶¶ 2 and 9 Ex. A (last page) Ex. H p. 7).

638036.14

1, 6 (1st Cir. 2000) citing Mid-America Care Found. v. NLRB, 148 F.3d 638, 642 (6th Cir. 1998).[11]

Insofar as HIFSCO suggests that present 12b-1 fees pay for past costs, it errs.  At page 18 of the 2010 Annual Report for the Hartford Growth Opportunity Fund, HIFSCO, by way of example, reports that HIFSCO "**is** engaged in distribution activities which include marketing and distribution of [Class B] shares." (Emphasis added; Dec. R. Skinner, Ex. 6, p. 18).[12]  The 12b-1 Plan is designed, HIFSCO maintains, to "compensate the distributor (HIFSCO) for activities **intended to result** in the sale. . .." Id.  (Emphasis added).  Moreover, the 12b-1 Plans authorize payments to HIFSCO "regardless of HIFSCO' s expenditures " for sales and distribution. (Dec. R. Skinner, Ex. 10, p. 149).  Defendants' undocumented speculation is factual in nature, cannot be reconciled with the documents it cites, and is more appropriate for resolution on summary judgment.

All of HIFSCO' s cases are distinguishable.  In ING Principal Prot. Funds Derivative Litig., 369 F. Supp. 2d 163, the parties had engaged in substantial discovery prior to the motion to dismiss, and plaintiff's allegations were remarkably sparse. Id. at 168.  Here, no discovery has taken place and the Plaintiffs have comprehensively addressed the Gartenberg Factors.  In Yameen, plainitffs' allegations put in issue only one Gartenberg Factor and the sole claim was that the "Trustees failed to consider the fact that the Fund was closed to new investors when they approved the fees" in violation of § 36(b).  Yameen, 394 F. Supp. 2d at 355-56.  In re Goldman Sachs Mut. Funds Fee

---

[11] The August 19, 1993 Letter and the August 16, 1993 Memorandum also make clear that they do not represent the type of  "final agency action" that is afforded any deference by the courts, because they contemplate further investigation and monitoring of the practices at issue "to determine whether changes are necessary to prevent possible abuses arising from these practices." See Skinner Cert., Ex. 14, August 19, 1993 Letter.  When the opinions expressed contemplate such future action, they do not constitute "final agency action" and are afforded no deference. Auto. Mfrs., 208 F.3d at 5-6.

[12] Each Annual Report contains similar language.

29

Litig., No. 04-cv-2567, 2006 WL 126772, at *9 (S.D.N.Y. Jan. 17, 2006) stands for the proposition that "mere assertions that fees increased with the size of the Funds are not enough to establish that benefits from economies of scale were not passed on to investors."   Here, Plaintiffs detailed allegations comperhensively address the Gartenberg Factors.

Accordingly, the extensive facts pled in the SAC, taken together, demonstrate that the 12b-1 fees charged to the Class A and B shareholders are  excessive and breach HIFSCO's fiduciary duty under ICA §36(b).

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be denied.
Respectfully submitted,

**SZAFERMAN, LAKIND**
**BLUMSTEIN & BLADER, P.C.**

Dated: March 21, 2012

By: s/ Robert L. Lakind
Robert L. Lakind
Arnold C. Lakind
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648
(609) 275-4500

**LEVY PHILLIPS & KONIGSBERG, LLP**
Moshe Maimon
Danielle Disporto
800 Third Avenue
New York, NY 10022
(212) 605-6200
*Attorneys for Plaintiffs*

30

638036.14