**NOT FOR PUBLICATION**                                    [Dkt. Ent. 37]

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

**CAMDEN VICINAGE**

| | |
|---|---|
| JENNIFER KASILAG, et al., | |
| Plaintiffs, | Civil No. 11-1083 (RMB/KMW) |
| v. | **OPINION** |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | |
| Defendant. | |

Arnold Carl Lakind, Esq.
Robert Lawrence Lakind, Esq.
Szaferman, Lakind, Blumstein, Blader & Lehmann, PC
Quakerbridge Executive Center
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648

Moshe Maimon, Esq.
Levy, Philips & Konigsberg, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, NJ 08648

Danielle Disporto, Esq.
Levy, Philips & Konigsberg, LLP
800 Third Avenue
New York, NY 10022

        Counsel for Plaintiffs

Gregory Robert Haworth, Esq.
Duane Morris, LLP
One Riverfront Plaza
1037 Raymond Boulevard, Suite 1800
Newark, NJ 07102

Anthony Sylvester, Esq.
Anthony C. Valenziano, Esq.
Riker, Danzig, Scherer, Hyland & Perretti, LLP
One Speedwell Avenue
Morristown, NJ 07962

    Counsel for Defendant

**BUMB**, United States District Judge:

    The plaintiffs, Jennifer Kasilag, Louis Mellinger, Judith M. Menendez, Jacqueline M. Robinson, and Linda A. Russell ("Plaintiffs"), bring this action on behalf of six mutual funds (the "Funds").[1]  They are suing Hartford Investment Financial Services, LLC ("HIFSCO"), the investment advisor to the Funds, for charging excessive management and distribution fees in violation of § 36(b) of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35(b).  HIFSCO previously filed a motion to dismiss the Amended Complaint, which the Court granted in part and denied in part with leave to amend.  [Dkt. Ents. 32, 33.] Plaintiffs subsequently filed a Second Amended Complaint (the "Complaint"), and HIFSCO now moves to dismiss again.  [Dkt. Ent. 37.]  For the reasons set forth below, this motion is GRANTED in part and DENIED in part.

## I. LEGAL STANDARD

---

[1] The mutual funds are the Hartford Global Health Fund (which has been renamed the "Hartford Healthcare Fund"), the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Inflation Plus Fund, the Hartford Advisers Fund, and the Hartford Capital Appreciation Fund.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Sheridan v. NGK Metals Corp., 609 F.3d 239, 263 n. 27 (3d Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

The Court conducts a three-part analysis when reviewing a claim:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, "because they are no more than conclusions are not entitled to the assumption of truth." Id. at 1950. Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Id.

Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010); see also Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts.").

## II.    ANALYSIS

The Complaint contains two claims for excessive fees in violation of § 36(b) of the ICA. Count I pertains to investment management fees, and Count II pertains to distribution fees

pursuant to the Securities and Exchange Commission's Rule 12b-1

("12b-1 fees").[2]

Section 36(b) imposes a "fiduciary duty" on investment

advisers with respect to the compensation they receive for

providing services to mutual funds.  15 U.S.C. § 35(b).[3]  In

Jones v. Harris Associates L.P., the Supreme Court resolved a

split among the Courts of Appeals over the proper standard under

§ 36(b).  -- U.S. --, 130 S. Ct. 1418, 1425 n.2 (2010).[4]  Drawing

---

[2] Pursuant to 17 C.F.R. § 270.12b-1, a fund may market and sell
its shares using shareholder funds ("distribution fees") deducted
from fund assets.

[3] Section 36(b) provides in relevant part:

> [T]he investment adviser of a registered investment company
> shall be deemed to have a fiduciary duty with respect to the
> receipt of compensation for services, or of payments of a
> material nature, paid by such registered investment company,
> or by the security holders thereof, to such investment
> adviser or any affiliated person of such investment adviser.

