# REDACTED

[Civ. No. 11-1083 Dkt. Nos. 143, 144, 148, 149]
[Civ. No. 14-1611 Dkt. Nos. 34, 37, 41, 42]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| JENNIFER L. KASILAG, et al.,<br><br>Plaintiffs,<br><br>       v.<br><br>HARTFORD INVESTMENT FINANCIAL SERVICES, LLC,<br><br>Defendant. | Civil No. 11-1083 (RMB/KMW) |
| JENNIFER L. KASILAG, et al.,<br><br>Plaintiffs,<br><br>       v.<br><br>HARTFORD FUNDS MANAGEMENT COMPANY, LLP,<br><br>Defendant. | Civil No. 14-1611 (RMB/KMW)<br><br>**OPINION (Filed Under Seal)** |

<u>APPEARANCES</u>:

Arnold Carl Lakind
Szaferman, Lakind, Blumstein,
Blader & Lehmann, PC
Quakerbridge Executive Center
101 Grovers Mill Road
Suite 200
Lawrenceville, NJ 08648
       *Attorney for Plaintiffs*

Anthony J. Sylvester
Sherman Wells Sylvester &
Stamelman LLP
210 Park Avenue, 2nd Floor
Florham Park, NJ 07932
        *Attorney for Defendants*

Sean M. Murphy
Robert C. Hora
Milbank, Tweed, Hadley &
McCloy LLP
1 Chase Manhattan Plaza
New York, NY 10005
        *Attorneys for Defendants*

Christopher A Barbarisi
Jeffrey B. Maletta
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
        *Attorneys for Proposed Interveners*


**BUMB**, United States District Judge:

    This matter comes before the Court upon the filing of eight motions in two related cases, Kasilag v. Hartford Investment Financial Services, LLC, Civ. No. 11-1083, and Kasilag v. Hartford Funds Management Company, LLC, Civ. No. 14-1611.[1]

    In Civil Action No. 11-1083, Hartford Investment Financial Service, LLC ("HIFSCO") has filed a motion for summary judgment. [Civ. No. 11-1083 Dkt. No. 143.]  Likewise, in Civil Action No. 14-1611, Hartford Funds Management Company ("HFMC") has filed a

---

[1] A third related case, Kasilag v. Hartford Funds Management Company, LLC, Civ. No. 15-1876, is also pending before this Court, but has been stayed pending the outcome of the instant two cases.  [Civ. No. 15-1876 Dkt. No. 11.]

substantively identical motion for summary judgment.[2]  [Civ. No.
14-1611 Dkt. No. 37.]  In each case, the individual plaintiffs[3]
have also cross-moved for partial summary judgment with respect
to liability regarding one of the seven funds — the Capital
Appreciation Fund – along with moving for summary judgment
respecting several other ancillary issues.  [Civ. No. 11-1083
Dkt. No. 144; Civ. No. 14-1611 Dkt. No. 34.]

        In addition to the motions for summary judgment, the
Hartford Defendants have moved to seal non-public financial
information in each action.  [Civ. No. 11-1083 Dkt. No. 148;
Civ. No. 14-1611 Dkt. No. 41.]  Finally, Wellington Management
Company, LLP and Wellington Management Group, LLP[4] have moved to
intervene in each case and seal their own non-public financial

---

[2] In January 2013, HFMC replaced HIFSCO as the sole adviser
to the funds, at which point HIFSCO became the sole distributor
for the funds.  (Lakind Dec. at Ex. 4 HIF-00122432.)  Due to
their similar roles as advisers, HIFSCO and HFMC will be
collectively referred to in this Opinion as the "Hartford
Defendants."
[3] Plaintiffs in Civ. No. 11-1083 are Jennifer Kasilag, Louis
Mellinger, Judith Menendez, and Jacqueline Robinson.  Plaintiffs
in Civ. No. 14-1611 are Jennifer Kasilag, Louis Mellinger,
Judith Menendez, Jacqueline Robinson, Dennis Russell, and Darin
Dudek.  On March 2, 2016, the Court was notified that an
additional plaintiff in both actions, Linda Russell, had passed
away.  [See, e.g., Civ. No. 11-1083 Dkt. No. 179.]  The Court
was also informed that the estate of Ms. Russell wishes to
continue the action.  The above-listed plaintiffs in both
actions, including the proposed estate of Ms. Russell, will be
collectively referred to in this Opinion as the "Plaintiffs."
[4] The two Wellington entities will be collectively referred to in
this Opinion as "Wellington."

3

information.  [Civ. No. 11-1083 Dkt. No. 149, Civ. No. 14-1611 Dkt. No. 42.]

## I.  **FACTUAL BACKGROUND**

The underlying claims in this case are derivative in nature and center on the fees charged by the Hartford Defendants to manage seven mutual funds (the "Funds"): the Hartford Healthcare Fund, the Hartford Conservative Allocation Fund, the Hartford Growth Opportunities Fund, the Hartford Balanced Fund, the Hartford Inflation Plus Fund, the Hartford Capital Appreciation Fund, and the Hartford Floating Rate Fund.  [Civ. No. 11-1083 Dkt. No. 173-5 (Pls.' Resp. to Defs.' Statement of Material Facts Not In Dispute at ¶ 1 (hereinafter "First SOF at ¶ ___.")); see also Civ. No. 14-1611 Dkt. No. 60-1 (same).][5]

### i. **The Funds**

"A mutual fund is a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the individual investors holding shares in the fund."  Jones v. Harris Assocs. L.P., 559 U.S. 335 (2010) (quoting Burks v. Lasker, 441 U.S. 471, 490 (1979).)  Mutual funds generally have no employees.

---

[5] This case has yielded several statements of facts pursuant to Local Rule 56.1 in this District.  As such, Defendants' Response to Plaintiffs' Supplemental Statement of Facts Not in Dispute, [Civ. No. 11-1083 Dkt. No. 173-4; Civ. No. 14-1611 Dkt. No. 66-4], will be cited "Second SOF at ¶ ___."  Defendants' Response to Plaintiffs' Statement of Facts Not in Dispute, [Civ. No. 11-1083 Dkt. No. 166-1; Civ. No. 14-1611 Dkt. No. 59-1], will be cited as "Third SOF at ¶ ___."

Id.; (Third SOF at ¶ 6.) Typically, a sponsor creates the mutual fund, selects the directors of the fund and selects an adviser — often itself — to provide other investment and administrative services to the fund thereafter. See Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 534 (1984). This creates the potential for conflicted bargaining between the sponsor-selected directors and the sponsor-turned-adviser of the mutual fund. Jones, 559 U.S. at 338-339 (Because of the relationship between the fund and the adviser, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." (citation omitted)). As a result, Congress enacted the Investment Company Act of 1940, which creates protections from conflicts of interest for the shareholders of mutual funds, including requiring the adviser to act as a fiduciary. Id. at 339.

In this case, each of the Funds is a series of either the Hartford Mutual Fund, Inc. ("HMF") or the Hartford Mutual Funds II, Inc. ("HMF II"), registered investment companies under the Investment Company Act of 1940. (First SOF at ¶ 2.) In creating and operating the Funds, HMF and HMF II, by way of their board of directors (the "Board"), entered into Investment Management Agreements ("IMAs") with the Hartford Defendants,

engaging them to serve as the Funds' adviser. (Lakind Dec. Exs. 1, 2, 5, 6; Third SOF at ¶ 2.)

### ii. **The IMAs**

Pursuant to the IMAs, the Hartford Defendants undertook a number of obligations with regard to advising and managing the Funds.

For instance, one duty undertaken by the Hartford Defendants was to provide investment management services. (Id. Ex. 1 (IMA between HIFSCO and HMF).) This entailed four key responsibilities. Pursuant to Section 2 of the IMAs,[6] HIFSCO agreed to, by itself or by way of an affiliate:

(1) "[R]egularly provide investment advice and recommendations to each [applicable fund] with respect to its investments, investment policies and the purchase and sale of securities";

(2) "[S]upervise continuously the investment program of each [applicable fund] and the composition and performance of its portfolio securities and determine what securities shall be purchased or sold by each [applicable fund]";

(3) "[A]rrange . . . for the purchase of securities and other investments for each [applicable fund] and the sale of securities and other investments held in each [applicable fund.]"; and

(4) "[P]rovide . . . , such economic and statistical data relating to each [applicable fund] and such information concerning important economic, political and other developments as the Adviser shall deem appropriate or as shall be requested by the Company's Board of Directors."

---

[6] The IMAs are substantively similar for both of the defendants and for both HMF and HMF II. (See generally Id. Exs. 1, 2, 5, 6.)

(Id. Ex. 1 at § 2.)

Pursuant to the IMAs, the Hartford Defendants also agreed to provide, or cause an affiliate to provide, administrative services.  Specifically, the administrative services to be provided by the Hartford Defendants were to:

(1)  Assist in the supervision of all aspects of HMF's operation, "including coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder servicing agents (if any), attorneys and other parties performing services or operational functions for [HMF]";

(2)  Provide HMF with employees and officers capable of providing the administrative and clerical functions necessary to administer HMF;

(3)  "Provide [HMF] with adequate office space and related services necessary for its operations . . ."; and

(4)  "Provide such other services as the parties hereto may agree upon from time to time";

(Id. at § 3.)

