[Dkt. No. 236]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| JENNIFER L. KASILAG, et al., | |
| Plaintiffs, | Civil No. 11-1083 (RMB/KMW) |
| v. | |
| HARTFORD INVESTMENT FINANCIAL SERVICES, LLC, | |
| Defendant. | |
| JENNIFER L. KASILAG, et al., | |
| Plaintiffs, | Civil No. 14-1611 (RMB/KMW) |
| v. | |
| HARTFORD FUNDS MANAGEMENT COMPANY, LLP, | |
| Defendant. | |
| JENNIFER L. KASILAG, et al., | |
| JENNIFER L. KASILAG, et al., | |
| Plaintiffs, | |
| v. | Civil No. 15-1876 (RMB/KMW) |
| HARTFORD FUNDS MANAGEMENT COMPANY, LLP, | **OPINION** |
| Defendant. | |

**BUMB**, United States District Judge:

This case was brought pursuant to Section 36(b) of the Investment Company Act of 1940.  Plaintiffs are shareholders in six mutual funds (the "Funds") managed by Defendants Hartford Investment Financial Services, LLC and Hartford Funds Management Company, LLP (the "Defendants").

Beginning November 9, 2016 and concluding November 16, 2016, the Court conducted a four-day bench trial.  Thereafter, the parties submitted proposed findings of fact and post-trial briefs.  On February 1, 2017, the Court heard closing arguments from the parties.  At that time, the Court reserved judgment.  This Opinion sets forth the findings of fact and conclusions of law of the Court.[1]

## I.   <u>LEGAL STANDARD</u>

This case was tried pursuant to Section 36(b) of the Investment Company Act of 1940.  Section 36(b) imposes a "fiduciary duty" on investment advisers with respect to the compensation they receive for providing services to mutual funds.  15 U.S.C. § 80a-35(b).  The most recent Supreme Court case to interpret this statute, <u>Jones v. Harris Associates L.P.</u>, 559 U.S. 335 (2010) interpreted an earlier Second Circuit decision in <u>Gartenberg v. Merrill Lynch Asset Management, Inc.</u>,

---

[1] The Court compliments counsel on their professionalism and excellent advocacy throughout the course of these proceedings.

694 F.2d 923 (2d Cir. 1982).  In so doing, Jones resolved a split among the Courts of Appeals over the proper standard under § 36(b).  Specifically, the Jones Court held that in order to face liability under Section 36(b), the investment adviser's fee must be **so disproportionate that it does not bear a reasonable relationship to the service the defendant rendered and could not have been negotiated at arm's-length**.  Jones, 559 U.S. at 344. In essence, that is the fundamental inquiry underlying the trial that this Court examined.

In applying this overarching standard, courts look to the multifactor test outlined in Gartenberg.  Those factors are: "(1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the advisers; (3) "fall-out" benefits; (4) the economies of scale realized by the adviser; (5) comparative fee structures with similar funds; and (6) the independence and conscientiousness of the independent trustees."  Gallus, 497 F. Supp. 2d at 979.  It is important to note that the Gartenberg factors embody a non-exclusive list of considerations.  Courts should instead consider "all relevant circumstances."  Id. at 347 (citing Gartenberg, 694 F.2d at 929); see also Sivolella v. AXA Equitable Life, Civ. A. No. 11-cv-4194 (PGS)(DEA), 2016 WL 4487857, at *4 ("The Court weighs all of the evidence presented

3

and the gravity of each factor adjudicate the case." (citation omitted)).

It is also important to note that "the standard for fiduciary breach under Section 36(b) does not call for judicial second-guessing of informed board decisions." Jones, 130 S. Ct. at 1429 (citations omitted). Put differently, the Gartenberg multifactor standard reflects Congress's decision to "rely largely upon independent director 'watchdogs' to protect shareholders' interests." Id. (citations omitted). Indeed, if "the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently." Jones, 559 U.S. at 351. Nevertheless, a fee may still "be excessive even if it was negotiated by a board in possession of all relevant information, but such a determination must be based on evidence that the fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Jones, 559 U.S. at 351 (quoting Gartenberg, 528 F. Supp. at 928).

This Court first addressed the evidence in this case at summary judgment. Upon the showing that was put forward at that time, the Court identified several issues that were not in dispute to limit the issues to be resolved at trial. The Court

first analyzed the evidence as it related to the Board approval
of the fees.  Consistent with Jones's instruction to give
considerable weight to a disinterested approval, and viewing the
facts under the requisite standard, this Court held that the
independent director's approval was entitled to substantial
weight.[2]

Nevertheless, as cautioned above, a determination of an
informed and disinterested Board is entitled to considerable,
but not conclusive weight.  Consequently, the Court also looked
to the Gartenberg multifactor analysis to determine if there
existed a triable issue of fact under those factors and Jones's
guidance.  Due to the presence of disputed facts, the Court
ruled that Defendants' motion for summary judgment should be
denied.  Op. 54 ("[W]hile the Board's process is entitled to
substantial weight, disputed facts permeate the Gartenberg
factors.  Therefore, a grant of summary judgment in favor of
either party would be improper.").

---

[2] As the Court's summary judgment Opinion set forth, much of
Plaintiffs' argument seeking to undermine the Board's decision
hinged on "captious nitpicking."  Op. 40 [ECF No. 40].  The
Court's ruling that the approval was entitled to substantial
weight is, of course, consistent with the notion that
disinterested Board approval may be given considerable weight.
Jones, 559 U.S. at 351.

In so ruling, the Court held that five <u>Gartenberg</u> factors
remained in genuine dispute.[3]  The Court at that time noted that
it did not expect the trial would be a "far-flung foray into the
annals of accounting procedures or mutual fund administration,"
as discovery was.  Instead, the Court believed an adequate trial
would resolve these remaining, narrow factual disputes:

- The nature of the services provided by the Hartford
  Defendants with regard to the Funds.

- The quality of the services provided, as measured by the
  performance of the Funds.

- The profitability of the Funds, including testimony
  concerning the proper method of accounting for sub-adviser
  services.

- What, if any, fall-out benefits existed and their
  magnitude.

- Whether economies of scale were realized and the extent to
  which those realized economies of scale were passed along
  to the Funds.

- What comparative fee structures indicate about the size of
  the fee.

<u>Id.</u> at 53-54.  These were fundamentally the grounds upon which
the Court proceeded at trial.[4]

---

[3] The only factor that was not genuinely disputed was the
independence and conscientiousness of the trustees, which
dovetailed with the Court's analysis of the Board's process.
[4] The Court notes that, although the trial was limited to these
issues, the parties engaged in a much broader trial.  In an
abundance of caution, and consistent with the relevant case
law's instruction to consider all relevant circumstances, the
Court permitted this latitude to the parties.

II.   <u>**STANDARD OF PROOF**</u>

Plaintiffs must meet the burden of proving their case by a preponderance of the evidence.  "That means Plaintiffs have to prove that their claims are more likely than not . . . .  To say it differently, if one puts the evidence favorable to Plaintiffs and the evidence favorable to Defendants on opposite sides of the scales, Plaintiffs would have to make the scales tip somewhat to their side. If Plaintiffs fail to meet this burden, the verdict must be for Defendants."  <u>See</u> Model Jury Charge 1.10, "Preponderance of the Evidence," available at http://www.ca3.uscourts.gov/model-civil-jury-table-contents-and-instructions (July 2015); <u>see also</u> <u>Sivolella</u>, 2016 WL 4487857, at *4-5.

III. <u>**FACTUAL FINDINGS**</u>[5]

   A. <u>**Background Facts**</u>

Plaintiffs are shareholders in six mutual funds.[6]  Joint Stip. of Facts ("JSOF") ¶ 1.  Each of the Funds is a series of

---

[5] The Court's recitation of these facts constitutes its findings of fact for this trial.

[6] The Funds are: (1) the Hartford Balanced Fund; (2) The Hartford Capital Appreciation Fund; (3) The Hartford Floating Rate Fund; (4) The Hartford Growth Opportunities Fund; (5) The Hartford Healthcare Fund; and (6) The Hartford Inflation Plus Fund.  JSOF ¶ 1.  Plaintiffs are: (1) Jennifer Kasilag, who has been a shareholder in the Hartford Healthcare Fund since at least January 1, 2010;  (2) Louis Mellinger, who has been a shareholder in the Hartford Growth Opportunities Fund and the Hartford Inflation Plus Fund since at least January 1, 2010; (3) Judith Menendez, who has been a shareholder in the Hartford

either The Hartford Mutual Fund, Inc. or The Hartford Mutual Funds II, Inc.  Id. ¶ 5.  These are corporations registered under Maryland law and registered with the United States Securities and Exchange Commission ("SEC") as investment companies under the ICA.  Id.  The Funds range in size, with assets under management during the relevant time period of hundreds of millions to billions of dollars.  Id. ¶¶ 20-25.

For ease of reference, the Funds' average net assets under management ("AUM") are set forth in the table below for the years 2010 through 2013:

| The Funds' Average Net Assets Under Management | | | | |
|---|---|---|---|---|
| **Fund** | **2010** | **2011** | **2012** | **2013** |
| **Hartford Balanced Fund** | $721,645,000 | $650,676,000 | $591,847,000 | $627,290,000 |
| **Hartford Capital Appreciation Fund** | $19,396,127,000 | $17,388,021,000 | $12,331,306,000 | $11,764,413,000 |
| **Hartford Floating Rate Fund** | $4,573,555,000 | $6,506,496,000 | $5,658,156,000 | $6,773,759,000 |

---

Balanced Fund since at least April 1, 2010; (4) Jacqueline Robinson, who has been a shareholder in the Hartford Balanced Fund since at least April 1, 2010 and the Hartford Inflation Plus Fund since at least December 1, 2010; (5) Courtney Russell, who is a substituted plaintiff and beneficiary of former Plaintiff Linda Russell's IRA, and has been a shareholder in the Hartford Balanced Fund, the Hartford Capital Appreciation Fund and the Hartford Growth Opportunities Fund since at least May 20, 2016 (taking over for Linda Russell who was a shareholder in those three funds since at least December 1, 2010); (6) Dennis Russell, who has been a shareholder in the Hartford Capital Appreciation Fund since at least December 31, 2010; (7) K.D. Kohl Trust, who was a shareholder in the Hartford Floating Rate Fund at least as of December 31, 2015.  Id. ¶¶ 6-12.

| Hartford Growth Opportunities Fund | $1,942,767,000 | $1,935,198,000 | $1,896,773,000 | $2,387,115,000 |
|---|---|---|---|---|
| Hartford Healthcare Fund | $377,848,000 | $374,193,000 | $413,853,000 | $578,202,000 |
| Hartford Inflation Plus Fund | $2,080,195,000 | $2,180,448,000 | $2,396,917,000 | $1,814,042,000 |

Id.

Pursuant to Investment Management Agreements (the "IMAs") with the Funds, Defendants serve or served as investment managers for the Funds. See, e.g., JX-93; JX-144. Specifically, Defendant Hartford Investment Financial Services, LLC ("HIFSCO") served as investment manager until December 31, 2012. JSOF ¶ 26. Defendant Hartford Funds Management Company, LLC ("HFMC") then has served as investment manager since January 1, 2013. Id. ¶ 27.

The parties agree that under the IMAs, Defendants are obligated to:

- Provide investment advice to the Funds with respect to each Fund's investment policies, investments, and purchase and sale of securities;

- Continuously supervise each Fund's investment program and performance;

- Provide economic and statistical data and other information relating to each Fund to the Funds' Board of Directors; and

- "[P]erform . . . such other duties as may be necessary or appropriate in connection with its services as investment manager."