15 U.S.C. § 35(b).

[4] The Jones opinion also provided a useful summary of the ICA,
its background, and purpose:

> The [ICA] regulates investment companies, including
> mutual funds.  A mutual fund is a pool of assets,
> consisting primarily of a portfolio [of] securities,
> and belonging to the individual investors holding
> shares in the fund.  The following arrangements are
> typical.  A separate entity called an investment
> adviser creates the mutual fund, which may have no
> employees of its own.  The adviser selects the fund's
> directors, manages the fund's investments, and provides
> other services.  Because of the relationship between a
> mutual fund and its investment adviser, the fund often
> cannot, as a practical matter, sever its relationship
> with the adviser.  Therefore, the forces of arm's-
> length bargaining do not work in the mutual fund
> industry in the same manner as they do in other sectors
> of the American economy.

from the Second Circuit's decision in _Gartenberg v. Merrill Lynch Asset Management, Inc._, 694 F.2d 923 (2d Cir. 1982), the _Jones_ Court adopted the following formulation:

> [T]o face liability under § 36(b), an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

_Jones_, 130 S. Ct. at 1426.  In applying this standard, courts employ the multi-factor _Gartenberg_ test, which considers "all relevant circumstances."  _Id._ at 1427 (citing _Gartenberg_, 694 F.2d at 929; ICA § 36(b)(2), 84 Stat. 1429).  These include:

(1)  The adviser-manager's cost in providing the service;

(2)  The extent to which the adviser-manager realizes economies of scale as the fund grows larger;

(3)  The volume of orders which must be processed by the manager;

(4)  The nature and quality of the services provided to the fund and shareholders;

(5)  The profitability of the fund to the adviser;

---

> Congress adopted the [ICA] because of its concern with the potential for abuse inherent in the structure of investment companies.  Recognizing that the relationship between a fund and its investment adviser was fraught with potential conflicts of interest, the Act created protections for mutual fund shareholders. Among other things, the Act required that no more than 60 percent of a fund's directors could be affiliated with the adviser and that fees for investment advisers be approved by the directors and the shareholders of the fund.

_Jones_, 130 S. Ct. at 1422 (citations, quotations, and brackets omitted).

> (6) Any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund;
>
> (7) Comparative fee structures (meaning a comparison of the fees with those paid by similar funds); and
>
> (8) The independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation.

Jones, 130 S. Ct. at 1425-26 & n.5 (citing Gartenberg, 694 F.2d at 929-32).

The plaintiff need not address all of the Gartenberg factors to survive a motion to dismiss if, when taken as a whole, the complaint demonstrates a plausible claim for relief under § 36(b). Reso v. Artisan Partners Ltd., Civ. No. 11-873, 2011 WL 5826034, *5-6 (E.D. Wis. Nov. 18, 2011) (collecting cases).

Importantly, "the standard for fiduciary breach under § 36(b) does not call for judicial second-guessing of informed board decisions." Jones, 130 S. Ct. at 1429. (citations omitted). The Gartenberg standard reflects Congress' decision to "rely largely upon independent director 'watchdogs' to protect shareholders' interests." Id. (citations omitted).

**A.   Count One – Investment Management Service Fees**

HIFSCO moves to dismiss Count I on three grounds:  first, that the Complaint's comparison to sub-advisory fees fails to plead facts specific to HIFSCO that plausibly allege a fiduciary breach under § 36(b); second, that the allegations that HIFSCO charges higher fees than its competitor, Vanguard, does not

6

plausibly support a claim under § 36(b); and third, that
Plaintiff's theory of liability based on a comparison to
institutional fees should be limited to the single fund as to
which the Complaint alleges facts.

As an initial matter, it is worth noting that the Court's
analysis of each claim must be guided by all relevant
circumstances, viewed collectively.  130 S. Ct. at 1427.  As
such, the Court considers each of Defendants' challenges but
ultimately considers the sufficiency of Count One as a whole, in
light of all the facts alleged, through the lens of the
Gartenberg factors.  The Court therefore addresses each relevant
factor in turn.