The IMAs also contained a provision regarding the engagement of sub-advisers or sub-contractors to perform the Hartford Defendants' duties.  In its entirety, the pertinent clause reads:

The Adviser, upon approval of the Board of Directors, may engage one or more investment advisers that are registered as such under the Investment Advisers Act of 1940, as amended, to act as subadviser with respect to existing and future Portfolios of the Company. Such sub-adviser or sub-advisers shall assume such responsibilities and obligations of the Adviser pursuant to this Investment Management Agreement as shall be delegated to the sub-adviser or sub-advisers, and the Adviser will supervise and oversee the activities of any such sub-adviser or sub-advisers. In addition, the

> Adviser may subcontract for any of the administrative
> services set forth in Section 3 above.

(Id. at § 4.)

### iii. **The Role of Sub-Advisers**

In attempting to fulfill its role as the adviser to the
Funds, the Hartford Defendants did indeed retain a sub-adviser:
Wellington.  While the parties debate who retains ultimate
responsibility for the duties under the IMAs, at least some
documents in the record indicate that Wellington "has
responsibility for day-to-day management of the Fund."  (Id. Ex.
16 at INDDIR0014582.)  That said, the IMAs make clear, "[T]he
Adviser will supervise and oversee the activities of any such
sub-adviser or sub-advisers."  (See, e.g., Id. Ex. 1 at § 4.)

Wellington performs many functions in its role as sub-
adviser for the Funds.  Wellington has approximately 285
employees directly involved in performing sub-advising services
in connection with the Hartford Defendants.  By contrast,
Plaintiffs' experts' calculated that the Hartford Defendants
utilized 21.5 full-time employees in fulfilling their
obligations to the Funds.[7]  (Second SOF at ¶¶ 26, 28, 30.)
Pursuant to the agreement between HIFSCO and Wellington,

---

[7] The Hartford Defendants contest the validity and usefulness of
this calculation by Plaintiffs' expert.  (Second SOF at ¶¶ 28,
30.)

Wellington agreed to perform the following duties with regard to the HMF series advised by the Hartford Defendants:

- Evaluate and implement an investment program, updating it from time to time as conditions change as determined by HIFSCO and Wellington;

- In consultation with HIFSCO when appropriate, make all determinations "with respect to the investment of the assets of the Portfolios and the purchase or sale of portfolio securities";

- Regularly furnish reports to the Board including economic outlook and investment strategy;

- Manage each Portfolio in conformity with the applicable by-laws and regulations;

- Select the brokers or dealers that will execute the purchases and sales of portfolio securities;

(Lakind Ex. 14 at PL-HART-AGMT-0000109.)

Despite these duties performed by Wellington, the Hartford Defendants retain some obligations under the IMAs. For instance, the Hartford Defendants assert that they must still:

- Be available "upon reasonable notice for consultation with any of the Directors and officers of [the Hartford Mutual Funds] with respect to any matters dealing with the business and affairs of [the same.]";

- "[P]rovide [the Hartford Mutual Funds] with adequate office space and related services necessary for its operations . . .";

- Provide economic and statistical data relating to each portfolio, including political and economic developments;

- "Assist in the supervision of all aspects of [the Hartford Mutual Fund's] operation, including the coordination of all matters relating to the functions of the custodian, transfer agent or other shareholder

> servicing agents . . . , accountants, attorneys and other parties performing services or operational functions . . .";

- "Supervise and oversee the activities of any [sub-advisers.]"

(See generally Defs.' MSJ Br. at 12-13.)

### iv. Fees

For providing or causing to be provided the services under the IMAs, the Hartford Defendants received an investment management fee from each fund based upon the average daily net asset value of the fund. (First SOF at ¶ 6, 7.) The agreements make use of "breakpoints," which decrease the percentage fee the Hartford Defendants collect as the asset levels under management grow. (See, e.g., Lakind Dec. Ex. 1, at PL-HART-AGMT-0000009-14; First SOF at ¶ 8.) For instance, with regard to the Hartford Capital Appreciation Fund (the "Cap App Fund") between 2010 and 2014, the fee breakpoints are as follows:

| Asset Level Under Management | Fee Percentage |
|:---:|:---:|
| $0 – $500 million | 0.8000% |
| $500 million – $1 billion | 0.7000% |
| $1 billion – $5 billion | 0.6500% |
| $5 billion – $10 billion | 0.6475% |
| Over $10 billion | 0.6450% |

(First SOF at ¶ 10; Lakind Dec. Ex. 1 at PL-HART-AGMT-0000009.) The anticipation of the breakpoints is that while a given fund

10

grows in size, the costs of managing the funds do not grow at the same rate, and accordingly, the Funds should reap the benefit of that along with the Hartford Defendants. Nevertheless, the parties dispute whether the Hartford Defendants realized any of these economies of scale or the degree to which these breakpoints resulted in a meaningful savings to the Funds. (See, e.g., First SOF at ¶ 9.)

In a similar manner to the Hartford Defendants, Wellington is paid typically with a tiered structure, although some series, such as the Cap App Fund, are managed at a flat rate. (See, e.g., Lakind Dec. Ex. 14 at PL-HART-AGMT-0000114.) The rates at which Wellington was compensated for its services are less than the rate at which the Hartford Defendants collect fees. By way of comparison, for advising the Cap App Fund, the lowest rate by which the Hartford Defendants might be paid for any assets under management is .645%, while Wellington was paid a flat rate of .25% across the board for sub-advising the entirety of that fund. (See, e.g., id.)

Moreover, while the parties vigorously disagree with any attempt by their opponents to describe the nature or magnitude of the advisory fees, the record indicates that, for example in 2011, the Cap App Fund's gross advisory fee amounted to over $113 million, based upon an average asset value of $17.3 billion. (Id. Ex. 18 at HIF-00030267.) During that same time

11

period, HIFSCO incurred ██████████ in direct operating expenses

and paid Wellington $43.47 million for sub-advisory expenses.

(Id.)  The chart below shows the same data for the Cap App Fund

across four years:

| Year | Gross Advisory Fee Paid by the Funds to Hartford Defs.' | Sub-Advisory Fee Paid By Hartford Defs.' to Wellington | Hartford Defs.' Internal Expenses |
|---|---|---|---|
| 2010 | $126.48 million | $48.49 million | ███████████ |
| 2011 | $113.53 million | $43.47 million | ███████████ |
| 2012 | $80.91 million | $30.83 million | ██████████ |
| 2013 | $77.26 million | $29.41 million | █████████ |

(Id. Ex. 18 at HIF-00020634 (2010); id. Ex. 19 at HIF-00030267

(2011); id. Ex. 20 at HIF-00116777 (2012); id. Ex. 21 at HIF-

02467288 (2013).)  Thus, regardless of the significance, the

record makes clear that the sub-advisory fee was significantly

higher than the Hartford Defendants' expenses for services they

directly provided.

     v. **The Board's Approval of the IMAs**

     The structure by which the Hartford Defendants collected

their fees was included in the IMAs and approved by the Board

and annually reviewed.  Likewise, the sub-advisory agreements
are also Board approved.  (First SOF at ¶ 47.)[8]

Between 2010 and 2014, twelve different individuals filled
the nine seats on the Board.  (Id. at ¶ 11.)  As is often the
case, the Board is comprised of business professionals with
impressive resumes.  Among other well-credentialed members, the
Board included the former President of Macalester College, a
former partner of a private equity firm, the CEO of Homeworks
Concierge, LLC, and a professor of finance at the University of
Maryland.  (Id.)  From a statutory perspective, seven out of
nine of these directors were entitled to the presumption of
independence through September 2014, after which time eight
members on the Board were statutorily independent.  (Id. at ¶¶
12-13.)[9]  Plaintiffs do not contest that the number of directors
falling below the 25% threshold was as described by the Hartford
Defendants.  Nonetheless, Plaintiffs do vehemently argue that
these independent directors were not "autonomous, self-
regulating, [or] uninfluenced."  (Id. at ¶¶ 12-13.)

---

[8] Plaintiffs deny that the sub-advisory agreements were reviewed
or understood prior, but do not appear to deny the plain fact
that they were approved.  (Id.)

[9] The statutory definition of independence, 15 U.S.C. §
80a2(a)(9), provides that board members who do not own 25
percent of shares are independent.  Amron v. Morgan Stanley Inc.
Advisors Inc., 464 F.3d 338, 344 (2d Cir. 2006) ("the '40 Act
contains an express presumption that mutual fund trustees and
natural persons who do not own 25% of the voting securities are
disinterested.").

Also during the relevant time period, the Board met regularly, holding quarterly meetings, annual educational meetings, and special meetings as needed. (Id. at ¶ 16; Hora Dec. Ex. 52 (agendas for all Board meetings in relevant time period); Id. Ex. 54 (agendas of "special" meetings).) The Board also met each June and August to review the IMAs for all of the funds overseen. (Id. Ex. 53 (agendas for all Board meetings to renew IMAs).) In total, the Board met between 14 and 25 days annually, for a total of 37 meetings over the relevant time period. (First SOF at ¶ 19.) In addition, the Board's investment committee, nominating committee, audit committee, compliance committee, and contract committee also met throughout the relevant time period. (Id. at ¶ 20; Hora Dec. Ex. 52.)