Defs.' Prop. Findings of Fact [ECF No. 235] and Pls.' Resps.
[ECF No. 241] ¶ 10 (hereinafter, "DPFOF & PR ¶ ___."); <u>see also</u>
JX-144 §§ 1, 2.  The IMAs also state that the Defendants shall
"perform, or shall cause an affiliate to perform" a series of
administrative services:

- Assist[ing] in the supervision of all aspects of the
  Company's operation, including the coordination of all
  matters relating to the functions of the custodian,
  transfer agent or other shareholder servicing agents
  (if any), accountants, attorneys and other parties
  performing services or operational functions for the
  Company;

- Provid[ing] the Company with the services of a person,
  who may be the Adviser's officers or employees,
  competent to serve as officers of the Company and to
  perform such administrative and clerical functions as
  are necessary in order to provide effective
  administration for the Company, including the
  presentation and maintenance of required reports,
  books and records of the Company; []

- Provid[ing] the company with adequate office space and
  related services necessary for its operations as
  contemplated in [the IMA;] [and]

- Provid[ing] such other services as the parties hereto
  may agree upon from time to time.

JX-144 § 3.

### i. **<u>The Funds' Fee System</u>**

Pursuant to the IMAs, Defendants received an investment
management fee from each Fund calculated based on a percentage

of each Fund's average daily AUM.[7]  JSOF ¶ 30.  The fee schedule

associated with calculating the fee contained various discounts

("breakpoints") as the asset level under management grew.  For

instance, with regard to the Hartford Capital Appreciation Fund,

the fee was scheduled at .8000% for the first $500 million under

management, but for assets of $500 million to $1 billion, the

fee decreased to .7000%.  Id. ¶ 31.  Based on the AUM, the gross

investment management fees paid by the Hartford Capital

Appreciation Fund ranged from .6520% to .6570% between 2010 and

2013.[8]  Id. ¶ 33.

The gross management fee collected by Defendants and paid

by the Funds are set forth on the below table:

| | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Balanced Fund | $4,835,000 | $4,392,000 | $4,024,000 | $4,246,000 |
| Capital Appreciation Fund | $126,480,000 | $113,528,000 | $80,912,000 | $77,255,000 |
| Floating Rate Fund | $27,676,000 | $38,988,000 | $33,894,000 | $40,288,000 |
| Growth Opportunities Fund | $13,899,000 | $13,796,000 | $13,527,000 | $16,962,000 |
| Healthcare Fund | $3,401,000 | $3,368,000 | $3,725,000 | $5,161,000 |
| Inflation Plus Fund | $10,485,000 | $10,062,000 | $10,977,000 | $8,372,000 |

Pls.' Prop. Findings of Fact [ECF No. 237] & Defs.' Resps. [ECF

No. 240-1] ¶ 71 (hereinafter, "PPFOF & DR ¶ ___.").[9]  In total,

---

[7] A table outlining the investment management fee schedule for
each fund can be found in the Joint Stipulation of Facts at
Paragraph 31.
[8] The remaining gross investment management fee schedules can be
found in the Joint Stipulation of Facts at Paragraphs 32 through
37.
[9] Although the parties generally agree that the amounts contained
in the above table represent the gross management fees collected
by Defendants during the years 2010 to 2013, they disagree

Defendants were paid $670,253,000 in gross management fees across the six at-issue funds in the above-listed four years. Id.

### ii.  **Use of Sub-Advisory Services**

Much of the core of the case comes down to Defendants' use of sub-advisers to meet a portion of their obligations under the IMAs.  The parties agree, however, that the use of sub-advisers is not unusual.  DPFOF & PR ¶ 24.  Indeed, the IMAs specifically contemplated that Defendants might seek to make use of sub-advisers to meet their obligations under the agreements:

> The Adviser, upon approval of the Board of Directors, may engage one or more investment advisers that are registered as such under the Investment Advisers Act of 1940, as amended, to act as sub-adviser with respect to existing and future Portfolios of the Company.  Such sub-adviser or sub-advisers shall assume such responsibilities and obligations of the Adviser pursuant to this Investment Management Agreement as shall be delegated to the sub-adviser or sub-advisers, and the Adviser will supervise and oversee the activities of any such sub-adviser or sub-advisers.  In addition, the Adviser may subcontract for any of the administrative services set forth in Section 3 above.

---

whether the sub-advisory fee was paid out of the Funds' assets. PPFOF & DR ¶ 71.  As this is a relatively meaningful distinction, insofar as it colors the Courts' treatment of sub-advisory expenses, the Court notes here that it finds that the sub-advisory fee was not paid out of the Funds' assets, but rather out of the Defendants' assets pursuant to the sub-advisory agreements.  See, e.g., JX-703 § 7(c) ("The Sub-Adviser will not be entitled to receive any payment for the performance of its services hereunder from the Portfolios.").

12

JX-144 § 4.  Consistent with this section of the IMAs, for all years at issue, Defendants made use of Wellington Management Company, LLP ("Wellington") to act as a sub-adviser for some of the Funds.  JSOF ¶ 38.  Further, during a limited period of time, Defendants also made use of HIMCO to act as a sub-adviser for some of the Funds, although Wellington ultimately took over for HIMCO.[10]  With the exception of fee schedules, the terms of the sub-advisory agreements are substantively identical.  Id. ¶ 42.  Additionally, the parties agree that "Wellington is a highly respected sub[-]adviser that Hartford has had a relationship with for over 30 years."  DPFOF & PR ¶ 19; see also Trial Tr. 785:13-17 (Meyer Testimony).

Wellington, like Defendants, was compensated with a sliding-scale fee schedule that made use of breakpoints for all but two Funds, which were sub-advised on a flat rate (Hartford Capital Appreciation Fund and Hartford Growth Opportunities Fund).[11]  For example, while the fee rate for the first $50 million in assets under management was .220% for the Hartford

---

[10] The precise breakdown of the years during which HIMCO operated as a sub-adviser can be found in the Joint Statement of Facts at Paragraphs 38 through 44.  Ultimately, Wellington took over for HIMCO on all of HIMCO's funds in 2012.  JSOF ¶¶ 40-41.
[11] By contrast, HIMCO's sub-advisory expenses were paid in an agreement whereby Defendants were obligated to pay HIMCO "the amount of all direct and indirect expenses incurred in connection with the performance of [HIMCO's] duties under [the sub-advisory agreement]."  JSOF ¶ 45.

Balanced Fund, which made use of breakpoints, the gross management fee rate paid in 2010 was .1510%.  JSOF ¶ 48. Defendants are contractually responsible for the payment of these fees, not the Funds.  JX-703 ("As compensation for the performance of the services by the Sub-Adviser hereunder, the Adviser shall pay to the Sub-Adviser, as promptly as possible after the last day of each calendar year quarter, a fee accrued daily and paid quarterly . . . ."); see also id. § 7(c) ("The Sub-Adviser will not be entitled to receive any payment for the performance of its services hereunder from the Portfolios.").

The below table sets forth the fees that were paid to the sub-advisers by Defendants:

| | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Balanced Fund | $1,092,000 | $1,003,000 | $930,000 | $974,000 |
| Capital Appreciation Fund | $48,490,000 | $43,470,000 | $30,828,000 | $29,411,000 |
| Floating Rate Fund | $6,777,000 | $9,452,000 | $7,379,000 | $9,483,000 |
| Growth Opportunities Fund | $5,245,000 | $5,225,000 | $5,121,000 | $6,454,000 |
| Healthcare Fund | $1,422,000 | $1,410,000 | $1,548,000 | $2,080,000 |
| Inflation Plus Fund | $1,544,000 | $1,480,000 | $1,545,000 | $1,197,000 |
| *Evidence* | *PX-774* | *PX-774* | *PX-774* | *PX-774* |

PPFOF & DR ¶ 76.[12]   In the aggregate, Defendants incurred

$223,560,000 in sub-advisory expenses across the six at-issue

funds during the above-listed four-year period.[13]

### B. Services Provided by the Defendants

#### i. Testimony of Vernon Meyer

To this day, Defendants provide a series of services to the

Funds.  Vernon Meyer was called during Defendants' portion of

the case to testify to the specific services the Defendants

provide.[14]  Mr. Meyer works with the Hartford Funds as the Chief

Investment Officer and Head of Product.  Trial Tr. 708:24-25.

As Chief Investment Officer, he and his team are responsible for

---

[12] Defendants dispute whether the above table shows the portion of the gross management fee was paid to the sub-advisers.  To the extent this is a distinction with a difference, the Court agrees that the above table sets forth Defendants' sub-advisory expenses for the relevant funds in the associated time period, **not** the portion of the gross management fee that was paid to the sub-advisers. JX-703 § 7)a_ ("As compensation for the performance of the services by the Sub-Adviser hereunder, the Adviser shall pay to the Sub-Adviser, as promptly as possible after the last day of each calendar year quarter, a fee accrued daily and paid quarterly . . . ."); see also id. § 7(c) ("The Sub-Adviser will not be entitled to receive any payment for the performance of its services hereunder from the Portfolios."). The fees in this table were paid pursuant to the sub-advisory agreements, not the IMAs.  As such, the Court does not divide the unitary fees pursuant to the IMAs into components earmarked for Defendants or the sub-advisers.

[13] It is generally undisputed that Wellington's profit margin was lower than Defendants', PPFOF & DR ¶ 110; Trial Tr. 464:9-14, a fact that is not that significant or surprising given the businesses are different.

[14] The Court, having viewed the testimony of Mr. Meyer, finds his testimony credible and persuasive.

managing the full line of mutual funds that are offered to the marketplace.  As he testified, "we are responsible for product management, product development, product integrity.  We are responsible for managing the portfolio managers, evaluating the performance, reporting to the board . . . ."  Id. 710:19-25.

Mr. Meyer testified that Defendants help in the establishment of the fund strategy, and re-evaluate that strategy as necessary.[15]  Specifically, Mr. Meyer was asked to broadly describe "the portfolio [of] management services that the investment manager provides to the at-issue funds[.]"  He explained:

> So, it would include things, some of which I referenced earlier, the establishment of the fund strategy, inclusive of constantly re-evaluating that fund strategy, is it working, and whether or not changes need to be made to a fund strategy.  So, it's a continuous process evaluating that fund strategy.

Trial Tr. 725:11-19.  As Mr. Meyer explained, "that constant evaluation entails things like should the fund strategy, if it's an equity fund and it's a strategy that invests in large cap or large U.S. companies, should the strategy also allow for

---

[15] Plaintiffs argue that Defendants do not ever re-evaluate the strategy, but other than pointing to the fact that in the 2010-2014 period the strategies generally were unchanged, Plaintiffs do not provide any evidence that this was abnormal or that Defendants were not undertaking their obligation to change fund strategy as needed. PR ¶ 29.

16

investment in smaller companies or mid cap companies." Id.
726:14-23.

Defendants are also directly responsible for "selecting and
monitoring the sub-advis[e]rs or portfolio managers." Id.
725:20-21. This process included several components, generally
revolving around "making constant decisions around keeping them
or maintaining that portfolio manager, [or] changing the
portfolio manager." Id. 725:20-25. Underneath the broad
umbrella of assessing and selecting a sub-adviser is the task of
"selecting and monitor[ing] the portfolio manager or portfolio
management team within a sub-advis[e]r[.]" Id. 727:11-13. This
selection and monitoring of the portfolio manager or team is
"done at multiple levels." Id. 728:5. These include
quantitatively measuring the performance of an individual
portfolio manager and qualitatively evaluating the portfolio
manager through conversations with him. Id. 728:5-20. This
task also includes meeting with every portfolio manager at least
twice a year, and Mr. Meyer testified that "we also have the
ability to pick up the phone and talk to someone on the
portfolio management team or the portfolio manager if there's a
particular question or issue as well." Id. 728:21-729:3.[16]

---

[16] The Court does note that for four of the Funds, the sub-
adviser did not change during the relevant time period. JSOF ¶
39.