**1.   Nature and Quality of Services**

The Court rejects HIFSCO's first argument, that the Court
should give little weight to the sub-advisory fee comparison.
According to the Complaint, HIFSCO pays sub-advisors to perform
"substantially all" of the investment management services that it
provides to the Funds at a fraction of the fee it charges for
such services.  Compl. at Part A.1.  At oral argument on HIFSCO's
previous motion to dismiss, the Court rejected this contention as
conclusory and unsupported.  Transcript from Sept. 8, 2011
hearing at 70 ("Tr.").  The Court permitted Plaintiffs to re-
plead this allegation with greater specificity, and they have
done so in the operative Complaint.  It now includes eight

7

additional pages and multiple tables detailing the investment
management services provided by HIFSCO to the Funds under the
Investment Management Agreements ("IMA's"), the services provided
by the sub-advisors to HIFSCO, the overlap between the two, and
the difference between their fees for "substantially the same"
services.  Compl. at Part A.1.

    According to the Complaint, the management fees HIFSCO
charges the Funds are, on average, three times (and sometimes
more than five times) the amount HIFSCO pays its sub-advisors for
substantially the same services.  Compl. ¶ 48.  The Complaint
supports this allegation with a table comparing the language in
the sub-advisor contracts with the language in the IMA's.  Compl.
at 14-15.  These contracts, as reflected in the table, provide
for essentially the same investment management services, <u>i.e.</u>,
making investment decisions appropriate for each portfolio, such
as when to purchase or sell securities.   <u>Id.</u>

    The Court expressed concern at oral argument on the previous
motion to dismiss that Plaintiffs were ignoring the fact that
HIFSCO's management fees also cover administrative and
supervisory services.  Citing the Funds' annual reports and SEC
filings, the new Complaint now addresses this issue.  It alleges,
in great detail, that the investment management services provided
by the sub-advisors constitute the most expensive and important
services required under the IMA, that the additional supervisory

and administrative services provided by HIFSCO are minimal, and that the Funds pay for these additional services through separate agreements and/or fees.[5] Compl. at Part A.1.b.

HIFSCO counters, again, that it provides the Funds with extensive administrative and investment management services that are not delegated to the sub-advisers.  This is a merits argument, however, that is more appropriate at summary judgment. Curran v. Principal Mngmt. Corp., Civ. No. 09-433, 2010 WL 2889752, *8 (S.D. Iowa June 8, 2010), vacated on other grounds, 2011 WL 223872 (S.D. Iowa Jan. 24, 2011) (rejecting defendants' invitation to engage in a factual inquiry as to propriety of adviser fees that would be inappropriate in context of 12(b)(6) motion).

Assuming, as Plaintiffs have alleged, that HIFSCO charged the Funds an average of three times what it cost to provide its investment management services, Plaintiffs have raised a plausible inference that HIFSCO's fees are excessive under § 36(b).  See Curran, 2010 WL 2889752 at *8 (denying motion to dismiss where defendants charged more than sub-advisors, who provided bulk of investment advice).

**2.  Comparative Fee Structures**

---

[5] Given the posture of this case at the pleadings stage, the Court credits these allegations in light of the specificity with which they are plead and without relying on the declaration Plaintiff attached in support thereof.

The Court now turns to HIFSCO's second and third arguments, which pertain to the Gartenberg "comparative fee" factor. The Complaint draws a comparison between HIFSCO's fees and the fees charged by its competitor, Vanguard, as well as the fees charged by HIFSCO's affiliate to institutional clients.[6] Compl. at Part I.C.2. As discussed above, HIFSCO objects to both.

**i.   Comparison to Vanguard**

At oral argument on HIFSCO's previous motion, the Court dismissed this portion of the Amended Complaint without prejudice and permitted Plaintiffs the opportunity to amend. The operative Complaint beefs up this section with five additional pages of factual allegations. Although some portions of the Complaint are redundant, Plaintiffs now provide a detailed comparison of HIFSCO's investment management fees with Vanguard's "management and administration" fees.[7] Compl. ¶¶ 135-36.