When evaluating the fees for the Funds, the independent directors of the Board also relied upon the advice of outside consultants and counselors. As noted in the 2010 Annual Report for the Cap App Fund (and the relevant Annual Reports thereafter), the independent directors were advised by independent legal counsel in the form of the law firm of Goodwin Proctor. (Hora Dec. Ex. 2 at 32.) Moreover, the Board also retained two service providers to advise them with regard to the fund: Lipper Inc. and Bobroff Consulting. Both consultants assisted the Board in evaluating and comparing the Funds' fee structure in regard to other similar funds. (Id.)

14

According to Board members' testimony, the fee-test outlined in Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982) played a significant role guiding their analysis of the fees.  Robert Gavin — the chairman of the Board — testified that the Board received information on all of the Gartenberg factors for each fund and worked through that information.  (Hora Ex. 105 at 89:7-90:16 ("Q: Is each fund separately evaluated on each Gartenberg factor by the board? A: Yes.  We go fund by fund through the process.").)  While Gavin conceded that the Board did not explicitly discuss each Gartenberg factor for each of the dozens of series comprising HMF and HMF II if it was not warranted, he testified that the Board receives information on each factor.  (Id. at 90:9-15 ("We certainly get information on all the factors and every director reviews the information, but whether or not someone thinks it's important to mention economies of scale on a particular fund, I can't say that that happens every time."); Id. Ex. 38 at 106:12-107:7 (testimony of Board Member Duane Hill also noting the board used the Gartenberg factors during the 15(c) process).)  Meeting minutes from the time period also indicate the topics were discussed.  (Hora Ex. 35 at HIF-00017129.)

As the Board reviewed the fees paid to the Hartford Defendants, it also requested additional information or concessions from them to assist their evaluation.  (First SOF at

¶ 30.)  These discussions were sometimes, but not always fruitful for the Board.  For instance, the Board minutes from the June 2010 meeting indicate that "the independent directors [] identified several issues that warranted additional follow-up and discussion," including requesting "Management to consider making a proposal to reduce fees on [the HMF Inflation Plus Fund.]"  (Hora Ex. 35 at HIF-00017145.)  In response, HIFSCO proposed "[p]ermanently reduc[ing] management fees by 5 bps at all breakpoints" and "[r]educ[ing] expense caps across all share classes by 5 bps."  (Id. Ex. 60 at HIF00008889-91.)

Likewise at the June 2011 meeting, "the independent directors [] identified several issues that warranted additional follow-up and discussion," including requesting "that Management provide the Board with a proposal for additional breakpoints to effect a further sharing of economies of scale . . . ."  (Id. Ex. 39 at HIF-00024722.)  The follow up memorandum from HIFSCO and HL Investment Advisors, LLC back to the Board explained the fund's breakpoint level and stated that "Management believes that economies of scale are being appropriately shared with shareholders as fund assets grow and looks forward to continuing its assessment and discussion of this issue with the Board in the future."  (Id. Ex. 61 at HIF-00017763.)

Finally, in a July 2012 memorandum to the Board, HIFSCO provided a detailed information concerning the Lipper peers of

16

the Cap App Fund. (Id. Ex. 62 at HIF-00027722.) In response to the Board's request for a proposal for appropriate changes in portfolio management structure, HIFSCO stated its expectation to more fully discuss the issue with the Board at the July 2012 Board meeting. (Id. Ex. 62 at HIG-000227723.) The June 2013 and 2014 meetings show additional back-and-forth between the Board and the Hartford Defendants concerning advising and fee issues. (Id. Ex. 63, 64.)

As noted above, the result of these dialogues between the Board and the Hartford Defendants appears to be at least some headway into reducing or renegotiating fees. With regard to two of the Funds — Inflation Plus and Conservative Allocation — the Board and the Hartford Defendants reached agreement on additional breakpoints. (First SOF at ¶ 32.) Other times, the Board's overtures were rejected. (E.g., Hora Dec. Ex. 61.) The annual contract renewal process also resulted, occasionally, in reductions to the upper limits on fees, although these have had a debatable impact on the ultimate fees charged to the Funds. (Id.)

## II.  PROCEDURAL BACKGROUND AND MOTIONS TO SEAL

Case No. 11-1083 was filed on February 25, 2011. The Second Amended Complaint in that case, filed November 14, 2011, brought claims under the Investment Companies Act of 1940 for excessive investment management fees and excessive distribution

17

fees. [Civ. No. 11-1083 Dkt. No. 35 at ¶¶ 245-258.] On December 17, 2012, this Court dismissed count two of the Second Amended Complaint (pertaining to distribution fees) and permitted the investment management fees claim to proceed. [Dkt. No. 44 (Mot. to Dismiss Op.) at 25.] Case No. 14-1611 was filed on March 12, 2014. This Complaint alleged only claims for excessive investment management fees with regard to the Funds.

After extensive discovery in the ensuing years, the instant motions for summary judgment and cross-motions for partial summary judgment were filed on June 5, 2015. (Case No. 11-1083 Dkt. Nos. 143-144; Case No. 14-1611 Dkt. Nos. 34, 37.) The associated motions to seal by the Hartford Defendants and motions to intervene for purposes of sealing by Wellington were filed thereafter on June 15, 2015. (Case No. 11-1083 Dkt. Nos. 148-149; Case No. 14-1611 Dkt. Nos. 41-42.) The Court decides all eight currently pending motions below.

## A. **Motions to Seal**

The Hartford Defendants and Wellington have moved to seal various portions of the record. In this District, Local Civil Rule 5.3 governs all motions to seal or otherwise restrict public access to both materials filed with the Court and judicial proceedings themselves. See Allyn Z. Lite, N.J. Federal Practice Rules, Comment 1 to L. Civ. R. 5.3 (Gann 2016).

18

Under L. Civ. R. 5.3(c)(2), a party seeking an Order to seal materials or judicial proceedings must describe:

> (a) The nature of the materials or proceedings at issue, (b) the legitimate private or public interests which warrant the relief sought, (c) the clearly defined and serious injury that would result if the relief sought is not granted and (d) why a less restrictive alternative to the relief sought is not available.

Local Civ. R. 5.3(c)(2).

### B. The Hartford Defendants' Motions to Seal

With regard to the Hartford Defendants' motions to seal, the Court finds that under the standard enunciated above, there is good cause to redact the documents as the Hartford Defendants suggest in their motions. Regarding the first requirement for sealing, the Hartford Defendants seek to redact from the record and briefing any mention of "competitively sensitive, non-public financial information regarding [the Hartford Defendants'] costs and profits." (MacDonald Aff. at ¶ 5.) Putting a finer point on it, this information is financial data that reveals their profit margins or costs in specific amounts. The Court is unpersuaded by Plaintiffs' request that the Hartford Defendants identify the reason for redaction at a more granular level than this. Defendants have sufficiently identified for the Court what they seek to redact. As such, the Court finds that these materials are sufficiently described.

19

As noted in the affidavit, none of the information the Hartford Defendants seek to redact is publicly available and "competitors could develop strategies to undermine the competitive standing of The Hartford and The Hartford's mutual funds." (Id. at ¶ 16.) Companies possess a legitimate private interest in keeping "cost and profit information sealed from the public and their competitors, to ensure their competitiveness in the marketplace." Bracco Diagnostics, Inc. v. Amersham Health, Inc., Civ. A. No. 03-6025(FLW), 2007 WL 2085350, at *5 (D.N.J. July 18, 2007). Although the Court is mindful of public policy favoring open courts and protecting the many investors who make use of mutual funds, sealing sensitive competitive information is commonplace, and for good reason. Id. As such, the private interests at stake outweigh the public interests.

The Hartford Defendants have also identified a clearly defined and serious injury that will result if the redactions are not permitted. Specifically, the competitive harm that could potentially befall the Hartford Defendants if their non-public cost data were released to their competitors is sufficient for purposes of the "good cause" analysis. See Grant Heilman Photog., Inc. v. Pearson Educ., Inc., Civ. A. No. 11-cv-4649, 2012 WL 1521954, at *6 (E.D. Pa. Apr. 30, 2012) (explaining the harm that may befall a company if competitors are able to ascertain profitability data). Empowered with the

20

Hartford Defendants' profitability data, a competitor could use that information to gain an advantage in pricing. Such a harm is sufficient for a "good cause" showing.

Finally, the Hartford Defendants have sought to restrict access in a minimally restrictive way. Instead of requesting far-reaching sealing of all documents or the entirety of some documents, the Hartford Defendants have put forth targeted redactions of numerical data. The Court can ascertain no less restrictive means that would protect the information from disclosure.

Accordingly, because the Hartford Defendants have made the requisite showing for purposes of sealing, the Court will grant their motions to seal.

### C. **Wellington's Motions to Seal**

Wellington also moves to intervene in this action for purposes of sealing certain portions of the record.