The Defendants also serve in monitoring and reporting functions, as Mr. Meyer explained.  This includes a "constant evaluation of the performance of the portfolios or how the funds are doing" and reporting that information to the Board on a quarterly basis as well as in compliance "with the annual 15(c) contract renewal."  Id. 726:1-7.  As Mr. Meyer testified:

> So, as we perform this role and this assessment of
> performance or how the portfolio manager is doing, we
> have a series of reporting mechanisms that we look at[,]
> as well as the board has asked us to produce reports on
> a quarterly basis for the investment committee[,] and to
> share with the full board about how the funds are
> performing, what's going into the funds, what's our
> assessment.
>
> It could be things like a general market review of what's
> worked in the marketplace this given quarter and how our
> individual funds have performed, to the other extreme
> where for each fund we produce what's known as a fund
> fact sheet or a fully comprehensive review of the fund,
> its performance, its characteristics, what are the top
> 10 holdings, what has it done during different market
> environments, again, things of that nature.  And we share
> that and report that to the mutual fund board.

Id. 732:11-733:1.[17]

Furthermore, as Mr. Meyer described, Defendants also perform legal services for the Funds, including generating the annual prospectus, the statement of additional information, the preparation of and negotiation of contracts with service providers, and the arrangement of any Board or shareholder

---

[17] Mr. Meyer additionally testified about Wellington's lack of a chief investment officer, and how his team filled that role. Trial Tr. 734:1-17.

18

meetings.  Additionally, the Defendants perform compliance services, which include "assess[ing] the effectiveness of compliance programs and [the] oversee[ing of] the compliance programs, and the compliance programs of the sub-adviser as well."  Id. 735:23-736:1.

Finally, Mr. Meyer also testified about administrative services that were provided to the at issue funds, including the provision of personnel and office space and assistance with meetings.  Id. 736:5-8.

## C. Risks Borne by the Defendants

In addition to performing the work described above, Mr. Meyer testified about the risks Defendants face in their provision of services under the IMAs.  Specifically, he testified concerning entrepreneurial risk, reputational risk, and legal/regulatory risk.  Entrepreneurial risk, Mr. Meyer explained, was viewed by Defendants as the risk that one of the Funds might be offered but then the "market changes," such that a feature of the fund that was deemed beneficial in the market no longer is considered to be a plus.  Id. 741:4-16.  Mr. Meyer also discussed reputational risks that are borne by the Defendants.  He testified that if the funds fail to deliver what the shareholders are expecting, their name is at risk because it is associated with the Funds.  Id. 741:23-742:4.  Finally, with regard to legal and regulatory risk, Mr. Meyer testified that as

regulations change, or interpretations of regulations change, there is a risk borne by Defendants that "what we have built or the way we manage our fund is – in the future changes either with new regulation or with a different interpretation of the regulation."  Id. 742:8-15.

Plaintiffs' expert witness, Dr. Kopcke, see infra, also testified concerning risks.  He assessed the risks faced by Defendants as "relatively low."  Id. 475:6-7.  He explained that the liability-related clauses contained in the IMAs protect against any outsized risk:

> [B]ecause of the clauses we discussed earlier in the management agreement, that basically says as long as they behave themselves and don't steal and act very grossly negligent, they're held harmless.  And the way a – financially firms usually work is that we have a variety of laws and regulations that apply to them.  And, in general, if you behave yourself and follow the compliance implied by the laws and regulations, nobody's going to hold you at fault if things go wrong.  They're kind of a safe harbor that defines activities that spare you this problem.

Id. 475:9-18.  Certainly, the contractual provisions limiting liability reduce risk, as Dr. Kopcke testified.  Defendants do not appear to contest this fact.  The testimony from Dr. Kopcke, however, did not address the types of risk, such as entrepreneurial risk or reputational risk, which Defendants view to be important.

D. **Performance**

Several metrics for assessing the performance of the Funds were presented by the parties throughout the trial.  Both parties had their preferred methodologies for assessing performance.  Defendants argued that the Court should consider two metrics: a Lipper peer group analysis and an analysis of performance by their expert witness, Dr. Glenn Hubbard.[18] Plaintiffs argued that neither of these performance analyses is useful, and instead urged the Court to rely upon a comparison of the Funds' performance to the Funds' own benchmarks.

i. **Lipper Peer Group Analysis[19]**

The Funds' performance as shown in the Lipper Performance Universe during the 2010-2014 time period is set forth below:

---

[18] Dr. Hubbard is a professor of finance and economics and the Dean of Columbia Business School.  Id. 950:3-7, 1004:6-1005:2. He has been a professor at Columbia since 1988.  Id. 950:8-9. He has been the Dean of the Business School since 2004.  Id. 950:13-14.

[19] The Lipper peer group chart and Lipper analyses have been challenged as hearsay in a motion in limine by Plaintiffs. Pls.' Br. in Supp. Mot. In Limine 19-22. The Court believes the Lipper performance reports to be admissible under Federal Rule of Evidence 803(17), which permits market reports and similar commercial publications.  See id. (permitting "market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations").  Moreover, there is sufficient evidence before this Court to determine Lipper performance reports are relied upon in the mutual fund industry and Plaintiffs' attempts to discredit Lipper performance data is unpersuasive to this Court. As such, Plaintiffs' motion in limine on this ground is denied. Moreover, even if the Lipper performance reports were not admissible, the result of this Court's ultimate analysis in the

| At-Issue Fund (Inception Date) | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile |
| Hartford Balanced Fund (August 1996) | 73/95 | 77% | 85/95 | 89% | 86/99 | 87% | 88/105 | 84% | 81/113 | 71% |
| Hartford Capital Appreciation Fund (August 1996) | 43/125 | 34% | 20/210 | 9% | 16/220 | 7% | 35/149 | 23% | 49/152 | 32% |
| Hartford Floating Rate Fund (May 2005) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| Hartford Growth Opportunities Fund (January 2001) | n/a | n/a | n/a | n/a | 37/111 | 33% | 33/112 | 29% | 35/111 | 31% |
| Hartford Healthcare Fund (June 2000) | n/a | n/a | 3/10 | 22% | 4/13 | 25% | 6/13 | 42% | 6/13 | 42% |
| Hartford Inflation Plus Fund (November 2002) | n/a | n/a | n/a | n/a | n/a | n/a | 8/13 | 58% | 8/16 | 47% |

DX-507.[20]

The Court also received testimony and evidence from both parties concerning the use of Lipper performance data.  Dr. Hubbard testified that Lipper has "got to be close to universally used among advisors."  Trial Tr. 968:19-20.  He added "I can think of none who don't use it . . . ."  Id. 968:20-22.  Mr. Meyer likewise testified that his understanding was that Lipper is used in the industry and is "highly regarded

---

case would not change, given that Dr. Hubbard's analysis is similar in outcome on the issue of performance.  While his analysis is based on Lipper data, it is based on basic raw data from Lipper, which certainly falls under the purview of Federal Rule of Evidence 803(17) and all selections and calculations were made by Dr. Hubbard himself.  Trial Tr. 964:2-5 ("I used the underlying raw data.  So, Lipper is doing no calculations for me.  I'm simply taking the data and imposing my own judgment on how to construct a peer group."); see also id. ("I did my own analysis.  So, Hartford didn't talk to me, Lipper didn't talk to me.  The only input to my analysis other than my own economics is the raw data from Lipper, no calculations.").
[20] A fund that contains an entry of "n/a" indicates that the fund did not have data applicable for the ten-year period due to the fund's inception date.  Trial Tr. 748:17-22.

for providing this type of competitive information." Id. 745:12-15.

On the other hand, Plaintiffs offered evidence seeking to undermine the viability of Lipper performance data. Plaintiffs note that Lipper boasts in the "Introduction" section of its reports that its data has "been introduced by fund companies as evidence in litigation and a consistent record of defendant victories has been established." JX-542B at 12248; JX-549B at 20887; JX-557B at 30392; JX-563 at 116879; JX-571B at 2467824. Additionally, Lipper reports contain a disclaimer that "there are no guarantees as to the accuracy, completeness or reliability of the information included in its reports." See, e.g., JX-557B at 30389.

Finally, and most germane to this case, Plaintiffs presented evidence that suggested that Defendants interacted with Lipper in the process of selecting peer groups prior to that performance data being reported to the Board. Specifically, Mr. Meyer testified that Defendants reviewed drafts of the Lipper reports before they were provided to the Board. Periodically he "requested" changes to improve HFMC's peer group ranking, and Lipper would acquiesce. Id. 919:16-920:15; PX-828 (email exchange indicating that Lipper revisions, made at the request of Defendants, had yielded an improved peer ranking).

Looking directly to his testimony, Mr. Meyer sufficiently explained the neutral reasons for Defendants' involvement in the Lipper's peer group ranking analysis.  That is, as Mr. Meyer explained, the reason Defendants would interact with Lipper was to understand the peer group selection and to make comments or ask questions when they did not understand or agree with a peer grouping.  For instance, they might point out that "based on [Lipper's] methodology – our understanding of their methodology, that other funds could have been chosen, why were they not?" Id. 920:13-15.  Mr. Meyer also testified that it is "common practice for the management company and Lipper to engage in providing the information, the drafts, reviewing the drafts and asking questions."  He testified to at least one instance in which Lipper has refused to change a peer grouping based on commentary from his group.  Id. 927:4-8 ("We said to Lipper we don't agree with that assessment.  The manager hasn't changed. And they stood firm and said, you know, this is our methodology, this is what we're reporting to the board.  They reported [it] to the board.").

In its final analysis, the Court finds that the data from Lipper is reliable.  The Court makes this factual finding for several reasons.  First, the Court finds that Mr. Meyer's explanation of the reason behind Defendants' interaction with Lipper is credible.  Defendants seek to understand Lipper's peer

24

grouping and – to the extent they see it as problematic based on their understanding of where they should be grouped – they may voice that disagreement with Lipper.  If evidence had been presented that Lipper universally accepted such requests without question or hesitation, that might impugn the reliability of Lipper.  The evidence, however, was exactly the opposite.

Second, the Court is simply not persuaded that a generalized disclaimer that there may be inaccuracies in data meaningfully undermines the validity of Lipper.  Likewise, the fact that Lipper in its reports' introductions, which are addressed to "boards of directors/trustees," might boast that its data has led to defense victories strikes this Court as marketing puffery, certainly, but not a meaningful indication that the data itself is wrong or unreliable.  The same introduction also contains a section discussing its experience in the industry, a section discussing its objectivity, and a remark that "The *Wall Street Journal*, *Barron's* and the *Associated Press*, among others, rely on Lipper for accurate, up-to-date investment company data."  JX-542B at 4.[21]

---

[21] The Court is additionally unpersuaded by Dr. Kopcke's testimony that Lipper should not be used.  Dr. Kopcke described Lipper as "not very valuable information" because it is backwards-looking and hard to reproduce.  However, apart from those general complaints, Dr. Kopcke was unsure how Lipper actually arrives at its methodology.  This does not sufficiently explain why Lipper should not be used.

As such, the Court does not discount Lipper's data based on Plaintiffs' factual arguments, and it finds the data to be reliable.[22]  That said, the Court certainly views Lipper as only one of several metrics by which performance might be assessed. See infra.

### ii.  Hubbard Performance Analysis

As mentioned, Defendants' expert witness, Dr. Hubbard,[23] also prepared his own peer group analysis of the Funds.  The Funds' performance under that analysis is set forth below:

---

[22] Although not necessary to this Court's determination of the reliability of Lipper data, the Court does note that many courts addressing claims such as this one have also looked to Lipper data and determined it to be reliable.  See, e.g., In re Am. Mut. Funds Fee Litig., No. Civ. 04-5593 GAF (RBNx), 2009 WL 5215755, at *25 (C.D. Cal. Dec. 28, 2009) ("Lipper . . . is a recognized industry-leading third-party source for mutual fund industry data"); Sivolella, 2016 WL 4487857, at *64-65 (refusing to accept the plaintiffs' argument that Lipper data is unreliable).