Both advisers allegedly use the same sub-adviser (Wellington) to manage their respective mutual funds' investments and decide the securities to be purchased or sold. Id. HIFSCO's management fees are an average of three times Vanguard's

---

[6] Additionally, the Complaint reiterates the comparison between HIFSCO's fees and the significantly smaller fees paid to sub-advisers. Compl. at Part I.C.1. While HIFSCO challenges the merits of Plaintiffs' contention, see supra, it does not contest the relevance of such a comparison.

[7] Vanguard does not charge "investment management fees" per se, except for the Vanguard Morgan Growth Fund, which is charged a fee of 1 basis point. Compl. ¶ 169.

"management and administration" fees (once Wellington's fees are deducted from both).[8]  However, since Vanguard actually provides more services for its fees than HIFSCO does, their fee disparity is in reality closer to 50 to 1.  Compl. ¶¶ 140, 142, 145. HIFSCO's investment management fee, according to the Complaint, only covers supervision of the sub-advisers in addition to minimal administrative services, whereas Vanguard's management and administration fee also includes transfer agent expenses (which the Funds pay for separately).  Id. at 152-56, 162-63. These transfer costs eat up the vast majority of Vanguard's fee. Id.  The fee Vanguard actually charges for oversight and administrative services are therefore minimal - either nothing or one basis point – while HIFSCO charges between 50 and 55 basis points for such services.  Compl. at Part I.C.2.c.

HIFSCO urges the Court to reject this comparison, arguing that Vanguard is a not-for-profit entity that specifically markets itself as a low-cost mutual fund provider.  HIFSCO argues, as it did at oral argument, that Vanguard "represents just one data point at the lowest end of the range of possible fees."  Def.'s Moving Br. 17.  Plaintiffs respond that the Vanguard comparison is an apt one because both Vanguard and

---

[8] By the Court's calculation based on the data provided (Compl. table at ¶ 142), HIFSCO's fees amount to an average of 318% of Vanguard's fees.  Plaintiffs' calculation that HIFSCO's fee "exceeds" Vanguard's fees, on average, by "360%" appears to be a

HIFSCO rely on the same sub-advisor (a for-profit entity), and the gross disparity in the fees suggests a lack of arm's length bargaining.

Courts may consider fee comparisons but must give them the weight they merit in light of the similarities and differences in the services provided.  Jones, 130 S. Ct. at 1428.  The Supreme Court has cautioned, however, that "[i]f the services rendered [by separate investment advisers] are sufficiently different that a comparison is not probative, then courts must reject such a comparison."  Id. at 1429 (citations omitted).  Other courts have acknowledged that Vanguard is a low-cost option and have given such comparisons limited weight.  See Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 345 (2d Cir. 2006) ("That a mutual fund has an expense ratio higher than Vanguard, a firm known for its emphasis on keeping costs low, raises little suspicion under this [Gartenberg] factor."); Reso v. Artison Partners, Civ. No. 11-873, 2011 WL 5826034, *8 (E.D. Wis. Nov. 18, 2011) (noting that "extremely limited comparisons" such as plaintiff's comparison to the Vanguard funds are of "little value"); Turner v. Davis Select Advisers LP, Civ. No. 08-421, *15 (D. Ariz. June 1, 2011) (finding that comparison to Vanguard funds, "which are known in the industry for having low fees," had "little probative value"); Kalish v. Franklin Advisers, Inc., 742

clerical error.  Compl. ¶¶ 140, 145.

12

F. Supp. 1222, 1231 (S.D.N.Y. 1990), <u>aff'd</u>, 928 F.2d 590 (2d Cir. 1991), <u>cert. den'd</u>, 502 U.S. 818 (1991) (finding "some basis" for comparison of defendant's fund with Vanguard, but noting "significant differences in structure, peculiar to the Vanguard family of funds, which lessen the value of the comparison").

To be sure, the Vanguard comparison is extremely limited. As Defendants point out, it represents just one data point at the bottom end of the spectrum.  Nevertheless, since Vanguard and HIFSCO employ the same sub-adviser, this comparison is more apt than in the typical case.  Securities holders in the Funds receive comparable investment management services to the Vanguard funds but pay substantially greater fees.  Thus, while certainly not decisive, the Court gives some, limited weight to this comparison.