Rule 24(b) of the Federal Rules of Procedure permits a court to allow a third party to intervene when that party is given a conditional right to intervene by statutes or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). In applying this rule, the Third Circuit has held that "the procedural device of permissive intervention is appropriately used to enable a litigant who was not an original party to an action to

challenge protective or confidentiality orders entered in that action." <u>Pansy v. Borough of Stroudsburg</u>, 23 F.3d 772, 778 (3d Cir. 1994). Courts applying the holding of <u>Pansy</u> have ruled that parties may intervene under Rule 24(b) for purposes of "bringing to the Court's attention its view with respect to what should be contained in [a] protective order." <u>U.S. v. Dentsply Intern., Inc.</u>, 187 F.R.D. 152, 157-58 (D. Del. 1999).[10] As such, the Court grants Wellington's motion to intervene.

Turning to Wellington's motion to seal certain documents contained in the record, the Court is inclined to grant the motions for the same reasons the Hartford Defendants' motions to seal were granted. Specifically, the information sought to be protected is internal, confidential financial information concerning costs and profits. Disclosure of that information would work a competitive harm to Wellington. And finally, Wellington has proposed the sealing of a very small number of documents, the information in which could not be protected with less restrictive means.

Accordingly, Wellington's motion to seal is also granted.[11]

---

[10] It is also worth noting that Plaintiffs explicitly do not contest Wellington's ability to intervene in the action for purposes of sealing. (Pls.' MTS Opp. Br. at 3 [11-1083 Dkt. No. 162].)
[11] Consistent with this ruling, the Court has also filed this Opinion under seal. The Hartford Defendants must file, within ten (10) days of the entry of this Opinion and the accompanying Order, proposed redacted versions for public use.

22

## III. <u>SUMMARY JUDGMENT</u>

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." <u>Id.</u>

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. <u>Anderson</u>, 477 U.S. at 252. Nevertheless, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. <u>Scott v. Harris</u>, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."

23

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" <u>Anderson</u>, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record;" mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. <u>Orsatti v. N.J. State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995); <u>Jackson v. Danberg</u>, 594 F.3d 210, 227 (3d Cir. 2010) (citing <u>Acumed LLC v. Advanced Surgical Servs., Inc.</u>, 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

A. **The Hartford Defendants' Motions for Summary Judgment**

i. **Standing**

The Hartford Defendants argue that certain plaintiffs lack standing to bring claims with regard to two funds because they no longer own shares of these funds: the Small Company Fund and the Floating Rate fund.  (Defs.' Br. at 30.)  Ownership is a requirement for Section 36(b) actions.  See Santomenno v. John Hancock Life Ins., 677 F.3d 178, 182-85 (3d Cir. 2012) ("[A] continuous ownership requirement throughout the pendency of the litigation assures that the plaintiff will adequately represent the interests of the security holders in obtaining a recovery for the benefit of the company.").  Plaintiffs do not contest that no individual plaintiff owns a share of the Small Company Fund and consent to the dismissal of that claim, but argue that a plaintiff in Kasilag v. Hartford Funds Management Company, LLC, Civ. No. 15-1876, a related action, owns shares in the Floating Rate Fund and accordingly standing exists.  While that plaintiff may have standing to assert a claim in the related action, and the ruling with regard to the instant action may be somewhat of a technicality, standing does not exist for the two actions presently before the Court and accordingly any claims

related to the Small Company Fund and Floating Rate Fund are dismissed.[12]

### ii. **Section 36(b) Standard**

As this Court has previously noted, Section 36(b) imposes a "fiduciary duty" on investment advisers with respect to the compensation they receive for providing services to mutual funds. 15 U.S.C. § 35(b); see also Kasilag v. Hartford Inv. Financial Services, LLC, Civ. No. 11-1083 (RMB/KMW), 2012 WL 6568409, at *1 (D.N.J. Dec. 17, 2012). In Jones v. Harris Associates L.P., the Supreme Court, drawing from Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923 (2d Cir. 1982), resolved a split among the Courts of Appeals over the proper standard under § 36(b). 559 U.S. 335 (2010). Specifically, the Jones Court held that to face liability under § 36(b), the investment adviser's fee must be so disproportionate that it does not bear a reasonable relationship to the service the defendant rendered and could not have been negotiated at arm's length. Jones, 559 U.S. at 344.

In applying this standard and the accompanying multi-factor Gartenberg test, courts consider "all relevant circumstances." Id. at 347 (citing Gartenberg, 694 F.2d at 929. It is important

---

[12] While the claims for these two funds will not proceed, the Court nevertheless continues to use the label "the Funds." It is intended that this usage does not hereafter include reference to these two funds.

to note, however, that "the standard for fiduciary breach under
§ 36(b) does not call for judicial second-guessing of informed
board decisions." <u>Jones</u>, 130 S. Ct. at 1429. (citations
omitted).  The <u>Gartenberg</u> standard reflects Congress's decision
to "rely largely upon independent director 'watchdogs' to
protect shareholders' interests."  <u>Id.</u> (citations omitted).
Indeed, if "the disinterested directors considered the relevant
factors, their decision to approve a particular fee agreement is
entitled to considerable weight, even if a court might weigh the
factors differently."  <u>Jones</u>, 559 U.S. at 351.  Nevertheless,
even if the Board was "in possession of all relevant
information," a fee may still "be excessive even if it was
negotiated by a board in possession of all relevant information,
but such a determination must be based on evidence that the fee
is so disproportionately large that it bears no reasonable
relationship to the services rendered and could not have been
the product of arm's-length bargaining."  <u>Jones</u>, 559 U.S. at 351
(quoting <u>Gartenberg</u>, 528 F. Supp. at 928.)

### iii. <u>Deference Given to Board Approval</u>

As the Supreme Court noted in its holding in <u>Jones</u>, it is
not the job of this Court to second-guess a disinterested Board
that approved the fees at issue.  Indeed, the intent of Congress
was to rely upon independent directors, not courts which are
"institutionally unsuited to gather the facts upon which

27

economic predictions can be made, and professionally untrained to make them." Id. (quoting General Motors Corp v. Tracy, 519 U.S. 278, 308 (1997)). As such, the first phase of the review under Gartenberg and Jones is to "calibrat[e] the degree of deference" that should be given to the Board's decision to approve the fees. Id.

Plaintiffs' arguments that the Board's process was not fulsome or comprehensive and that the Hartford Defendants withheld meaningful information from the Board are legion. (Pls.' Br. at 15-16, 33-37.) Plaintiffs argue:

1. The Board did not understand the nature of the services provided by the Hartford Defendants, (Pls.' MSJ Opp. Br. at 33);

2. The Hartford Defendants used a misleading method of accounting for their profit margin, (id. at 33-34);

3. The Hartford Defendants withheld a document concerning whether advisory and administrative fees should be separately evaluated, (id. at 34);

4. HIFSCO did not allow the Board to take notes in its deliberations, (id. at 35-36);

5. The Board did not consider alternate advisors, (id. at 36);

6. The Board was unaware of regulatory violations by the Hartford Defendants, (id. at 36-37);

7. The Board was misled to believe that HIFSCO had no role in selecting funds that were used in fee comparisons, (id. at 37);

8. HIFSCO did not inform the Board that it earned a "float" on sub-advisory fees, (id. at 37.)

28

As discussed _infra_, Plaintiffs' quibbles with the Board's process really amount to no more than nit-picking the Board's process; they do not create a triable issue of fact with regard to the Board's independent approval of the fees.

**Director testimony**. Plaintiffs point first to deposition testimony from two directors. In one deposition, Director Lemma Senbet stated that he did not care how tasks were allocated between HIFSCO and Wellington, and stated "I don't know what the [advisory] fee pays for." (Lakind Dec. Ex. 124 at 91:1.) In another deposition, Director Duane Hill stated that "HIFSCO is the transfer agent," when HASCO (a different Hartford entity) is actually the transfer agent. (Id. Ex. 38 at 170:9-11.) Any level of meaningful scrutiny applied to these two lonesome statements in hundreds of pages of deposition testimony of directors reveals they do not create a triable issue of fact.