[23] The Court had the opportunity to receive the testimony of Dr. Hubbard.  Because of the observed demeanor of Dr. Hubbard, as well as the consistency of his testimony, the Court found the entirety of his testimony to be credible.  The Court is not swayed by Plaintiffs' argument that Dr. Hubbard's work with the ICI or prior work in 36(b) cases damages his credibility in this case.

| At-Issue Fund (Inception Date) | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile |
| Hartford Balanced Fund (August 1996) | 25/28 | 89% | 23/28 | 81% | 26/30 | 86% | 22/31 | 70% | 14/29 | 46% |
| Hartford Capital Appreciation Fund (August 1996) | 18/115 | 15% | 34/122 | 27% | 18/117 | 15% | 17/117 | 14% | 40/115 | 34% |
| Hartford Floating Rate Fund (May 2005) | 3/8 | 29% | 3/8 | 29% | 3/7 | 33% | 3/7 | 33% | 4/7 | 50% |
| Hartford Growth Opportunities Fund (January 2001) | 18/41 | 43% | 26/48 | 53% | 11/42 | 24% | 13/40 | 31% | 11/41 | 25% |
| Hartford Healthcare Fund (June 2000) | 3/14 | 15 | 3/11 | 20% | 6/12 | 45% | 7/12 | 55% | 7/14 | 46% |
| Hartford Inflation Plus Fund (November 2002) | - | - | - | - | - | - | 2/6 | 20% | 4/11 | 30% |

DX-509.[24]

Dr. Hubbard testified concerning his methodology for selecting these peer groups.[25]  Although Dr. Hubbard relied upon underlying Lipper data, the "rules and the categorizations and

---

[24] Funds with no data for a given year are the result of years in which Dr. Hubbard could not identify five peers for the fund. Trial Tr. 1006:19-22.

[25] The creation of peer groups and Dr. Hubbard's comparative fee analysis are subject to a motion in limine by Plaintiffs.  Pls.' Br. in Supp. Mot. In Limine 17-19.  As set forth infra, the Court does not read Jones to require that Defendants demonstrate comparative fees were negotiated at arm's-length.  Jones simply cautions against overreliance on comparative fee analyses because of the possibility that they will make use of corrupt comparators.  Jones, 559 U.S. at 349-50 ("[C]ourts may give such comparisons the weight that they merit in light of the similarities and differences between the services that the clients in question require, but courts must be wary of inapt comparisons.").  The Court has heeded this instruction in Jones. With regard to Plaintiffs' second ground for exclusion – that Dr. Hubbard's selected peers were not actually comparable – the Court finds that Dr. Hubbard gave sufficient foundation to his comparisons to render them admissible in the form of his testimony that he selected similar funds.  Trial Tr. 963:13-967:16.  Any other criticisms of them would go to the weight assigned by the Court.

the calculations were my own." Id. 1004:19-22.  This included selecting his own peer groups against which to compare the Funds' performance.  Id. 1004:23-24.  Like Lipper, Dr. Hubbard analyzed a ten-year time horizon in viewing performance in order to smooth out the effects of business cycles.  Id. 1007:13.  As he remarked, actively managed funds can make use of a mix of style and industry bets, and "[s]ome of that can look very good in business cycle peaks, or sometimes strategies can look better in business cycle downturns.  So to smooth it out, you'd want a period that goes longer than a business cycle."  Id. 1007:15-18.

Dr. Hubbard testified that, analyzing performance from his perspective, "for most funds and most, if not all, years, these are well within the range of peers."  Id. 1010:2-7.  He also focused his testimony on the worst performing Fund that he analyzed, the Hartford Balanced Fund.  He explained that the Hartford Balanced Fund "went through a number of management changes."  He remarked favorably that the most recent period of performance for that Fund, the ten-year period running from 2004-2014 showed above average performance for the Fund—46th percentile.  Id. 1010:8-12.

### iii. Benchmarks

Plaintiffs presented their own analysis of the Funds' performance by comparing the Funds' benchmarks as defined in the offering documents for the Fund.  For instance, with regard to

28

the Capital Appreciation Fund and its benchmarks, the
performance (expressed as a percentage of growth) of the Fund
over 1, 5 and 10 year intervals dating back from December 31,
2014 was:

| Hartford Capital Appreciation Fund | | | |
|---|---|---|---|
| Fund | 1 Year | 5 Year | 10 Year |
| Hartford Capital Appreciation Fund | 1.43% | 10.56% | 7.00% |
| S&P 500 | 13.69% | 15.63% | 7.67% |
| Russell 3000 Index | 12.56% | 15.63% | 7.94% |

JX-49 at 2251.

    With regard to the remaining Funds, the performance against
the relevant benchmarks was:

| Hartford Growth Opportunities Fund | | | |
|---|---|---|---|
| Fund | 1 Year | 5 Year | 10 Year |
| Hartford Growth Opportunities Fund | 7.22% | 14.08% | 8.47% |
| Russell 3000 Growth Index | 12.44% | 15.89% | 8.5% |
| Russell 3000 Growth Index | 13.05% | 15.81% | 8.49% |

JX-50A at 5-6.

| Hartford Inflation Plus Fund | | | |
|---|---|---|---|
| Fund | 1 Year | 5 Year | 10 Year |

| | | | |
|---|---|---|---|
| Hartford Inflation Plus Fund | -3.95% | 2.13% | 3.28% |
| Barclays U.S. Tips 1-10 Year Index | .91% | 2.78% | 3.75% |
| Barclays U.S. Tips Index | 3.64% | 4.11% | 4.37% |

JX-48D at 937.

| Hartford Healthcare Fund | | | |
|---|---|---|---|
| **Fund** | **1 Year** | **5 Year** | **10 Year** |
| Hartford Healthcare Fund | 19.48% | 19.62% | 11.18% |
| S&P North American Health Care Sector Index | 25.69% | 20.70% | 11.86% |
| S&P 500 Index | 13.69% | 15.45% | 7.67% |

JX-48C at 848-49.

| Hartford Floating Rate Fund | | | |
|---|---|---|---|
| **Fund** | **1 Year** | **5 Year** | **10 Year** |
| Hartford Floating Rate Fund | -3.25% | 4.48% | 3.48% |
| Credit Suisse Leveraged Loan Index | 2.06% | 5.83% | 4.68% |

JX-48B at 483.

| Hartford Balanced Fund | | | |
|---|---|---|---|
| **Fund** | **1 Year** | **5 Year** | **10 Year** |
| Hartford Balanced Fund | 3.55% | 9.44% | 5.63% |

| S&P 500 Index | 13.69% | 15.45% | 7.67% |
|---|---|---|---|
| Barclays Government/Credit Bond Index | 6.01% | 4.69% | 4.70% |
| Bank of America Merrill Lynch 3-Month U.S. Treasury Bill Index | .03% | .09% | 1.54% |
| Balanced Fund Blended Index | 10.32% | 11.04% | 6.61% |

JX-48A at 6-7.  A reading of this benchmark data shows that the Funds did not often beat their respective benchmarks.[26]

Concerning the viability of assessing performance by looking solely at benchmarks, as Plaintiffs urge, Defendants elicited testimony dealing with the problems of assessing performance solely on this metric.  Specifically, Dr. Hubbard testified that he did not believe if a fund underperforms its benchmark that it is performing poorly.  He stated that this was the case for "conceptual reasons and just the plain arithmetic."  Trial Tr. 1011:3-10.  He testified that benchmarks are "a broad measure" and that "Boards will routinely look at benchmarks because you want to see that.  But it's not – if your purpose is peer-type analysis or is a fee or a performance reasonable, I

---

[26] The data does indicate that the Hartford Healthcare Fund beat one of its two benchmarks over all intervals and the Hartford Balanced Fund, which performed the worst under Dr. Hubbard's and Lipper's methodology, beat two of its benchmarks in 5 of 6 intervals.

would argue it's less apt . . . It's one data point." Id. 1011:17-24.  Additionally, Dr. Hubbard testified that "[t]he benchmark, you're assuming there is no cost of operating the benchmark.  So you're kind of putting yourself behind from the get-go." Id. 1011:11-15.

As Dr. Hubbard testified, one cannot invest in a benchmark. Id. 011:16-17.  This notion is corroborated by each of the prospectuses from which Plaintiffs pull their benchmark comparisons, where each benchmark performance listing notes that the performance of the benchmark "reflects no deduction for fees, expenses or taxes."  See, e.g. JX-50A at 6.  As Mr. Meyer testified with regard to the Capital Appreciation fund as compared to the benchmark, "[Y]ou're not taking any fees out of the Russell 3000 Index, so someone's got to pay the financial adviser, and in this example the SEC requires you to assume it's the maximum sales load, which has been taken out of the returns of the Capital Appreciation fund.  And if I heard you correctly, you're comparing it to the 12.56 of the Russell 3000 Index, which doesn't equally take that cost out of the calculation.  So it's not apples to apples."  Trial Tr. 905:5-13.[27]  As such, while the Court does find comparison to benchmarks to be a valid method by which to evaluate performance, the Court does agree

_____

[27] No witness for Plaintiffs testified concerning performance issues.  DPFOF & PR ¶ 49.

with Defendants that there are certain problems associated with
consideration of solely benchmark performance.

### E. Comparative Fee Structures

Defendants, but not Plaintiffs, presented evidence of fee
structures of other funds.  Defendants presented two
methodologies by which to analyze comparative fee structures:
consultation of the fee structures of peer groups as selected by
Lipper, and consultation of peer groups as selected by Dr.
Hubbard.  Additionally, within those two methodologies,
Defendants presented evidence of the comparative fee structure
looking through two different lenses: (1) the total expense
ratio, and (2) simply the management fee.[28]  Because the Court
finds consideration of simply comparative fee structures on the
management fee sufficient to make its determination, it does not
consider the evidence related to "total expense ratio."

---

[28] The comparison of total expense ratio or the consideration of
other fees or agreements than the investment management fee has
been challenged by Plaintiffs on several grounds in one of their
motions in limine.  Pls.' Br. in Supp. Mot. In Limine 1-12.
They make this argument even against the backdrop of a
Gartenberg analysis, which considers "all relevant
circumstances."  While the Court is inclined to disagree with
Plaintiffs because a board negotiating a fee with an eye toward
arm's-length bargaining might well consider the overall fee
backdrop against which they are negotiating, the Court
nevertheless declines to reach the issue of Plaintiffs' first
motion in limine, as it is unnecessary to the ultimate
disposition of the case, which is based solely on the investment
management fee.

Defendants presented evidence of the management fee of the Funds ranked against the management fees of its Lipper Expense Universe.  The results of that analysis are summarized in the below table:

| At Issue Fund | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile |
| Hartford Balanced Fund | 23/55 | 41% | 27/52 | 51% | 26/50 | 51% | 25/47 | 52% | 28/46 | 60% |
| Hartford Capital Appreciation Fund | 48/82 | 58% | 88/150 | 58% | 78/137 | 57% | 42/77 | 54% | 46/87 | 52% |
| Hartford Floating Rate Fund | 12/19 | 61% | 9/19 | 44% | 14/25 | 54% | 15/29 | 50% | 14/33 | 41% |
| Hartford Growth Opportunities Fund | 33/57 | 57% | 38/67 | 56% | 46/73 | 63% | 27/70 | 38% | 28/64 | 43% |
| Hartford Healthcare Fund | 8/16 | 47% | 20/26 | 76% | 25/31 | 80% | 29/35 | 82% | 27/35 | 76% |
| Hartford Inflation Plus Fund | 11/14 | 77% | 12/17 | 69% | 14/18 | 76% | 14/19 | 72% | 17/21 | 80% |

DX-522.