**ii. Comparison to fees paid by institutional accounts and independent mutual funds**

The Complaint also provides a comparison between investment management fees charged by HIFSCO to the Hartford Inflation Plus Fund and fees charged by HIMCO[9] to two institutional clients and an independent mutual fund.  HIFSCO allegedly charges the Hartford Inflation Plus Fund 44 basis points (or .44%) of the average net assets managed, while HIMCO charges the State of

---

[9] HIMCO is HIFSCO's affiliate and a sub-adviser to two of the Funds.

Connecticut between 9 and 11 basis points and the State of Florida 10 basis points for the same services.  Compl. ¶ 180. Additionally, HIMCO charges an independent mutual fund, which is not associated with the Funds, 25 basis points.  Compl. ¶ 180. According to the Complaint, this is an "apples-to-apples" fee comparison, because the Funds have separate agreements covering those services that set them apart from the institutional clients.  Compl. ¶ 176.

     At oral argument on HIFSCO's previous motion to dismiss, the Court found this portion of the Amended Complaint sufficiently detailed such that it did not require re-pleading. Tr. 70-72.  HIFSCO now urges the Court to limit litigation over this "sub-allegation" to the single Fund to which it is addressed, the Hartford Inflation Plus Fund.  As discussed <u>supra</u>, the Court must consider all of the relevant factors collectively in deciding whether Count One survives.  Since this portion of the Complaint only alleges a comparison as to one Fund, its probative value only pertains to that Fund.  The Court considers this factor accordingly.

### 3.   Remaining <u>Gartenberg</u> Factors

     HIFSCO's motion to dismiss does not address the remaining <u>Gartenberg</u> factors cited in the Complaint:  economies of scale[10],

---

[10] An economy of scale is a "decline in a product's per-unit production cost resulting from increased output, [usually] due to

conscientiousness of the board of directors, and profitability of the fund to the adviser.  Since the Court must consider all of the relevant factors in determining whether Count One survives, it addresses these factors briefly.

### i.  Economies of Scale

With respect to the first factor, Plaintiffs allege that HIFSCO does not share with them the benefits from the economies of scale realized by the Funds.  Such economies of scale are created when fund portfolios grow, while "the incremental cost of servicing additional assets approaches zero."  Compl. ¶ 109. Mutual fund structures often use "breakpoints" – the point at which a fee rate decreases when net assets increase – to pass on to shareholders the benefits realized from such economies of scale.  Turner, at 16 (citing Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1239 (S.D.N.Y. 1990)).

The Complaint alleges that HIFSCO's fee schedule sets the initial breakpoints too high, spaces them too far apart, and reduces the fee by too small an amount to give Plaintiffs any meaningful benefit of the economies of scale.  Compl. ¶ 117. Plaintiffs bolster this allegation with specific facts pertaining to the individual Funds.  The Complaint alleges, for example, that in 2010, the first breakpoint for two of the Funds (the

increased production facilities; savings resulting from the greater efficiency of large-scale processes."  Black's Law

Hartford Global Health Fund and Hartford Conservation Allocation Fund) was set at $500 million, an amount so high that neither Fund ever reached it. Compl. ¶¶ 118-19. Further, by the Court's calculation (based on the fee schedules in the Complaint), the Funds can receive a drop, on average, of only 10 basis points over the course of reaching $10 billion in assets. Compl. table at ¶ 111.

By contrast, the contracts allegedly negotiated at arm's length between HIFSCO and its sub-advisers provide for much more competitive breakpoint schedules. For example, Wellington, a for-profit, independent sub-adviser to four of the Funds, agreed not only to a much lower initial management fee (approximately one third of HIFSCO's fee), but also to a fee schedule that permits a greater drop in fees as a percentage of the initial fee. Compl. at table ¶ 111. Additionally, Wellington agreed to a schedule with breakpoints at much lower asset levels than HIFSCO. Compl. ¶ 111, 121. For example, HIFSCO gives its first fee reduction to the Hartford Advisers Fund and the Hartford Global Health Fund when assets reach $500 million, while Wellington reduces its sub-adviser fee much sooner - when assets reach $50 million and $100 million, respectively. The Complaint provides a detailed table illustrating this, and the Court has included the relevant portion below. Compl. ¶ 111.