The full excerpts of Mr. Senbet's testimony reveal that the reason he "[did] not care" about who performed which services is that his primary concern was making sure that the shareholders "are getting the full range of services between Wellington, between Hartford and so on." (Lakind Dec. Ex. 55 at 188:11-22.) The Court struggles to take issue with Mr. Senbet's particular formulation of how he views the fulfillment of the services under the IMAs. With regard to his statement that he does not know what the advisory fee pays for, further discussion

29

thereafter reveals that Mr. Senbet focuses on the aggregate fee and does not parse it down between Wellington and the Hartford Defendants. (Lakind Dec. Ex. 55 at 90:20-91:6.) Again, merely because the Plaintiffs would have preferred Mr. Senbet view the facts as they see them does not mean he ignored facts or abrogated his duty to make uninformed decisions. Gallus v. Ameriprise Fin., Inc., 497 F. Supp. 2d 974, 983 (D. Minn. 2007) (merely because the "Board may have placed greater emphasis on [one portion of their analysis] than Plaintiffs would have liked, such evidence does not create a genuine issue of material fact that the process was not an arm's-length one.").[13]

As to Mr. Hill's testimony concerning the transfer agent, his misstatement about the identity of the transfer agent does not create an issue of fact. That statement came in the midst of a discussion about how the adviser monitors outside service

---

[13] The procedural history of Gallus warrants explanation. In that case, also dealing with a Gartenberg analysis at summary judgment, the Court granted summary judgment for the Defendant. On appeal, the Eight Circuit reversed the court and adopted the non-Gartenberg reasoning of the Seventh Circuit in Jones v. Harris Assocs., 537 F.3d 728 (7th Cir. 2008). Gallus v. Ameriprise Fin., Inc., 561 F.3d 816 (8th Cir. 2009). The Supreme Court, after reversing the Seventh Circuit in Jones, vacated the opinion of the Eight Circuit in Gallus. 559 U.S. 1046 (2010). On remand from the Supreme Court, the original district court opinion was reinstated. Civ. No. 04-4498 (DWF/SRN), 2010 WL 5137419. The original district court opinion, now reinstated, was again appealed to the Eight Circuit where it was affirmed in its entirety. Gallus v. Ameriprise Fin., Inc., 675 F.3d 1173 (8th Cir. 2012).

providers versus handling matters in-house (i.e., by a Hartford affiliate or an outside service provider). (Lakind Dec. Ex. 38 at 170:5-171:5.) Moreover, the record also establishes that on a yearly basis, Mr. Hill and the Board review the transfer agency contracts, indicating they are aware of who performs which services. (Hora Dec. Ex. 45 (Board Meeting minutes indicating the Board "reviewed the services provided under the Funds' contract with [HASCO].") Even if Mr. Hill's phrasing was inadvertent or unartful, it does not rise above a scintilla of evidence that the Board misunderstood the services provided.

**Accounting methodology.** Plaintiffs also argue that the accounting methodology by which the Hartford Defendants reported their profitability was misleading. Plaintiffs do not, however, contend that any actual amount of profit or information was withheld from the Board, only that the methodology by which profit margin was calculated in information presented to the Board was misleading. Plaintiffs' argument that this evidence renders the Board uninformed fails.

Plaintiffs cannot reconcile the fact that the entirety of their argument that the information was misleading is based on re-arranging the documents and information that were provided to the Board. For instance, Plaintiffs do not argue that in 2011 the Board was not aware that it paid $113 million in gross advisory fees for the management of the Cap App Fund. (Lakind

Dec. Ex. 18 at HIF-00030267.)  Likewise Plaintiffs do not argue that in 2011, the Board was unaware that $43 million of that amount was paid by the HIFSCO on to Wellington to cover sub-advisory expenses, and that HIFSCO incurred ███████ of its own operating expenses.  (Id.)  Of course, the reason that this is not argued is because this information was conveyed directly to the Board in preparation for its duties to approve the advisory fee.  (Id.)  The fact that the Board was given one accounting treatment of these inputs over another does not in and of itself impugn the Board's approval.  See Gallus, 497 F. Supp. 2d at 981.[14]

**Withheld fee bifurcation analysis.**  Plaintiffs point to a request made by the Board in 2009 and 2010, in which the Board requested that, "[f]or funds that are parties to the Administrative Services Agreement with Hartford Life Insurance Company . . . please respond to the following":

> For comparative purposes, please provide information on the impact of administrative service fees (in basis points) charged by peer fund complexes.  If you believe it is appropriate to consider the advisory and administrative functions together for comparative fee purposes, please explain the basis for your belief.  To the extent you believe this information is not

---

[14] As the Court noted in Gallus, in strong similarity to the record before this Court, "while Plaintiffs contend that the information Defendants provided the Board was misleading, Plaintiffs fail to describe how these alleged deficiencies affected the results of the Board's fee-negotiation process." 497 F. Supp. at 983.

32

> reasonably available, describe the efforts you have made
> to obtain it.

(Third SOF ¶ 69.)  HIFSCO, in response to a Board inquiry

providing information on the impact of administrative advisory

and administrative expenses, responded that they believed "that

it is appropriate to consider the advisory and administrative

functions together for comparative fee purposes." (Second SOF

at ¶¶ 121-122.)  Plaintiffs argue that, despite this answer,

HIFSCO "undertook a study which it called 'Assessment of Fee

Bifurcation/Unified Mgmt. Fee Pricing Strategies' in which it

did precisely what the Board asked albeit for a different group

of Hartford funds." (Pls.' Br. at 34.)

    Plaintiffs' argument unfairly distorts the record.  The

record does not reflect that the Funds were subject to

administrative services agreements with Hartford Life. (Hora

Dec. Ex. 126 at HIF-00011903.)[15]  As such, the Board's 2009 and

2010 requests were not aimed at the information contained in

HIFSCO's analysis, but rather funds which were administered

pursuant to an administrative services agreement. (Third SOF at

¶ 69.)  This Court cannot conclude for purposes of summary

judgment that the information the Board supposedly lacked — the

---

[15] In fact, the Funds received investment management services and
administrative services jointly through the IMAs. (Hora Dec.
Ex. 126 at HIF-00011903.) Subsequent to March 1, 2010, the
Hartford Life funds also moved to a joint
advisory/administrative fee agreement.

33

bifurcated profit margin — would have impacted the Board's determination in this case.

**Note taking.** Plaintiffs also argue that disabling the note taking feature in "Diligent," the interface used by the Board to review documents, inhibited the Board's review of the fees. (Pls.' MSJ Opp. Br. at 36.) This manufactured deficiency in the Board's approval process does not undermine the Board's approval, either. As the Hartford Defendants point out, if the Board had sought to take notes, they could have done so by other means outside of the Diligent interface. Moreover, Plaintiffs cite to no record evidence indicating the result of the fee negotiation would have been different if the Board could takes notes through Diligent.

**Alternate advisors.** Plaintiffs also argue that the Board never considered retaining someone other than HIFSCO as the adviser, nor did it explore contracting directly with Wellington. (Pls.' Br. at 36.) This argument again seeks to manufacture a flaw in the Board's review. Plaintiffs rely on their expert who stated that "information overload" for the Board may have caused it to overlook the nature of the Hartford Defendants' duties and "had Wellington's sub-advisory agreements been between it and each fund, rather than between it and HIFSCO, the directors would have been better able to assess the true nature of HIFSCO's duties and the reasonableness of its

34

fees." (Lakind Dec. Ex. 60 at 6.) Regardless of whether the
Board would have realized this, Plaintiffs' own expert testified
that he, as a member of a mutual fund board, had never
terminated the services of an adviser because those boards
always felt the fund was doing "well or at least okay." (Hora
Dec. Ex. 91:4-8.) This meshes coherently with the deposition
testimony of Mr. Hill, one of the Funds' directors, who stated,
"[F]or us to change an investment advisor without there being
some really substantial reason to do so, I'm not sure that would
be in the shareholder's best interest. I mean, it's a pretty
catastrophic – I mean, it's done, but very rarely in the mutual
fund industry . . ." (Hora Dec. Ex. 184:11-20.) The inquiry
with regard to Board deference is not whether a better deal
could hypothetically have been reached. Plaintiffs have not
shown that the failure to consider alternate advisers to the
fund rendered the Board's decision one that could not be arm's
length.

**Regulatory violations.** Plaintiffs also contend that the
Hartford Defendants withheld information from the Board
concerning "large fines for regulatory violations." (Second SOF
at ¶ 134.) Plaintiffs' evidence for this fact is the
recollection of one Board member who testified that he did not
recall several specific instances of the Hartford Defendants
being subject to regulatory fines from 2006 and 2007. (Id. at

35

¶¶ 135-37.)[16]  The record does not demonstrate how regulatory
fines, typically from long before the fees were negotiated,
would have been relevant to an arm's length negotiation of the
fees during the relevant time period.  Moreover, the record does
not contain a genuine dispute that this information was withheld
— rather Plaintiffs' argument relies solely on the recollection
of one director concerning disclosures that would have happened
many years before the fees were negotiated.

**HIFSCO's involvement in selecting peer groups.**  Plaintiffs
further contend that the Board was unaware that Lipper's
presentation of peer groups against which the Funds were
compared was influenced by HIFSCO.  (Pls.' MSJ Opp. Br. at 37.)
In support of this argument Plaintiffs point to communications
between HIFSCO and Lipper which purportedly show that the peer
group recommendations were improperly altered at HIFSCO's
request prior to being shared with the board.  (Second SOF at ¶¶
115-16.)  The first of Plaintiffs' e-mails is a 2009 e-mail
which references a 2005 letter in which it was "suggested to
[Lipper that they] make some modifications to their peers."
(Lakind Dec. Ex. 80 at HIF-00157715.)[17]  In addition to the fact

---

[16] One settlement agreement for $100,000 reached with FINRA came
about in February 2013, dealing with conduct from prior to the
filing of these actions.

[17] In further support of this argument, Plaintiffs also cite a
2009 internal email stating: "[a]s a follow up to our questions
that I had on Growth Opps [Fund], Lipper made revisions to the

that this refers to a 2005 suggestion to Lipper, this does not
show that the data Lipper presented to the Board regarding the
Funds' peer groups would have been different or could have
rendered it no longer an arm's length transaction.