Defendants' expert, Dr. Hubbard, also conducted an analysis using his own peer groups to analyze the Funds' management fees. That chart is presented below:

| At Issue Fund | 2010 | | 2011 | | 2012 | | 2013 | | 2014 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile | Rank | Percentile |
| Hartford Balanced Fund | 20/42 | 46% | 21/42 | 49% | 20/41 | 48% | 25/42 | 59% | 24/37 | 64% |
| Hartford Capital Appreciation Fund | 105/192 | 54% | 91/192 | 47% | 96/176 | 54% | 93/182 | 51% | 85/161 | 53% |
| Hartford Floating Rate Fund | 8/18 | 41% | 11/21 | 50% | 15/26 | 56% | 16/29 | 54% | 18/34 | 52% |
| Hartford Growth Opportunities Fund | 26/55 | 46% | 34/65 | 52% | 25/65 | 38% | 26/62 | 41% | 24/61 | 38% |
| Hartford Healthcare Fund | 14/20 | 68% | 14/16 | 87% | 14/16 | 87% | 14/17 | 81% | 14/18 | 76% |
| Hartford Inflation Plus Fund | 14/17 | 81% | 12/18 | 65% | 13/21 | 60% | 16/22 | 71% | 14/21 | 65% |

DX-518.

As noted above, no witnesses for Plaintiffs testified regarding comparative fees of other mutual funds. As such, Defendants' comparative fee analysis is the only one this Court considers.

## F. **Plaintiffs' "Retained Fee" Theory**

The crux of Plaintiffs' case largely turns upon the argument that one should consider the services performed specifically by Defendants as separate and apart from those performed by the sub-adviser. In support of this theory, Plaintiffs presented the expert testimony of Mr. Kent Barrett.[29]

---

[29] Mr. Barrett's testimony that dealt with the salient issue of the sub-adviser fee was mostly unpersuasive, as such testimony illustrated several shortcomings. First, Mr. Barrett admitted that he had testified previously numerous times, under oath, that he had never served as a trustee or a director to a mutual fund. Trial Tr. 296:16-25. This was not true, as Mr. Barret

Mr. Barrett is a practicing accountant who has been licensed since 1983.  He has practiced as an accountant for a large accounting firm and has carried out consulting work. Trial Tr. 78:17-18, 79:4-5.  In his current capacity, Mr. Barrett leads major litigation engagements, typically in situations involving allegations of auditor misconduct or financial statement improprieties.  Id. 80:3-12.  Mr. Barrett has also conducted a host of other engagements and has been awarded other prestigious awards and designations that underlie his status as an expert. Id. 81:4-92:11.  Additionally, Mr. Barrett has serviced as an Executive Vice-President and Chief Financial Officer for American General's retirement services division, which brought him into contact with the mutual fund industry.  Id. 90:6-92:19.[30]  Mr. Barrett was qualified as an expert in the areas of "accounting, financial reporting, and

---

had, in fact, served as a management representative on a board. Second, on the same subject, the board upon which Mr. Barrett served as a trustee involved a "retained fee" of 40 basis points, id. 303:14-18, which is near identical to the retained fee on the Capital Appreciation Fund that Mr. Barrett pointedly criticizes.  Id. 304:21-23; PX-593 at 3.  Mr. Barrett testified that he has no recollection of asking for numbers to be presented to him at that time in any format that conveyed true "economic reality," which he faults the Defendants' profitability numbers for concealing. Id. 306:18-25.

[30] Mr. Barrett clarified that he was not involved in the actual administration of mutual funds, but his responsibilities did encompass financial reporting as to mutual funds.  Id. 92:12-93:3.

financial analysis, with a specialization [in] insurance and other financial services." Id. 99:12-100:15.

Mr. Barrett testified concerning the distribution of labor between the sub-adviser and the Defendants. Id. 106:21-107:3. Mr. Barrett testified that it was his understanding that:

> Wellington performs virtually all of the actual
> investment management services and activities, the
> actual investment of the assets, determining which
> assets to purchase or sell, arranging for the purchase
> and sale of those assets, ensuring that the investments
> comply with both any and all regulatory requirements as
> well as just the established investment policies for
> each fund. Really, I mean, you said it, the day-to-day
> operations, the actual investment activity I believe is
> all done by Wellington.

Id. 127:3-11.

With regard to the services performed directly by Defendants, Mr. Barrett testified that his understanding was:

> [T]hey are responsible for selecting the sub-advisors
> with board approval. They are responsible for reviewing
> everything that the sub-advisors do, supervising the
> activity of the sub-advisors, and then in addition, as
> we mentioned before under the IMA agreement, those
> administrative functions of coordinating with other
> parties that are providing services to the funds,
> providing space for the funds, providing the officers
> and directors of the funds.

Id. 127:14-22.

Mr. Barrett also testified on the proper way to allocate the costs of the Defendants to the specific funds using a cost-allocation methodology. Id. 137:13-25. Using this methodology, he was able to perform an analysis of the amount of full-time

equivalent employees Defendants had working to provide services to the Funds.  Id. 148:7-11.  This calculation was done based on instructions provided by defense counsel.  Id. 148:12-16.  In so doing, Mr. Barrett calculated that Defendants had the equivalent of between 20.6 and 21.5 full-time employees, on average, performing services pursuant to the IMAs in 2010 through 2013 for all 50 plus retail funds in the group to which the Funds belonged.  As Plaintiffs are quick to point out, a simple division of the full-time employees working on the group of funds by the total number of funds indicates that less than one full-time employee was devoted to working on each fund.  This analysis, of course, does not include services performed by sub-advisers, including how many employees they used to meet their obligations under the sub-advisory agreements.

Consistent with his identification of the disparity between costs incurred directly by Defendants and incurred through a sub-adviser, Mr. Barrett also testified concerning Defendants' "retained fee" in this case.  This is Mr. Barrett's methodology for conveying the disparity between Defendants' profit and comparatively small in-house expenses.  As Mr. Barrett testified, a "retained fee is, in this case, where we understand that HFMC charges a gross fee to the fund, and then it passes along a portion of that fee to Wellington as the sub-advisor, the retained fee is simply the portion that HFMC retains.  So it

would be the total gross fees collected from the funds minus the amount passed along to Wellington, giving the amount that HFMC retains or keeps." Id. 178:7-13.  To reach the retained advisory fee for Defendants, Mr. Barrett testified that one should take the Gross Advisory Fee, subtract the advisory fee waiver, sub-advisory fees, and the reimbursement of the advisory fee.  Id. 181:13-182:21; PX-767.  He provided this overlay to clarify the calculation:



PX-767.

Calculating the "retained fee" using this methodology, the following values were obtained by Mr. Barrett for each Fund during the years 2010 to 2013:

PX-772.

Mr. Barrett also prepared a table demonstrating the total operating expenses (excepting sub-advisory fees) that the Defendants incurred with regard to each Fund, obviously excluding any amounts that were paid to the sub-adviser.  That table is reproduced below:

| **Defendants' Total Operating Expenses under "Retained Fee" Analysis** | | | | |
|---|---|---|---|---|
| **Fund** | **2010** | **2011** | **2012** | **2013** |
| **Hartford Balanced Fund** | $122,000 | $174,000 | $224,000 | $285,000 |
| **Hartford Capital Appreciation Fund** | $811,000 | $918,000 | $773,000 | $787,000 |
| **Hartford Floating Rate Fund** | $264,000 | $434,000 | $461,000 | $562,000 |
| **Hartford Growth Opportunities Fund** | $167,000 | $231,000 | $285,000 | $364,000 |
| **Hartford Healthcare Fund** | $109,000 | $162,000 | $216,000 | $283,000 |
| **Hartford Inflation Plus Fund** | $172,000 | $242,000 | $308,000 | $338,000 |

PX-772.

Mr. Barrett then sought to convert this "retained fee" and direct cost data into a profit margin, so the Defendants' profitability could be analyzed.  To do so, Mr. Barrett subtracted the total operating expenses (again, exclusive of sub-adviser costs) from the "retained fee" and arrived at a value for Defendants' profits in his "retained fee" methodology.

40

Using these calculations, Mr. Barrett arrived at the following profit amounts:

| Defendants' Profits Under "Retained Fee" Analysis | | | | |
|---|---|---|---|---|
| **Fund** | **2010** | **2011** | **2012** | **2013** |
| **Hartford Balanced Fund** | $3,398,000 | $2,949,000 | $2,598,000 | $2,881,000 |
| **Hartford Capital Appreciation Fund** | $77,178,000 | $69,118,000 | $49,284,000 | $47,045,000 |
| **Hartford Floating Rate Fund** | $20,612,000 | $29,060,000 | $26,010,000 | $30,200,000 |
| **Hartford Growth Opportunities Fund** | $7,716,000 | $8,196,000 | $8,042,000 | $10,111,000 |
| **Hartford Healthcare Fund** | $1,869,000 | $1,789,000 | $1,953,000 | $2,796,000 |
| **Hartford Inflation Plus Fund** | $8,302,000 | $8,011,000 | $8,813,000 | $6,348,000 |

PX-770.

Mr. Barrett then explained that a profit margin can be calculated by taking the profits earned by Defendants and dividing by the retained fee. So, for the Capital Appreciation Fund for 2011, one would divide $69.118 million by $70.036 million and find a profit margin of 98.7%. Id. 198:14-199:12; see also PX-593 (outlining all profitability calculations). Suffice it to say that under Mr. Barrett's methodology, the profit margins for the Funds are exceedingly high, given direct, internal expenses for the Defendants never topped $1 million.

41

Mr. Barrett defends his methodology for adopting the "retained fee" theory on the "economic reality" of the situation.  Specifically, Mr. Barrett testified that the proper way to view the costs of a sub-adviser is through the lens that Defendants' payment to the sub-adviser passes right through the Defendants.  Trial Tr. 199:15-24.  For instance, with regard to the Capital Appreciation Fund in 2011,

> [Defendants] spent $900,000 and they get $70 million in exchange.  That's where they end up.  Now, they get[$]113 million and they pass [$]43 million along, so there's some different steps in the process, but at the end of the day, they end up with $70 million more than they had when they started.

Id. 216:15-21.  In effect, Mr. Barrett's methodology compares the work that Defendants did in-house with the profit that they ultimately kept themselves.  See id. 200:6-8.  Mr. Barrett highlighted the fact that for running the day-to-day operations of the Funds, Wellington received far less in fees than did Defendants, and the Wellington contract was indisputably negotiated at arm's-length.  Id. 202:20-203:4.

On cross-examination, Defendants established several facts which are important to this Court's holdings.  First, Mr. Barrett's testimony that the payments to sub-advisers shouldn't be considered as expenses of Defendants was undermined by his own concession that he had no supporting accounting authority for his novel position.  Id. 227:8-17.  In fact, Mr. Barrett

42

readily conceded that under the Generally Accepted Accounting Principles ("GAAP"), sub-advisory fees are treated as an expense of the adviser, just as Defendants have asked the Court to treat them.  Id. 232:4-7.  Likewise, Mr. Barrett testified that he would not be surprised to learn that the international financial reporting standards also indicate that sub-advisory fees should be treated as an expense of the adviser.  Id. 237:4-7.