---

Dictionary (9th ed. 2009).

| Hartford Fund | Investment Services/Sub-Advisory Agreement | HIFSCO's Fee Schedule (annual rate based on avg. daily net assets) | Sub-Adviser Fee Schedule (annual rate based on avg. daily net assets) |
|---|---|---|---|
| Hartford Advisers Fund | Wellington | First $500M[11]—.69%<br>Next $500M - .625%<br>Next $4B - .575%<br>Next $5B - .5725%<br>Over $10B - .57% | First $50M - .22%<br>Next $100M - .18%<br>Next $350M - .15%<br>Over $500M - .125% |
| Hartford Global Health Fund | Wellington | First $500M - .9%<br>Next $500M - .85%<br>Next $4B - .8%<br>Next $5B - .7975%<br>Over $10B - .795% | First $100M - .45%<br>Next $400M - .35%<br>Over $500M - .3% |

In light of these well-pleaded facts, Plaintiffs have sufficiently alleged that HIFSCO's breakpoints did not give shareholders meaningful benefits from the economies of scale enjoyed by the Funds. Cf. Curran, 2010 WL 2889752, *8-9 (advisory fees did not reflect benefits derived from economies of scale where breakpoints to the fees were "immaterial"); Reso, 2011 WL 5826034, *9 (denying motion to dismiss 36(b) claim and noting that plaintiff's "strongest allegations relate[d] to economies of scale factor," where mutual funds received a drop of only 10 basis points over course of reaching nearly $12 billion in assets). Accordingly, this Gartenberg factor weighs in Plaintiffs' favor.

ii. **Conscientiousness of the Board**

The Complaint also alleges that the Funds' board of directors has not acted conscientiously in approving the IMA's.

---

[11] "M" refers to "million", and "B" refers to "billion".

Compl. at Part I.D.  Plaintiffs cite several facts to support
this allegation.  First, they claim that the Funds' nine board
members are responsible for overseeing all 85 mutual funds in the
Hartford Funds Complex, a task that precludes them from assessing
each Fund individually.  Id.  Second, Plaintiffs claim that truly
independent directors would not have approved HIFSCO's management
fees in light of the minimal services HIFSCO provided for them;
the economies of scale enjoyed by HIFSCO; the profitability of
the Funds to HIFSCO; and the exorbitant nature of HIFSCO's fees
in relation to (i) the fees charged by its sub-advisers, (ii) the
fees charged by HIFSCO's competitors with similar fund
structures, and (iii) the fees charged by HIFSCO or its
affiliates to institutional clients and independent mutual funds.
Third, Plaintiffs allege that the President of HIFSCO executed
the IMA's, which should have been a "red flag" to the board.  Id.
at ¶ 200.  It is unclear to the Court, however, whether such
conduct is customary in mutual funds, given their inherently
incestuous structure.  Fourth, Plaintiffs allege that HIFSCO was
the subject of a Cease and Desist proceeding by the SEC regarding
its, and its affiliates', improper use of Fund assets.  Id. at ¶
202.  According to Plaintiffs, the fact that the board continued
to approve large fees for an adviser that had been found guilty
of committing fraud and deceit suggests that the board was not
acting conscientiously.  Id. at ¶ 203.  Finally, Plaintiffs cite

18

the Vanguard comparison again as evidence that the board should have known that HIFSCO's fees were excessive.  Id. at ¶ 206-11.

While these allegations are certainly not dispositive of the Gartenberg analysis, when taken together they create an inference that the board of directors may not have adequately considered important facts when approving HIFSCO's management fees.  Cf. Reso, 2011 WL 5826034, *7.  As such, the directors' approval requires somewhat less deference than it would have had they diligently performed their "watchdog" role.