Likewise, the Court does not construe from the evidence
Plaintiffs point to that HIFSCO exerted control over Lipper to
the detriment of the Board. (Second SOF at ¶ 116.)
Specifically, Plaintiffs point to Lipper's alteration of
language in a footnote reading "Load-specific Performance
Universes were provided at the request of Hartford and the
consultant to the Independent Directors," to remove the fact
that Hartford requested the inclusion. The Court finds that
this does not place the factual issue in genuine dispute.
Plaintiffs have not demonstrated that the Board's unawareness of
the Hartford Defendants' purportedly secret request to include
load-specific performance universes rendered the Board's
decision uninformed.

---

peer group range. With Lipper revisions . . . fee [rank]
improved from 4th quintile to 3rd quintile." (See Second SOF at
¶ 115.) The cite to this quote is incorrect and the Court has
no method to verify this quotation. Nevertheless, on its face
it would not change this Court's evaluation of the
communications between HIFSCO and Lipper. Even under a
charitable reading, the fact that Lipper made some sort of
revision to their methodology based upon questions asked by
HIFSCO does not demonstrate that the Board's process was not
informed.

**The float.** Plaintiffs argue that the Board was not fully informed because the Hartford Defendants' failed to disclose to the Board that it earned interest from collecting its advisory fee monthly, but only payed Wellington's management fee quarterly. (Pls.' Br. at 37.) Instead, the Hartford Defendants reported to the Board that, "There are no 'floats' realized on Fund-related transactions." (Lakind Dec. Ex. 67 at HIF-00029892.) This so-called float amounts to approximately $175,000 across all mutual funds, or about $4,000 per fund. Against millions (and sometimes hundreds of millions of dollars) of fees, Plaintiffs have not genuinely disputed whether the Board was fully informed on the basis of this relatively <u>de minimis</u> windfall. Indeed, Plaintiffs' own expert conceded the float was not a significant issue and "the case is not going to turn on this [issue.]" (<u>Id.</u> Ex. 145 238:17-239:2.) Another of Plaintiffs' experts stated:

> Q: And $172,000 spread across 40 funds is relatively trivial in terms of amounts?
>
> . . .
>
> A: Of course. We're talking about -- as we've been talking all day, we're talking about tens or hundreds of millions of dollars of fees. We're talking about -- even as respect to HFMC's expenses, direct expenses, ██ ██ ██ ███████, here it's $172,000. So it's relatively insignificant in the broad scheme of things.

(<u>Id.</u> Ex. 142 221:8-17.)

As such, the Court does not find that the failure to disclose the existence of the float, to the extent it was a "float" at all, meaningfully undermines the Board's determination by depriving it of important information. <u>See Jones</u>, 559 U.S. at 352 (noting a problem only if the adviser withheld "<u>important</u> information" (emphasis added)).

In sum, the Court agrees with the Hartford Defendants that Plaintiffs' perceived shortcomings do not create a triable issue of fact with regard to whether the Board's approval is entitled to deference.[18]  Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have not genuinely contested the board members' independence, 15 U.S.C. § 80a2(a)(9), nor have they shown the Board was uninformed or the process tainted by important withheld information.  <u>See Gallus</u>, 497 F. Supp. 2d at 983 ("[W]hile Plaintiffs contend that the information Defendants provided to the Board was misleading, Plaintiffs fail to

---

[18] Plaintiffs also cite an additional shortcoming in the Board's process in their motions for partial summary judgment.  (Pls.' MPSJ Br. at 29.)  In particular, Plaintiffs argue that Lipper provided two reports to the Board, one demonstrating the expenses of competitor funds and one demonstrating the performance of competitor funds, and that these two reports made use of different competitor funds, thereby misleading the Board. Again, this shortcoming does not create a triable issue of fact with regard to the Board's approval of the fees.  Plaintiffs have not demonstrated that had the Board been presented with the information Plaintiffs' counsel's law clerk presents in his declaration their result would have been any different.

describe how these alleged deficiencies affected the results of the Board's fee-negotiation process.")

In general, a plaintiff should not be able to survive summary judgment through armchair quarterbacking and captious nit-picking. Such a standard would put defendants in the untenable posture of defending interminable, manufactured, and protracted litigation involving second-guessing a board's process. Here, Plaintiffs seek to do just that. They rely only upon their own experts' testimony and cherry-picked deposition excerpts suggesting Plaintiffs might have negotiated a different deal had they been in the directors' seats, but not showing that the Board abandoned or failed its watchdog function. Such carping, if sufficient, would eviscerate the deference that is to be paid to an informed Board's process under Jones. As such, the Court determines that the Board's decision is entitled to "substantial weight."

Nevertheless, as the Supreme Court noted in Jones, "[A] fee may be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." 559 U.S. at 351. Accordingly, the Court proceeds to review the Gartenberg factors, infra, as a means of

40

determining whether, despite Board approval, the fee disproportionately exceeds the bounds of arm's length bargaining.

### iv. *Gartenberg* Factors

As noted above, under Gartenberg, courts consider all pertinent facts: "(1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the advisers; (3) "fall-out" benefits; (4) the economies of scale realized by the adviser; (5) comparative fee structures with similar funds; and (6) the independence and conscientiousness of the independent trustees." Gallus, 497 F. Supp. 2d at 979. Few courts have reached the summary judgment stage with regard the Gartenberg analysis. Indeed, the Court is only aware of two recent decisions doing so. Nevertheless, one recent decision in this District, which Plaintiffs have brought to this Court's attention, denied summary judgment on very similar facts. See Sivolella v. AXA Equitable Life Ins. Co., Civ. No. 11-4194 (PGS) (D.N.J. Aug. 5, 2015). On the record as it now stands, the Court is inclined to largely agree with the Sivolella court, with exceptions as the particular facts of this case require.

### 1. Nature and Quality

The first Gartenberg factor for assessing a mutual fund's advisory fee concerns the nature and quality of the services

41

provided by the adviser.  <u>Gallus</u>, 497 F. Supp. 2d at 980.  This
inquiry necessarily involves a determination of what services
may be permissibly considered.

    Plaintiffs contend that the proper services to be
considered are only those directly performed by the Hartford
Defendants.  (Pls.' MSJ Opp. Br. at 10-12  ("Plaintiffs are
arguing that the portion of the fee retained by HIFSCO does not
bear the indicia of an 'arm's length bargain.'").)  This stance
of course precludes consideration of Wellington's services,
which were a significant portion of the services owed under the
IMAs.  (<u>See</u> <u>supra</u> pp. 7-9.)  Plaintiffs additionally argue that,
even if one considers the full panoply of services provided by
the Hartford Defendants and Wellington, the fees could not be
the product of arm's length bargaining.  (Pls.' MSJ Opp. Br. at
14.)  Defendants call this view myopic — arguing there is no
basis in law or the nature of the relationship between the Funds
and the Hartford Defendants or Wellington to bifurcate the
consideration of services considered by the adviser or sub-
adviser.

    With regard to the proper services to consider, the Court
is inclined to consider both the services performed by
Wellington in its capacity as sub-adviser and the services
performed by the Hartford Defendants as adviser.  These combined

42

services should be measured against the totality of the advisory fee.

As an initial matter, the IMAs explicitly permitted the Hartford Defendants to seek sub-advisers. (Lakind Dec. Ex. 1 at § 4.) Indeed, the contract has an entire provision outlining the scope of the Hartford Defendants' obligation regarding the oversight of such sub-advisers. (Id.) It would be a strange holding to rule that the nature or quality of the services provided by the Hartford Defendants were inferior solely because they were contracted out to Wellington, when the parties acknowledged this as a possibility in their initial contract. Put differently, what's the difference to the Funds if the Hartford Defendants perform the services directly or by way of a sub-adviser? The sub-adviser clause in the contract seems to indicate that (barring rejection of the sub-adviser by the Board) there is no difference.

This result also meshes with the holding in Gartenberg itself. There, the Court referred to the House Report, which stated:

> It is intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser had properly acted as a fiduciary in relation to such compensation.

House Report, at 37, U.S. Code. Cong. & Admin, News 1970, p. 4910. Gartenberg dealt with three related entities servicing a fund. In evaluating the net earnings, the Court was inclined to consider not only services provided by each defendant in relation to their respective fee, but also those performed by "closely related entities whose functions intimately impinge on one another." Gartenberg, 528 F. Supp. at 1049. Indeed, the Gartenberg court considered the totality of services, including those performed under "a contractual arrangement" whereby a single defendant provided the "overwhelming bulk of shareholder services." Id. at 1047. There is no reason here to consider Wellington's services any differently. The plain fact is, as part of the Board's bargain with the Hartford Defendants, the performance of the duties ultimately tasked to Wellington was secured. Disregarding those services solely because the Hartford Defendants made the permissible business decision that they were better or more efficiently (or even more inexpensively) performed by Wellington is non-sensical.