The fact that GAAP and other accounting authorities treat sub-adviser fees as an expense of the adviser was further corroborated by Mr. Barrett's own experience on a mutual fund board.  Mr. Barrett testified that he would not be surprised to learn sub-adviser expenses were treated by his board as an expense of the adviser, contrary to how his "economic reality" model of the "retained fee" would treat them.  Id. 305:23-306:1.  Indeed, he testified that he has been involved in a number of similar cases, and "in all of these cases that I've seen, that's the way they're presented to the board."  Id. 306:1-4.  Despite his experience on a board and his opinion regarding the economic reality of these transactions, Mr. Barrett had no recollection of ever suggesting that the board he served on be shown profitability calculations that treated sub-advisory fees as contra-revenue rather than expenses of the adviser.  Id. 306:18-25.  Further, the board upon which Mr. Barrett served as a management representative involved a "retained fee" of 40 basis

points with regard to the sub-adviser's, which is nearly identical to the retained fee on the Capital Appreciation Fund in certain years.  Id. 304:21-23.  Finally, Mr. Barrett conceded on cross-examination that his opinion concerning the treatment of sub-advisory expenses came about during the recent Sivolella case.  Before that case, he testified, he hadn't "ever thought about [these] issues."  Id. 309:5-6.[31]

Additionally, Defendants' accounting expert, Dr. Robin Cooper,[32] gave credible testimony in the area he was qualified in, accounting.[33]  Id. 620:1-6.  Dr. Cooper testified about the

---

[31] The Court also notes that on re-direct it was established that in at least some documents prepared by Defendants, sub-advisory costs were treated as contra-revenue.  Trial Tr. 323:1-8.  This was not particularly persuasive as evidence that the Court should view them that way too, as Defendants' expert, Dr. Cooper, persuasively testified that "what I observed about the two examples that Mr. Barrett used is one he acknowledged for the sale of the business and the other is one for the creation or potential creation of a joint venture between the Hartford Manager and Wellington, and both of those reports are prepared for outside the normal course of managing the business."  Id. 645:2-10.
[32] Dr. Cooper is a 1975 Harvard Business School graduate, with experience in accounting for a large accounting firm.  Trial Tr. 607:14-25.  He additionally taught at Harvard Business School as an assistant and associate professor for ten years.  Id. 608:18-21, 25.  He was also on the faculty at Emory University for fourteen years.  Id. 609:7-11.  At these institutions he has taught a variety of accounting courses.  Id. 609:16-610:2.
[33] Plaintiffs have brought a motion in limine to exclude portions of Dr. Cooper's testimony.  First, Plaintiffs argue that Dr. Cooper's statement that he reached his opinion by letting his brain "munge" all of his research into the treatment of sub-advisory fees impugns his ability to testify as an expert.  Trial Tr. 626:7-11.  Plaintiffs argue that munging is not a reliable process for purpose of Federal Rule of Evidence 702.

difference between management accounting, which is not based on
an overall set of rules and is designed to represent financial
information in any way that is "useful for the decision-maker,"
id. 625:1, and financial accounting, which is "the accounting
where the recipient of the accounting information is an external
stakeholder" and is a more rules based approach that "hands over
a standard pack [of information on economic substance] to the
external user."  Id. 622:11-17.

Dr. Cooper then testified about how Defendants accounted
for sub-advisory expenses in this case.  He testified that in
this case, sub-advisory fees were classified as an expense by
Defendants, Id. 625:16-17, contrary to the methodology
Plaintiffs urge should be used to assess the fees, contra-
revenue, which would treat sub-advisory fees as neither revenue
nor an expenses of Defendants.  PPFOF ¶ 98 ("[T]he sub-advisory

---

The Court disagrees and notes that Dr. Cooper appears to have
used the phrase as a synonym for "reasoning through data."  The
Court disagrees with Plaintiffs' assessment of his methodology
and does not exclude testimony on that ground.  Second, the
Court finds that Plaintiffs' criticism of Dr. Cooper's
methodology for arriving at a determination of principal/agency
relationship goes more to weight.  Whether his assessment of
control was fulsome enough is a subject ripe for cross-
examination, not one of admissibility.  Third, with regard to
Plaintiffs' argument that Dr. Cooper's testimony is inadmissible
because it was received from others, the Court disagrees and
believes the record supports a finding that Dr. Cooper's
testimony was arrived at independently without undue assistance
of counsel.  The Court, likewise, does not find the assistance
of Analysis Group to be improper, either.

fees should be treated by the Court as contra-revenue. Treatment of the sub-advisory fees as contra-revenue means that they would not be treated as revenue to HFMC or an expense."); see also Trial Tr. 222:24-223:3 ("Q: So I think you testified to this, Mr. Barret, but the only difference between how you would calculate the profit margin and how Hartford calculated it is how we treat sub-advisory expenses.  Correct?  A: Yes, that's correct").  Dr. Cooper then testified that the accounting treatment by Defendants was "not only correct; it's the only way that they can treat it." [34]  Trial Tr. 626:12-16; see also id. 633:16-21 ("[Mr. Barrett's] approach would delete the sub-advisory fees completely from the books of account of the Hartford Manager.").[35]

### G. **Plaintiffs' "Rent-Seeking" Theory**

Plaintiffs additionally called Dr. Richard Kopcke to provide expert testimony in this case.  Dr. Kopcke is an

---

[34] Dr. Cooper also persuasively testified about the perils of viewing profit margin similar to Mr. Barrett's approach.  By permitting a party to exclude sub-advisory expenses from its balance sheet, it would permit an investment manager to selectively move costs in-house to minimize profit margin. Trial Tr. 655:4-15.

[35] On cross-examination, Plaintiffs sought to demonstrate that Dr. Cooper's use of Analysis Group undermined his testimony, which this Court did not find persuasive.  The Court additionally did not find persuasive the fact that Dr. Cooper had minimal experience working for a mutual fund because of his broad-based experience teaching accounting and  his general qualification as an accounting expert.

economist and a financial analyst currently employed by the U.S. Treasury as an adviser to foreign governments.  Id. 347:21-25. Dr. Kopcke was qualified to testify as an expert witness in the areas of economics, econometrics, financial markets and financial institutions, including investment management and financial analysis and services.  Id. 379:7-10.

Dr. Kopcke first testified on issues related to competitive markets and specifically, flawed markets that do not show competitive market traits.[36]  Id. 381:2-20.  He also testified more generally on the benefits of competitive markets, such as the ability of parties to seek alternatives and the price benefits that come from self-interested parties.  Id. 382:9-13.

This background testimony on economic and market theory served as a prelude to one particular issue that arises in the context of competitive (or non-competitive markets): rent-seeking behavior.  Id. 386:17.  As Dr. Kopcke described it, rent-seeking is the behavior of pursuing more compensation for one's effort than a competitive market would allow.  Id. 386:18-24. Rent-seeking behavior ultimately results in a degradation of the foundations of a competitive market.  Id. 388:25-389:5.

---

[36] Dr. Hubbard also testified briefly concerning investment management fees and competition.  See, e.g., Trial Tr. 953:7-954:20.  This testimony is subject to a motion in limine to be excluded by Plaintiffs. The Court determines the motion is moot, as it does not consider this testimony in reaching its decision.

On the other end of the spectrum, Dr. Kopcke testified as
to what an arm's-length deal truly signifies.  He testified, "it
means to me that each party must see a reasonable amount of
value in the deal, and if it's reached at arm's-length, when
both knew that they could seek other – other ways of doing their
business, I would say it comes close to approximating what we
would call a competitive market price."  Id. 389:17-22.  One
requirement of an arm's-length bargain is that the parties
cannot be related to each other, even indirectly.  Id. 389:23-
390:2.

Against this background, Dr. Kopcke testified about
competitive issues that can arise in the context of mutual
funds.  Id. 396:20-1 ("[T]he main problem is it's not the
practice in the mutual fund industry for the board to put the
advisory function, the manager's function, out to bid every
year. They will continually return to the advis[e]r established
by the sponsor of the fund and rely on that advisor's financial
statements and assertions about how the fund is performing in
making its decisions.").  This raises several issues:

> Well, we have conflict of interest problems at every
> level in the negotiations, but, in particular, the
> advis[e]r or administrator's negotiations with the
> board. We also have a principal agent problem there as
> well. And so, therefore, the information and the access
> of all parties and the bargaining power of all parties
> are not equal.  It would be more equal, for example, if
> there were competitive bidding, but that's just not the
> way it's done, so that check on ensuring the conditions

48

for competitive arm's length bargaining or competitive markets is missing.

Id. 398:4-13.

Dr. Kopcke then engaged in a lengthy analysis and description of the IMAs and the sub-adviser agreements. He ultimately determined that the configuration of the IMAs and sub-advisory agreements made sense:

> This is a pretty standard and reasonable setup. It makes a lot of sense that the advis[e]r would engage a specialized expert such as Wellington to conduct many of the day-to-day operations of the funds, while the advis[e]r retains the responsibility of communicating to the board, the responsibility of overseeing the sub-advis[e]r and directing the sub-advisor, as necessary. So it's supervisor, administrative, and takes the responsibility of reviewing the daily pricing and compliance from the data supplied by the – in part, the sub-advisor.

Id. 416:12-21.

Dr. Kopcke also testified that the **sub-advisory agreements** represented arm's-length bargains. Id. 420:1-6. On the other hand, Dr. Kopcke's analysis of the profitability of Defendants led him to believe that the IMAs did not represent an arm's-length bargain. Dr. Kopcke used the same process as Mr. Barrett to arrive at a retained fee. Id. 423:15-22. He then compared the profit that Defendants earned based on that retained fee and the expenses Defendants directly incurred. Id. 426:6-8. He testified that, in the context of an arm's length fee, he would expect to see "some reasonable correspondence between the two

numbers." Id. 526:10-11. Instead, he determined that Defendants' profit is "extraordinarily disproportionate." Id. 426:20-22. He testified, "we just don't see profit margins of 98 percent in competitive market transactions, because nobody expects to pay a profit 70 times the provider's cost." Id. 427:14-16. Ultimately, he testified that the profit margin of all of the funds indicated that the agreements could not have been negotiated at arm's-length. Id. 430:2-9.

Dr. Kopcke's rationale for considering profit independent of sub-advisory fees was that one should generate a profit on the resources he personally commits and the work he does for a service or for a product. "You're not entitled to earn a profit on work others do. That's just basic economic principles. In other words, we call it in economics value added. You add value, you get paid for it." Id. 430:12-17. Ultimately, he testified, the behavior of Defendants in this case amounts to the capture of economic rent. Id. 434:9-12.

Dr. Kopcke then engaged in an analysis of the proper means and amount of profit for Defendants to earn in this case. Upon a question from the Court, he testified that the proper profit margin he would expect to see would usually top out around 60 percent. Id. 436:11-19. He testified that breakpoints as included in the fee schedules did not change his analysis. Id.

455:6-8.  He also testified that a profit margin around 30 percent was usual in the industry.  Id. 459:4-7.

Problematically, on direct, the witness was asked to look at the gross management fee paid on the Capital Appreciation Fund in 2011 ($113,528,000).  The sub-advisory expense for that period was $43,470,000.  PX-767.  The direct operating expenses for Defendants during that period were $918,000.  Trial Tr. 453:22-23.

> Q:  Okay.  Now, concerning the total [investment management] fee paid, do you have an opinion as to whether or not that is excessive as [it] relates to the expenses, including both HFMC and the sub-advisory fee?
>
> . . .
>
> A:  It's a little high, but it could have resulted from an arm's length bargain.

Id. 454:5-20.

Additionally, on cross-examination, Dr. Kopcke admitted that his method of reaching a proper profit for Defendants involved using an "expense-plus approach."  Id. 509:9-11.  The exchange proceeded:

> Q: Okay.  And then – so here, you're taking an expense-plus approach, right?
>
> A: Correct.
>
> Q:  Okay.  And the concept, if I understand correctly, is that the total fee charged to the funds would be the sum of, 1 HFMC's operating expense; plus, 2, 43 percent of HFMC's operating expense; plus, 3, the fee paid to the sub-advisory.  Is that right?

A: Correct.

Id. 509:9-16.