### iii. Profitability of the fund to the adviser

Finally, Plaintiffs allege that the costs and profitability of providing investment management services did not justify HIFSCO's excessive fee.  This portion of the Complaint recounts the facts previously discussed and concludes that the Funds have been very profitable to HIFSCO.  According to the Complaint, in 2010 alone, HIFSCO earned $157,636,769 in investment management fees from the Funds and only paid $57,583,826 for sub-advisory services, retaining roughly $1 million for providing minimal supervisory services.  Compl. ¶ 228.  The Court agrees that this fact also weighs in Plaintiffs' favor.

In sum, the Court finds that while the standard under Jones and Gartenberg is onerous, Plaintiffs' 80-page Complaint alleges sufficient facts to satisfy their burden at this early stage of the proceedings.  Construing all of the facts set forth above in

Plaintiffs' favor, a plausible inference arises that HIFSCO's management fees are so disproportionately large that they bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.  HIFSCO's motion to dismiss Count One is therefore DENIED.

**B.    Count Two – Rule 12b-1 Distribution Fees**

Defendants also move to dismiss Count Two of the Complaint, which alleges that HIFSCO charged excessive 12b-1 fees to Class A and Class B shareholders of the Funds.  At oral argument on HIFSCO's prior motion to dismiss, the Court permitted this claim to proceed.  Tr. 95, 105.  HIFSCO now moves to dismiss this claim again.

First, HIFSCO contends that Plaintiff's claim constitutes a mere disagreement with the policies behind Rule 12b-1.  The Court considered this assertion at oral argument, acknowledged that there were portions of the Amended Complaint that improperly relied on policy arguments, but ultimately found that the remaining allegations saved the claim.  Tr. 95, 105.  The Court therefore rejects HIFSCO's rehashing of its prior argument.

Second, HIFSCO moves to dismiss Count Two with respect to Class A shares by challenging the basis for this claim, i.e., that the 12b-1 fees charged to Class A shareholders are in

addition to front-end sales loads and are therefore excessive.[12]
At oral argument on HIFSCO's prior motion to dismiss, the Court
permitted this claim to proceed in reliance on Plaintiffs'
allegation that HIFSCO told the SEC it would charge front-end
sales loads in place of 12b-1 fees but instead charged both.  Tr.
95-99.  This allegation, the Court found, tended to support
Plaintiffs' contention that the 12b-1 fees were excessive.  Id.
The Court noted, however, that if Plaintiffs had misrepresented
HIFSCO's statement, the Court would reconsider the issue.  Tr.
98-99, 105.  Plaintiffs subsequently filed the operative
Complaint and attached the relevant SEC filing.

     Defendants now cite this SEC filing and argue that it does
not support Plaintiffs' position.  The Court agrees.  The
relevant sentence simply provides that "potential benefits",
which the distribution plans "may provide" include "the ability
to provide investors with an alternative to paying front end
sales loads."  Compl. Ex. C at 182 of 235.  This same document,
just a few pages earlier, provides a chart detailing the front-
end sales loads charged to each class, including Class A,

---

[12] Sales loads are a one-time fee, generally charged to an
investor's account at the time of purchase ("front-end" fees) or,
in some cases, at the time of redemption ("back-end" fees).  In
re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., Civ. No.
03-8208, 2006 WL 1008138, *12, n.21 (S.D.N.Y. Apr. 18, 2006); see
also SEC, Mutual Fund Fees and Expenses,
http://www.sec.gov/answers/mffees.htm#distribution (last visited
Dec. 14, 2012).

followed by a class-by-class description of the ongoing 12b-1 fees paid by shareholders.  <u>Id.</u> at 178, 181.  Contrary to Plaintiffs' former representation, this document does not indicate that Class A shareholders would pay <u>either</u> a front-end sales load or 12b-1 fee but not both.  Accordingly, the Court now considers HIFSCO's pending motion to dismiss.