That said, this Court understands the concerns expressed by the court in Sivolella. Civ. Nos. 11-4194 & 13-213, Hr'g Tr. at 78:9-79:12. Here, Plaintiffs have argued that, even considering the services performed by Wellington, the nature of the services was de minimis in relation to the fee extracted. In Sivolella, the court ruled that "the fact that the parties disagree between

44

whether the services were di minimis [in relation to the fee extracted] or whether they were in accordance with what [the defendant] has set forth to this Court presents a substantial question of fact that is not subject to disposition on summary judgment." (Id.) Plaintiffs here, too, have argued the services performed by the Hartford Defendants, even in combination with Wellington's services, were de minimis. Because the true nature of the services performed remains relatively nebulous and wrangled-over, viewing the facts in the light most favorable to Plaintiffs suggests that summary judgment on this factor is inappropriate.

Moreover, with regard to the nature of the services, viewing the evidence in the light most favorable to Plaintiffs, some evidence exists that the quality of the services was poor. As Plaintiffs' expert opined, "For the 5 year period [ending in] 2014, the Capital Appreciation Fund performed worse than 94% of the funds in its peer group, and the Hartford Inflation Plus fund performed worse than 80% of the funds in its peer group." (Second SOF at ¶¶ 36-37.) Also with regard to the Cap App Fund, Plaintiffs' expert calculated that for the period ending December 31, 2014, the Cap App Fund's performance as compared to its benchmark cost shareholders approximately $6 billion. (Id. at ¶ 36-37.) This is only some of the evidence Plaintiffs point to regarding the performance of the funds. (Id. at ¶¶ 36-44.)

While the Hartford Defendants vehemently refute the performance analysis that Plaintiffs put forward, and in the end may prevail, the dispute concerning the actual services performed by the Hartford Defendants and the quality of those services remains genuine.  As such, the issue should not be resolved on summary judgment.

### 2. **Profitability**

In many ways, much of the case comes down to how the profits of the Hartford Defendants are viewed.  Plaintiffs and the Hartford Defendants have each put forward their own respective method of accounting for the profits, and have provided expert testimony to that effect.

One method of calculating the profit margin is to divide the cost of the services the Hartford Defendants provides to the Funds directly by the advisory fee less the cost of sub-advisers.  This method treats the sub-adviser expenses as "contra-revenue."  This is Plaintiffs' method and it yields a comparatively high profit margin — around ███.  (Pls.' MSJ Opp. Br. at 20.)  Another method is to divide the cost of the services provided inclusive of the fees paid to the sub-adviser by the gross advisory fee.  This method essentially treats sub-advisers as an "expense" which is factored into profit margin.  This is the Hartford Defendants' method and it yields a lower profit margin — between ██ and ██.  In support of their

46

arguments that their methodology is the proper one for calculation, Plaintiffs and the Hartford Defendants have put forward extensive expert opinions on the topic. (Second SOF at ¶¶ 54-55; Lakind Dec. Ex. 26, 37.)

This is a nearly identical argument as the one presented by the Court in Silovella. Civ. Nos. 11-4194 & 13-213, Hr'g Tr. at 78:9-79:12 ("[Plaintiffs' and defendant's] expert disagree on the proper methodology for calculating [defendant's] profits, and whether [sub-adviser] costs passed along to FMG should be incorporated into such a calculation. . . . [T]hat's a fact question that must be determined at trial."). Nevertheless, this is also a similar argument to that which was presented and rejected in Gallus, where the court held,

> Plaintiffs do not dispute that Defendants provided
> detailed reports on its profitability to the Board.
> Instead, Plaintiffs' expert takes issue with how the
> information was presented to the Board by criticizing
> the cost allocation methodology used. Although
> Plaintiffs suggest that the Board should have had
> different information than what the Board was provided,
> Plaintiffs do not point to any authority detailing
> requirements for the presentation of profitability data.
> Furthermore, Plaintiffs fail to show how any such
> failings in the data create a genuine issue of material
> fact regarding whether the board negotiates the fees at
> arm's length.

974 F. Supp. at 981.

Unlike Gallus, which did not deal with the allocation of sub-adviser costs, Plaintiffs have pointed to at least some authority which might suggest it was improper or misleading to

present profit margin in a manner that included sub-adviser
expenses as revenue.  (Pls.' MSJ Opp. Br. at 22-23.)  While the
precedent relied upon by Plaintiffs — an SEC consent order and
somewhat differentiable case law concerning pass-through
payments – is thin, it narrowly places Plaintiffs beyond the
summary judgment standard in combination with their expert
evidence.  As such, this Court rules in line with the Silovella
court, which held that such a record creates a genuine dispute
for trial.

### 3. "Fall-Out" Benefits

Fall-out benefits are those which accrue to the mutual fund
adviser as a result of its work on behalf of the mutual fund.
Hoffman v. UBS, 591 F. Supp. 2d 522, 539.

Plaintiffs' expert identifies three main fall-out benefits:

(1) Profits earned by the Hartford Defendants for providing
fund accounting services and transfer agent services,

(2) The "float" which occurred while he Hartford Defendants
retained Wellington's fee monthly but only paid out
quarterly and did not disclose this benefit amounting to
$172,000 annually, and

(3) Revenue from charging investors a "front-end sales load"
of 5.5% on new investments in the Funds' class A shares
which provided an additional $13.7 million, in addition
to $10 million for its back end sales charge.

(Hora Dec. Ex. 99, Barrett Report at 29.)

The Hartford Defendants argue that the fall-out benefits in
the form of transfer agent fees and accounting fees are not
fall-out benefits at all because they are not indirect, but

48

rather very direct benefits that were known by the Board.
(Defs.' MSJ Br. at 28-29.)  The Hartford Defendants also contend
that the "float" that Plaintiffs' expert has identified is not a
float at all, just a timing difference.  Moreover, Defendants
argue that the total value of the so-called float amounted to no
more than $4300 per fund.  (Id.)  Defendants do not contest that
they did not reveal the existence of this benefit to the board.
Indeed, to the contrary, Defendants represented that they did
not receive a float at all.  (Lakind Dec. Ex. 18 at HIF-
0029892.)

As noted with regard to the "float", supra pp. 36-38, the
Court is skeptical that this so-called fall-out benefit was an
important one that would have impacted the Board's negotiation.
See Jones, 559 U.S. at 352 (noting a problem only if the adviser
withheld "important information" (emphasis added)).
Nevertheless, the significance and extent of these fall out
benefits (particularly the transfer agent fees and front-end
sales load) remains largely in dispute between the parties.  The
resolution of this factual dispute would be material to the
analysis of whether, despite the substantial weight to be
accorded to the Board's approval, these fall-out benefits in
conjunction with the other Gartenberg factors in dispute
rendered the fee excessive.

### 4. **The Economies of Scale**

The fourth Gartenberg factor deals with the extent to which the fee charged to the Funds shared in economies of scale. An "economy of scale" is defined as a "decline in a product's per-unit production cost resulting from increased output, [often] due to increased production facilities; savings resulting from the greater efficiency of large-scale processes." Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (quoting Black's Law Dictionary (8th ed. 2004)).

Plaintiffs argue that the Hartford Defendants' fee structure did not adequately convey the benefit of economies of scale. Indeed, as Plaintiffs point out there is roughly a $130 million difference between the parties' respective experts' calculations of how much the savings of the Hartford Defendants were passed on. (Pls.' Br. at 29.) Plaintiffs also argue that by delegating substantial duties to Wellington, substantial economies of scale were realized. (Second SOF at ¶ 91; Pls.' MSJ Opp. Br. at 28.) The Hartford Defendants' response is that Plaintiffs' have not shown that economies of scale were even realized by the Hartford Defendants because Plaintiffs have impermissibly compartmentalized their costs. (Pls.' Br. at 23.) Moreover, even if economies of scale were realized, they were passed on via breakpoints which saved over $130 million.

Once again, Plaintiffs have narrowly survived the summary judgment stage with regard to this Gartenberg factor. Given the back and forth nature of negotiations between the Board and the Hartford Defendants concerning breakpoints, the Court hastens to note that the fees appear to reflect economies of scale, and thereby, an arm's length bargain. Again, this is magnified by the substantial weight to be afforded to the Board's process and decision. Nevertheless, viewing the evidence in the light most favorable to Plaintiffs, this Court cannot ignore expert testimony highlighting a large factual dispute concerning the economies of scale that were passed on to the Funds. Silovella, Civ. Nos. 11-4194 & 13-213, Hr'g Tr. at 83:9-10 (holding, on similar facts, that economies of scale issues remained in dispute).

### 5. **Comparative Fee Structures**

The fifth Gartenberg factor concerns how the fee structure of the Funds differs from comparable funds. Gallus, 497 F. Supp. 2d at 982.

Plaintiffs have focused their argument on what a truly arm's length fee would look like. According to Plaintiffs' expert on the subject matter, the Hartford Defendants' fee should be range between .0134% and .0496% to be representative of an arm's length fee. (Pls.' MSJ Opp. Br. at 27.) Instead, Plaintiffs argue, the Hartford Defendants' fees are 10 to 25

51

times that level.  (Id.)  Defendants counter that the Board
reviewed and considered Lipper peer data, and that data
indicates that the Funds' fee structures are wholly in line with
industry peers.  (First SOF at ¶ 48-49.)