Further, it was shown on cross-examination that Dr. Kopcke's proffered reasonable fee for the Floating Rate Fund in 2013 (15.19 basis points, of which 14 basis points would compensate Wellington and 1.19 would compensate Defendants) yielded an ultimate management fee of one-one-hundredth of one percent of AUM. Id. 510:23-511:1. By way of comparison, the actual management fee charged by the Floating Rate Fund during 2013 was rated near 60 basis points, which placed it at 15th out of 29 in its Lipper peer group for management fees. See supra. Dr. Kopcke's suggested fee of 15.19 basis points would have been 11.11 basis points lower than the lowest fund in the Lipper peer group. Dr. Kopcke's response to this fact was that the comparison funds seemed to be "quite expensive." Id. 515:23.

**IV.   ANALYSIS**

Having framed the factual evidence as it was presented, the Court now sets forth its analysis of the Gartenberg factors, including all relevant surrounding information. As set forth above, those non-exhaustive factors are: "(1) the nature and quality of the services provided by the adviser to the shareholders; (2) the profitability of the mutual fund to the advisers; (3) "fall-out" benefits; (4) the economies of scale realized by the adviser; (5) comparative fee structures with

similar funds; and (6) the independence and conscientiousness of the independent trustees." Gallus, 497 F. Supp. 2d at 979. This Court has already determined that the final listed factor, the independence and conscientiousness of the independent trustees, cuts in favor of Defendants' position.

### i.   Nature and Quality of Services Provided

#### 1. Nature of the Services

A crucial metric in this case is a determination of the nature of the services provided by the Defendants.  Under Plaintiffs' principal theory of the case, the services provided by Defendants are woefully minimal compared to the excessive profit they reaped, amounting to less than one full-time employee per fund.  This is a tangential result of Plaintiffs' "retained fee" theory of the case, as primarily outlined by Plaintiffs' expert Mr. Barrett, whereby the services of sub-advisers are not considered as an expense of the Defendants.

At summary judgment, the Court expressed its preliminary thoughts on the issue of Plaintiffs' theory of excluding the services of sub-advisers from consideration under Section 36(b):

> It would be a strange holding to rule that the nature or quality of the services provided by the [] Defendants were inferior solely because they were contracted out to Wellington, when the parties acknowledged this as a possibility in their initial contract.  Put differently, what's the difference to the Funds if the [] Defendants perform the services directly or by way of a sub-adviser? The sub-adviser clause in the contract seems to indicate that (barring rejection of the sub-adviser by the Board)

> there is no difference.  The plain fact is, as part of
> the Board's bargain with the [] Defendants, the
> performance of the duties ultimately tasked to
> Wellington was secured.  Disregarding those services
> solely because the [] Defendants made the permissible
> business decision that they were better or more
> efficiently (or even inexpensively) performed by
> Wellington is non-sensical.

Op. 44.  Despite this Court's earlier reservation, Plaintiffs

labored during trial to present much evidence explaining why

this Court should not consider the services of Wellington.

Nevertheless, the Court finds that consideration of services

performed by Wellington is proper.  As an initial matter, the

Court is reminded of a central tenet of Section 36(b), that

courts must consider "all services rendered to the fund or its

shareholders and all compensation and payments received, in

order to reach a decision as to whether the adviser has properly

acted as a fiduciary in relation to such compensation."  S. Rep.

No. 91-184, at 13 (1969), reprinted in 1970 U.S.C.C.A.N. 4897,

4910 (1970); see also Gartenberg v. Merrill Lynch Asset Mgmt.,

Inc., 528 F. Supp. 1038, 1052 (S.D.N.Y. 1981) (it is "entirely

proper for the fiduciary to consider the totality of the values

placed at the disposal of the shareholders in appraising the

fairness of the compensation, or else form would be substituted

for substance"); Benak v. Alliance Cap. Mgmt. L.P., No. 01-5734,

2004 WL 1459249, at *8 (D.N.J. Feb. 9, 2004) ("[U]nder § 36(B)

it is the overall nature and quality of the services provided by

the investment adviser that is at issue – not merely some small percentage of those services".).  This is a challenge of the investment management fee that Defendants collected; that fee was paid pursuant to the IMAs.  As such, the Court will consider all services provided under the IMAs for that fee, whether Defendants performed them or hired others to fulfill their obligations.

As to the SEC consent judgments cited by Plaintiffs, which are held out to stand for the notion that a sub-advisory type relationship is suspect when the adviser makes a significant profit, the Court is unpersuaded that these consent judgments carry the weight Plaintiffs urge.  To the extent stipulated consent judgments before the SEC are persuasive authority, the Court is nevertheless convinced that each case cited by Plaintiffs involved facts far different from those at play here.

In <u>SEC v. Am. Birthright Tr. Mgmt. Co. Litig.</u>, 1980 WL 1479 (D.D.C. Dec. 30, 1980), the complaint alleged that the offering documents associated with the mutual funds "**<u>failed to disclose or misrepresented</u>** material facts and circumstances relating to, among other matters, . . . the advisory services performed by the 'sub-adviser' to the funds and the compensation paid to it . . . ." <u>Id.</u> (emphasis added).  In this case, any allegations that information was misrepresented by Defendants did not proceed to trial.  Indeed, there has never been any allegation

that Defendants failed to disclose or misrepresent that
Wellington was performing sub-advisory services and what the
compensation for those services was.  As such, the Court finds
American Birthright to be distinguishable.

Likewise, In re Smith Barney Fund Mgmt. is also
distinguishable.  That case, and ultimately the consent
judgment, involved allegations of misleading the Board as to the
economic substance of a relationship with a transfer agent:

> [T]he Adviser, which serves as an investment adviser to
> the Smith Barney Family of Funds . . . , recommended the
> Funds contract with an affiliate of the Adviser, which
> would perform limited transfer agent services and sub-
> contract with the Funds' existing transfer agent.  The
> existing transfer agent would perform almost all of the
> same services it had performed previously, but at deeply
> discounted rates, permitting the affiliate of the
> Adviser to keep most of the discount for itself and make
> a high profit for performing limited work.  **In making
> this recommendation, the Adviser misled the board by
> omitting material facts, which led the boards to believe
> that the Adviser's recommendation was made in the Funds'
> best interests, which was not true.**

Id. at ¶ 1 (emphasis added).  At trial, there was no allegation
that the Board was materially misled by information provided by
Defendants.

Next, the Court is unpersuaded that R.W. Grand Lodge of F &
A.M. of Pa. v. Salomon Bros. All Cap Value Fund, 425 F. App'x
25, 30-31 (2d Cir. 2011) or Operating Local 469 Annuity Trust
Fund v. Smith Barney Fund Mgmt., LLC, 595 F.3d 86, 93 (2d Cir.
2010) counsel in favor of excluding sub-advisory services from

consideration.  That case involved allegations at the motion to dismiss stage of a defendant entering into a phony relationship for the purpose of fleecing the shareholders:

> Defendants caused the [funds] to negotiate a contract with an SSB affiliate to replace the Funds' existing transfer agent.  Once it replaced the existing agent, the SSB affiliate then sub-contracted with that agent to continue to perform virtually the same services that it had previously performed, but at a steep discount. Rather than pass the resulting savings on to investors in the form of lower fees, SSB's affiliate kept the windfall, permitting Defendants to profit at the expense of the SSB Funds and their investors.

Id. at *30; see also Operating Local 469, 595 F.3d at 93 ("Deloitte expressed doubts to CAM as to the legality of the arrangement, questioning, among other things, whether the anticipated savings [on the new arrangement] belonged to the Funds as opposed to the investment adviser and whether the Fund Boards would ever approve such an arrangement.  At that point, CAM changed course and created a transfer agent subsidiary[.]").  This case contains no allegations that Defendants negotiated a sham contract to provide the same services they had previously contracted to provide under a different contract solely for the purpose of an ill-gotten windfall.  There was simply no evidence put forward by Plaintiffs that the Board was not aware of the services and method by which Wellington would be compensated.[37]

---

[37] The Court is additionally unpersuaded that the Pfeiffer case is persuasive.  In that case, "serving as a pass-through entity for . . . payments [did] not constitute 'receipt' under the

The Court is also unconvinced by Plaintiffs' resort to common law fiduciary principles to show that the "economic reality" requires the Court consider only Defendants' retained fee (and associated services).  The Supreme Court has declined to articulate the exact overlap of common law fiduciary duties and those under Section 36(b), and has noted at least one difference between the standards that raises the bar for Plaintiffs.  Jones, 559 U.S. at 347 ("The [ICA] modifies this duty in a significant way: it shifts the burden of proof from the fiduciary to the party claiming breach . . . .");see also Sivolella, 2016 WL 4487857, at *3 ("However, the fiduciary duty imposed by § 36(b) is significantly more circumscribed than common law fiduciary duty doctrines." (citation omitted)).  Moreover, the Restatement (Third) of Trusts, which suggests that a rule of "reasonable compensation" should apply when a portion of the investment function is delegated directly contradicts Congress's intent in enacting Section 36(b).  Jones, 559 U.S. at 352 ("Congress rejected a 'reasonableness' requirement that was

---

ICA."  Pfeiffer v. Bjurman, Barry & Assocs., No. 03 Civ. 9741, 2006 WL 497776, at *5 (S.D.N.Y. Mar. 2, 2006), aff'd, 215 F. Appx. 30, 31-32 (2d Cir. 2007).  In this case, the evidence does not establish that Defendants served as a pass through entity for Wellington's service, particularly in light of Mr. Meyer's testimony concerning oversight obligations and Defendants' retention of risk and liability.

criticized as charging the courts with rate-setting responsibilities.").[38]

Although the costs that were directly incurred by Defendants were low in relation to the gross management fee that was paid, the Court finds that a consideration of all of the services performed, including those performed by sub-advisers, Plaintiffs have not carried the burden of showing that the nature of the services indicates the fees were so disproportionate that they could not have been negotiated at arm's-length. This is particularly so in light of the risks that were also borne by Defendants, which Plaintiffs only tacitly disagreed with in the examination of Dr. Kopcke. See Sivolella, 2016 WL 4487857, at *42-44 (considering risks faced by the adviser).

Most problematically, however, Plaintiffs presented little or no evidence in their case on the nature of the services provided by Wellington,[39] which the parties do not dispute

---

[38] The Court is similarly unpersuaded by reliance on the Uniform Trust Act, § 708 (2010 rev.), which notes that "a downward adjustment of fees may be appropriate if a trustee has delegated significant duties to agents, such as delegation of investment authority to outside managers." Id. Defendants retain ultimate responsibility for ensuring all of the Funds' investment management services are performed.
[39] The Court is also unpersuaded that the Board could have contracted directly with Wellington and thereby secured a separate analysis of Wellington's and the Defendants' contracts, consistent with what they argue is the "economic reality" of the case. Those are not the facts of the case, and the Court is

accounted for millions of dollars and the vast majority of services (at least monetarily) performed under the IMAs.  Absent evidence showing the nature of these services was somehow suspect or inadequate, Plaintiffs have not carried their burden.

### 2. **Quality of the Services**

The Court also heard evidence concerning the quality of the services performed by Defendants.  Plaintiffs and Defendants presented three metrics by which one might assess the performance of the Funds.  Each of these presents a different look at the overall picture, and the Court does not find that one method over another is better or worse.

Defendants' two performance analyses, Lipper's and Dr. Hubbard's, both support a finding that the Funds performed roughly in a middle-of-the-road fashion or better for most of the Funds.  For instance, looking to the Fund that Plaintiffs used as an exemplar throughout most of the trial, the Capital Appreciation Fund, the Lipper performance numbers show the fund performed in the 34th, 9th, 7th, 23rd and 32nd percentiles between 2010 and 2014.  The Court finds this performance is

---

unconvinced on the evidence before it that such a hypothetical separate agreement, if it had been reached, would have been in all other ways identical to the relationships, risks and liabilities borne by the respective parties.  Likewise, the Court is unconvinced that Wellington's fiduciary duty to the Funds necessarily implies that the fees can be bifurcated as Plaintiffs treat them.

unquestionably strong based on an analysis of Lipper data. The Court likewise finds that the performance of all remaining funds, except the Balanced Fund was average or strong based on this particular metric.