Plaintiffs respond that regardless of HIFSCO's disclosure to the SEC, the fact that Class A shareholders are charged both front-end sales loads and 12b-1 fees means these fees are excessive under <u>Gartenberg</u>.  Plaintiff has not cited any case law, however, to support this contention.  According to the SEC, charging both fees is customary:  "Class 'A' shares generally are sold with a front-end sales load, and also often have a 12b-1 fee of about 25 basis points."  SEC Proposed Rules, Mutual Fund Distrib. Fees, 75 Fed. Reg. 47064, 47070 (proposed Aug. 4, 2010).  Indeed, here, the 12b-1 fee charged to Class A shareholders is 25 basis points.  Compl. ¶ 91.

Plaintiffs' remaining allegations as to the Class A 12b-1 fees are sparse and conclusory.  The Complaint alleges, for example, that based on the fact that the board of directors approved this fee, the board could not have acted independently. Compl. ¶ 220.  The Complaint also provides a chart setting forth the total 12b-1 fees for each Fund, but notably omitting the costs of such services.  Compl. table at ¶ 242.  Based on these

facts, Plaintiffs have failed to state a claim under § 36(b) for Class A shares.  HIFSCO's motion to dismiss this portion of Count Two is therefore GRANTED, and this claim is DISMISSED without prejudice.

Third, HIFSCO argues that Plaintiffs lack Article III standing to challenge distribution fees charged to Class B shares because none of the Plaintiffs own shares in this class.[13] Plaintiffs respond by citing case law that mutual fund investors in a given share class have statutory standing to pursue claims for other classes.[14]  But, as HIFSCO correctly points out, Plaintiffs do not address the Supreme Court's holding in Gollust v. Mendell that, notwithstanding statutory standing, "the plaintiff still must allege a distinct and palpable injury to himself" to satisfy Article III's "case or controversy" requirement.  501 U.S. 115, 126 (1991).  As the Supreme Court instructed, "the plaintiff must maintain a 'personal stake' in the outcome of the litigation throughout its course," even where the plaintiff brings a derivative action, as Plaintiffs have done

---

[13] HIFSCO also argues that Plaintiffs have not stated a claim with regard to Class B distribution fees.  HIFSCO urges the Court to reject Plaintiffs' contention that such fees are excessive because Class B is closed to new shareholders.  Since the Court grants HIFSCO's motion to dismiss on standing grounds, it need not reach this argument.
[14] HIFSCO apparently concedes that Plaintiffs have statutory standing under § 36(b) to pursue claims involving Class B shares.

here.[15]  Gollust, 501 U.S. at 126.

Notably, the record is devoid of any allegations suggesting that Plaintiffs have a personal stake in this action regarding distribution fees on shares they do not own.  While this Court could certainly speculate as to how Class A shareholders might be injured by excessive fees to Class B shares, such speculation would be improper.  Plaintiffs bear the burden of establishing their standing to bring this claim.  See, e.g., Salazar v. Buono, -- U.S. --, 130 S. Ct. 1803, 1826 (2010) (citations omitted).  At the motion to dismiss stage, they must make "general factual allegations of injury resulting from defendant's conduct."  N.J. Phys., Inc. v. Pres. of U.S., 653 F.3d 234, 239 (3d Cir. 2011) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  Id. (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)).  This Court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  Id.

---

[15] Neither party has addressed the second step of the injury analysis in derivative actions such as this.  "[B]ecause a derivative action generally is a mere procedural device to enforce substantive rights belonging to the issuer, there must be injury in fact to that real party in interest," here, the Funds.  Donoghue v. Bulldog Investors Gen. Partnership, 696 F.3d 170, 175-76 (2d Cir. 2012) (internal citations and quotations omitted).  Since excessive fees to Class B shares would certainly

(citing Whitmore v. Arkansas, 495 U.S. 149, 155–56 (1990)).

Since the record is factually barren with respect to standing, the Court DISMISSES this claim without prejudice.

### III. CONCLUSION

FOR THESE REASONS, HIFSCO's motion to dismiss is DENIED as to Count One and GRANTED as to Count Two.  An appropriate Order shall issue herewith.

s/Renée Marie Bumb
RENÉE MARIE BUMB
United States District Judge

Dated: December 17, 2012

---

harm the Funds, it appears the parties do not dispute this.