The Court is again doubtful this evidence, even in
combination with the remaining Gartenberg factors could overcome
the substantial weight given to the Board's process and result.
This is particularly so given the Court's skepticism that
Plaintiffs' idealistic expert analysis of the Funds' comparative
fee structure would ultimately carry the day at trial when
compared to actual peers, as the Hartford Defendants have done.
Nevertheless, at summary judgment, viewing the evidence in the
light most favorable to Plaintiff, the Court finds that disputed
facts remain for trial with regard to this factor as well.  If a
jury were to find that this fee exceeded an arm's length fee by
a multiple of 25, in combination with resolving other factual
disputes in Plaintiffs' favor, such findings could override the
substantial deference given to the Board's result.

### 6. **Independence and Conscientiousness of the Trustees**

This factor dovetails with the procedural aspect of Jones.
As this Court outlined with regard to the "substantial weight"
to be granted to independent director approval, the final factor
of the Gartenberg analysis is not in genuine dispute.  As such,

the independence and conscientiousness of the trustees factor points in favor of finding the fee appropriate.

### v. *Gartenberg* Outcome

As described above, five of the Gartenberg factors remain disputed.  While the Court has afforded substantial deference to the Board's process, viewing the evidence in the light most favorable to Plaintiffs, the Court cannot say that the Hartford Defendants are entitled to summary judgment at this stage because narrow issues with regard to those factors remain.  As such, while the Court will preserve the substantial weight afforded to the Board's decision, the factual disputes regarding the five Gartenberg factors in dispute require trial.

The Court also notes its expectation that the trial would not be a far-flung foray into the annals of accounting procedures or mutual fund administration, as discovery was. Instead, the Court believes an adequate trial would resolve these remaining factual disputes:

- The nature of the services provided by the Hartford Defendants with regard to the Funds.

- The quality of the services provided, as measured by the performance of the Funds.

- The profitability of the funds, including testimony concerning the proper method of accounting for sub-adviser services.

- What, if any, fall-out benefits existed and their magnitude.

53

- Whether economies of scale were realized and the extent to which those realized economies of scale were passed along to the Funds.

- What comparative fee structures indicate about the size of the fee.

The Court does not anticipate that the resolution of these factual disputes would require more than a few days of trial time.

## B. Plaintiffs' Motions for Partial Summary Judgment

### i. Plaintiffs' Motions for Partial Summary Judgment With Regard to the Cap App Fund

As the above analysis makes clear, while the Board's process is entitled to substantial weight, disputed facts permeate the Gartenberg factors. Therefore, a grant of summary judgment in favor of either party would be improper. For this reason, Plaintiffs' motions for partial summary judgment with regard to liability under § 36(b) regarding the Cap App Fund should be denied as well.

### ii. Disgorgement

Plaintiffs move for summary judgment, as well, with regard to the proper remedy, should it be found that the investment management fee is so disproportionately large that it could not have been the result of an arm's length bargain. Plaintiffs argue that in the event the Hartford Defendants are found liable, the proper remedy is disgorgement of all profits by the Hartford Defendants. (Pls.' MPSJ Br. at 34-35.) In support of

54

this argument, Plaintiffs point to fiduciary rules with regard
to the Restatement of Trusts, which note the significance of
disgorgement as a remedy for breach of fiduciary duty.  (Id.)
Defendants respond that this reading of fiduciary law misplaces
the actual statutory language of Section 36(b).  Defendants
argue that the "actual damages" language contained in the
statute limits damages to the amount paid by the Funds in excess
of a fee that could be negotiated at arm's length.  (Defs.' MPSJ
Opp. Br. at 28-29.)

     While Plaintiffs' argument is tempting in that the Hartford
Defendants are fiduciaries of the Funds, and thus it might be
attractive to import breach of fiduciary duty remedies from
other contexts, it nevertheless misses the mark.  Looking to the
language of the statute itself, this Court determines the proper
measure of damages "shall be limited to the actual damages
resulting from the breach of fiduciary duty."  15 U.S.C. § 80a-
35(b)(3).  In this case, the actual damages would be the
difference between the fee paid and a fee that would have been
"fair"—i.e., a fee that could have been negotiated at arm's
length.  Cf. Krasner v. Dreyfus Corp., 500 F. Supp. 36. 42
(S.D.N.Y. 1980) ("actual damages" means the "amount by which the
. . . fee [level] exceeded a fair fee."); accord In re
Evangelist, 760 F.2d 27, 29 (1st Cir. 1985) ("the remedy
Congress created" under Section 36(b) was the "payment of any

55

excess fee to the company").[19]  As such, the Court denies Plaintiffs' request to determine at summary judgment that disgorgement is the proper remedy.

### iii. **The Applicable Damage Period**

Finally, Plaintiffs argue that this Court should determine that the Hartford Defendants' affirmative defense relating to the applicable damages period is invalid.  Specifically, the Hartford Defendants assert that the Investment Company Act requires that the damages period be limited to one year before the filing of the action and cannot continue past the date of filing.  (Defs.' MSPJ Opp. Br. at 29-30.)  Plaintiffs respond that while the explicit statutory text limits damages to no earlier than a year before filing, the damages limit does not foreclose damages from after the filing.  While the case law is conflicted, the Court is persuaded by Plaintiffs' argument.

The applicable statutory provision reads, "No award of damages shall be recoverable for any period **prior to one year before the action was instituted**."  15 U.S.C. § 80a-35(b)(3) (emphasis added).  The language of this statute would seem quite clear: damages are not available to the extent that they occurred more than a year before the action was filed.  Nevertheless, in interpreting this provision, Courts have not

---

[19] It is also worth noting that Plaintiffs make no functional reply to Defendants' contention.  (Pls.' MPSJ Rep. Br. at 18.)

uniformly found such clarity with regard to this statute.  For
instance, in In re Franklin Mut. Funds Fee Litig., 478 F. Supp.
2d 677 (D.N.J. 2007), a court in this District held that
"[w]hile § 36(b)(3) does not explicitly place an end date on
when a plaintiff may recover damages under § 36(b), the intent
and purpose of the statute clearly limits recovery to one year."
Id. at 685.  The court went on to note that because the
Investment Company Act required that a fund's investment
advisory and principal underwriting contracts be approved
annually, it can be inferred that "the intent of § 36(b)(3) was
to provide fund shareholders, along with the Securities Exchange
Commission, a means for testing newly passed advisory and
distribution contracts."  Id.

The Court is not persuaded by the reasoning in Franklin and
instead adopts the reasoning at play in In re Federated Mutual
Funds Excessive Fee Litigation, No. 2:04cv352, 2011 WL 846068
(W.D. Pa. Mar. 8, 2011), in which the Court held that because
the language in § 36(b)(3) is clear, no limitation on post-
filing damages can be inferred.  In that case, the Court
declined to go beyond the clear language of the statute to
legislative intent.  The court noted, "The plain meaning of §
36(b)(3) as read in its 'ordinary and natural sense' indicates
that the sole temporal limitation imposed is only on those
damages that were incurred prior to the filing of suit."  Id. at

57

*2.  This Court agrees that the provision in § 36(b)(3) is clearly a limitation only on how far back damages can go prior to filing.

Moreover, to the extent this Court were to go beyond the plain text of Section 36(b)(3), it would not find the legislative intent as clear as the <u>Franklin</u> court makes it out to be.  Under that court's reading, the continuous ownership obligation throughout the litigation becomes a bizarre requirement if the damages period ends at the time of filing. Further, reading the statute as the Hartford Defendants suggest invites the path Plaintiffs have taken – the filing of multiple, substantively identical related actions to avoid (or perhaps more aptly put, circumvent) the supposed intent the <u>Franklin</u> court finds.

In light of the plain language of the statute, the Court rules that Plaintiffs' damages, should Plaintiffs establish liability, will not be limited to the one-year period prior to filing, but can flow past filing.

IV.  **<u>CONCLUSION</u>**

In light of the above analysis, the Court **GRANTS** Wellington's and the Hartford Defendants' motions to seal.  The Court **GRANTS** the Hartford Defendants' motions for summary judgment insofar as they pertain to standing to pursue claims regarding the Small Company Fund and the Floating Rate Fund.

The Court additionally **GRANTS** the Hartford Defendants' motions
for summary judgment insofar as the Court determines that the
Board's determination is entitled to substantial weight.
Nevertheless, the Court determines genuine issues of material
fact preclude an outright grant of summary judgment and trial is
the appropriate venue to resolve whether, despite the
substantial weight this Court affords the Board's approval, the
fee is "so disproportionately large that it bears no reasonable
relationship to the services rendered and could not have been
the product of arm's length bargaining." Jones, 559 U.S. at
351. In that respect, the Court **DENIES** the Hartford Defendants'
motions for summary judgment. The Court also **DENIES** Plaintiffs'
motions for partial summary judgment with regard to the Cap App
Fund and the issue of disgorgement. Finally, the Court **GRANTS**
Plaintiffs' motions for summary judgment on the issue of the
relevant damages period. An appropriate Order follows.


DATED: March 24, 2016


                              s/Renée Marie Bumb
                              RENÉE MARIE BUMB
                              UNITED STATES DISTRICT JUDGE