On the other hand, the Fund that appears to have performed the worst, the Hartford Balanced Fund, does not have similarly strong data.  Based on the Lipper peer group, the performance ranged between the 77th and 71st percentile.  The Court finds that this performance is well-labeled as below-average, although the Court does note that in the final 10-year reporting period (2014), the Balanced Fund outperformed 29% of its competitors. Dr. Hubbard's unrebutted testimony that the fund was undergoing management changes, and the fact that the Fund performed strongest during the final ten-year period presented to the Court softens the determination that the Fund overall performed weakly.

Dr. Hubbard's analysis using his own independently selected peer groups is similar in outcome to Lipper's.  His analysis, DX-509, demonstrates that all of the funds except the Hartford Balanced Fund outperformed the majority of their peers in the vast majority of 10-year reporting periods.  Id.  Once again, the Balanced Fund was somewhat of a straggler, although it performed better under Dr. Hubbard's analysis, ultimately outperforming more than half of its competitors in the final 10-

year reporting period.  Id.  Again, the Balanced Fund's poor performance is softened by the credible and unrebutted explanation that the managerial shakeup with the Fund and an associated increase in performance in the final interval.

Plaintiffs additionally have argued that the performance of the Funds was poor based on their near-universal failure to exceed the performance of their selected benchmarks.  See supra. Certainly benchmarks are a way to assess the performance of a fund.  But, Plaintiffs presented little evidence that the failure to hit a benchmark is a strong indication of poor performance.  The Court has little trouble believing that mutual funds in general strive to do as well as possible, including frequently attempting to beat any and all benchmarks.  However, the opposite notion, that failure to hit a benchmark is the *sine qua non* of poor performance is not well-established on the evidence before the Court.

On the other hand, the Court did receive persuasive and competent testimony from Dr. Hubbard concerning the value of benchmarks in assessing performance.  As he set forth in his testimony, they are one metric for evaluating performance, but they are a metric that analyzes performance in a vacuum, because fees are not involved.  For instance, although the Hartford Capital Appreciation Fund failed to outperform the Russell 3000 Index over any of the 1, 5 or 10 year spans pointed to by

Plaintiffs, based on the testimony of Dr. Hubbard, this is not surprising, as the Russell 3000 is not a mutual fund, but an index which does not incorporate fees.  As such, in going against a benchmark, a mutual fund begins in the hole.

Although the performance evidence the Court received seems to indicate one of the Funds, the Hartford Balanced Fund, performed below average during the relevant time periods, the remaining Funds appear to have performed – at worst – middle of the pack.  For those Funds, the quality factor of the Gartenberg analysis does not point in favor of finding the fees paid Defendants could not have been part of an arm's-length agreement.  With regard to the Hartford Balanced Fund, this generally weak performance tips very mildly in Plaintiffs' favor.

### ii.  **Profitability**

With regard to the issue of profitability, the Court is guided by the notion that it is not a permissible approach under Section 36(b) to argue that the adviser "just plain made too much money."  Kalish v. Franklin Advs., Inc., 742 F. Supp. 1222, 1237 (S.D.N.Y. July 24, 1990).  Section 36(b) has never required a "cost-plus" method of setting profits. Consistent with the Court's consideration of the services provided by Wellington in considering the "nature of services" provided, the Court considers profitability inclusive of Wellington's fees.  As

such, the Court does not give weight to Mr. Barrett's "retained fee" methodology for calculating profitability, which yielded extremely high profit margins.  Instead, the Court looks to the profitability as reported based on Lipper's and Dr. Hubbard's analyses.

Excluding consideration of distribution fees, the profit margins for the Defendants were as follows:

| Hartford's Investment Management Profit Margins for At-Issue Funds (Pre-Tax) (2009 – 2013) | | | | | |
|---|---|---|---|---|---|
| Fund | 2009 | 2010 | 2011 | 2012 | 2013 |
| Balanced Fund | 61.2% | 70.3% | 67.4% | 64.6% | 67.9% |
| Capital Appreciation Fund | 61.3% | 61.0% | 60.9% | 60.9% | 60.9% |
| Floating Rate Fund | 72.3% | 74.5% | 74.5% | 76.7% | 75.0% |
| Growth Opportunities Fund | 45.6% | 55.5% | 59.4% | 59.4% | 59.6% |
| Healthcare Fund | 54.4% | 54.9% | 53.1% | 52.4% | 54.2% |
| Inflation Plus Fund | 50.8% | 79.2% | 79.6% | 80.3% | 75.8% |

JX-3E; JX-5E; JX-7E; JX-9E; JX-11D; see also PX-593 ("Reported Profitability Ratio (Gross)").

The Court has little evidence before it with which to determine whether these profit margins are so great that they could not have been achieved at arm's-length.[40]  See generally In re Am. Mut. Funds Fee Litig., 2009 WL 5215755, at *50 ("Section

---

[40] The Court is unpersuaded that the proper course is to compare the profit margins of Defendants to Wellington, as Plaintiffs urge. PPFOF ¶¶ 110.  Although Wellington's profit margin is lower than Defendants', PPFOF & DR ¶ 110, as Defendants point out, the Court is in receipt of little evidence that the profitability of a sub-adviser with a different role and different risks, among other differences, can be compared. Trial Tr. 468:6-14.

36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit."). Looking to the case law, pre-tax margins (like these) as high as 77.3% have been affirmed. Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 972 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987).

Moreover, the Court is also not persuaded by Dr. Kopcke's opinion on profitability because his model essentially seeks to adopt a cost-plus approach. Trial Tr. 436:7-9, 508:25-509:11 ("Q. . . . [S]o here, you're taking an expense[-]plus approach, right? A. Correct."). It is well-established that Section 36(b) does not require cost-plus profit for advisers. Schuyt, 663 F. Supp. at 972 (Senate Report "indicates that the investment adviser is entitled to make a profit and that the bill neither requires a 'cost-plus' advisory agreement nor general concepts of rate regulations, such as those applicable to public utilities") (citing S. Rep. No. 91-184).

In this light, Plaintiffs have failed to meet their burden of establishing that the Funds were so profitable that their fee could not have been negotiated at arm's-length. This was perhaps best demonstrated by Dr. Kopcke's own direct examination where, when presented with the exact figures of a particular year for a particular fund, he testified that the profits were "a little high, but could have resulted from an arm's length

65

bargain."  Simply put, if a fee <u>could</u> have resulted from an arm's-length bargain, then Plaintiffs have failed to meet their burden.

### iii. **Fall-Out Benefits**

Plaintiffs, despite the Court's holding that the issue of fall-out benefits was a disputed one at summary judgment, do not make any argument with regard to fall-out benefits after trial. Pls.' Br. 25 ("Plaintiffs did not address economies of scale or fall out benefits").  Fall-out benefits are those which accrue to the mutual funds adviser as a result of its work on behalf of the mutual fund.  <u>Hoffman v. UBS-AG</u>, 591 F. Supp. 2d 522, 539 (S.D.N.Y. 2008).  Accordingly, for purposes of meeting their burden of proof, the Court finds that the absence of evidence with regard to fall out benefits that were realized by Defendants in its relationship with the Funds militates against a finding that the fee was so disproportionate that it could not have been negotiated at arm's-length.  Plaintiffs have not carried their burden with regard to this factor, either.

### iv. **Economies of Scale**

Likewise, Plaintiffs also concede that they did not address economies of scale at trial.  Pls.' Br. 25.  The reason behind the omission of this evidence is that "Defendants' costs are so low that even were they to have experienced economies of scale, those economies would have no meaningful impact on their costs."

Id.  For purposes of meeting their burden of proof, the Court
finds that the absence of evidence with regard to economies of
scale that were realized by Defendants in their relationship
with the Funds against a finding that the fee was so
disproportionate that it could not have been negotiated at
arm's-length.

> **v.   Comparative Fee Structures**

Plaintiffs additionally made no effort to present evidence
of comparative fee structures at trial.  Indeed, their post-
trial brief emphasizes the unimportance of comparative fee
structures.  Pls.' Rep. Br. 9 ("[C]omparative fees are
relatively unimportant[.]").  Plaintiffs are certainly correct
that courts should be wary of giving undue weight to fees
charged by other mutual funds.  As the Supreme Court in Jones
noted, "[t]hese comparisons are problematic because these fees,
like those challenged, may not be the product of negotiations
conducted at arm's length."  559 U.S. at 350-51.  Contrary to
Plaintiffs' position, however, "not relying too heavily" on
comparisons does not mean "not relying at all."  Id.  Indeed, a
fulsome reading of the section of the Jones opinion explicitly
reveals that comparative fee structures, when the circumstances
are appropriate, should be considered: "courts may give such
comparisons the weight that they merit in light of the
similarities and differences between the services that the

clients in question require, but courts must be wary of inapt
comparisons." Id. at 350-51.  Wariness of inapt comparisons and
an instruction not to rely too heavily upon fee comparisons does
not equal an outright bar to the consideration of comparative
fee analyses under Jones.  See DPFOF & PR ¶ 55 ("Defendants
proffered no evidence that the fees in their suggested fee
comparisons were negotiated at arm's length.  Thus, Defendants'
comparative fee "evidence" is tainted and irrelevant under
Jones.").

Considering the evidence before the Court on the issue of
comparative fees, the Court finds that this factor weighs
against a determination that the fees charged to the Funds by
Defendants were excessive.  As set forth, supra, no Fund under
either the Lipper analysis or Dr. Hubbard's analysis ever fell
into even the bottom tenth percentile.  While it is inescapably
true that some of these peers may not operate under an arm's-
length fee agreement, either, nothing Plaintiffs have put
forward has undermined the generally median fee levels of the
Funds as opposed to their competitors.  Under this evidentiary
showing, the Court rules that this factor weighs in favor of
finding against Plaintiff.

**B. Weighing Under Gartenberg**

Plaintiffs are correct that the Gartenberg analysis is not
a checklist.  A plaintiff need not triumph with regard to each

factor – or any particular factor – to demonstrate that a fee is improper under Section 36(b). As such, that Plaintiffs did not present evidence with regard to certain of the factors does not doom Plaintiffs' claims, although it certainly moves them no closer to meeting their burden of proof.

In addition to the above, this Court had already determined that the independence and conscientiousness of the Board cut in favor of Defendants. Further, Plaintiffs have elected to present minimal evidence with regard to comparative fee structures, fall out benefits, or economies of scale. This leaves a determination by the Court whether Plaintiffs have demonstrated that the fee is so disproportionate that it could not be one that was negotiated at arms' length based upon a select few of the <u>Gartenberg</u> considerations. Plaintiffs have not done so.[41]

---

[41] The Court also notes that Plaintiffs have advanced an alternate theory that, even if the Court considers the services performed by Wellington in evaluating the fee, the Defendants have still violated the ICA because of the disparity between Defendants' and Wellington's profit margins, the Funds' performance against the benchmarks, and the generally high profits. The Court disagrees. It remains unexplored in the record why Wellington's profit margin can (or should) be compared to Defendants. Benchmarks still remain one of several methods by which performance is analyzed. The generally high profit numbers are insufficient. <u>Kalish</u>, 742 F. Supp. at 1237 (noting it is insufficient to argue a defendant "just plain made too much money.").

As noted above, the Court has determined that the nature of the services provided by Defendants, the quality of those services, and Defendants' profitability do not suggest that the fee is so disproportionate that it could not have been negotiated at arm's-length.[42]  Accordingly, Plaintiffs have not carried their burden of proof.  Judgment in favor of Defendants is therefore proper.  An appropriate Order will follow.

DATED: February 28, 2017

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

---

[42] The singular poor performance of the Hartford Balanced Fund does not outweigh the remaining factors, which weigh in favor of Defendants.